**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JEFFREY S. STEIN IN SUPPORT OF CHAPTER 11**
**PETITIONS, FIRST DAY MOTIONS, AND RELATED RELIEF**

I, Jeffrey S. Stein, declare as follows under penalty of perjury.

1.      I am a Co-Founder and Managing Partner of Breakpoint Partners LLC ("**Breakpoint**"), a boutique corporate advisory and investment banking firm that provides consulting services to companies navigating complex transactions, challenging capital structures, and strategic transformations. I am the Chief Restructuring Officer of Linqto, Inc. ("**Linqto Parent**"), Linqto Texas, LLC ("**Linqto Texas**"), Linqto Liquidshares, LLC ("**Liquidshares**"), and Linqto Liquidshares Manager, LLC ("**Liquidshares Manager**" or, collectively with Linqto Parent, Linqto Texas, Liquidshares, and Liquidshares Manager the "**Debtors**" and, collectively with their non-debtor affiliates, "**Linqto**" or the "**Company**"). The Debtors' corporate organization chart is attached hereto as **Exhibit A**.

2.      I submit this declaration (the "**Declaration**") in support of: (i) the Debtors' voluntary Chapter[2] 11 petitions (the "**Petitions**"); (ii) the "first-day" motions and applications that

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto Texas, LLC [5745], Linqto, Inc. [0332], Linqto Liquidshares, LLC [8976], and Linqto Liquidshares Manager, LLC [8214]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

[2]      Unless otherwise stated, "**Chapter**" and "**Section**" shall refer to Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"). "**Bankruptcy Rule**" shall refer to the Federal Rules of Bankruptcy Procedure.

are being filed with the Court concurrently herewith (collectively, the "**First Day Motions**"); and (iii) related relief. I am familiar with the contents of each of the First Day Motions and believe the relief sought therein is (i) necessary to enable the Debtors to operate their business during the pendency of these cases (the "**Chapter 11 Cases**") with minimal disruption or loss of productivity and value, (ii) are critical to achieving a successful restructuring of the Debtors' financial affairs, and (iii) are in the best interests of the Debtors, their estates, and all stakeholders. The facts set forth in each of the First Day Motions are incorporated herein by reference.

3.       As of the Petition Date, the following individuals are members of Linqto Parent's board of directors (the "**Board**"): Adam T. Henderson (Chairman), Francis Daniel ("Dan") Siciliano II, William ("Bill") Sarris, Alison Kutler, Norman Reed, and Jeremy Rosenthal—a newly appointed independent director.[3]

4.       On March 13, 2025, the Board created that certain committee of the Board (the "**General Committee**"), currently comprised of the following individuals: Adam T. Henderson, Dan Siciliano, Alison Kutler, Norman Reed, and Jeremy Rosenthal. The General Committee holds the powers and responsibility of the Board, except with respect to (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the General Corporate Law of Delaware to be submitted to stockholders for approval, or (ii) adopting, amending or repealing any Bylaw of Linqto.

---

"**Civil Rule**" shall refer to the Federal Rules of Civil Procedure. "**Bankruptcy Local Rule**" or "**BLR**" shall refer to the Bankruptcy Local Rules for the Southern District of Texas.

[3]       Victor Jiang and Karim Nurani resigned from Linqto Parent's Board on May 30, 2025. Though Bill Sarris resigned as CEO on January 2, 2025, and was terminated from his employment with Linqto on March 10, 2025, he has not resigned from the Board. There are also three Board observers: John Deaton, Gavin Solomon, and Adam Thompson.

I.      **THE SPECIAL SUBCOMMITTEE.**

5.      To facilitate a fair and thorough process with respect to the Debtors' review of restructuring alternatives and investigation of claims, effective as of June 3, 2025, the General Committee created a special subcommittee comprised of Alison Kutler, Norman Reed, and Jeremy Rosenthal (the "**Special Subcommittee**").

