**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
SECURED FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. on July 8, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 8, 2025 at 4:00 pm in Courtroom 400, 4th Floor, United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Avenue, Houston, TX 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "Judge Perez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") respectfully state as follows in support of this motion:[2]

## RELIEF REQUESTED

1.    The Debtors seek entry of an order, substantially in the form attached hereto (the "**Proposed Interim Order**"), and a final order (the "**Proposed Final Order**" and, together with the Interim Order, the "**DIP Orders**"),[3] (a) authorizing the Debtors to: (i) enter into a senior secured superpriority multi-draw term loan credit facility in an aggregate principal amount of up to $60,000,000 (the "**DIP Facility**") from Sandton Capital Solutions Master Fund VI, LP (the "**DIP Lender**"), under the terms and conditions set forth in the DIP Orders and the DIP Documents (as defined herein), with up to $10,000,000 available on an interim basis; (ii) enter into the *Senior Secured Debtor-in-Possession Loan Agreement* among the Debtors and the DIP Lender, substantially in the form attached as **Exhibit A** to the Proposed Interim Order (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, together with ancillary documentation, the "**DIP Documents**"); (iii) grant the DIP Lender allowed superpriority administrative expense claims and senior secured superpriority liens on DIP Collateral (as defined in the DIP Orders), subject only to

---

[2]    Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure. "**Bankruptcy Local Rule**" or "**BLR**" references are to the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas. All other capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration or Interim Order, as applicable.

[3]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

the Carve Out (as defined herein); (b) modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; and (c) pursuant to Bankruptcy Rule 4001(c)(2), setting a date for a final hearing (the "**Final Hearing**") as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

2.    In support of this motion, the Debtors respectfully submit (a) the *Declaration of Jeffrey S. Stein in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, attached hereto as **Exhibit 1** (the "**Stein Declaration**"); (b) the *Declaration of Ryan Hamilton in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, attached hereto as **Exhibit 2** (the "**Hamilton Declaration**" and together with the Stein Declaration, the "**DIP Declarations**"); and (c) the First Day Declaration (defined below).

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157 (b). The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The basis for the relief requested herein are Sections 105(a), 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Bankruptcy Local Rules 1075-1, 2002-1, 4001-1, 4002- 1, and 9013-1.

## BACKGROUND

### A.     The Debtors' Business.

4.     On July 7, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors continue to operate their business and manage their property as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and no request for the appointment of a trustee or examiner has been made.

5.     From February of 2020 until March 14, 2025, Linqto operated a platform (the "**Platform**") designed to provide customers (the "**Customers**") with indirect access to investments in the equity of private companies (the "**Issuing Companies**" and each, an "**Issuing Company**"), with a focus on the technology sector. Debtor Linqto Liquidshares LLC ("**Liquidshares**") purchased and held investment securities (the "**Securities**"), comprised of shares of Issuing Companies and membership units in entities that own shares in Issuing Companies. Liquidshares then purported to allocate economic interests in the Securities to series limited liability companies (the "**Series**") and sell units in the Series to the Customers. More than 13,000 Customers participated through the Linqto Platform. As of the Petition Date, Liquidshares holds Securities in 111 Issuing Companies with an estimated fair market value of in excess of $500 million.

6.     Upon their appointment at the beginning of 2025, the Company's new management learned of pending investigations by the U.S. Securities and Exchange Commission

4

(the "**SEC**") and Financial Industry Regulatory Authority, Inc., along with allegations of serious regulatory compliance failures. As Linqto's new leadership team gained access to company records and spoke with Linqto personnel, they quickly developed concerns regarding, among other things, the Company's historical interpretation of and non-compliance with applicable securities laws and its organizational and governance structure. Further investigation uncovered myriad regulatory compliance violations along with a culture of systematic and pervasive non-compliance, requiring immediate and serious corrective action. Linqto's current management, together with the Debtors' professionals, are cooperating with the SEC and other regulators.

7.     As new management became aware of the depth and extent of the Company's historical non-compliance with the securities laws, the Company determined that continued operation of the Platform would be ill advised and likely exacerbate the Company's liabilities. As a result, the Company determined to indefinitely suspend operation of the Platform and, by extension, its primary revenue-generating operations, on March 13, 2025.

