## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING (A) PROCEDURES FOR THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) ENTRY INTO BROKER FEE ARRANGEMENTS IN CONNECTION WITH SUCH SALES; (II) APPROVING THE ASSUMPTION OF EXECUTORY CONTRACTS IN CONNECTION WITH THE SALE OF CERTAIN ASSETS AND RELATED FEE AGREEMENTS; AND (III) GRANTING RELATED RELIEF

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on August 5, 2025 at 1:00 pm in Courtroom 400, 4th Floor, United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Avenue, Houston, TX 77002.**

**You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "Judge Perez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

1

> **in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-debtor affiliates, "**Linqto**" or the "**Company**") state as follows in support of this motion:[2]

## RELIEF REQUESTED

1.      The Debtors seek the entry of an order, in connection with the Reserved Securities (defined herein) only, substantially in the form attached hereto (the "**Proposed Order**") as follows:

   a.    authorizing and approving expedited procedures (the "**Sale Procedures**") for the sale or transfer in any individual transaction or series of related transactions (collectively, the "**Block Trades**" and each such sale or transfer, a "**Block Trade**"), of certain investment securities in non-public companies (collectively, the "**Securities**") held by Debtor Linqto Liquidshares, LLC ("**Liquidshares**");

   b.    authorizing and approving certain procedures for scheduling a hearing (a "**Sale Hearing**") to approve one or more Block Trades if the Debtors receive objection(s) to a Block Trade from one or more Notice Parties (as defined below);

   c.    approving the Debtors' form of notice with respect to the Block Trades, substantially in the form attached to the Proposed Order as **Exhibit 1**;

   d.    approving the assumption of prepetition Transfer Agreements (defined below) pursuant to Section 365(a);

   e.    approving the assumption of fee agreements with broker-dealers ("**Broker Fee Agreements**") entered into prior to the Petition Date pursuant to Section 365(a) and authorizing the Debtors to enter into new Broker Fee Agreements pursuant to Section 363(b);

---

[2]      Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure. "**Bankruptcy Local Rule**" or "**BLR**" references are to the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas. Other capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration (as defined herein).

    f.   approving the Block Trades free and clear of liens, claims, encumbrances, and other interests (collectively, the "**Encumbrances**") other than those permitted by the applicable transfer agreement for the relevant Securities; and

    g.   granting related relief.

## JURISDICTION AND VENUE

2.     In support of the relief requested, the Debtors submit the *Declaration of Jeffrey S. Stein in Support of Debtors' Motion for Entry of an Order (I) Approving (A) Procedures for the Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Entry Into Broker Fee Arrangements In Connection With Such Sales; (II) Approving the Assumption of Executory Contracts in Connection With the Sale of Certain Assets and Related Fee Agreements; and (III) Granting Related Relief* attached hereto as **Exhibit A**.

3.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.     The Debtors confirm their consent to the entry of a final order by the Court.

5.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The bases for the relief requested herein are Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Bankruptcy Local Rules 2002-1 and 9013-1.

## BACKGROUND

### A.    The Debtors' Business.

7.     On July 7, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors continue to operate their business and manage their property as debtors and debtors in

possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and no request for the appointment of a trustee or examiner has been made.

8.      From February of 2020 until March 14, 2025, Linqto operated a platform (the "**Platform**") designed to provide customers (the "**Customers**") with indirect access to investments in the equity of private companies (the "**Issuing Companies**" and each, an "**Issuing Company**"), with a focus on the technology sector. Debtor Linqto Liquidshares LLC ("**Liquidshares**") purchased and held investment securities (the "**Securities**"), comprised of shares of Issuing Companies and membership units in entities that own shares in Issuing Companies. Liquidshares then purported to allocate economic interests in the Securities to series limited liability companies (the "**Series**") and sell units in the Series to the Customers. More than 13,000 Customers participated through the Linqto Platform. As of the Petition Date, Liquidshares holds Securities in 111 Issuing Companies with an estimated fair market value of in excess of $500 million. Of these Securities, more than $500 million correspond to Customer accounts (the "**Platform Securities**") and approximately $16 million were held in reserve by Liquidshares for its own account and subsequent sales of units to Customers (the "**Reserved Securities**") as of the Petition Date.

