Case 25-90186   Document 80-1   Filed in TXSB on 07/14/25   Page 1 of 8

**Exhibit A**

**Stein Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: <br><br> LINQTO TEXAS, LLC, *et al.*,[1] <br><br> Debtors. | ) <br> ) Chapter 11 <br> ) <br> ) Case No. 25-90186 <br> ) <br> ) (Jointly Administered) <br> ) |

**DECLARATION OF JEFFREY S. STEIN IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
(A) PROCEDURES FOR THE SALE OF CERTAIN ASSETS FREE AND CLEAR
OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) ENTRY
INTO BROKER FEE ARRANGEMENTS IN CONNECTION WITH SUCH SALES;
(II) APPROVING THE ASSUMPTION OF EXECUTORY CONTRACTS IN
CONNECTION WITH THE SALE OF CERTAIN ASSETS AND RELATED FEE
AGREEMENTS; AND (III) GRANTING RELATED RELIEF**

I, Jeffrey S. Stein, declare as follows under penalty of perjury.

1. I am the Chief Restructuring Officer of Linqto, Inc. ("**Linqto Parent**"), Linqto Texas, LLC ("**Linqto Texas**"), Linqto Liquidshares, LLC ("**Liquidshares**"), and Linqto Liquidshares Manager, LLC ("**Liquidshares Manager**" or, collectively with Linqto Parent, Linqto Texas, Liquidshares, and Liquidshares Manager the "**Debtors**" and, collectively with their non-debtor affiliates, "**Linqto**" or the "**Company**").

2. Additional information regarding my background, the Debtors, their business, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set forth in the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

1

*Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions, and Related Relief* (the "**First Day Declaration**"), which is incorporated herein by this reference.[2]

3. I submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for Entry of an Order (I) Approving (A) Procedures for the Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Entry Into Broker Fee Arrangements In Connection With Such Sales; (II) Approving the Assumption of Executory Contracts in Connection With the Sale of Certain Assets and Related Fee Agreements; and (III) Granting Related Relief* (the "**Motion**").

4. I am familiar with the contents of the Motion and believe the relief sought therein is necessary to fund the administration of these cases (the "**Chapter 11 Cases**") and will help minimize the costs incurred by the Debtors' estates during the prosecution of these Chapter 11 Cases.

**A.    Block Trades in Secondary Market Transactions.**

5. As set forth in the Motion and the First Day Declaration, the cessation of the Platform on March 13, 2025, effectively ceased the Debtors' primary revenue-generating operations.

6. Following the shutdown of the Platform, the Company has generated revenue through the sales of Reserved Securities to sophisticated purchasers in accordance with available exemptions from registration and qualification requirements under the Federal and state securities laws and in compliance with any contractual restrictions imposed by the applicable Issuing Company. Twelve of these Block Trades were completed between March 6, 2025, and the Petition

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion or the First Day Declaration, as applicable.

2

Date, generating $10,221,158.21 in revenue. Since the Petition Date, Liquidshares has received $1,163,940.00 in proceeds from a Block Trade completed prior to the Petition Date and anticipates receiving an additional $370,539.00 in proceeds from another Block Trade prior to the Petition Date.

7. These Block Trades follow one of two general models:

(a) In a Direct Share Sale, Liquidshares agrees to sell its shares in an Issuing Company to a buyer, subject to the Issuing Company's transfer terms, typically including the Issuing Company's ROFR right and other applicable transfer restrictions. In a Direct Share Sale, the transferee must notify the Issuing Company of the proposed transfer, and the closing of the transaction is subject to the Issuing Company's consent or exercise of its ROFR. The closing of a Direct Share Sale typically occurs within approximately 10 to 45 days of providing notice of the transfer to the Issuing Company.

(b) Where Liquidshares does not own Securities of an Issuing Company directly but instead holds units in a third-party investment vehicle that owns the Issuing Company's shares, Liquidshares enters into a Unit Transfer Transaction whereby it agrees to sell a specified number of units in the collective entity, each having the rights set out in the operative documents of the collective entity, including any transfer restrictions, typically comprised of a limited liability company agreement of the collective entity and a subscription agreement. Because Liquidshares is not transferring the Issuing Company's shares in a Unit Transfer Transaction, the transaction typically is not subject to the Issuing Company's consent or other limitations on the sale. As a result, a Unit Transfer Transaction generally closes within approximately seven days of execution of the applicable unit transfer agreement. In a Unit Transfer Transaction, the purchaser typically acknowledges

and agrees that no market for the resale of the units currently exists, and no such market may ever exist, and the units are subject to any restrictions on transfer set out in the operating documents of the related entity.

