IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al*.,[1] | ) ) ) | Case No. 25-90186 |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF VICTOR JIANG
IN SUPPORT OF SAPIEN GROUP USA LLC'S EMERGENCY
MOTION TO TRANSFER VENUE OF THE DEBTORS' CASES
TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1412**

I, Victor Jiang, declare as follows under penalty of perjury.

1. I am the Founder and Managing Partner of Sapien Group USA LLC and its group affiliates (together "**Sapien**"), a major shareholder of the Debtor Linqto, Inc. ("**Parent Debtor**" or "**Corporation**"). I submit this declaration in support of *Sapien Group USA LLC's Emergency Motion to Transfer Venue of the Debtors' Cases to the District of Delaware Pursuant to 28 U.S.C. § 1412* ("**Motion**")[2] filed by Sapien in the jointly-administered Chapter 11 cases ("**Cases**") of the Parent Debtor, Linqto Liquidshares, LLC ("**Liquidshares**"), Linqto Liquidshares Manager, LLC ("**Liquidshares Manager**," and together with Liquidshares, "**Related Debtors**"), and Linqto Texas, LLC ("**Texas Debtor**, and together with Parent Debtor and Related Debtor, "**Debtors**").

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

1

2. Sapien was the lead investor in the Corporation's Series AA preferred stock financing in 2020 and continues to hold a significant position in the Corporation's preferred stock, as well as SPV units in Linqto Liquidshares LLC with interests in underlying common shares of the Corporation. In addition, prior to the Petition Date, Sapien purchased common stock and also received written consents and proxies for additional shares that together represent a majority of the common shares. These consents and proxies can be used to replace a majority of the Corporation's board of directors ("**Board**"). The remainder of the Board may be elected by Sapien and other preferred shareholders.

3. I am a former Director of the Corporation. I served on the Board from October, 2022 to May 30, 2025, when I submitted my written resignation along with another director, Karim Nurani ("**Joint Resignation Letter**"). A true and correct copy of the Joint Resignation Letter is attached hereto as **Exhibit A**. Both I and Mr. Nurani were elected to the Board by preferred shareholders, who remain entitled to elect three directors.

4. Both I and Mr. Nurani resigned from the Board because we believe that the Board has engaged in very serious breaches of fiduciary duties to the shareholders of the Corporation, violated securities laws, and failed to adhere to corporate governance requirements under Delaware law and the Corporation's Certificate of Incorporation and Bylaws. Mr. Nurani and I were non-executive directors, not involved in the day-to-day management of the Corporation.

5. At the time of our resignations, Mr. Nurani and I demanded that the Corporation schedule a shareholder meeting for the purpose of holding a valid election of directors to determine the rightful directors of the Corporation.

6. A detailed recitation of the numerous breaches of fiduciary duties, breaches of the duty of loyalty, and securities law violations that Mr. Nurani and I believe the current sitting

Board has consistently engaged in are set forth in the Joint Resignation Letter. In this Declaration, I want to focus on the corporate governance laws which I believe the Board violated, which ultimately must be decided under Delaware law and impacts the legitimacy of the pending bankruptcy petitions and their transfer to the District of Delaware.

7. A crucial issue in this case is whether the necessary and appropriate corporate approvals were obtained to seek bankruptcy relief. The real company here is Linqto, Inc., the Parent Debtor. It is a Delaware corporation. Whether it properly entered bankruptcy depends on whether necessary actions by its directors and shareholders were properly taken. That is a question of Delaware corporate law, including Delaware's corporate statute, the Delaware General Corporation Law ("**DGCL**"), and Delaware's extensive case law.

8. The Corporation has consistently failed to hold annual shareholder meetings for the purpose of electing directors, despite its obligation to do so under Delaware law and the Corporation's Bylaws. Specifically, it is my understanding that DGCL Sections 211 and 222 require that directors be elected for one-year terms at an annual meeting of shareholders preceded by notice to all shareholders, which is consistent with the Corporation's Bylaws.

9. Section 2.2 of the Corporations amended Bylaws provide: "The annual meeting of stockholders shall be held on such date, time and place, either within or without the State of Delaware, as may be designated by resolution of the Board of Directors each year." Section 3.3 of the Corporation's Bylaws provides: "Except as provided in Section 3.4 of these Bylaws, and unless otherwise provided in the certificate of incorporation, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting."

