# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re:

LINQTO TEXAS, LLC, *et al.*,

Debtors.[1]

Chapter 11

Case No. 25-90186

(Jointly Administered)

## SWAGAR PARTIES' LIMITED OBJECTION AND RESERVATION OF RIGHTS REGARDING THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE USE OF ESTATE PROCEEDS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) DETERMINING THAT THE RIPPLE SALE PROCEEDS ARE ASSETS OF THE BANKRUPTCY ESTATE, AND (III) GRANTING RELATED RELIEF

Ryan Swagar, The WRS 2020 Family Trust, and The Katherine Swagar 2020 Descendants Trust (together, the "Swagar Parties"), by and through their undersigned counsel, hereby submit this limited objection and reservation of rights (the "Limited Objection") with respect to *The Debtors' Motion for Entry of an Order (I) Authorizing the Use of Estate Proceeds Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Determining that the Ripple Sale Proceeds are Assets of the Bankruptcy Estate, and (III) Granting Related Relief*[2] (ECF No. 79, the "Ripple Proceeds Motion") filed by the Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), and respectfully state as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

[2] Capitalized terms used but not otherwise defined in the Statement shall have the meaning ascribed to them in the Ripple Proceeds Motion.

## LIMITED OBJECTION AND RESERVATION OF RIGHTS

1.      In August 2024, The WRS 2020 Family Trust and The Katherine Swagar 2020 Descendants Trust each signed agreements to transfer 30,000 Series B Preferred shares of Ripple Labs, Inc. ("Ripple") stock to Linqto Liquidshares LLC ("Liquidshares") at a price per share of $25.00, for a total consideration of $1,500,000. The Stock Transfer Agreement with respect to The WRS 2020 Family Trust, dated August 12, 2024, is attached hereto as **Exhibit A** (the "August WRS 2020 Family Trust Stock Transfer Agreement"). The Purchase Agreement with respect to The Katherine Swagar 2020 Descendants Trust, dated August 26, 2024, is attached hereto as **Exhibit B** (the "August Katherine Swagar 2020 Descendants Trust Purchase Agreement," and together with the August WRS 2020 Family Trust Stock Transfer Agreement, the "August Stock Transfer Agreements"). These proposed transactions (the "August Transactions") were notified to Ripple on July 19, 2024, and the consideration was received from Linqto on August 7, 2024.

2.      Pursuant to the August WRS 2020 Family Trust Stock Transfer Agreement, Liquidshares represented that, as transferee, it was purchasing these shares "for the Transferee's own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Transferred Shares within the meaning of the Securities Act of 1933" and that it "has no present intention of selling or otherwise disposing of all or any portion of the Transferred Shares, and no one other than the Transferee has any beneficial ownership of any of the Transferred Shares." Ex. A ¶ 3.2. Liquidshares also agreed that "any transfer or purported transfer of Transferred Shares shall be null and void unless the terms, conditions and provisions of this Agreement are strictly observed and followed." Ex. A ¶ 8.3.

3.      Pursuant to the August Katherine Swagar 2020 Descendants Trust Purchase Agreement, Liquidshares represented that, as buyer, it was "purchasing the Shares solely for

investment purposes, and not for further distribution," covenanted "that all legal and beneficial interest in the Shares shall be held solely for his, her or its own account," and represented that it was "not a party to and does not presently intend to enter into any contract or other arrangement with any other person involving the resale, transfer, or other distribution of any of the Shares." Ex. B ¶ 4.2.4.

4.    On October 9, 2024, The WRS 2020 Family Trust and The Katherine Swagar 2020 Descendants Trust each signed agreements to transfer 44,000 shares of Common Stock of Ripple to Liquidshares at a price per share of $28.50, for a total consideration of $2,508,000.  The Purchase Agreement with respect to The WRS 2020 Family Trust, dated October 9, 2024, is attached hereto as **Exhibit C**.  The Purchase Agreement with respect to The Katherine Swagar 2020 Descendants Trust, dated October 9, 2024, is attached hereto as **Exhibit D** (together with Exhibit C, the "October Purchase Agreements" and with the August Stock Transfer Agreements, the "Purchase Agreements").  These proposed transactions (the "October Transactions" and, together with the August Transactions, the "Swagar Transactions") were notified to Ripple on August 16, 2024, and the consideration was received from Liquidshares on August 20, 2024.

5.    Pursuant to the October Purchase Agreements, Liquidshares represented that, as buyer, it was "purchasing the Shares solely for investment purposes, and not for further distribution," covenanted "that all legal and beneficial interest in the Shares shall be held solely for his, her or its own account," and represented that it was "not a party to and does not presently intend to enter into any contract or other arrangement with any other person involving the resale, transfer, or other distribution of any of the Shares."  Ex. C ¶ 4.2.4; Ex. D ¶ 4.2.4.

6.    On July 14, 2025, the Debtors filed the Ripple Proceeds Motion, which seeks a determination by this Court that the Cash Assets, comprised of the Ripple Tender Proceeds and

certain other funds, are assets of the Debtors' bankruptcy estate which may be used by the Debtors in the administration of these Chapter 11 Cases.  *See* Ripple Proceeds Motion ¶ 1.

7.      The Ripple Tender Proceeds may contain proceeds from Ripple shares Liquidshares obtained through the Swagar Transactions.  As discussed *supra* ¶¶ 2, 4–5, Liquidshares represented in the Purchase Agreements that the purchased Ripple shares would only be used for investment purposes and would not be further distributed or sold.  The August WRS 2020 Family Trust Stock Transfer Agreement also provides that the agreement would be "null and void unless the terms, conditions and provisions of this Agreement are strictly observed and followed."  Ex. A ¶ 8.3 .

8.      Further, at the time of each of the Swagar Transactions, the Swagar Parties have reason to believe that Liquidshares violated Section 47 of the Investment Company Act of 1940 (the "40 Act") in failing to register with the SEC as an investment company .  *See* 15 U.S.C. § 80a-3(a)(1).  The 40 Act provides that "[a] contract that is made, or whose performance involves, a violation of this subchapter, or any rule, regulation, or order thereunder, is unenforceable by either party."  *See* 15 U.S.C. § 80a-46(b).  Accordingly, the acquisition of Ripple shares in the Swagar Transactions in furtherance of that unlawful activity was in violation of the 40 Act, and as provided thereunder, the default rule provides that "[t]o the extent that [the contract] has been performed, a court may not deny rescission at the instance of any party."  15 U.S.C. § 80a-46(b)(2).

9.      The Swagar Parties file this Limited Objection to request that any Order made in connection with the Ripple Proceeds Motion be amended so that (i) the Swagar Parties are not prejudiced by virtue of an Order granting the Ripple Proceeds Motion, and (ii) the Swagar Parties' rights to pursue claims as stated in this Limited Objection are preserved and not adversely affected by the Order.

10.     Through the Limited Objection, the Swagar Parties reserve all rights with respect to the appropriateness of the use of Ripple Tender Proceeds to the extent the Ripple Tender Proceeds derive from Ripple shares obtained by the Debtors through the Swagar Transactions. The Swagar Parties also reserve all rights with respect to the distribution or sale of any unsold Ripple shares obtained by the Debtors through the Swagar Transactions. This Limited Objection is without prejudice to the Swagar Parties' right to seek other appropriate relief, including to pursue recission or other claims to obtain property of the Debtors' estates resulting from the Swagar Transactions.

[*The remainder of this page is left blank intentionally.*]

Dated: September 2, 2025

Respectfully submitted,

_/s/ Sean A. O'Neal_

Sean A. O'Neal (*pro hac vice* pending)
Joshua Brody (*pro hac vice* pending)
Madeline Finnegan (*pro hac vice* pending)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
soneal@cgsh.com
jbrody@cgsh.com
mafinnegan@cgsh.com

*Counsel for Ryan Swagar, The WRS 2020 Family Trust, and the Katherine Swagar 2020 Descendants Trust*

**Exhibit A**

# STOCK TRANSFER AGREEMENT

This Stock Transfer Agreement (this "<u>Agreement</u>") is made and entered into as of <u>  August 12, 2024  </u> (the "<u>Effective Date</u>") by and among <u>Linqto Liquidshares LLC  </u> (the "<u>Transferee</u>"), <u>  The WRS 2020 Family Trust  </u> (the "<u>Transferor</u>") and Ripple Labs Inc., a Delaware corporation (the "<u>Company</u>").

## RECITALS

A.      WHEREAS, the Transferor is the record owner of certain shares of <u>  Series B  </u> Preferred Stock of the Company and desires to sell <u>  30000.00  </u> shares (the "<u>Transferred Shares</u>") of the Company's <u>  Series B  </u> Preferred Stock to the Transferee.

B.      WHEREAS, the Transferee desires to acquire all of the Transferor's right, title and interest to the Transferred Shares at a price of $ <u>25.00  </u> per share (the "<u>Purchase Price Per Share</u>") for the aggregate price of $ <u>750000.00  </u> (the "<u>Purchase Price</u>").

C.      NOW, THEREFORE, for and in consideration of the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.      TRANSFER OF SHARES.

1.1      **Transfer**.  On the Effective Date and subject to the terms and conditions of this Agreement, the Transferor hereby sells to Transferee the Transferred Shares and Transferee, hereby purchases from the Transferor the Transferred Shares against payment of the Purchase Price. As used in this Agreement, the Transferred Shares shall include all of the Transferred Shares sold and transferred under this Agreement and all securities received (a) in replacement of the Transferred Shares, (b) as a result of conversion of the Transferred Shares, (c) as a result of stock dividends or stock splits in respect of the Transferred Shares and (d) as substitution for the Transferred Shares in a recapitalization, merger, reorganization or the like.

1.2      **Obligation of Transferee and Company**. The Transferee acknowledges that the Transferor purchased the Transferred Shares pursuant to a certain Transfer Agreement, to which the Transferor was a party (the "<u>Transfer Agreement</u>"). Shares subject to the Transfer Agreement were originally issued pursuant to a <u>  Series B  </u> Preferred Stock Purchase Agreement, dated as of <u>  March 28, 2016  </u> (the "<u>Stock Purchase Agreement</u>"), by and among the Company and certain investors in the Company. In connection with the Transfer Agreement, the Transferor also entered into that certain Amended and Restated Investors' Rights Agreement, dated December 20, 2019, as amended on June 23, 2022 (the "<u>Investors' Rights Agreement</u>"), that certain Amended and Restated First Refusal and Co-Sale Agreement, dated December 20, 2019 (the "<u>Co-Sale Agreement</u>") and that certain Amended and Restated Voting Agreement, dated December 20, 2019 (the "<u>Voting Agreement</u>"), between the Company, the Transferor and certain investors in the Company (collectively, the "<u>Ancillary Agreements</u>").  The Transferee and the Company agree that the Transferee and the Company shall each be bound by all of the terms and provisions of the Stock Purchase Agreement and the Ancillary Agreements as if the Transferee were a party thereto.  Specifically, Transferee shall be deemed an "Investor" under the Investors' Rights Agreement, the Co-Sale Agreement and the Voting Agreement. Furthermore, Transferee agrees upon the reasonable request of the Company to execute any further documents or instruments necessary or desirable to carry out the purposes or intent of the foregoing. Without limiting the foregoing, the Transferred Shares shall be subject to (a) the transfer restrictions contained in the Stock Purchase Agreement, (b) the voting provisions contained in the Voting Agreement and (c) the market stand-off (or lock-up provisions) contained

1

in the Investors' Rights Agreement. Transferor acknowledges that upon Effective Date, all of Transferor's rights under the Stock Purchase Agreement and Ancillary Agreements with respect to the shares shall immediately terminate and be of no further force or effect with respect to the Transferred Shares.

2. **CLOSING.**

2.1 **Deliveries by Transferor.** The Transferor hereby delivers to the Company: (a) the stock certificate(s) representing the Transferred Shares, if in the Transferor's possession, or otherwise authorizes the Company to remove any such stock certificate(s) from escrow for cancellation and reissuance; (b) an executed copy of this Agreement; (c) if Transferor is an individual and is married, a Spousal Consent in the form attached hereto as **Exhibit A** duly executed by Transferor's spouse; and (d) one (1) executed and completed Stock Power and Assignment Separate from Stock Certificate attached hereto as **Exhibit B**, transferring Transferor's Transferred Shares to Transferee, in each case the delivery of which is hereby acknowledged to be an express condition of the Company's execution, delivery and performance pursuant to this Agreement and the transactions contemplated hereby. The Transferor hereby delivers to Transferee an executed copy of this Agreement.

2.2 **Deliveries by Transferee.** Transferee hereby delivers to the Company an executed copy of this Agreement. Transferee hereby delivers: (i) to Transferor, an executed copy of this Agreement and (ii) to the Transferor, a wire transfer of the Purchase Price.

2.3 **Deliveries of Stock Certificate(s).** The Transferor hereby instructs the Company to: (a) cancel the stock certificate(s) issued to the Transferor representing the Transferred Shares; (b) issue duly executed stock certificates evidencing the Transferred Shares in Transferee's name; and (c) issue duly executed stock certificate(s) evidencing the number of shares of capital stock of the Company remaining after the sale to the Transferee, if any, in the Transferor's name. The Company shall cancel such stock certificate(s) of the Transferor specified in the subclause (a) above and issue new stock certificates specified in the subclause (b) and (c) within a reasonable period of time following the Effective Date. The closing of the sale shall occur on the Effective Date. For the avoidance of any doubt, Transferee becomes a stockholder of record with respect to the Transferred Shares from the Effective Date.

2.4 **Consents.** It is an express condition to Transferee's obligations hereunder that (i) all consents, approvals, authorizations, security interest releases and waivers, and orders required for the execution and delivery of this Agreement and the transfer of the Transferred Shares under this Agreement being sold to Transferee hereunder shall have been obtained in a form reasonably acceptable to Transferee and be in full force and effect (collectively, the "Restriction Agreements") and (ii) all restrictions on the Transferor's ability to transfer the Transferred Shares shall have been complied with or waived. The Company hereby waives any right of first refusal it has with respect to the sale and the Transferred Shares including without limitation any right of first refusal.

