## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | (Emergency Hearing Requested) |
|  | ) |  |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) APPROVING SETTLEMENT BETWEEN THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND THE DEATON PARTIES REGARDING RIPPLE TENDER PROCEEDS, DIP FINANCING, AND CUSTOMER TREATMENT <u>PURSUANT TO BANKRUPTCY RULE 9019, AND (II) GRANTING RELATED RELIEF</u>

**Emergency relief has been requested. Relief is requested not later than 4:00 p.m. on October 3, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on _____, at 4:00 pm in Courtroom 400, 4th Floor, United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Avenue, Houston, TX 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "Judge Perez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

> **Judge Perez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), hereby submit their (the "**Motion**") for entry of an order, substantially in the form attached hereto, approving the proposed settlement set forth in the Settlement Stipulation Regarding Ripple Tender Proceeds, DIP Financing, Customer Treatment, and Related Relief (the "**Stipulation**") attached to the proposed Order as **Exhibit A** (the "**Stipulation**" and the settlement documented therein, the "**Settlement**"), between the Debtors, the Official Committee of Unsecured Creditors (the "**Committee**"), and John E. Deaton ("**Deaton**"), on behalf of himself and the "Deaton Represented Creditors" (together with Deaton, the "**Deaton Parties**"), pursuant to Bankruptcy Rule 9019(a).[2]

The proposed Settlement resolves objections to the *Debtors' Motion for Entry of an Order (i) Authorizing the Use of Estate Proceeds Free and Clear of all Liens, Claims, Encumbrances, and Interests, (ii) Determining that the Ripple Sale Proceeds are Assets of the Bankruptcy Estate, and (iii) Granting Related Relief* (the "**Ripple Motion**") [Docket No. 79] and the *Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Financing Motion**") [Docket No. 16], and sets forth terms for the

---

[2]     Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure. "**Bankruptcy Local Rule**" or "**BLR**" references are to the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas. Other capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration (as defined herein).

treatment of the claims or interests of Customers pursuant to a plan of reorganization, subject to Sections 1125, 1126, and 1129 of the Bankruptcy Code.

In support of the Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The Debtors confirm their consent to the entry of a final order by this Court.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.

**BACKGROUND**

5.      On July 7, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors continue to operate their business and manage their property as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On July18, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Committee. *See* Docket No. 98. To date, no request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**I.      Summary of Events Leading to Commencement of the Chapter 11 Cases.**

6.      From February of 2020 until March 14, 2025, Linqto operated a platform (the "**Platform**") to provide customers (the "**Customers**") with indirect access to investments in the equity of private companies (the "**Issuing Companies**" and each, an "**Issuing Company**"), with

a focus on the technology sector. Debtor Linqto Liquidshares LLC ("**Liquidshares**") purchased and held investment securities (the "**Securities**"), comprised of shares of Issuing Companies and membership units in entities that own shares in Issuing Companies. Liquidshares then purported to allocate economic interests in the Securities to series limited liability companies (the "**Series**") and sell units in the Series to the Customers. More than 13,000 Customers participated through the Linqto Platform – some of whom are unaccredited investors. As of the Petition Date, Liquidshares holds Securities in 111 Issuing Companies with an estimated fair market value of in excess of $500 million.

7.      Upon their appointment at the beginning of 2025, the Company's new management learned of pending investigations by the U.S. Securities and Exchange Commission (the "**SEC**") and the Financial Industry Regulatory Authority, along with allegations of serious regulatory compliance failures. As Linqto's new leadership team gained access to company records and spoke with Linqto personnel, they quickly developed concerns regarding, among other things, the Company's historical interpretation of and non-compliance with applicable securities laws and its organizational and governance structure. Further investigation uncovered myriad regulatory compliance violations along with a culture of systematic and pervasive non-compliance, requiring immediate and serious corrective action. Linqto's current management, together with the Debtors' professionals, are cooperating with the SEC and other regulators.

