**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | Case No. 25-90186 (ARP) |
| Debtor. | (Jointly Administered) |

**EMERGENCY MOTION OF THE AD HOC GROUP OF EQUITY HOLDERS**
**FOR ENTRY OF AN ORDER DIRECTING THE U.S. TRUSTEE TO APPOINT**
**AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**
**PURSUANT TO 11 U.S.C. § 1102**

> **Emergency relief has been requested.  Relief is requested not later than 11:00 a.m. (prevailing Central Time) on October 3, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The ad hoc group of shareholders of Linqto, Inc. (the "**Ad Hoc Group**")[2] respectfully states the following in support of this emergency motion (this "**Motion**") seeking entry of an order directing the U.S. Trustee for the Southern District of Texas (the "**U.S. Trustee**") to appoint an official committee of equity security holders (an "**Official Equity Committee**") of Linqto, Inc.

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

[2]   The Ad Hoc Group includes owners of Linqto, Inc. Common Stock, Preferred Stock, and/or Options and RSUs, including Sapien Ventures LP Fund No. 1; John Murray; Hugh Molotsi; Robert Canepa; Antonio Derossi; John Dicconson; and Philip Reicherz.  These equity security holders own approximately 3.491% of all outstanding common stock and approximately 17.745% of outstanding preferred stock issued by Linqto and have the support of approximately 67% of holders of Common Stock and Preferred Stock across all voting share classes of Linqto's equity securities (all such holders of shares in Linqto, the "**Linqto Shareholders**") for the appointment of an Official Equity Committee.

("**Linqto**" and, together with its debtor affiliates, the "**Debtors**" or the "**Company**") in these chapter 11 cases.

## PRELIMINARY STATEMENT[3]

1.    The appointment of an Equity Committee is critical here given the Debtors have only two real economic stakeholders in these cases: the Linqto Shareholders and the Unitholders (defined below).  The prepetition Debtors intended to create a particular structure which would have resulted in virtually no debt.  The Unitholders were to be given equity units in Company-operated SPVs, and the SPVs were to hold Securities in certain private companies, including Ripple and other cutting-edge technology and fintech companies with the potential for massive upside.  After filing for bankruptcy, the Debtors have alleged that this structure was not actually implemented and, instead, (i) the Securities were held by the Debtors and not allocated to the SPVs and (ii) the SPVs were not properly constituted under Delaware law.  Of the aggregate Securities held by the Debtors, a valuable amount of those Securities (defined herein as the Reserved Securities) are held separate and apart from the Securities intended to be allocated to the SPVs. Such Reserved Securities remain on the Company's balance sheet and inure to the benefit of the Linqto Shareholders, providing them with a real economic interest to protect.

2.    Yet the Debtors and the Creditors' Committee have reached a settlement on the treatment of alleged claims held by Unitholders and the funding of the administration of these chapter 11 cases.  Under the proposed settlement, not only is there zero recovery contemplated for Linqto Shareholders, but the Reserved Securities are to be fully liquidated to finance the chapter 11 cases, with apparently no consideration given to the possibility that there is value to the Linqto

---

[3]    Capitalized terms used in this section but not otherwise defined herein shall have the same meanings as ascribed to them later in the Motion.

business, or a transaction that might realize that value.  Linqto Shareholders, who number in the hundreds and many for whom it would not be feasible to hire counsel or share costs, have no stakeholder at the table advocating for their interests.  The Creditors' Committee appears to be exclusively pursuing the interests of Unitholders (as trade debt is virtually zero).  And Debtors' counsel, in a recent email to a concerned Linqto Shareholder, expressly disclaimed any duty to consider the interests of the Linqto Shareholders.[4]

3.      The appointment of an Official Equity Committee is necessitated here, where: (i) the Debtors have clearly abdicated their duties to work in the interests of all stakeholders, which includes Linqto Shareholders; (ii) there exists material value for equity; and (iii) the Debtors and the Creditors' Committee are working together to force through a settlement that destroys all remaining value for equity.

