# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] ) | |
| ) | Case No. 25-90186 |
| Debtors. ) | |
| ) | (Jointly Administered) |
| ) | **Re Docket No. 574** |

### DEBTORS' OBJECTION TO THE EMERGENCY MOTION OF THE AD HOC GROUP OF EQUITY HOLDERS FOR ENTRY OF AN ORDER DIRECTING THE U.S. TRUSTEE TO APPOINT AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS PURSUANT TO 11 U.S.C. § 1102

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-debtor affiliates, "**Linqto**" or the "**Company**") file this objection (the "**Objection**") in response to the *Emergency Motion of the Ad Hoc Group of Equity Holders for Entry of an Order Directing The U.S. Trustee to Appoint an Official Committee of Equity Security Holders Pursuant to 11 U.S.C. § 1102* [Docket No. 574] (the "**Equity Committee Motion**") filed by the ad hoc group of shareholders of Linqto, Inc. (the "**Ad Hoc Equity Group**") seeking entry of an order directing appointment of an official committee of equity security holders (an "**Equity Committee**") in these chapter 11 cases. In support of this Objection, the Debtors respectfully state as follows:[2]

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2] Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure. "**Bankruptcy Local Rule**" or "**BLR**" references are to the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas. Other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion and/or the *Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions, and Related Relief* [Docket No. 10].

1

**PRELIMINARY STATEMENT**

1. An Equity Committee is neither necessary nor beneficial to these Chapter 11 Cases. Appointing an Equity Committee is the exception, not the rule, and the Ad Hoc Equity Group has failed to satisfy its high burden of demonstrating that the appointment of an equity committee is necessary to adequately represent equity's interests.

2. First, the interests of equity holders are already adequately represented by professionals of the estate, including the Debtors and the Official Committee of Unsecured Creditors (the "**UCC**"), whose fiduciary duties bind them to maximize value for all stakeholders. Appointment of an Equity Committee, whose costs would be borne by the estates, would result in significant duplication of effort and an unsupportable increase in administrative expense for no tangible benefit.

3. Second, the Debtors are insolvent. There are substantial unresolved liabilities associated with customer claims, securities based recission claims, fraud-based claims, and governmental fines and penalties, some of which may stem from certain equity holders' conduct. As a result, there is likely no recovery for equity in these cases and they are out of the money.

4. Third, while these Chapter 11 cases involve complex legal issues and a large Customer base, those factors do not justify the appointment of an Equity Committee and the associated substantial costs. There is simply no need for another estate-funded group with another set of professionals to further crowd the Court's docket and deplete estate resources.

5. In sum, the Ad Hoc Equity Group has failed to produce a record that would justify the extraordinary remedy of appointing an official equity committee and the Equity Committee Motion should be denied.

**BACKGROUND**

6. On July 7, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors continue to operate their business and manage their property as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On July18, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Committee. *See* Docket No. 98. To date, no request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.[3]

**I.    Request to U.S. Trustee for Appointment of an Official Preferred Equity Committee**

7. On or about August 28, 2025, White & Case LLP, on behalf of the Ad Hoc Equity Group, submitted a letter to the U.S. Trustee requesting the appointment of an official committee of Linqto, Inc. equity security holders.

8. On September 5, 2025, at U.S. Trustee's invitation, the Debtors sent a letter to the U.S. Trustee stating their opposition to the appointment of an Equity Committee in these chapter 11 Cases. The UCC also sent a letter to the U.S. Trustee opposing the Ad Hoc Committee's request.

9. On September 10, 2025, the U.S. Trustee notified Debtors' counsel that it has determined not to appoint an official equity committee.

---

[3] Pursuant to Federal Rule of Evidence 201 and Bankruptcy Rule 9017, the Debtor respectfully requests that the Court take judicial notice of the docket in this case, including all filings, orders, and entries reflected therein, as maintained by the Clerk of the Court through the CM/ECF system.

