IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>LINQTO TEXAS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90186 (ARP)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 574** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE EMERGENCY MOTION OF THE AD HOC GROUP OF EQUITY HOLDERS FOR ENTRY OF AN ORDER DIRECTING THE U.S. TRUSTEE TO APPOINT AN OFFICIAL COMMITTEE OF EQUITY HOLDERS PURSUANT TO 11 U.S.C. § 1102**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of Linqto Texas, LLC and its affiliated debtors (collectively, the "**Debtors**") submits this objection (this "**Objection**") to the *Motion of the Ad Hoc Group of Equity Holders for Entry of an Order Directing the U.S. Trustee to Appoint an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 11102* [Docket No. 574] (the "**Motion**").[2] In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Committee, the Debtors, the DIP lender, Customers, and creditors are on the verge of achieving a global resolution of these cases. It is at this juncture, in tandem with its

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2] Capitalized terms used in this Objection but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

objection to the settlement, that the Ad Hoc Group is making a last-ditch effort to appoint an official equity committee.

2. The shareholders have tried this before. In late August, the Ad Hoc Group sent a letter to the U.S. Trustee requesting the appointment of an official equity committee. That letter was replete with errors and misconceptions. Most glaringly, the request was premised on the assumption that the Debtors held Reserved (i.e., non-Customer) Securities worth $150 million that would be available for distribution. That was their basis for a path to solvency. That assumption was entirely wrong, as the Ad Hoc Group now admits in the Motion.

3. The Committee pointed out this and other doubtful assertions and arguments in a response letter to the U.S. Trustee, who ultimately determined not to appoint an official equity committee. One would think that the Motion – filed weeks later, giving the Ad Hoc Group plenty of time to research stronger arguments and data points (to the point of requiring emergency consideration) would present a stronger case and respond point by point to the Committee's counters.

4. Not so. The Motion's arguments for appointment of an equity committee are much weaker than in the Ad Hoc Group's letter. The Ad Hoc Group has given up the nonsense assertion that the Reserved Securities are worth $150 million, but produced nothing but vague statements about potential value and other incomplete or mistaken allegations to fill that gap. Moreover, the Motion contains essentially no new legal arguments or data points to counteract the errors the Committee had identified.

5. In sum, the Motion merely rehashes the arguments that the U.S. Trustee evaluated and rejected.

6. Nor does the Motion establish the elements courts consider in determining whether to appoint an additional committee. The Debtors have no path to solvency. Any increases in value of the Securities or recovery of assets to the estates will (i) reduce or eliminate the shortfall Customers expect to face instead of getting the full benefit of their bargain; (ii) fund recoveries for creditors and on account of other claims derived from the Debtors' prepetition fraud (such as Customer direct claims and regulatory penalties); or (iii) fund these cases. It is simply implausible that equity will recover.

7. In any case, shareholders have been adequately represented and participated throughout this case, litigating a venue challenge, requesting the U.S. Trustee appoint an official equity committee, filing the Motion, and objecting to the Rule 9019 Motion seeking approval of the global settlement of these cases. To appoint an equity committee now would not help achieve the best possible outcome for all stakeholders.

8. Further, it would cost a lot. Those costs would be borne by the estates and therefore by Customers facing a shortfall on their Securities. It is hard to see how the additional costs would be justified.

9. At bottom, no path to solvency exists; equity holders are already adequately represented by the Ad Hoc Group, among others. The costs of another official committee are unwarranted. The Court should deny the Motion.

