**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>LINQTO TEXAS, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-90186 (ARP)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 16, 79, 505, 555, 564, 565, 566, 571, 577, 578, 579, 580, 581, 582, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 639, 640, 641, 642, 643, 645, 646, 647, 648, 649, 650, 651, 652, 653, 654, 655, 657, 658, 659, 664, 665, 666, 667, 668, 669, 671, 672, 673, 674, 678**<br><br>**Hearing Date: October 3, 2025, 11:00 a.m. (CT)** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OMNIBUS REPLY TO OBJECTIONS TO THE
EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) APPROVING
SETTLEMENT BETWEEN THE DEBTORS, THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, AND THE DEATON PARTIES REGARDING RIPPLE
TENDER PROCEEDS, DIP FINANCING, AND CUSTOMER TREATMENT
PURSUANT TO BANKRUPTCY RULE 9019 AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the

Chapter 11 cases of Linqto Texas, LLC., and its affiliated debtors (collectively, the "**Debtors**"

and, together with their subsidiaries and non-Debtor affiliates, the "**Company**" or "**Linqto**")

respectfully submits this omnibus reply (the "**Reply**") to the responses and objections received to:

(a) the *Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Between the*

*Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple*

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

*Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* (the "**Settlement Motion**" seeking approval of the "**Settlement**") [Docket No. 505]; (b) the *Debtors' Emergency for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 16] (the "**DIP Financing Motion**"); and (c) the *Debtors' Motion for Entry of an Order (I) Authorizing the Use of Estate Proceeds Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Determining that the Ripple Sale Proceeds are Assets of the Bankruptcy Estate, and (III) Granting Related Relief* [Docket No. 79] (the "**Customer Securities Motion**" and, together with the DIP Financing Motion and, the "**Financing Motions**").[2]

Specifically, the Committee submits this Reply to:

(i)     The *Limited Objection and Reservation of Rights of the Ad Hoc Group of Equity Holders to the Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 671] (the "**AHG Objection**");

(ii)    Certain *pro se* letters that follow a consistent template and raise the same issues [Docket Nos. 564, 565, 566, 571, 577, 578, 579, 580, 581, 582, 607, 608, 610, 611, 612, 613, 614, 615, 616, 640, 641, 642, 643, 645, 646, 647, 648, 649, 650, 651, 652, 653, 654, 655, 657, 658, 659, 664, 666, 667, 668, 669, 673, 674] (the "**Pro Se Letters**");

(iii)   The *Objection to Proposed Creditor Settlement* [Docket No. 555] (the "**Murray Letter**");

---

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the DIP Financing Motion or the Customer Securities Motion, as applicable.

(iv)    The *Request for Independent Trustee or Constructive Trust* [Docket No. 639] (the "**Jones Letter**") and the *Limited Objection and Joinder of Alan Clark to Generic Motion (Docket No. 79)* [Docket No. 609] (the "**Clark Letter**");

(v)    The *Swagar Parties' Limited Objection and Reservation of Rights Regarding the Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple Tender Proceeds, Dip Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 672] (the "**Swagar Objection**"); and

(vi)    The *SPV Unitholders' Pro Se Limited Objection To and Request For An Adjournment In Respect of the Debtors' Bankruptcy Rule 9019 Settlement Motion Subject To Appointment of an Independent Manager for Linqto Liquidshares, LLC and the Series LLCs* [Docket No. 678] (the "**SPV Adjournment Objection**").

(vii)    In addition, Ripple filed a reservation of rights [Docket No. 665], but the Committee does not read that reservation of rights as raising any issues that need to be responded to at this time.

In support of this Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    The Settlement delivers the best possible outcome of these cases to account holders at Linqto ("**Customers**"). It preserves their value in-kind. It limits the costs that can be charged against their accounts. It speeds the process of recovering their accounts. It gives them choice in how to receive their value. It is a result that, given the legal and factual realities on day one of these cases, vastly exceeds what Customers could reasonably have hoped for. It does so while preserving value for unsecured creditors who can recover through a litigation trust.

2.    Many Customers, rightfully, do not feel glad. They should not: the legal and factual situation on day one of this bankruptcy *should not have been what it was*. It was not what Linqto, under its historical management, had promised Customers. It was not what it had represented to them time and time again. It was, in short, the result of fraud that appears to have been perpetrated under the leadership of William Sarris and other pre-petition management.

3.    The Committee intends to hold each party responsible for that fraud to account.

But first, Customer Securities (defined below) must be returned to Customers, and these cases (and their associated costs) quickly brought to a close.

