**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO**
**(I) DIP FINANCING MOTION (DOCKET NO. 16), (II) RIPPLE**
**MOTION (DOCKET NO. 79), AND 9019 MOTION (DOCKET NO. 505)**

The above-captioned debtors and debtors in possession (each a "**Debtor** and, collectively, the "**Debtors**"), by and through their undersigned counsel, Schwartz PLLC, hereby submit their reply (the "**Reply**") to the following (collectively, the "**Objections**"):

1.      Objections to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 16] (the "**DIP Financing Motion**"), including *Sapien Entities' Limited Objection to Entry of Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Super Priority Administrative Expense Claims, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 230] (the "**Sapien DIP Objection**"), filed by Sapien Group USA LLC and its group affiliates (together, "**Sapien**"), and various

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

objections filed by Debtors' customers (the "**Customers**"), including joinders to *John E. Deaton's and Deaton Represented Creditors' Objection to Debtor's Motion to Approve DIP Financing and Use of Collateral* (the "**Deaton Objection**") [Docket No. 142];

2.      Objections to the *Debtors' Motion for Entry of an Order (I) Authorizing the Use of Platform Securities Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Determining that the Ripple Sale Proceeds are Assets of the Bankruptcy Estate, and (III) Granting Related Relief* [Docket No. 79] (the "**Ripple Motion**" and, together with the DIP Financing Motion, the "**Financing Motions**"), including the *Sapien Entities' Objection To Debtors' Motion For Entry Of An Order (I) Authorizing the Use of Platform Securities Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Determining That the Ripple Sale Proceeds Are Assets of the Bankruptcy Estate, and (III) Granting Related Relief* [Docket No. 231] (the "**Sapien Ripple Objection**" and, together with the Sapien DIP Objection, the "**Sapien Objections**") and various objections by Customers, including joinders to the Deaton Objection; and

3.      Objections to the *Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 505] (the "**9019 Motion**" and, collectively with the Financing Motions, the "**Motions**"), including objections by Customers and limited objections and reservations of rights filed by the ad hoc group of shareholders of Linqto, Inc. (the "**Ad Hoc Group**") [Docket No. 671] and Ripple Labs, Inc. ("**Ripple**" and, collectively with Sapien, the Ad

Hoc Group, and all other parties asserting the Objections, the "**Objecting Parties**") [Docket No. 665].[2]

This Reply is supported by (1) the following points and authorities, (2) the declarations in support of the DIP Financing Motion, Ripple Motion, and 9019 Motion (Docket Nos. 16-1, 16-2, 79-1, 617, 619, and 620), (3) the pleadings, motions, documents, and other papers comprising the Court's file in the Debtors' Chapter 11 cases,[3] and (4) such other and further argument(s) the Court may permit and otherwise entertain with respect to these matters.

## PRELIMINARY STATEMENT

1.      The Debtors have the right to use the Ripple Tender Proceeds and the right to pledge the Platform Securities as collateral for the DIP Facility based on the terms of Liquidshares' governing documents, including the Liquidshares Operating Agreement (defined below) and the Subscription Agreements (defined below) agreed to by the Customers, Delaware law, and the Bankruptcy Code. Further, the relief requested in the Financing Motions is properly sought in these contested matters and Bankruptcy Rule 7001 is not implicated.

2.      Taking the procedural issue first, Bankruptcy Rule 7001(b) states that a "proceeding to determine the validity, priority, or extent of a lien or other interest in property – except a proceeding under Rule 3012 or Rule 4003(d)" are adversary proceedings. Fed. R. Bankr. P. 7001(b). The Financing Motions are not such proceedings, and the Objections attempt to invert

---

[2]      This Reply is addressed to the primary substantive objections to the DIP Financing Motion, Ripple Motion, and 9019 Motion. Attached hereto as <u>Exhibit A</u> is a table setting forth the Debtors' responses to additional, miscellaneous arguments in opposition to the requested relief.

[3]      Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure. "**Bankruptcy Local Rule**" or "**BLR**" references are to the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas. Other capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration (as defined herein).

the burden imposed by Section 363(p), Bankruptcy Rule 7001, and governing Circuit law. *See, e.g., Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 437 (5th Cir. 1994) ("We may begin our analysis with the proposition that if Swinehart's claim against the Haber Oil estate was one seeking an equitable interest in property, such as a constructive trust, rather than a general unsecured claim, it was incumbent on him to file an adversary proceeding in the bankruptcy court."). The Financing Motions do not seek to determine the Customers' interest in the Platform Securities (defined below) or the Platform Securities Proceeds (defined below). Instead, the Financing Motions seek to use estate property (the Ripple Motion) and grant liens in estate property as collateral for the DIP Facility (the DIP Financing Motion)—relief routinely and properly granted by motion, not adversary proceedings.

3.      Liquidshares tendered Ripple Shares that were owned by Liquidshares to Ripple, resulting in payment of the Ripple Tender Proceeds. Indeed, if Liquidshares did not own the Ripple Shares, the sale to Ripple would not have closed. Likewise, Liquidshares acquired each of the Platform Securities with its own funds, and the share certificates in the Platform Securities were issued to Liquidshares. If certain of the Customers contend that they have an equitable interest in the Ripple Tender Proceeds or Platform Securities such that Liquidshares holds only legal title to such property pursuant to Section 541(d), the Customers bear the burden of demonstrating that interest under Section 363(p)(2), Bankruptcy Rule 7001(b), and the Fifth Circuit's decision in *Haber Oil*. The Customers have not met their burden.

4.      The Liquidshares Operating Agreement and the Subscription Agreements signed by the Customers, which bind them to the terms of the Liquidshares Operating Agreement, demonstrate that the Debtors hold more than mere legal title to the Platform Securities and

Platform Securities Proceeds, as the Debtors have the right to use and pledge such assets in order to fund the operation of their business and the administration of these Chapter 11 Cases.

5. Correspondingly, the Debtors' agreement to enter into the stipulation and term sheet accompanying the 9019 Motion (the "**Settlement**") also represents a valid exercise of Debtors' business judgment as the relief requested in the 9019 Motion is fair and equitable and rests well above the lowest point in the range of reasonableness of litigation outcomes with respect to the relief requested in the Financing Motions. The Objections to the 9019 Motion, which are not objections based on the factors applicable to settlements under Bankruptcy Rule 9019 but are objections to confirmation of a plan and can be asserted at that time, should be overruled.

