1

United States Courts
Southern District of Texas
F I L E D

OCT 0 3 2025

Nathan Ochsner, Clerk of Court

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS – HOUSTON DIVISION

In re:
LINQTO TEXAS, LLC, et al.,
Debtors.
CHAPTER 11
CASE Nos. 25-90186 THROUGH 25-90189 (Jointly Administered)

Hon. Alfredo R. Perez, United States Bankruptcy Judge

---

**SUBMISSION IN SUPPORT OF THE EMERGENCY MOTION FOR APPOINTMENT OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

---

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS:

The interested party, Mr. H. Gavin Solomon ("**Interested Party**"), acting pro se, respectfully supports the Emergency Motion for the appointment of an Official Committee of Equity Security Holders ("**OCEH**") as filed in these proceedings by an Ad Hoc Group of Equity Holders (Docket No. 574) ("**Motion**").

## SECTION A – SUPPORT FOR THE MOTION

1. The Interested Party respectfully supports the Motion.

2. This Submission is made in good faith and based solely on the Interested Party's personal knowledge, publicly available information, and a review of relevant records. Nothing herein is intended as a final adjudication of liability or wrongdoing by any person or entity.

3. The Interested Party further requests consideration for appointment as a member of such OCEH, should one be formed.

---

## SECTION B - BACKGROUND

4. The term "Shareholders" in this filing means all holders of common stock of Linqto, Inc. and all holders of preferred stock of Linqto, Inc. ("**Shareholders**").

5. The Interested Party's interest in the Debtors include:

   a. As of March 13, 2025 (based on the most recent Capitalization Table available to the Interested Party) his personal entities held/owned combined ~9.58% of Linqto's common stock of Linqto, Inc.

   b. As an example, currently one of the Interested Party's personal entities, Conrad Corporation Pty Ltd ATF Conrad Discretionary Trust of 37 Kells Creek Road Woodlands 2575 Australia, is the legal and beneficial holder/owner of 2,120,247 common stock

shares in Linqto, Inc., which the Interested Party understands may represent ~5.05% of total common stock shares in Linqto, Inc.

c.   The Interested Party and his associated entities have held equity interest in Linqto, Inc. continuously since 31st January 2019.

6.   The Interested Party has filed prior submissions in these cases including a Notice of Preservation of Rights and Conditional Objection to Classification of Unitholders as Creditors (Docket Nos. 358, 388 and 448 – all being identical documents but due to delays in physical delivery by courier services between Australia (where the Interested Party resides) and Houston Texas for abundant caution the Interested Party considered it prudent to lodge 3 separate yet identical documents) (**"Reservation Notice"**) and Motion to File Electronically (CM/ECF Access) (docket 426),

7.   On 9th September 2025 (AEST) the Interested Party emailed to the Office of the United States Trustee (**"US Trustee"**) regarding his "Submission in Support of the Official Formation of Official Committee of Equity Security Holders" (**"Interested Party Submission"**) and, if formed, that the Interested Party be considered to be appointed a member of the **Official Committee of Equity Security Holders ("OCEH")**. The Interested Party's Submission contained most, if not all of the below facts and circumstances.

8.   On 10th September 2025 (AEST) the US Trustee advised the Interested Party by email that "*The US Trustee has determined to not appoint an equity committee in this case*".

9.   The Interested Party supports the Motion to ensure equity holders are adequately represented and protected in these proceedings.

## SECTION C - GROUNDS FOR SUPPORT

### I. INTRODUCTION

10.  The Interested Party respectfully submits that, given the operation of the absolute priority rule, there is a substantial likelihood that the Shareholders are entitled to a meaningful distribution from the Debtors' estates. Absent the appointment of an OCEH, Shareholders' interests cannot be adequately represented or protected.

11.  The Interested Party submits that an OCEH should be formed as Shareholders' equity and rights are significant and are not currently adequately represented for the reasons set out in the Motion.

### II. FAILURE TO HOLD ANNUAL SHAREHOLDER MEETINGS AND ELECTION OF DIRECTORS

12.  The directors of the parent company, Linqto, Inc. (**"Directors"**) are currently:

a.   Adam T. Henderson – appointed 2019 (Chairman).

b.   William (Bill) Sarris – appointed 2010 (CEO from 2010 to January 2025).
   • Mr. Sarris has been publicly identified in regulatory matters reported by third parties, including Maxwell v. Sarris, 1:25-cv-05643 (S.D.N.Y.). The Interested Party

does not assert or adopt any position regarding such proceedings but notes their public existence as context potentially relevant to these cases.

  c. Norman Reed – appointed 2023 (Head of Risk since 2023 and involved in Debtors' compliance matters relating to issues now under regulatory review).

  d. Francis Daniel (**Dan**) Siciliano II – appointed to represent Common Shareholders without Shareholder approval in January 2025 (CEO).
    • Mr Siciliano is a Fellow of Harvard Law School and Co-Founder/Fellow of the Rock Centre of Corporate Governance which expertise may become relevant as outlined below and is a Director Nikkl, Inc.

  e. Alison Kutler – appointed to represent Preferred Shareholders in January 2025 (with preferred shareholder approval) and after resigning in March 2025 was then on the same day appointed to represent Common Shareholders without Shareholder approval.
    • Ms. Kutler is a Nikkl Inc. noteholder.

  f. Jeremy Rosenthal - appointed to represent Common Shareholders without Shareholder approval in May 2025.

13. On 21st May 2025 the Interested Party made a Formal Demand to the Directors for the convening of an Annual Shareholder Meeting (Docket 88 and for ease of reference is Exhibit A hereto) ("**Shareholder Requisition**").

14. As set out in the Shareholder Requisition:

  a. A Delaware company such as Linqto, Inc. is required to convene an annual meeting of shareholders in accordance with Section 211 of the Delaware General Corporation Law ("**DGCL**") i.e. every 12 months. The DGCL requires at every such meeting of Shareholders an election of Directors must be held.

  b. No annual meeting of Shareholders of Linqto, Inc. has been convened/held since at least 31st January 2020 in violation of DGCL § 211 and despite numerous requests from Common Shareholders including the Interested Party, as under the Linqto, Inc constitutive documents, the Common Shareholders are entitled to appoint up to six (6) directors and have not been given the opportunity to do so since 2020.