6.      The General Committee delegated to the Special Subcommittee, among other things: (a) non-exclusive authority to examine, investigate, analyze, assess, evaluate, and make one or more recommendations to the General Committee regarding the Company's entry into or consummation of any debt financing, sale of all or a portion of the Debtors' assets, or commencing Chapter 11; (b) exclusive authority to (i) conduct an internal investigation ("**Investigation**") of the Debtors' claims, causes of action, and defenses between the Company, on one hand, and any of its related parties (collectively, "**Related Parties**"), including current and former directors or officers, on the other hand (each, an "**Investigation Matter**"), and (ii) assert any claims or causes of action regarding any Investigation Matter, including the prosecution, assignment or settlement of such matters; (c) exclusive authority to assess, evaluate and approve the terms and conditions of any related party transactions that present actual or potential conflicts of interest ("**Conflict Matters**"); (d) exclusive authority to design, negotiate, adopt, evaluate and monitor a key employee incentive plan; and (e) non-exclusive authority to examine, investigate, analyze, assess and evaluate the terms and conditions of any proposed transaction involving the Company to engage in any business combination, sell assets or publicly list its securities. The Debtors engaged Katten Muchin Rosenman LLP ("**Katten**" or "**Special Subcommittee Counsel**") as special counsel to provide independent legal services at the sole direction of the Special Subcommittee, including with respect to the Investigation.

7.      Since its appointment, the Special Subcommittee has been in regular communication with members of the General Committee, the management team, and the Company's advisors regarding the Investigation.

8.      I understand that Special Subcommittee Counsel will seek an order of the Court approving its retention pursuant to Section 327(e) of the Bankruptcy Code. In furtherance of this Investigation, the Special Subcommittee, with the assistance of Special Subcommittee Counsel, is performing diligence into the Debtors' relationship with and transactions involving Related Parties, conducting interviews (with additional interviews anticipated to occur in the coming weeks), and engaging in an in-depth review of the Company's prior business operations. I understand that the Special Subcommittee's Investigation is ongoing.[4]

9.      Effective as of June 3, 2025, the General Committee ratified that certain engagement agreement between the Debtors and Breakpoint, pursuant to which Breakpoint agreed to designate me to serve as the Debtors' Chief Restructuring Officer (the "**CRO Agreement**"). The General Committee also designated me as a non-voting *ex officio* member and advisor to the Special Subcommittee. I am not a member of the Board, the General Committee, or a manager of any of the Debtors. I am not an equity holder of any of the Debtors. I am a member of Breakpoint.

10.     Since the Debtors' retention of Breakpoint, I have become familiar with the Debtors' day-to-day operations, books and records, and financial affairs. My investigation of the Debtors' operational history, current business activities, capital structure, and organizational documents is ongoing. Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge of the Debtors' business, employees, operations, and financial

---

[4]      Certain members of the Special Subcommittee are recused from the Investigation as to specific Investigation Matters where the Chairperson of the Special Subcommittee has determined that a conflict of interest exists or is reasonably likely to exist.

4

condition that I have obtained since Breakpoint was retained, my review of relevant documents, and my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and my discussions with members of the Board, the General Committee, the Debtors' senior management and employees, and the Debtors' professionals. If called upon to testify, I would testify competently to the facts set forth in this Declaration and the First Day Motions. I am authorized to submit this Declaration on the Debtors' behalf.

## II.   PROFESSIONAL BACKGROUND.

11.    I have over 30 years of experience as a corporate executive, director, and investment professional, and have been engaged to support companies experiencing significant challenges, including complex contract renegotiation and litigation, increased regulatory oversight, financial restructuring, and emergence from bankruptcy.

12.    I have served in various capacities, including as a CEO, CRO, Executive Chairman, Liquidating Trustee, and as a Director for more than 30 public and private companies and have developed a track record of steering companies from distress to stability. I currently serve as Chairman of the Board of Ambac Financial Group, Inc. and Liquidating Trustee for the bankruptcy estate of Ditech Holding Corporation. I also recently served as the CEO and CRO of Rite Aid Corporation and GWG Holdings, Inc.

13.    I previously served as CRO of Whiting Petroleum Corporation, Philadelphia Energy Solutions, LLC, and Westmoreland Coal Company, and as Executive Chairman of Ambac Assurance Corporation and MLR Petroleum LLC. I previously served as an independent director of Vertex Energy, Inc., Aearo Technologies LLC (subsidiary of 3M Company), Intelsat Connext Finance S.A. (subsidiary of Intelsat S.A.), NMC Health plc, NAC Aviation 29 (subsidiary of

Nordic Aviation Capital), Seadrill North Atlantic Holdings Limited (subsidiary of Seadrill Limited), and TRU Taj LLC (subsidiary of Toys "R" Us, Inc.). I also currently serve as an independent director of Sunnova Energy International Inc.