8.     The Company ultimately determined that seeking protection under Chapter 11 will afford the Company the opportunity to (a) preserve the value of its assets, (b) deliberately assess strategic alternatives to maximize the value of its business, (c) negotiate a path forward with the SEC and other regulators and explore restructuring alternatives that bring its operations and structure into compliance with applicable securities laws, (d) address the Debtors' outstanding liabilities, including the claims of Customers, the SEC, and other regulators, and (e) secure financing to achieve the foregoing objectives.

9.     Additional information regarding the Debtors, their business, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set forth in the *Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions, and Related Relief* (the "**First Day**

**Declaration**"), filed substantially contemporaneously with the Debtors' voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**B.**     **The DIP Financing.**

10.     As set forth above and in the First Day Declaration, the Company indefinitely suspended operation of the Platform and, by extension, its primary revenue-generating operations, on March 13, 2025. As a result, the Debtors have limited operations and are generating limited revenue, primarily from the sale of Securities. *See* Stein Declaration, ¶ 7.

11.     As a result of these liquidity challenges, the Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility in order to, among other things, pay operating expenses and fund working capital needs, and pay administrative expenses incurred in the Chapter 11 Cases, each to the extent permitted by, and in accordance with, an Approved Budget (defined below). A copy of the initial Approved Budget (the "**Initial Budget**") is attached to the Proposed Interim Order as **Exhibit B**.

12.     The Debtors, with the assistance of their advisors, developed the Initial Budget. The Initial Budget contains line items for each category of revenue anticipated to be received and all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth therein. The Initial Budget establishes that the Debtors will have adequate liquidity during to operate their business and administer their Chapter 11 Cases if the DIP Facility is authorized. *See* Stein Declaration, at ¶¶ 9-11.

13.     The Initial Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the not less than the first three weeks of the Chapter 11 Cases. *See* Stein Declaration, ¶ 11.

14.     Incurring postpetition debt under the DIP Documents is necessary and vital to the preservation and maintenance of the Debtors' assets and going concern. Immediate and irreparable harm will be caused to the Debtors and their estates if financing is not obtained immediately.

15.     Absent funds available from the DIP Facility and the cooperation of key business partners at this critical early stage of the Chapter 11 Cases, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' restructuring depends—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors. *See* Stein Declaration, ¶ 12.

16.     Specifically, the Debtors need the DIP Facility to fund, among other things, payroll and benefits, insurance, vendors, and other costs required for the maintenance of the Debtors' operations. As of the Petition Date, the Debtors' currently available cash on hand is approximately $123,000, which is insufficient to operate their business and pay operating expenses in the ordinary course as they come due before a final hearing can be held.

17.     The DIP Facility is the product of extensive, arm's-length negotiations with the DIP Lender. The DIP Facility was preceded by a third-party marketing process by the Debtors' proposed investment banker, Jefferies LLC ("**Jefferies**"), designed to secure postpetition financing on the best available terms. *See* Stein Declaration, ¶¶ 13, 19.

18.     More specifically, the Debtors, with the assistance of Jefferies, contacted fifty-six (56) third-party financial institutions to solicit proposals for debtor-in-possession financing. Twenty-one (21) introductory calls were conducted and twenty-four (24) parties executed non-disclosure agreements to obtain access to information to learn more about the Debtors' business and their related finances. *See* Stein Declaration, ¶ 13; *see also* Hamilton Declaration, ¶ 8.

19.     The Debtors then received term sheets from four (4) prospective lenders containing terms upon which such prospective lenders would be willing to provide the DIP Facility to the Debtors. *See* Stein Declaration, ¶ 14; Hamilton Declaration, ¶ 9.

20.     After arm's length negotiations, the Debtors selected to obtain the DIP Facility from the DIP Lender, as the DIP Lender's terms and conditions for the DIP Facility were, in the Debtors' reasonable business judgment after consultation with counsel and other professionals, the highest and best terms for the DIP Facility. *See* Stein Declaration, ¶ 15-19; Hamilton Declaration, ¶ 10.

21.     For these reasons, and for the reasons set forth below and in the DIP Declarations and the First Day Declaration, entry into the DIP Credit Agreement will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court grant the motion and enter the DIP Orders.