9.      Upon their appointment at the beginning of 2025, the Company's new management learned of pending investigations by the U.S. Securities and Exchange Commission (the "**SEC**") and Financial Industry Regulatory Authority, Inc., along with allegations of serious regulatory compliance failures. As Linqto's new leadership team gained access to company records and spoke with Linqto personnel, they quickly developed concerns regarding, among other things, the Company's historical interpretation of, and non-compliance with, applicable securities laws. In

addition, Linqto's new leadership team developed concerns regarding Linqto's organizational and governance structure. Further investigation uncovered myriad regulatory compliance violations along with a culture of systematic and pervasive non-compliance, requiring immediate and serious corrective action. Linqto's current management, together with the Debtors' professionals, are cooperating with the SEC and other regulators.

10.     As new management became aware of the depth and extent of the Company's historical non-compliance with the securities laws, the Company determined that continued operation of the Platform would be ill advised and likely exacerbate the Company's liabilities. As a result, the Company determined to indefinitely suspend operation of the Platform and, by extension, its primary revenue-generating operations, on March 13, 2025.

11.     The Debtors ultimately determined that seeking protection under Chapter 11 will afford the Company the opportunity to (a) preserve the value of its assets, (b) deliberately assess strategic alternatives to maximize the value of its business, (c) negotiate a path forward with the SEC and other regulators and explore restructuring alternatives that bring its operations and structure into compliance with applicable securities laws, (d) address the Debtors' outstanding liabilities, including the claims of Customers, the SEC, and other regulators, and (e) secure financing to achieve the foregoing objectives.

12.     Additional information regarding the Debtors, their business, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set forth in the *Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions, and Related Relief* (the "**First Day Declaration**"), filed substantially contemporaneously with the Debtors' voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

B.      **Block Trades in Secondary Market Transactions.**

13.     As set forth above, the cessation of the Platform on March 13, 2025, effectively ceased the Debtor's revenue-generating operations. Following the shutdown of the Platform, the Debtors have generated revenue through the sales of Reserved Securities to sophisticated purchasers in accordance with available exemptions from registration and qualification requirements under the Federal and state securities laws and in compliance with any contractual restrictions imposed by the applicable Issuing Company. Twelve of these Block Trades were completed between March 6, 2025, and the Petition Date, generating $10,221,158.21 in revenue.[3] These Block Trades follow one of two general models.

14.     In a direct sale transaction (a "**Direct Share Sale**"), Liquidshares agrees to sell its shares in an Issuing Company to a buyer, subject to the Issuing Company's transfer terms, typically including the Issuing Company's right of first refusal ("**ROFR**") and other applicable transfer restrictions. In a Direct Share Sale, the transferee must notify the Issuing Company of the proposed transfer, and the closing of the transaction is subject to the Issuing Company's consent or exercise of its ROFR. The closing of a Direct Share Sale typically occurs within approximately 10 to 45 days of providing notice of the transfer to the Issuing Company.

15.     Where Liquidshares does not own Securities of an Issuing Company directly but instead holds units in an investment vehicle that owns the Issuing Company's shares, Liquidshares agrees to sell a specified number of units in the collective entity, each having the rights set out in the operative documents of the collective entity, including any transfer restrictions, typically comprised of a limited liability company agreement of the collective entity and a subscription

---

[3]      Since the Petition Date, Liquidshares has received $1,163,940.00 in proceeds from a Block Trade completed prior to the Petition Date and anticipates receiving $370,539.00 in proceeds from another Block Trade completed prior to the Petition Date.

agreement (a "**Unit Transfer Transaction**"). Because Liquidshares is not transferring the Issuing Company's shares in a Unit Transfer Transaction, the transaction typically is not subject to the Issuing Company's consent or other limitations on the sale. As a result, a Unit Transfer Transaction generally closes within approximately seven days of execution of the applicable unit transfer agreement. In a Unit Transfer Transaction, the purchaser typically acknowledges and agrees that no market for the resale of the units currently exists, and no such market may ever exist, and the units are subject to any restrictions on transfer set out in the operating documents of the related entity.