8.  Both shares of the Issuing Companies and units in collective entities are generally illiquid because, absent an exemption, a purchaser must generally be an "accredited investor," as defined in Rule 501(c) of Regulation D promulgated under the Securities Act. Furthermore, the purchaser must typically represent and warrant that it is purchasing the Securities for the purchaser's own benefit and account for investment purposes only, and not with a view to, or in connection with, any public offering, resale, or distribution thereof, and that the purchaser will not sell, assign, transfer, or otherwise dispose of any of the Securities, or any interest therein, unless they are registered with the SEC and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Accordingly, the secondary market for the Securities is small relative to the market for publicly traded companies.

9.  In order to obtain the highest or best price for the Block Trades, the Debtors engage Brokers pursuant to Broker Fee Agreements in which Liquidshares agrees to pay a percentage of the gross purchase price, typically ranging from 2% to 5%, to the Broker upon the closing of the transaction. The Debtors select Brokers for particular Block Trades based on the Brokers' history of trades with the applicable Issuing Company or their relationships with venture capital firms, industries, companies, and/or investors.

10.  Investment in the Securities of private companies is at the core of the Debtors' prepetition business model. Though the Debtors did not routinely engage in Block Trades of the Reserved Securities prior to suspending the Platform, twelve Block Trades were closed prior to the Petition Date. Further, selling securities, including through Brokers, is the sort of transaction

commonly undertaken by companies in the industry of investing in private companies' securities sold on the secondary market.

11. While the private secondary market is more opaque and fragmented than public exchanges, the Debtors are able to determine the highest or best price for the Block Trades through evaluation of trade data reported by secondary market platforms, consultation with brokers who have compiled historical trade data regarding the relevant Issuing Company, and, where available, review of the Issuing Company's valuation or share price in its most recent fundraising round, the value assigned to the Issuing Company's shares by companies or funds with public financials, and independent appraisals of the Issuing Company's common stock required by § 409A of the Internal Revenue Code. The market price is also impacted by the size of the Block Trade, the class of the Securities, the timing of the sale, and whether the relevant Issuing Company cooperates by providing the relevant consent for the private trades of its equity.

12. Because Block Trades must be executed quickly, or risk counterparties electing not to close, the Debtors seek approval of the Sales Procedures set forth in the Motion to facilitate an efficient and fair process for the benefit of their estates and stakeholders.

13. I believe that private sales are appropriate under the circumstances of these Chapter 11 Cases because the Securities are not freely transferable, the market for the Securities is opaque and fragmented, and prospective purchasers are unlikely to consummate the Block Trades if transactions that typically take between 7 and 30 days are delayed by Court approval of bidding procedures and an auction process.

14. I believe that each Purchaser will be a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code because the Purchasers are unrelated third parties, their offers are solicited by Brokers, and the Transfer Agreements are negotiated at arm's-length.

15. To the best of my knowledge, formed after a reasonable inquiry, the Reserved Securities are not subject to any Encumbrances other than the security interests granted to the DIP Lender by the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (Docket No. 40).

16. As set forth in that certain *Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 16], the Debtors are seeking to borrow up to $60,000,000 to fund this reorganization. The cost of the postpetition financing the Debtors seek to borrow may be as high as 20%. The Debtors anticipate that proceeds raised through the sale of Reserved Securities could create significant savings to the estates through reduced borrowing costs under the postpetition financing.

17. I believe that participation in the Block Trades is a sound exercise of the Debtors' business judgment because such transactions will limit the need for costly financing. Without the use of the proceeds raised through Block Trades, the Debtors will have to borrow more extensively to execute a plan of reorganization that returns value to the Customers and other creditors.

18. Accordingly, authorizing the Debtors to sell the Reserved Securities through Block Trades is in the best interests of the Debtors, their estates, and their creditors, including the Customers.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 14, 2025

/s/ *Jeffrey S. Stein*
Jeffrey S. Stein
Chief Restructuring Officer