10. Despite the unanimous agreement to schedule a shareholder meeting by the members of the Board, once the current Chief Executive Officer, Dan Siciliano, was hired in

December 2024, the promise of an annual shareholder meeting was not kept and to date the Corporation has not held an annual shareholder meeting since November of 2023. An annual shareholder meeting was initially scheduled to be held in November 2024. Thereafter, after numerous additional promises to hold an annual shareholder meeting, a "Formal Demand To Hold Annual Meeting of Shareholders Pursuant to DGCL § 211" was made on May 21, 2025 by Herbert Gavin Solomon, a shareholder of the Corporation ("**Shareholder Demand**"). A true and correct copy of the Shareholder Demand is attached hereto as **Exhibit B**. The Shareholder Demand outlines in detail the many broken promises to hold an annual shareholder meeting and even states Mr. Solomon's belief that, in his view, "no annual meeting of Linqto shareholders in compliance with the provisions of DGCL § 211 has been convened/held since at least 31st January 2020."

11.     Mr. Siciliano is a Stanford Law School fellow and former professor specializing in corporate governance. I firmly believe that the failure to schedule an annual shareholder meeting was for nefarious reasons, namely to prevent shareholders from exercising their fundamental right to vote for the election of directors and prevent the removal of any sitting director.

12.     Once Mr. Siciliano was hired by the Corporation as its CEO, he thereafter purported to act as a Director. As set forth above, I understand that Delaware law requires that directors be elected for one-year terms at an annual meeting of shareholders preceded by notice to all shareholders. Mr. Siciliano, I believe, was never elected to the Board by shareholders, either at a meeting of shareholders or by written consent. Nor do I believe he was ever appointed by the Board to fill a vacancy on the Board. Therefore, I do not believe that any actions he has taken as a Director, or any actions taken by the Board that needed his vote to pass, are valid. This

is an issue that will require additional factual investigation and the application of Delaware law to determine the legitimacy of Mr. Siciliano's appointment as a Director and the validity of his and the Board's subsequent actions, including actions with respect to the bankruptcy.

13. In addition, another Director, Alison Kutler, was initially elected as a Director to represent preferred shareholders of the Corporation. I understand that her directorship was subsequently "switched" to represent common shareholders of the Corporation after Mr. Siciliano began purporting to act as a Director.

14. With the switch of Ms. Kutler to a common director and Mr. Siciliano purporting to be a common director, they were able to achieve a majority voting block and control of the Corporation.

15. The "switch" was not authorized by either the common shareholders or the preferred shareholders of the Corporation. I also do not believe it was validly approved by the Board, if permissible under Delaware law in the first place. The Corporation's governing documents permit the common shareholders to elect six directors and the preferred shareholder to elect three directors. My understanding is that directors are meant to be elected by shareholders, not "switched around" by purported board action. I also understand that any board action requires that all directors be permitted to participate; this was not permitted with respect to the "switch" because the Board (that is, the persons claiming to be the Board) did not permit a new preferred director to join their meeting. All of these matters raise significant issues of legality and corporate governance under Delaware law that will require additional factual investigation and the application of Delaware law to determine the legitimacy of Ms. Kutler's switch to a common director and all of the Board's subsequent actions since her and Mr. Siciliano's appointment, including the decision to file for bankruptcy relief.

16. Further, once Mr. Siciliano gained control of the Corporation, he caused the Board to amend the Corporation's Bylaws to make it more difficult for shareholders to exercise their voting rights to remove directors of the Corporation by written consent of a majority of shareholders, which they were entitled to do under Delaware law and the Corporation's existing Bylaws before they were amended.

17. In the Spring of 2025, the Board became aware that certain shareholders were asserting their rights to an election and could be contemplating attempting to take action without an election. In response, the Board adopted Bylaws severely restricting shareholder voting rights by adding additional notice requirements which I am told are usually found only in the bylaws of public corporations and rarely in the bylaws of private companies.

18. This amendment and the manner in which it came about raise significant corporate governance issues and is subject to additional factual investigation. I am told that they may be subject to attack on numerous grounds under Delaware law, including that the board vote adopting them may have been unauthorized (for the reasons concerning director status noted above), and that they are inequitable and unreasonable both in general and in the particular context here, when they were adopted after knowledge that shareholders were attempting to exercise their voting rights. It is my view that such Bylaws are inequitable and should not be permitted to impede shareholder voting rights, including pursuant to the consents and proxies noted in Paragraph 2 of this Declaration.

19. The validity of this amendment to the Corporation's Bylaws will likely have to be determined under Delaware law since a majority of the common stockholders desire the immediate removal of the common directors of the Corporation.