3. **REPRESENTATIONS AND WARRANTIES OF TRANSFEREE.** Transferee represents and warrants to the Transferor and the Company as of the Effective Date as follows:

3.1 **Authorization.** Transferee has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder. All action on the Transferee's part required for the lawful execution and delivery of this Agreement has been taken. Upon the execution and delivery of this Agreement, this Agreement will be valid and binding obligations of Transferee, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.2    **Purchase for Own Account for Investment.**  The Transferee is purchasing the Transferred Shares being sold to it hereunder for the Transferee's own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Transferred Shares within the meaning of the Securities Act of 1933, as amended (the "Securities Act"). The Transferee has no present intention of selling or otherwise disposing of all or any portion of the Transferred Shares, and no one other than the Transferee has any beneficial ownership of any of the Transferred Shares.

3.3    **Accredited Investor**.  The Transferee is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act.

3.4    **Access to Information.**  Transferee has had access to all information regarding the Company and its present and prospective business, assets, liabilities and financial condition that Transferee requested or desired to know in connection with the purchase of the Transferred Shares.

3.5    **Understanding of Risks.**  The Transferee is fully aware of: (a) the highly speculative nature of the Transferred Shares; (b) the financial hazards involved; (c) the lack of liquidity of the Transferred Shares and the restrictions on transferability of the Transferred Shares; (d) the qualifications and backgrounds of the management of the Company; and (e) the tax consequences of acquiring the Transferred Shares. The Transferee hereby acknowledges and agrees that (i) any future purchase, sale or other valuation of the Company's capital stock could be at a premium or a discount to the Purchase Price Per Share, (ii) such purchase or sale could occur at any time or not at all, (iii) the current value of the Company may not support a sale of any of the Transferred Shares at the Purchase Price Per Share as of the Effective Date or any future date at a price per share equal to the Purchase Price Per Share (and may only support such a sale at a price per share that is substantially lower than the Purchase Price Per Share), and (iv) the Transferor currently has, and later may come into possession of, information with respect to the Company or the Transferred Shares that is not known to the Transferee and that may be material to a decision to purchase or sell the Transferred Shares, including, without limitation, information that may relate to any one or more of the following: the Company's financial or tax position; any valuation of the Company or its securities for the purposes of or relating to Section 409A of the United States Internal Revenue Code of 1986, as amended; or the Company's results of operations, sales, or revenues (or the increase or diminution of any of the foregoing). The Transferee acknowledges and agrees that, by agreeing to purchase the Transferred Shares from the Transferor, it is accepting all risks associated with acquisition and ownership of such Transferred Shares as of the Effective Date, including any depreciation or diminution in the value of the Company's capital stock.

3.6    **Transferee's Qualifications.**  By reason of the Transferee's business or financial experience, the Transferee is capable of evaluating the merits and risks of this prospective investment, has the capacity to protect the Transferee's own interests in this transaction and is financially capable of bearing a total loss of the Transferred Shares. Furthermore, the Transferee is able to fend for itself in the transactions contemplated by this Agreement and has the ability to bear the economic risk of this investment indefinitely.

3.7    **Sophisticated Transferee.**  The Transferee: (a) is a sophisticated individual familiar with transactions similar to those contemplated by this Agreement; (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the purchase of the Transferred Shares; (c) has independently and without reliance upon any Transferor, and based on such information and the advice of such advisors as the Transferee has deemed appropriate, made their own analysis and decision to enter into this Agreement. The Transferee acknowledges that neither the Transferor nor any of their affiliates or agents are acting as a fiduciary or financial or investment adviser to the Transferee, and that neither the Transferor nor their affiliates or agents have given the Transferee any investment advice, opinion or other information on whether the purchase of such Transferred Shares is prudent. The Transferee acknowledges that: (i) Transferor or its affiliates or agents currently may have, and

later may come into possession of, information with respect to the Company that is not known to the Transferee and that may be material to a decision to purchase the Transferred Shares ("<u>Transferee Excluded Information</u>") and (ii) the Transferee has determined to purchase the Transferred Shares notwithstanding his lack of knowledge of the Transferee Excluded Information.  The Transferee acknowledges the price being paid for the Transferred Shares may be more than fair market value and the price of a share may significantly appreciate or depreciate over time and by agreeing to purchase the Transferred Shares from the Transferor pursuant to this Agreement, Transferee is giving up the opportunity to purchase the Transferred Shares at a possible lower price in the future.  Transferee understands that Transferor will rely on the accuracy and truth of the foregoing representations, and Transferee hereby consents to such reliance.

        **3.8**      **No General Solicitation**.  At no time was the Transferee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the sale of the Transferred Shares.

        **3.9**      **Compliance with Securities Laws.**  The Transferee understands and acknowledges that, in reliance upon the representations and warranties made by the Transferee herein, the Transferred Shares have not been and are not being registered with the United States Securities and Exchange Commission (the "<u>SEC</u>") under the Securities Act, and have not been and are not being qualified under any state securities or blue sky laws, but instead are being transferred under an exemption or exemptions from the registration and qualification requirements of the Securities Act and any other applicable securities laws which impose certain restrictions on the Transferee's ability to transfer such Transferred Shares.

        **3.10**      **No Public Market**.  The Transferee understands that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Transferred Shares.  The Transferee understands that the Company has no present intention to file a registration statement with the SEC in connection with a proposed public offering of its securities.

        **3.11**      **Securities Law Restrictions on Transfer.**  The Transferee understands that the Transferee may not transfer any of the Transferred Shares unless such Transferred Shares are registered under the Securities Act or qualified under any applicable securities laws or unless, in the opinion of counsel to the Company, exemptions from such registration and qualification requirements are available.  The Transferee understands that only the Company may file a registration statement with the SEC or any other applicable securities commissioners and that the Company is under no obligation to do so with respect to the Transferred Shares.  The Transferee has also been advised that exemptions from registration and qualification may not be available or may not permit the Transferee to transfer all or any of such Transferred Shares in the amounts or at the times proposed by the Transferee.

        **3.12**      **Restricted Securities.**  The Transferee acknowledges that, because the Transferred Shares have not been registered under the Securities Act, such Transferred Shares must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from such registration is available.  The Transferee is familiar with the provisions of Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby under the Securities Act.

        **3.13**      **Bad Actor Representations and Covenants**.  The Transferee hereby represents and warrants to the Company that the Transferee has not been convicted of any of the felonies or misdemeanors or has been subject to any of the orders, judgments, decrees or other conditions set forth in Rule 506(d) of Regulation D promulgated by the SEC, which are excerpted in their current form on **Exhibit C**.  The Transferee covenants to provide immediate written notice to the Company in the event Transferee is convicted of any felony or misdemeanor or becomes subject to any order, judgment, decree or other

condition set forth in Rule 506(d) of Regulation D promulgated by the SEC, as may be amended from time to time.  Transferee covenants to provide such information to the Company as the Company may reasonably request in order to comply with the disclosure obligations set forth in Rule 506(e) of Regulation D promulgated by the SEC, as may be amended from time to time.

       **3.14**    **Waiver of Information Rights**. The Transferee hereby waives its right to request or demand to inspect the Company's stock ledger, list of stockholders and other books and records, or any of the books and records of a subsidiary of the Company, and any other rights it may enjoy pursuant to Section 220 of the Delaware General Corporation Law ("Inspection Rights"), with the exception of the Transferee retaining Inspection Rights for information that the Company is required to disclose under Rule 701 of the Securities Act, unless otherwise agreed to in writing between the Company and Transferee.

       **4.**    **REPRESENTATIONS AND WARRANTIES OF TRANSFEROR.**  The Transferor represents and warrants to the Company and Transferee as follows.

       **4.1**    **Transfer for Own Account.**  The Transferor is selling the Transferred Shares for the Transferor's own account only and not with a view to, or for sale in connection with, a distribution of such Transferred Shares within the meaning of the Securities Act.  No portion of the Purchase Price payable to the Transferor will be received directly or indirectly by the Company.

       **4.2**    **No General Solicitation.**  At no time has the Transferor presented any Transferee with or solicited any Transferee through any publicly issued or circulated newspaper, mail, radio, television or other form of general advertisement or solicitation in connection with the sale.

       **4.3**    **No Broker-Dealer.**  The Transferor has not effected the sale by or through a broker-dealer in any public offering.

       **4.4**    **Title to Shares.**  Immediately prior to the Effective Date, the Transferor had valid title to the Transferred Shares, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest.

       **4.5**    **Consents.**  All consents, approvals, authorizations and orders required for the execution and delivery of this Agreement and the sale under this Agreement have been obtained and are in full force and effect, including any consent from the Company or its stockholders required under the Restriction Agreements and/or all restrictions on the Transferor's ability to transfer the Transferred Shares shall have been complied with, including, without limitation, the release and waiver of any security interests in the Transferred Shares by the Company.  Other than the Restriction Agreements and the restrictions on transfer under state and federal securities laws, there are no restrictions on the Transferor's ability to transfer the Transferred Shares, nor will there be any additional restrictions by which any Transferee or the Transferred Shares will be obligated or by which any Transferee will be bound immediately following the closing of the sale.

       **4.6**    **Authority.**  The Transferor has full legal right, power and authority to enter into and perform its obligations under this Agreement and to transfer the Transferred Shares under this Agreement.  This Agreement constitutes a valid and binding obligation of the Transferor enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.7     **Sophisticated Transferor**.  The Transferor: (a) is a sophisticated individual familiar with transactions similar to those contemplated by this Agreement; (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Transferred Shares; (c) has independently and without reliance upon any Transferee, and based on such information and the advice of such advisors as the Transferor has deemed appropriate, made his own analysis and decision to enter into this Agreement. The Transferor acknowledges that neither the Transferee nor any of their affiliates or agents are acting as a fiduciary or financial or investment adviser to the Transferor, and that neither the Transferee nor their affiliates or agents have given the Transferor any investment advice, opinion or other information on whether the sale of such Transferred Shares is prudent. The Transferor acknowledges that: (i) Transferee or its affiliates or agents currently may have, and later may come into possession of, information with respect to the Company that is not known to the Transferor and that may be material to a decision to sell the Transferred Shares ("Transferor Excluded Information") and (ii) the Transferor has determined to sell the Transferred Shares notwithstanding his lack of knowledge of the Transferor Excluded Information.  The Transferor acknowledges the price being paid for the Transferred Shares may be less than fair market value and the price of a share may significantly appreciate or depreciate over time and by agreeing to sell the Transferred Shares to the Transferee pursuant to this Agreement, Transferor is giving up the opportunity to sell the Transferred Shares at a possible higher price in the future. Transferor understands that Transferee will rely on the accuracy and truth of the foregoing representations, and Transferor hereby consents to such reliance.

4.8     **Tax Matters.**  The Transferor has reviewed with its own tax advisors the federal, state, local and foreign tax consequences of the transaction contemplated by this Agreement.  The Transferor relies solely on such advisors and not on any statements or representations of the Transferee or any of their agents for the federal, state, local and foreign tax consequences to the Transferor that may result from the transactions contemplated by this Agreement.  The Transferor understands that the Transferor shall be responsible for any tax liability of any party hereto that may arise as a result of the transactions contemplated by this Agreement, including United States federal, state, local and foreign income, withholding, payroll, employment, social security, and unemployment taxes (including any interest and penalties) arising as a result of the payments made by Transferee to the Transferor pursuant to this Agreement.

4.9     **Full Disclosure.**     Transferor acknowledges that Transferor has received all information from the Company that it considers necessary or appropriate for deciding whether to enter into this Agreement.  Transferor further represents that Transferor has had an opportunity to ask questions and receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which the Transferor considers relevant or appropriate in connection with entering into this Agreement.  In making its decision to sell the Transferred Shares, Transferor is relying on his or her own knowledge and experience, the representations and warranties of the Transferee, and the information it received from the Company.  Transferor understands that all non-public information it has received regarding the Company and the sale, including, without limitation, the terms of this Agreement, is subject to strict confidentiality restrictions and shall not be disclosed to any third party nor used by Transferor other than in connection with the sale.

4.10     **Stock Value.**  Transferor acknowledges that (a) Transferor shall have no rights with respect to the Transferred Shares with respect to any future sale, redemption, acquisition, merger, liquidation, dissolution or other corporate event regarding the Company or its assets (any of the foregoing, a "Corporate Event"); (b) any such Corporate Event may result in the payment by a third party or the Company of funds or other consideration to the Company's stockholders in an amount that may be greater, on a per share basis, than the Purchase Price Per Share; (c) the value of the Company's capital stock, including the Transferred Shares, may appreciate in value in excess of the per share Purchase Price Per Share; and (d) depending on market conditions, the Company may in the future file a registration statement

with the SEC in connection with a proposed public offering of its common stock, the initial per share offering price of which could be greater than the Purchase Price Per Share.

**4.11** **No Transferee Reimbursement**.  To Transferor's knowledge, no portion of the Purchase Price paid by Transferee has been or will be delivered, paid or remitted, directly or indirectly, to the Transferee or any of its affiliates.  Transferor has not and will not enter into any agreement providing for the delivery, payment or remittance, directly or indirectly, of any portion of the Purchase Price paid by Transferee to Transferee or any of its affiliates.

**4.12** **Claims and Legal Proceedings.**  There is no claim, action, suit, arbitration, criminal or civil investigation or proceeding pending or involving or, to the Transferor's knowledge, threatened against such Transferor before or by any court or governmental or non-governmental department, commission, board, bureau, agency or instrumentality, or any other person or entity, that questions the validity of this Agreement or any action taken or to be taken by Transferor pursuant to this Agreement or in connection with the transactions contemplated hereby.

**4.13** **No Conflicts.**  The execution, delivery and performance of this Agreement by Transferor, and the consummation of the transactions contemplated hereby, will not (a) constitute a violation (with or without the giving of notice or lapse of time, or both) of any provision of any law or any judgment, decree, order, regulation or rule of any court, agency or other governmental authority applicable to Transferor, (b) result in a default (with or without the giving of notice or lapse of time, or both) under, acceleration or termination of, or the creation in any party of the right to accelerate, terminate, modify or cancel, any agreement, lease, note or other restriction, encumbrance, obligation or liability to which Transferor is a party or by which it is bound or to which any assets of Transferor are subject, or (c) result in the creation of any lien or encumbrance upon the assets of such Transferor, or upon any such Transferred Shares or other securities of the Company.