8.      As new management became aware of the depth and extent of the Company's historical non-compliance with the securities laws, the Company determined that continued operation of the Platform would be ill advised and likely exacerbate the Company's liabilities. As a result, the Company determined to indefinitely suspend operation of the Platform and, by extension, its primary revenue-generating operations, on March 13, 2025.

9.      The Debtors ultimately determined that seeking protection under Chapter 11 will afford the Company the opportunity to (a) preserve the value of its assets, (b) deliberately assess strategic alternatives to maximize the value of its business, (c) negotiate a path forward with the SEC and other regulators and explore restructuring alternatives that bring its operations and structure into compliance with applicable securities laws to the extent practicable, (d) address the Debtors' outstanding liabilities, including the claims of Customers, the SEC, and other regulators, and (e) secure financing to achieve the foregoing objectives.

10.     Additional information regarding the Debtors, their business, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set forth in the *Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions, and Related Relief* (the "**First Day Declaration**") [Docket No. 10].

## II.     The DIP Financing Motion.

11.     On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Financing Motion**") [Docket No. 16], seeking to borrow up to $60,000,000 (the "**DIP Financing**"), including $10,000,000 on an interim basis.

12.     On July 8, 2025, the Court entered an order (the "**Interim DIP Order**") [ECF No. 40] authorizing the Debtors to incur and guarantee the DIP Obligations (as defined in the Interim DIP Order up to $10,000,000 on an interim basis and granting the DIP Lender, inter alia, superpriority administrative expense claims against each of the Debtors, on a joint and several basis, and legal, valid, enforceable, non-avoidable, and automatically and fully perfected DIP Liens (as defined in the Interim DIP Order) in all of the Debtors' right, title, and interest to cash

and cash equivalents, funds in any deposit account, all securities, and other DIP Collateral (as defined in the Interim DIP Order) to secure the DIP Obligations.

13.     The DIP Obligations total $10,000,000, plus fees and costs.

14.     The Debtors are currently holding approximately $7.8 million in unrestricted funds, exclusive of the Platform Securities Proceeds (defined below).

### III.     The Ripple Tender Proceeds and Other Platform Securities Proceeds.

15.     As of the Petition Date, Liquidshares held Securities in 111 Issuing Companies with an estimated fair market value of in excess of $500 million. Of these Securities, more than $500 million corresponded to Customer accounts (the "**Platform Securities**") and approximately $16 million were held in reserve by Liquidshares for its own account and subsequent sales of units to Customers (the "**Reserved Securities**").

16.     In December 2024, Ripple Labs, Inc. ("**Ripple**") announced a tender offer that closed on or about January 8, 2025 (the "**December Ripple Tender**"). Liquidshares tendered 243,444 shares of Ripple in the December Ripple Tender, for an expected purchase price of approximately $30 million. Of the 243,444 shares offered, Ripple purchased 151,105 shares (the "**Ripple Shares**") at a price of $125 per share, for total proceeds of approximately $18.8 million (the "**Ripple Tender Proceeds**").[3]

17.     The December Ripple Tender occurred before current management was hired in January 2025. Upon learning of the various securities investigations the Debtors faced, the Debtors' new management elected to hold the Ripple Tender Proceeds in a money market account at Silicon Valley Bank, a division of First-Citizens Bank & Trust, held by Liquidshares (the "**Proceeds Account**"). While the Debtors elected to segregate the Ripple Tender Proceeds from

---

[3]     The Ripple Shares were Platform Securities.

funds held in other money market and operating accounts, the Proceeds Account is not a restricted account or escrow account.

18.     As of the Petition Date, the Proceeds Account held roughly $19,230,000 in Ripple Tender Proceeds, inclusive of interest.

19.     Along with the Ripple Tender Proceeds, the Proceeds Account holds funds arising from distributions and dividends from Issuing Companies other than Ripple (collectively with the Ripple Proceeds, the "**Platform Securities Proceeds**"). As of the Petition Date, the Proceeds Account held roughly $641,000 from Platform Securities other than Ripple.