## RELIEF REQUESTED

4.      By this Motion, the Ad Hoc Group seeks entry of an order, substantially in the form attached hereto (the "**Order**"), directing the U.S. Trustee to appoint an Official Equity Committee comprised of Linqto, Inc. shareholders pursuant to section 1102(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**").

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue for this Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested in this Motion is section 1102(a) of the Bankruptcy Code, Rules 1007, 9018, and 9037 of the Federal

---

[4]     A copy of this correspondence is attached hereto as **Exhibit A**.

3

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Bankruptcy

Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

## BACKGROUND

### A.    General Background

6.     On July 7, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses

and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.

7.     On July 18, 2025, the U.S. Trustee appointed an official committee of unsecured

creditors (the "**Creditors' Committee**") [Dkt. No. 98].  The facts and circumstances surrounding

the Debtors' cases are more fully detailed in the *Declaration of Jeffrey S. Stein in Support of the*

*Chapter 11 Petitions, First Day Motions, and Related Relief* [Dkt. No. 10] (the "**First Day**

**Declaration**").[5]

### B.    Prepetition Operations

8.     As described in the First Day Declaration, prior to the Petition Date the Debtors

operated a platform that invited users (the "**Unitholders**") to indirectly invest in private

companies, with a focus on the technology sector.  First Day Decl. ¶ 21.  The Company's

operational model proposed to: (i) purchase Securities[6] in private companies; (ii) transfer such

Securities to Company-operated special purpose vehicles ("**SPVs**"); and (iii) deliver units of a

membership interest in these SPVs to the Unitholders.  *See generally id.* ¶¶ 21-32.  Unitholders

---

[5]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day
Declaration.

[6]     These "**Securities**" include securities in certain privately held companies, including Ripple and other cutting-
edge technology and fintech companies, which were purchased and held by the Debtors prepetition.  *See* First
Day. Decl. ¶ 21; *Invest in Pre-IPO Companies*, LINQTO, https://www.linqto.com/products/ (last visited Sept. 13,
2025).

would pay Debtor Linqto Liquidshares LLC ("**Liquidshares**") for the specific SPV membership interests that correlated with the private company in which they wanted to invest. *See id.* ¶ 21. Linqto's website describes this clearly, explaining to users: "When you invest with Linqto, you're purchasing units in a private fund (series LLC) that holds shares of the underlying private company."[7]   The Debtors have alleged, however, that Liquidshares held the Securities of the private companies without properly allocating these Securities to the applicable SPVs and the SPVs were not formed in accordance with Delaware law. *Id.* ¶¶ 23, 25.  The Debtors also maintain that Unitholders do not "hold title to or direct beneficial interests in" the underlying Securities from the issuing companies held by Liquidshares. *Id.* ¶ 22.

9.      According to the Debtors' Chief Restructuring Officer, the Debtors commenced these chapter 11 cases after purportedly discovering "extensive regulatory compliance violations along with a culture of systemic and pervasive non-compliance" and have alleged that "prior management had knowingly failed to cure extensive and serious securities law violations that began as early as 2020." *Id.* ¶¶ 43–44.  The Debtors maintain they are seeking to restructure through chapter 11 to "be better positioned to address its historical regulatory compliance issues and related liabilities, protect Customers' interests, and potentially resume operations through a compliant structure." *Id.* ¶ 55.  The Debtors have established a "Special Subcommittee," which has been delegated authority to conduct an "Investigation" of the Debtors' claims and causes of action. *Id.* ¶ 5–6.

C.      **Prepetition Capital Structure**

10.      The Debtors disclosed that they did not have any funded debt as of the Petition Date. *See, e.g.*, *July Monthly Operating Reports Global Notes* [Dkt. No. 458] at 2 (the "**July**

---

[7]      *What We Offer*, LINQTO, https://www.linqto.com/what-we-offer/ (last visited Sept. 13, 2025).