10. On September 26, 2025, the Ad Hoc Equity Group filed the Equity Committee Motion. No other party has filed a motion seeking appointment of an official equity committee. Nor has any party filed a joinder to the Equity Committee Motion.[4]

**ARGUMENT**

**I. Appointment of an Equity Committee Is "Extraordinary Relief" and Must Be "Necessary" to Ensure Adequate Representation of Equity's Interests.**

11. Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2). Although courts apply varying definitions of "necessary," they uniformly agree that an appointment of an official equity committee "constitutes extraordinary relief and is the exception rather than the rule." *In re SunEdison Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016) (*quoting In re Eastman Kodak Co.,* 2012 WL 2501071, at *2 (Bankr. S.D.N.Y. June 28, 2012); *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009); *see also In re Linn Energy, LLC*, Case No.16-60040 (Bankr. S.D.Tex. Feb. 2, 2017) (Jones, J.), ECF No.1673 at pg.1 ("The appointment of an equity committee is the exception and not the rule."). The Ad Hoc Committee bears the burden of demonstrating that appointment of an official equity committee is "necessary" to adequately represent equity's interest and the burden "is far more onerous than if the statute merely provided that a committee be useful or appropriate." *In re SunEdison Inc.*, 556 B.R. at 103 (collecting cases).

---

[4] On September 27, 2025, the Debtors received an email from Mr. Gavin Solomon ("**Solomon**") attaching a submission in support of the Equity Committee Motion. As of the date of this Objection, Solomon's submission has not been filed on the docket in these cases.

4

12. In determining whether an equity committee should be appointed in a given case, courts generally consider the following factors: "(i) whether Debtors are likely to prove solvent; (ii) whether equity is adequately represented by stakeholders already at the table; (iii) the complexity of the Debtors' cases; and (iv) the likely cost to Debtors' estate of an equity committee." *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009).

13. This Court has repeatedly—and recently—made clear that the key question when deciding whether an equity committee should be appointed is whether the committee will "contribute anything to the process." *In re Core Scientific, Inc.*, Case No. 22-90341 (Bankr. S.D. Tex.), Mar. 1, 2023 Hr'g Tr. at 7:12–15; *see also In re Sandridge Energy, Inc.*, Case No. 16-32488 (Bankr. S.D. Tex.), Aug. 1, 2026 Hr'g Tr. at 94:11–14 [Docket No. 686] (focusing on the "practical" question of whether the committee is "going to add something to the case"); *In re CJ Holding Company*, Case No. 16-33590 (Bankr. S.D. Tex.), Nov. 1, 2016 Hr'g Tr. at 204:2–5 (on whether an equity committee should be appointed, "you have to show me why, and you have to show me that it's a positive to the case").

14. Here, the factors weigh against the appointment of an Equity Committee.

**II.   Equity is Adequately Represented by Existing Stakeholders.**

15. The Ad Hoc Equity Group asserts that equity's interests are not adequately represented in these Chapter 11 Cases because: (1) the UCC is comprised of holders of Customer claims and vendor claims and those parties have no incentive to represent the equity holders' interests; (2) the Debtors' board of directors and management have conflicts of interest which prevent them from protecting the equity holders' interests; and (3) equity holders were not afforded an opportunity to engage in any settlement discussions which ultimately yielded a proposed settlement among the Debtors, the UCC and the Deaton Parties that is purportedly unfavorable to equity. Equity Committee Motion at ¶¶ 26-30. In sum, the Ad Hoc Committee

5

suggests that because equity's interests are not exclusively and equally represented by an independent fiduciary paid for by the Debtors' estates, they are not adequately represented in these Chapter 11 Cases. The standard is not whether equity's interests are "exclusively" represented, but rather, whether their interests are "adequately represented." *See In re Williams Commc'ms Grp. Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002); *In re Edison Bros. Stores, Inc.*, No. 95-1354 (PJW), 1996 WL 534853, at *4 (D. Del. Sept. 17, 1996).

16. There is no need for a formal, estate-funded official committee to represent equity holders because they are already well-represented. Existing constituencies, including the Debtors' management team, board of directors, the Special Subcommittee, the UCC, and even members of the Ad Hoc Equity Group themselves (acting as an ad hoc committee) more than adequately represent the interests of equity holders in maximizing the value of the estate.