## RELEVANT FACTUAL BACKGROUND

10. On August 28, 2025, Sapien Ventures LP Fund No. 1 (together with its affiliates, "**Sapien**") and the other equity holders now comprising the Ad Hoc Group sent a letter to the U.S. Trustee requesting the appointment of an official equity committee (the "**Letter**", attached hereto as **Exhibit A**). The Letter argued that the Debtors were likely to prove solvent because, among

other things, (i) the Debtors held $150 million worth of Reserved Securities "**whose sole residual beneficiary are the Linqto Shareholders**"; (ii) the Debtors had sufficient funds to pay vendors in full; and (iii) no "liquidity crisis" existed contributing to the Debtors decision to file these Chapter 11 cases.  Letter at 4-5 (emphasis original).  In the same section the Letter noted "our client's view that (i) the Customers should be owed the upside of the [Platform] Securities allocated to the SPVs[.]" *Id.* at 5 (emphasis original).

11.   The Letter also argued that equity holders are not adequately represented, asserting the Debtors "have only two major groups of stakeholders: the Customers and the Linqto Shareholders." *Id.* at 5-6.  In arguing this point, the Letter notes that the shareholders were "troubled" because "it appears that a significant component of the deal is for a litigation vehicle overseen by the UCC to commence litigation against certain Linqto Shareholders." *Id.* at 2; *see also id.* at 5-6 ("As for the Special Subcommittee, its mandate is focused on investigating and pursuing potential estate claims and causes of action, including against related parties, rather than preserving value for the Linqto Shareholders.").

12.   The Letter further argued that an official equity committee was warranted because these cases are complex, and the benefits of appointing the committee would outweigh the costs. *Id.* at 6-7.

13.   On September 5, 2025, the Committee responded via its own letter to the U.S. Trustee (the "**UCC Letter**", attached hereto as **Exhibit B**)[3], copying the Ad Hoc Group.  Mot. ¶ 15.

---

[3] Exhibit A to the UCC Letter, which included estimates of the prices of Linqto's non-customer securities, has been omitted as the Ad Hoc Group is no longer contending they are worth $150 million.  While the Committee obtained the Debtors' approval to share that exhibit with the Ad Hoc Group, it does not have approval to file that exhibit publicly.

4

14. On September 9, 2025, the U.S. Trustee determined not to appoint an official equity committee and notified counsel to the Ad Hoc Group. *Id.* ¶ 16.

**OBJECTION**

15. Now, just before the hearing on a proposed global resolution of these Chapter 11 cases, the Ad Hoc Group again requests the appointment of an official equity committee, on an emergency basis. The Motion largely rehashes the arguments made in the Letter, which the U.S. Trustee rejected, without responding to the errors and counterarguments raised by the Committee in its response letter.[4]

16. The Motion, like the Letter, falls short. The Ad Hoc Group has failed to carry its burden to justify the appointment of an equity committee. *In re Spansion, Inc.,* 421 B.R. 151, 156 (Bankr. D. Del. 2009) ("The Ad Hoc Equity Committee, as the moving party, has the burden of proving that an additional committee is needed for adequate representation."); *see In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009) (the movant bears the "burden of showing that Debtors are, in fact, solvent or nearly solvent."). The Ad Hoc Group requests "extraordinary relief" that should be the "rare exception." *In re Spansion,* 421 B.R. at 156. The Motion fails to justify that.

17. The Motion is riddled with errors. The Debtors are hopelessly insolvent, equity is already adequately represented, and the costs of an official equity committee far outweigh any purported benefits. The Motion should be denied.

**I.     The Debtors Are Hopelessly Insolvent.**

18. The Committee does not contest that insolvency for purposes of appointing an official equity committee is based on the available data. Mot. ¶ 21. But the actual data proffered

---

[4] As a result, this Objection will not repeat all the arguments in the UCC Letter, which the Committee incorporates by reference herein.

5

– which is much the same as that in the Letter[5] – shows the opposite of what the Ad Hoc Group argues it does.