4.      The Settlement delivers the best result possible for Customers, while avoiding costly litigation that would likely be paid for, one way or another, by Customers.  The Settlement took considerable time to achieve, was the product of arms' length and often heated negotiations. As described more fully below, the Settlement delivers the highest value to Customers given the situation.  Because of the Debtors' fraud, it is either impossible, or extremely costly, to deliver something that (a) represents the specific shares Customers wanted to purchase an indirect interest in; and (b) allows those indirect interests to be sold.  Under the Settlement, Customers can choose one of those options.  If Customers elect the Liquidating Trust (defined below), then they can maintain their securities, and get an interest that 1:1 corresponds to what they purchased.  On the other hand, if Customers elect the Closed-End Fund, then they will have the ability to sell their interests as the Closed-End Fund will be registered and publicly traded.

5.      Without the case funding proposed in the Settlement, then the Committee sees no viable path to return Customer Securities to Customers.  A liquidation of Customer Securities and distribution in cash, through a Chapter 7 process, would likely be inevitable – and the cash distributed might be capped at the value of those securities as of the date Linqto filed for bankruptcy.  Simply put, Linqto does not have assets today to fund these cases without using Customer Securities or the Ripple Proceeds (defined below).  Without funding these cases, there is no path to Customers recovering their securities (indirectly) and the upside of those securities.

6.      To be clear, the Committee will explore every avenue to minimize the costs of these cases Customers ultimately bear.  But as part of that effort, this Court should overrule all objections to the Settlement, and approve the Financing Motions (as modified by the Settlement).

## BACKGROUND

### I.    Procedural Background

7.      On July 7, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

8.      On July 8, 2025, the Debtors filed the DIP Financing Motion.

9.      On July 14, 2025, the Debtors filed the Customer Securities Motion.

10.      On July 18, 2025, the Office of the United States Trustee appointed the Committee. *See The United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 98].

11.      On September 16, 2025, the Debtors filed the Settlement Motion.

### II.    Linqto's Fraud and Chaotic Operations

12.      From February of 2020 until March 14, 2025, Linqto operated a platform (the "**Platform**") promising to provide Customers with indirect access to investments in the equity of private companies (the "**Issuing Companies**," and each, an "**Issuing Company**").  On the Platform, Customers believed they were selling and buying indirect equity interests in private companies.

13.      Linqto purchased blocks of private company equities with its own funds, then would sell shares of purported series limited liability companies holding those equities to Customers.  Shares that were sold to Customers are referred to as "**Customer Securities**" and shares that Linqto bought, but did not resell to Customers, are referred to as "**House Securities**."

5

14.     Customers gave Linqto money based on Linqto's representations that the Customer Securities would be owned by bankruptcy-remote special-purpose entities ("**SPVs**"), and Customers would own interests in those SPVs.  Linqto further represented to Customers that these indirect interests were also transferable, and that it was complying with federal securities laws.

15.     However, contrary to the Company's representations, it appears that Linqto never actually transferred these interests to the SPVs.  There is also a serious question if the SPVs were ever set up properly in the first place.

16.     These issues are all further described in the Committee's Statement In Support Of The Emergency Motion For Entry Of An Order (I) Approving Settlement Between The Debtors, The Official Committee Of Unsecured Creditors, And The Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, And Customer Treatment Pursuant To Bankruptcy Rule 9019, And (II) Granting Related Relief (Docket No. 583), which is incorporated by reference.

## III.     The Settlement Motion

17.     Because of the aforementioned fraud, the Customer Securities were never placed in bankruptcy-remote SPVs but were instead held at Debtor Liquidshares.  The Committee, and other creditors, have asserted constructive and/or resulting trust arguments to remove those shares from being considered "property of the estate."

18.     A settlement was ultimately reached, whereby Customers are given "customer status" and will be treated as a distinct class or classes.  Under the Settlement, only Customers will be entitled to receive Customer Securities.  Customers who prefer to maintain their securities, and get an interest that 1:1 corresponds to what they purchased can elect the liquidating trust that will be established pursuant to the Settlement (the "**Liquidating Trust**").  While interests in the Liquidating Trust are nontransferable, Customers, can, on the other hand, elect into a closed-end

fund to be established pursuant to the Settlement (the "**Closed-End Fund**"), which will be registered and publicly traded.

19.     On September 16, 2025, the Debtors filed the Settlement Motion, which also settled objections to the Financing Motions.