## RELEVANT FACTS

6. On July 7, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors continue to operate their business and manage their property as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7. On July 18, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Committee**"). *See* Docket No. 98.

8. From February of 2020 until March 14, 2025, Linqto operated a platform (the "**Platform**") designed to provide customers (the "**Customers**") with indirect access to investments in the equity of private companies (the "**Issuing Companies**" and each, an "**Issuing Company**"), with a focus on the technology sector. Debtor Linqto Liquidshares LLC ("**Liquidshares**") purchased and held investment securities (the "**Securities**") comprised of shares of Issuing Companies and membership units in otherwise unaffiliated entities that own shares in Issuing

Companies. Liquidshares then purported to allocate economic interests in certain of the Securities (the "**Platform Securities**") to series limited liability companies (the "**Series**") and sell units in the Series to the Customers.

9.      Upon their appointment at the beginning of 2025, the Company's new management learned of pending investigations by the U.S. Securities and Exchange Commission (the "**SEC**") and Financial Industry Regulatory Authority, Inc., along with allegations of serious regulatory compliance failures. As Linqto's new leadership team gained access to company records and spoke with Linqto personnel, they quickly developed concerns regarding, among other things, the Company's historical interpretation of, and non-compliance with, applicable securities laws and its organizational and governance structure. Further investigation uncovered myriad regulatory compliance violations along with a culture of systematic and pervasive non-compliance, requiring immediate and serious corrective action. Linqto's current management, together with the Debtors' professionals, are cooperating with the SEC and other regulators.

10.      As new management became aware of the depth and extent of the Company's historical non-compliance with the securities laws, the Company determined that continued operation of the Platform would be ill advised and likely exacerbate the Company's liabilities. As a result, the Company determined to indefinitely suspend operation of the Platform and, by extension, its primary revenue-generating operations, on March 13, 2025.

11.      As of the Petition Date, Liquidshares held Securities in 111 Issuing Companies with an estimated fair market value of in excess of $500 million. Of these Securities, more than $500 million are Platform Securities and approximately $16 million were held in reserve by Liquidshares for its own account and subsequent sales of units to Customers (the "**Reserved Securities**").

12.     As described in the Ripple Motion and the *Declaration Of Jeffrey S. Stein In Support Of:  (A) Debtors' Motion For Entry Of An Order (I) Authorizing The Use Of Estate Proceeds Free And Clear Of All Liens, Claims, Interests, And Encumbrances, (II) Determining That The Ripple Sale Proceeds Are Assets Of The Bankruptcy Estate, And (III) Granting Related Relief; and (B) Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense* [Docket No. 619], Liquidshares, through the Debtors' former management participated in the December 10, 2024, tender offer of Ripple, resulting in total proceeds of approximately $18.8 million (the "**Ripple Tender Proceeds**").

13.     Upon learning of the various securities investigations the Debtors faced, the Debtors' new management elected to hold the Ripple Tender Proceeds in a money market account at Silicon Valley Bank, a division of First-Citizens Bank & Trust, held by Liquidshares (the "**Proceeds Account**"), which Proceeds Account was transferred to a to a debtor-in-possession money market account at Customers Bank on or about September 10, 2025.

14.     In addition to the Ripple Tender Proceeds, Liquidshares is holding funds arising from distributions and dividends from other Platform Securities (collectively with the Ripple Proceeds, the "**Platform Securities Proceeds**").

15.     While the Debtors elected to segregate the Platform Securities Proceeds from funds held in other money market and operating accounts out of an abundance of caution, the Proceeds Account is not a restricted account or escrow account.

16.     The Securities (both the Reserved Securities and Platform Securities) were purchased by Liquidshares, with Liquidshares' own funds.

17.     When Customers signed up for the Linqto platform, they each executed a subscription agreement (collectively, the "**Subscription Agreements**"), in which they agreed to be bound by the Liquidshares Operating Agreement, as it may be amended from time to time. The Subscription Agreements specifically state:[4]

SUBSCRIPTION AGREEMENT INSTRUCTIONS

1.      This Subscription Agreement contains the following sections, which must be read and agreed to if you wish to invest in the membership interests (the "Interests") of Linqto Liquidshares LLC – _____ (the "Series") in accordance with the provisions of the Amended and Restated Limited Liability Company Operating Agreement between Linqto Liquidshares LLC ("The Company") and Linqto Liquidshares Manager LLC ("the Managing Member") for the Series (the "Operating Agreement"):

2.      Prospective investors must agree to all relevant sections of this Subscription Agreement. Failure to do so may result in a delay of acceptance of a prospective investor's subscription until a properly completed Subscription Booklet has been received, processed, and approved.

3.      If you have any questions regarding any of the above (including agreement with any of this Subscription Agreement and exhibits), please contact Linqto Liquidshares Manager LLC.

4.      In the event of conflict between the provisions of this Subscription Agreement, the provisions of the Operating Agreement and the provisions of any other documents evidencing the Company, the provisions of the Operating Agreement shall prevail.

## ARGUMENT

## I.     The Objecting Parties' Constructive Trust Arguments Fail.

### A.     The Fifth Circuit Narrowly Construes Constructive Trusts.

18.     Constructive trust arguments are neither novel nor new in bankruptcy cases. As the Fifth Circuit observed over thirty years ago:

> Just as medieval alchemists bent all their energies to discovering a formula that would transmute dross into gold, so too do modern creditors' lawyers spend prodigious amounts of time and effort seeking to convert their clients' general unsecured claims against a bankrupt debtor into something more substantial. The creditors' lawyer in this

---

[4]     The Subscription Agreements are substantially similar though not all precisely identical. The below is an example of a representative excerpt of a Subscription Agreement.

8

> case achieved success in this regard that can only be described as
> phenomenal, transforming the lead of a breach of contract claim into the
> gold of a constructive trust and, in turn into the platinum of cash when
> it turned out that the real property on which the trust was belatedly to be
> imposed had been sold. Under the Bankruptcy Code, such sorcery
> demands the highest attention to the requirements of pleading and proof
> by its practitioner. Because those requirements were not met, we are
> required to REVERSE in part the decision of the court below.