15. On 21 October 2023, the then Directors of Linqto, Inc., through documentation and attachments distributed by Goodwin Procter LLP, then counsel to the Debtors, circulated to all Shareholders certain materials ("**Rectification Documentation**"). The stated purpose of the Rectification Documentation was to "*approve and ratify (past) corporate actions taken by the Company to reaffirm the Company's (then) current capitalization table, board composition, and governing documents.*" In the Interested Party's reasonable view, such process appeared inconsistent with the requirements of § 204 of the Delaware General Corporation Law ("**DGCL**"). The Interested Party respectfully submits that no valid Shareholder resolutions were passed in relation to the Rectification Documentation for reasons including, without limitation:

  a. The Rectification Documentation provided only 13 days' notice to Shareholders, whereas § 204(d)(1) of the DGCL stipulates 20 days' notice.

b. Circulation of the Rectification Documentation did not constitute the convening of a Shareholders' "*meeting*" as contemplated by the DGCL.

c. The Rectification Documentation provided solely for an "*Approval/Yes*" vote on a single omnibus resolution without offering "*No/Against*" or "*Abstain*" options and without presenting multiple separate resolutions for consideration.

d. The Rectification Documentation did not exclude the votes of Directors and their related entities, even though such resolutions sought ratification of "*Defective Corporate Acts*" as defined in the DGCL.

e. The Rectification Documentation appears to have permitted holders of "*putative stock*" to vote, contrary to the DGCL.

f. Linqto Liquidshares LLC ("**Liquidshares**") was, and remains, a wholly owned subsidiary of Linqto, Inc. As the then Board of Liquidshares comprised the same individuals serving as Directors of Linqto, Inc. all shares/stock held by Liquidshares - approximately 12% of Linqto's then-outstanding Common Stock and Preferred Stock - may properly have been classified as "*putative stock*" for purposes of the Rectification Documentation. The Interested Party believes that such votes should not have been counted toward approval of any resolution.

g. The Interested Party believes that shares held by then Directors, their related entities and Liquidshares were in fact voted in favor of, and included in the tabulation of, the Rectification Documentation resolutions.

h. Contrary to § 204(b)(2) of the DGCL, the Rectification Documentation did not specify the exact "*date of each defective corporate act,*" instead providing vague generalities and failing to clearly identify the acts in question.

i. All of the above issues were presented to management and Board of Linqto, Inc. via zoom conference and in writing by the Interested Party in November 2023 without any response to date.

16. For the foregoing reasons, the Interested Party respectfully contends that the Certificate of Incorporation filed by the Debtors in these proceedings may be subject to challenge as it was predicated upon the Rectification Documentation

17. During 2025, the Directors announced to Shareholders three (3) set dates for an Annual Meeting of Shareholders including election of Directors (namely, 28th April 2025, , 24th June 2025 and 30th June 2025) but failed to convene any of them. This failure warrants scrutiny.

18. The Directors did not act on the Shareholder Requisition and failed to hold an election of Directors on 24th June 2025. This failure warrants scrutiny.

19. Notably, within hours of a reported Shareholder proxy effort to effect a Board spill, the Directors filed for Chapter 11 protection on 7th July 2025. Whilst the timing may be coincidental, the timing raises questions which may warrant examination regarding the effect on Shareholder rights.

20. By email by the Directors to all Shareholders dated 28th March 2025 they advised that on 25th March 2025 *"the Board of Directors of Linqto, Inc. changed the (original company) bylaws of the Company, specifically, amendments were made to Sections 2.11 and 2.12, and Sections 2.14 and 2.15 were added"* (**"Second Bylaws"**).

21. By email by the Directors to all Shareholders dated 31st May 2025 they advised that *"the Board of Directors of Linqto, Inc. recently changed the bylaws of the Company as of May 21, 2025. Specifically, amendments were made in Sections 2.16, 3.2, 3.7, and 3.8 to provide for more orderly stockholder and board actions/meetings"* (**"Third Bylaws"**).

22. The Interested Party respectfully observes that, in his view, the effect of the Second Bylaws and the Third Bylaws may have been to alter procedures in ways that detrimentally impacts the timing or mechanics of director removal and election. This observation is made without alleging improper intent.

23. The Directors have never given Shareholders the opportunity to approve, vary or revoke either or both the Second Bylaws and the Third Bylaws. This failure warrants scrutiny.

24. If the Court does not form an OCEH, Shareholders will be deprived of the opportunity to have input into the Restructuring Plan and, if the Motion is correct, the current proposed Restructuring Plan will eliminate all Shareholder value and equity without recourse.

25. The above facts demonstrate that Shareholders have been deprived of their statutory right to elect directors and that, absent the formation of an OCEH, Shareholders will have no meaningful opportunity to participate in the Restructuring Plan.

26. On 19th September 2025 the Directors as advised by their counsel expressly disclaim any duty to consider the interest of Shareholders (see **Exhibit B** hereto) when the Debtor's counsel advised the Interested Party which statements were disputed as set out in Exhibit B:

> *"As you may know, I am one of Linqto's bankruptcy counsel. I reviewed your email below and am writing to correct a misperception regarding the duties of officers and directors. **Specifically, in Chapter 11, the duties of officers and directors are to the creditors of the debtor, not to shareholders.** Under the Bankruptcy Code, Linqto is presumed to be insolvent, the result of which puts the shareholders out of the money. Unless and until such time as it is proven Linqto is solvent, neither the officers nor the directors owe any duties to shareholders."*

27. This misconception by the Directors regarding their duties to Shareholders alone warrants the formation of an OCEH.

## III. DIRECTOR ENTRECHMENT

28. On the Interested Party's information and belief that:

   a. One of the effects of the Chapter 11 filing may have been to prevent a Shareholder-led election of Directors and thereby entrench the current Board.

   b. This conduct may raise questions appropriate for review regarding Directors' compliance with fiduciary obligations particularly given that Shareholders have not had an opportunity to elect directors for at least 5 years. The Interested Party does not assert

that any breach occurred but respectfully submits that these matters could warrant oversight and examination.

29. The Chapter 11 stay may prevent Shareholders from exercising their statutory right to elect directors.

30. On 18th June 2025 Mr. Siciliano advised at a "town hall" online meeting attended by a large number of Shareholders and SPV equity holders who had invested ~$460M in pre-IPO companies such as Ripple, Circle etc. (which SPV equity holders the Interested Party has described and named as Unitholders in the Reservation Notice) (**Unitholders**) Mr. Siciliano stated his intention to remain CEO and Director of the Debtors post implementation of the Restructuring Plan.

31. In mid-2024 the then Directors obtained an independent, third party written valuation (Carta) of Linqto, Inc. of ~$400M ($4.63 per share). Between April and September 2024, during the SPAC transaction, Linqto, Inc. was valued at $700M (~$9.00 per share) (refer https://www.sec.gov/ix?doc=/Archives/edgar/data/0001873441/000121390024031672/ea0 203593-8k425_block1.htm). Yet, within less than 12 months the Directors now propose a Restructuring Plan that eliminates up to $700M of reported Shareholder value without recourse absent Court oversight.

32. Both these valuations excluded the value of all investments by Unitholders.

33. Shareholder reliance and expectations were established based on both these matters in the value range of $400M to $700M yet the current draft Restructuring Plan (unseen) being negotiated between the Debtors and the UCC appears to result in zero Shareholder equity and value post approval of the Restructuring Plan. These valuations were prepared by third parties and the Interested Party makes no representation as to their accuracy or completeness but notes them as relevant to Shareholder expectations.