14.     I received a B.A. in Economics from Brandeis University and an M.B.A. with Honors in Finance and Accounting from New York University and am a Certified Turnaround Professional (CTP).

## III.     COMPANY BACKGROUND.

### A.     Corporate Structure.

15.     Linqto Parent, a Delaware corporation, is the direct or indirect parent of Linqto Texas, Liquidshares, Liquidshares Manager, and non-debtors Linqto Capital LLC ("**Linqto Capital**"), Linqto Investment Management, LLC, and Linqto QP, LLC.[5]

16.     Liquidshares Manager, a Delaware limited liability company, is the managing member of Liquidshares. Jesus Ancheta, Linqto Parent's Chief Administrative Officer, serves as the manager of Liquidshares Manager.

17.     Linqto Parent is the managing member of Linqto Texas, a Texas limited liability company.

18.     Non-debtor Linqto Capital is an SEC registered broker-dealer and a member of the Financial Industry Regulatory Authority, Inc. ("**FINRA**"), approved to engage in the private placement of securities as well as the operation of an alternative trading system for Securities. Sean Bowden, a Series 24 licensed principal, became Linqto Capital's CEO on or about December 23, 2024. Linqto Capital has never operated as a broker-dealer, has few creditors, and has limited

---

[5]     Linqto Investment Management, LLC and Linqto QP, LLC are not operating and have de minimis assets. Linqto Parent intends to dissolve these entities. Linqto Parent also owned 100% of the equity of Trustline, LLC, which was dissolved prior to the Petition Date.

assets related to the maintenance of its status as a broker-dealer. While Linqto Capital does not need to restructure, and due to the limitations set forth in Section 741 of the Bankruptcy Code, did not file for protection under the Bankruptcy Code, the Debtors believe that Linqto Parent's ownership and control of a captive broker-dealer enhances the going-concern value of the Debtors' business and may be necessary or beneficial to facilitating a restructuring transaction.

19.     Linqto Parent has historically provided a variety of services to the other Debtors and non-debtor affiliates, including management, tax planning, financial, and administrative services, under typical shared services arrangements, including an Expense Sharing Agreement between Linqto Parent and Linqto Capital.

**B.     Linqto's Business.**

20.     Founded in 2010 by Bill Sarris as a technology and software development company providing services to financial technology firms, Linqto evolved into a leading financial technology platform that was intended to enable investors to indirectly invest in private-market startups and pre-IPO companies.

21.     From February of 2020, until March 14, 2025, Linqto operated a platform (the "**Platform**") that purported to allow customers (the "**Customers**") to indirectly invest in private companies, with a focus on the technology sector. More specifically, Liquidshares, a Delaware limited liability company, would purchase and hold securities (the "**Securities**") of privately held companies (the "**Issuing Companies**" and each, an "**Issuing Company**"), or equity in a fund that owns shares of an Issuing Company. Liquidshares then purported to allocate an economic interest in the Securities to a special purpose vehicle in the form of a series limited liability company (the "**Series**") and offered Customers the opportunity to purchase an indirect economic interest in the Securities of particular Issuing Companies by purchasing units in the Series.

22.     In reality, Customers do not hold title to or direct beneficial interests in the Securities or any portion thereof. The allocation of economic interests in the Securities was supposed to be done in conformity with that certain *Second Amended and Restated Limited Liability Company Operating Agreement* of Liquidshares, dated as of January 1, 2024 (as amended, the "**Liquidshares Operating Agreement**"), (b) the applicable Series schedule to be attached to the Liquidshares Operating Agreement (each, a "**Series Schedule**"), (c) that certain Master Investment Securities Purchase Agreement, dated as of June 1, 2024 (as amended, the "**Master Purchase Agreement**"), and (d) those certain subscription agreements agreed to by each Customer (each, a "**Subscription Agreement**" and collectively, the "**Subscription Agreements**").