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001 AND THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS PROCEDURES FOR COMPLEX CHAPTER 11 CASES**

22.     The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(c)(1)(B) and the Complex Case Procedures.[4]

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 and ¶ C(8) of the Complex Case Procedures |
|---|---|
| ***Borrowers***<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Borrowers are: Linqto Texas, LLC, a Texas limited liability company; Linqto, Inc., a Delaware corporation; Linqto Liquidshares Manager LLC, a Delaware limited liability company; and Linqto Liquidshares LLC, a Delaware limited liability company. |

---

[4]     The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| | |
|---|---|
| | *See* DIP Credit Agreement, pg. 1, Recitals |
| ***Guarantors***<br><br>Bankruptcy Rule 4001(c)(1)(B) | Not applicable. |
| ***DIP Lender***<br><br>Bankruptcy Rule 4001(c)(1)(B) | Sandton Capital Solutions Master Fund VI, LP<br><br>*See* DIP Credit Agreement, pg. 1, Recitals |
| ***Term and Repayment***<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement shall be repaid in full on the earliest of : (a) the Scheduled Maturity Date, which is listed as 12 months from the Closing Date of the DIP Facility (*See* DIP Credit Agreement, pg. 21, § 1.01); (b) the "effective date" of a confirmed Plan; (c) the date on which the Debtors consummate a sale of all or substantially all of the assets pursuant to Section 363 of the Bankruptcy Code or otherwise; or (d) the date of acceleration of the obligations upon the occurrence of an event of default in accordance with the DIP Credit Agreement and DIP Orders (any of these instance of maturity requiring repayment constitute the "**Repayment Date**").<br><br>*See* DIP Credit Agreement, pg. 21, § 1.01; pg. 25, § 2.03. |
| ***DIP Facility***<br><br>Bankruptcy Rule 4001(c)(1)(B) | Senior revolving credit facility in an aggregate principal amount of up to $60,000,000 (the "**Commitment**") with the priority as described by the header "Collateral Security and Priority" below.<br><br>*See* DIP Credit Agreement, pg. 5, § 1.01. |
| ***Funding Dates***<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Initial Term Loan</u>. $10 million ("**Initial Draw**"), available on the entry of the Interim Order approving the DIP Credit Agreement on an interim basis. *See* DIP Credit Agreement, pg. 24, § 2.01(a)<br><br><u>Additional $50 million</u>. Available to the Debtors during the term of the loan, as set forth above, in minimum incremental borrowings of $5,000,000, the total of which including the Initial Term Loan is not to exceed the Commitment.<br><br>*See* DIP Credit Agreement, pg. 24, § 2.01(a)–(b); pg. 25, § 2.02(a). |
| ***Interest Rate and Fees*** | (i)      Issuance Fee: issuance fee of 2.5% on the Initial Draw and each additional draw, which fee will be earned and payable on the date of each funding (Issuance Fee will be paid in kind ("**PIK**") by |

| | | |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | | being added to the principal balance of the DIP Credit Agreement on the date of funding). |
| | (ii) | <u>Cash Interest</u>: None. |
| | (iii) | <u>PIK Interest</u>: PIK interest at 14.5% per annum on the outstanding funded amount of DIP Credit Agreement, which shall be added to the principal amount funded on a monthly basis. PIK'ed interest will not be counted against draw limits for any of the contemplated draws. |
| | (iv) | <u>Exit Fee</u>: Debtors will pay the DIP Lender an exit fee multiplied by the total amount funded. If the Debtor has drawn over 60% of the total Commitment amount, the exit fee will be 2.5%; if the Borrower has drawn less than 60% of the Commitment amount, the exit fee will be 3.0%. Such exit fees will be payable on the earlier to occur of any date of prepayment or instance when DIP Credit Agreement becomes fully due and payable. |
| | (v) | <u>Default Interest Rate</u>: During the occurrence and continuance of an Event of Default, the PIK Interest rate will increase by 300 basis points, or to 17.5% per annum. |
| | (vi) | <u>Renewal Fee</u>: If the DIP Credit Agreement is not repaid on or before the date of repayment as required under the DIP Documents, time being of the essence, the Debtors will pay to the DIP Lender, in addition to all other amounts due under the DIP Documents, a renewal fee of 2.5% of the total amount funded, which shall extend the date of repayment by an additional 3 months (this renewal fee will be capitalized on the balance of the DIP Credit Agreement at the time of extension). Debtor shall be entitled to two (2) three- month extension periods at the date of repayment (based on mutually agreed operating and restructuring milestones). |
| | (vii) | <u>Unused Fee</u>: the Debtors will pay the DIP Lender an unused line fee at 2.0% per annum on the undrawn outstanding Commitment amount, which shall be added to the principal amount funded on a monthly basis and will not be counted against draw limits for any of the draws contemplated by the DIP Documents. |
| | (viii) | <u>Minimum Multiple of Invested Capital</u>: cash fee at exit such that the DIP Lender's multiple of invested capital for each advance funding, exclusive of any fees, shall be no less than 1.15x. |
| | | *See* DIP Credit Agreement, pg. 24, § 2.08(a)–(d); pgs. 28-29. |