16.     Both shares of the Issuing Companies and units in collective entities are generally illiquid because, absent an exemption, a purchaser must generally be an "accredited investor," as defined in Rule 501(c) of Regulation D promulgated under the Securities Act. Furthermore, the purchaser must typically represent and warrant that it is purchasing the Securities for the purchaser's own benefit and account for investment purposes only, and not with a view to, or in connection with, any public offering, resale, or distribution thereof, and that the purchaser will not sell, assign, transfer, or otherwise dispose of any of the Securities, or any interest therein, unless the Securities are registered with the SEC and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Accordingly, the secondary market for the Securities is small relative to the market for publicly traded companies.

17.     In order to obtain the highest or best price for the Block Trades, the Debtors engage registered broker-dealers (the "**Brokers**" and each, a "**Broker**") pursuant to Broker Fee Agreements in which Liquidshares agrees to pay a percentage of the gross purchase price, typically ranging from 2% to 5%, to the Broker upon the closing of the transaction. The Debtors select Brokers for particular Block Trades based on the Brokers' history of trades with the applicable

Issuing Company or their relationships with venture capital firms, industries, companies, and/or investors.

18.     While the private secondary market is more opaque and fragmented than public exchanges, the Debtors are able to determine the highest or best price for the Block Trades through evaluation of trade data reported by secondary market platforms, consultation with brokers who have compiled historical trade data regarding the relevant Issuing Company, and, where available, review of the Issuing Company's valuation or share price in its most recent fundraising round, the value assigned to the Issuing Company's shares by companies or funds with public financials, and independent appraisals of the Issuing Company's common stock required by § 409A of the Internal Revenue Code. The market price is also impacted by the size of the Block Trade, the class of the Securities, the timing of the sale, and whether the relevant Issuing Company cooperates by providing the relevant consent for the private trades of its equity.

19.     By way of this motion, the Debtors seek approval of procedures for, and authority to sell its Reserved Securities.

## **PROPOSED SALE PROCEDURES**

20.     In order to fund the administration of their Chapter 11 Cases, the Debtors seek authority to close any Block Trades pending as of the Petition Date, including by assuming existing Transfer Agreements (defined below) pursuant to Section 365(a), and execute new Block Trades during the Chapter 11 Cases. As set forth below, the Debtors submit that the Block Trades are within the ordinary course of business of the Debtors pursuant to Section 363(c)(1) but, to the extent that such sales are outside of the ordinary course of business, seek authority to consummate pending transactions and enter into new transactions under Section 363(b).

21.     The Debtors also seek approval of the Broker Fee Agreements necessary to facilitate the Block Trades, including by assumption of Broker Fee Agreements entered into prior to the Petition Date pursuant to Section 365(a) and authorization to enter into new Broker Fee Agreements pursuant to Section 363(b).

22.     Because Block Trades must be executed quickly, or risk counterparties electing not to close, the Debtors seek approval of the following Sale Procedures to facilitate an efficient and fair process for the benefit of their estates and stakeholders:

a.  **Block Trade Notice**. The Debtors shall give written notice of each Block Trade, substantially in the form attached to the Proposed Order as **Exhibit 1** (a "**Block Trade Notice**"), to the Notice Parties (defined below). Each Block Trade Notice will contain:

   i.   a description of the Securities to be sold or transferred;

   ii.  the name of the transferee (the "**Purchaser**") and the Purchaser's relationship (if any) to the Debtors;

   iii. the name of the manager of the collective entity, if any, and the collective entity's relationship (if any) to the Debtors;

   iv.  the purchase price;

   v.   the material terms of the applicable share transfer agreement or unit transfer agreement (each, a "**Transfer Agreement**" and collectively, the "**Transfer Agreements**");

   vi.  the name of the Broker, if any, engaged to facilitate the Block Trade; and

   vii. the material terms, including but not limited to the amount of the commission, of the applicable Broker Fee Agreement, if any.