20. The majority of shareholders desire to remove the current directors of the Corporation because they believe that the current bankruptcy filings are part of a well-orchestrated scheme designed to steal their equity in the Corporation.

21. Once Mr. Siciliano gained control of the Corporation, the Board, through his majority control, shut down the Corporation's investor platform, depriving it of all of its sources of income. At the time, the Corporation had cash reserves of approximately $16.4 million.

22. Although the Corporation had regulatory issues that were required to be resolved, there was no order from any governmental body requiring it to shut down its investing platform.

23. In the ensuing months, the cash reserves of the Corporation were completely depleted by paying exorbitant professional fees to attorneys and others who were steering the Corporation to seek bankruptcy relief.

24. The filing of bankruptcy relief made utterly no sense because the Corporation had virtually no creditors and a large cash reserve until its investor platform was shut down and its cash reserves were spent paying attorneys and others since February 2025. In only a few short months, the Corporation's cash reserves of approximately $16.4 million at the end of 2024 were almost entirely depleted, coincidentally providing the justification for the current bankruptcy filings in Texas, where the Corporation never operated and never had any connections.

25. As I understand, the filing for bankruptcy relief in the State of Texas is predicated on the formation of a Texas company, Linqto Texas LLC, in April 2025 that did no business in Texas or anywhere, employed no employees in Texas and holds no assets in Texas. Indeed, the formation of the Texas company was kept secret from me and I believe other directors, and there is no justifiable reason for these cases to go forward in Texas given the numerous issues of Delaware Law that will impact the course of these bankruptcy proceedings.

26.     Accordingly, the Court should grant Sapien's Motion and transfer venue of the Debtors' Cases to the District of Delaware.

Pursuant to 28 U.S.C. § 1746, I declare under t penalty of perjury that the foregoing is true and correct.

Dated: July 16, 2025.

*/s/Victor Jiang*
Victor Jiang

# Exhibit A

# Resignations from the Linqto, Inc. Board of Directors

**Effective as of May 30th, 2025**

We, the undersigned directors, hereby tender our collective resignation from the Board of Directors of Linqto, Inc., effective immediately. We further call for an immediate shareholder election to replace all sitting directors due to material breaches of fiduciary duties and violations of applicable securities laws and Delaware corporate governance requirements.

## Statement of Fiduciary Duty Violations

Our resignations stem from the Board's systematic failure to fulfill its fundamental fiduciary duties of care and loyalty to shareholders, constituting material violations of Delaware General Corporation Law (DGCL) and applicable securities regulations. These failures have been compounded by multiple formal shareholder demands for transparency and accountability that the Board has refused to address, including concerns raised by coalitions representing over 80 shareholders. The Board's refusal to discuss legitimate shareholder concerns demonstrates a pattern of governance breakdown and contempt for fiduciary obligations. The Board has abdicated its core responsibilities in the following critical areas:

### I. Violations of SEC Securities Laws and Regulations

**A. Securities Law Violations and Customer Protection Failures**

- **Customer Asset Protection**: The Board has failed to address management's indefinite freeze of customer assets and deposited funds since February 27, 2025, potentially violating state securities laws and creating liability under common law principles of bailment and fiduciary duty to customers.

- **Securities Fraud Exposure**: Management has published materially negative announcements without Board oversight or remedial solutions, potentially exposing the company to securities fraud liability under state and federal anti-fraud provisions, particularly given the company's investment advisory activities.

- **Platform Decommissioning Without Disclosure**: The Board has permitted management to decommission the trading platform for months without adequate shareholder disclosure or timeline for restoration, while company valuation has declined dramatically, representing potential securities fraud through material omissions.

**B. Financial Oversight and Governance Failures**

- The Board has permitted management to operate without presenting regular financial statements from January to May 2025, violating fundamental corporate governance principles and the Board's duty of care.

- Failed to ensure proper oversight of the company's financial condition despite managing approximately $800-900 million in customer assets, creating potential liability for gross negligence in corporate oversight.
- **Selective Information Disclosure**: The Board has allowed management to provide selective updates to certain shareholders while withholding material information from the broader shareholder base, violating principles of equal treatment and transparency.
- **Failure to Address Liquidity Crisis**: Despite shareholder demands for transparency regarding the company's liquidity, liabilities, and remaining assets, the Board has failed to provide adequate financial disclosure or strategic direction.