**5.** **NO RELIANCE.**  The Transferor and Transferee acknowledges and agrees that neither the Company, nor any of its stockholders, officers, directors, employees, or agents (other than the Transferor) have (i) acted as an agent, finder or broker for the Transferor or any Transferee or their respective agents with respect to the offer, purchase and/or sale of the Transferred Shares, (ii) made any representations or warranties of any kind, express or implied, to the Transferor or any Transferee or their respective agents in connection with the offer, purchase and/or sale of the Transferred Shares or (iii) at any time had any duty to the Transferor or any Transferee or their respective agents to disclose any information relating to the Company, its business, or financial condition or relating to any other matters in connection with the offer, purchase and/or sale of the Transferred Shares.  In making its decision to sell the Transferred Shares, the Transferor is relying solely on the representations and warranties of Transferee (and not on any information provided by the Company or its agents).  In making its decision to purchase the Transferred Shares, Transferee is relying solely on the representations and warranties of the Transferor (and not on any information provided by the Company or its agents).

**6.** **COMPLIANCE WITH LAWS AND REGULATIONS.**  Any future transfer of any Transferred Shares will be subject to and conditioned upon compliance by the Company and Transferee with all applicable state and federal laws and regulations and with all applicable requirements of any stock exchange or automated quotation system on which the Company's capital stock may be listed or quoted at the time of such issuance or transfer.

**7.** **OTHER RESTRICTIONS**.

**7.1** **Further Assurances.**  At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any

further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

8. **RESTRICTIVE LEGENDS AND STOP-TRANSFER ORDERS.**

8.1 **Legends.** Transferee understands and agrees that the Company will place the legends set forth below or similar legends on any stock certificate(s) evidencing the Transferred Shares, together with any other legends that may be required by state or federal securities laws, the Company's Restated Certificate of Incorporation or Bylaws, each as amended and/or restated from time to time, any other agreement affecting the Transferred Shares between the Transferor and the Company, or between Transferor and any third party, or any other agreement applicable to the Transferee:

> THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT.

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD AFTER THE EFFECTIVE DATE OF THE ISSUER'S REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE ISSUER), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

8.2 **Stop-Transfer Instructions.** Transferee agrees that, in order to ensure compliance with the restrictions imposed by this Agreement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company acts as its own transfer agent, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Transferred Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (b) to treat as owner of such Transferred Shares, or to accord the right to vote or pay dividends, to any Transferee to whom such Transferred Shares have been so transferred. Transferee further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that Transferee's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Transferred Shares.

8.3 **Unpermitted Transfers Void.** Transferee agrees that any transfer or purported transfer of Transferred Shares shall be null and void unless the terms, conditions and provisions of this Agreement are strictly observed and followed.

9.    **RELEASOR'S ACKNOWLEDGEMENT AND RELEASE OF CLAIMS.**

9.1    **Acknowledgement and Release of Claims.**  In consideration of the Company's facilitating the transfer of the Transferred Shares and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, to the fullest extent permitted by law, the Transferor and Transferee (each a "Releasor") each acknowledges and confirms that effective immediately, Releasor fully and forever releases (the "Release") and will have no claims whatsoever against the Company, its affiliated companies, successors and assigns, past and present directors, officers, employees, agents, representatives, affiliates, stockholders, attorneys, insurers, heirs, and all persons acting by, through, under or in concert with them, or any of them, jointly and severally (collectively, the "Released Parties"), of and from any and all actions, in law or in equity, suits, agreements, covenants, promises, liability, obligations, claims, demands, damages, losses, costs or expenses, direct or indirect, of any kind or nature whatsoever, known or unknown, fixed or contingent, state or federal, under common law, statute or regulation, liquidated or unliquidated, suspected or unsuspected, claimed or concealed, at and through the date hereof, by reason of any act, cause, matter or thing whatsoever, regarding the sale, other than those arising from a Released Party's gross negligence or willful misconduct (collectively, the "Released Matters.  It is expressly provided that the Transferee does not release the Company and any of the Released Parties from the Released Matters which may arise out of the obligations of the Company or Released Parties under this Agreement. For the avoidance of doubt, Released Matters shall not include any rights or interests a Releasor may have directly or indirectly relating its existing shares including without limitation rights and interests under the Company's Restated Certificate of Incorporation and the Ancillary Agreements.

9.2    **Covenant Not to Sue**.  Releasor hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any judicial, quasi-judicial or arbitral proceeding of any kind against the Released Parties, based upon any Released Matters.

9.3    **Waiver of Unknown Future Claims.**  Releasor hereby waives application of California Civil Code Section 1542 and any other analogous statutes or common law principles with a similar effect with respect to the Release contained herein.  Releasor further certifies that it has read the following provision of California Civil Code Section 1542:

> *A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.*

Releasor understands and acknowledges that the significance and consequence of this waiver of California Civil Code Section 1542 is that even if Releasor or its attorneys or agents discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the subject matter of this Agreement such that Releasor should eventually suffer additional damages, Releasor will not be able to make any claim for those damages.  Furthermore, Releasor acknowledges that Releasor intends these consequences even as to claims for damages that may exist as of the date of this Agreement but of which Releasor is unaware and which, if known, would materially affect Releasor's decision to execute this Agreement, regardless whether such lack of knowledge is the result of ignorance, oversight, error, negligence or any other cause.

10.     **GENERAL PROVISIONS.**

10.1     **Successors and Assigns; Assignment.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this Agreement; provided, however, that the Company acknowledges and agrees that it shall not assign its obligations under clause 2.3 of this Agreement.  No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except assignments made (i) to an affiliate of such party or (ii) with the prior written consent of the Company.

10.2     **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to that body of laws pertaining to conflict of laws.

10.3     **Dispute Resolution**.  The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

10.4     **Confidentiality**.  Transferee agrees that it will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the transactions contemplated hereby and any information obtained pursuant to this Agreement or otherwise as a stockholder of the Company which the Company identifies in writing as being proprietary or confidential and Transferee acknowledges that it will not, unless otherwise required by law or the rules of any national securities exchange, association or marketplace, disclose such information without the prior written consent of the Company except, in each case, such information that (a) was in the public domain prior to the time it was furnished to Transferee, (b) is or becomes (through no willful improper action or inaction by Transferee) generally available to the public, (c) was in its possession or known by Transferee without restriction prior to receipt from the Company, (d) was rightfully disclosed to Transferee by a third party without restriction or (e) was independently developed without any use of the Company's confidential information.  Notwithstanding the foregoing, if Transferee is a limited partnership or limited liability company, it may disclose such proprietary or confidential information to any former partners or members who retained an economic interest in Transferee, as applicable, current or prospective partner of the partnership or any subsequent partnership under common investment management, limited partner, general partner, member or management company of Transferee, as applicable, (or any employee or representative of any of the foregoing) (each of the foregoing persons, a "Permitted Disclosee") or legal counsel, accountants or representatives for such  Transferee, as applicable.  Furthermore, nothing contained herein shall prevent Transferee or any Permitted Disclosee from (i) entering into any business, entering into any agreement with a third party, or investing in or engaging in investment discussions with any other company (whether or not competitive with the Company), provided that Transferee or Permitted Disclosee does not, except as permitted in accordance with this Section 12.4, disclose or otherwise make use of any proprietary or confidential information of the Company in connection with such activities, or (ii) making any disclosures required by law, rule, regulation or court or other governmental order.

10.5     <u>Notices</u>.

(a)     Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following:  (a) at the time of personal delivery, if delivery is in person; (b) one (1) business day after deposit with an express overnight courier for United States deliveries, or ten (10) business days after such deposit for deliveries outside of the United States; or (c)  five (5) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.  All notices for delivery outside the United States will be sent by express courier.  All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto.  A "<u>business day</u>" shall be a day, other than Saturday or Sunday, when the banks in the city of New York are open for business.  Notices to the Company will be marked "Attention: General Counsel," with a copy to Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP, Attention: Brooks Stough, Esq., 1 Bush Plaza, Suite 1200, San Francisco, CA 94104.

(b)     Each of Transferor and Transferee hereby consents to receive any notice given by the Company under the Restated Certificate of Incorporation or Bylaws of the Company, as the same may be amended and/or restated from time to time, or the General Corporation Law of the State of Delaware, by electronic mail at the electronic mail address set forth on the signature page to this Agreement in accordance with Section 232 of the General Corporation Law of the State of Delaware.  Each of Transferor and Transferee further agrees to notify the Company of any change to Transferor's or Transferee's electronic mail address as set forth on the signature page hereto, and further agrees that the provision of such notice shall constitute the consent of Transferor or Transferee, as applicable, to receive notice as provided in Section 12.5 at such electronic mail address.  In the event that the Company is unable to deliver notice to Transferor or Transferee at the electronic mail address so provided by Transferor or Transferee, Transferor or Transferee, as the case may be, shall, within 2 business days after a request to the Transferor or Transferee at the physical address set forth below their respective signature line to this Agreement, as the case may be, by the Company, provide the Company with a valid electronic mail address to which Transferor or Transferee, as the case may be, consents to receive notice at such electronic mail address as provided in this Section 12.5.

10.6     <u>Titles and Headings</u>.  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

10.7     <u>Entire Agreement</u>.  This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

10.8     <u>Amendment and Waivers</u>.  This Agreement may be amended only by a written agreement executed by each of the parties hereto.  No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought.  Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.  No waiver granted under this Agreement as to any one provision herein shall constitute a

subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

       **10.9**    **Cost of Enforcement**.  If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings against any other party to this Agreement, the non-prevailing party or parties named in such legal proceedings shall pay all costs and expenses incurred by the prevailing party or parties, including, without limitation, all reasonable attorneys' fees.

       **10.10**    **Counterparts; Facsimile Signatures.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  This Agreement may be executed and delivered by facsimile or as an attachment to an e-mail and upon such delivery, a copy of the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

       **10.11**    **Expenses.**  The Transferor and Transferee shall each pay their own expenses in connection with the transaction contemplated by this Agreement.  In addition, Transferor will pay $ 3,500.00 to the Company to cover costs and expenses incurred in connection with the transactions contemplated by this Agreement.

       **10.12**    **Counsel.**  The Transferor and Transferee acknowledges and agrees that it has had the opportunity to consult with counsel of its own choice in connection with the transactions contemplated by this Agreement and is not relying, in any way, on Gunderson Dettmer, as counsel to the Company, in connection therewith.

12

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and the Transferor and the Transferee have each executed this Stock Transfer Agreement, as of the Effective Date.

**TRANSFEROR:**

The WRS 2020 Family Trust

By: *Ellen Polcari* _____

Name: Ellen Polcari

Title: Authorized Signer

Address: ███████████████████████

E-mail: ellen@swagarcapital.com

13

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and the Transferor and the Transferee have each executed this Stock Transfer Agreement, as of the Effective Date.

**TRANSFEREE:**

 Linqto Liquidshares LLC 

By: ___ *Joseph Endoso* _____

Name: Joseph Endoso _____

Title: Managing Member _____

Address: P.O. Box 2859, Sunnyvale, California 94087, US

E-mail: joe@linqto.com

14

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and the Transferor and the Transferee have each executed this Stock Transfer Agreement, as of the Effective Date.

**ACKNOWLEDGED AND AGREED:**

**RIPPLE LABS INC.**

By: _____ *Brian Lozada* _____

Name: _____ Brian Lozada _____

Title: _____ Vice President, Global Tax _____

# EXHIBIT A

## CONSENT OF SPOUSE

The undersigned spouse of _____ (the "***Stockholder***") has read, understands and hereby approves all the terms and conditions of that certain Stock Transfer Agreement dated _____ (the "***Agreement***") by and between _____ (the "***Transferee***"), Stockholder, and Ripple Labs Inc., a Delaware corporation (the "***Company***"), pursuant to which Stockholder proposes to sell to Transferee an aggregate of _____ shares of _____ Preferred Stock of the Company  (the "***Shares***").

I hereby consent to my spouse selling the Shares to the Transferee pursuant to and on the terms and conditions contained in the Agreement.  In consideration of the Company granting my spouse the right to sell the Shares to the Transferee under the Agreement, I hereby agree to be irrevocably bound by all the terms and conditions of the Agreement and further agree that any community property interest I may have in the Shares will be similarly bound by the Agreement.

I hereby appoint Stockholder as my attorney-in-fact, to act in my name, place and stead with respect to any amendment of the Agreement.

Dated:   _____

_____
Signature of Spouse

_____
Name of Spouse

_____
x☐  Check this box if Transferor is not married

16

**EXHIBIT B**

**STOCK POWER AND ASSIGNMENT SEPARATE FROM CERTIFICATE**

**(TRANSFEROR)**

**Transferor Stock Power and Assignment**
**Separate From Stock Certificate**

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement dated as of

_____August 12, 2024_____ (the "Agreement"), the undersigned hereby assigns and transfers unto

_Linqto Liquidshares LLC_ an aggregate of _30000.00_ shares of the _Series B_ Preferred Stock

of Ripple Labs Inc., a Delaware corporation (the "Company"), standing in the undersigned's name on the

books of the Company represented by the certificate numbers and shares amounts identified below and

delivered herewith, and does hereby irrevocably constitute and appoint Gunderson Dettmer Stough

Villeneuve Franklin & Hachigian, LLP as the undersigned's attorney-in-fact, with full power of

substitution, to transfer said stock on the books of the Company.

| Stock Certificate Number | Class of Shares | Number of Shares |
|---|---|---|
| PB-215 | Series B  Preferred Stock | 30000.00 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Dated: _____July 29, 2024_____

By: _Ellen Polcari_____
    Transferor

By: _____
    Spouse:

17

Docusign Envelope ID: 5A456383-B56E-4C20-AA98-FB12F229B182

18

## EXHIBIT C

## RULE 506(D) BAD ACTOR REPRESENTATIONS

No Stockholder:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

( *1* ) Association with an entity regulated by such commission, authority, agency, or officer;

( *2* ) Engaging in the business of securities, insurance or banking; or

( *3* ) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

19

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78 *o* (b) or 78 *o* -4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78 *o* (c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

**Exhibit B**

# Purchase Agreement

This Purchase Agreement (this "**Agreement**") is made and entered into as of the date that the last signature is affixed hereto (the "**Effective Date**"), by and between the buyer (the "**Buyer**") and the seller (the "**Seller**"), each as set forth on the signature page hereto. Each of the Buyer and the Seller are hereinafter referred to as a "**Party**" and together as the "**Parties**."