20.     On July 14, 2025, the Debtors filed the Ripple Motion, seeking authority to use the Platform Securities Proceeds, including the Ripple Tender Proceeds, free and clear of all liens, claims, encumbrances, and interests, (ii) determining that the Platform Securities Proceeds are assets of the Debtors' bankruptcy estate and may be used by the Debtors for the daily operations of the enterprise, which includes the administration of the Chapter 11 Cases, and (iii) granting related relief.

21.     As described in the Ripple Motion, the Debtors seek to use the Ripple Tender Proceeds in order to limit borrowing under the DIP Financing facility.  Unlike the DIP Financing, there are no incremental fees or costs to use the Ripple Tender Proceeds. As such, the Debtors would like to use as little of the DIP Financing facility as possible to reduce costs to the estates and to maximize the return to their creditors and Customers.

**IV.**     **Objections to the DIP Financing and Ripple Motions.**

22.     The Committee, shortly after its appointment, asserted informal objections directly to the Debtors regarding the DIP Financing and Ripple Motions.  The Committee asserted, in its informal objections, that the Platform Securities and the Platform Sale Proceeds were held in a constructive or resulting trust and such did not constitute "property of the estate" - and that

customers of Linqto were not unsecured creditors under the Bankruptcy Code.  The Committee did not file a formal objection due to the settlement negotiations that ultimately led to the Stipulation.

23.     On July 29, 2025, John E. Deaton ("**Deaton**"), on behalf of himself and the "Deaton Represented Creditors" (together with Deaton, the "**Deaton Parties**") filed an objection to the DIP Financing Motion and Ripple Motion (the "**Deaton Objection**") [Docket No. 142]. Approximately 186 Customers filed joinders to the Deaton Objection or similar objections, responses, or requests for relief as *pro se* parties in interest (collectively, the "**Customer Objections**"). Of these Customer Objections, approximately 90 were filed by Deaton Represented Creditors. The Deaton Parties objected to the DIP Financing and use of the Platform Securities Proceeds, contending that the Platform Securities and Platform Securities Proceeds are not assets of the Debtors' estates but are held in constructive trust for the Customers.

24.     On August 12, 2025, Sapien Group USA LLC and its group affiliates ("**Sapien**"), filed a limited objection to the DIP Financing Motion and Ripple Motion [Docket No. 230] (the "**Sapien Limited Objection**"), essentially arguing that the relief sought by the Debtors is premature and the Customers' alleged interest in the Platform Securities should be fully litigated before the Debtors can secure the funding necessary to administer their Chapter 11 Cases.

## **SETTLEMENT TERMS**[4]

25.     After arms'-length negotiations, the Debtors, the Committee, and the Deaton Parties (collectively, the "**Settlement Parties**") have reached a compromise regarding funding the administration of these Chapter 11 Cases and the treatment of the claims or interests of Customers.

---

[4]     This summary of the Stipulation should not be construed to contradict or limit the terms of the Stipulation. To the extent of any inconsistency between this Motion and the terms of the Stipulation, the terms of the Stipulation shall control.

26.     Under the Settlement, the Debtors will be authorized to finance the administration of the Chapter 11 Cases through use of (i) the proceeds of Reserved Securities, (ii) the Platform Securities Proceeds (including the Ripple Tender Proceeds), and (iii) DIP financing in an aggregate amount of up to $25,000,000, in accordance with the budget attached to the Stipulation as **Exhibit 2** (the "**Approved Budget**"). In exchange, the Debtors have agreed to the treatment of Customer claims or interests under a plan of reorganization to be proposed, the principal terms of which are set forth in the "Customer Securities Treatment Term Sheet" attached to the Stipulation as **Exhibit 1** (the "**Term Sheet**").