**Monthly Operating Report**") (listing the amount of prepetition secured debt as $0). The Debtors have represented that, as of the Petition Date, Liquidshares holds Securities in 111 issuing companies with an estimated fair market value "in excess of $500 million." First Day Decl. ¶ 27; *Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors and the Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Dkt. No. 505] (the "**Rule 9019 Motion**") ¶ 6. The Debtors have purportedly determined the value of the Securities as of June 30, 2025 using an "internal methodology," which the Debtors have not publicly disclosed. *See Linqto Liquidshares LLC Schedule A/B: Assets – Real and Personal Property* [Dkt. No. 224] at Question 15.

11.   Certain of the Securities held by the Debtors are maintained as inventory shares of reserved securities that were not sold to Unitholders and were funded with the Debtors' own capital (the "**Reserved Securities**"). The Ad Hoc Group understands that the Reserved Securities, though difficult to assess their value, do have significant value.[8] Moreover, given the nature of the issuers of the Securities, the Reserved Securities have the potential to rise in value very quickly. Even the Debtors, using their undisclosed methodology, have valued these Reserved Securities at approximately $16 million. *See* Rule 9019 Mot. ¶ 15.

---

[8]   The Debtors have made much of the Ad Hoc Group's estimate of this value in their letter to the U.S. Trustee, discussed below, arguing that the Ad Hoc Group's estimate was overstated. Since submitting that letter, the Ad Hoc Group has been informed that the Debtors sold, in pre-petition "block trades," many of the most valuable securities upon which their estimate was based. In part due to these sales, as well as the difficulty of valuing the shares in question and the opaque nature of the Debtors' valuation methodology, the Ad Hoc Group does not here argue that the Reserved Securities have the value estimated in the Ad Hoc Group's letter or otherwise attempt to estimate the value of the Reserved Securities.

**D.     The DIP Financing**

12.     On July 8, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 16] (the "**DIP Motion**").  The DIP Motion seeks approval of $60 million in postpetition financing on a superpriority senior secured basis (the "**DIP Financing**" and the loans made, advanced or deemed advanced thereunder, the "**DIP Loans**").  The same day, this Court entered an interim order [Dkt. No. 40] approving the DIP Financing on an interim basis, which allowed the Debtors to borrow $10 million.

13.     The Debtors are seeking final approval of the DIP Financing at a hearing scheduled for October 3, 2025.  If the DIP Financing is approved on a final basis, $50 million of the DIP Loans will be made available to the Debtors in one or more borrowings, and the following fees will be approved: (i) an issuance fee of 2.5% PIK interest; (ii) a 2.5% to 3% exit fee depending on the total amount ultimately drawn; (iii) a renewal fee of 2.5% for extending the maturity date by an additional three months; (iv) an unused fee of 2% for undrawn amounts; and (v) an minimum multiple of invested capital, or cash fee at exit such that the DIP lender's multiple of invested capital for each advance funding, exclusive of fees, is at least 1.15x.  *See* DIP Mot. ¶ 22.

**E.     The Rule 9019 Motion**

14.     On September 16, 2025, the Debtors filed their Rule 9019 Motion.  The Rule 9019 Motion details the proposed settlement among the Debtors, the Creditors' Committee, and Unitholders represented by John Deaton, and purports to resolve objections to the Debtors' DIP Financing and the Debtors' request to deem $19 million in cash proceeds from prepetition sales of

certain Securities as estate property. *See generally id.* Specifically, the Debtors seek authorization to finance the administration of these chapter 11 cases through use of (i) the proceeds of Reserved Securities, (ii) the Platform Securities Proceeds (as defined in the Rule 9019 Motion), and (iii) DIP Financing in an aggregate amount of up to $25 million. *Id.* ¶ 26. The settlement also provides for the treatment of claims held by Unitholders under a forthcoming plan whereby Unitholders would have the option to either (i) have their interests in the Securities contributed to a registered and publicly-listed closed-end fund or (ii) retain a beneficial interest in a trust that holds the equity of Liquidshares. *Id.* ¶ 28. No recovery is contemplated for Linqto Shareholders.