### A. The Debtors' Board and Management Team Adequately Represent the Equity Holders' Interests.

17. The Debtors' management team, board of directors and the Special Subcommittee, each have fiduciary duties to maximize value for the benefit of the Debtors' estates as a whole, including creditors and equity holders alike. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (noting that "the fiduciary duty of the trustee runs to shareholders as well as to creditors . . . if a debtor remains in possession" and the "debtor's directors bear essentially the same fiduciary obligations to creditors and shareholders as would the trustee for a debtor out of possession") (internal citation omitted). It is well settled that a company's board of directors owe fiduciary duties to shareholders when a company is solvent, but once the board determines that the company is insolvent, the creditors take the place of shareholders as the principal constituency. *North American Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007); *see also Weintraub*, 471 U.S. at 345 (1985) ("[U]nlike

6

the management of a solvent corporation, the trustee's primary loyalty goes not to shareholders but to creditors. . . . Even though in some cases the trustees exercise of the privilege will benefit only creditors, such a result is in keeping with the hierarchy of interests created by the bankruptcy laws."). Even so, the company's insolvency does not absolve the board of its fiduciary duty to the shareholders. *In re Eastman Kodak Co.,* 2012 WL 2501071, at *2 (Bankr. S.D.N.Y. June 28, 2012) ("Although the interests of a company's board may diverge from shareholders for plan purposes, the 'usual presumption [is] that the Board will pay due (perhaps special) regard to the interests of shareholders' in bankruptcy.") (citing *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576, at *2 (Bankr. S.D.N.Y. May 4, 2006)).

18.  Courts have generally only found the Debtors' board to be insufficient fiduciaries where there are special circumstances that render the board unable to adequately represent equity holders. The Ad Hoc Equity Group cites *In re Oneida* to suggest that such special circumstances exist here because the interests of the Debtor's board and management "do not align with those of the Debtors' non-insider equity holders," particularly since those parties "stand to benefit from any recovery on account of claims that the Debtors' estates may bring against them." Equity Committee Motion ¶¶ 28-29. The Ad Hoc Equity Group's reliance on *In re Oneida* is misplaced. In *Oneida*, the debtor's secured lenders, as part of an initial out-of-court restructuring step, gained effective control of the debtor's board through exercising the right to appoint six of the nine directors. *In re Oneida Ltd.*, 2006 WL 1288576, at *2. The subsequent board then "endorsed a plan of reorganization that wipes out old equity and allocates all of the equity of the reorganized companies to those Lenders who are not being paid in full." *Id.* The court found that "under the unusual (perhaps unique) circumstances of this case," the "usual presumption that the Board will pay due" regard to shareholder interests was unrealistic, because the debtors were controlled by

7

their lenders. *Id.* at *2. Unlike in *Oneida*, the Ad Hoc Committee has offered no evidence—only speculation—that the Debtors' exiting board of directors is incapable of discharging its fiduciary duties. *See In re Edison Bros.*, 1996 WL 534853, at *4 (affirming the bankruptcy court's order denying a motion to appoint an official equity committee and noting that shareholders failed to establish that the debtors' management was incapable of honoring their fiduciary duties).

19. Further, in *Oneida*, the court noted that, because unsecured creditors were being paid in full under the terms of the prepackaged plan, there was no official committee of unsecured creditors, and therefore "the usual checks and balances [were] not present." *Id.* at *3. Here, the UCC has been appointed and has every incentive to maximize the value of the Debtors' estates, which would inure to the benefit of the Debtors' shareholders. *Eastman Kodak Co.*, 2012 WL 2501071 at *2 ("All the other constituencies in the case have the same goals as a shareholders' committee—to maximize the value of the estate."); *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 139-40 (Bankr. S.D. Cal. 2003) (denying appointment of an equity committee where "[t]he economic interests of the [unsecured creditors' committee] and shareholders appear to be the same—that is, to find the highest realistic value for the company. And it is the fiduciary duty of the [creditors' committee] to do so."); *In re Celsius Network LLC*, 645 B.R. 165, 173 (Bankr. S.D.N.Y. 2022) (denying appointment of an equity committee in part because the "Requesting Equity Holders will also be represented by the Committee [which] has a duty to maximize the value of the Debtors' estates"); *Williams Commc'ns Group*, 281 B.R. 216 at 222-23 ("[T]he Creditors' Committee has sufficiently aligned or parallel interests with the Shareholders to preclude the need for an additional committee").