### A. The Motion's Solvency Analysis Contains Fatal Errors.

19. It is worth noting at the outset that the Reserved Securities alleged in the Letter to be worth $150 million are worth nothing near that amount. *See* Letter at 2-3, 4, 6. The Motion admits as much. *See* Mot. ¶ 11, n. 8. The Debtors estimated their value at around $16 million, and the Committee provided to the Ad Hoc Group the backing for that estimate. The value of private securities is subject to substantial uncertainty and the value realized may be more or less than $16 million – but as the Ad Hoc Group now admits, that uncertainty can get no one close to $150 million.[6] The revelation of this massive error, on which the entire solvency argument in the Letter rests, should alone suffice to disprove the AGH's solvency arguments. But further errors exist in the Motion that apart, or together, are fatal.

20. *First*, the Motion assumes that the $19 million in cash proceeds from the Ripple tender offer was of "prepetition liquidation of securities of privately held companies, which can be used to fund these chapter 11 cases." Mot. ¶ 21. The Committee has heard this before (Letter at 4), and already pointed out the conceptual error (UCC Letter at 3). These proceeds are the result of the *improper* sale of *Customers'* Platform Securities. *See* UCC Letter at Ex. B. The sale thus caused a shortfall in Platform Securities, creating claims from Customers for on account of the improper sale. The idea that the Ripple proceeds are completely unencumbered and thus freely available is simply false.

---

[5] *Compare* Mot. ¶¶ 20-24 *with* Letter at 4-5.
[6] If the Ad Hoc Group truly believes that the Debtors and the Committee are significantly undervaluing the non-customer securities, it has a simple way to ensure that excess value flows to equity holders: offer to buy them. To date, it has not. To be very clear, the Committee would happily consider offers for the non-customer securities from the Ad Hoc Group.

21. **Second**, in support of the possibility that equity can recover, the Motion points to the value of the Platform Securities, which the Ad Hoc Group alleges are "likely much more" than the $500 million estimate the Debtors have provided. Mot. ¶ 21(b). But as the Ad Hoc Group conceded, Customers are entitled to any upside from Platform Securities. *See* Letter at 2 (equity holders "support providing Customers with the benefit of their bargain and giving Customers an interest (in whatever form that may take) that reflects the Securities in which they invested"), and 5 ("Customers should be owed the upside of the Securities allocated to the SPVs"). In other words, the value of Platform Securities is irrelevant to the issue of solvency. To the extent their value is greater, the Ad Hoc Group agrees that value should go to Customers.

22. The Motion also emphasizes the supposed undervaluing of the Securities by the Debtors. Mot. ¶ 24. As the only example, the Ad Hoc Group points out that the Debtors' scheduled fair market value for the Ripple shares is less than the value assigned to Ripple shares in a June 2025 tender offer. *Id.* This proposed method of establishing fair market value is improper: the tender offer valued the shares well above trading prices before and after and the offer was limited in volume and oversubscribed. The Ad Hoc Group's assertion is also irrelevant: there is currently a shortfall of Ripple shares, and Customers are entitled to claims for that shortfall. If the shares are worth more than the Debtors say, the Customer shortfall claim increases, making the Debtors ***more insolvent***.

23. **Third**, while the Motion harps on the value of the Securities and the Ripple proceeds, it completely ignores Customer liabilities and regulatory assessments that will increase the claims pool. As noted previously in this case, the Linqto's own counsel found that Linqto violated all the major U.S. federal securities laws and various FINRA rules. *See* UCC Letter, at Ex. B. These violations and associated misconduct will give rise to unsecured claims from

7

Customers (in addition to their Customer Claims), such as various forms of common law fraud, recovery of excessive markups charged, rescission damages for Securities that have declined in value, or private rights of action pursuant to the securities laws. These claims will only raise the substantial hurdle faced for equity to be in the money.

24. We can also reasonably expect government penalty claims based on these violations. While the Committee cannot at this moment estimate the size of any penalty claims, and does not concede any liability, reason exists for believing the liability will be *substantial*. And although the Committee does not expect such penalty claims to be levied in front of Customers and other creditors, it does expect any penalties to come before any recovery for equity. The Debtors are unlikely to find a viable path to paying off all regulatory and Customer claims, even if all other claims are paid in full.