**IV.     Objections to the Settlement Motion**

    **A.     Pro Se Letter Objections to the Settlement Motion**

20.     The Pro Se Letters were filed by certain Customers who object to the Settlement Motion, as well as to the Financing Motions, on the following grounds: Each is visibly drafted off of a template and make the same arguments and request the same relief, with occasional changes to a personal statement or other non-substantive points.  The Jones Letter, while it does not follow the form of the Pro Se Letters (and includes considerable additional detail), raises the same substantive points.

21.     *Constructive Trust*.  The Pro Se Letters argue that a constructive trust should instead be created to preserve and segregate the assets purchased through SPVs with Customer money. *See* Pro Se Letters.

22.     *Dismissal of the Chapter 11 Cases*.  The Pro Se Letters argue that if the Debtors cannot substantiate their claims that the SPVs were never properly formed, then the cases should be dismissed.

23.     *Appointing an Independent Trustee*.  The Pro Se Letters argue that an independent trustee should be appointed to investigate the discrepancies between the information in the Debtors' Schedule K-1s that were filed with the IRS regarding the SPVs and the Debtors claims that the SPVs were not properly set up.

24.    *Objection to the Liquidating Trust, Closed-End Fund, and Fees*.  The Pro Se Letters argue that the Committee's proposal to establish a Liquidating Trust and a Closed-End Fund will dilute the Customers' interests, impose unnecessary fees, and create new administrative burdens.

25.    *Objection to the Customer Securities Motion*.  The Pro Se Letters assert that the Ripple Proceeds came from the sale of SPV assets, which were originally funded by the Customers. They argue that the Ripple Proceeds should therefore only be used to pay Customers, and not used to pay administrative fees.

26.    *Joinder to the Deaton DIP Objection*.  On July 29, 2025, John E. Deaton and the Deaton Represented Creditors filed an objection to the Financing Motions [Docket No. 142] (the "**Deaton DIP Objection**").  The Pro Se Letters join in the Deaton Objection, specifically with respect to the following: (i) excluding SPV-owned Ripple shares, Circle shares, and Ripple proceeds from the bankruptcy estates; (ii) establishing that such assets are held in constructive trust for the Customers; and (iii) preventing the Customer Securities from being pledged as collateral or sold to fund bankruptcy administrative fees.

**B.    The Ad Hoc Group's Objection to the Settlement Motion**

27.    The Ad Hoc Group objects to the Settlement Motion on three primary grounds. First, the Ad Hoc Group argues that the Settlement Motion cannot be a final compromise of the disputed issues concerning the treatment of Customers' claims because a settlement under Bankruptcy Rule 9019 cannot be used to dictate the terms of the Debtors' plan of reorganization. *See* AHG Objection ¶ 4.  The Ad Hoc Group requests that approval of the Settlement, to the extent that it relates to the treatment of Customer claims, or any other plan terms, is only an approval of the Settlement parties' agreement to seek such plan terms and claim treatment.

28.     Second, the Ad Hoc Group argues that the Settlement should include a "fiduciary out" to allow the Debtors (and the Committee) to consider alternative options to the Settlement that would maximize the value of the estates for stakeholders.  *See* AHG Objection ¶ 5.  The Ad Hoc Group asserts that approval of the Settlement would ultimately foreclose the term sheet it proposed for an alternative transaction.  Further, the Ad Hoc Group argues that the treatment of Customer claims under the Settlement may violate the absolute priority rule in that parties cannot receive more than the full amount of their entitlement under the Bankruptcy Code.  *See* AHG Objection ¶ 7.

29.     Third, the Ad Hoc Group objects to the use of House Securities under the terms of the Settlement.  *See* AHG Objection ¶ 9.  The Ad Hoc Group asserts that the House Securities have the potential to increase in value, which would be lost in a liquidation and destroy value for Linqto shareholders.  The Ad Hoc Group further argues that the Debtors have not established that the use of House Securities is necessary to fund the case.  *See Id*.

30.     Furthermore, the Ad Hoc Group reserves its rights, including the right to supplement its objection and object to confirmation of any Chapter 11 plan on any grounds, including the treatment of claims under the Settlement.  *See* AHG Objection ¶ 10.

**C.     The Murray Letter's Objection to the Settlement Motion**

31.     The Murray Letter (which does not follow the template of the Pro Se Letters) raises three issues/objections.  First, the letter requests that the Settlement be required to allow Customers to make an election between the Liquidating Trust and the Closed-End Fund on a holding-by-holding basis, rather than an account basis.   Second, it requests a comprehensive portfolio valuation.   Third, it raises questions regarding the value of "house securities" (securities not associated with Customer accounts).