*In re Haber Oil Co.*, 12 F.3d at 431.

19.    The sentiments described above echo in the Customer Objections. The repeated
recurrence of constructive trust arguments in bankruptcy cases makes their assertion here all the
more understandable, but mistaken. As the Fifth Circuit's quote above indicates, such arguments
often prove unsuccessful. The "prodigious amounts of time and effort" referenced by the *Haber
Oil* Court also counsel against the active prosecution of such claims here because they needlessly
dissipate scarce resources that could otherwise be used to maximize the value of Debtors' estates
for the benefit of all stakeholders, especially Debtors' Customers.

20.    The *Haber Oil* Court observed that constructive trust claims are disfavored in
bankruptcy cases:

> The remedy of a constructive trust is thus a potent one in bankruptcy
> because it gives the successful claimant priority over the defendant's
> unsecured creditors to the extent of the property subject to the trust…As
> a result, creditors of a bankrupt debtor have every incentive to argue that
> their unsecured claims are eligible under state law for the remedy of a
> constructive trust. *Because the constructive trust doctrine can wreak
> such havoc with the priority system ordained by the Bankruptcy Code,
> bankruptcy courts are generally reluctant to impose constructive trusts
> without a substantial reason to do so…A constructive trust is an
> equitable remedy that should not be imposed cavalierly, especially in
> the context of a bankruptcy proceeding. The burden of establishing the
> existence of the constructive trust rests on the claimant, as does the
> burden of tracing the trust property.*

*Id.* at 436 (emphasis added) (internal citations and quotation marks omitted).

21.     The Fifth Circuit adopted this view of constructive trust claims out of concern that any regime that proved too lax or accommodating in its recognition of constructive trusts would have the effect of distorting the Bankruptcy Code's priority scheme and policy of ratable distribution among creditors. *See id.* at 435 ("The states can therefore have some effect on the operation of the federal bankruptcy system by exercising their power to define property rights. We have emphasized that state law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities.") (citations and internal quotation marks omitted).

22.     The Fifth Circuit is not alone in these concerns. *See, e.g., Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.),* 377 F.3d 209, 217-218 (2d Cir. 2004) ("[C]onstructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, and not from the offending debtor" and because they "…create[e] a separate allocation mechanism outside of the scope of the bankruptcy system…"); *XL/Datacamp v. Wilson (In re Omegas Group)*, 16 F.3d 1443, 1451 (6th Cir. 1994) (observing that "a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code…"); *Amendola v. Bayer,* 907 F.2d 760, 763 (7th Cir. 1990) (applying Illinois law and stating, "the grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion."). Consistent with the Fifth Circuit's narrow view of constructive trusts, the Ninth Circuit stated in *In re N. Am. Coin & Currency*,

> While we agree that any constructive trust that is given effect must be a creature of Arizona law, we cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust … because of countervailing policies behind the Bankruptcy Act, state law could not be permitted to impose a trust on commingled property of a bankrupt's estate. A constructive trust is not the same kind of interest in property as a joint tenancy or a remainder. It is a remedy, flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it … Moreover, in the case presented here, it is an

10

inchoate remedy; we are not dealing with property that a state court decree has in the past placed under a constructive trust. We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.

767 F.2d 1573, 1575 (9th Cir. 1985).

23.     It is against this formidable backdrop of authorities calling for narrow applications of, and substantial justifications for, constructive trust claims in bankruptcy proceedings that the Objecting Parties' constructive trust claims must be assessed. As the Debtors demonstrate below, such claims fail here.

1.   <u>The Constructive Trust Claims Fail Under Texas and Governing Fifth Circuit Law As They Did Not Exist On The Petition Date, Did Not Attach Prepetition, and Are Too Attenuated Given Their Derivative Nature to Succeed.</u>

24.     The arguments advanced by the Objecting Parties raise an issue determined in the first instance by reference to otherwise applicable non-bankruptcy law—here, the law of Texas. Because this issue does not directly implicate the Bankruptcy Code, the choice of law rules of the forum state govern. *See, e.g., Wilmington Sav. Fund Soc'y, FSB v. iHeart Communs., Inc. (In re IHeartMedia, Inc.)*, 597 B.R. 339, 350 (Bankr. S.D. Tex. 2019) (Isgur. J.) ("…Wilmington's alleged causes of action arise outside of the Bankruptcy Code and are based on state law causes of action such as … unjust enrichment … Accordingly, the Court applies the choice of law rules of Texas, the applicable forum, to determine the applicable law for Wilmington's causes of action."). Notwithstanding the fact that the choice of law provision of the Operating Agreement selects Delaware law, remedial matters, such as the availability of a constructive trust, are governed by the law of the forum. *Id.* ("In this case, although the Indentures agree that New York law controls the interpretation of the contracts, the equitable lien and constructive trust Wilmington seeks are remedial in nature, and Texas law determines their application.").

25.     Both Texas and Delaware view constructive trusts as remedial, not substantive. *Compare Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("It [constructive trust] is an equitable remedy of great flexibility and generality, and is viewed as a remedial [and] not a substantive institution.") (internal quotation marks and citations omitted) *with York v. Boatman*, 487 S.W.3d 635, 647 (Tex. App. – Texarkana 2016, no pet.) ("Thus, when a party asserts a constructive trust cause of action, she does not ask the court to *enforce* a constructive trust that the parties created between themselves, but instead asks the court to *impose* a constructive trust on their relationship to prevent the other party from being unjustly enriched. *The constructive trust is the remedy sought, not the underlying relationship itself*.) (emphasis added) (citation omitted).

26.     Importantly, under Texas law, a constructive trust does not exist until it is judicially imposed as a remedy. *BBX Operating, L.L.C. v. Bank of Am., N.A. (In re Connect Transp., L.L.C.)*, 825 Fed. Appx. 150, 154 (5th Cir. Aug. 11, 2020) ("Thus, under Texas law, [n]o constructive trust exists unless and until a court imposes it as a remedy … Here, no court has ordered a constructive trust to be imposed, so BBX could not have an ownership interest in the funds at the time of their conversion based on a constructive trust theory.") (internal quotation marks and citation omitted); *see also York*, 487 S.W.3d at 647 ("No constructive trust exists unless and until a court imposes it as a remedy.").