34. Shareholders were advised by Directors less than 12 months ago the Debtors business was worth up to $700M so if Shareholders do not receive any equity participation under the Restructuring Plan (including the go-forward business model of the Debtors) then the value of the Debtors' business/assets (including IP, technology, databases, licences, know-how etc.) could potentially inure to Unitholders and/or other parties to the exclusion of Shareholders.

35. On information and belief the Interested Party is unsure if the incorporation of Linqto Texas, LLC was authorized by the Board of Directors of Linqto, Inc. and that, as such, the Interested Party is uncertain whether all actions related to the incorporation of Linqto Texas, LLC were duly authorized. The Interested Party does not allege wrongdoing, but respectfully submits that clarification of this issue warrants investigation by an OCEH as it may have consequences for the entire Chapter 11 Case.

36. Even after two months under Chapter 11, the Directors have not advised Shareholders of their potential Restructuring Plan nor its impact on Shareholder equity.

37. If no OCEH is formed:

    a. Shareholders will have no input into the Restructuring Plan despite potentially losing all value and equity.

b. The current Directors' positions will be entrenched despite material issues whether they have properly been appointed to represent the Shareholders. This is contrary to the principle that directors are elected by Shareholders and all with the imprimatur of the Court.

38. All of the above raises potential governance and fiduciary compliance questions that could impact Shareholders thus demonstrating the urgent need for oversight by an OCEH.

## IV. LITIGATION FUND CONFLICTS

39. The Interested Party understands that the UCC may be the operator/administrator of the proposed Litigation Fund to be established as part of the Restructuring Plan to protect all Equity Holders yet Shareholders do not get to participate as ongoing equity holders.

40. As set out in the Reservation Notice, on information and belief possible significant recovery opportunities may exist, subject to further review by an OCEH and the Court, including but not limited to former executives, current and former board members, lawyers, auditors, broker-dealers (who acted as corporate advisors), outside advisors and any reference is not an assertion of liability but recognition that such matters may be relevant for investigation (the Interested Party does not assert liability or wrongdoing but notes the public existence of these matters as potentially relevant context):

    a. Current Directors for matters such as possible inaccuracies or inconsistencies to the Court, potential questions of fiduciary compliance and/or breach of loyalty to Shareholders, shareholder harm and the like.

    b. Individuals who may be the subject to regulatory scrutiny or enforcement actions by the SEC, FINRA and DOJ including potentially some current and former Board and former Management members.

    c. Past Board members for matters such as those forming part of the regulatory investigations, potential questions of fiduciary compliance and/or breach of loyalty to Shareholders and the like.

    d. Clawback – it is possible that certain cash bonus payments to Board Members, Management and employees since 2020 may warrant review to determine whether they were calculated appropriately and in line with accurate financial information. For instance, based on company communications and records available to the Interested Party, Mr. Sarris (a current Director) was reported to have received bonuses exceeding US$3.6M in 2024. The Interested Party does not allege wrongdoing but submits that these matters may merit further examination by an OCEH.

    e. Lawyers – potential claims may warrant review, including but not limited to outside professionals who acted for the Debtors since 2020 and, in particular, in relation to:

        i. The establishment, operation and regulatory compliance of the SPVs; and

        ii. Around the SPAC transaction.

    f. Auditors – potential claims may warrant review including but not limited to in May 2024 signing off unqualified opinion of the Debtors' CY2022 and CY2023 financial

reports which were relied upon in the SPAC transaction and which may raise due diligence questions.

g.  Broker-dealers acting as corporate advisors for the Debtors in relation to the SPAC transaction – potential claims may warrant review including but not limited to due diligence and advice due in part to possible conflict of interest as they may also have been the promoters of the SPAC e.g. the Debtors paid $5M to the SPAC in October 2024 upon termination of the SPAC transaction.

h.  Such recoveries could materially benefit trade creditors and all equity holders alike.

41. Unitholders interests in pursuing any/all recovery actions against numerous parties including the above may be completely different to Shareholders interests who have seen up to $700M of value destroyed in the past 12 months.

42. It is respectfully submitted that any Litigation Fund established as part of the Restructuring Plan must be independently administered and not overseen by either the UCC or the current Board both of which may have potential conflicts of interest especially Directors who may be potential litigation targets.

43. Further, should the Litigation Fund be structured or operated in a manner that disproportionately benefits certain classes (e.g. Trade Creditors or professionals who may also face litigation exposure), this could risk undermining recoveries rightly due to Shareholders.

44. Without an OCEH the Litigation Fund may be structured to unduly favour trade creditors – including potential litigation targets such as lawyers and auditors – who could be paid in full despite possible Debtor claims of up to or exceeding $700M that rightfully belong to Shareholders especially if the UCC does not wish to litigate against them under the Restructuring Plan. Recoveries that should flow to Shareholders now risk being lost entirely.

45. It appears possible that Management and Board members could benefit from litigation recoveries, though the extent of such benefit has not been fully disclosed to Shareholders. The Interested Party respectfully submits that transparency on this issue would be in the best interests of all stakeholders.

46. Conflict of interest— on information and belief the UCC has incentives different from Shareholders especially where potential targets of litigation are creditors themselves. That alone should be a convincing argument for formation of an OCEH.

47. It is submitted that the most logical and appropriate administrator of the Litigation Fund is the OCEH.

## V. MISCLASSIFICATION OF UNITHOLDERS

48. In the filing by the Debtors dated July 7th, 2025 the Directors stated in section 14 that the Debtors had estimated Creditors of *"10,001-25,000"* and in section 16 it had liabilities of *"$500,000,001-$1 billion"* – as such the Debtors' filing appears to imply that all Unitholders are being treated as Creditors and thus the Directors' filings could be interpreted as creating a potential misimpression before the Court which warrants clarification.

49. It is respectfully submitted that the classification of Unitholders as Creditors under the Bankruptcy Code is both inconsistent with applicable law and unsupported by the nature of their investments.

50. On information and belief, most if not all Unitholders made equity-style investments in SPVs or pooled vehicles formed (or to be formed) by the Debtors for access to pre-IPO shares. These bear the characteristics of equity interests rather than debt obligations.

51. As set out in the Reservation Notice, investments by all Unitholders bear equity risk and cannot both claim parity with Trade Creditors and preserve upside.

52. The current classification of Unitholders as Creditors is inconsistent with their own filings, which consistently describe themselves as investors.

53. Unitholders do not qualify for appointment to the UCC under 11 U.S.C. § 1102(b)(1).

54. 11 U.S.C. § 1102(b)(1) clearly excludes equity holders from UCC eligibility.

55. Unitholders would want to be classified as Security Holders so that as part of the Restructuring Plan they could be made whole for their original investment including all upside of the underlying assets yet if they remain classified as creditors then all they would be entitled to is being made whole of the original investment with zero upside.