23.     The Company's internal investigation, discussed below, found that the Debtors did not operate as intended or prescribed under Liquidshares' Certificate of Formation, the Liquidshares Operating Agreement, the Master Purchase Agreement, or the Subscription Agreements. While Liquidshares offered Customers units in one or more Series, Liquidshares' original Certificate of Formation did not comply with Section 18-215 of the Limited Liability Company Act of the State of Delaware with respect to formation of a series limited liability company. The original Certificate of Formation did not state that Liquidshares was a series limited liability company in accordance with Delaware law. It also did not include the appropriate addendum authorizing Liquidshares to establish individual series with their own limited liability protections. As a result, the Series were not properly formed.[6]

24.     Similarly, while the Liquidshares' Operating Agreement authorized Liquidshares

---

[6]     On August 17, 2021, Liquidshares amended its Certificate of Formation to reflect that the company is a series limited liability company.

Manager to cause Liquidshares to establish one or more Series as designated in a Series Schedule annexed to the Liquidshares' Operating Agreement, no Series Schedules were created or attached to the operating agreement. Further, Liquidshares did not enter into the Master Purchase Agreement until June 1, 2024, several years after the Platform started operating. Although the Master Purchase Agreement required that Securities would be transferred to and vested in the name of the applicable Series on the books and records of Liquidshares Manager, the Securities were never transferred to Liquidshares Manager and new management has found no evidence that the recordkeeping requirements were adhered to in practice in the course of the Platform's operation, either before or after the execution of the Master Purchase Agreement.

25.     Each Series was supposed to be associated with a different Issuing Company on the Linqto Platform, and one unit or interest in each Series was purportedly corresponded to one share of the underlying Issuing Company acquired and held by Liquidshares. Further, even if Liquidshares had tried to transfer ownership of the Securities to a Series despite these deficiencies, such transfers likely would have violated Liquidshares' purchase agreements with the sellers of the Securities and the Issuing Companies' transfer restrictions. To effect such transfers, Liquidshares first needed to receive permission from the Issuing Company to transfer ownership. Liquidshares books and records do not contain any discernable attempts to obtain permission to transfer any Securities or any effort to actually transfer any Securities to a Series.

26.     During the Platform's operation, Liquidshares acquired Securities through transactions exempt from registration under federal and state securities laws. In order to sell or liquidate Securities, Liquidshares must comply with the Issuing Companies' contractual transfer restrictions. In addition, the Securities may only be disposed pursuant to (x) an effective registration statement filed with the U.S. Securities and Exchange Commission (the "**SEC**") and

qualified by state authorities, or (y) an exemption from such registration and qualification requirements.

27.     As of the Petition Date, Liquidshares holds Securities in 111 Issuing Companies with an estimated fair market value of in excess of $500 million.

28.     Consistent with the Company's past marketing practices, discussed in more detail below, many of the Customers believe that they acquired shares of an Issuing Company by purchasing on the Linqto Platform, as follows:



29.     The following flow chart reflects how the Debtors were designed to operate:



30.     The following flow chart reflects how the Debtors operated in practice:



31.     As set forth in the Subscription Agreements, the units were intended to be issued to Customers in reliance upon exemptions from registration under applicable federal and state securities laws. Moreover, the units are subject to certain restrictions on transferability. Accordingly, there is no public market for the units. Customers primarily realized value on their investments only when selling Securities back to Liquidshares on the Platform[7] or an Issuing Company underwent a merger or acquisition, tender offer, public offering, redemption, or other transaction that otherwise resulted in liquidity involving the applicable Securities (an "**Exit Event**"). In the case of an Exit Event for a particular Issuing Company, and after any applicable lockup period, Linqto would transfer proceeds to Customers by transferring the resulting shares to

---

[7]     In April of 2023, Linqto began offering "liquidity" to Customers by allowing Customers to "redeem" their units, *i.e.*, sell their units back to Liquidshares.

the Customers' brokerage account, transferring cash to an FBO account under the Customer's name, or both.

32.     The Company generated revenue from the difference between the price paid by Liquidshares for the Securities and the price of the units "sold" to Customers. That revenue was used to fund operation of the Platform, including payments to insiders and marketing expenses to promoters and influencers recommending Customers participate on the Platform.

33.     As discussed in more detail below, the Company shut down the Platform on March 13, 2025, effectively ceasing its revenue-generating operations. Following the shutdown of the Platform, the Company has generated revenue through the sales of Securities held in Liquidshares' inventory (*i.e.*, Securities that were not allocated to Customers) to sophisticated purchasers (such sales, the "**Block Trades**") in accordance with available exemptions from registration and qualification requirements under the federal and state securities laws and in compliance with any contractual restrictions imposed by the applicable Issuing Company. From March 6, 2025, through the Petition Date, the Debtors generated $10,221,635.06 in net revenue from Block Trades.