| | |
|---|---|
| ***Use of DIP Facility***<br><br>Bankruptcy Rule 4001(b)(l)(B) | The DIP Credit Agreement will be available to the Debtors to fund expenses in accordance with the Initial Budget attached to the Interim Order as **Exhibit B**, and all subsequent budgets (collectively, the "**Approved Budget**"). The Approved Budget shall be agreed to by the Debtors and the DIP Lender and will include, without limitation, budgeted professional fees.<br><br>*See* DIP Credit Agreement, pgs. 49-50, § 6.11(a)–(c). |
| ***Prepayment*** | The Debtors may prepay the DIP Credit Agreement in full or in part at any time (the date on which any such prepayment occurs, a "**Prepayment Date**"). There will be a mandatory repayment of the DIP Credit Agreement upon the sale of any assets (other than a "Permitted Disposition" unless otherwise agreed to by the parties), the receipt of insurance/condemnation proceeds, and proceeds from issuances of debt or equity).<br><br>*See* DIP Credit Agreement, pg. 26, § 2.05; pgs. 26-27, §2.06. |
| ***Milestones***<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Complex Case Rules, ¶ C(8)(a) | The DIP Credit Agreement contains the following milestones:<br><br>(a) The Bankruptcy Court shall have entered the Final DIP Order by the date that is no later than 45 days after the Interim Order Entry Date;<br><br>(b) The Debtors shall have filed a motion with the Bankruptcy Court seeking entry of an Approved Plan by no later than October 3, 2025;<br><br>(c) The Bankruptcy Court shall have entered an order confirming an Approved Plan by no later than January 16, 2026; and<br><br>(d) An Approved Plan shall have become effective in accordance with its terms by no later than April 15, 2026.<br><br>*See* DIP Credit Agreement, pg. 53, § 6.20(a)–(d). |
| ***Collateral Security & Priority***<br><br>Bankruptcy Rule 4001(c)(1)(B) | The collateral for the DIP Credit Agreement (the "**Collateral**") will include, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, a fully perfected first priority security interest in all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Debtors including, without limitation, all securities accounts, accounts, securities, shares other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, general intangibles, investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds. DIP Lender will |

| | |
|---|---|
| | receive a perfected first lien security interest in the Debtors' and related companies' portfolio of shares (both Company and Investor shares).<br><br>*See* DIP Credit Agreement, pgs. 30-31, § 2.13(a)–(e). |
| ***Adequate Protection***<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) and (ii) | Not applicable. |
| ***Carve Out*** | The DIP Liens, DIP Superpriority Claim the Prepetition Liens, the Prepetition Replacement Liens, and the Prepetition Superiority Claims are subordinate only to the following (collectively, the "**Carve Out**"):<br><br>(i)     all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate;<br><br>(ii)    all reasonable and documented fees and expenses incurred by a trustee under Bankruptcy Code section 726(b).<br><br>(iii)   Subject to the terms and entry of the Approved Budget and upon entry of the Final DIP Order, reasonable fees and costs incurred by the Borrowers' professionals in the Cases as approved by the Bankruptcy Court.<br><br>*See* DIP Credit Agreement, pg. 4, § 1.01; pgs. 29–30, § 2.13; pg. 35, § 4.01(j); pgs. 49-50 § 6.11 (a)–(b). |
| ***Covenants***<br><br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative, negative, and other financial and operational covenants customary for transactions of this type, including but not limited to:<br><br>(i)     Minimum cash balance of at least $3,000,000. (which may be funded from borrowed funds);<br><br>(ii)    Maximum capital expenditures;<br><br>(iii)   No dispositions or any other upstream payments or distributions (except Permitted Dispositions);<br><br>(iv)   No change of control, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code; |