b.  **Notice Parties**. The Debtors shall cause the Block Trade Notice to be served, by email, if available, or overnight delivery, to the following (collectively, the "**Notice Parties**"): (i) counsel to Sandton Capital Solutions Master Fund VI, LP (the "**DIP Lender**"); (ii) counsel to any official committee of unsecured creditors or other specialty interest holders appointed in these Chapter 11 cases (a "**Committee**"); (iii) the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"); (iv) any party known by the Debtors to have an interest in such Securities, including the Issuing Company; (v) the

9

proposed Purchaser; (vi) the proposed Broker; and (vii) those parties requesting notice pursuant to Bankruptcy Rule 2002.

c. **Objections**. Notice Parties shall have three (3) business days to notify Debtors' counsel, by email, of any objection to the Block Trade identified in the Block Trade Notice. If no timely objection is made, the Debtors are authorized to consummate the Block Trade; provided that if a Purchaser requests an order of the Court approving the Block Trade, the Debtors shall file a certification of no objection seeking entry of such proposed order. Upon notice of an objection to a Block Trade, the Debtors have shall three (3) business days to resolve (the "**Resolution Period**") the objecting Notice Parties' objection. Upon expiration of the Resolution Period, if a resolution is not reached, the objecting Notice Parties shall have two (2) business days to file a formal objection (a "**Block Trade Objection**"). The Debtors shall have two (2) business days to file a reply to any Block Trade Objection.

d. **Resolved Objection**. If any Notice Party timely files a Block Trade Objection, then the Block Trade shall only be consummated upon either (i) submission of a consensual form of stipulation and order resolving the objection as between the Debtors and the objecting Notice Party, or (ii) upon a further order of the Court following a hearing (a "**Sale Hearing**").

e. **Unresolved Objection**. In the event a Notice Party's Block Trade Objection cannot be resolved, the Debtors may file a copy of the Block Trade Notice with the Court and notice a Sale Hearing as soon as reasonably practicable and in accordance with the Court's calendar. The name of the Purchaser, the name of the collective entity, if any, and any other details the Debtors determine confidential shall be redacted in any Block Trade Notice filed on the Court's docket and an unredacted copy shall be filed as a Sealed Motion. Notice of the Sale Hearing shall be served on the Notice Parties.

f. **Free and Clear Sale**. Any Block Trade, where no Block Trade Objection has been filed or where a Block Trade Objection has been resolved or overruled, shall be, without need for any action by any party, final, fully authorized by the Court, and free and clear of all Encumbrances, with such Encumbrances, if any, attaching only to the proceeds of such Block Trade with the same validity, extent, and priority as had attached to the applicable assets immediately prior to such Block Trade.

g. **Good Faith Purchaser**. Good faith purchasers of any Block Trade pursuant to these Sale Procedures shall be entitled to the protections of Section 363(m) of the Bankruptcy Code.

h. **Modifications to or Recission of a Block Trade Notice**. The Debtors reserve the right (exercisable in their sole discretion) to remove any Securities from a

Block Trade Notice or rescind any Block Trade at any time prior to the consummation thereof without further relief from this Court.

i. **Itemized Statement**. When a Block Trade is completed, the Debtors shall file an itemized statement of the Securities sold, the name of the Purchaser(s), and the consideration received, in accordance with Bankruptcy Rule 6004(f)(1)(A).