## II. Delaware General Corporation Law Violations

### A. Breach of Duty of Care (8 Del. C. § 141)

- **Business Judgment Failures**: The Board failed to make informed decisions regarding the suspension of trading activities, accepting management's "legal speculations" without independent analysis or regulatory confirmation.
- **Inadequate Oversight**: Systematic failure to monitor management performance, financial condition, and regulatory compliance as required under *In re Caremark International Inc. Derivative Litigation*.
- **Failure to Act on Red Flags**: Despite clear warning signs of management incompetence and potential conflicts of interest, the Board failed to exercise proper oversight or take corrective action.

### B. Breach of Duty of Loyalty

- **Material Conflicts of Interest**: The Board has failed to address CEO Daniel Siciliano's ongoing ownership stake in Nikkl – a direct competitor of Linqto – despite his appointment being contingent upon completing the Linqto-Nikkl acquisition that never occurred. This creates an inherent conflict where management decisions may benefit Nikkl at Linqto's expense.
- **Entrenchment and Self-Dealing**: The Board permitted wholesale replacement of Linqto's heritage management team with former Nikkl employees (including CEO Dan Siciliano, GC Mike Huskins, COO Cathy Siciliano, and CAO Jesus Ancheta) who retain significant ownership in a competing entity, while simultaneously removing or sidelining existing Linqto executives and directors.
- **Resource Misallocation**: Permitted management to engage multiple law firms for overlapping services while justifying workforce reductions of 75%, suggesting prioritization of management protection over operational necessities.

### C. Breach of Fiduciary Process Requirements

- **Denial of Information Rights**: Violated DGCL Section 220 by restricting certain directors' access to corporate information and legal representation.
- **Procedural Violations**: Manipulated board processes through exclusionary sub-committees, last-minute meeting calls, and forced voting procedures designed to silence dissenting voices.
- **Shareholder Disenfranchisement**: Added new board members without shareholder approval and modified corporate bylaws without proper shareholder notification, violating fundamental corporate democracy principles.

## III. Corporate Governance Failures

### A. Shareholder Rights Violations

- **Annual Meeting Obligations**: Failed to conduct the Annual Shareholders Meeting despite unanimous prior agreement, with delays spanning from November 2024 through May 2025 without proper notice or justification.
- **Information Rights**: Modified company bylaws to limit shareholder informational rights without proper shareholder disclosure or approval procedures.
- **Merger Obligations**: Failed to ensure completion of the Nikkl-Linqto merger despite it being a contractual condition of CEO Dan Siciliano's employment and material to shareholder interests.
- **Shareholder Communication Failures**: The Board has allowed management to publish inflammatory and unprofessional shareholder updates and press releases that dismiss dissenting board members and provide alarming descriptions of internal investigations without meaningful business updates, contributing to reputational harm and shareholder confusion.
- **Refusal to Address Shareholder Concerns**: Despite receiving formal demands from multiple shareholder groups the Board has refused to discuss or respond to legitimate concerns about financial transparency, strategic direction, and governance failures, demonstrating contempt for shareholder rights and fiduciary obligations.

### B. Risk Management Failures

- Permitted management to recommend Chapter 11 bankruptcy proceedings without material creditor claims or regulatory enforcement actions, potentially serving the interests of conflicted management rather than shareholders.
- Failed to provide public reassurance to customers regarding the security of their investments and the company's operational solvency, despite managing substantial customer assets.
- Allowed operational suspension and platform revenue cessation based on management's "legal speculations" rather than actual regulatory determinations, while failing to explore alternative business strategies to allow the business to operate as a "going concern".

- Failed to ensure that any bankruptcy considerations involve a fully informed, conflict-free board process with appropriate shareholder input.

## Legal and Regulatory Consequences

The Board's conduct exposes the corporation and its directors to potential liability under:

- Delaware derivative litigation for breach of fiduciary duties
- State securities law enforcement actions and customer protection violations
- Shareholder litigation for breach of fiduciary duty and corporate waste
- Personal liability for directors under Delaware law standards for grossly negligent decision-making (*Smith v. Van Gorkom*)
- Investment adviser regulatory violations and customer restitution claims

## Conclusion

The systematic nature of these violations demonstrates that this Board has fundamentally failed in its core responsibilities to shareholders and stakeholders. The pattern of conduct reveals not isolated mistakes, but a comprehensive abdication of the fiduciary duties that form the foundation of corporate governance.

We cannot, in good conscience, continue to serve on a Board that has so thoroughly compromised its obligations to shareholders and violated fundamental principles of corporate law and securities regulation.