WHEREAS, the Seller is the sole owner and holder of the number of shares of the Share Type of the Issuer (each, as defined below) set forth under Transaction Details attached hereto as Exhibit A (the "**Shares**"), which Seller holds as evidenced by that certain Stock Certificate Number CSA-11301 dated August 20, 2024 (the "**Acquisition Agreement**"), attached hereto as Exhibit B.  As used in this Agreement, "**Shares**" shall include all Shares sold and transferred under this Agreement and all securities and other proceeds received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares, and (c) as substitution for or in consideration of the Shares in a recapitalization, exchange, merger, reorganization or the like. To the extent that any other stockholder of the Issuer exercises its co-sale rights, the definition of Shares shall not include the shares of such exercising stockholder, and the number of Shares shall be reduced by the number of shares included through the co-sale right.

WHEREAS, the Seller desires to sell the Shares to Buyer, and Buyer desires to purchase and acquire the Shares from the Seller, on the terms and conditions set forth in this Agreement.

WHEREAS, the Parties acknowledge that this Agreement is binding as between the Buyer and the Seller, and each of the Buyer and Seller may exercise legal and/or equitable remedies against the other in the event that the other fails to perform under this Agreement.

WHEREAS, the Parties acknowledge that the Shares are subject to certain transfer restrictions and that all transfer restrictions on the purchase and sale of the Shares are either contained in the Acquisition Agreement, or the other restrictive agreements and documents applicable to the Seller and/or the Shares (such agreements and documents, the "**Other Restrictive Agreements**" and, together with the Acquisition Agreement, the "**Restrictive Agreements**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, the Parties hereby agree as follows:

1. **PURCHASE AND SALE OF SHARES; TRANSFER AGREEMENT AND OTHER MATTERS.**

    1.1.    Subject to the terms and conditions of this Agreement, at the Closing, the Seller hereby agrees to sell to the Buyer, and the Buyer shall purchase all of Seller's right, title and interest in and to the Shares, as set forth under the Transaction Details (the "**Transaction**").  Subject to and upon the terms and conditions of this Agreement, in consideration and as payment in full for the Shares, at the Closing the Buyer shall pay to Seller the Purchase Price set forth under the Transaction Details.

    1.2.    The Parties acknowledge and agree that the Issuer may require the Buyer and the Seller to enter into one or more transfer or other agreements (collectively, the "**Transfer Agreement**"), in form and substance acceptable to the Issuer to consummate the Transaction. Each of the Buyer and the Seller agrees to enter into any such Transfer Agreement. In addition, and to the extent required by the Issuer, the Party set forth on Exhibit A agrees to and shall be responsible for and

deliver (a) any transfer fee payable to the Issuer or its transfer agent, and (b) a legal opinion regarding the transfer of Shares.

2. **ADJUSTMENTS; CLOSING; TRANSFER OF SHARES.**

    2.1.   *Share Adjustments*.

        2.1.1.  If the Seller's right to sell and transfer the Shares is subject to restrictions, including but not limited to pre-emptive rights, rights of first refusal, co-sale or similar rights, and the Issuer or a party with such rights exercises such rights, then the number of Shares to be purchased and sold under this Agreement and the Purchase Price shall be automatically adjusted to reflect the exercise of such rights, and <u>Exhibit A</u> shall be updated accordingly (which shall not be deemed to be an amendment to this Agreement). The Buyer shall be solely responsible for distributing any part of the Purchase Price to other parties that have exercised pre-emptive co-sale or similar rights under the Restrictive Agreements.

        2.1.2.  The number of Shares and the price per Share, each as set forth on <u>Exhibit A</u>, are based on the Issuer not having effected any stock split, stock dividend, spin-off, recapitalization or similar transaction affecting the Shares (each a "**Capital Restructuring Event**") during the period between the Issuer filing its Amended and Restated Certificate of Incorporation with the State of Delaware on 06/14/2023 (the "**COI Date**")(such Certificate of Incorporation, the "**COI**") and the Closing Date (as defined below). In the event the Issuer has effected a Capital Restructuring Event during such period, the number of Shares to be purchased and sold under this Agreement and the price per Share shall be automatically adjusted to reflect Capital Restructuring Event, and <u>Exhibit A</u> shall be updated accordingly (which shall not be deemed to be an amendment to this Agreement).

    2.2.   *Closing*.  Subject to the terms and conditions of this Agreement, the purchase and sale of the Shares contemplated hereby shall take place at a closing (the "**Closing**") no later than two (2) business days after the last of the conditions to Closing set forth in Section 6 has been satisfied or waived (other than conditions and deliverables which, by their nature, are to be satisfied and/or delivered on the Closing Date), remotely by exchange of documents and signatures (or their electronic counterparts) (the day on which the Closing takes place being the "**Closing Date**").

    2.3.   *Transactions to be Effected at the Closing*.  At the Closing:

        2.3.1.  The Seller shall deliver and transfer to the Buyer, and the Buyer shall accept from the Seller, all beneficial and record ownership of the Shares in accordance with the terms of this Agreement and any Transfer Agreement.

        2.3.2.  The Buyer shall deliver the Purchase Price to the Seller.

2.4.   *Further Assurances*.  Each of the Buyer and the Seller agree to take every other action reasonably required to effect the Transaction including, without limitation, the execution of any Transfer Agreement.

3.   **AGREEMENTS APPLICABLE TO THE SHARES.**

In the event that the Shares are subject to one or more transfer restrictions, true and complete statements of all such restrictions are set forth in the Restrictive Agreements.  Effective at the Closing, the Buyer agrees to be bound by the terms of, and to execute, any agreement containing transfer restrictions if required by any of their terms to properly effect the Transaction.

4.   **REPRESENTATIONS, WARRANTIES AND COVENANTS.** The following representations, warranties and covenants shall survive the Closing.

4.1.   *Seller's Representations and Warranties.* The Seller represents and warrants to the Buyer and to the third-party beneficiaries of this Agreement that on the Effective Date and at all times through the Closing:

4.1.1.   The Seller holds valid and marketable title to the Shares, which are fully paid and non-assessable, and owns the Shares free and clear of all liens, claims, encumbrances, security interests, contractual rights or similar obligations, restrictions on transfer, repurchase rights, or other defects in title of any kind, and is offering, selling and transferring the Shares to the Buyer free and clear of all liens, claims, encumbrances, security interests, restrictions on transfer, repurchase rights, or other defects in title of any kind or description, except in each case for (1) applicable securities laws, and (2) rights pursuant to the Restrictive Agreements;

4.1.2.   Assuming compliance with the Restrictive Agreements, (1) the Seller has the right, power and authority to enter into and carry out the terms of this Agreement, including without limitation, the offer, sale and transfer of the Shares to the Buyer, and has taken all action necessary to validly do so, and (2) neither the execution or performance of this Agreement or the Transaction will conflict with or result in a breach or termination of any agreement or evidence of indebtedness;

4.1.3.   This Agreement is a legal, valid and binding agreement of the Seller enforceable in accordance with its terms. Any Transfer Agreement will, upon signature, be a legal, valid and binding agreement of the Seller enforceable in accordance with each of their terms; and

4.1.4.   The Seller has delivered to the Buyer true and complete copies of the Acquisition Agreement and certain Other Restrictive Agreements as set forth on Exhibit C. The Restrictive Agreements contain all of the transfer restrictions on the purchase and sale of the Shares.

4.2.   *Buyer's Representations and Warranties.*  The Buyer represents and warrants to the Seller and to the third-party beneficiaries of this Agreement that on the Effective Date and at all times through the Closing:

4.2.1. The Buyer is an "accredited investor" as defined in the Securities Act of 1933, as amended (the "**Securities Act**");

4.2.2. (1) the Buyer has the right, power and authority to enter into and carry out the terms of this Agreement and any Transfer Agreement, and (2) this Agreement is a legal, valid and binding agreement of the Buyer enforceable in accordance with its terms. Any Transfer Agreement will, upon signature, be a legal, valid and binding agreement of the Buyer enforceable in accordance with each of their terms;

4.2.3. The Buyer understands that the sale of the Shares has not been registered under the Securities Act and that the Seller relies on the Buyer's representations in this Agreement in entering into the Transaction;

4.2.4. The Buyer is purchasing the Shares solely for investment purposes, and not for further distribution, and covenants that all legal and beneficial ownership interest in the Shares shall be held solely for his, her or its own account, except to the extent that (1) affiliates of the Buyer, its or their respective directors, officers, managers or members, stockholders may be deemed to have an indirect beneficial ownership interest in the Shares, or (2) such Shares are held jointly with a spouse. The Buyer is not a party to and does not presently intend to enter into any contract or other arrangement with any other person involving the resale, transfer, or other distribution of any of the Shares;

4.2.5. The Buyer can properly evaluate the merits and risks of an investment in the Shares and can protect his, her or its own interests in this regard, whether by reason of the Buyer's own business and financial expertise, the business and financial expertise of professional advisors unaffiliated with the Seller with whom the Buyer has consulted, or the Buyer's preexisting business or personal relationship with the Issuer's directors or controlling persons;

4.2.6. The Buyer is sufficiently aware of the Issuer's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the Shares. The Buyer has received all information he, she or it deems appropriate for assessing the risk of an investment in the Shares;

4.2.7. The Buyer realizes that the purchase of the Shares involves a high degree of risk, and that the Issuer's future prospects are uncertain. The Buyer is able to bear the complete loss of an investment in the Shares; and

4.2.8. The Buyer understands that the Shares are "restricted securities", may not be freely traded, and that the sale of the Shares has not been registered under the Securities Act. The Buyer also understands and agrees that:

4.2.8.1. No public market now exists for any of the securities of the Issuer and that there can be no assurance that a public market for such securities will ever exist;

4.2.8.2. The Shares must be held indefinitely, unless any subsequent proposed resale is registered under the Securities Act, or an exemption from registration is otherwise available;

4.2.8.3. The Issuer is under no obligation to, and cannot be expected to, register any subsequent resale of the Shares;

4.2.8.4. The Issuer may require the Buyer to (a) give it written notice containing detailed information regarding any future proposed sale, (b) provide an opinion of counsel to the effect that such sale will not require registration, and (c) obtain notice from the Issuer in writing that its counsel concurs in such opinion; and

4.2.8.5. The certificate evidencing the Shares may be imprinted with a legend prohibiting transfer of the Shares unless such transfer is registered or such registration is not required in the opinion of the Issuer's counsel.

4.2.9. The Buyer has received and reviewed copies of the Acquisition Agreement and certain Other Restrictive Agreements as set forth on <u>Exhibit C</u>, and has waived the right to receive and/or review all Other Restrictive Agreements not set forth thereon.

4.3. *Representations, Warranties and Covenants of the Parties Regarding the Transaction.* Each of the Buyer and the Seller represent, warrant and covenant to each other and to the third party beneficiaries of this Agreement that as of the Effective Date and at all times through the Closing:

4.3.1. They have had the opportunity to review this Agreement and are entering into this Agreement voluntarily and are not under any form of duress;

4.3.2. They and/or their legal counsel are familiar with applicable securities laws and regulations regarding the Shares and the Transaction, and each of the Buyer and the Seller is responsible for ensuring that the purchase and Sale of the Shares and entry into the Transaction is in compliance with such laws;

4.3.3. Each Party agrees to comply at all times with the terms of and to meet their obligations under any Transfer Agreement. Each Party agrees that, pursuant to Section 7.2.1, any failure to perform under any Transfer Agreement shall be deemed a failure to perform his, her or its obligations under this Agreement;

4.3.4. Each Party acknowledges that it has received all information it has deemed appropriate or necessary to enable such Party to evaluate its decision to enter into this Agreement. Without limiting the foregoing, each Party expressly acknowledges that (i) the other Party currently may have, and later may come into possession of, information with respect to the Issuer that is not known to such Party and that may be material to a decision to sell the Shares ("**Excluded Information**"), (ii) each Party has determined

to enter into this Agreement notwithstanding its lack of knowledge of the Excluded Information, and (iii) the Parties shall have no liability to one another, and each Party hereby waives and releases any claims that it might have against the other Party, Forge Securities LLC (together with its affiliates, "**Forge**"), the Issuer, or any other party, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement;

4.3.5.  Each Party has reviewed the COI.  Each Party is not aware, and has taken all reasonable steps to inform itself, of (i) the declaration or occurrence of any Capital Restructuring Event since the COI Date, (ii) the declaration or occurrence of an extraordinary dividend payable in a form other than stock since the COI Date, and (iii) any amendment and/or restatement of the COI since the COI Date;

4.3.6.  Other than as explicitly stated in this Agreement, they have not relied on any other representation or warranty of the other Party, or any third party including, without limitation, Forge or the Issuer;

4.3.7.  They are not relying on any express or implied legal or investment advice or information (including, without limitation, third-party materials) from the other Party, Forge or the Issuer, with respect to the prospects or value of the Issuer, the Shares or any aspect of the Transaction.  They are aware and acknowledge that Forge is not representing or serving as counsel for any party to the Transaction and that there is no attorney-client relationship established between Forge and the Buyer or the Seller;

4.3.8.  They (i) acknowledge that the Purchase Price was negotiated at arm's-length, may not represent the fair market value of the Shares, and that the Shares may have a current or future value greater or lesser than the amount paid for the Shares under this Agreement, and (ii) understand that that the Issuer's plans for the future, if successful, may result in the Shares becoming significantly more or less valuable and that the future value of the Shares could be greater or lesser than the Purchase Price;

4.3.9.  They acknowledge and agree that any actual or perceived price volatility or fluctuation in the Shares, the Issuer and/or the secondary market between the Effective Date and the Closing shall not (i) constitute a breach or default by any Party under this Agreement, or (ii) be used as a basis for or justify a Party's breach or default of this Agreement or failure to close the Transaction; and

4.3.10. The Parties acknowledge that neither Forge nor the Issuer is a party to this Agreement, and that neither of them shall be liable to the Buyer or the Seller with respect to this Agreement, any Transfer Agreement or the Transaction.

4.4.    *Additional Covenants of the Parties.*

4.4.1.   Each of the Buyer and the Seller agree not to take or allow to be taken any action that is within their control during the term of this Agreement that has the effect of circumventing the terms of this Agreement;

**4.4.2.   If either the Buyer or the Seller becomes aware that any representation or warranty made in this Agreement is or becomes untrue at any time prior to the Closing, he/she/it agrees to immediately deliver written notice to the other party and Forge identifying the relevant representation or warranty in question and a brief description of the pertinent facts and circumstances; and**

4.4.3.   The Parties have agreed not to open an escrow account with any escrow provider to facilitate the deliveries and transfer pursuant to Section 2.