27.     The Settlement will ensure that the estates have adequate capital to administer these Chapter 11 Cases in a manner that maximizes value for customers and all parties in interest, facilitate the collaborative formulation of a plan that delivers economic interests to Customers which, to the greatest extent legally and financially possible, match the economic interests purported to be sold to such Customers, and enable the plan confirmation process to proceed, free of the uncertainty and expense of litigation regarding the validity and extent of Customer interests in the Platform Securities.

28.     Pursuant to the Term Sheet, the Debtors will propose a plan of reorganization (the "**Plan**") that provides each Customer with the option to elect to have its interests in the Platform Securities contributed to a registered and publicly-listed closed-end fund (a "**CEF**") or retain a beneficial interest in a liquidating trust or trusts (collectively, the "**Trust**") that holds the equity of Liquidshares. In other words, Customers may elect to either (a) hold a non-transferable beneficial interest in the Trust that closely models the economic interests purported to be sold to such Customers when they sought to purchase Securities that will allow customers to receive the underlying security when that security goes public, or cash when customers elect to have their

securities liquidated pursuant to the mechanisms provided for such liquidation, or (b) obtain an interest in a CEF that will be publicly tradable.  This structure will ensure Customers retain the "upside" of their investments, rather than having such investments liquidated to cash in a Chapter 7 proceeding or otherwise.

29.     With respect to the Ripple Tender Proceeds, the Settlement Parties have agreed the Plan will provide those Customers affected by the sale of Ripple shares with a separate ratable interest related to the cash held by the Debtors.

30.     Notably, the Debtors have both accredited and unaccredited customers. The agreement reached by the Settlement Parties pursuant to the Term Sheet allows for distributions to both accredited and unaccredited Consumers in the same manner (i.e. unaccredited Customers will not be prejudiced relative to accredited Customers). The inclusiveness of the Term Sheet and the settlement embodied therein is a further basis for its approval.

31.     Ultimately, this agreement allows Customers to receive the "benefit of their bargain" - and allow the estates and all parties in interest to minimize litigation costs.  Importantly, it allows the estates to avoid the potential Chapter 7 conversion that might result if the Debtors had no access to financing for these cases – which would likely result in the liquidation of the Platform Securities.

**BASIS FOR RELIEF**

**I.     The Settlement Is a Sound Exercise of the Debtors' Business Judgment.**

32.     The Court should approve the Debtors' entry into the Stipulation as a sound exercise of the Debtors' business judgment under Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. 11 U.S.C. § 363. Under Section 363(b), courts within the Fifth

Circuit require only that a debtor "show that a sound business purpose justifies such actions." *See,
e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011)
("'[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and
equity holders, there must be some articulated business justification for using, selling, or leasing
the property outside the ordinary course of business.'") (quoting *In re Cont'l Air Lines, Inc.*, 780
F.2d 1223, 1226 (5th Cir. 1986)).

33.     In addition, the Court may exercise its equitable powers under Section 105(a) of
the Bankruptcy Code to grant the relief requested herein. Under Section 105(a) of the Bankruptcy
Code, a court "may issue any order, process, or judgment that is necessary or appropriate to carry
out the provisions of this title." 11 U.S.C. § 105(a).

34.     In the Debtors' business judgment, the Settlement is a value maximizing outcome
for their estates. The Settlement ensures the Debtors' access to funding necessary to administer
their estates, preserve the value of the Platform Securities and other assets, avoid potential costly
and value destructive litigation, and, ultimately, allow the Debtors to distribute value to their
Customers. Accordingly, entry into and performance under the Stipulation satisfies the standard
set forth in Section 363(b) of the Bankruptcy Code and should be approved.