F.     **The Ad Hoc Group's Request to the U.S. Trustee for Appointment of an Official Equity Committee**

15.     On August 28, 2025, the Ad Hoc Group sent a letter to the U.S. Trustee requesting appointment of an Official Equity Committee in these chapter 11 cases pursuant to section 1102(a)(1) of the Bankruptcy Code. The Ad Hoc Group received a copy of the Creditors' Committee's letter sent to the U.S. Trustee opposing the Ad Hoc Group's request. The Ad Hoc Group understands that the Debtors have also sent a letter to the U.S. Trustee in response to the Ad Hoc Group's letter, but the U.S. Trustee has, to date, declined to provide a copy of the Debtors' letter.

16.     On September 9, 2025, the U.S. Trustee notified counsel to the Ad Hoc Group that it has determined not to appoint an Official Equity Committee in these chapter 11 cases.

<u>**BASIS FOR RELIEF**</u>

17.     The Court has discretion under section 1102(a)(2) of the Bankruptcy Code to "order the appointment of additional committees . . . of equity security holders of necessary to assure adequate representation of . . . equity security holders." 11 U.S.C. § 1102(a)(2). The Bankruptcy

Code does not define "adequate representation," and courts have considered the following factors in determining whether an official equity committee should be appointed in a given case:

      a.    whether Debtors are likely to prove solvent;

      b.    whether equity is adequately represented by stakeholders already at the table;

      c.    the complexity of the Debtors' cases; and

      d.    the likely cost to Debtors' estate of an equity committee.

*In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009); *see also In re Wang Labs. Inc.*, 149 B.R. 1, 2 (Bankr. D. Mass 1992).  No one factor is dispositive, and the weight attributed to each factor depends upon the facts and circumstances of each case.  *See In re Beker Industries Corp.*, 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985).

      18.    This Court's determination of the need for an additional committee is unfettered and *de novo*, without regard to any prior determination of the U.S. Trustee.  *In re McLean Indus., Inc.*, 70 B.R. 852, 856-57 (Bankr. S.D.N.Y. 1987); *see, e.g., Pilgrim's Pride*, 407 B.R. at 217 (appointing an equity committee over the objection of the U.S. Trustee).  Official committees of equity holders have been appointed in many large and complex cases such as this one.  *See, e.g., In re STI Therapeutics Inc.*, Case No. 23-90085 (Bankr. S.D. Tex. 2023), Dkt. No. 325; *In re Energy XXI Ltd.*, Case No. 16-31928 (Bankr. S.D. Tex. 2016), Dkt. No. 510; *In re Spectrum Jungle Labs Corp.*, Case No. 09-50455 (Bankr. W.D. Tex. 2009), Dkt. No. 254; *Pilgrim's Pride*, Case No. 08-45664 (Bankr. N.D. Tex. 2008), Dkt. No. 2352; *In re Gadzooks, Inc.*, Case No. 04-31486 (Bankr. N.D. Tex. 2004), Dkt. No. 599; *In re Mirant Corp.*, Case No. 03-46590 (Bankr. N.D. Tex. 2003), Dkt. No. 840.

19.     As set forth below, the Ad Hoc Group has satisfied its burden with respect to each relevant factor and this Court should appoint an Official Equity Committee in these chapter 11 cases.

### A.     The Debtors Are Not Hopelessly Insolvent

20.     The applicable legal standard on a motion requesting appointment of an official equity committee is not whether the debtor is insolvent, but rather whether it "appears that a debtor is hopelessly insolvent." *Wang Labs*, 149 B.R. at 3 (appointing an official equity committee even though the company was operating "at a loss" because the debtor was "not hopelessly insolvent"). When there are competing allegations of insolvency, a Court does not need to determine whether the debtor is insolvent under applicable tests because the standard is "hopelessly insolvent." *See Wang Labs*, 149 B.R. at 3.  If it appears that the debtor is solvent, then shareholders have a meaningful economic interest to protect, and the presumption should be in favor of appointing an official equity committee. *See* 7 COLLIER ON BANKR. § 1102.03[2][a] (16th ed.).