**B.    The UCC Adequately Represents the Equity Holders' Interests.**

20. The Ad Hoc Committee argues that the interests of the UCC and equity are generally adverse and therefore the UCC cannot adequately protect the interests of equity holders.

Equity Committee Motion ¶¶ 26-27. The UCC (and its legal and financial advisors) have been heavily involved in these cases, further ensuring their integrity and advancing similar interests as those held by shareholders. The Ad Hoc Equity Group provides no evidence to suggest that disagreement on certain issues in the case renders the appointment of an equity committee necessary. Nor is there any evidence that the UCC will cease its efforts to maximize the value of the Debtors' estates at the point when it is determined that they will recover the full benefit of their bargain in these cases. Indeed, the UCC has both the statutory authority and the economic incentive to scrutinize the Debtors' actions, investigate potential estate claims, and maximize value for all stakeholders, including any residual value that might potentially flow to equity. Appointing an equity committee would only duplicate those efforts and increase administrative costs, without any material benefit to the estates and at a time where the current estate professionals are doing everything possible to shorten the timeline of these cases and to reduce administrative costs to increase recoveries.

21.     The Ad Hoc Equity Group cites *In re Pilgrim's Pride Corp.* for the proposition that an equity committee should be appointed where the interests of shareholders and unsecured creditors diverge. Equity Committee Motion ¶ 27. But *Pilgrim's Pride* does not stand for the proposition that any disagreement between equity and unsecured creditors merits an official equity committee. In *Pilgrim's Pride* there was substantial public evidence that the Debtors' assets exceeded their liabilities and the Debtors' largest shareholder served as "creditor, as guarantor of Debtors' bank debt and as Debtors' contractual counterparty" such that the Debtors' board and creditors' committee could not adequately represent equity. *Pilgrim's Pride*, 407 B.R. at 217–218. Here, the evidence points to the Debtors' insolvency. Along with administrative claims and the scheduled customer claims, which are based on the economic interests the customers' should hold,

the Debtors expect to face substantial claims by the federal and state governments for violations of the Securities Act of 1933, the Investment Company Act of 1940, the Securities Act of 1934, along with recission and fraud claims, and tax claims under state and federal law. Unless and until all of those liabilities, along with significant administrative expenses, are satisfied in full, equity has no economic stake to protect. Any arguments to the contrary that the existing stakeholders' interests and shareholder interests are not aligned are speculative and premature.

22.   Moreover, while there may be legal disagreements among parties, the Debtors do not serve as both the largest shareholder and a creditor such that their fair representation of all stakeholders is precluded. *Id*. Also, in *Pilgrim's Pride* the risk of burdening the debtor with unnecessary fees was not present, given that under then governing Fifth Circuit standards, "professionals representing an equity committee may not be entitled to compensation if the subject case ultimately provides no return to equity[.]" *Id.* at 217. *Pilgrim's Pride* is therefore inapposite.

      **C.**      **The Ad Hoc Equity Group Adequately Represents the Equity Holders' Interests Without the Need for the Appointment of an Equity Committee.**

23.   The Ad Hoc Equity Group's representation through independent counsel is adequate to represent equity's interests without the title of an official committee and the burden such committee would have on the estate's resources.