25. The omission of any discussion of these additional claims is puzzling considering the Committee explicitly pointed them out in its response. The Ad Hoc Group makes no effort whatsoever to explain why it does not believe any such liability exists, or could be satisfied.

26. *Fourth*, the Motion falsely asserts the lack of any "insolvency crisis" – in the Letter, "liquidity crisis" was used – precipitating the filing of these cases. But as the Debtors have disclosed, as of the Petition Date the Debtors held $123,000 in available cash on hand, which was clearly insufficient for Linqto to operate and pay its debts as they came due. *See* DIP Mot. ¶ 16.

27. *Fifth*, the posture of these cases makes it *abundantly* clear the Debtors are not solvent and not likely to be. If there was substantial equity value, the Committee would not support any "surcharge" of customer accounts for the costs of these cases, nor would the Debtors have begun these cases with a dispute over "property of the estate" – a dispute the Debtors certainly knew would be a bitter one. This is not a case where a stakeholder might benefit by lowballing

8

the valuation of an operating business such that it receives equity with a true value above its claim. The Ad Hoc Group can come up with *no possible reason* that the Committee would overlook value that could ensure its constituents were paid in full. None exists.

      **B.**      <u>**Estate Causes of Action Will Not Provide A Path For Equity To Recover, Especially If An Official Equity Committee With Potential Conflicts Of Interest Is Appointed**</u>.

28. Aside from the mistaken assertions and misconceptions, the Ad Hoc Group is left only with estate causes of action for a path to solvency. The Ad Hoc Group observes that "[t]he Debtors likely own valuable causes of action against various parties." Mot. ¶ 21(g). That is all they say.

29. The Ad Hoc Group makes no effort to value any causes of action, have not conducted any investigation, and do not point to one cause of action it finds promising. Again, the burden is on the Ad Hoc Group: and it is likely that the reason that the Ad Hoc Group cannot go into further detail is because its own members are (as it has admitted) potential targets of litigation – and, it should be noted, potential "deep pockets" in such litigation. This bald observation does not move the needle for solvency.

30. Moreover, the Ad Hoc Group's previous statements give us reason to doubt the interest of any official equity committee to pursue *all* estate causes of action. While the Motion asserts that shareholders should be the beneficiaries of claims and causes of action, including against insiders, the shareholders were "troubled" by the potential creation of a litigation vehicle to commence litigation against insiders, including "certain Linqto Shareholders." Mot. ¶ 30; Letter at 2. It thus appears the Ad Hoc Group would want an official equity committee to ***defend against*** estate causes of action. While the Committee has not yet investigated claims against any Linqto shareholders, the Committee expects the Ad Hoc Group's concern may be with potential claims against Sapien, the largest shareholder, which held a seat on Linqto's board of directors via one of

9

its principals[7] from October 2022 through May 30, 2025. Docket No. 196 ¶¶ 21, 27. Under these circumstances, appointing an official equity committee may hinder, not help, prosecute estate causes of action for the benefit of all stakeholders.

II.     **Shareholders Are Adequately Represented.**

31.     Equity holders have participated in substantial ways throughout the course of these cases without an official equity committee. Sapien filed and litigated a venue transfer motion, purportedly for the benefit of equity holders. The Ad Hoc Group sent the Letter to the U.S. Trustee requesting the appointment of an official equity committee, and when that failed they filed the Motion. On October 1, 2025, the Ad Hoc Group filed a fulsome objection to the Rule 9019 Motion. Docket No. 671. The Ad Hoc Group and Sapien have shown that equity holders are active participants represented in these cases without appointment of an official equity committee, which would only add unnecessary costs to the estate. Further, while the Ad Hoc Group claims that the debtors have disclaimed fiduciary duties to shareholders (Motion at pp 2), the exhibit attached reveals otherwise: the Debtors simply reiterated the well understood principle that their fiduciary duties in the zone of insolvency shift to creditors "until such time as it is proven Linqto is solvent[.]" Motion Ex. A. The Debtors are not solvent.