**D.      The Swagar Objection and Reservation of Rights to the Settlement Motion**

32.      On October 1, 2025, the Swagar Parties filed the Swagar Objection.  The Swagar Objection reserves potential disputes with the structure of any plan, but seeks to have any order ensure that their rights regarding certain purported claims are not affected.

**E.      The SPV Adjournment Objection**

33.      On October 2, 2025 an objection was docketed (which, based on the Court's stamp, was received on September 30, 2025) filed by certain SPV unitholders.  This objection requests an adjournment of the hearing, pending appointment of an independent manager.

## REPLY

**I.      The Court Should Grant the Settlement Motion As A Fair And Reasonable Resolution Of Complex Legal And Factual Disputes That Would Otherwise Result In Protracted Litigation Harmful to The Estates.**

**A.      The Standard For Approval of A Settlement**

34.      The Debtors and the Committee need only show that the Settlement falls above the lowest point in the range of reasonableness.  *See In re Josiahs Trucking, LLC*, 2025 WL 2214038 at \*4 (Bankr. S.D. Tex. Aug. 4, 2025) ("The Court does not substitute its own judgment for the trustee's, but instead reviews all the issues and determines 'whether the settlement falls below the lowest point in the range of reasonableness.'"); *In re ASARCO LLC*, 2009 WL 8176641 at \*10 (Bankr. S.D. Tex. June 5, 2009) ("Rather than being forced to decide all questions of law and fact that are settled, a Court need only 'canvas the issues [to] see whether the settlement fall[s] below the lowest point in the range of reasonableness.'" (citations omitted)).

35.      In determining whether to approve a settlement under Bankruptcy Rule 9019(a), Fifth Circuit caselaw directs courts to use a three-factor test with a focus on comparing "the terms of the compromise with the likely rewards of litigation."  *In re Age Refining, Inc.*, 801 F.3d 530,

540 (5th Cir. 2015) (citing *Rivercity v. Herpel (in re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).  A bankruptcy court should evaluate: (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law: (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (c) all other factors bearing on the wisdom of the compromise.  *See In re Age Refining*, 801 F.3d at 540 (citing *Jackson Brewing co.*, 624 F.2d at 602); *see also In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (citing same); *In re Superior Offshore Int'l, Inc.*, 2009 WL 1507135, at *2 (S.D. Tex. May 28, 2009).

36.     Other factors that would support the approval of a Bankruptcy Rule 9019 motion include: "(i) 'the best interests of the creditors, "with proper deference to their reasonable views"'; and (ii) '"the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'"  *See In re Age Refining*, 801 F.3d at 540 (citations omitted).

## B.     The Settlement Motion Avoids the Risk of An Uncertain Outcome In Litigating Constructive Trust Claims

37.     The Settlement is an incredible result for Customers.  Customers came into this bankruptcy facing the risk they were merely unsecured creditors, with a dollar value entitlement fixed as of an arbitrary date in time, no protection against dilution by other creditors, and no control over the costs of this case.  As a result of the Settlement, each of those risks has been eliminated.

38.     The Committee believes strongly in its constructive trust claims and was prepared to litigate those claims.  Nonetheless, the Committee is – and has always been – clear-eyed about their risks.  Constructive trust is an equitable remedy disfavored in bankruptcy, and would require full-blown litigation for an (at best) uncertain outcome.  Victory alone would not deliver Customers the 'benefit of the bargain' – units in SPVs that were securities-law compliant and bankruptcy-remote, and bearing no costs of these cases (or, of that litigation).

39.     Ultimately, however, the Settlement delivers to Customers the remedy they seek. Customers receive their securities in-kind – in a structure that complies with securities laws – so they obtain the upside of their securities.   Customers make only two meaningful concessions. *First*, Customers have to elect a structure that is compliant with securities law.   *Second*, Customers must pay, to the extent the assets of Linqto are insufficient, the costs of delivering this structure.

40.     More cannot be delivered without, not only winning the constructive trust arguments, but *also* resolving *extremely* thorny securities law issues that potentially could not be resolved (and, would require significant additional expense).

41.     Further, the Committee believes that Customers would ultimately have needed to "pay the freight" of preserving their securities – or, such securities would have needed to be liquidated.  There simply is not value in Linqto today for any other result.

42.     The Pro Se Letters (and similar *pro se* objections) raise objections that, in the Committee's view, misunderstand what is even possible with a "complete win."   A constructive trust is a remedy, not a structure.  The securities law issues at stake mean some structure *must* be created to deliver an indirect interest in those shares to Customers.  That structure will have costs (just as Linqto itself did): there is no way forward without such costs.