27.     The absence of a judicial decree by a court of competent jurisdiction awarding any of the Objecting Parties the remedy of a constructive trust prior to the Petition Date necessarily defeats the assertion of such claims against property held by Debtors' bankruptcy estates here. Under Section 541(d) of the Bankruptcy Code, any equitable interest in property of Debtors' estates necessarily had to exist as of the Petition Date. Section 541(d) of the Bankruptcy Code provides:

> Property in which the debtor holds, *as of the commencement of the case,* only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added).

28.     Because the Texas courts have clarified since *Haber Oil* that no constructive trust exists under Texas law until such a remedy is issued by judicial decree, no constructive trust existed with respect to any property of Debtors' bankruptcy estates as of the commencement of their respective Chapter 11 Cases. The Fifth Circuit's application of Texas law in *BBX Operating* affirming the trial court's dismissal of a conversion claim predicated on an alleged property interest conferred through a constructive trust further supports Debtors' argument that, absent a judicial decree as of the Petition Date conferring a constructive trust on any property of Debtors' bankruptcy estates, no such constructive trust claim can be asserted successfully by the Objecting Parties here. As a result, the Objecting Parties' Objections should be overruled on this basis alone.[5]

　　　　　2.     The Constructive Trust Claims Fail For Lack of Prepetition Attachment.

29.     Even if the Objecting Parties could somehow benefit from a retroactive effect or relation-back of a subsequently conferred constructive trust, *see Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex. 1974), the Fifth Circuit has made emphatically clear that the constructive trust

---

[5]     The Ninth Circuit is in accord. In *XL/Datacamp v. Wilson (In re Omegas Group)*, 16 F.3d 1443, 1451 (6th Cir. 1994), the court observed that "a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code…" and recognized that the remedial nature of constructive trusts precludes their application absent a prior judicial determination made prepetition:

> Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment "impressing" defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an "equitable interest" in the debtor's estate existing prepetition, excluded from the estate under § 541(d)."

must attach prior to the petition date. *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1014 n. 10 (5th Cir. 1985) ("We emphasize that section 541(d) overcomes the trustee's section 544 powers only where state law confers equitable title on a third party *effective prior to the commencement of the bankruptcy case*.") (emphasis added).

30.     Under *Quality Holstein Leasing*, all of the elements of a constructive trust claim must exist as of the Petition Date before property comprising estate property by operation of Sections 541(a)(1) and 541(a)(2) of the Bankruptcy Code may otherwise be excluded from the bankruptcy estate by operation of Section 541(d). *See, e.g.*, *In re Haber Oil Co.,* 12 F.3d at 436 ("From the foregoing, it is clear that we must survey the law of Texas before we can determine whether Swinehart adequately demonstrated that he was entitled to a constructive trust in the disputed properties *at the time Haber Oil's bankruptcy case commenced*.") (emphasis added); *In re Omegas Group,* 16 F.3d at 1451 ("a creditor's claim of entitlement to a constructive trust is not an 'equitable interest' in the debtor's estate existing prepetition, excluded from the estate under § 541(d); *In re Quality Holstein Leasing*, 752 F.2d at 1014 n. 10. All of the elements of a breach of fiduciary duty or actual fraud claim forming the basis of an Objecting Parties' constructive trust theory had to exist and be capable of being established by competent and admissible evidence as of the Petition Date. The leading case under Texas law, *Meadows v. Beirschwale*, bears this out.

31.     In *Meadows*, the Supreme Court of Texas held that a constructive trust related back and was impressed upon fraudulently transferred property "when legal title passes…" or when the underlying actual fraud claim or breach of fiduciary duty has been completed. 516 S.W.2d at 133. Thus, all of the elements of the *prima facie* case for a breach of fiduciary duty or actual fraud claim must necessarily exist as of the Petition Date for there to be any chance for a constructive trust to be impressed upon property of Debtors' bankruptcy estates. That is not the case here.

32.     To establish a claim for breach of fiduciary duty and/or actual fraud, one of the necessary elements of the *prima facie* case for either tort is damages. *See, e.g.*, *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The federal question overlay on state law provided by the Fifth Circuit in *Haber Oil* requires that those damages to be substantial. *In re Haber Oil*, 12 F.3d at 436 ("[b]ecause the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant to impose constructive trusts *without a substantial reason to do so*.") (emphasis added) (internal quotation marks and citations omitted). The Objecting Parties have failed to establish any damages, let alone substantial damages, from the failure to properly form and maintain the contemplated Series. The only time such damages would come into existence is when the failure to segregate assets among the various would-be Series exposed their potential assets to the claims of general creditors.

33.     Here, the Debtors' Schedules and Statements of Financial Affairs do not disclose any prepetition lawsuits alleging fraud, breach of fiduciary duty, or constructive trust claims brought by Debtors' Customers or the Objecting Parties. The apparent absence of any such claims further supports a finding that that no valid constructive trust claims had attached to any assets of Debtors' bankruptcy estates. The failure to segregate assets through the would-be Series LLC structure could lead to potential damages claims (Debtors do not concede that is, in fact, the case here) only when such assets were exposed to the claims of general creditors. Here, the earliest point in time when such exposure could have arisen is upon the filing of Debtors' Chapter 11 Cases and creation of Debtors' bankruptcy estates by operation of Section 541(a) of the Bankruptcy Code. Because the Petition Date is the earliest point in time in which any potential breach of

fiduciary duty or actual fraud claim(s) could have crystallized through the realization of substantial damages, any such constructive trust(s) had not attached to property of the Debtors' estates as a matter of law on the Petition Date. Absent a fully developed and cognizable breach of fiduciary duty and/or actual fraud claim during the prepetition period, the Objecting Parties would not be able to plead, let alone establish, all of the *prima facie* elements necessary for the remedy of a constructive trust to issue. Because Section 541(d) of the Bankruptcy Code requires the existence of a cognizable constructive trust claim "as of the commencement of the case," the Objecting Parties' constructive trust arguments are, therefore, barred as a matter of law. *See* 11 U.S.C. § 541(d).