56. The Interested Party supports Unitholders being classified as Equity Holders.

57. As set out in the Reservation Notice:

   a. Under 11 U.S.C. § 101(10) a "*creditor*" must have a right to payment, whether fixed, contingent, matured, or otherwise.

   b. Unitholders should NOT be treated or classified as "*creditors*" of the Debtors. Instead, they are Equity Holders or Security Holders in the special purpose vehicles that the Debtors purportedly formed for investments in private company stocks.

   c. Unitholders do not hold bona fide claims against Linqto that would entitle them to Creditor status under the Bankruptcy Code.

   d. Unitholders are not eligible for appointment to the UCC.

   e. Even if any Unitholder asserts claims as Creditors, they must be subordinated under 11 U.S.C. § 510(b) because such claims arise from:

      i. The purchase or sale of securities issued by Linqto; or

      ii. Alleged damages arising from such equity investments.

   f. 11 U.S.C. § 510(b) mandates that claims arising from the purchase of a security be subordinated to all general unsecured claims and to prevent investors from converting failed equity risk into parity with trade and operational creditors.

g.  The Interested Party believes that U.S. Courts have consistently interpreted 11 U.S.C. § 510(b) to prevent investors from gaining parity with true trade creditors when they assumed equity risk.

58. On information and belief most, if not all, of the Members of the UCC are not Creditors and, as such, it is appropriate that the Court to interrogate each of them so they understand that if they continue to classify themselves as Creditors then they are only entitled to be made whole of their investment and thus lose all upside from the underlying investments.

59. If a member of the UCC concedes that they are not a Creditor then they may wish to reconsider their position on the UCC to avoid the risk of misclassification.

60. Unitholders should not be permitted to "*double dip*" i.e. Unitholders should not be permitted to simultaneously claim Creditor and Equity status.

61. Any UCC decision taken with Members improperly classified as Creditors may create a scenario whereby such decisions could be subject to challenge.

62. Under the Bankruptcy Code, specifically 11 U.S.C. § 101(17), an "*equity security holder means a holder of an equity security of the debtor*" and an "*equity security*" is defined in 11 U.S.C. § 101(16) to include any interest in a debtor that is similar to a share in a corporation.

63. Also, it should be noted that:

a.  Virtually every filing by Unitholders in the Chapter 11 Case all state that they each "*invested*" with the Debtors and none have said they are Trade Creditors.

b.  John Deaton, an experienced Chapter 11 counsel, has created what he describes as an unofficial "*Deaton Represented Creditors*" list but in reality all thousands of them are in fact Unitholders (e.g. Docket 446).

64. Interestingly, the Debtors and their Counsel in original Court filings generally used the term "*creditor*" to describe Unitholders but in recent weeks have moved to only using the term "*customers*" to describe Unitholders.

65. In Chapter 11 of the Bankruptcy Code the term "*customer*" is not a generally defined term:

a.  Chapter 11 provisions use terms like "*debtor*," "*creditor*," "*equity security holder*," "*claim*" and "*interest*" but "*customer*" is not among the defined terms.

b.  When "*customer*" appears in ordinary Chapter 11 filings or proceedings, it is usually used in its plain, everyday sense referring to parties that buy goods or services from the debtor i.e. trade creditors.

c.  The Bankruptcy Code does define "*customer*" in a narrow context - specifically under Chapter 7 subchapter (11 U.S.C. § 741(2)).

d.  In a Chapter 11 corporate reorganization, customers are not a legally distinct class like Creditors or Equity Holders. They may be affected (e.g. if they have prepaid for services or hold warranty claims) but they are treated under the broader definitions of creditors or claimants, not as a statutory class of "*customers*."

66. Even if one were to agree Unitholders are Customers (which the Interested Party does not agree) then that still reinforces that they are not Creditors and, as such, no Unitholder can be a Member of the UCC.

67. As of July 7, 2025 (**Petition Date**) on information and belief:

   a.  No amounts were owed by the Debtors to Unitholders.

   b.  No distributions to Unitholders of shares, cash, or property were outstanding (other than the $18.8M Ripple disputed cash).

   c.  No redemption rights for Unitholders existed or had matured.

   d.  No contractual obligation required the Debtors to return investments to Unitholders.

   e.  No basis for Unitholder claims under 11 U.S.C. § 101(10) existed.

   f.  There were no fixed, enforceable or matured obligations on the Debtors to pay monies to Unitholders which is the core requirement to be classified as a "*creditor*" under 11 U.S.C. § 101(10).

   g.  There was no entitlement for any Unitholders to seek return of investment, rescission or compensation due to inability of the Debtors to liquidate securities.

   h.  The Debtors had completed approximately 8 to 10 prior liquidity events involving IPOs or other realizations of underlying securities held by the SPVs with distributions in specie by Linqto to the respective Unitholders.

68. The interests of Unitholders and Shareholder are not the same and this warrants the formation of an OCEH.

69. Without correction, misclassification of Unitholders threatens the integrity of these proceedings.

**VI. REGULATORY CONSIDERATIONS**

70. It is reasonable to expect that the U.S. regulatory authorities, including the SEC and DOJ, would prefer to view Unitholders as Equity Holders rather than Creditors which would support broader investor protections and enforcement scope.

71. Such a viewpoint supports the formation of the OCEH to safeguard investor protections.

**VII. CHALLENGE TO CHAPTER 11 ELIGIBILITY**

72. According to the Debtors' Court filings (e.g. as set out in the Motion):

   a.  The Debtors commenced these Chapter 11 cases after purportedly discovering "*extensive regulatory compliance violations along with a culture of systemic and pervasive non-compliance*" and have alleged that "*prior management had knowingly failed to cure extensive and serious securities law violations that began as early as 2020.*"

12

b.  The Debtors maintain they are seeking to restructure through Chapter 11 to "*be better positioned to address its historical regulatory compliance issues and related liabilities, protect Customers' interests, and potentially resume operations through a compliant structure.*"

73. On its face, this Chapter 11 filing does not present the typical triggers such as widespread unpaid Trade Creditors or imminent enforcement actions. Chapter 11 commonly provides a stay to pause litigation and collection activity whilst the Debtor negotiates with Trade Creditors.

74. Here the stated focus is regulatory remediation and the resolution of potential claims by Equity Holders (Unitholders) with no mention of insolvency by the Directors or the Debtors.

75. As set out in the Reservation Notice, as at the Petition Date:

a.  Based on Debtors' disclosures, the Debtors had cash at bank and liquid assets of circa $20M (excluding the $18.8M Ripple disputed cash) with minimal Trade Creditors if one excluded Unitholders as Trade Creditors.

b.  The Debtors' disclosures do not identify material outstanding loan facilities or lender enforcement seeking immediate repayment.

c.  The Debtors appeared able to pay its debts as and when they fell due if Unitholders were correctly classified as Equity Holders rather than as Trade Creditors.

d.  Trade Creditors total in the low millions.

e.  A number of Debtors' trade creditors listed in the Chapter 11 are parties involved/acting for the Debtors in relation to the ill-fated US$700M SPAC merger transaction including but not limited to its lawyers, accountants, auditors and the like and all of these debts may have been subject to dispute or challenge by the Debtors noting the Debtors had expended in CY2024 some US$9.6M out of pocket expenses in relation to the SPAC Transaction.

f.  The Debtors may have significant potential recovery opportunities against former executives, former and current board members, lawyers, auditors, broker-dealers acting as advisors to the Debtors and other professionals as set out above.