## IV.     <u>EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES.</u>

### A.     <u>Retention of New Management.</u>

34.     The Board engaged in efforts to hire a new CEO to succeed Bill Sarris and other executive management beginning in early 2024. Following a months-long search for a new chief executive, the Board appointed Dan Siciliano, co-founder and CEO of Nikkl, Inc. ("**Nikkl**"), as the Chief Executive Officer of Linqto Parent and a member of Linqto Parent's Board. Mr. Siciliano began serving as CEO on January 2, 2025. Along with Mr. Siciliano, Mike Huskins, Cathy Siciliano, and Jesus Ancheta joined Linqto Parent's executive leadership team as General Counsel,

Chief Operating Officer, and Chief Administrative Officer, respectively.[8] At the same time, the parties began to explore a transaction in which the Debtors would acquire Nikkl.

35.     Mr. Siciliano is an independent director and Chair of the board of the Federal Home Loan Bank of San Francisco, the co-founder and CEO of Nikkl, co-founder, board member, and Chairman of the Silicon Valley Directors' Exchange (SVDX), and former Chairman of the national non-partisan American Immigration Council. He is also the founder of Optemy, a strategy consulting group that trains and advises boards and executives on various topics, including disruption/change management, the impact of autonomous (AI/ML/robotic) systems and innovations, executive compensation, corporate compliance, and technological competitiveness and security.

36.     Mr. Siciliano is a Non-Resident Fellow at Stanford Law School (CodeX), Emeritus Co-Director of Stanford's Directors' College, prior Co-Chair of the We Robot Conference on AI/Robotics, Law, and Policy, and the past faculty director of the Rock Center for Corporate Governance at Stanford University. He co-founded the Rock Center in 2006 and, as a Professor of the Practice and Associate Dean at Stanford Law School, led the Center until 2017. He was a Stanford faculty member (Stanford Law Professor of the Practice and Associate Dean) for more than a decade, with a focus on corporate strategy and governance, capital financial markets, technological disruption (including fintech, insurtech, AI, and cybersecurity), and executive compensation. Mr. Siciliano is also qualified as an audit committee financial expert under NYSE Manual Section 303A.07(a). Mr. Siciliano has a J.D. from Stanford University and a B.A. from University of Arizona.

---

[8]     Mike Huskins originally joined Linqto as General Counsel of Linqto Capital and became General Counsel of Linqto Parent on March 25, 2025.

37.     Mike Huskins, Linqto's General Counsel, is a co-founder and Chief Legal Officer of Nikkl. Mr. Huskins spent nearly eight years as head of product operations at Twilio Inc. and nearly seven years at McKinsey. He also served as General Counsel at a global semiconductor company manufacturer and practiced corporate and securities law at Wilson Sonsini. Mr. Huskins has an M.B.A from the Wharton School of University of Pennsylvania and an A.B. from Princeton University.

38.     Cathy Siciliano, Linqto's Chief Operating Officer, has over 25 years of experience in high tech and financial services industries, including as multi-channel digital marketing leader at Silicon Valley Bank. Ms. Siciliano has an M.B.A. from Harvard Business School and an A.B from Stanford University.

39.     Jesus Ancheta, Linqto's Chief Administration Officer, is an executive with over 15 years of experience leading finance, operations, administration, services and customer success organizations in the software (SaaS) industry. Mr. Ancheta has a BS from the University of Arizona.

40.     Sean Bowden, CEO of Linqto Capital, has over 25 years of experience building out business, regulatory, operational, and financial management programs. Mr. Bowden holds FINRA Series 7, 14, 14A, 21, 24, 25, 27, 28, 63, 79 and 99 licenses. Mr. Bowden has a B.A. from Fordham University.

41.     Linqto and Nikkl contemplated Linqto's eventual acquisition of Nikkl in conjunction with the appointment of Nikkl's leadership team to lead Linqto. After discovering the challenges confronting Linqto (as more fully discussed herein), however, Nikkl elected to withdraw from consideration as an acquisition target for Linqto on or about March 11, 2025. No purchase or sale agreement was ever executed.