| | |
|---|---|
| | (v)   Maintenance of appropriate insurances and addition of Lender as additional insured, lender's loss payee and/or mortgagee, as applicable, under such insurance policies; |
| | (vi)   Limitations on additional debt, guarantees, and hedging arrangements, including the subordination of all intercompany indebtedness; |
| | (vii)   Limitations on liens and further negative pledges; |
| | (viii)   Limitations on sales, transfers, and other dispositions of assets, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to sections 363 or 1129 of the Bankruptcy Code; |
| | (ix)   Limitations on loans and investments; |
| | (x)   Agreed upon milestones for the Borrowers' chapter 11 cases, including confirmation of a plan of reorganization; |
| | (xi)   Limitations on creating new subsidiaries or becoming a general partner in any partnership; and |
| | (xii)   Limitations on transactions with affiliates except as permitted. |
| | *See* DIP Credit Agreement, pgs. 53–58, §§ 7.01–7.20. |
| ***Conditions***<br><br>Bankruptcy Rule 4001(c)(1)(B) | The obligation of the DIP Lender to make available the DIP Facility shall be subject to the satisfaction (or waiver by the DIP Lender, in its sole and absolute discretion) of the following conditions:<br><br>(i)   The DIP Documents shall have been executed and delivered by each party thereto, in form and substance satisfactory to the DIP Lender;<br><br>(ii)   The Petition Date shall have occurred, and each Debtors shall be a debtor and debtor in possession;<br><br>(iii)   The Interim Order shall have been entered, authorizing and approving the making of the loans in the amounts consistent with those set forth in the "DIP Facility" section above and the granting of the superpriority claims and liens and other liens referred to under the heading "Security and Priority" (such order, the "Interim Order" and together with the Final Order, the "DIP Orders"), which Interim Order shall not have been vacated, reversed or stayed in any respect<br><br>*See* DIP Credit Agreement, pgs. 34-36, § 4.01. |

| | |
|---|---|
| ***Representations & Warranties***<br><br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax status, compliance with law, and operational and financial disclosures.<br><br>*See* DIP Credit Agreement, pgs. 37–44, §§ 5.01–5.23. |
| ***Events of Default***<br><br>Bankruptcy Rule 4001(c)(l)(B) | Events of Default will include, in addition to other such events customarily found in transactions similar to the DIP Credit Agreement:<br><br>(i)      Payment defaults;<br><br>(ii)     Covenant defaults; and<br><br>(iii)    Representation or warranty breaches. Among other remedies, upon the occurrence of an Event of Default, the DIP Lender may accelerate all of the DIP Credit Agreement obligations and enforce its remedies against the Collateral.<br><br>*See* DIP Credit Agreement, pgs. 58–63, §§ 8.01–8.03. |
| ***Expenses***<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors will be responsible for all reasonable out of pocket fees and expenses incurred by the DIP Lender to perform due diligence and in connection with the negotiation, preparation, documentation and administration of the DIP Credit Agreement, regardless of whether the DIP Credit Agreement is consummated. The Debtors will be responsible for all out-of-pocket fees and expenses incurred by DIP Lender to enforce the terms of the DIP Credit Agreement or otherwise to protect its rights under the DIP Documents.<br><br>*See* DIP Credit Agreement, pg. 13, § 1.01, pg. 65, § 9.04(a). |
| ***Releases***<br><br>Bankruptcy Rule 4001(c)(1)(B);<br>Complex Case Rules, ¶ C(8)(f) | Upon entry of the Final DIP Order, the right to surcharge the DIP Lender's collateral under Section 506(c) of the Bankruptcy Code is waived.<br><br>*See* Interim Order, ¶ 17. |
| ***Liens on Avoidance Actions***<br><br>Bankruptcy Rule 4001(c)(1)(B);<br>Complex Case Rules, ¶ C(8)(d) | Not applicable, provided however, the DIP Lender's Collateral cannot be used to prosecute claims against the DIP Lender.<br><br>*See* DIP Credit Agreement, pg. 50, § 6.11(b). |
| ***Cross Collateralization*** | Not applicable. |