## BASIS FOR RELIEF

**A.**   **The Proposed Transactions Are Within the Ordinary Course of the Debtors' Business.**

23.     Courts in the Fifth Circuit "use a two-part test to determine whether a transaction was within the ordinary course of business: (i) the 'vertical' test, which asks whether the transaction falls within the scope of a debtor's pre-petition business practices (considering whether the transaction would fall within a hypothetical creditor's expectations), and (ii) the 'horizontal' test, which asks whether the transaction was of the sort commonly undertaken by other companies in a debtor's industry." *Mr. W Fireworks, Inc. v. 2317 Pinn Rd. Inv. Inc. (In re Electro Sales & Serv.)*, Nos. 21-50546-MMP, 22-05045-MMP, 2024 Bankr. LEXIS 1806, at *9 (Bankr. W.D. Tex. Aug. 2, 2024); *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) ("to determine whether a transaction was inside or outside a debtor's ordinary course of business, courts have sometimes utilized a 'vertical' test and a 'horizontal' test").

24.     "In general, under the vertical test, courts look at whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit," while under "the horizontal test . . . courts look at whether the transaction was of the sort commonly undertaken by companies in the industry." *Patriot Place, Ltd.*, 486 B.R. at 793. "The primary focus is on the debtor's pre-petition business practices and conduct." *Id*. (citing *In re Sportsman's Warehouse, Inc*., 457 B.R. 372, 399-400 (Bankr. D. Del. 2011); *In re Media Cent., Inc*., 115 B.R. 119, 125 (Bankr. E.D. Tenn. 1990)); *see also Aalfs v. Wirum (In re Straightline*

*Invs.)*, 525 F.3d 870, 879 (9th Cir. 2008) (*citing Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir. 1988)).

25.    The Block Trades satisfy both the vertical and horizontal dimension tests. Investment in the Securities of private companies is at the core of the Debtors' prepetition business model. While the Debtors did not routinely engage in Block Trades of the Reserved Securities prior to suspending the Platform, twelve Block Trades were closed prior to the Petition Date. Further, selling securities, including through Brokers, is the sort of transaction commonly undertaken by companies in the industry of investing in private companies' securities sold on the secondary market.

**B.    The Proposed Transactions Are Sound Exercises of the Debtors' Business Judgment.**

26.    Courts in the Fifth Circuit have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in disposing of an estate asset. *See, e.g., In re Continental Air Lines, Inc*., 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp*., 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").

27.    Courts generally show great deference to a debtor's decisions when applying the business judgment standard. *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1)."). Deference to a debtor's business judgment is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment,

but only on bad faith, or whim or caprice." *Lubrizol Enters., Inc.* v. *Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985). Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

28.     The Block Trades allow the Debtors to convert restricted, illiquid Securities into cash they can utilize to fund the administration of their Chapter 11 Cases and reduce their financing costs. Accordingly, the Debtors have offered a sound business justification for the Block Trades.

**C.     The Block Trades Are Proposed in Good Faith and Without Collusion, and Any Purchaser Will Be a Good-Faith Purchaser.**

29.     The Debtors request that the Court find that the any Purchaser will be entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the sale(s). Section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

13

30.     Section 363(m) thus protects the purchaser of assets sold pursuant to Section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Paulson*, 276 F.3d 389, 392 (8th Cir. 2002).

31.     The Debtors submit that each Purchaser will be a "good faith purchaser" within the meaning of Section 363(m) as the Purchasers are unrelated third parties, their offers are solicited by Brokers, and the Transfer Agreements are negotiated at arm's-length.

**D.     The Debtors' Assumption of Existing Transfer Agreements and Broker Fee Agreements Is Supported by a Valid Business Justification.**

32.     Sections 365(a) and 1107(a) of the Bankruptcy Code permit a debtor in possession to assume or reject executory contracts or expired leases with the Court's approval, subject to exceptions in subsections (b), (c), and (d) of Section 365 that are not applicable here. 11 U.S.C. § 365(a) and 1107(a).

33.     Unlike many other sections of the Bankruptcy Code, Section 365(a) does not require a showing of "cause" to support a debtor's decision to assume an executory contract. Rather, the debtor's determination to assume an executory contract is governed by the "business judgment" standard. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that "the question whether a lease should be rejected . . . is one of

business judgment.") (*quoting Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550, 63 S. Ct. 727, 742, 87 L. Ed. 959 (1943)); *see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985). "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. . . ." *Id.* (*quoting Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 Bankr. 484, 495 (Bankr. S.D. Ohio 1982)).