We hereby demand immediate shareholder action to reconstitute the Board of Directors with individuals committed to lawful corporate governance and shareholder protection.

**Resigned Directors:**

| **Victor Jiang** | **Karim Nurani** |
|---|---|
| Date: May 30th, 2025 | Date: May 30th, 2025 |

# EXHIBIT B

**H. GAVIN SOLOMON**
37 Kells Creek Road Woodlands, New South Wales, Australia 2575
E: gs@larpagroup.com  Cell: +61 412 978777

**DATED:  21st MAY 2025 (Sydney time)**

| | |
|---|---|
| TO: | THE CORPORATE SECRETARY |
| | AND THE DIRECTORS |
| | LINQTO, INC. |
| By express mail: | 101 Metro Drive, Suite 335 |
| | San Jose, CA 95110 |
| <u>And:</u> | |
| By express mail: | P.O. Box 2859 |
| | Sunnyvale, CA 94087-0859 |
| <u>And:</u> | |
| By Email: | Dan Siciliano – dan@linqto.com |
| | Adam Henderson - adam@linqto.com |
| | Bill Sarris – ws@williamsarris.com |
| | Alison Kutler – alisonkutler@me.com |
| | Norman Reed – normanreed@gmail.com |
| | Karim Nurani - karimnurani@yahoo.com |
| | Victor Jiang - victor@sapienventures.vc |
| | Michael Huskins - michael@linqto.com |

**FORMAL DEMAND TO HOLD ANNUAL MEETING OF SHAREHOLDERS PURSUANT TO DGCL § 211**

Dear Corporate Secretary and Directors,

I am a shareholder of Linqto, Inc. (**Linqto** or **Company**) and am writing to formally request that the Company convene an annual meeting of shareholders in accordance with Section 211 of the Delaware General Corporation Law (**DGCL**). The DGCL requires such annual meeting of shareholders for the election of Directors and other corporate governance matters.

In my view, no annual meeting of Linqto shareholders in compliance with the provisions of DGCL § 211 has been convened/held since at least 31st January 2020. Accordingly, it has now been more than thirteen (13) months since the last annual meeting of Linqto shareholders.

On 10th December 2024 (AEST/Sydney time) Mr Victor Jiang (Linqto Director) advised shareholders by email that an annual meeting of shareholders would be convened "….. *likely to be sometime in the second half of January 2025*" (**January Meeting**). No particulars for this meeting including, without limitation, venue details, virtual meeting dial-in details, agenda, proxy or other shareholder information was ever distributed by the Company to shareholders in relation to this proposed January Meeting. This January Meeting did not take place.

On 11th March 2025 (Pacific Time) Mr Dan Siciliano (CEO/Director of Linqto) verbally advised shareholders during an online "*town hall*" shareholder meeting that an annual meeting of shareholders would be convened on 28th April 2025 (Pacific Time) (**April Meeting**). No particulars for this meeting including, without limitation, venue details, virtual meeting dial-in details, agenda, proxy or other shareholder information was ever distributed by the Company to shareholders in relation to this proposed April Meeting. This April Meeting did not take place.

On 26th April 2025 (Pacific Time) Linqto advised shareholders by email that *"Linqto's annual stockholder meeting is being rescheduled to a future date in compliance with a resolution passed by the General Committee of the board of directors, not earlier than June 2, 2025 and not later than June 30, 2025. We will announce the specific date, time and place by May 10, 2025"*.

On 9th May 2025 (Pacific Time) Linqto advised all shareholders by email that *"Linqto's annual stockholder meeting is rescheduled for Tuesday, June 24, 2025 at 3:00 pm Pacific Time"* (**June Meeting**). No particulars for this meeting including, without limitation, venue details, virtual meeting dial-in details, agenda, proxy or other shareholder information has yet been distributed by the Company to shareholders in relation to this proposed June Meeting. I have concerns that this proposed June Meeting may not take place.

Therefore, I hereby demand pursuant to DGCL § 211 that Linqto schedule and hold an annual meeting of shareholders within a reasonable time from receipt of this letter being not later than 3 pm Tuesday 24th June 2025 (Pacific Time). If Linqto fails to act accordingly, I reserve my right to petition, without further notice, the Delaware Court of Chancery to compel Linqto to comply with its legal obligations together with an application for costs.

Please confirm receipt of this letter and advise of the Company's intent within ten (10) days.

Yours Sincerely.

*Gavin Solomon*

**Herbert Gavin Solomon**
Shareholder, Linqto, Inc.
Linqto Share Certificate Number: CS-127