5.   **INDEMNIFICATION; EXCULPATION; DISCLAIMER.**

5.1.   The Buyer and the Seller each agree to defend, indemnify and hold harmless each other and each of their respective partners, members, officers, directors, managers, managing members, employees, agents, representatives, successors and assigns from and against any claim, damage, liability, loss, cost or expense (including reasonable attorneys' fees) asserted by a third party arising directly or indirectly out of: (i) any failure of theirs to perform their obligations as set forth in this Agreement or the Transfer Agreement; (ii) any inaccuracy or breach of any of the representations or warranties made by such Party in this Agreement or the Transfer Agreement, and (iii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.  The remedies provided in this Section 5 shall be cumulative and shall not preclude the assertion by any Party of any other rights or remedies against the other.

5.2.   Each Party acknowledges and agrees that Forge shall not be liable to the Buyer or the Seller for mistakes of judgment, fact or law, or for action or inaction, taken in good faith for a purpose reasonably believed to be in the best interests of completing the Transaction, or for losses due to such mistakes, action or inaction of Forge or of any employee, broker, or other agent of Forge (except to the extent that a court of competent jurisdiction determines that the Forge's willful misconduct or fraud was the primary cause of any loss).  Forge may consult with counsel and accountants in respect of the Transaction and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants.  Under no circumstances will Forge be liable to a Party to this Agreement for the other Party's failure to perform his, her or its obligations under this Agreement. Solely to the extent that such liability may not be waived, modified, or limited under applicable law, this Section 5.2 shall be construed so as to effectuate its provisions to the fullest extent permitted by law.

6.   **CONDITIONS TO CLOSING.**  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

6.1.    Seller shall have obtained all requisite consents, authorizations, and approvals to consummate the Transaction, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, and approval shall have been revoked.

6.2.    No (i) action or proceeding shall have been commenced against the Buyer or the Seller which would prevent the Closing, and (ii) injunction or restraining order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

6.3.    Each Party shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by such Party on or before the Closing.

7.    TERMINATION.  This Agreement may be terminated at any time prior to the Closing:

7.1.    by the mutual written consent of the Parties;

7.2.    by a Party upon two (2) days prior written notice to the other Party if:

7.2.1.    (i) the other Party commits a material breach or material default in the performance or observance of any of its obligations under (1) this Agreement or (2) any Transfer Agreement, and (ii) such breach or default continues for a period of five (5) business days after delivery by the other Party of written notice reasonably detailing such breach or default; or

7.2.2.    any of the other Party's representations or warranties are untrue in any material respect at any time prior to the Closing.

7.3.    In the event of the termination of this Agreement in accordance with this Section 7, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except:

7.3.1.    as set forth in Sections 5 through 9 hereof; and

7.3.2.    that nothing herein shall relieve any Party from liability for any fraud or willful breach of any provision hereof.

ARBITRATION AGREEMENT.

8.    All controversies arising hereunder shall be resolved by binding arbitration in the City and County of San Francisco, California, conducted by JAMS if available, or by an alternate arbitration service of comparable reputation if not.  The Parties shall maintain the confidential nature of the arbitration proceeding and of any award, including the hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. All awards rendered by the arbitrator(s) shall be binding and final, and judgment upon the award may be entered in any court of competent jurisdiction. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration

agreement against any person who has initiated in court a putative class action or who is a member of putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.  Notwithstanding the foregoing, nothing in this Agreement shall be deemed to limit the Parties' rights to seek injunctive relief in any other court of law of competent jurisdiction.

9.  **MISCELLANEOUS.**

9.1.  *Electronic Notices.* Any and all instruments, agreements, information, documents, communications, and notices required or permitted hereunder may be executed or delivered electronically by confirmed email, or electronic document service.

9.2.  *Confidentiality.* The Buyer and the Seller agree to hold the identity of the Parties, the terms of this Agreement, and any documents, materials or information regarding the other Party acquired in connection with this Agreement in confidence and not to disclose the same, except when reasonably required to complete the Transaction or in required financial reports to investors or tax reports.

9.3.  *Entire Agreement; Successors and Assigns.*  This Agreement and any Transfer Agreement contain the entire understanding between the Parties and together supersede any prior written or oral agreement among the Parties concerning the subject matter contained herein.  If any provision of this Agreement conflicts with a provision contained in any Transfer Agreement, the Transfer Agreement will control solely to the extent of the conflicting provision. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

9.4.  *Third Party Beneficiaries.* This Agreement is made solely and specifically between and for the benefit of the Parties and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise; provided, that Forge and the Issuer are express third-party beneficiaries of this Agreement, and each of them may enforce the provisions of this Agreement in their own name.   In the event that any Transfer Agreement purports to supersede and/or negate any right of Forge hereunder, each Party acknowledges and agrees that, notwithstanding the terms of the Transfer Agreement, Forge shall be entitled to enforce any such rights hereunder.

9.5.  *Waiver.*  No waiver of any breach or default of this Agreement by any Party shall be considered a waiver of any other breach or default of this Agreement.

9.6.  *Electronic Signature; Party's Identity.* This Agreement may be executed with an electronic signature and in counterparts. When executed by each of the Buyer and the Seller this Agreement is a valid and binding agreement upon each Party.  Each of the Buyer and the Seller acknowledges and accepts that one or both of them may not have known the identity of the other at the time they executed this Agreement, that this fact in no way effects the validity or enforceability of this

Agreement. Each of the Buyer and the Seller agrees and covenants not to challenge the validity or enforceability of this Agreement on any such grounds.

9.7.    *Amendment*.  Except with respect to updating the Transaction Details pursuant to Section 2, this Agreement may be amended or modified only by a written agreement duly executed by the Parties; provided, however, that any amendment or modification of the terms of this Agreement which affects the rights of Forge, or the Issuer, in each case in such party's capacity as a third party beneficiary to this Agreement, shall also be subject to the written consent of such party.

9.8.    *Choice of Law*.  This Agreement shall be interpreted in accordance with, and governed by, the laws of the State of Delaware without reference to the choice of law rules in effect at any time in the State of Delaware.

9.9.    *Specific Performance*.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each Party shall be entitled to seek specific performance of the terms hereof against the other Party, in addition to any other remedy to which they are entitled at law or in equity.

9.10.   *Expenses*.  In the event of any arbitration or other legal proceeding arising out of or relating to this Agreement or any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and expenses (in addition to any other relief to which the prevailing party may be entitled) as determined by and within the discretion of the arbitrators or court.  Except as provided in the immediately preceding sentence, each Party shall bear their respective costs and expenses (including legal fees and costs) in connection with the Transaction.

9.11.   *Headings*.  The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

9.12.   *Severability*.  If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect.

*[The remainder of this page is intentionally left blank.]*

*The Parties to this Agreement have caused this Agreement to be executed below.*

**BUYER:**

**Linqto Liquidshares LLC**

By: *Joe Endoso*
    65900CA3849448C...

Date: August 26, 2024

Name: Joe Endoso

Title: Managing Member

Address: 101 Metro Drive, Ste. 335

San Jose, CA 95110

**SELLER:**

**The Katherine Swagar 2020 Descendants Trust**

By: *Katherine Swagar*
    8925DB70DF6B433...

Date: August 26, 2024

Name: Katherine Swagar

Title: Managing partner

Address: ███████████████

**EXHIBIT A**

<u>Transaction Details</u>

|  | **Original** | **As Adjusted** |
|---|---|---|
| **Issuer**: | <u>Ripple Labs, Inc.</u> | |
| **Share Type**: | <u>Common</u> | |
| **Number of Shares:** | <u>44,000</u> | _____ |
| **Price per Share:** | <u>$28.50</u> | $_____ |
| **Purchase Price**: | <u>$1,254,000.00</u> | $_____ |
| **Transfer Fee (if applicable):** | **Seller** | |
| **Legal Opinion (if applicable):** | **Seller** | |

**EXHIBIT B**

<u>Acquisition Agreement</u>

Number | Shares

**CSA-11301** | **120,493**



THIS CERTIFICATE REPLACES ANY PREVIOUSLY ISSUED STOCK CERTIFICATE REPRESENTING SUCH SHARES WITH A CERTIFICATE NUMBER IDENTICAL TO THE CERTIFICATE NUMBER OF THIS CERTIFICATE. ANY PREVIOUSLY ISSUED STOCK CERTIFICATE REPRESENTING SUCH SHARES WITH A CERTIFICATE NUMBER IDENTICAL TO THE CERTIFICATE NUMBER OF THIS CERTIFICATE IS DEEMED VOID.

*See Legends on Reverse*

Incorporated Under the Laws of the State of Delaware

# RIPPLE LABS INC.

This Certifies that The Katherine Swagar 2020 Descendants Trust is the registered holder of One Hundred Twenty Thousand Four Hundred Ninety-Three (120,493) Shares of Class A Common Stock of Ripple Labs Inc. transferrable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, said Corporation has caused this Certificate to be signed by its duly authorized officers as of August 20, 2024.

_____
Chief Executive Officer

*Jon Bilich*
_____
Chief Financial Officer

COPY

Shareworks

**EXHIBIT C**

<u>Other Restrictive Agreements</u>

(if applicable)

**Exhibit C**

# Purchase Agreement

This Purchase Agreement (this "**Agreement**") is made and entered into as of the date that the last signature is affixed hereto (the "**Effective Date**"), by and between the buyer (the "**Buyer**") and the seller (the "**Seller**"), each as set forth on the signature page hereto. Each of the Buyer and the Seller are hereinafter referred to as a "**Party**" and together as the "**Parties**."

**WHEREAS**, the Seller is the sole owner and holder of the number of shares of the Share Type of the Issuer (each, as defined below) set forth under Transaction Details attached hereto as <u>Exhibit A</u> (the "**Shares**"), which Seller holds as evidenced by that certain Stock Certificate Number CSA-13004 dated September 25, 2024 (the "**Acquisition Agreement**"), attached hereto as <u>Exhibit B</u>.  As used in this Agreement, "**Shares**" shall include all Shares sold and transferred under this Agreement and all securities and other proceeds received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares, and (c) as substitution for or in consideration of the Shares in a recapitalization, exchange, merger, reorganization or the like. To the extent that any other stockholder of the Issuer exercises its co-sale rights, the definition of Shares shall not include the shares of such exercising stockholder, and the number of Shares shall be reduced by the number of shares included through the co-sale right.

**WHEREAS**, the Seller desires to sell the Shares to Buyer, and Buyer desires to purchase and acquire the Shares from the Seller, on the terms and conditions set forth in this Agreement.

**WHEREAS**, the Parties acknowledge that this Agreement is binding as between the Buyer and the Seller, and each of the Buyer and Seller may exercise legal and/or equitable remedies against the other in the event that the other fails to perform under this Agreement.

**WHEREAS**, the Parties acknowledge that the Shares are subject to certain transfer restrictions and that all transfer restrictions on the purchase and sale of the Shares are either contained in the Acquisition Agreement, or the other restrictive agreements and documents applicable to the Seller and/or the Shares (such agreements and documents, the "**Other Restrictive Agreements**" and, together with the Acquisition Agreement, the "**Restrictive Agreements**").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, the Parties hereby agree as follows:

1. **PURCHASE AND SALE OF SHARES; TRANSFER AGREEMENT AND OTHER MATTERS.**

    1.1.    Subject to the terms and conditions of this Agreement, at the Closing, the Seller hereby agrees to sell to the Buyer, and the Buyer shall purchase all of Seller's right, title and interest in and to the Shares, as set forth under the Transaction Details (the "**Transaction**").  Subject to and upon the terms and conditions of this Agreement, in consideration and as payment in full for the Shares, at the Closing the Buyer shall pay to Seller the Purchase Price set forth under the Transaction Details.

    1.2.    The Parties acknowledge and agree that the Issuer may require the Buyer and the Seller to enter into one or more transfer or other agreements (collectively, the "**Transfer Agreement**"), in form and substance acceptable to the Issuer to consummate the Transaction. Each of the Buyer and the Seller agrees to enter into any such Transfer Agreement. In addition, and to the extent required by the

Issuer, the Party set forth on <u>Exhibit A</u> agrees to and shall be responsible for and deliver (a) any transfer fee payable to the Issuer or its transfer agent, and (b) a legal opinion regarding the transfer of Shares.

**2. ADJUSTMENTS; CLOSING; TRANSFER OF SHARES.**

2.1. *Share Adjustments*.

2.1.1. If the Seller's right to sell and transfer the Shares is subject to restrictions, including but not limited to pre-emptive rights, rights of first refusal, co-sale or similar rights, and the Issuer or a party with such rights exercises such rights, then the number of Shares to be purchased and sold under this Agreement and the Purchase Price shall be automatically adjusted to reflect the exercise of such rights, and <u>Exhibit A</u> shall be updated accordingly (which shall not be deemed to be an amendment to this Agreement). The Buyer shall be solely responsible for distributing any part of the Purchase Price to other parties that have exercised pre-emptive co-sale or similar rights under the Restrictive Agreements.

2.1.2. The number of Shares and the price per Share, each as set forth on <u>Exhibit A</u>, are based on the Issuer not having effected any stock split, stock dividend, spin-off, recapitalization or similar transaction affecting the Shares (each a "**Capital Restructuring Event**") during the period between the Issuer filing its Amended and Restated Certificate of Incorporation with the State of Delaware on 06/14/23 (the "**COI Date**")(such Certificate of Incorporation, the "**COI**") and the Closing Date (as defined below).  In the event the Issuer has effected a Capital Restructuring Event during such period, the number of Shares to be purchased and sold under this Agreement and the price per Share shall be automatically adjusted to reflect Capital Restructuring Event, and <u>Exhibit A</u> shall be updated accordingly (which shall not be deemed to be an amendment to this Agreement).

2.2. *Closing*.  Subject to the terms and conditions of this Agreement, the purchase and sale of the Shares contemplated hereby shall take place at a closing (the "**Closing**") no later than two (2) business days after the last of the conditions to Closing set forth in Section 6 has been satisfied or waived (other than conditions and deliverables which, by their nature, are to be satisfied and/or delivered on the Closing Date), remotely by exchange of documents and signatures (or their electronic counterparts) (the day on which the Closing takes place being the "**Closing Date**").