II.     **The Settlement Satisfies Bankruptcy Rule 9019 and Should Be Approved.**

35.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate
notice and a hearing, approve a compromise or settlement so long as the proposed settlement is
fair, reasonable, and in the best interest of the estate. Fed. R. Bankr. P. 9019; *In re Age Refin. Inc.*,
801 F.3d 530, 540 (5th Cir. 2015). "Compromises are a normal part of the process of
reorganization," *Protective Comm. for Indep. S'holders of TMT Trailer Ferry Inc. v. Anderson*,
390 U.S. 414, 424 (1968) (internal quotations omitted), and are "'desirable and wise methods of
bringing to a close proceedings otherwise lengthy, complicated and costly.'" *In re ASARCO LLC*,

11

No. 05-21207, 2009 WL 8176641, at *9 (Bankr. S.D. Tex. June 5, 2009) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F .2d 599, 602 (5th Cir. 1980)).

36.     Ultimately, approval of a compromise is within the sound discretion of the bankruptcy court. *See In re AWECO, Inc.*, 725 F.2d 293, 297-98 (5th Cir. 1984).

37.     In determining whether to approve a settlement, the Fifth Circuit directs bankruptcy courts to apply a three-factor test with a focus on comparing "the terms of the compromise with the likely rewards of litigation." *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 607 (5th Cir. 1980)). A bankruptcy court should evaluate: (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (c) all other factors bearing on the wisdom of the compromise. *See In re Age Refining*, 801 F.3d at 540 (citing *Jackson Brewing Co.*, 624 F.2d at 602); *see also In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (citing same); *In re Superior Offshore Int'l, Inc.*, 2009 WL 1507135, at *2 (S.D. Tex. May 28, 2009).

38.     Among the "other factors bearing on the wisdom of the compromise," the Fifth Circuit has directed courts to consider "the paramount interest of creditors with proper deference to their reasonable views," *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995), and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 918; *In re Age Ref.*, 801 F.3d 540 (quoting *In re Cajun Elec. Power Coop.*, 119 F.3d at 356).

39.     "In evaluating a Rule 9019 settlement, a bankruptcy court need not conduct a minitrial to determine the probable outcome of any claims waived in the settlement." *In re Age Ref.*, 801 F.3d at 541 (internal quotations omitted); *see also Watts v. Williams*, 154 B.R. 56, 59

(S.D. Tex. 1993). Instead, "[t]he judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision," *In re Cajun Elec. Power Coop.*, 119 F.3d at 356, and determine whether the settlement as a whole is fair and equitable, *Anderson*, 390 U.S. at 424. As courts across the country have concluded, a court should canvas the issues and determine only whether the settlement "falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Alice Prop., LLC*, 637 B.R. 465, 477 (Bankr. E.D. La. 2021).

### A.    The Probability of Success in Litigation is Uncertain.

40.    The probability of success in any litigation is highly uncertain for all parties.

41.    The Debtors contend that the Securities and the proceeds thereof are property of Liquidshares. Liquidshares purchased the Platform Securities with its own funds pursuant to transfer agreements between Liquidshares and the transferors, and the Platform Securities are held in the name of Liquidshares. To the extent Customers contend that they own an equitable interest in the Platform Securities by virtue of a constructive trust or other theory, the Customers bear the burden of proving such interest. 11 U.S.C. § 363(p)(2) ("In any hearing under this section … the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."); *In re Grubb & Ellis Co.*, No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, at *17-18, 29 (Bankr. S.D.N.Y. Mar. 27, 2012) (the burden of establishing the existence of a constructive trust falls on the party asserting that assets cannot be sold under Section 541(d) because they were held in constructive trust).

42.    The Debtors also submit that constructive trust is not a remedy available to the Customers because imposition of a constructive trust is predicated on an equitable ownership interest in property held by a third party. Here, the Debtors did not agree to deliver Platform Securities or economic interests in Platform Securities to the Customers. Instead, the Customers

contracted to acquire equity interests in Series that would hold investments in Platform Securities. Specifically, Customers would subscribe to a Series by, among other things, executing and delivering a Subscription Agreement for the relevant Series in which the Customer agreed to purchase interests in the Series which, in turn, held an investment in an Issuing Company. Thus, the Debtors agreed to provide the Customers an economic interest in an entity, not in the assets of the entity. Under Delaware law, a limited liability company interest is personal property, and a member of a limited liability company has no interest in specific property of the limited liability company. 6 Del. C. § 18-701. Accordingly, the Customers have asserted no basis for an equitable interest in the Platform Securities, rather than claims for breach of contract. *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) ("Delaware courts have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012); *Teachers' Ret. Sys. v. Aidinoff*, 900 A.2d 654, 671 n.24 (Del. Ch. 2006).