21.     Here, the Debtors are not "hopelessly insolvent."  In assessing insolvency for purposes of appointing an Official Equity Committee, the focus is on whether the debtor appears to be hopelessly insolvent based upon the available data and not on a full-fledged valuation analysis (which is premature prior to a confirmation hearing). *See Pilgrim's Pride*, 407 B.R. at 217 n.14 (indicating that a full-blown valuation analysis is not necessary for purposes of considering requests to appoint an equity committee as it would be "too complex and time-consuming").  The information currently available to the Ad Hoc Group demonstrates the Debtors are solvent, including:

        a.     The Debtors have no prepetition funded debt.  *See, e.g.*, July Monthly Operating Report at 2.

10

b.  The Debtors possess Securities in the issuing companies with an estimated value of at least $500 million (and likely much more).  *See* First Day Decl. ¶ 22; Rule 9019 Mot. ¶ 15.

c.  The Debtors hold over $19 million in cash proceeds realized from its prepetition liquidation of securities of privately held companies, which can be used to fund these chapter 11 cases.  *See Motion for Entry off an Order (I) Authorizing the Use of Estate Proceeds Free and Clear of All Liens, Claims, Interests, And Encumbrances, (II) Determining That the Ripple Sale Proceeds Are Assets of the Bankruptcy Estate, and (III) Granting Related Relief* [Dkt. No. 79] ¶ 17.

d.  The Debtors' trade debt is around $2.1 million and the Debtors have sufficient cash to pay trade vendors in full.  *See generally Debtors' Schedules of Assets and Liabilities* [Dkt Nos. 218, 220, 222 and 224] (the "**Schedules**").

e.  The Debtors and the UCC appear to agree that the Unitholders should receive the benefit of the bargain through the proper allocation of the Platform Securities for the benefit of the Unitholders.

f.  The Debtors hold Reserved Securities of significant but indeterminate value, and even the Debtors (using an undisclosed methodology) value the Reserve Securities at $16 million.  Rule 9019 Mot. ¶ 15.

g.  The Debtors likely own valuable causes of action against various parties. *See, e.g.*, First Day Decl. ¶ 6 (the Special Subcommittee is conducting an ongoing internal investigation of the Debtors' claims and causes of action between the Company and any of its related parties); Rule 9019 Mot. ¶ 45 (noting allegations by the Creditors' Committee and Unitholders about how Debtors' prior management was aware of regulatory and legal violations and "failed to take corrective action"); Dkt. No. 529 (Sept. 16 Hr'g Tr.) at 21:16-24 (Mr. Aulet: "[P]art of this case and the Plan is a Litigation Trust to go out and hold people accountable for that fraud . . . . the Committee is going to be doing an investigation.  [T]here's a number of parties that need to be looked at.").

h.  The Debtors' purported basis for seeking chapter 11 protection is not because of an insolvency crisis, but to be "better positioned to address its historical regulatory compliance issues and related liabilities, protect Customers' interests, and potentially resume operations through a compliant structure."  First Day Decl. ¶ 55.

22.  Critically, there are outstanding questions about the value of the Reserved Securities, which are held as inventory shares and whose sole residual beneficiary are the Linqto

11

Shareholders.  The Reserved Securities are admittedly difficult to value, but, given the nature of the issuing companies of these Securities, the Reserved Securities have the potential to rise in value very quickly.  Even the Debtors concede that the Reserved Securities have significant value, valuing them at $16 million.  *See* Rule 9019 Mot. ¶ 15.