24.   While the Ad Hoc Equity Group argues that "hundreds" of other equity holders require an official equity committee to represent their interests in these Chapter 11 Cases, the Ad Hoc Equity Group has already demonstrated its ability to advocate for the interests of the majority of equity holders. *See* Equity Committee Motion, fn. 2 (stating that the Ad Hoc Equity Group owns "approximately 3.491% of all outstanding common stock and approximately 17.745% of outstanding preferred stock issued by Linqto," yet they have garnered the support of

"approximately 67% of holders of Common Stock and Preferred Stock across all voting share classes of Linqto's equity securities . . . for the appointment of an Official Equity Committee."). Moreover, the Ad Hoc Equity Group's contention that the appointment of an equity committee is the only feasible means of adequately representing the hundreds of other equity holders is disingenuous at best given the apparent coordination of efforts between the Ad Hoc Equity Group and certain parties who purport to be *pro se*. *See, e.g.*, Equity Committee Motion at Ex. A (September 19, 2025 email from Debtors' counsel to purported *pro se* party Solomon, which was shared with the Ad Hoc Equity Group's counsel). Even so, given the robust *pro se* participation in these cases (including by Solomon and others), an official equity committee is not necessary to adequately represent the interests of equity holders.

25. Courts have routinely held that equity holders are adequately represented through unofficial, ad hoc committees, such as the Ad Hoc Equity Group. *See, e.g.*, *Eastman Kodak*, 2012 WL 2501071, at *2-3 (denying the appointment of an official committee of equity security holders where shareholders' interests were adequately represented by other constituencies, including an equity owning board of directors, a "well-organized" ad hoc committee, and an unsecured creditors committee); *Spansion*, 421 B.R. at 163. As in *Spansion*, the Ad Hoc Equity Group here is "well organized, well represented by counsel, and adequate to the task of representing [their] interests without 'official' status." *Id*. There is simply no evidence that the interests of equity holders cannot (and will not) be adequately represented absent the appointment of an equity committee. Indeed, there is nothing precluding equity holders—whether through the Ad Hoc Equity Group or otherwise—from participating in these Chapter 11 Cases.

26. In sum, the existing parties in the case (including the Debtors' independent Chief Restructuring Officer, the Debtors' management, the Special Subcommittee and the UCC)

11

have every incentive to advocate for a recovery to equity if it were possible under the facts of these cases. The parties have identified a path to exit that maximizes value for all stakeholders who are entitled to share in that value, including equity holders. The Ad Hoc Equity Group has made no showing of how an official equity committee would benefit the process. At this stage in the case, there is no reason to add yet another set of professionals, paid by the estate, to advocate for the exact same arguments that are already being advanced aggressively by other constituencies, particularly when there is no likelihood of a recovery for equity.

## II. There is No Meaningful Possibility of Recovery for Equity Holders.

27. Courts have repeatedly held that a separate equity committee is only warranted where equity holders can demonstrate a substantial likelihood of recovery and that their interests are not only distinct but also likely to be prejudiced absent formal representation. *See Celsius*, 645 B.R. at 174 (holding that an equity committee should not be appointed unless equity holders establish a "substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule."). That is not the case here.

28. The Ad Hoc Equity Group asserts that the Debtors are not "hopelessly insolvent" because they: (1) have no prepetition funded debt; (2) possess Securities in the Issuing Companies with an estimated value of at least $500 million; (3) hold $19 million in cash proceeds which can be used to fund the Chapter 11 Cases; (4) have sufficient cash to pay trade vendors in full; (5) appear to agree that the Customers should receive the benefit of the bargain through the proper allocation of the Platform Securities for the benefit of the Customers; (6) hold Reserved Securities valued approximately $16 million; (7) likely own valuable causes of action against various parties; and (8) are not facing a liquidity crisis. *See* Equity Committee Motion ¶ 21.

29. The Ad Hoc Equity Group's arguments fail for multiple reasons. First, while the Debtors may not have prepetition funded debt, the aggregate effect of substantial customer claims,

12

fraud-based claims, recission claims, regulatory fines and penalties, and case costs renders them insolvent for purposes of the Chapter 11 analysis. The Debtors face multiple significant financial risks that continue to materialize during the Chapter 11 Cases, all of which are likely to result in liabilities that exceed the value of the Debtors' assets including: (1) the administrative and professional costs already incurred and anticipated throughout the Chapter 11 Cases; (2) the potential for large, potentially unquantifiable rescission and fraud-based claims, which may be treated as general unsecured claims; and (3) potential regulatory penalties, which may be subordinated under 11 U.S.C. § 726(a)(4), but still represent material claims against the estate to be paid ahead of equity. Collectively, these liabilities reinforce the probability that the Debtors' obligations far exceed the value of their assets, leaving equity "out of the money" under any reasonable valuation.