32.     Further, while the Committee agrees its fiduciary duties do not flow to equity holders, the Ad Hoc Group claims that its claims against management must be investigated by "an independent fiduciary (with no connection to the Board, unlike the Special Subcommittee)[.]" The Committee *is* that independent fiduciary, and is investigating all causes of action to benefit its constituents *because absent litigation its constituents will not be paid in full*.

---

[7]     That principal was Mr. Jiang, who submitted a declaration in support of the motion to transfer venue. Docket No. 88-1.

### III. Appointing An Official Equity Committee Will Cost The Estates And May Harm Customers Without Providing Any Corresponding Benefit.

33.     The estates are insolvent and have no hope of being solvent given the costs of this case; let alone the likely additional unsecured claims from Linqto's prepetition conduct described above.  Even so, equity holders have been active throughout.  Customers are already facing an anticipated shortfall of 5% of their Securities.

34.     Under these circumstances, the Committee and the Debtors must focus on reducing the costs of these cases to reduce that shortfall and get Customers as much as possible of what the Ad Hoc Group agrees Customers are entitled to: the benefit of their bargain.  Letter at 2.  Indeed, the Committee and the Debtors have worked tirelessly to drastically reduce the budget for these cases.  *See* Docket No. 583 ¶ 37.

35.     In this context, the costs of an official equity committee will be borne by Customers, and are unjustifiable.  Given that equity is already adequately represented, the only "benefit" from appointing an equity committee would be to get the Ad Hoc Group's attorneys' fees paid out of the estates.

36.     Indeed, rather than benefit, an official equity committee may outright harm the estates and Customers: as noted above, the Letter suggested that one potential focus of an official equity committee would be ***defending against*** estate causes of action.  *See* Letter at 2.  The Motion appears to reiterate (though in a more veiled manner) Sapien's goal of using an equity committee to litigate its parochial issues that will not benefit the estate.  *See* Motion at pp 28.  It would be especially improper to appoint an official equity committee that would shift the costs of defending against estate investigations of and claims against potential malfeasants (to the detriment of the estate) onto the estates.

## **RESERVATION OF RIGHTS**

37. The Committee reserves the right to address or rebut any of the Ad Hoc Group's responses, additional arguments, or evidence at the hearing on the Motion.

**CONCLUSION**

**WHEREFORE**, the Committee respectfully requests that the Court deny the Motion.

Dated: October 2, 2025
Houston, Texas

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

*/s/ Ryan C. Wooten*
Ryan C. Wooten
State Bar No. 24075308
S.D. Tex. Bar No. 1259974
609 Main Street, 40th Floor
Houston, TX 770002
Telephone: (713) 658-6400
Email: rwooten@orrick.com

Mark P. Franke (admitted *pro hac vice*)
Brandon D. Batzel (admitted *pro hac vice*)
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5149
Email: mfranke@orrick.com
         bbatzel@orrick.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
Jeffrey L. Jonas (admitted *pro hac vice*)
Kenneth J. Aulet (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Seven Times Square, 47th Floor
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
         jjonas@brownrudnick.com
         kaulet@brownrudnick.com
         bsilverberg@brownrudnick.com

Stephen A. Best (admitted *pro hac vice*)
Stephen D. Palley (admitted *pro hac vice*)
1900 N Street NW, 4th Floor
Washington, D.C. 20036
Telephone: (202) 536-1700
Email: sbest@brownrudnick.com

13

spalley@brownrudnick.com

*Counsel for the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of October 2025, a true and correct copy of the foregoing *Official Committee of Unsecured Creditors' Objection to the Emergency Motion of the Ad Hoc Group of Equity Holders for Entry of an Order Directing the U.S. Trustee to Appoint an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 1102* was served on all parties registered to receive electronic notice of filings in this case through the Court's CM/ECF system.

/s/ Ryan C. Wooten
Ryan C. Wooten