### i.     The Probability of Success in Litigation is Uncertain

43.     While the Committee is confident in the merits of its claims, the probability of success is still uncertain for all parties.  Because the shares are held by Liquidshares in its own name, were purchased with the Debtors' funds, and based on the Subscription Agreements, the Debtors took the position that Customers do not "own" anything: the shares are the property of Liquidshares.  The Debtors' position is that Customers have unsecured claims, but no entitlement to receive their shares back outside the bankruptcy process.

44.     The Committee strongly disagrees with the Debtors' position.  As a result of the Committee's investigation, it appears that the shares were not formally transferred to the SPVs, and there is a question of whether the SPVs were even created to begin with.  The Committee believes that these facts justify the imposition of an equitable remedy known as a "constructive trust" or a "resulting trust."  Accordingly, the Committee takes the position that Customers are not unsecured creditors.

45.     However, the Committee has the burden of proof and would need to show a constructive trust is justified in these circumstances.  Customers would face significant risk in litigating constructive trust claims.  If the Committee loses, Customers would become unsecured creditors and would lose the ability to get their assets back.  On the other hand, if the Committee does win, then there would be severe obstacles hindering the return of shares to Customers, including the conversion to a liquidation under Chapter 7 of the Bankruptcy Code.  Under a Chapter 7 liquidation, there are no tools available to allow the Chapter 7 trustee to distribute shares "in kind" to Customers.  The Settlement avoids such an unfavorable outcome.

ii.     **The Complexity and Likely Duration of the Litigation and Any Attendant Expense, Inconvenience and Delay Would be High**

46.     Additionally, advancing constructive trust claims would require expensive and time-consuming litigation to prevail.  However, the Committee has the burden of proof to show a constructive trust.  Even though the Committee believes that this standard has been met, it would still require expensive and time-consuming litigation.  The Debtors strongly disagree with the Committee's claims and, therefore, a trial would be required, which is expensive and the outcome would be uncertain.

### iii.   Even If A Constructive Trust Were Imposed, Customers Would Likely Be Required To Finance The Costs Of This Case

47.     Customers – rightfully – are upset that they are being forced to bear the costs of this case to the extent that the undisputed estate assets are insufficient.  However, the Pro Se Letters generally presume that there is a path forward that avoids that result.  The Committee does not believe there is one.

48.     The costs of litigating constructive trust theories in these Chapter 11 cases would easily exceed the value of the Debtors' cash on hand and likely exceed the value the Debtors could realize from the sale of non-Customer Securities during the pendency of that litigation.  The Debtors cannot maintain a Chapter 11 proceeding without the ability to pay administrative claims, and would likely be forced to convert to Chapter 7.  Even if they did not, the costs of proposing a Chapter 11 plan that implemented a securities-law compliant structure certainly would exceed the Debtors' assets: implementing such a plan and *not* litigating constructive trust is estimated to require a 5% charge against Customer accounts.

49.     In a Chapter 7 proceeding, a Chapter 7 trustee likely would be forced to liquidate Customer Securities and return only cash, given their inability to return shares directly.

50.     There is no other source of funds to pay those costs.  And those costs would need to be paid one way or another, even if constructive trust theories were successful, and the Committee believes those costs would come out of Customer recoveries.  The Debtors, or a Chapter 7 Trustee, would likely have common fund claims against Customers for the costs of preserving their property during the bankruptcy process.  This equitable rule is based upon the principle that when "one [ ] preserves or protects a common fund . . . others so benefited should bear their just share of the expenses . . . and that the most equitable way of securing such contribution is to make such expenses a charge on the fund so protected or recovered."  *Knebel v.*

*Capital Nat'l Bank in Austin*, 518 S.W.2d 795, 799 (Tex. 1974) (citations omitted); *see also Libhart v. Copeland*, 949 S.W.2d 783, 803-04 (Tex. App. 1997) (judgment requiring property sold and percentage of proceeds paid to parties' attorney upheld under common fund doctrine; "the doctrine usually has application where a plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class . . .'" (quoting *Hall v. Cole*, 412 U.S. 1, 5 (1973)).

51.     Here, the Settlement is clearly in the best interests of Customers - and creditors -as it allows the distribution of shares to Customers much sooner than if the constructive trust claims were fully litigated, at significantly lower cost.  The agreed-upon budget significantly reduces the costs of these cases (ultimately charged against Customers one way or another in any situation they recover their property, and many in which they do not).