3. The Objecting Parties' Derivative Constructive Trust Claims Fail.

34.     On the Petition Date, the Debtors became debtors in possession and, therefore, serve as the legal equivalent of a bankruptcy trustee and representative of their bankruptcy estates. *See, e.g.,* 11 U.S.C. §§ 323(a), 1101(1), 1106–1108. In their capacities as debtors in possession, the Debtors were cloaked as of the Petition Date with, among other rights and powers, the status of a judgment lien creditor with respect to personal property in their possession. 11 U.S.C. §§ 544(a)(1)–(a)(2); *see also, Belisle v. Plunkett*, 877 F.2d 512, 514 – 515 (7th Cir. 1989) ("Section 544(a)(3) complements §§ 544(a)(1) and (2), which give the trustee the status of a judgment creditor vis-à-vis chattels in the debtor's possession.") (Easterbrook, J.). "Exercise of the [strongarm] powers allows the estate to avoid, among other interests, secret or otherwise unperfected liens on property that the debtor appears to own on the petition date." *In re Quality Holstein Leasing*, 752 F.2d at 1014.

35.     Importantly, the Fifth Circuit limited the potential application of constructive trusts through Section 541(d) of the Bankruptcy Code only to the actual beneficiaries of a constructive trust and not those who attempt to claim or assert such remedies through the actual beneficiary of

a constructive trust. "One who claims an interest in estate property through the beneficiary of a constructive trust, in other words, may not thus avoid the trustee's strong-arm powers. Section 544 prevents such piggy-backing." *Id.* at 1015.

36.     The Debtors submit that is the case here. The actual beneficiary of a constructive trust, if any, would have to be the would-be Series that were not formed in accordance with applicable non-bankruptcy law and to whom Liquidshares failed to transfer the Securities. As explained below, the Objecting Parties would not own the underlying Securities; rather, had the Debtors' operations functioned as originally contemplated, the underlying Securities would be owned by the would-be Series, and the Objecting Parties, in turn, would own units or interests in the would-be Series.[6] As a result, the Objecting Parties are essentially piggy-backing on the potential rights of the would-be Series.

37.     As set forth in Section 2.2 of the Operating Agreement, the would-be Series were intended to function as much as possible as limited liability companies. This necessarily means that the only property interest the Objecting Parties would have with respect to a Series LLC is their ownership or unit interest in the would-be Series LLC itself, not in the underlying property of the Series, LLC. *See, e.g.,* 6 Del. C. § 18-701. The property that is allegedly being misappropriated by the Debtors is property that would belong to a Series LLC – not the Objecting Parties. As the Fifth Circuit explained in *Quality Holstein Leasing*:

> A contrary holding would lead to untoward results and hinder the purposes of section 544. It seems likely that creditors of third parties from whom a debtor fraudulently procured property would unduly burden the bankruptcy courts with claims similar to Borg-Warner's.

---

[6]     Indeed, the structuring of the Subscription Agreements such that the Objecting Parties had ownership of units or interests in a limited liability company (or a series LLC), rather than a direct ownership interest in the Securities themselves, was done out of necessity and underlines the whole point of the Linqto enterprise. That is, securities laws prohibit the Objecting Parties from having a direct ownership interest in the private securities at issue. Linqto was conceptualized and then marketed to customers as a means for customers to obtain an indirect economic interest in private securities which they could not own directly under applicable law.

> Such claims would prove no less insidious to the orderly workings of
> the bankruptcy structure than the hidden interests and unperfected liens
> that section 544 in the main authorizes the trustee to avoid. The policy
> consists in doing equity among creditors. Remote creditors such as
> Borg-Warner should do no better than direct but imperfected security
> holders.

752 F.2d at 1015.

38.     Under *Quality Holstein Leasing*, therefore, the Objecting Parties' constructive trust

claims are defeated through the Debtors' invocation of their strong-arm powers under Section 544

of the Bankruptcy Code.

### 4.   The Securities Belong to Liquidshares, Not the Objecting Parties

39.     Pursuant to Delaware law, "[a] limited liability company interest is personal

property. A member has no interest in specific limited liability company property." 6 Del. C. § 18-

701. The Objecting Parties argue for a constructive trust, which is predicated on an equitable

ownership interest in property held by a third party. While the Objecting Parties claim to hold a

property interest in the Platform Securities, they contracted to obtain membership interests in

Series that would, indirectly, hold economic interests in the Platform Securities. The Objecting

Parties provide no authority for how a membership interest in an entity may be transmuted into a

property interest in the assets of that entity when black letter Delaware statutory law expressly

rejects this argument. 6 Del. C. § 18-701. Under Delaware law, the Platform Securities remain the

exclusive property of the Debtors and the Objecting Parties hold only claims.[7] In other words, the

---

[7]     While remedial matters (as discussed above), such as the availability of a constructive trust, are governed by
the law of the forum (Texas law), the internal affairs doctrine dictates that the law of the state of incorporation (here,
Delaware) governs matters related to a corporation's internal affairs such as the relationships among the corporation
and its shareholders. *See In re Uplift Rx*, 667 B.R. 665, 684 (Bankr. S.D. Tex. 2024) ("Generally, federal courts sitting
in Texas apply the law of the state of incorporation when a corporation's internal affairs are implicated.")
(citing *Sommers Drug Stores Co. Emp. Profit Sharing v. Corrigan*, 883 F.2d 345, 353-54 (5th Cir. 1989)). Thus,
Delaware law is applied throughout this Reply in regard to the rights and interests held by the Customers in the
Debtors, and Texas law is applied as to the viability of the remedies sought by the Objecting Parties.

Objecting Parties never held any sort of ownership interest in the Platform Securities as they were, at all times, owned by the Debtors.

40.     Sapien has also raised the question of who owns the Platform Securities as the basis for its opposition. *See* ECF Nos. 230 at ¶ 5; 231 at ¶¶ 19–25. This issue is similarly disposed of under Delaware law as set forth above. There is no legal vehicle available to Sapien or the Objecting Parties to assert ownership over the assets of the LLC or any series LLCs that were never properly formed.