76. This Chapter 11 Case is highly unusual as it does not involve unpaid Trade Creditors, Creditor enforcement actions or imminent insolvency. Chapter 11 is usually used to stop lawsuits, foreclosures, repossessions, collection actions and to give breathing room to negotiate with trade creditors – none of which are applicable to the Debtors.

77. These circumstances may raise questions as to whether the Debtors were in fact insolvent or in genuine financial distress at the Petition Date. The Interested Party does not assert a conclusion but respectfully submits that this issue may benefit from Court review.

78. Also, the timing and context of the filing of the Chapter 11 Case raises concerns that warrant further examination, particularly regarding the impact of Shareholder rights.

13

79. As trade creditors could easily have been paid out of the Debtors' estate prior to the Petition Date (and still can today) then the Debtors have $1B+ of assets and Shareholders should be entitled to participate in some manner in such assets rather than solely Unitholders hence the need for an OCEH to be formed.

80. These facts raise questions as to whether the Chapter 11 filings were driven primarily by insolvency considerations or whether shareholder rights were indirectly affected. Appointment of an OCEH is necessary to provide oversight in this unusual context.

81. The Interested Party respectfully submits that equity holders' interests could be prejudiced if these cases proceed without the appointment of an OCEH empowered to evaluate and examine these issues.

## VIII. FINANCIAL REPORTING & AUDIT CONCERNS

82. The Interested Party understands that financial statements have, at times, been delayed or inconsistent, potentially constrained Shareholders' ability to fully evaluate the Debtors' position.

83. Auditor turnover and qualifications raise doubts about independence and adequacy of audits. Changes in auditors and questions regarding qualifications may warrant further examination regarding independence and adequacy of audits.

84. The Interested Party respectfully submits that Directors have not provided sufficient explanation regarding certain restatements and variances, which may warrant further clarification.

## SECTION D – SUMMARY OF THIS SUBMISSION

85. This Submission demonstrates that it is imperative that an OCEH be formed to ensure that Shareholders are adequately represented in the Chapter 11 Case and have a meaningful role in the development of any Restructuring Plan.

86. Absent the formation of an OCEH, Shareholders' interest will remain unrepresented and unprotected, contrary to the principles of the Bankruptcy Code.

87. For the foregoing reasons, the formation of an OCEH is not only appropriate but essential to safeguard Shareholder rights, promote compliance with applicable duties and help preserve value that might otherwise be diminished or excluded from Shareholder participation.

88. The Interested Party requests consideration for appointment as a member of such OCEH, should one be formed.

## SECTION E - DISCLAIMER

89. The Interested Party respectfully presents that this Submission is based solely on publicly available information, personal knowledge, and a good faith review of relevant materials. The Interested Party prepared this Submission without the benefit of legal counsel in either the United States or Australia and is proceeding pro se. Nothing contained herein constitutes, or

should be relied upon as, legal advice. No representation is made as to the completeness or accuracy of third-party information. The Interested Party does not seek to assert legal claims or allegations against any person or entity through this Submission and expressly disclaims any such intent.

## SECTION F - RESERVATION OF RIGHTS

90. The Interested Party reserves all rights to amend, supplement, or withdraw this Submission as additional facts become available. Nothing herein should be construed to allege, assert, or establish liability, wrongdoing, or misconduct by any individual or entity. Nothing herein is intended, nor should it be construed, as an accusation of misconduct, fraud, or illegality. All references to individuals, entities, or events are made solely for context and subject to the accuracy of public information available.

**Respectfully submitted.**

**Dated**: September 27th, 2025 (Australian Eastern Standard Time)

**Herbert Gavin Solomon**
37 Kells Creek Road
Woodlands NSW 2575, Australia
Email: gs@larpagroup.com
Phone: +61 412 978 777

15

# EXHIBIT A

1

**H. GAVIN SOLOMON**
37 Kells Creek Road Woodlands, New South Wales, Australia 2575
E: gs@lamagroup.com  Cell: +61 412 978777

DATED:  21st MAY 2025 (Sydney time)

TO:     THE CORPORATE SECRETARY
        AND THE DIRECTORS
        LINQTO, INC.
        By express mail:        101 Metro Drive, Suite 335
                                San Jose, CA 95110

        And:
        By express mail:        P.O. Box 2859
                                Sunnyvale, CA 94087-0859

        And:
        By Email:               Dan Siciliano – dan@linqto.com
                                Adam Henderson - adam@linqto.com
                                Bill Sarris – ws@williamsarris.com
                                Alison Kutler – alisonkutler@me.com
                                Norman Reed – normanreed@gmail.com
                                Karim Nurani - karimnurani@yahoo.com
                                Victor Jiang - victor@sapienventures.vc
                                Michael Huskins - michael@linqto.com

FORMAL DEMAND TO HOLD ANNUAL MEETING OF SHAREHOLDERS PURSUANT TO DGCL § 211

Dear Corporate Secretary and Directors,

I am a shareholder of Linqto, Inc. (Linqto or Company) and am writing to formally request that the Company convene an annual meeting of shareholders in accordance with Section 211 of the Delaware General Corporation Law (DGCL). The DGCL requires such annual meeting of shareholders for the election of Directors and other corporate governance matters.

In my view, no annual meeting of Linqto shareholders in compliance with the provisions of DGCL § 211 has been convened/held since at least 31st January 2020. Accordingly, it has now been more than thirteen (13) months since the last annual meeting of Linqto shareholders.

On 10th December 2024 (AEST/Sydney time) Mr Victor Jiang (Linqto Director) advised shareholders by email that an annual meeting of shareholders would be convened "..... *likely to be sometime in the second half of January 2025*" (January Meeting). No particulars for this meeting including, without limitation, venue details, virtual meeting dial-in details, agenda, proxy or other shareholder information was ever distributed by the Company to shareholders in relation to this proposed January Meeting. This January Meeting did not take place.

On 11th March 2025 (Pacific Time) Mr Dan Siciliano (CEO/Director of Linqto) verbally advised shareholders during an online "*town hall*" shareholder meeting that an annual meeting of shareholders would be convened on 28th April 2025 (Pacific Time) (April Meeting). No particulars for this meeting including, without limitation, venue details, virtual meeting dial-in details, agenda, proxy or other shareholder information was ever distributed by the Company to shareholders in relation to this proposed April Meeting. This April Meeting did not take place.

2

On 26th April 2025 (Pacific Time) Linqto advised shareholders by email that *"Linqto's annual stockholder meeting is being rescheduled to a future date in compliance with a resolution passed by the General Committee of the board of directors, not earlier than June 2, 2025 and not later than June 30, 2025. We will announce the specific date, time and place by May 10, 2025"*.