**B.      Historical Violations of Securities Laws and Compliance Failures.**

42.      Shortly before commencing his duties as CEO, Mr. Siciliano learned that, in October 2024, the SEC's Division of Enforcement had notified Linqto Parent of an investigation to determine if violations of the federal securities laws had occurred. Along with the SEC investigation, FINRA had conducted an examination of Linqto Capital, Linqto's broker-dealer affiliate, and referred the matter to FINRA Enforcement in December 2024. Further, Linqto's former Chief Revenue Officer, Gene Zawrotny, commenced a lawsuit on October 7, 2024, against Linqto Parent, Bill Sarris, and Joe Endoso (Linqto's President at that time), alleging serious compliance failures and retaliation.

43.      As Linqto's new leadership team gained access to company records and spoke with Linqto personnel, they quickly developed concerns about how the Company had historically interpreted and complied with applicable securities laws requirements. In particular, the new leadership team realized that prior management had knowingly failed to cure extensive and serious securities law violations that began as early as 2020.

44.      In light of these violations, Mr. Siciliano removed a number of senior executives from their roles, and Linqto's new management team began investigating the Company's business operations and regulatory compliance issues and cooperating with ongoing investigations from regulators. Throughout the course of these investigations, which are ongoing, management discovered extensive regulatory compliance violations along with a culture of systematic and pervasive non-compliance, requiring immediate and serious corrective action.

45.      In February of 2025, the Company engaged Sullivan & Cromwell LLP ("**S&C**") to, among other things, facilitate full cooperation with the SEC investigation and other investigations, assess the Platform's regulatory compliance and advise on how the company could

operate in a compliant manner going forward. Among myriad other compliance issues, Linqto's management also discovered that Linqto failed to maintain an effective system for verifying the accredited status of its Customers with respect to offerings available only to accredited investors.[9]

46.     As a result of the misinformation provided to Customers and the improper operating structure, the Debtors face substantial contingent liabilities to their Customers, which, taken together, may render the Debtors insolvent on a balance sheet basis.

47.     When new management became aware of the Company's severe and pervasive operational and compliance deficiencies in February of 2025, management paused operation of the Platform while it sought to implement proper controls and procedures. As new management became aware of the depth and extent of the Company's historical non-compliance with the securities laws, however, the Company determined that continued operation of the Platform would be ill advised and likely exacerbate the Company's liabilities. As a result, the Company determined to indefinitely suspend operation of the Platform and, by extension, its Customer-facing operations, on March 13, 2025. The Company cannot resume Customer-related operations without addressing its non-compliant structures and obtaining the requisite regulatory approvals to restructure its operations into a compliant model.

48.     In addition to the SEC investigation, FINRA's investigation of Linqto Capital is ongoing.

49.      As these investigations are ongoing, Linqto's current management, together with the Debtors' professionals, are cooperating with the SEC and other regulators.

---

[9]      These offerings were available to individuals qualifying as accredited investors under 17 CFR § 230.501(a)(5), (a)(6), and (a)(10), which include individuals with a net worth of $1,000,000, exclusive of their primary residence, individuals who have earned $200,000 in gross income the last two years ($300,000 if filing with a spouse or partner) and reasonably expects to earn the same in the current year, and individuals who hold valid FINRA Series 7, 65, or 82 licenses.

C.      **Efforts to Reduce Operating Costs and Expenses.**

50.      In the months leading up to the filing of these Chapter 11 Cases, the Debtors'
management implemented a variety of measures to improve efficiency and reduce operating costs.
Between January and June of 2025, the Company implemented three reductions in force ("**RIFs**")
and several terminations, reducing its total number of full-time employees from 87 to 28 and
reducing its monthly payroll by approximately $1,070,000, or approximately 68%, compared to
January of 2025.

51.      In addition to reducing its labor costs considerably, the Company has eliminated
expenses related to advertising and operation of the Platform and cut other costs, resulting in
annualized cost reductions of approximately $7.8 million.

V.      **PATH FORWARD.**

52.      When the depth and extent of the Debtors' historical non-compliance with the
securities laws became apparent and revenue-generating operations were suspended, in addition
to hiring S&C, the Debtors retained Schwartz, PLLC ("**Schwartz**") and other advisors, including
Jefferies LLC and Triple P TRS, LLC ("**Portage Point**"), to assist with efforts to evaluate
restructuring options. All of the estates' professionals will seek approval of their retention in
accordance with Section 327 of the Bankruptcy Code.