| Complex Case Rules, ¶ C(8)(b) | |
|---|---|
| ***Indemnification***<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Lender will receive customary indemnification, which excludes any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence, actual fraud, or willful misconduct.<br><br>*See* DIP Credit Agreement, pgs. 64-65, § 9.04; *see also* Interim Order, ¶ F. |
| ***Waiver of the Automatic Stay***<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Complex Case Rules, ¶ C(8)(e) | The automatic stay is waived on a limited basis pursuant to the Interim Order to allow for the perfection of the DIP Lender's liens.  *See* Interim Order, ¶ 33.<br><br>The DIP Documents and the Final DIP Order authorize the DIP Lender to exercise default remedies without seeking relief from the automatic stay.<br><br>*See* DIP Credit Agreement, pg. 63, § 8.02; *see also* Interim Order, ¶¶ 12 and 13(b). |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

23.      The Interim Order contains certain of the provisions (the "**Significant Provisions**")[5] identified on Exhibit B to the Complex Case Procedures as summarized above, including, but not limited to, imposing deadlines for filing a plan and disclosure statement and granting superpriority administrative claims. Importantly, however, the DIP Lender is not a pre-petition creditor of the Debtors and as a result, neither the instant Motion nor the DIP Orders seek to modify any pre-petition debts of the DIP Lender.

---

[5]      Significant Provisions refer to those provisions that:  (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in Section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights  under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under Chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

24.     The Interim Order grants first priority secured liens and superpriority administrative expense claims (the "**DIP Superpriority Claim**") to the DIP Lender, subject only to the Carve Out.

25.     For the reasons set forth below, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these Chapter 11 Cases and have been narrowly tailored to the DIP Facility. Accordingly, the Significant Provisions in the Interim Order should be approved.

## BASIS FOR RELIEF

### A.     The Debtors Have a Need for Debtor-in-Possession Financing.

26.     As discussed in the First Day Declaration, the Company indefinitely suspended operation of the Platform and, by extension, its primary revenue-generating operations, on March 13, 2025. The Debtors require an immediate capital infusion in order to operate postpetition and to preserve their estates while they pursue their restructuring initiatives. As of the Petition Date, the Debtors' currently available cash on hand is approximately $123,000, which is insufficient to operate their business and pay operating expenses in the ordinary course of business as they come due. Stein Declaration, ¶ 7.

27.     Absent funds available from the DIP Facility and the cooperation of vendors at this critical early stage of the Chapter 11 Cases, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' restructuring depends—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors. *Id.* at ¶ 12.

B.     **Alternative Sources of Financing Are Not Available.**

28.     As described above, the DIP Facility followed a third-party marketing process conducted by Jefferies. 56 third-party financial institutions were contacted and 24 parties executed non-disclosure agreements. Ultimately, four indications of interest were received. *See* Stein Declaration, ¶ 13; *see also* Hamilton Declaration, ¶¶ 8, 9.

29.     The Debtors, with the assistance of Jefferies, solicited other sources of post-petition financing to determine whether the Debtors could obtain such postpetition financing on better terms.  None of these other potential sources of postpetition financing, however, offered to make available financing that the Debtors deemed to be better than the DIP Facility. Additionally, no party contacted as part of the financing search process was interested in providing, or willing to provide, postpetition financing to the Debtors solely on an unsecured or administrative priority basis. *See* Stein Declaration, ¶ 17; *see also* Hamilton Declaration, ¶14.

30.     After reviewing and considering the indications of interest, the Debtors, in consultation with their legal professionals and other advisors, determined that the DIP Lender's proposal represented the best available terms and conditions for DIP financing. *Id.* at ¶ 15;

31.     The terms of the DIP Facility are the product of extensive, arm's-length negotiations between the Debtors, together with their professionals and advisors, and the DIP Lender. The Debtors believe, in their reasonable business judgment and after consultation with counsel and other professionals, that the DIP Facility, taken as a whole, provides the most favorable terms available for postpetition financing under the circumstances of these Chapter 11 Cases. *Id.* at ¶ 19; Hamilton Declaration, ¶¶ 10, 12, 17.

32.     For these reasons, the Debtors, in consultation with their advisors, determined the DIP Lender's financing proposal represents the only viable postpetition financing option presently available to the Debtors. *Id.* at ¶¶ 15, 19.