34.     Once a debtor articulates a valid business justification, "[t]he business judgment rule becomes 'a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)). The Court should defer to the business judgment of the Debtors, unless "the decision of the [Debtors] that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol,* 756 F.2d at 1047.[4]

35.     Assumption of existing Transfer Agreements and Broker Fee Agreements will help facilitate, and are necessary for, the proposed Block Trades. Accordingly, the Debtors submit that a sound business justification exists for the assumption of the Transfer Agreements and Broker Fee Agreements under Section 365(a).

---

[4]     The requirement that defaults are cured and compensation is given for any loss associated with the default is not applicable here, as the Debtors are not in default of any of the applicable agreements. Further, Section 365(b)(3), which requires that the debtor provide adequate assurance of future performance, is satisfied because the Debtors are only required to tender the relevant Securities to the Purchaser.

E.     **The Sale Procedures Should be Approved.**

36.     In lieu of seeking approval of bidding procedures and an auction process that would likely take 60-90 days, the Debtors are proposing to sell the Reserved Securities through a series of private sales to unrelated third parties at fair market value, determined by a thorough the evaluation of available trade data, Issuing Company valuations, independent appraisals of the Issuing Company's common stock required by § 409A of the Internal Revenue Code, and other publicly-available information. By retaining Brokers with histories of trades with the applicable Issuing Companies or relationships with venture capital firms, industries, companies, and/or investors, the Debtors are ensuring that the Securities are thoroughly exposed to eligible buyers in the target market before selecting a Purchaser.

37.     "Rule 6004(f)(1) expressly allows sales outside the ordinary course of business to be done through either a public auction or a private sale." *In re 9 Hous. LLC*, 578 B.R. 600, 618 (Bankr. S.D. Tex. 2017) (citing Fed. R. Bankr. P. 6004(f)(1)) ("All sales not in the ordinary course of business may be by private sale or by public auction."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D. N.Y. 1998) ("Unlike judicial sales under the former Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to administer the estate, including authority to conduct public or private sales of estate property."); *Penn Mut. Life Ins. Co. v. Woodscape Ltd., P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale . . . and this is no requirement that the sale be by public auction."). Such private sales are appropriate under the circumstances of these Chapter 11 Cases because the Securities are not freely transferable, the market for the Securities is opaque and fragmented, and prospective purchasers are unlikely to consummate the Block Trades if transactions that typically take between 7 and 30 days are delayed by Court approval of bidding procedures and an auction process.

38.     The sales will be subject to a transparent process that allows key parties in interest to object to any Block Trade and require the Court's review before the Block Trade can be consummated if an objection cannot be resolved. Further, the Debtors are reserving their rights to rescind a Block Trade if the Debtors believe in their reasonable business judgment that entry into any such sale will not maximize the value of the applicable Securities. These Sale Procedures will provide key parties in interest with appropriate notice without unnecessarily burdening the Debtors' estates with costs that undermine the Debtors' efforts to maximize value for the benefit of all stakeholders.

**F.      The Debtors Will Provide Adequate and Reasonable Notice of the Block Trades.**

39.     The Debtors propose to provide a Block Trade Notice containing: (i) a description of the Securities to be sold or transferred; (ii) the name of the Purchaser and the Purchaser's relationship (if any) to the Debtors; (iii) in the case of a Unit Transfer Transaction, the name of the manager of the collective entity, if any, and the collective entity's relationship (if any) to the Debtors; (iii) the purchase price; (iv) the material terms of the applicable share Transfer Agreement; (v) the name of the Broker (if any) engaged to facilitate the Block Trade; and (vi) the material terms, including but not limited to the amount of the commission, of the applicable Broker Fee Agreement (if any) to the following Notice Parties:  (i) counsel to the DIP Lender; (ii) counsel to any Committee; (iii) the U.S. Trustee; (iv) any party known by the Debtors to have an interest in such Securities, including the Issuing Company; (v) the proposed Purchaser; (vi) the proposed Broker; and (vii) those parties requesting notice pursuant to Bankruptcy Rule 2002. As provided in the Sale Procedures, should any Notice Party oppose any Block Trade, their unresolved opposition will heard by the Court before the closing of the contested Block Trade.

40. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a sale hearing. Bankruptcy Rule 2002(a) and (i), however, permit the Court to limit notice. Bankruptcy Rule 2002(i)(2) provides:

> *Limiting Notices*. The court may order that a notice required by (a)(2), (3), or (6) be:
>
> (A) sent to the United States trustee; and
>
> (B) mailed only to:
>
>> (i) the committees elected under §705 or appointed under §1102, or to their authorized agents; and
>>
>> (ii) those creditors and equity security holders who file—and serve on the trustee or debtor in possession—a request that all notices be mailed to them.

41. As noted in the Sale Procedures, the Debtors propose to provide Notice Parties with three (3) business days to notify Debtors' counsel, by email, of any objection to the Block Trade identified in a Block Trade Notice. The Debtors will be authorized to consummate the Block Trade without further notice or a hearing if no timely objection is made, but if a Notice Party timely objects, then the Block Trade will only be consummated upon either resolution of the objection or upon further order of the Court following a Sale Hearing.

42. The Debtors submit that notice of this motion and the related hearing to consider entry of the Proposed Order, coupled with service of the Block Trade Notice upon the Notice Parties, constitute good and adequate notice of the sales and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that the Court approve the form and manner of the Block Trade Notice.

### G.       The Sales Should Be Approved "Free and Clear" Under Section 363(f).

43.       Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

44.       Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Reserved Securities free and clear of encumbrances. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

45.       While the Debtors do not believe that the Reserved Securities are subject to any Encumbrances other than the security interests of the DIP Lender,[5] the Debtors submit that any interest which may exist will satisfy at least one of the five conditions of Section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by having any such interest attach to the net proceeds of the Block Trades, subject to any of the Debtors' claims and defenses. The Debtors accordingly request authority to consummate the Block Trades free and clear of all Encumbrances to the fullest extent permitted by the Bankruptcy Code and applicable nonbankruptcy law, with any such interests to attach to the proceeds of the Block Trades; *provided*

---

[5]         *See Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (Docket No. 40).

that any payment on account of such interests, other than those of the DIP Lender, are subject to further order of this Court.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

46.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies the requirements of Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h). The Debtors' ability to close the Block Trades on the terms set forth in the Transfer Agreements—including timely closing—will be critical to their ability to monetize the value of such assets for the benefit of their estates and stakeholders.

## RESERVATION OF RIGHTS

47.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) except as set forth herein or any Block Trade Notice, a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of

any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## NOTICE

48.      The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the holders of the 100 largest customer claims against the Debtors; (d) the DIP Lender; (e) the office of the attorneys general for the states in which the Debtors operate; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) other regulatory agencies having a regulatory or statutory interest in these Chapter 11 Cases; (j) any official or statutory committee appointed in these Chapter 11 Cases; (k) Customers; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice is necessary.

WHEREFORE, the Debtors request that the Court enter the Proposed Order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: July 14, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

_/s/ Gabrielle A. Hamm_
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted _pro hac vice_)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:    (713) 900-3737
Facsimile:    (702) 442-9887
Email:        ghamm@nvfirm.com
              vpolnick@nvfirm.com
              aagelakopoulos@nvfirm.com

Samuel A. Schwartz (admitted _pro hac vice_)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:    (702) 385-5544
Facsimile:    (702) 442-9887
Email:        saschwartz@nvfirm.com

_Proposed Counsel for the Debtors and Debtors in Possession_

22

## **Certificate of Service**

I certify that on July 14, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Gabrielle A. Hamm
Gabrielle A. Hamm