2.3. *Transactions to be Effected at the Closing.*  At the Closing:

2.3.1. The Seller shall deliver and transfer to the Buyer, and the Buyer shall accept from the Seller, all beneficial and record ownership of the Shares in accordance with the terms of this Agreement and any Transfer Agreement.

2.3.2. The Buyer shall deliver the Purchase Price to the Seller.

2.4. *Further Assurances*.  Each of the Buyer and the Seller agree to take every other action reasonably required to effect the Transaction including, without limitation, the execution of any Transfer Agreement.

3. **AGREEMENTS APPLICABLE TO THE SHARES.**

In the event that the Shares are subject to one or more transfer restrictions, true and complete statements of all such restrictions are set forth in the Restrictive Agreements.  Effective at the Closing, the Buyer agrees to be bound by the terms of, and to execute, any agreement containing transfer restrictions if required by any of their terms to properly effect the Transaction.

4. **REPRESENTATIONS, WARRANTIES AND COVENANTS.** The following representations, warranties and covenants shall survive the Closing.

4.1. *Seller's Representations and Warranties*. The Seller represents and warrants to the Buyer and to the third-party beneficiaries of this Agreement that on the Effective Date and at all times through the Closing:

4.1.1. The Seller holds valid and marketable title to the Shares, which are fully paid and non-assessable, and owns the Shares free and clear of all liens, claims, encumbrances, security interests, contractual rights or similar obligations, restrictions on transfer, repurchase rights, or other defects in title of any kind, and is offering, selling and transferring the Shares to the Buyer free and clear of all liens, claims, encumbrances, security interests, restrictions on transfer, repurchase rights, or other defects in title of any kind or description, except in each case for (1) applicable securities laws, and (2) rights pursuant to the Restrictive Agreements;

4.1.2. Assuming compliance with the Restrictive Agreements, (1) the Seller has the right, power and authority to enter into and carry out the terms of this Agreement, including without limitation, the offer, sale and transfer of the Shares to the Buyer, and has taken all action necessary to validly do so, and (2) neither the execution or performance of this Agreement or the Transaction will conflict with or result in a breach or termination of any agreement or evidence of indebtedness;

4.1.3. This Agreement is a legal, valid and binding agreement of the Seller enforceable in accordance with its terms. Any Transfer Agreement will, upon signature, be a legal, valid and binding agreement of the Seller enforceable in accordance with each of their terms; and

4.1.4. The Seller has delivered to the Buyer true and complete copies of the Acquisition Agreement and certain Other Restrictive Agreements as set forth on <u>Exhibit C</u>. The Restrictive Agreements contain all of the transfer restrictions on the purchase and sale of the Shares.

4.2. *Buyer's Representations and Warranties*.  The Buyer represents and warrants to the Seller and to the third-party beneficiaries of this Agreement that on the Effective Date and at all times through the Closing:

4.2.1.  The Buyer is an "accredited investor" as defined in the Securities Act of 1933, as amended (the "**Securities Act**");

4.2.2.  (1) the Buyer has the right, power and authority to enter into and carry out the terms of this Agreement and any Transfer Agreement, and (2) this Agreement is a legal, valid and binding agreement of the Buyer enforceable in accordance with its terms.  Any Transfer Agreement will, upon signature, be a legal, valid and binding agreement of the Buyer enforceable in accordance with each of their terms;

4.2.3.  The Buyer understands that the sale of the Shares has not been registered under the Securities Act and that the Seller relies on the Buyer's representations in this Agreement in entering into the Transaction;

4.2.4.  The Buyer is purchasing the Shares solely for investment purposes, and not for further distribution, and covenants that all legal and beneficial ownership interest in the Shares shall be held solely for his, her or its own account, except to the extent that (1) affiliates of the Buyer, its or their respective directors, officers, managers or members, stockholders may be deemed to have an indirect beneficial ownership interest in the Shares, or (2) such Shares are held jointly with a spouse. The Buyer is not a party to and does not presently intend to enter into any contract or other arrangement with any other person involving the resale, transfer, or other distribution of any of the Shares;

4.2.5.  The Buyer can properly evaluate the merits and risks of an investment in the Shares and can protect his, her or its own interests in this regard, whether by reason of the Buyer's own business and financial expertise, the business and financial expertise of professional advisors unaffiliated with the Seller with whom the Buyer has consulted, or the Buyer's preexisting business or personal relationship with the Issuer's directors or controlling persons;

4.2.6.  The Buyer is sufficiently aware of the Issuer's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the Shares. The Buyer has received all information he, she or it deems appropriate for assessing the risk of an investment in the Shares;

4.2.7.  The Buyer realizes that the purchase of the Shares involves a high degree of risk, and that the Issuer's future prospects are uncertain. The Buyer is able to bear the complete loss of an investment in the Shares; and

4.2.8.  The Buyer understands that the Shares are "restricted securities", may not be freely traded, and that the sale of the Shares has not been registered under the Securities Act. The Buyer also understands and agrees that:

    4.2.8.1. No public market now exists for any of the securities of the Issuer and that there can be no assurance that a public market for such securities will ever exist;

4.2.8.2. The Shares must be held indefinitely, unless any subsequent proposed resale is registered under the Securities Act, or an exemption from registration is otherwise available;

4.2.8.3. The Issuer is under no obligation to, and cannot be expected to, register any subsequent resale of the Shares;

4.2.8.4. The Issuer may require the Buyer to (a) give it written notice containing detailed information regarding any future proposed sale, (b) provide an opinion of counsel to the effect that such sale will not require registration, and (c) obtain notice from the Issuer in writing that its counsel concurs in such opinion; and

4.2.8.5. The certificate evidencing the Shares may be imprinted with a legend prohibiting transfer of the Shares unless such transfer is registered or such registration is not required in the opinion of the Issuer's counsel.

4.2.9. The Buyer has received and reviewed copies of the Acquisition Agreement and certain Other Restrictive Agreements as set forth on <u>Exhibit C</u>, and has waived the right to receive and/or review all Other Restrictive Agreements not set forth thereon.

4.3. *Representations, Warranties and Covenants of the Parties Regarding the Transaction.* Each of the Buyer and the Seller represent, warrant and covenant to each other and to the third party beneficiaries of this Agreement that as of the Effective Date and at all times through the Closing:

4.3.1. They have had the opportunity to review this Agreement and are entering into this Agreement voluntarily and are not under any form of duress;

4.3.2. They and/or their legal counsel are familiar with applicable securities laws and regulations regarding the Shares and the Transaction, and each of the Buyer and the Seller is responsible for ensuring that the purchase and Sale of the Shares and entry into the Transaction is in compliance with such laws;

4.3.3. Each Party agrees to comply at all times with the terms of and to meet their obligations under any Transfer Agreement. Each Party agrees that, pursuant to Section 7.2.1, any failure to perform under any Transfer Agreement shall be deemed a failure to perform his, her or its obligations under this Agreement;

4.3.4. Each Party acknowledges that it has received all information it has deemed appropriate or necessary to enable such Party to evaluate its decision to enter into this Agreement. Without limiting the foregoing, each Party expressly acknowledges that (i) the other Party currently may have, and later may come into possession of, information with respect to the Issuer that is not known to such Party and that may be material to a decision to sell the Shares ("**Excluded Information**"), (ii) each Party has determined

to enter into this Agreement notwithstanding its lack of knowledge of the Excluded Information, and (iii) the Parties shall have no liability to one another, and each Party hereby waives and releases any claims that it might have against the other Party, Forge Securities LLC (together with its affiliates, "**Forge**"), the Issuer, or any other party, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement;

4.3.5.  Each Party has reviewed the COI.  Each Party is not aware, and has taken all reasonable steps to inform itself, of (i) the declaration or occurrence of any Capital Restructuring Event since the COI Date, (ii) the declaration or occurrence of an extraordinary dividend payable in a form other than stock since the COI Date, and (iii) any amendment and/or restatement of the COI since the COI Date;

4.3.6.  Other than as explicitly stated in this Agreement, they have not relied on any other representation or warranty of the other Party, or any third party including, without limitation, Forge or the Issuer;

4.3.7.  They are not relying on any express or implied legal or investment advice or information (including, without limitation, third-party materials) from the other Party, Forge or the Issuer, with respect to the prospects or value of the Issuer, the Shares or any aspect of the Transaction.  They are aware and acknowledge that Forge is not representing or serving as counsel for any party to the Transaction and that there is no attorney-client relationship established between Forge and the Buyer or the Seller;

4.3.8.  They (i) acknowledge that the Purchase Price was negotiated at arm's-length, may not represent the fair market value of the Shares, and that the Shares may have a current or future value greater or lesser than the amount paid for the Shares under this Agreement, and (ii) understand that that the Issuer's plans for the future, if successful, may result in the Shares becoming significantly more or less valuable and that the future value of the Shares could be greater or lesser than the Purchase Price;

4.3.9.  They acknowledge and agree that any actual or perceived price volatility or fluctuation in the Shares, the Issuer and/or the secondary market between the Effective Date and the Closing shall not (i) constitute a breach or default by any Party under this Agreement, or (ii) be used as a basis for or justify a Party's breach or default of this Agreement or failure to close the Transaction; and

4.3.10. The Parties acknowledge that neither Forge nor the Issuer is a party to this Agreement, and that neither of them shall be liable to the Buyer or the Seller with respect to this Agreement, any Transfer Agreement or the Transaction.

4.4.    *Additional Covenants of the Parties.*

4.4.1.  Each of the Buyer and the Seller agree not to take or allow to be taken any action that is within their control during the term of this Agreement that has the effect of circumventing the terms of this Agreement;

**4.4.2.  If either the Buyer or the Seller becomes aware that any representation or warranty made in this Agreement is or becomes untrue at any time prior to the Closing, he/she/it agrees to immediately deliver written notice to the other party and Forge identifying the relevant representation or warranty in question and a brief description of the pertinent facts and circumstances; and**

4.4.3.  The Parties have agreed not to open an escrow account with any escrow provider to facilitate the deliveries and transfer pursuant to Section 2.

5.  **INDEMNIFICATION; EXCULPATION; DISCLAIMER.**

5.1.  The Buyer and the Seller each agree to defend, indemnify and hold harmless each other and each of their respective partners, members, officers, directors, managers, managing members, employees, agents, representatives, successors and assigns from and against any claim, damage, liability, loss, cost or expense (including reasonable attorneys' fees) asserted by a third party arising directly or indirectly out of: (i) any failure of theirs to perform their obligations as set forth in this Agreement or the Transfer Agreement; (ii) any inaccuracy or breach of any of the representations or warranties made by such Party in this Agreement or the Transfer Agreement, and (iii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.  The remedies provided in this Section 5 shall be cumulative and shall not preclude the assertion by any Party of any other rights or remedies against the other.

5.2.  Each Party acknowledges and agrees that Forge shall not be liable to the Buyer or the Seller for mistakes of judgment, fact or law, or for action or inaction, taken in good faith for a purpose reasonably believed to be in the best interests of completing the Transaction, or for losses due to such mistakes, action or inaction of Forge or of any employee, broker, or other agent of Forge (except to the extent that a court of competent jurisdiction determines that the Forge's willful misconduct or fraud was the primary cause of any loss).  Forge may consult with counsel and accountants in respect of the Transaction and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants.  Under no circumstances will Forge be liable to a Party to this Agreement for the other Party's failure to perform his, her or its obligations under this Agreement. Solely to the extent that such liability may not be waived, modified, or limited under applicable law, this Section 5.2 shall be construed so as to effectuate its provisions to the fullest extent permitted by law.

6.  **CONDITIONS TO CLOSING.**  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

6.1.    Seller shall have obtained all requisite consents, authorizations, and approvals to consummate the Transaction, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, and approval shall have been revoked.

6.2.    No (i) action or proceeding shall have been commenced against the Buyer or the Seller which would prevent the Closing, and (ii) injunction or restraining order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

6.3.    Each Party shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by such Party on or before the Closing.

**7.    TERMINATION.**  This Agreement may be terminated at any time prior to the Closing:

7.1.    by the mutual written consent of the Parties;

7.2.    by a Party upon two (2) days prior written notice to the other Party if:

7.2.1.    (i) the other Party commits a material breach or material default in the performance or observance of any of its obligations under (1) this Agreement or (2) any Transfer Agreement, and (ii) such breach or default continues for a period of five (5) business days after delivery by the other Party of written notice reasonably detailing such breach or default; or

7.2.2.    any of the other Party's representations or warranties are untrue in any material respect at any time prior to the Closing.

7.3.    In the event of the termination of this Agreement in accordance with this Section 7, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except:

7.3.1.    as set forth in Sections 5 through 9 hereof; and

7.3.2.    that nothing herein shall relieve any Party from liability for any fraud or willful breach of any provision hereof.

**ARBITRATION AGREEMENT.**

**8.**    All controversies arising hereunder shall be resolved by binding arbitration in the City and County of San Francisco, California, conducted by JAMS if available, or by an alternate arbitration service of comparable reputation if not.  The Parties shall maintain the confidential nature of the arbitration proceeding and of any award, including the hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. All awards rendered by the arbitrator(s) shall be binding and final, and judgment upon the award may be entered in any court of competent jurisdiction. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration

agreement against any person who has initiated in court a putative class action or who is a member of putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.  Notwithstanding the foregoing, nothing in this Agreement shall be deemed to limit the Parties' rights to seek injunctive relief in any other court of law of competent jurisdiction.

9.   MISCELLANEOUS.

9.1.   *Electronic Notices.* Any and all instruments, agreements, information, documents, communications, and notices required or permitted hereunder may be executed or delivered electronically by confirmed email, or electronic document service.

9.2.   *Confidentiality.* The Buyer and the Seller agree to hold the identity of the Parties, the terms of this Agreement, and any documents, materials or information regarding the other Party acquired in connection with this Agreement in confidence and not to disclose the same, except when reasonably required to complete the Transaction or in required financial reports to investors or tax reports.

9.3.   *Entire Agreement; Successors and Assigns.*  This Agreement and any Transfer Agreement contain the entire understanding between the Parties and together supersede any prior written or oral agreement among the Parties concerning the subject matter contained herein.  If any provision of this Agreement conflicts with a provision contained in any Transfer Agreement, the Transfer Agreement will control solely to the extent of the conflicting provision. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

9.4.   *Third Party Beneficiaries.* This Agreement is made solely and specifically between and for the benefit of the Parties and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise; provided, that Forge and the Issuer are express third-party beneficiaries of this Agreement, and each of them may enforce the provisions of this Agreement in their own name.   In the event that any Transfer Agreement purports to supersede and/or negate any right of Forge hereunder, each Party acknowledges and agrees that, notwithstanding the terms of the Transfer Agreement, Forge shall be entitled to enforce any such rights hereunder.