43.     In the Subscription Agreements, the Customers also agreed to be bound by the Liquidshares operating agreement, as may be amended from time to time, and that the operating agreement would control in the event of a conflict between the provisions of the relevant Subscription Agreement and the operating agreement. Because the *Second Amended and Restated Limited Liability Company Operating Agreement of Linqto Liquidshares, LLC*, as amended (the "**Liquidshares Operating Agreement**"), authorizes the relief sought by the Debtors, the Customers cannot establish unjust enrichment—a necessary prerequisite to imposition of a constructive trust. *See Nemec*, 991 A.2d at 1129 ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a

breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.").[5]

44.     On the other hand, the Committee, the Deaton Parties and other Customers allege that the Customers paid funds to Linqto that were specifically earmarked for the purchase of the Platform Securities and were told that such Platform Securities would be held in special purpose vehicles (SPVs) and administered by an independent custodian. Further, the Committee and the Deaton Parties allege that the Debtors described the SPV structure as essential to providing Customers equitable and beneficial ownership of the Platform Securities and that the Platform Securities would be bankruptcy remote. The Committee alleges that the Company issued documents, including K-1 tax forms, that reflected that the SPV structure actually existed, and that to the extent it did not, such facts were unknown and unknowable to Customers – but not to the Debtors.  The Committee further alleges that the "special circumstances" often required to find a constructive trust in a bankruptcy case are met here, given the existence of several bespoke bankruptcy regulatory regimes for similar cases that protect customers in a similar manner (e.g. SIPA liquidations, FCM liquidations, or FDIC receiverships).  The Committee and the Deaton Parties allege that these facts give rise to a constructive and/or resulting trust (either in favor of customers directly, or in favor of the SPVs in which customers had an ownership interest) that would deliver Customers the benefit of their bargain.

45.     Consistent with the Debtors' own internal investigation, the Committee, the Deaton Parties and other Customers also allege that the Debtors' prior management was informed by both

---

[5]     Here, the Liquidshares Operating Agreement provides the Managing Member with broad authority to incur and pay expenses on behalf of Liquidshares and pledge the Platform Securities, including under Sections 2.4(b), 2.4(v), and 4.2

employees and its own counsel that it was violating numerous regulatory and legal obligations yet failed to take corrective action.

46.     With respect to the Ripple Tender Proceeds in particular, the Deaton Parties have also alleged that the Debtors essentially engaged in an arbitrage of the Ripple Shares by tendering the Ripple Shares for more than $18 million without informing the Customers, then attempting to replace the tendered Ripple Shares rather than distributing the Ripple Tender Proceeds to Customers.

47.     While the Debtors believe that these allegations, even if true, do not give rise to a constructive trust in the Platform Securities or Platform Securities Proceeds in light of the contractual relationship between the Debtors and their Customers, the Debtors cannot be assured of success on the merits. Further, a litigation victory for the Debtors may well be a Pyrrhic one. If the Debtors are required to litigate Customer claims of equitable title in the Platform Securities and Platform Securities Proceeds before securing funding to administer their Chapter 11 Cases and prosecute a plan of reorganization, the Debtors will not have the resources necessary to confirm a plan of reorganization. Litigation with the Customers would likely result in a default under the *Senior Secured Debtor-in-Possession Loan Agreement*, deplete the Debtors' resources, and leave nothing for the Debtors to implement a restructuring transaction that delivers value to the Customers and other creditors.