23.     Given the foregoing, it is not at all clear that the Debtors in these cases are "hopelessly insolvent."  *See Wang Labs*, 149 B.R. at 3.  To the contrary, the Linqto Shareholders have a real economic interest at stake in these chapter 11 cases, separate from the Unitholders' interests.  The Linqto Shareholders should receive the benefit of any value left in the estates, including the Reserved Securities along with management fees and other revenues generated by the Company's platform in the future (as would any shareholder in a solvent enterprise).

24.     Further, although a full-blown valuation analysis is neither required nor appropriate in connection with a request under section 1102(a)(2), *see Pilgrim's Pride*, 407 B.R. at 217 n.14, the Debtors appear to have, whether intentionally or unintentionally, significantly undervalued the fair market value of the Securities (including the Reserved Securities).  As an example, the Debtors have valued the Ripple shares they have at approximately $400 million as of June 30, 2025.  *See Linqto Liquidshares LLC Schedule A/B: Assets – Real and Personal Property* [Dkt. No. 224] at 9. On June 12, 2025, Ripple offered to repurchase its shares at $175/share.[9]  Using the $175 per share valuation, and based on the Ad Hoc Group's understanding of the number of shares held by the Debtors, the value of the Debtors' Ripple holdings would be at least $800 million.

25.     This Court has recognized the need for an official equity committee in analogous circumstances where debtors have faced wildly divergent valuations within a short period of time:

---

[9]     Abdulkarim AbdulWahab, *Ripple Launches $700M Share Buyback at $175 Per Share*, THE CRYPTO BASIC (June 12, 2025), https://thecryptobasic.com/2025/06/12/ripple-launches-700m-share-buyback-at-175-per-share/.

> [S]omething happened between December and now, or the December representations were misleading—perhaps intentional, perhaps unintentional. There may be claims arising out of that. Now, I will say that counsel is telling me that he thinks there probably would not be a claim against the debtor, and I'm not finding that there is a claim against the debtor for such a misrepresentation. But something stinks. And no one's going to look at it, unless they have an equity security committee or the unsecured creditors committee that's going to look at it.

*Energy XXI, Ltd.*, (June 15, 2016 Hr'g Tr.) at 164:3-12 (Isgur, J.); *accord In re Horsehead Holding Corp.*, Case No. 16-10287 (Bankr. D. Del.) (May 2, 2016 Hr'g Tr.) at 100:16-101:7 (Sontchi, J.) (directing the appointment of an official committee because something did not "smell right" with respect to debtors' pre- and post-petition valuation).

### B.    The Linqto Shareholders are not Adequately Represented

26.    Shareholders are not presumed to be adequately represented by an official creditors' committee. *See In re Mirant Corp.*, 334 B.R. 800, 815 (Bankr. N.D. Tex. 2005) (noting that it is unlikely that creditors will be disposed to value Debtors so liberally that equity may be sure to receive its due); *see also In re Saxon Indus.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (providing that unsecured creditors' committees and equity committees "are separate and distinct entities with the members of the unsecured creditors and equity creditors class possessing variant priorities and interests with respect to their relationship with the debtor"); *In re Evans Prods., Co.*, 58 B.R. 572, 575 (S.D. Fla. 1985) (noting "[t]he interests of creditors and shareholders are likely to conflict over the course of a Chapter 11 proceeding").

27.    Indeed, as noted previously, this case is unique in that the Debtors—who have no prepetition funded debt and *de minimis* trade debt—have only two major groups of stakeholders: the Unitholders and the Linqto Shareholders. *See supra*, ¶ 21. The Linqto Shareholders' interests are not adequately represented by the Creditors' Committee, which is comprised entirely of holders of Unitholder claims and vendor claims, and has no incentive to represent the equity holders'

interests.  *See Pilgrim's Pride*, 407 B.R. at 217 n.17 (rejecting the argument that the unsecured creditors' committee serve as an adequate protector of the interests of equity owners, noting that "when it comes to valuation and determination of future capital structure for plan purposes, [shareholders' and unsecured creditors'] agendas are likely to be very much at odds").