30. Second, while the Debtors currently hold approximately $19 million in cash proceeds from the Ripple tender transaction, these proceeds are the result of the sale of shares of Ripple in which the customers have alleged they hold an interest. Further, the Ripple cash must be used to fund the Chapter 11 Cases, including the costs of administration, professional fees, and other allowed administrative claims. There is no evidence that this cash, or any other estate assets, will be available for distribution to equity holders.

31. Similarly, the Ad Hoc Equity Group has not established that the Debtors currently have sufficient cash on hand to pay trade vendors in full after payment of administrative claims. Moreover, other than the Ripple cash, the Debtors' other available cash are $10,000,000 of proceeds of the DIP financing. Not only are these funds necessary to fund the administration of these Chapter 11 Cases, but the DIP lender has a lien in those funds and a superpriority administrative claim pursuant to the interim DIP order for its fees and costs, which

are accruing. Accordingly, those funds are not available to pay prepetition trade vendors, much less make distributions to equity.

32. Further, there is no evidence that the securities that Linqto Liquidshares LLC purchased and held in reserve for its own account and subsequent sales of units to customers (the "**Reserved Securities**") are valued at $150 million - and the Shareholder Group has offered no such evidence. Rather, as the Debtors have previously stated, the Reserved Securities are valued at approximately $16 million as of the Petition Date. (*See Debtors' Motion for Entry of an Order (I) Approving (A) Procedures for the Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Entry Into Broker Fee Arrangements In Connection With Such Sales; (II) Approving the Assumption of Executory Contracts in Connection With the Sale of Certain Assets and Related Fee Agreements; and (III) Granting Related Relief* [Docket No. 80], ¶ 8.).

33. Finally, the Ad Hoc Equity Group's assertion that the Debtors did not file the Chapter 11 Cases because of a liquidity crisis is simply incorrect. While liquidity was not the sole reason for filing the Chapter 11 Cases, the Debtors' available cash on hand (*i.e.*, cash other than the Ripple proceeds and restricted cash) on the Petition Date was approximately $123,000. Presently, the Debtors' cash on hand secures the DIP facility. Importantly, the Debtors are not operating and are only generating revenue from the sales of Reserve Securities. Whether the Debtors are facing an immediate liquidity crisis, however, is irrelevant to the question of solvency and equity recovery. Solvency requires that the value of the Debtors' assets exceed the full scope of their liabilities, including unliquidated, contingent, and disputed claims such as the potentially significant Customer rescission and fraud claims and the potential government penalties at issue in these Chapter 11 Cases. While available cash may allow the Debtors to fund the Chapter 11

Cases and pay certain claims, there is no indication that equity holders are "in the money" or that there will be any meaningful residual value after the estate addresses its obligations.

34. The Debtors have represented that they are likely insolvent and that conclusion is well-founded given the scope of Debtors' potential liabilities. Appointing an Equity Committee under these circumstances would impose unnecessary administrative costs on the estate and is unwarranted given the speculative nature of any potential equity recovery. *See Celsius*, 645 B.R. at 174 ("Equity committees should not be appointed unless equity holders establish that . . . there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule."); *Spansion*, 421 B.R. at 156 ("if equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan"); *Eastman Kodak,* 2012 WL 2501071, at *6 ("[T]he estate will not be forced to fund a constituency that appears to be out of the money").

35. Even if the Debtors were solvent (which they are not), solvency alone is not a dispositive factor. *In re SunEdison, Inc*., 556 B.R. 94, 106 (Bankr. S.D.N.Y. 2016) ("[T]he debtor's solvency is still no guarantee that an equity committee should be appointed."); *Edison Bros. Stores,* 1996 WL 534853, at *3 (declining to appoint equity committee even though parties agreed debtors were not hopelessly insolvent). Here, an Equity Committee will not contribute more to these cases than the existing stakeholders and fiduciaries are already contributing to maximize value for the benefit of all stakeholders, including equity.