52.     The Committee fully understands the concerns expressed by the Pro Se Letters (and others) regarding the potential fees of any securities-law compliant structure.  The Committee will be focused on ensuring such costs are as low as is consistent with those structures protecting Customer Securities.

53.     The Settlement was the product of good faith, arms-length negotiations.  It delivers benefits to Customers that likely exceed the "full win" scenario under a constructive trust litigation.  It cuts costs and paves the way for a plan that ends these cases as quickly as possible.  The Committee submits that the Settlement *vastly* exceeds the "lowest rung on the range of reasonableness" in every respect.  Accordingly, the Settlement should be approved.

## II.     Other Relief Sought In Pro Se Objections Should Be Denied

### A.     These Cases Should Not Be Dismissed And An Independent Trustee Is Unnecessary

54.     The Pro Se Letters request that these Chapter 11 cases should be dismissed or an independent trustee should be appointed.  However, the Pro Se Letters give no legal or factual

basis for this relief, nor is it appropriate to seek it in an objection rather than by motion. These requests should be summarily denied, without prejudice to the rights of any party to raise such an issue properly by motion.

55.     Further, such relief would plainly not be in the interests of Customers or creditors. The Pro Se Letters appear not to have considered what it means if these cases are dismissed; the short answer is, nothing good. Liquidation of the Customer portfolio would likely be inevitable, and it is unclear if Customers would recover anything.

56.     The Pro Se Letters also request appointment of an "independent trustee" which the Committee understands to mean a Chapter 11 trustee. The SPV Adjournment Objection seeks appointment of an independent manager. In all of these, no caselaw is cited. The Committee, at this time, sees no benefit to these cases by the appointment of a Chapter 11 trustee, and the attendant added costs and delay, nor has any party made an effort to meet the standard for one to be appointed.

**B.     The Relief Sought in the Murray Letter is Premature or Should Be Denied**

57.     The Murray Letter raises three points. To the extent any are objections to the Settlement, they should be denied.

58.     *First*, it argues that customers should have the opportunity to split their claim so that some portion receives the Liquidating Trust treatment, and some portion receives the Closed-End Fund treatment. The Committee expects that in practice this proposal is unworkable or the increased costs would outweigh any benefit: the Court should not require it. Nonetheless, the Committee does not believe that anything in the Settlement *prohibits* such an approach, and should the Committee and the Debtors be convinced that such an approach is worth the additional costs, it could be implemented in a proposed Plan that is consistent with the Settlement.

59.     *Second*, the Murray Letter requests a "fully-independent and detailed valuation analysis" of Customer Securities.   However, it appears that the Murray Letter believes this valuation would be required for Customers to make a decision between the Liquidating Trust and the Closed-End Fund.   Accordingly, this is more properly a (premature) argument as to what level of disclosure is required in a proposed disclosure statement.   To be clear, the Committee does not believe such a valuation is required for a disclosure statement to contain "adequate information" or would be a prudent use of scarce estate resources.

60.     *Third*, the Murray Letter notes a lack of clarity as to the value of non-Customer Securities.   This does not go to approval of the Settlement, nor does the Murray Letter request any specific relief.   Nonetheless, the Murray Letter reveals certain misunderstandings that should be corrected.   The Debtors' schedules that were on file at the time of the Murray Letter value Customer accounts based on *initial buy-in price*, not estimated value of the accounts on the filing date.   As a result, you cannot compare that value to any present estimate of all securities held by the estate (Customer or not) to deduce the value of non-Customer Securities.   The Committee believes these scheduled values were not an appropriate valuation of Customer claims under its view of the "property of the estate" legal issues *or* the Debtors' view of those issues.   The Committee understands that the Debtors are in the process of amending those schedules (and such amendment will be complete by the hearing on the Settlement).

### C.     The Adjournment Request Should Be Denied

61.     The SPV Adjournment Objection requests that the hearing on the Settlement be adjourned pending appointment of an "independent manager."   However, the signatories do not identify any infirmity in the Settlement, nor any reason why they were unable to raise any objections in a timely manner.   Their adjournment request should be denied.

III.    **The Ad Hoc Group's' Objection Should Be Overruled.**

   A.    **The Ad Hoc Group Has Not Presented An Actionable Proposal**

62.    The Committee is concerned that the Ad Hoc Group's Objection may mislead Customers of Linqto regarding the proposal put forward by the Ad Hoc Group.   While the Committee will engage with the Ad Hoc Group and determine if an actionable proposal exists, it is important to correct the misconceptions that the AHG Objection leaves regarding the AHG Term Sheet (as defined in the AHG Objection).