**B.      Even if the Constructive Trust Argument Could Survive the Threshold Issues Set Out Above, the Objecting Parties Fail to Establish a Basis for a Constructive Trust.**

41.     To establish that a constructive trust exists under Texas law, the proponent must prove (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable *res*. *Mowbray v. Avery*, 76 S.W.3d 663, 681 n.27 (Tex. App.—Corpus Christi 2002, pet. denied). Here, the Objecting Parties cannot establish a claim of unjust enrichment nor can they show breach of a special trust, fiduciary relationship or actual fraud.

1.    The Objecting Parties Have Made No Showing of Unjust Enrichment.

42.     Claims of unjust enrichment are based on quasi-contract and are predicated on the absence of an express contract controlling the circumstances. *See Fortune Production Co. v. Conoco*, Inc., 52 S.W.3d 671, 683 (Tex. 2000). Generally, there can be no recovery under a quasi-contract theory when there is a valid, express contract covering the subject matter of the parties' dispute. *Id.*

43.     Here, the Agreements comprise the contract that governs the relationship between the Objecting Parties and the Debtors.  In fact, it is conceded in the Deaton Objection that the matter is resolved pursuant to the Agreements. Deaton Objection at p. 5. As a result, the Objecting

Parties may not make a claim for unjust enrichment and, thus, have no constructive trust relief available.

44.    Further the Objecting Parties cannot establish the necessary elements for such a claim. Under Texas law, unjust enrichment has been defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.- San Antonio [4th Dist.] 1982, pet. denied). The Objecting Parties have neither demonstrated that the Debtors are being enriched by preserving value in the instant Chapter 11 Cases, nor how the Platform Securities were their property.

45.    First, there is no unjust enrichment of the Debtors at the expense of the Objecting Parties, because the Debtors are contractually permitted to take the steps at issue in good faith to effectuate a restructuring of the Debtors in bankruptcy. As discussed above, unjust enrichment is an equitable remedy prescribed for instances where no remedy at law exists for a breach of a certain duty. Here, the Agreements set forth the rights of the Debtors to effectuate a bankruptcy restructuring in good faith. Specifically, the Debtors are permitted to "make other changes that the Managing Member determines in good faith not to be adverse to the Members," "accommodate the creation of any holding vehicle for the purpose of facilitating Company Investments, investments by Members, or otherwise in connection with the operations and affairs of the Company," "add to the representations, duties, or obligations of the Managing Member, or surrender any right or power (but not responsibilities) granted to the Managing Member in this Agreement," "make any other amendments that, in the reasonable discretion of the Managing Member, would not be materially adverse to the Members," and very importantly, "make any changes required by any governmental body or agency or to comply with any applicable

requirements of law that are deemed by the Managing Member to be for the benefit or protection of the Members." Operating Agreement Art. 11, ¶ 11.1. These broad powers, set forth in the Operating Agreement, define the nature of any restrictions placed on the Debtors, not the completely undefined duty to segregate the Platform Securities as the Objecting Parties suggest. This permissive structure set forth above, may not be supplanted in equity with a set of principles unilaterally identified and implemented by the Objecting Parties, when they are incorporated into the governing documents of the Debtors and control, as conceded by the Objecting Parties in their papers. Generally, there can be no recovery under a quasi-contract theory when there is a valid, express contract covering the subject matter of the parties' dispute. *Fortune Production Co.*, *supra*, 52 S.W.3d at 683. This issue is indeed addressed by Agreements as the Debtors are permitted to restructure in bankruptcy in good faith for "the benefit or protection of the members." With the impending SEC investigation, that is precisely what the Debtors are doing. Not only are the Debtors permitted to carry out the acts at issue, but the Operating Agreement also permits them to surcharge the Platform Securities to implement their changes under the Operating Agreement in its Art. 4, ¶ 4.2. To wit: the Debtors may surcharge the Platform Securities for extraordinary expenses or expenses incurred in connection with any threatened, pending or anticipated litigation, Internal Revenue Service examination or audit, or other proceeding, which would include a restructuring brought on by the SEC investigation. Further, the Debtors have turned over the investigation of these matters to a special subcommittee, empaneled to investigate these claims.

46.     Second, there is no unjust enrichment because the Objecting Parties have failed to establish an ownership interest in the Platform Securities. As set forth above, Delaware law makes clear that the owner of an interest in a limited liability company has no direct ownership interest in the assets of that company. *See* 6 Del. C. § 18-701. Rather, the owner holds only rights to hold

a respective ownership interest in the entity as a whole, not its assets. *Id*. Because the Objecting Parties have never owned the Platform Securities, they simply cannot claim that property, which they have no legal title to, is unjustly enriching the Debtors. As such, the Objecting Parties must bring their claims in conformity with applicable law, not equity, as set forth under the Agreements and a claim seeking a constructive trust is foreclosed.

     2.   <u>The Objecting Parties Have Not Shown Breach of a Special Trust, Fiduciary Relationship, or Actual Fraud Giving Rise to a Constructive Trust.</u>

47.    The Objecting Parties have made no showing of breach of fiduciary duty or fraud that would entitle them to equitable title to the Platform Securities.

48.    The Debtors do not argue that no fraud was committed. Indeed, the conduct of the Debtors under their former management, including engaging in FOMO marketing practices, pumping specific Issuing Companies, sharing insider information with social media "finfluencers," offering special pricing for certain Customers, and various other misrepresentations and nondisclosures likely violated the antifraud provisions of federal securities laws.

49.    The Debtors, however, did not agree to deliver Platform Securities or economic interests in Platform Securities to the Customers. Instead, Customers would subscribe to a Series by, among other things, executing and delivering a Subscription Agreement for the relevant Series in which the Customer agreed to purchase interests in the Series which, in turn, would hold an investment in an Issuing Company. Thus, the Debtors agreed to provide the Customers an economic interest in an entity, not in the assets of the entity. In other words, the fraud was not in failing to deliver Platform Securities to the Customers, as the governing documents expressly provided that the Customers would receive interests in series LLCs rather than ownership of the Platform Securities.

50.     To prevail on a fraud claim under Texas law, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). As the Customers contracted to receive interests in Series rather than the Platform Securities, the Objecting Parties cannot establish that the Customers actually and justifiably relied on any representation that they would own the Platform Securities.