On 9th May 2025 (Pacific Time) Linqto advised all shareholders by email that *"Linqto's annual stockholder meeting is rescheduled for Tuesday, June 24, 2025 at 3:00 pm Pacific Time"* (June Meeting). No particulars for this meeting including, without limitation, venue details, virtual meeting dial-in details,  agenda, proxy or other shareholder information has yet been distributed by the Company to shareholders in relation to this proposed June Meeting. I have concerns that this proposed June Meeting may not take place.

Therefore, I hereby demand pursuant to DGCL § 211 that Linqto schedule and hold an annual meeting of shareholders within a reasonable time from receipt of this letter being not later than 3 pm Tuesday 24th June 2025 (Pacific Time). If Linqto fails to act accordingly, I reserve my right to petition, without further notice, the Delaware Court of Chancery to compel Linqto to comply with its legal obligations together with an application for costs.

Please confirm receipt of this letter and advise of the Company's intent within ten (10) days.

Yours Sincerely,

*Gavin Solomon*

Herbert Gavin Solomon
Shareholder, Linqto, Inc.
Linqto Share Certificate Number: CS-127

**EXHIBIT B**

**From:** Gavin Solomon
**Sent:** Monday, 22 September 2025 5:20 PM
**To:** 'Samuel A. Schwartz' <saschwartz@nvfirm.com>
**Cc:** Jeremy Rosenthal <jrosenthal@force10partners.com>; Adam Henderson <adam@linqto.com>; normanreed@gmail.com; Alison Kutler <alisonkutler@me.com>; Jeffrey S. Stein <jstein@breakpointpartnersllc.com>; Dan Siciliano <dan@linqto.com>; ws@williamsarris.com
**Subject:** RE: [EXTERNAL] Fw: A letter from Dan to the Linqto Community

Samuel, I refer to your email below and make the following comments regarding its wording:

1.  You state: "*I reviewed your email below and am writing to correct a misperception regarding the duties of officers and directors. Specifically, in Chapter 11, the duties of officers and directors are to the creditors of the debtor, not to shareholders.*"

    a.  I respectfully disagree with that characterization - it is inaccurate as a general proposition.

    b.  I am generally familiar with the fiduciary duties of care and loyalty owed by Directors under applicable US corporate law and how those duties operate in bankruptcy depending on solvency, governing law and the Bankruptcy Code.

    c.  Upon the commencement of a Chapter 11 case, the character of Directors' responsibilities may shift toward preserving and maximising estate value for **all Stakeholders** being Trade Creditors and Equity Holders (in Linqto's case Unitholders and Shareholders) - the precise duties depend on solvency, applicable state law and the Bankruptcy Code.

    d.  Fiduciary balancing: Directors must treat Trade Creditors fairly. Where solvency is demonstrated, Directors may continue to owe primary duties to Shareholders and where insolvency is demonstrated, Trade Creditor interests take priority.

    e.  I respectfully submit that there are facts suggesting Linqto's solvency as of the Petition Date (see below) and, when solvency is clear, Directors do not owe a primary fiduciary duty to Trade Creditors - just compliance with the Code and avoidance of bad faith.

    f.  Even if Linqto is insolvent (which I dispute) Directors still owe duties to the company as a whole which includes both Equity Holders and Trade Creditors - but practically speaking, Trade Creditors' interests dominate during insolvency.

    g.  If the company is solvent (assets > liabilities and it can ultimately pay Trade Creditors in full), Directors' fiduciary duties continue to run primarily to Shareholders, just as outside bankruptcy.

    h.  Litigation risk: in solvent cases such as Linqto, Directors may be subject to Shareholder litigation if they are seen as favoring Trade Creditors unnecessarily or undervaluing/removing Shareholder equity.

18

2. You state: *"Under the Bankruptcy Code, Linqto is presumed to be insolvent, the result of which puts the shareholders out of the money.  Unless and until such time as it is proven Linqto is solvent, neither the officers nor the directors owe any duties to shareholders."*

    a. I dispute the assertion that Linqto was insolvent as at the Petition Date.

    b. According to the Debtors' Chief Restructuring Officer in the Debtors' Court filings:

        ii. The Debtors commenced these Chapter 11 cases after purportedly discovering *"extensive regulatory compliance violations along with a culture of systemic and pervasive non-compliance"* and have alleged that *"prior management had knowingly failed to cure extensive and serious securities law violations that began as early as 2020."*

        iii. The Debtors maintain they are seeking to restructure through Chapter 11 to *"be better positioned to address its historical regulatory compliance issues and related liabilities, protect Customers' interests, and potentially resume operations through a compliant structure."*

    c. On its face, this Chapter 11 filing does not present the typical triggers such as widespread unpaid Trade Creditors or imminent enforcement actions. Chapter 11 commonly provides a stay to pause litigation and collection activity whilst the Debtor negotiates with Trade Creditors.

    d. Here the stated focus is regulatory remediation and the resolution of potential claims by Equity Holders (Unitholders) with no mention of insolvency by the Directors or the Chief Restructuring Officer.

    e. As at the Petition Date:

        i. Based on Debtors' disclosures, the Debtors had cash at bank and liquid assets of circa $20M (excluding the $18.8M Ripple disputed cash) with minimal Trade Creditors if one excluded Unitholders as Trade Creditors.

        ii. The Debtors' disclosures do not identify material outstanding loan facilities or lender enforcement seeking immediate repayment.

        iii. The Debtors appeared able to pay its debts as and when they fell due if Unitholders were correctly classified as Equity Holders rather than as Trade Creditors.

        iv. Trade Creditors total in the low millions.

        v. A number of Trade Creditors listed in the Chapter 11 are parties involved/acting for the Debtors in relation to the ill-fated US$700M SPAC merger transaction including but not limited to Deloitte, Lowenstein and Wilson Sonini. All of these debts may be subject to dispute or challenge by the Debtors noting that the Debtors had already expended in CY2024 some $9.6M out of pocket expenses in relation to the SPAC Transaction.

vi.   The Debtors may have significant potential recovery opportunities against former executives, former and current Board members, lawyers, auditors, broker-dealers acting as advisors to the Debtors and other professionals as set out in clause 31 of my Court filing Docket 358.

vii.  Directors have a duty to Shareholders to evaluate and, where appropriate, pursue recovery actions against numerous parties including the abovenamed Trade Creditors especially as Shareholders have seen up to $700M of value destroyed in the past 12 months.

viii. It is respectfully submitted that any Litigation Fund established as part of a Restructuring Plan:

   a.   Must be independently administered and not overseen by Trade Creditors, the UCC or the current Board - some of which may have potential conflicts of interest especially any who may be potential litigation targets.

   b.   Further, Directors should be aware that should the Litigation Fund be structured or operated in a manner that disproportionately benefits certain classes (e.g. Trade Creditors or professionals who may also face litigation exposure) this could risk undermining recoveries rightly due to Shareholders.

f.   These facts suggest that questions may exist as to whether the Debtors were in fact insolvent or in genuine financial distress at the Petition Date.

g.   The timing and context of the Chapter 11 filing raise concerns that merit further examination, particularly as to the impact on Shareholder rights.

h.   As Trade Creditors could easily have been paid out of the Debtors' estate prior to the Petition Date (and still can today) then the Debtors have $1B+ of assets plus an ongoing business model and Shareholders should be entitled to participate in some manner in these rather than solely Unitholders and Directors with zero for Shareholders as per the Directors' Term Sheet recently filed with the Court.

i.   These facts raise questions whether the Chapter 11 filings were principally a response to insolvency or whether they were used in a manner that may curtail Shareholder rights.

j.   **I respectfully submit that Shareholders may be prejudiced if Directors do not take steps, consistent with their fiduciary duties, to protect Shareholder interests.**

3.  *You state: "Importantly, I understand you have counsel, so please do consult your lawyers if you have further questions".*

   a.   That statement is inaccurate. I have not retained counsel in either the United States or Australia in connection with these Chapter 11 proceedings or my filings, as stated in my Court filing (Docket No. 358 at clause 36). Please correct your record.