53.      The Company, with the assistance of its professionals, has concluded that the best
way to preserve value for the benefit of all parties in interest is to seek protection under Chapter
11 of the Bankruptcy Code, which will  afford the Company the opportunity to (a) preserve the
value of its assets, (b) deliberately asses strategic alternatives to maximize the value of its business,
(c) explore restructuring alternatives that bring its operations and structure into compliance with
applicable securities laws, (d) negotiate a path forward with the SEC and other regulators that will

facilitate a fair resolution of government and customer litigation in a manner that treats everyone equitably and fairly, (e) address the Debtors' outstanding liabilities, including the claims of Customers, the SEC, and other regulators, and (f) secure financing to achieve the foregoing objectives.

54.     The Debtors have evaluated, and are continuing to evaluate, a variety of alternatives for addressing their organizational structure, obtaining the requisite regulatory approvals and licenses to operate, and distributing value to their stakeholders.

55.     Because of the defects in the Debtors' corporate structure, violations of the securities laws, and the nature of the Debtors' assets, the Debtors believe that a number of these potential alternatives are not feasible and will not maximize the value of the Debtors' assets for the benefit of their Customers or other creditors. Instead, by restructuring through Chapter 11, Linqto will be better positioned to address its historical regulatory compliance issues and related liabilities, protect Customers' interests, and potentially resume operations through a compliant structure.

56.     The Company is proactively engaging with various stakeholders and is prepared to work expeditiously during the Chapter 11 process to reach consensual agreements with parties.

## VI.    FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY MOTIONS.[10]

57.     The First Day Motions seek, among other things, to (i) preserve the value of the Company's assets and maximize the recovery of the Debtors' creditors, including their Customers, (ii) ensure the continuation of the Debtors' cash management system and other business operations with minimal disruption or loss of productivity or value, (iii) implement certain administrative

---

[10]     Unless otherwise defined herein, all capitalized terms in this Section VI shall have the meanings ascribed to them in the applicable First Day Motions.

procedures that will promote the timely and efficient administration of the Chapter 11 Cases. I am familiar with the content of the Petitions and First Day Motions and related proposed orders (the "**Proposed Orders**"), and it is my belief that the relief sought therein will preserve and maximize the value of the Debtors' estates for the benefit of their creditors.[11] The First Day Motions include:

(a) **Administrative and Procedural Motions**

- Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**");

- Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Implement Certain Notice Procedures, (II) Redact Certain Personal Identification Information, and (III) Approve the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "**Notice Procedures Motion**");

- Debtors' Emergency Motion for Entry of an Order: (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs; and (II) Granting Related Relief (the "**Schedules Extension Motion**"); and

- Debtors' Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent (the "**Noticing and Claims Agent Application**").

(b) **Business Operations Motions – Emergency Relief Requested**

- Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to: (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (II) Continue to Perform Intercompany Transactions, and (III) Maintain Existing Business Forms (the "**Cash Management Motion**");

- Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "**Wages Motion**");

- Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy

---

[11] For the avoidance of doubt, as to those First Day Motions that seek authorization to pay prepetition obligations, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations that are the subject of the First Day Motions.

Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees and Commissions, (D) Honor the Terms of Premium Financing Agreements, and (E) Enter Into New Premium Financing Agreements in the Ordinary Course of Business; and (II) Granting Related Relief (the "**Insurance Motion**"); and

**(c) Financing Motion**[12]

- Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "**DIP Motion**").

58.    I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions: (a) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimal disruption to their business, and without loss of productivity or value; (b) is necessary to preserve valuable relationships with Customers, trade vendors, and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates and a prudent exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 8, 2025

*/s/ Jeffrey S. Stein*
Jeffrey S. Stein
Chief Restructuring Officer

---

[12]    Facts supporting the relief sought in the DIP Motion are set forth in separate declarations.

## <u>Exhibit A</u>
Linqto Corporate Structure



Linqto, Inc. Board of Directors

Adam T. Henderson
Francis Daniel Siciliano II
Alison Kutler
Norman Reed
Jeremy Rosenthal
William Sarris

\* Nondebtor affiliate