33.     The terms and conditions of the DIP Facility, including the fees, interest rate, and default rate, are competitive and reflect the market interest in providing the Debtors with postpetition financing. *Id.* at ¶ 20; Hamilton Declaration, ¶¶ 12, 15.

34.     Accordingly, approval of the DIP Facility is in the best interest of the Debtors' estates and the Debtors respectfully request entry of the DIP Orders approving the DIP Facility. *Id.* at ¶ 22.

C.     **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

35.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

36.     To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In*

*re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the Code").

37.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also *Unsecured Creditors' Comm. Mobil Oil Corpg. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

38.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of alternatives. The Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their Chapter 11 Cases and their ongoing operations. The Debtors negotiated the DIP Documents in good faith, at arm's length, and with the assistance of their advisors, and they have obtained the best financing available under the circumstances. *Id.* at ¶¶ 15, 19; Hamilton Declaration, ¶¶ 12, 17. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**D.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.**

39.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to Section 364(c) of the Bankruptcy Code.

40.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section

364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing,

upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test

to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy

Code. Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary*

*Hospg.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

41.     No party contacted as part of the above-described process was interested in

providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.

Indeed, no constituency was willing to provide postpetition financing on anything other than a

superpriority basis with respect to all of the Debtors' assets. The DIP Lender was not willing to

provide the DIP Facility on any other terms. *See* Stein Declaration, ¶ 17; Hamilton Declaration, ¶ 14.

42.     Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable debtor-in-possession financing alternatives.

43.     Further, Section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either prepetition secured parties have consented prepetition or secured parties' interests in collateral are adequately protected. Here, there are no prepetition liens on the Debtors' assets and thus, no prepetition lender consent or adequate protection is needed to grant the DIP Lender first priority priming liens on the Debtor's assets. Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**E.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

44.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful

contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under Section 364(a) and (b)).

45.     Here, the Debtors conducted a competitive and comprehensive debtor-in-possession marketing process that resulted in four (4) third-party financing proposals. Following arm's-length negotiations with the DIP Lender, the Debtors determined that the DIP Facility is the provides the Debtors with flexibility to pursue the restructuring transactions in their Chapter 11 Cases and represents the best available alternative under the circumstances to fund these Chapter 11 Cases. *Id.* at ¶¶ 14-15, 19, Hamilton Declaration, ¶¶ 9-10.

**F.**   **The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender under the DIP Documents.**

46.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Lender. The Debtors have also agreed to pay the fees and expenses of counsel and other professionals retained as provided for in the DIP Documents. In particular, the Debtors have agreed to pay:

      a.    ***PIK Interest Rate.*** The Debtors will pay the DIP Lender PIK interest at 14.5% per annum on the outstanding funded amount, which shall be added to the amount of the DIP Credit Agreement funded to that point (the "**Funded Amount**"), on a monthly basis. PIK'ed interest will not be counted against draw limits for any of the draws contemplated herein.

      b.    ***Issuance Fee.*** The Debtors will pay DIP Lender an issuance fee of 2.5% on the initial drawdown and on each additional drawdown, which fee will be earned and payable on the date of each draw (the issuance fee will be capitalized and added to the Funded Amount but not counted against draw limits).

c.   ***Exit Fee.*** The Debtors will pay the DIP Lender an exit fee multiplied by the Funded Amount. If the Debtors have drawn over 60% of the DIP Credit Agreements' total principal amount (the "**Total Principal Amount**"), the exit fee will be 2.5%, If the Debtors have drawn less than 60% of the Total Principal Amount, the exit fee will be 3.0%. Such exit fees will be payable on the earlier to occur of any Prepayment Date and Repayment Date.

d.   ***Default Interest Rate.*** During the occurrence and continuance of an event of default as defined in the DIP Documents, the PIK Interest rate will increase by 300 basis points, or from 14.5% per annum to 17.5% per annum.

e.   ***Renewal Fees:*** If the DIP Credit Agreement is not repaid in full on or before the its designated date of repayment (the "**Repayment Date**"), time being of the essence, the Debtors will pay to the DIP Lenders, in addition to all other fees and other amounts as set forth in the DIP Documents, a renewal fee of 2.5% of the total principal amount as of the Repayment Date, which shall extend the Repayment Date by an additional 3 months with the Renewal Fee capitalized and added to the Funded Amount at the time of extension. Debtors shall be entitled to no more than two (2) three-month extension periods at the Repayment Date (based on mutually agreed operating and restructuring milestones).