9.5.   *Waiver.*  No waiver of any breach or default of this Agreement by any Party shall be considered a waiver of any other breach or default of this Agreement.

9.6.   *Electronic Signature; Party's Identity.* This Agreement may be executed with an electronic signature and in counterparts. When executed by each of the Buyer and the Seller this Agreement is a valid and binding agreement upon each Party.  Each of the Buyer and the Seller acknowledges and accepts that one or both of them may not have known the identity of the other at the time they executed this Agreement, that this fact in no way effects the validity or enforceability of this

Agreement. Each of the Buyer and the Seller agrees and covenants not to challenge the validity or enforceability of this Agreement on any such grounds.

9.7.    *Amendment*.  Except with respect to updating the Transaction Details pursuant to Section 2, this Agreement may be amended or modified only by a written agreement duly executed by the Parties; provided, however, that any amendment or modification of the terms of this Agreement which affects the rights of Forge, or the Issuer, in each case in such party's capacity as a third party beneficiary to this Agreement, shall also be subject to the written consent of such party.

9.8.    *Choice of Law*.  This Agreement shall be interpreted in accordance with, and governed by, the laws of the State of Delaware without reference to the choice of law rules in effect at any time in the State of Delaware.

9.9.    *Specific Performance*.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each Party shall be entitled to seek specific performance of the terms hereof against the other Party, in addition to any other remedy to which they are entitled at law or in equity.

9.10.    *Expenses*.  In the event of any arbitration or other legal proceeding arising out of or relating to this Agreement or any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and expenses (in addition to any other relief to which the prevailing party may be entitled) as determined by and within the discretion of the arbitrators or court.  Except as provided in the immediately preceding sentence, each Party shall bear their respective costs and expenses (including legal fees and costs) in connection with the Transaction.

9.11.    *Headings*.  The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

9.12.    *Severability*.  If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect.

*[The remainder of this page is intentionally left blank.]*

*The Parties to this Agreement have caused this Agreement to be executed below.*

**BUYER:**

**Linqto Liquidshares LLC**

By:    Date: October 9, 2024

Name: William Sarris

Title: Managing Member

Address: 101 Metro Dr, Ste 335

San Jose, CA 95111

**SELLER:**

**The WRS 2020 Family Trust**



By: William Ryan Swagar   Date: October 9, 2024

Name: William Ryan Swagar

Title: Managing Partner

Address: ██████████████

**EXHIBIT A**

Transaction Details

|  | **Original** | **As Adjusted** |
|---|---|---|
| **Issuer**: | Ripple Labs, Inc. |  |
| **Share Type**: | Common |  |
| **Number of Shares:** | 25,875 | _____ |
| **Price per Share:** | $29.00 | $_____ |
| **Purchase Price**: | $750,375.00 | $_____ |
| **Transfer Fee (if applicable):** | Seller |  |
| **Legal Opinion (if applicable):** | Seller |  |

Docusign Envelope ID: 221E3247-7654-46F9-88C0-9D7D869CCF36

**EXHIBIT B**

<u>Acquisition Agreement</u>

Number | Shares

**CSA-13004** | **76,493**



*THIS CERTIFICATE REPLACES ANY PREVIOUSLY ISSUED STOCK CERTIFICATE REPRESENTING SUCH SHARES WITH A CERTIFICATE NUMBER IDENTICAL TO THE CERTIFICATE NUMBER OF THIS CERTIFICATE. ANY PREVIOUSLY ISSUED STOCK CERTIFICATE REPRESENTING SUCH SHARES WITH A CERTIFICATE NUMBER IDENTICAL TO THE CERTIFICATE NUMBER OF THIS CERTIFICATE IS DEEMED VOID.*

*See Legends on Reverse*

Incorporated Under the Laws of the State of Delaware

# RIPPLE LABS INC.

This Certifies that The WRS 2020 Family Trust is the registered holder of Seventy-Six Thousand Four Hundred Ninety-Three (76,493) Shares of Class A Common Stock of Ripple Labs Inc. transferrable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, said Corporation has caused this Certificate to be signed by its duly authorized officers as of September 25, 2024.

_____
Chief Executive Officer

*Jon Bilich*
_____
Chief Financial Officer

COPY

**EXHIBIT C**

<u>Other Restrictive Agreements</u>

(if applicable)

**Exhibit D**

# Purchase Agreement

This Purchase Agreement (this "**Agreement**") is made and entered into as of the date that the last signature is affixed hereto (the "**Effective Date**"), by and between the buyer (the "**Buyer**") and the seller (the "**Seller**"), each as set forth on the signature page hereto. Each of the Buyer and the Seller are hereinafter referred to as a "**Party**" and together as the "**Parties**."

WHEREAS, the Seller is the sole owner and holder of the number of shares of the Share Type of the Issuer (each, as defined below) set forth under Transaction Details attached hereto as <u>Exhibit A</u> (the "**Shares**"), which Seller holds as evidenced by that certain Stock Certificate Number CSA-13006 dated September 25, 2024 (the "**Acquisition Agreement**"), attached hereto as <u>Exhibit B</u>. As used in this Agreement, "**Shares**" shall include all Shares sold and transferred under this Agreement and all securities and other proceeds received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares, and (c) as substitution for or in consideration of the Shares in a recapitalization, exchange, merger, reorganization or the like. To the extent that any other stockholder of the Issuer exercises its co-sale rights, the definition of Shares shall not include the shares of such exercising stockholder, and the number of Shares shall be reduced by the number of shares included through the co-sale right.

WHEREAS, the Seller desires to sell the Shares to Buyer, and Buyer desires to purchase and acquire the Shares from the Seller, on the terms and conditions set forth in this Agreement.

WHEREAS, the Parties acknowledge that this Agreement is binding as between the Buyer and the Seller, and each of the Buyer and Seller may exercise legal and/or equitable remedies against the other in the event that the other fails to perform under this Agreement.

WHEREAS, the Parties acknowledge that the Shares are subject to certain transfer restrictions and that all transfer restrictions on the purchase and sale of the Shares are either contained in the Acquisition Agreement, or the other restrictive agreements and documents applicable to the Seller and/or the Shares (such agreements and documents, the "**Other Restrictive Agreements**" and, together with the Acquisition Agreement, the "**Restrictive Agreements**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, the Parties hereby agree as follows:

1. **PURCHASE AND SALE OF SHARES; TRANSFER AGREEMENT AND OTHER MATTERS.**

    1.1.    Subject to the terms and conditions of this Agreement, at the Closing, the Seller hereby agrees to sell to the Buyer, and the Buyer shall purchase all of Seller's right, title and interest in and to the Shares, as set forth under the Transaction Details (the "**Transaction**"). Subject to and upon the terms and conditions of this Agreement, in consideration and as payment in full for the Shares, at the Closing the Buyer shall pay to Seller the Purchase Price set forth under the Transaction Details.

    1.2.    The Parties acknowledge and agree that the Issuer may require the Buyer and the Seller to enter into one or more transfer or other agreements (collectively, the "**Transfer Agreement**"), in form and substance acceptable to the Issuer to consummate the Transaction. Each of the Buyer and the Seller agrees to enter into any such Transfer Agreement. In addition, and to the extent required by the

Issuer, the Party set forth on <u>Exhibit A</u> agrees to and shall be responsible for and deliver (a) any transfer fee payable to the Issuer or its transfer agent, and (b) a legal opinion regarding the transfer of Shares.

**2. ADJUSTMENTS; CLOSING; TRANSFER OF SHARES.**

2.1. *Share Adjustments*.

2.1.1. If the Seller's right to sell and transfer the Shares is subject to restrictions, including but not limited to pre-emptive rights, rights of first refusal, co-sale or similar rights, and the Issuer or a party with such rights exercises such rights, then the number of Shares to be purchased and sold under this Agreement and the Purchase Price shall be automatically adjusted to reflect the exercise of such rights, and <u>Exhibit A</u> shall be updated accordingly (which shall not be deemed to be an amendment to this Agreement). The Buyer shall be solely responsible for distributing any part of the Purchase Price to other parties that have exercised pre-emptive co-sale or similar rights under the Restrictive Agreements.

2.1.2. The number of Shares and the price per Share, each as set forth on <u>Exhibit A</u>, are based on the Issuer not having effected any stock split, stock dividend, spin-off, recapitalization or similar transaction affecting the Shares (each a "**Capital Restructuring Event**") during the period between the Issuer filing its Amended and Restated Certificate of Incorporation with the State of Delaware on 06/14/23 (the "**COI Date**")(such Certificate of Incorporation, the "**COI**") and the Closing Date (as defined below). In the event the Issuer has effected a Capital Restructuring Event during such period, the number of Shares to be purchased and sold under this Agreement and the price per Share shall be automatically adjusted to reflect Capital Restructuring Event, and <u>Exhibit A</u> shall be updated accordingly (which shall not be deemed to be an amendment to this Agreement).

2.2. *Closing*. Subject to the terms and conditions of this Agreement, the purchase and sale of the Shares contemplated hereby shall take place at a closing (the "**Closing**") no later than two (2) business days after the last of the conditions to Closing set forth in Section 6 has been satisfied or waived (other than conditions and deliverables which, by their nature, are to be satisfied and/or delivered on the Closing Date), remotely by exchange of documents and signatures (or their electronic counterparts) (the day on which the Closing takes place being the "**Closing Date**").

2.3. *Transactions to be Effected at the Closing*. At the Closing:

2.3.1. The Seller shall deliver and transfer to the Buyer, and the Buyer shall accept from the Seller, all beneficial and record ownership of the Shares in accordance with the terms of this Agreement and any Transfer Agreement.

2.3.2. The Buyer shall deliver the Purchase Price to the Seller.

2.4.   *Further Assurances*.  Each of the Buyer and the Seller agree to take every other action reasonably required to effect the Transaction including, without limitation, the execution of any Transfer Agreement.

## 3.   AGREEMENTS APPLICABLE TO THE SHARES.

In the event that the Shares are subject to one or more transfer restrictions, true and complete statements of all such restrictions are set forth in the Restrictive Agreements.  Effective at the Closing, the Buyer agrees to be bound by the terms of, and to execute, any agreement containing transfer restrictions if required by any of their terms to properly effect the Transaction.

## 4.   REPRESENTATIONS, WARRANTIES AND COVENANTS. The following representations, warranties and covenants shall survive the Closing.

4.1.   *Seller's Representations and Warranties*. The Seller represents and warrants to the Buyer and to the third-party beneficiaries of this Agreement that on the Effective Date and at all times through the Closing:

4.1.1.   The Seller holds valid and marketable title to the Shares, which are fully paid and non-assessable, and owns the Shares free and clear of all liens, claims, encumbrances, security interests, contractual rights or similar obligations, restrictions on transfer, repurchase rights, or other defects in title of any kind, and is offering, selling and transferring the Shares to the Buyer free and clear of all liens, claims, encumbrances, security interests, restrictions on transfer, repurchase rights, or other defects in title of any kind or description, except in each case for (1) applicable securities laws, and (2) rights pursuant to the Restrictive Agreements;

4.1.2.   Assuming compliance with the Restrictive Agreements, (1) the Seller has the right, power and authority to enter into and carry out the terms of this Agreement, including without limitation, the offer, sale and transfer of the Shares to the Buyer, and has taken all action necessary to validly do so, and (2) neither the execution or performance of this Agreement or the Transaction will conflict with or result in a breach or termination of any agreement or evidence of indebtedness;

4.1.3.   This Agreement is a legal, valid and binding agreement of the Seller enforceable in accordance with its terms. Any Transfer Agreement will, upon signature, be a legal, valid and binding agreement of the Seller enforceable in accordance with each of their terms; and

4.1.4.   The Seller has delivered to the Buyer true and complete copies of the Acquisition Agreement and certain Other Restrictive Agreements as set forth on <u>Exhibit C</u>. The Restrictive Agreements contain all of the transfer restrictions on the purchase and sale of the Shares.

4.2.   *Buyer's Representations and Warranties*.  The Buyer represents and warrants to the Seller and to the third-party beneficiaries of this Agreement that on the Effective Date and at all times through the Closing:

4.2.1.  The Buyer is an "accredited investor" as defined in the Securities Act of 1933, as amended (the "**Securities Act**");

4.2.2.  (1) the Buyer has the right, power and authority to enter into and carry out the terms of this Agreement and any Transfer Agreement, and (2) this Agreement is a legal, valid and binding agreement of the Buyer enforceable in accordance with its terms. Any Transfer Agreement will, upon signature, be a legal, valid and binding agreement of the Buyer enforceable in accordance with each of their terms;

4.2.3.  The Buyer understands that the sale of the Shares has not been registered under the Securities Act and that the Seller relies on the Buyer's representations in this Agreement in entering into the Transaction;

4.2.4.  The Buyer is purchasing the Shares solely for investment purposes, and not for further distribution, and covenants that all legal and beneficial ownership interest in the Shares shall be held solely for his, her or its own account, except to the extent that (1) affiliates of the Buyer, its or their respective directors, officers, managers or members, stockholders may be deemed to have an indirect beneficial ownership interest in the Shares, or (2) such Shares are held jointly with a spouse. The Buyer is not a party to and does not presently intend to enter into any contract or other arrangement with any other person involving the resale, transfer, or other distribution of any of the Shares;

4.2.5.  The Buyer can properly evaluate the merits and risks of an investment in the Shares and can protect his, her or its own interests in this regard, whether by reason of the Buyer's own business and financial expertise, the business and financial expertise of professional advisors unaffiliated with the Seller with whom the Buyer has consulted, or the Buyer's preexisting business or personal relationship with the Issuer's directors or controlling persons;

4.2.6.  The Buyer is sufficiently aware of the Issuer's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the Shares. The Buyer has received all information he, she or it deems appropriate for assessing the risk of an investment in the Shares;

4.2.7.  The Buyer realizes that the purchase of the Shares involves a high degree of risk, and that the Issuer's future prospects are uncertain. The Buyer is able to bear the complete loss of an investment in the Shares; and

4.2.8.  The Buyer understands that the Shares are "restricted securities", may not be freely traded, and that the sale of the Shares has not been registered under the Securities Act. The Buyer also understands and agrees that:

4.2.8.1.  No public market now exists for any of the securities of the Issuer and that there can be no assurance that a public market for such securities will ever exist;

4.2.8.2. The Shares must be held indefinitely, unless any subsequent proposed resale is registered under the Securities Act, or an exemption from registration is otherwise available;

4.2.8.3. The Issuer is under no obligation to, and cannot be expected to, register any subsequent resale of the Shares;

4.2.8.4. The Issuer may require the Buyer to (a) give it written notice containing detailed information regarding any future proposed sale, (b) provide an opinion of counsel to the effect that such sale will not require registration, and (c) obtain notice from the Issuer in writing that its counsel concurs in such opinion; and

4.2.8.5. The certificate evidencing the Shares may be imprinted with a legend prohibiting transfer of the Shares unless such transfer is registered or such registration is not required in the opinion of the Issuer's counsel.