48.     Similarly, a litigation victory for Customers might similarly be a Pyrrhic victory. As the Platform Securities generally cannot be transferred directly to Customers, a structure or structures are required to deliver interests in such securities to Customers.  If the Debtors have no financing to pursue a Chapter 11 plan because they have no access to cash or assets (and undisputed estate assets are insufficient alone to fund these cases), a Chapter 7 conversion may be mandatory.

16

A Chapter 7 Trustee, unable to deliver Platform Securities to Customers or to propose and implement a plan of reorganization, might have no option but to liquidate Platform Securities to cash and distribute cash to Customers.

**B.      The Complexity and Likely Duration of the Litigation and Any Attendant Expense, Inconvenience and Delay Would be High.**

49.      The Debtors, their management team, and their professionals would need to spend significant time and expend valuable estate resources to litigate the Customers' equitable title claims. Resolving these disputes would necessarily involve litigation with thousands of Customers, which would likely take several months. That litigation would involve fact-intensive questions that will likely require extensive discovery regarding the Debtors' conduct and contractual relationships with over 13,000 Customers, along with expert testimony. Such litigation would divert resources that could otherwise be used for administration of the Chapter 11 Cases and distributions to creditors. Resolving these issues as set forth in the Stipulation allows the Chapter 11 Cases to move forward expeditiously, which in turn will help maximize the return to Customers and other creditors. Accordingly, the resolution embodied in the Stipulation weighs in favor of compromise under the circumstances of these Chapter 11 Cases.

**C.      All of the Other Relevant Factors Support Approval of the Settlement.**

50.      All of the other relevant factors support approval of the Settlement, including that the Settlement is in the best interest of creditors and was negotiated in good faith and at arm's length. The Settlement allows the Debtors and their creditors to avoid costly and time-consuming litigation and immediately focus their attention on formulating a plan of reorganization, thus clearing the path for distributions to the Customers (accredited and unaccredited) and other creditors and the ultimate conclusion of these Chapter 11 Cases.

51.     The Settlement is the product of good faith, arms'-length negotiations between the Settlement Parties and their respective advisors and is not the product of fraud or collusion. For the reasons stated herein, the Debtors believe that the Settlement represents a fair and reasonable compromise that is in the best interest of the Debtors' estates. Accordingly, the resolution embodied in the Stipulation is beneficial to the estates, is reasonable, and should be approved.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVER

52.     The Debtors request a waiver of any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to secure the Debtors' access to funding which is necessary to operate their business and administer the Chapter 11 Cases, and a stay would deprive the Debtors of funding needed at this critical juncture of their Chapter 11 Cases. Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h) to the extent such stay applies.

## RESERVATION OF RIGHTS

53.     Nothing contained herein or any action taken pursuant to the relief requested is intended to be or shall be construed as, other than as explicitly stated in the Stipulation, (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or non-bankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under Section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Likewise, if the Court grants the relief sought

herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

### **EMERGENCY RELIEF**

54.     Under Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion because relief is necessary to avoid immediate or irreparable harm that would be caused by delaying the approval of the Stipulation. Specifically, the Debtors require immediate access to funds to continue paying obligations that are essential for the continued operation of their business and preservation of their assets, including payroll and benefits for their employees, insurance, professional fees, and other costs.

### **NOTICE**

55.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the DIP Lender; (c) the Committee; (d) all parties on the Master Service List; (e) all creditors and equity security holders. The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice is necessary.

WHEREFORE, the Debtors request that the Court enter the Proposed Order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: September 16, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

*/s/ Veronica Polnick*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:     (713) 900-3737
Facsimile:     (702) 442-9887
Email:         ghamm@nvfirm.com
               vpolnick@nvfirm.com
               aagelakopoulos@nvfirm.com
               rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:     (702) 385-5544
Facsimile:     (702) 442-9887
Email:         saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

*/s/ Veronica Polnick*
Veronica Polnick

## **Certificate of Service**

I certify that on September 16, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Veronica Polnick*
Veronica Polnick