28.      Without the appointment of an Official Equity Committee, there is no fiduciary protecting the interests of equity holders.  This is especially true here where the Debtors' board and management are plagued by the distractions of its longstanding dispute with certain former members of the Debtors' management, who are some of the largest shareholders, as well as current management owning a stake in direct competitors of the Debtors.[10]  Additionally, the Debtors' board and management took certain actions leading up to the Petition Date that may give rise to potential causes of action.  *See* Jiang Decl. ¶ 6.

29.      This creates a clear conflict of interest between the Debtors' board and management and the Linqto Shareholders, who stand to benefit from any recovery on account of claims that the Debtors' estates may bring against them.  At the very least, there must be an independent fiduciary (with no connection to the Board, unlike the Special Subcommittee) investigating those claims for the benefit of the estates.  In circumstances where, as here, the interests of management do not align with those of the Debtors' non-insider equity holders, a statutory equity committee provides a meaningful counterweight and warrants appointment.  *See In re Oneida Ltd.*, 2006 WL 1288576,

---

[10]    Indeed, serious conflicts of interest concerns have been raised concerning Company management—including CEO Daniel Siciliano, GC Mike Huskins, COO Cathy Siciliano, and CAO Jesus Ancheta—all of whom hold ownership stakes in Nikkl, Inc. ("**Nikkl**") (a direct competitor of Linqto) and were former Nikkl employees.  *See Declaration of Victor Jiang in Support of Sapien Group USA LLC's Emergency Motion to Transfer Venue of the Debtors' Cases* [Dkt. No. 88-1] ¶ 2 (the "**Jiang Declaration**").  Further, current management has, to date, been unresponsive to shareholder demands and has not held an annual shareholder meeting since November 2023.  *See Sapien Group USA LLC's Emergency Motion to Transfer Venue of the Debtors' Cases* [Dkt. No. 88] ¶ 33.

at *2 (Bankr. S.D.N.Y. May 4, 2006) (ordering appointment of statutory equity committee upon a finding that "certain of the checks and balances" were not present).

30.     The critical necessity of an Official Equity Committee is evidenced by the Debtors' motion for approval of a settlement between the Debtors and the Creditors' Committee.  *See generally* Rule 9019 Mot.  The Linqto Shareholders were not invited to participate in this process and there is zero recovery contemplated for Linqto Shareholders.  Yet meaningful assets sit at Linqto.  The economic upside from the corporate structure, including the management fees and the Reserved Securities, should be available for the benefit of the Linqto Shareholders.  The Linqto Shareholders should also be the beneficiaries of any value provided to the estates resulting from the prosecution of claims and causes of action currently being investigated by the Special Subcommittee, including claims against the Debtors' insiders.  It would be unjust to permit the Debtors to formulate an exit strategy without any meaningful input from the Linqto Shareholders, who have a meaningful stake in the Debtors' enterprise.

### C.     The Cases are Large and Complex

31.     There is no dispute that these cases are complex and include significant liabilities and assets.  *See generally* Schedules; *see Pilgrim's Pride*, 407 B.R. at 220 ("[A]ppointment of [an equity committee] is more appropriate where the complexities of the case make it more difficult for another—here management—to protect equity interests as well as those of creditors.").  These chapter 11 cases involve novel and complicated securities law issues resulting from a company that purported to enable tens of thousands of investors to indirectly invest in pre-IPO companies and private-market startups through its platform.  *See* First Day Decl. ¶ 20.  Counsel to the Creditors' Committee even admitted during a hearing before the Court on August 19 that there were "very thorny" securities law limitations involved in making "in-kind" recoveries to

Unitholders.  *See* Dkt. No. 436 (Aug. 19 Hr'g Tr.) at 15:13-22.  Further, the Debtors agree these

cases are large and complex.  *See Notice of Designation As Complex Chapter 11 Cases* [Dkt. No.

2].  Without fiduciary representation, the Linqto Shareholders will not be able to maximize their

recovery as a class.