**III.   The Complexity of These Chapter 11 Cases Does Not Support Appointing an Equity Committee.**

36. The Ad Hoc Equity Group argues that "the novel and complicated securities law issues resulting from a company that purported to enable tens of thousands of investors to indirectly invest in pre-IPO companies and private-market startups through its platform"

15

warrants appointment of an Equity Committee to "assure adequate representation of Linqto Shareholders' interests." Equity Committee Motion ¶ 31.

37. While these Chapter 11 Cases involve complex legal issues and a large Customer base, those factors do not justify appointment of an Equity Committee, particularly where (1) there is no credible path to recovery for equity, and (2) such appointment would only add unnecessary costs and delays. *See Eastman Kodak,* 2012 WL 2501071, at *8 ("Although [these] chapter 11 cases are large and complex, the costs that would result from appointment of an equity committee are substantial and cannot be justified at this stage where equity's interests are represented by other constituencies seeking to maximize the value of the estate and by a sophisticated ad hoc group of shareholders.").

38. Moreover, "appointment of [a statutory equity committee] is more appropriate where the complexities of the case make it more difficult for another . . . to protect equity interests as well as those of creditors." *Pilgrim's Pride*, 407 B.R. at 220. In *Pilgrim's Pride*, the court found that there were so many variables to consider in valuing the debtors that no "single fiduciary" could perform "the two tasks of determining fair treatment of creditors and advocating the entitlement of equity to participation in a reorganized enterprise." *Id*. That is not the case here.  Advocacy for the fair treatment of creditors and for the continued rights of equity may, and will, proceed from the same source: the vigorous and speedy pursuit of a value-maximizing path to reorganization that secures the highest possible value for these estates. The cases are not so complex that existing parties cannot pursue this goal; an official equity committee would at most duplicate efforts and slow the process. *See Celsius*, 645 B.R. at 175 (even if "these Chapter 11 cases [were] complex . . . this complexity may cut against appointing an Official Preferred Equity Committee, as due to the number of stakeholders involved there is a higher risk of duplication of efforts, given that the

Examiner and other parties are already looking into some of the same questions as the Requesting Equity Holders").

### IV. The Debtors' Estates Should Not Bear the Added Costs of an Equity Committee.

39. The significant costs associated with the appointment of an Equity Committee outweigh any concern that equity is not adequately represented. But the Ad Hoc Equity Group contends that the Debtors' estates should bear such significant costs to "assure that the interests of the Linqto Shareholders are not wiped out by a plan currently being designed solely by the Debtors and the Creditors' Committee without any input from equity holders." Equity Committee Motion ¶ 34. Moreover, the Ad Hoc Equity Group would have the Debtors' estates bear the expense of investigating claims against its constituency. *Id.* at ¶ 30 ("The Linqto Shareholders should also be the beneficiaries of any value provided to the estates resulting from the prosecution of claims and causes of action currently being investigated by the Special Subcommittee, including claims against the Debtors' insiders.").

40. Importantly, an equity group claiming to be a major shareholder of Linqto Inc.—Sapien Group USA LLC and its group affiliates ("**Sapien**")—has been active in Chapter 11 Cases since the outset. *See, e.g.*, *Emergency Motion of Sapien Group USA LLC and its Group Affiliates to Transfer Venue of the Debtors' Cases to the District of Delaware Pursuant to 28 U.S.C. § 1412* [Docket No. 88].[5] While Sapien has elected not to file a verified statement pursuant to Bankruptcy Rule 2019 disclosing the identities and affiliations of its members and any potential connections between themselves and the broader group of equity holders, at least one of its members is a former

---

[5] Sapien states that it "was the lead investor in the Company's Corporation's Series AA preferred stock financing in 2020 and continues to hold a significant position in the Corporation's preferred stock, as well as SPV units in Linqto Liquidshares LLC with interests in underlying common shares of the Corporation. In addition, prior to the Petition Date, Sapien purchased common stock and also received written consents and proxies for additional shares that together represent a majority of the common shares." *Id.* at fn.2.