63.    *First*, although the AHG Objection claims that the AHG Term Sheet involves the Ad Hoc Group "putting its money where its mouth is," this is simply not true.  The proposed AHG Term Sheet contains **one** binding financial commitment: that the **Debtors** will pay to the Ad Hoc Group their costs up to $250,000.  The Ad Hoc Group commits to nothing in the AHG Term Sheet: it merely is an agreement to use "reasonable endeavors" subject to "legal and financial due diligence" to reach an agreement, and expressly states the term sheet "express[es] current intentions only" and is not "intended to be legally binding or give rise to legal rights or obligations" (other than the requirement for the Debtors to pay the Ad Hoc Group's costs).  In other words: this is not an actionable proposal at this time.

64.    *Second*, the AHG Term Sheet referred to in the Ad Hoc Group's objection was delivered *after* the AHG Objection was filed.  It updates a previous term sheet that had significant issues that the Committee identified and discussed with the Ad Hoc Group.  Needless to say, the Committee has not had time to review its updated proposal in detail.  Nor has the Committee had the opportunity to diligence that the Ad Hoc Group actually has the funds to implement its proposal, were it to be made binding.

65.     *Third*, the Committee has yet to diligence the Ad Hoc Group's financial capability to implement any proposal, and if it is an acceptable counterparty to manage Customer assets. Such diligence would be required before pursuing any transaction with the Ad Hoc Group (or any other party).

66.     The Committee (as it has conveyed to the Ad Hoc Group) will consider any proposal, but there are core principles the Committee will not deviate from.  First, any proposal must be in the interests of Customers and creditors: the Committee cannot and will not support a proposal that looks better "on the front end" but takes back more in fees and expenses.  Second, the Committee will not gamble Customer recoveries: any proposal from the Ad Hoc Group must not put Customers at risk of further cost and delay if that proposal ultimately proves unworkable. Third, the Ad Hoc Group continually trumpets its belief in the value of Linqto's non-Customer Securities: again, the Committee will not gamble Customer recoveries.  If the Ad Hoc Group has a strong belief in the value of the non-Customer Securities, then it can make an offer to purchase those securities.

67.     Ultimately, if the Ad Hoc Group (or any other party) can put forth an actionable proposal that is in the interests of Customers and creditors, the Committee will carefully consider that proposal.  No such proposal is yet on the table.

**B.     The Ad Hoc Group's Objections Are Irrelevant Or Wrong**

68.     The AHG Objection raises three actual issues with respect to the Settlement, aside from advertising its non-binding term sheet.  None go to any *actual* issues with the Settlement.

69.     *First*, it seeks confirmation that the Settlement does not short-circuit the requirements of the Bankruptcy Code regarding confirmation of a plan of reorganization.  *See* AHG Objection ¶ 4.  The Settlement does not.  As is evident by its plain terms the Settlement must

be implemented in a plan of reorganization, approved by this Court in compliance with the Bankruptcy Code, and nothing in the Settlement or the orders approving the Settlement seek to alter those requirements.

70.    Second, the AHG Objection seeks to require the Settlement to contain a "fiduciary out."  *See* AHG Objection ¶ 5.  This, too, is unnecessary: the Ad Hoc Group does not identify any aspect of the Settlement that limits the ability of the Committee or the Debtors to consider proposals from the Ad Hoc Group that enhance recoveries to Customers and unsecured creditors. The Ad Hoc Group spends time discussing how the Settlement does not implement its proposal (submitted after the AHG Objection was filed).  *See* AHG Objection ¶ 2.  This is true: the Settlement does not implement a proposal that was made after the Settlement and to which the Debtors and the Committee have not agreed (even if it were in a form where it could be agreed to). But the Ad Hoc Group identifies nothing in the Settlement that *forecloses* the Debtors or the Committee from doing so, if such a binding proposal materialized and was in the best interests of the estate, Customers, and unsecured creditors.

71.    Third, the AHG Objection makes a premature argument that equity holders ought to have an interest in the litigation trust.  *See* AHG Objection ¶ 8.  The Committee is glad to hear that the Ad Hoc Group believes litigation – including litigation it has already expressed might be filed against its members – will meet the requirements of *Mcorp Fin.* that such litigation will yield "in all likelihood 100% of principal plus interest" to unsecured creditors.  *See In re Mcorp Fin.*, *Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992).  The Committee's investigation, however, is not yet complete, nor is any proposed allocation of litigation trust interests before this Court or determined by the Settlement.