**C.      The Debtors Are Not Required to Initiate an Adversary Proceeding Because the Burden Rests on the Parties Seeking Imposition of a Constructive Trust.**

51.     In its papers, Sapien argues that the Debtors must bring an adversary proceeding to determine the owner of the Platform Securities. *See* Docket No. 231 at ¶ 14. "The burden of establishing the existence of the constructive trust rests on the claimant," however, "as does the burden of identifying or tracing the trust property." *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (quoting *In re Haber Oil*, 12 F.3d at 436). Consistent with these authorities, Section 363(p)(2) places the burden to establish an interest in property on the Objecting Parties. 11 U.S.C. § 363(p)(2) ("In any hearing under this section … the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."); *see also In re Grubb & Ellis Co.*, No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, at *17-18, 29 (Bankr. S.D.N.Y. Mar. 27, 2012) (the burden of establishing the existence of a constructive trust falls on the party asserting that assets cannot be sold under Section 541(d) because they were held in constructive trust). The Objecting Parties have not met their burden to establish that that they hold equitable title to the Platform Securities by initiating an adversary proceeding.

D.     **Any Resulting Trust Arguments Also Fail.**

52.     Under Texas law, a resulting trust must be established by clear and convincing evidence. *See, e.g., Equitable Trust Co. v. Roland*, 721 S.W.2d 530, 533 (Tex. App.–Corpus Christi 1986). None of the Objections presently before the Court are supported by competent, relevant, and otherwise admissible evidence that comes anywhere close to the meeting this heightened standard.

53.     As a conceptual matter, Texas law recognizes a resulting trust as a trust that arises when title is conveyed to one person following another person's payment (in full or in part) of the purchase price. *See, e.g., Cohrs v. Scott*, 338 S.W.2d 127, 130 (Tex. 1960). "The parties are presumed to have intended that the grantee hold title to the use of him who paid the purchase price and who equity deems to be the true owner." *Id.* Importantly, a resulting trust is deemed to arise out of the underlying purchase transaction itself and, critically, it must arise at the exact same time that title passes as part of the underlying purchase transaction. "Due to the nature of the doctrine, it is necessary that the party seeking to impose the trust trace his interest into the consideration which is given when legal title to the specific property is passed to the person against whom the trust is asserted." *Sheldon Petroleum Co. v. Pierce*, 546 S.W.2d 954, 957-58 (Tex. Civ. App. – Dallas 1977). Any oral agreements before or after the passage of title are similarly ineffective in establishing a resulting trust. *See, e.g., Wright v. Wright*, 132 S.W.2d 847, 849 (Tex. 1939). Here, a resulting trust did not arise at the time the Customers sought to purchase Series interests from the Debtors.

54.     The securities laws applicable to non-public companies simply do not permit the Securities to be held directly by an objecting Customer or claimant. This legal impossibility alone defeats the existence of a resulting trust because it cannot have been the intention of the parties

that title to the Platform Securities in question would vest in an individual Customer or claimant directly at the time of their purchase.

55.     In addition, any resulting trust arguments also fail due to the inability of an objecting Customer or claimant to trace the use of their funds to the purchase of the underlying Securities at issue—Liquidshares purchased the Securities with its own funds before Customers invested funds to acquire interests in the Series that were intended to hold an indirect interest in the Securities. None of the agreements governing the relationship between the Debtors and their Customers contemplated that the Customers would own the Securities themselves, rather than interests in the Series. The structure of the Debtors' operations and the manner in which the Debtors operated in the ordinary course of their business simply act as insurmountable factual hurdles to the establishment of a resulting trust over any Securities in question *at the time of their purchase.* Such resulting trust claims, therefore, fail as a factual matter under governing Texas law.

56.     Under governing Fifth Circuit authority, resulting trust claims would also fail here because the proper claimant (if any can be identified) would be the Series, not the individual Customers that purchased unit interests in such vehicles. As explained with respect to the various constructive trust claims that have been asserted by Objecting Parties, the Fifth Circuit's authoritative construction of Section 541(d) does not permit third parties to assert such claims in place of the appropriate trust beneficiaries (here, the would-be Series) and, essentially, piggyback on the rights of others. *See, In re Quality Holstein Leasing*, 752 F.2d at 1015 ("One who claims an interest in estate property through the beneficiary of a [resulting] trust, in other words, may not thus avoid the trustee's strong-arm powers. Section 544 prevents such piggy-backing."). Coincidentally, a resulting trust claim by a would-be Series LLC would also fail because (i) the

Series did not supply the consideration used to fund the purchase price of the applicable Securities, and (ii) it could not have been vested with title of the Securities at the time of their purchase as they were never properly formed (and, therefore, could not have been in existence at the time title must have passed to the would-be Series LLC in order for a valid resulting trust claim to spring into existence).

57.     For all of the foregoing reasons, any resulting trust claims made by any of the Objecting Parties fail in fact and as a matter of governing Texas and Federal law.

**II.     The Operative Documents and Delaware Law Permit Use of the Platform Securities and Platform Securities Proceeds.**

58.     The Liquidshares Operating Agreement grants the Managing Member (as defined therein) broad authority to incur and pay expenses and pledge the Platform Securities.[8] The Liquidshares Operating Agreement provides that, with regard expenses incurred related to Liquidshares' assets:

> Without limiting the other provisions of this Agreement, each Member understands that the Company or a particular Series, as applicable, shall pay each of the following:
>
> (i) any extraordinary expenses (including indemnification and contribution expenses, including the amount of any judgment or settlement paid in connection therewith); and
>
> (ii) all expenses (including reasonable attorneys' fees) incurred in connection with any threatened, pending or anticipated litigation, Internal Revenue Service examination or audit, or other proceeding.
>
> (iii) Additional Company Expenses payable by any Series shall be set forth in the Series Schedule applicable to such Series.

Operating Agreement, Art. 4, ¶ 4.2.

---

[8]     Pursuant to the 9019 Motion and the proposed *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, and (III) Granting Related Relief* [Docket No. 618], the Debtors are no longer seeking to grant the DIP Lender a lien on the Platform Securities.