I invite you and the Directors to correct your response as set out in your email and re-issue a more appropriate reply.

Regards

*Disclaimer and Reservation of Rights: I present the above based solely on publicly available information, personal knowledge and a good faith review of relevant materials. I do not seek to assert legal claims or allegations against any person or entity through this email and expressly disclaim any such intent. I reserve all rights to amend, supplement or withdraw some or all of the above as additional facts or documents become available. Nothing herein should be construed to allege, assert or establish liability, wrongdoing or misconduct by any individual or entity.*

**Gavin Solomon**
E:   gs@larpagroup.com
M: +61 (0) 412 978 777

---

IMPORTANT LEGAL NOTICE AND DISCLOSURES: Nothing contained in this email constitutes tax, legal, insurance or investment advice nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument. This email and any attachment(s) are intended only for the exclusive use of the addressee(s) and may contain information that is privileged and confidential. If you are not the intended recipient, any use, interference with, disclosure or copying of this material is unauthorised and strictly prohibited. If you have received this message in error, please notify the sender by return email immediately and delete the message from your computer without making any copies. Investing in securities in private companies is speculative and involves a high degree of risk. The recipient must be prepared to withstand a total loss of your investment. We strongly encourage the recipient to complete their own independent due diligence before investing in securities or financial instruments including obtaining additional information, opinions, financial projections and legal or other investment advice. All emails sent to or from this account's email systems may be retained, monitored and/or reviewed by us and other approved personnel. *Please consider the environment before printing this e-mail.*

**From:** Samuel A. Schwartz <saschwartz@nvfirm.com>
**Sent:** Friday, 19 September 2025 8:22 AM
**To:** Gavin Solomon <gs@larpagroup.com>
**Cc:** Jeremy Rosenthal <jrosenthal@force10partners.com>; Adam Henderson <adam@linqto.com>; normanreed@gmail.com; Alison Kutler <alisonkutler@me.com>; Jeffrey S. Stein <jstein@breakpointpartnersllc.com>; Dan Siciliano <dan@linqto.com>; ws@williamsarris.com
**Subject:** Re: [EXTERNAL] Fw: A letter from Dan to the Linqto Community

Gavin, good afternoon. As you may know, I am one of Linqto's bankruptcy counsel. I reviewed your email below and am writing to correct a misperception regarding the duties of officers and directors. Specifically, in Chapter 11, the duties of officers and directors are to the creditors of the debtor, not to shareholders. Under the Bankruptcy Code, Linqto is presumed to be insolvent, the result of which puts the shareholders out of the money. Unless and until such time as it is proven Linqto is solvent, neither the officers nor the directors owe any duties to shareholders. Importantly, I understand you have counsel, so please do consult your lawyers if you have further questions.

**Samuel A. Schwartz, Esq.**
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
702.802.2207 tel
SASchwartz@nvfirm.com

**\*\*CONFIDENTIALITY NOTICE\*\***
This email message is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged. It is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

**From:** Gavin Solomon <gs@larpagroup.com>
**Sent:** Wednesday, September 17, 2025 9:43 PM
**To:** Dan Siciliano <dan@linqto.com>; Adam Henderson <adam@linqto.com>; Bill Sarris - linqto () <ws@williamsarris.com>; Alisonkutler@me.com <Alisonkutler@me.com>; normanreed@gmail.com <normanreed@gmail.com>; jrosenthal@force10partners.com <jrosenthal@force10partners.com>
**Subject:** RE: A letter from Dan to the Linqto Community

Dear Linqto Directors,

I refer to my unanswered email below and the Chapter 11 case generally.

I also refer to Dan's and your Board's multiple emails, LinkedIn posts etc. concerning Unitholders but I, and many other shareholders who contact me, have yet to see or receive anything at all from any Linqto Director or the Board giving any form of shareholder update on the Chapter 11 case.

To me, each Director has an ongoing fiduciary duty to every single common and preferred stockholders to keep them apprised of your views of the Chapter 11 processes and, in particular, what you foresee as your desired outcome for Shareholders from your yet to be disclosed Restructuring Plan.

Your Term Sheet attached to Linqto's Court Motion (Docket 505) filed 16th September 2025 is totally silent as to its ramifications and involvement of Shareholders yet espouses multiple benefits and rewards for Unitholders.

So, I implore each of you on behalf of all Shareholders for an update please or even better any chance of a "*town hall*" shareholder meeting?.

Thanking you in anticipation. Regards

**Gavin Solomon**
**E:**   gs@larpagroup.com
**M:** +61 (0) 412 978 777

IMPORTANT LEGAL NOTICE AND DISCLOSURES: Nothing contained in this email constitutes tax, legal, insurance or investment advice nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument. This email and any attachment(s) are intended only for the exclusive use of the addressee(s) and may contain information that is privileged and confidential. If you are not the intended recipient, any use, interference with, disclosure or copying of this material is unauthorised and strictly prohibited. If you have received this message in error, please notify the sender by return email immediately and delete the message from your computer without making any copies. Investing in securities in private companies is speculative and involves a high degree of risk. The recipient must be prepared to withstand a total loss of your investment. We strongly encourage the recipient to complete their own independent due diligence before investing in securities or financial instruments including obtaining additional information, opinions, financial projections and legal or other investment advice. All emails sent to or from this account's email systems may be retained, monitored and/or reviewed by us and other approved personnel. *Please consider the environment before printing this e-mail.*

**From:** Gavin Solomon
**Sent:** Friday, 22 August 2025 9:49 AM
**To:** Dan Siciliano <dan@linqto.com>
**Cc:** Adam Henderson <adam@linqto.com>
**Subject:** FW: A letter from Dan to the Linqto Community

Dan, having received your email/letter I have already been contacted by 5 shareholders in the last 2 hours who to a person have strongly pointed out your silence about what is to happen to shareholders and that you and your Board are in breach of your fiduciary duties to protect shareholders and our rights.

Any chance of a concise email/letter addressed to shareholders?