f.   ***Unused Fee***: The Debtors will pay the DIP Lender an unused fee at 2.0% per annum on the undrawn outstanding Total Principal Amount, which shall be added to the Funded Amount on a monthly basis and will not be counted against draw limits for any of the draws contemplated herein.

g.   ***Minimum Multiple of Invested Capital***: The Debtors will pay the DIP Lender a cash fee at exit such that the DIP Lender's multiple of invested capital for each advance, exclusive of any fees, shall be no less than 1.15x.

47.    As set forth in the Stein Declaration, the fees and expenses were negotiated at arm's length and are, in aggregate, generally consistent with debtor-in-possession financings of this type and size and in relation to the Debtors' assets. *See* Stein Declaration, ¶ 15; *see also* Hamilton Declaration, ¶ 15.

48.    The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital

postpetition financing, and (ii) extensive arm's-length, good-faith negotiations with the DIP Lender. *Id.* at ¶ 19.

49.     The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the Approved Budget. *Id.* at ¶ 11.

50.     Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Documents in connection with the DIP Facility.

**G.     The DIP Lender Should Be Afforded Good-Faith Protection under Section 364(e).**

51.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

52.     As set forth above, the DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations with the DIP Lender. The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, the Debtors ran a competitive proposal process under the circumstances before selecting the DIP Lender's proposal as the winning bidder. Accordingly, the Court should find that the obligations arising under the DIP Facility and other

financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Lender are entitled to all of the protections afforded thereby.

**H.      The Automatic Stay Should Be Modified on a Limited Basis.**

53.      The Interim Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders and authorize the Debtors to make, and the recipients to retain and apply, payments. The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order. Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Lender to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents.

54.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See* Stein Declaration, ¶¶ 20, 22.

**EMERGENCY RELIEF**

55.      Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 may be commenced not earlier than fourteen (14) days after service of the motion. Upon request, however, the Bankruptcy Court is empowered to conduct an expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

56.     Further, the Court's Complex Case Procedures provide that upon a motion by the debtors, an initial financing hearing will routinely be conducted as a first-day hearing to consider interim debtor-in-possession financing, and require that the debtors must introduce a cash flow projection showing sources and uses of cash necessary for ongoing operations on a weekly basis for not less than the first 3 weeks of the case. The Initial Budget, attached to the Proposed Interim Order as **Exhibit B**, shows sources and uses of cash necessary for ongoing operations on a weekly basis for not less than the first 3 weeks of the case.

57.     As described above, an expedited hearing on the motion and interim approval of the DIP Facility is necessary to avoid immediate and irreparable harm to the Debtors' estates. As of the Petition Date, the Debtors' total cash on hand is approximately $150,000, which is insufficient to operate their enterprise and continue paying obligations that are essential for the continued operation of their business and preservation of their assets, including payroll and benefits for their employees, insurance, professional fees, and other costs.

## <u>RESERVATION OF RIGHTS</u>

58.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code;

(f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any prepetition liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.

## <u>NOTICE</u>

59.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the holders of the 100 largest customer claims against the Debtors; (d) the DIP Lender; (e) the office of the attorneys general for the states in which the Debtors operate; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) other regulatory agencies having a regulatory or statutory interest in these Chapter 11 Cases; (j) any official or statutory committee appointed in these Chapter 11 Cases; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: July 8, 2025  
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

/s/ *Gabrielle A. Hamm*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (*pro hac vice* pending)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:     (713) 900-3737
Facsimile:     (702) 442-9887
Email:         ghamm@nvfirm.com
               vpolnick@nvfirm.com
               aagelakopoulos@nvfirm.com

Samuel A. Schwartz (*pro hac vice* pending)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:     (702) 385-5544
Facsimile:     (702) 442-9887
Email:         saschwartz@nvfirm.com

*Proposed Counsel for the Debtors and Debtors in Possession*

### Certificate of Accuracy

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

/s/ *Gabrielle A. Hamm*
Gabrielle A. Hamm

### Certificate of Service

I certify that on July 8, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Gabrielle A. Hamm*
Gabrielle A. Hamm