4.2.9. The Buyer has received and reviewed copies of the Acquisition Agreement and certain Other Restrictive Agreements as set forth on <u>Exhibit C</u>, and has waived the right to receive and/or review all Other Restrictive Agreements not set forth thereon.

4.3. *Representations, Warranties and Covenants of the Parties Regarding the Transaction.* Each of the Buyer and the Seller represent, warrant and covenant to each other and to the third party beneficiaries of this Agreement that as of the Effective Date and at all times through the Closing:

4.3.1. They have had the opportunity to review this Agreement and are entering into this Agreement voluntarily and are not under any form of duress;

4.3.2. They and/or their legal counsel are familiar with applicable securities laws and regulations regarding the Shares and the Transaction, and each of the Buyer and the Seller is responsible for ensuring that the purchase and Sale of the Shares and entry into the Transaction is in compliance with such laws;

4.3.3. Each Party agrees to comply at all times with the terms of and to meet their obligations under any Transfer Agreement. Each Party agrees that, pursuant to Section 7.2.1, any failure to perform under any Transfer Agreement shall be deemed a failure to perform his, her or its obligations under this Agreement;

4.3.4. Each Party acknowledges that it has received all information it has deemed appropriate or necessary to enable such Party to evaluate its decision to enter into this Agreement. Without limiting the foregoing, each Party expressly acknowledges that (i) the other Party currently may have, and later may come into possession of, information with respect to the Issuer that is not known to such Party and that may be material to a decision to sell the Shares ("**Excluded Information**"), (ii) each Party has determined

to enter into this Agreement notwithstanding its lack of knowledge of the Excluded Information, and (iii) the Parties shall have no liability to one another, and each Party hereby waives and releases any claims that it might have against the other Party, Forge Securities LLC (together with its affiliates, "**Forge**"), the Issuer, or any other party, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement;

4.3.5.  Each Party has reviewed the COI.  Each Party is not aware, and has taken all reasonable steps to inform itself, of (i) the declaration or occurrence of any Capital Restructuring Event since the COI Date, (ii) the declaration or occurrence of an extraordinary dividend payable in a form other than stock since the COI Date, and (iii) any amendment and/or restatement of the COI since the COI Date;

4.3.6.  Other than as explicitly stated in this Agreement, they have not relied on any other representation or warranty of the other Party, or any third party including, without limitation, Forge or the Issuer;

4.3.7.  They are not relying on any express or implied legal or investment advice or information (including, without limitation, third-party materials) from the other Party, Forge or the Issuer, with respect to the prospects or value of the Issuer, the Shares or any aspect of the Transaction.  They are aware and acknowledge that Forge is not representing or serving as counsel for any party to the Transaction and that there is no attorney-client relationship established between Forge and the Buyer or the Seller;

4.3.8.  They (i) acknowledge that the Purchase Price was negotiated at arm's-length, may not represent the fair market value of the Shares, and that the Shares may have a current or future value greater or lesser than the amount paid for the Shares under this Agreement, and (ii) understand that that the Issuer's plans for the future, if successful, may result in the Shares becoming significantly more or less valuable and that the future value of the Shares could be greater or lesser than the Purchase Price;

4.3.9.  They acknowledge and agree that any actual or perceived price volatility or fluctuation in the Shares, the Issuer and/or the secondary market between the Effective Date and the Closing shall not (i) constitute a breach or default by any Party under this Agreement, or (ii) be used as a basis for or justify a Party's breach or default of this Agreement or failure to close the Transaction; and

4.3.10. The Parties acknowledge that neither Forge nor the Issuer is a party to this Agreement, and that neither of them shall be liable to the Buyer or the Seller with respect to this Agreement, any Transfer Agreement or the Transaction.

4.4.    *Additional Covenants of the Parties.*

4.4.1.  Each of the Buyer and the Seller agree not to take or allow to be taken any action that is within their control during the term of this Agreement that has the effect of circumventing the terms of this Agreement;

**4.4.2.  If either the Buyer or the Seller becomes aware that any representation or warranty made in this Agreement is or becomes untrue at any time prior to the Closing, he/she/it agrees to immediately deliver written notice to the other party and Forge identifying the relevant representation or warranty in question and a brief description of the pertinent facts and circumstances; and**

4.4.3.  The Parties have agreed not to open an escrow account with any escrow provider to facilitate the deliveries and transfer pursuant to Section 2.

5.  **INDEMNIFICATION; EXCULPATION; DISCLAIMER.**

5.1.  The Buyer and the Seller each agree to defend, indemnify and hold harmless each other and each of their respective partners, members, officers, directors, managers, managing members, employees, agents, representatives, successors and assigns from and against any claim, damage, liability, loss, cost or expense (including reasonable attorneys' fees) asserted by a third party arising directly or indirectly out of: (i) any failure of theirs to perform their obligations as set forth in this Agreement or the Transfer Agreement; (ii) any inaccuracy or breach of any of the representations or warranties made by such Party in this Agreement or the Transfer Agreement, and (iii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.  The remedies provided in this Section 5 shall be cumulative and shall not preclude the assertion by any Party of any other rights or remedies against the other.

5.2.  Each Party acknowledges and agrees that Forge shall not be liable to the Buyer or the Seller for mistakes of judgment, fact or law, or for action or inaction, taken in good faith for a purpose reasonably believed to be in the best interests of completing the Transaction, or for losses due to such mistakes, action or inaction of Forge or of any employee, broker, or other agent of Forge (except to the extent that a court of competent jurisdiction determines that the Forge's willful misconduct or fraud was the primary cause of any loss).  Forge may consult with counsel and accountants in respect of the Transaction and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants.  Under no circumstances will Forge be liable to a Party to this Agreement for the other Party's failure to perform his, her or its obligations under this Agreement. Solely to the extent that such liability may not be waived, modified, or limited under applicable law, this Section 5.2 shall be construed so as to effectuate its provisions to the fullest extent permitted by law.

6.  **CONDITIONS TO CLOSING.**  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

6.1.    Seller shall have obtained all requisite consents, authorizations, and approvals to consummate the Transaction, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, and approval shall have been revoked.

6.2.    No (i) action or proceeding shall have been commenced against the Buyer or the Seller which would prevent the Closing, and (ii) injunction or restraining order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

6.3.    Each Party shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by such Party on or before the Closing.

7.   **TERMINATION.**  This Agreement may be terminated at any time prior to the Closing:

7.1.    by the mutual written consent of the Parties;

7.2.    by a Party upon two (2) days prior written notice to the other Party if:

7.2.1.    (i) the other Party commits a material breach or material default in the performance or observance of any of its obligations under (1) this Agreement or (2) any Transfer Agreement, and (ii) such breach or default continues for a period of five (5) business days after delivery by the other Party of written notice reasonably detailing such breach or default; or

7.2.2.    any of the other Party's representations or warranties are untrue in any material respect at any time prior to the Closing.

7.3.    In the event of the termination of this Agreement in accordance with this Section 7, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except:

7.3.1.    as set forth in Sections 5 through 9 hereof; and

7.3.2.    that nothing herein shall relieve any Party from liability for any fraud or willful breach of any provision hereof.

**ARBITRATION AGREEMENT.**

8.   All controversies arising hereunder shall be resolved by binding arbitration in the City and County of San Francisco, California, conducted by JAMS if available, or by an alternate arbitration service of comparable reputation if not.  The Parties shall maintain the confidential nature of the arbitration proceeding and of any award, including the hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. All awards rendered by the arbitrator(s) shall be binding and final, and judgment upon the award may be entered in any court of competent jurisdiction. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration

agreement against any person who has initiated in court a putative class action or who is a member of putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein. Notwithstanding the foregoing, nothing in this Agreement shall be deemed to limit the Parties' rights to seek injunctive relief in any other court of law of competent jurisdiction.

9. **MISCELLANEOUS.**

   9.1.   *Electronic Notices.* Any and all instruments, agreements, information, documents, communications, and notices required or permitted hereunder may be executed or delivered electronically by confirmed email, or electronic document service.

   9.2.   *Confidentiality.* The Buyer and the Seller agree to hold the identity of the Parties, the terms of this Agreement, and any documents, materials or information regarding the other Party acquired in connection with this Agreement in confidence and not to disclose the same, except when reasonably required to complete the Transaction or in required financial reports to investors or tax reports.

   9.3.   *Entire Agreement; Successors and Assigns.*   This Agreement and any Transfer Agreement contain the entire understanding between the Parties and together supersede any prior written or oral agreement among the Parties concerning the subject matter contained herein.   If any provision of this Agreement conflicts with a provision contained in any Transfer Agreement, the Transfer Agreement will control solely to the extent of the conflicting provision. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

   9.4.   *Third Party Beneficiaries.* This Agreement is made solely and specifically between and for the benefit of the Parties and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise; provided, that Forge and the Issuer are express third-party beneficiaries of this Agreement, and each of them may enforce the provisions of this Agreement in their own name.   In the event that any Transfer Agreement purports to supersede and/or negate any right of Forge hereunder, each Party acknowledges and agrees that, notwithstanding the terms of the Transfer Agreement, Forge shall be entitled to enforce any such rights hereunder.

   9.5.   *Waiver.*   No waiver of any breach or default of this Agreement by any Party shall be considered a waiver of any other breach or default of this Agreement.

   9.6.   *Electronic Signature; Party's Identity.* This Agreement may be executed with an electronic signature and in counterparts. When executed by each of the Buyer and the Seller this Agreement is a valid and binding agreement upon each Party.   Each of the Buyer and the Seller acknowledges and accepts that one or both of them may not have known the identity of the other at the time they executed this Agreement, that this fact in no way effects the validity or enforceability of this

Agreement. Each of the Buyer and the Seller agrees and covenants not to challenge the validity or enforceability of this Agreement on any such grounds.

9.7.    *Amendment.*  Except with respect to updating the Transaction Details pursuant to Section 2, this Agreement may be amended or modified only by a written agreement duly executed by the Parties; provided, however, that any amendment or modification of the terms of this Agreement which affects the rights of Forge, or the Issuer, in each case in such party's capacity as a third party beneficiary to this Agreement, shall also be subject to the written consent of such party.

9.8.    *Choice of Law.*  This Agreement shall be interpreted in accordance with, and governed by, the laws of the State of Delaware without reference to the choice of law rules in effect at any time in the State of Delaware.

9.9.    *Specific Performance.*  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each Party shall be entitled to seek specific performance of the terms hereof against the other Party, in addition to any other remedy to which they are entitled at law or in equity.

9.10.   *Expenses.*  In the event of any arbitration or other legal proceeding arising out of or relating to this Agreement or any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and expenses (in addition to any other relief to which the prevailing party may be entitled) as determined by and within the discretion of the arbitrators or court.  Except as provided in the immediately preceding sentence, each Party shall bear their respective costs and expenses (including legal fees and costs) in connection with the Transaction.

9.11.   *Headings.*  The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

9.12.   *Severability.*  If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect.

*[The remainder of this page is intentionally left blank.]*

*The Parties to this Agreement have caused this Agreement to be executed below.*

**BUYER:**

**Linqto Liquidshares LLC**

By:     Date: October 9, 2024

Name: <u>William Sarris</u>

Title: <u>Managing Member</u>

Address: <u>101 Metro Dr, Ste 335</u>

<u>San Jose, CA 95111</u>

**SELLER:**

**The Katherine Swagar 2020 Descendants Trust**

By:     Date: October 9, 2024

Name: <u>Katherine Swagar</u>

Title: <u>Managing partner</u>

Address:

**EXHIBIT A**

<u>Transaction Details</u>

|  | **Original** | **As Adjusted** |
|---|---|---|
| **Issuer**: | <u>Ripple Labs, Inc.</u> | |
| **Share Type**: | <u>Common</u> | |
| **Number of Shares:** | <u>25,875</u> | _____ |
| **Price per Share:** | <u>$29.00</u> | $_____ |
| **Purchase Price**: | <u>$750,375.00</u> | $_____ |
| **Transfer Fee (if applicable):** | **Seller** | |
| **Legal Opinion (if applicable):** | **Seller** | |

**EXHIBIT B**

<u>Acquisition Agreement</u>

<u>Number</u>

**CSA-13006**



<u>Shares</u>

**76,493**

*THIS CERTIFICATE REPLACES ANY PREVIOUSLY ISSUED STOCK CERTIFICATE REPRESENTING SUCH SHARES WITH A CERTIFICATE NUMBER IDENTICAL TO THE CERTIFICATE NUMBER OF THIS CERTIFICATE. ANY PREVIOUSLY ISSUED STOCK CERTIFICATE REPRESENTING SUCH SHARES WITH A CERTIFICATE NUMBER IDENTICAL TO THE CERTIFICATE NUMBER OF THIS CERTIFICATE IS DEEMED VOID.*

*See Legends on Reverse*

Incorporated Under the Laws of the State of Delaware

## RIPPLE LABS INC.

This Certifies that The Katherine Swagar 2020 Descendants Trust is the registered holder of Seventy-Six Thousand Four Hundred Ninety-Three (76,493) Shares of Class A Common Stock of Ripple Labs Inc. transferrable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, said Corporation has caused this Certificate to be signed by its duly authorized officers as of September 25, 2024.

_____
Chief Executive Officer

*Jon Bilich*
_____
Chief Financial Officer

COPY

**EXHIBIT C**

<u>Other Restrictive Agreements</u>

(if applicable)