      **D.**      **The Critical Need for an Official Equity Committee Outweighs the Potential Costs**

      32.      Courts have made clear that the administrative costs of an equity committee alone

must not bar statutory equity committee appointment.  *See In re McClean Indus.*, 70 B.R. 852, 860

(Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive . . . security holders of

representation.").  Courts are required to balance "the cost of the additional committee against the

value of the representation to be provided."  *Wang Labs*, 149 B.R. at 3; *see also Beker Indus.*, 55

B.R. at 951 (holding that the opponents to the motion were unable to show that "the cost [of an

equity committee] is so burdensome to deny official representation").  Additional costs must be

weighed against the need for adequate representation of public shareholders.  *See Wang Labs*, 149

B.R. at 3-4; *Beker Indus.*, 55 B.R. at 949–51.

      33.      The costs associated with the appointment of an Official Equity Committee are far

outweighed by the need for adequate representation of the Linqto Shareholders.  *See Wang Labs*,

149 B.R. at 3–4.  Given the nature of the Debtors' business and their unique organizational

structure, it is both appropriate and necessary for these estates to incur reasonable expenses

associated with an Official Equity Committee to assure that the interests of the Linqto Shareholders

are not wiped out by a plan currently being designed solely by the Debtors and the Creditors'

Committee without any input from equity holders.  There are hundreds of Linqto Shareholders,

many for whom it would not be feasible to hire counsel or share costs.  Such a group would greatly

benefit from coordination vis-à-vis an Official Equity Committee when there are clearly economic

interests to protect.  An Official Equity Committee would give the Linqto Shareholders access to organized information flow, negotiations, and a seat at the table on any decisions made for all of the Debtors' stakeholders.

34.     Moreover, the Bankruptcy Code contains adequate means for controlling costs. *See, e.g.*, 11 U.S.C. §§ 330; 1103(a).  At all times, the costs of the Official Equity Committee would be subject to review (and, if appropriate, objection) by parties in interest.  *See In re Oneida Ltd.*, 2006 WL 1288576, at *3 ("An official equity committee would take on a fiduciary duty to all current shareholders and its compensation would be subject to the approval of the Court.").  And this Court, as the final arbiter of whether the costs are reasonable, has complete control over the expense of an Official Equity Committee.  *See, e.g.*, *Evans Prods. Co.*, 58 B.R. at 575–76 (holding that Bankruptcy Court erred in denying the equity committee's request to retain independent accountants).  Here, where equity very likely has substantial value, the benefits of an official committee representing the shareholders' interests far outweigh any additional costs to the Debtors' estates.

## EMERGENCY CONSIDERATION

35.     The Ad Hoc Group requests emergency consideration of this Motion, on or before October 3, 2025, pursuant to Bankruptcy Local Rule 9013-1(i).  Specifically, the Ad Hoc Group requests that this Motion be considered before, or together with, the Debtors' 9019 Motion, which is set to be heard on October 3.  As set forth above, the Debtors' Rule 9019 Motion contemplates no recovery for Linqto Shareholders.  If the Debtors, through the Rule 9019 Motion, commit to a Plan that provides no recovery for Linqto Shareholders, the relief requested in this Motion could be rendered moot.

17

## NOTICE

36.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Rule 9013-1(d), including Debtors' counsel.

## NO PRIOR REQUEST

37.     No prior request for the relief sought in this Motion has been made to this or any other court

## CONCLUSION

38.     The Ad Hoc Group requests that the Court grant the Motion and enter an order, substantially in the form attached hereto.

Dated: September 26, 2025

Respectfully submitted,

By: */s/ Gregory F. Pesce*

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Facsimile: (312) 881-5450
Email:  gregory.pesce@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Colin T. West (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  cshore@whitecase.com
            philip.abelson@whitecase.com
            cwest@whitecase.com

*Counsel for Ad Hoc Group of Equity Holders*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that, on September 26, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Gregory F. Pesce*

**<u>CERTIFICATE OF ACCURACY</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Gregory F. Pesce*