17

director of the Company. *See Declaration of Victor Jiang in Support of Sapien Group LLC's Emergency Motin to Transfer Venue of the Debtors' Cases to the District of Delaware Pursuant to 28 U.S.C. § 1412* [Docket No. 88-1] (the "**Jiang Declaration**"). Without Sapien's Bankruptcy Rule 2019 disclosure, the Debtors—and the Court—cannot assess whether the Ad Hoc Equity Group has undisclosed relationships or conflicts of interest that may compromise their ability to fairly represent the interests of all equity holders. This lack of transparency raises significant concerns that the Ad Hoc Equity Group may be seeking to populate the equity committee with insiders who would use estate resources to advance their own interests or to fund a defense against potential claims, rather than to advocate for the collective interests of equity. Until the required disclosures are made, any consideration of appointing an equity committee would be premature and potentially detrimental to the estate and its stakeholders.

41. The cardinal rule of sitting on a committee is that its members act on behalf of *all members* and not on behalf of their own interests. *See* 11 U.S.C. § 1103(c)(5) (providing that a committee appointed under Section 1102 of the Bankruptcy Code may "perform such other services as are *in the interest of those represented*.") (emphasis added); *In re Adelphia Commc'ns Corp.*, 544 F.3d 420, n.1 (2d Cir. 2008) ("[A] committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes, or the estate."). As such, an equity committee must not be comprised of disinterested equity holders (such as former insiders) whose interests conflict with the interests of ordinary equity holders. Here, it is unclear where the Ad Hoc Equity Group's interests lie. There is simply no basis for the estates to bear the costs of the equity holders defending themselves and the Ad Hoc Equity Group offers no justification for that result. Nor should the Debtors be required to fund the advancement of contingent legal theories upon which equity could recover at the expense of creditors.

42. The appointment of an Equity Committee would impose significant and unnecessary costs on the estate without producing any corresponding benefit to stakeholders. As an estate-funded fiduciary, an equity committee would be entitled to retain its own legal counsel and potentially financial advisors, likely resulting in millions of dollars in additional administrative expenses—all of which would be borne by the same estates that are already burdened by significant professional fees, administrative costs, and massive unresolved liabilities. These costs are particularly unjustified where, as here, equity holders are not reasonably likely to receive any recovery. Courts consistently hold that where equity is "out of the money," the appointment of an equity committee is inappropriate, because the marginal benefit of additional representation is outweighed by the certain cost to the estate. *See Williams Commc'ns Group*, 281 B.R. at 223 ("Such [equity security holders'] committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee"); *In re Emons Indus., Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) (opining that "no equity committee should be appointed when it appears that a debtor is hopelessly insolvent because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift").

43. Further, appointing an equity committee would likely result in duplication of the work already being performed by the Debtors' professionals and the UCC, with no unique value added. *Eastman Kodak*, 2012 WL 2501071 at *4 ("the costs that would result from appointment of an equity committee are substantial and cannot be justified at this stage where equity's interests are represented by other constituencies seeking to maximize the value of the

estate"). The issues that equity holders may wish to raise—such as valuation, corporate governance, or claims objections—are already within the scope of the Debtors' fiduciary duties or are addressed by other stakeholders with aligned interests in maximizing estate value.

44. Simply put, the incremental benefit of a separate committee representing equity holders is speculative, whereas the cost is immediate, material, and unavoidable. In a case where equity lacks a demonstrable economic interest, such a burden is unjustifiable and contrary to the equitable goals of Chapter 11.

## CONCLUSION

For the reasons set forth above, the Debtors respectfully request that the Court deny the Equity Committee Motion and grant such other relief as is just and proper under the circumstances.

Dated: October 2, 2025  
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC** /

*s/ Gabrielle A. Hamm*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:   (713) 900-3737
Facsimile:    (702) 442-9887
Email:           ghamm@nvfirm.com
                     vpolnick@nvfirm.com
                     aagelakopoulos@nvfirm.com
                     rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:   (702) 385-5544
Facsimile:    (702) 442-9887
Email:           saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*