72.     Fourth, the Ad Hoc Group objects to the sale of Reserved Securities (i.e. non-Customer Securities).  *See* AHG Objection ¶ 9.  It is unclear why: this Court has already approved a process for the sale of these securities (*see* Docket No. 329, the "**Sale Procedures Motion**") and nothing in the Settlement alters those procedures or, as the Ad Hoc Group claims, requires a "rushed liquidation."  *See* Sale Procedures Motion ¶ 9.  However, to the extent that the Ad Hoc Group believes those securities have substantial value above what the Debtors will realize from them in the orderly liquidation of such securities that the Debtors and the Committee have agreed on, it has a very easy way to make sure it captures that upside: make a bid.  By doing so, the Ad Hoc Group can capture that upside *regardless* of the amount of unsecured claims between it and a recovery.  That it has not speaks volumes.

73.     But this hearing is not the time for this Court to consider untimely objections to the procedure for the sale of those securities, as those procedures are unaffected by the Settlement, and so to the extent the Ad Hoc Group seeks to do so, the AHG Objection should be overruled.

## IV.     **The Swagar Objection Should Be Overruled.**

74.     The Swagar Parties appear to assert they hold recission claims against Linqto.  Such claims are classic unsecured claims.  Based on what the Swagar Parties have filed to date, the Committee is *extremely* skeptical they hold any unsecured claim, but that is for another day.  For today: nothing in the Settlement, or any of the Financing Orders, seeks to determine any unsecured claim that the Swagar Parties hold, nor is it clear how it could.  If this were the Swagar Parties' sole request, such language (however pointless) would not be an issue.

75.     But language that the Swagar Parties seek saying they may not be "prejudiced" by approval of the Settlement Motion or use of the Ripple Proceeds: as unsecured creditors, the Swagar Parties (like all unsecured creditors) are unfortunately prejudiced by the use of

unencumbered assets to fund administrative claims.  Accordingly, that request should be denied, and the Swagar Objection overruled.

**V.**     **Reservation of Rights.**

76.     Additional objections have been filed after the deadline of October 1, 2025, and may continue to be filed.  To the extent those raise points not otherwise addressed herein, the Committee reserves all rights to orally respond to such objections at the hearing on the Settlement.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court: (i) grant the relief requested in the Settlement Motion; (ii) deny the relief requested in the AHG Objection, Pro Se Letters, Murray Letter, Jones Letter, Clark Letter, and Swagar Objection; and (iii) grant such other and further relief as the Court deems just and proper.

Dated: October 2, 2025
          Houston, Texas                         Respectfully submitted,

                                                 */s/ Ryan C. Wooten*

                                                 **ORRICK, HERRINGTON & SUTCLIFFE LLP**
                                                 Ryan C. Wooten
                                                 State Bar No. 24075308
                                                 S.D. Tex. Bar No. 1259974
                                                 609 Main Street, 40th Floor
                                                 Houston, TX 77002
                                                 Telephone: (713) 658-6400
                                                 Email: rwooten@orrick.com

                                                 Mark P. Franke (admitted *pro hac vice*)
                                                 Brandon D. Batzel (admitted *pro hac vice*)
                                                 51 West 52nd Street
                                                 New York, NY 10019
                                                 Telephone: (212) 506-5149
                                                 Email: mfranke@orrick.com
                                                            bbatzel@orrick.com

-and-

**BROWN RUDNICK LLP**

Robert J. Stark (admitted *pro hac vice*)
Jeffrey L. Jonas (admitted *pro hac vice*)
Kenneth J. Aulet (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Seven Times Square, 47th Floor
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
       jjonas@brownrudnick.com
       kaulet@brownrudnick.com
       bsilverberg@brownrudnick.com

Stephen A. Best (admitted *pro hac vice*)
Stephen D. Palley (admitted *pro hac vice*)
1900 N Street NW, 4th Floor
Washington, D.C. 20036
Telephone: (202) 536-1700
Email: sbest@brownrudnick.com
       spalley@brownrudnick.com

*Counsel for the Official Committee of Unsecured Creditors*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 2nd day of October 2025, a true and correct copy of the the foregoing *Official Committee of Unsecured Creditors' Omnibus Reply to Objections to the Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019 and (II) Granting Related Relief* was served on all parties registered to receive electronic notice of filings in this case through the Court's CM/ECF system.

*/s/ Ryan C. Wooten*
Ryan C. Wooten