59.     The Liquidshares Operating Agreement also expressly provides for Company expenses to be charged against any Series formed, as well as their respective members. Liquidshares Operating Agreement, Art. 4, ¶ 4.5.

60.     The Liquidshares Operating Agreement also provides the following expansive powers to the Debtors' managers:

> (F) cure any manifest errors or ambiguity in the terms of this Agreement, including amendments to correct typographical errors, eliminate ambiguities, or make other changes that the Managing Member determines in good faith not to be adverse to the Members;
>
> (G) ensure that the Company's tax allocations comply with certain tax requirements;
>
> (H) prevent the Company from becoming an investment company required to be registered under the Investment Company Act;
>
> (I) accommodate the creation of any holding vehicle for the purpose of facilitating Company Investments, investments by Members, or otherwise in connection with the operations and affairs of the Company;
>
> (J) add to the representations, duties, or obligations of the Managing Member, or surrender any right or power (but not responsibilities) granted to the Managing Member in this Agreement;
>
> (K) make any changes required by any governmental body or agency or to comply with any applicable requirements of law that are deemed by the Managing Member to be for the benefit or protection of the Members; and
>
> (L) make any other amendments that, in the reasonable discretion of the Managing Member, would not be materially adverse to the Members.

Operating Agreement Art. 11, ¶ 11.1.

61.     Further, though the Platform Securities are not held in trust and the Objecting Parties have not established that a constructive trust should be imposed, Liquidshares would be permitted to use the Platform Securities and Platform Securities Proceeds if such assets were determined to be held in trust. Under Delaware law, a trustee is permitted to "exercise the rights

of an absolute owner" with respect to the *res* of the trust, which necessarily includes selling the trust assets, when operating within the context of their fiduciary duties and for the benefit of the trust and its beneficiaries. Del. Code Ann. tit. 12, § 3325 (8). A trustee is further permitted to "[p]rosecute or defend an action, claim or judicial proceeding in any jurisdiction to protect trust property and the trustee in the performance of the trustee's duties." Del. Code Ann. tit. 12, § 3325 (25); *see also Bankers Tr. Co. v. Duffy*, 295 A.2d 725, 726 (Del. 1972); *In re Nancy W. Couch Tr.*, 723 A.2d 376, 385 (Del. Ch. 1998).

62.     As the Delaware Supreme Court has found:

> The general law provides two situations in which an allowance from a trust corpus for attorneys' fees may be made: when the attorneys' services were necessary for the proper administration of the trust, Scott on Trusts (2nd Ed.) § 244; Restatement of Trusts 2nd § 188; or where the services otherwise resulted in a benefit to the trust, 7 C.J.S. Attorney and Client § 193. Delaware law is in accord with the general rule.

*Bankers Trust*, 295 A.2d at 726. The Delaware courts "have consistently allowed fiduciaries reimbursement from the fiduciary estate for 'necessary' expenses" and "have also permitted such an allowance on a theory that the services resulted in a benefit to the trust estate." *Id.* (citations omitted).

63.     Here, the Debtors seek to use the Platform Securities to fund the Chapter 11 Cases for the benefit of the Customers and creditors. As such, if the Platform Securities were determined to be held in trust for the benefit of the Customers, the Platform Securities would be properly surcharged to fund the necessary expenses of these Chapter 11 Cases.

**III.     The Objections to the 9019 Motion Should Be Overruled.**

64.     While the Objecting Parties are correct that the Fifth Circuit has held, as a general matter, that settlements affecting third party rights must be scrutinized carefully for the fairness of the hearing on the settlement motion and that consideration of the settlement motion only as to the

parties to the settlement is generally insufficient, such objections miss the mark here. *See, e.g., Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 754 & 764 (5th Cir. 1995). First, the fairness of the settlement hearing is readily established by the notice of the hearing on the 9019 Motion, as well as the multipole objections to the 9019 Motion by the Objecting Parties and the Objecting Parties' ability to participate at the hearing.

65.     Objections to the 9019 Motion assert generalized grievances to the Chapter 11 Cases and the treatment of Customer claims or interests that the Debtors have agreed to propose pursuant to the Settlement. *See, e.g.*, Docket No. 667 at pg. 1 ("The proposal advanced by the Unsecured Creditors Committee would dilute investors' interests, impose unnecessary fees, and create new administrative burdens. This is not an appropriate substitute for preserving what investors already own."). To the extent these Objections rest on the premise that the Customers hold equitable title to the Platform Securities, the Customers have not established such interest as set forth above. Moreover, the central purpose of the Settlement is to avoid protracted, value-destructive litigation regarding the constructive trust claims, which would deplete the Debtors' resources, result in a default under the DIP Facility, and impede the Debtors' ability to implement a restructuring transaction that delivers value to the Customers and creditors.

66.     Other Objections, including the Ad Hoc Group Objection and the Ripple Reservation of Rights, raise potential objections to elements of a plan that has not yet been filed or to the plan process. These Objections are premature, as a plan has not yet been proposed and the proposed Settlement does not preclude or limit the ability of the Objecting Parties to object to a plan.[9]

---

[9]     While the Ad Hoc Group discusses a proposal that it claims involves "$35-50 million of new equity capital" and avoids the 5% "haircut" to Customers' recoveries contemplated by the proposed Settlement, the proposal outlined in the Ad Hoc Group Objection is not an accurate or complete description of the proposal provided to the Debtors and the Committee.

67.     Because none of the Objections to the 9019 Motion refute the Debtors' evidence that the Settlement is fair, reasonable, and in the best interest of the estates under the factors set forth in *In re Age Refin. Inc.*, 801 F.3d 530 (5th Cir. 2015), they should be overruled.

## CONCLUSION

WHEREFORE, the Debtors request that the Court grant the Motions and such other and further relief as the Court deems appropriate under the facts and circumstances present here.

Dated: October 2, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

*/s/ Gabrielle A. Hamm*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:     (713) 900-3737
Facsimile:     (702) 442-9887
Email:           ghamm@nvfirm.com
                   vpolnick@nvfirm.com
                   aagelakopoulos@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:     (702) 385-5544
Facsimile:     (702) 442-9887
Email:           saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on October 2, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Gabrielle A. Hamm*
Gabrielle A. Hamm