**Gavin Solomon**
E:   gs@larpagroup.com
M: +61 (0) 412 978 777

IMPORTANT LEGAL NOTICE AND DISCLOSURES: Nothing contained in this email constitutes tax, legal, insurance or investment advice nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument. This email and any attachment(s) are intended only for the exclusive use of the addressee(s) and may contain information that is privileged and confidential. If you are not the intended recipient, any use, interference with, disclosure or copying of this material is unauthorised and strictly prohibited. If you have received this message in error, please notify the sender by return email immediately and delete the message from your computer without making any copies. Investing in securities in private companies is speculative and involves a high degree of risk. The recipient must be prepared to withstand a total loss of your investment. We strongly encourage the recipient to complete their own independent due diligence before investing in securities or financial instruments including obtaining additional information, opinions, financial projections and legal or other investment advice. All emails sent to or from this account's email systems may be retained, monitored and/or reviewed by us and other approved personnel. 🖳 *Please consider the environment before printing this e-mail.*

**From:** Linqto <noreply@service.linqto.com>
**Sent:** Friday, 22 August 2025 6:47 AM
**To:** Gavin Solomon <gs@larpagroup.com>
**Subject:** A letter from Dan to the Linqto Community

Dear Linqto Community,

This has been an awful year for Linqto customers, and no one is happy that we've arrived at this moment with a frozen platform and a bankruptcy filing. Time and court findings have started to show, and will continue to show even more clearly, that these steps were unavoidable. These steps were necessary to safeguard the assets in ways that should have been safeguarded for you, and to prevent further criminal activity and fraud. But none of that makes it any easier as we work through the process.

So first, in case this hasn't been said to you directly, I'm sorry this has happened — you deserved better.

The new executive team never expected to arrive at this moment. But we arrived to find a mess, and we will see it through by taking the necessary steps to exit bankruptcy. In cooperation with the Creditors Committee, we will help you get the value of your investments (lawyers call them claims).

We will continue to focus on this and hope we can all ignore those calling for violence or harassment. We instead want to let your voice be heard, work with the courts, and exit bankruptcy as quickly as possible and do everything possible to make you whole.

Read my <u>full letter</u> on the Linqto blog.

Best,

Dan

Dan Siciliano
CEO, Linqto

Copyright © 2025 LINQTO, INC. All rights reserved.

You're receiving this email because you're a user of Linqto and this message contains important information related to your account or experience on the Linqto platform.

**IMPORTANT LEGAL NOTICE AND DISCLOSURES:**
This email and any attachment(s) are intended only for the exclusive use of the addressee(s). If you have received this message in error, please notify the sender by return email immediately and delete the message from your computer. This information is proprietary property of Linqto, Inc and/or its affiliates (collectively, "Linqto") and any use, interference with, disclosure or copying of this material is unauthorized and strictly prohibited. This information is provided for informational purposes only and is subject to change without notice.

The information contained herein does not constitute any form of representation or undertaking, and nothing herein should in any way be deemed to alter the legal rights and obligations contained in the agreements between Linqto and its clients. Nothing herein is intended to constitute investment, legal, tax, accounting, insurance, or other professional advice. Linqto does not make any recommendations regarding the merit of any company, security or other financial product or investment strategy, or any recommendation regarding the purchase or sale of any company, security, financial product or investment, nor endorse or sponsor any company identified in this presentation. Investing in securities in private companies is speculative and involves a high degree of risk. Investors must be prepared to withstand the total loss of their investment. Investors are encouraged to complete their own independent due

diligence.

Linqto, Inc.,
P.O. Box 2859
Sunnyvale, CA 94087-0859

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. Force 10 Partners and each of its subsidiaries each reserve the right to monitor all e-mail communications through its networks.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27th, 2025 (Australian Eastern Standard Time), I caused a true and copy of the foregoing Motion to be served via electronic mail to each of the below named parties:

| PARTY | NAME | EMAIL |
|---|---|---|
| United States Bankruptcy Judge Alfredo R Perez | Case Manager | tyler_laws@txs.uscourts.gov |
| United States Bankruptcy Court for the Southern District of Texas | Pro Se Filing Email (for non-attorneys) | bankruptcy_ecf_helpdesk@txs.uscourts.gov |
| EPIQ Case Management | Claims and Case Administrator | LingtoInfo@epiqglobal.com |
| Debtors' Counsel | Schwartz PLLC | ghamm@nvfirm.com |
| United States Trustee | US Trustee, Region 7 | ha.nguyen@usdoj.gov |
| California Attorney General | Consumer Protection Section – Bankruptcy Notices | piu@doj.ca.gov |
| Securities and Exchange Commission | Alan Maza, Senior Bankruptcy Counsel | mazaa@sec.gov |
| Counsel for Lender | Faegre Drinker Biddle & Reath LLP | michael.stewart@faegredrinker.com |
| Additional Debtors' Counsel | Sullivan & Cromwell LLP | blassd@sullcrom.com |
| Counsel for Official Committee of Unsecured Creditors | Brown Rudnick LLP | spalley@brownrudnick.com |
| Counsel for Sapien Group USA, LLC | Leech Tishman Robinson Brog PLLC | jdercole@leechtishman.com |
| Counsel for Ad Hoc Group of Equity Shareholders | Gregory Pesce White & Case | gregory.pesce@whitecase.com |
| | | |

I declare that the foregoing is true and correct.

DATED: September 27th, 2025 (Australian Eastern Standard Time)

Respectfully submitted.

*H. S. Solo*

**H. Gavin Solomon**
37 Kells Creek Road
Woodlands, NSW 2575
Australia
Email: gs@larpagroup.com
Phone: +61 412 978 777

# DHL Express



EXPRESS WORLDWIDE

DOX

Origin:
NSW

SECURITY
INSPECTION
REQUIRED

From: P9 Biton Highlands
P9 Biton Highlands
Unit 6/6 10 Owen St
2575 MITTAGONG NSW
AUSTRALIA

To: US Bankruptcy Court Southern District
Nathan Ochsner Clerk of The Court
515 Rusk Avenue
77002 HOUSTON TX
UNITED STATES OF AMERICA

CVG   **US-IAH-IAH**

Day    Time    Piece
                1/1

Prefire Wght
**0.5 kg**

Ref No: 373187G/31

Content : Documents

WAYBILL 48 6660 1810

(2L)US7700243000000

**PACK&SEND**

PACK & SEND Southern Highlands
Unit 6/6-10 Owen St
MITTAGONG, NSW, 2575
Phone: 02 4872 3511
Email: southernhighlands@packsend.co

AU-SHGL0373187G

n Ochsner Clerk of The Court

kruptcy Court Southern District

sk Avenue

ON, TX, 77002

D STATES

ITEM   1   OF   1

421

810

ended weight

| g/1lb | 5 = 10 kg / 20 lb |
|---|---|
| g/2 lb | 6 = 15 kg / 30 lb |
| g/4 lb | 7 = 20 kg / 40 lb |
| g/10 lb | 8 = 25 kg / 50 lb |