IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>LINQTO TEXAS, LLC, *et al*.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90186 (ARP)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 129** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED OBJECTION TO DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE EMPLOYMENT AND RETENTION OF JEFFERIES LLC AS INVESTMENT BANKER, (B) WAIVING AND MODIFYING CERTAIN TIME-KEEPING REQUIREMENTS, AND (C) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of Linqto Texas, LLC and its affiliated debtors (collectively, the "**Debtors**") submits this limited objection (this "**Objection**") to the *Debtors' Application for Entry of an Order (A) Authorizing the Employment and Retention of Jefferies LLC as Investment Banker, (B) Waiving and Modifying Certain Time-Keeping Requirements, and (C) Granting Related Relief* [Docket No. 129] (the "**Application**").[2] In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2] Capitalized terms used in this Objection but not otherwise defined herein shall have the meanings ascribed to them in the Jefferies Application.

**PRELIMINARY STATEMENT**

1. This case is simply not a case that requires the ongoing services of an investment banker.

2. The Committee does not bring this objection because Jefferies LLC ("**Jefferies**") is unqualified. Jefferies is a world-class investment banker, capable of significant capital raises for multi-billion dollar companies, structuring complex restructurings, and valuing ongoing business – and charges fees to match its qualifications. But this is simply not a case where Jefferies has a role to play that will generate sufficient value to the estate to retain them on the terms proposed.

3. Jefferies seeks four forms of relevant compensation in this case. *First*, it seeks a fee for any financing raised, charging a market rate of 2% of any DIP financing raised. *Second*, it seeks a sliding scale fee between 2-4% on an M&A transaction. *Third*, it charges an ongoing monthly fee of $125,000 (regardless of the work done in that month). *Fourth*, it charges a fee of $2,500,000 upon the completion of this case (however they complete).

4. The Committee has no issues paying Jefferies its agreed-upon rate for its raising of the DIP financing facility. But the Committee does not see – and never has seen – an ongoing role for Jefferies in this case that warrants the cash drain of its monthly fees, or a restructuring fee.

5. The Committee spent ample time engaging with the Debtors seeking to determine what value Jefferies could provide on an ongoing basis. The Committee was provided a list (that it understands was drafted by Jefferies) which, in short, reads that other than raising DIP financing, Jefferies will consult on various tasks related to the restructuring. None of them, however, rise to the level of generating sufficient value to the estate that will exceed the fees charged.

6. Indeed, it is difficult to see how they could. The fundamental issues in this case are legal. Most significantly, what is or is not property of the estate, what the securities laws of the United States do and do not permit with regard to the private securities possessed by the Linqto estate, the fraudulent conduct of Linqto's former management, and Linqto's apparent pre-petition serial violations of securities laws under former management.

7. Jefferies' work has been done for some time. Jefferies assisted the Debtors and all stakeholders in this case by helping the Debtors procure and structure DIP financing as the Debtors' investment banker. The Committee does not object to awarding Jefferies fair, market compensation for those services in raising a DIP facility as set forth in its engagement letter – 2% of the amount raised.

8. Yet the Debtors seek approval of a Fee and Expense Structure for Jefferies that goes far beyond the raising of a DIP facility. Most notably, it includes a $2.5 million Restructuring Fee and an automatic $125,000 Monthly Fee, under Section 328(a) of the Bankruptcy Code. When a court approves the terms of compensation under that provision, those terms are essentially "locked in" and can only be modified under rare and particular circumstances. For that reason, courts take special care to ensure that compensation is reasonable under the circumstances and in the best interests of the estate, and applicants must provide meaningful evidentiary support to justify it.

9. The Committee and its professionals hold nothing but respect for Jefferies. No one doubts Jefferies' experience or capabilities, and the Committee does not seek to deny them compensation for valuable services rendered or call their qualifications and capabilities into question. But those capabilities cannot generate value to the estate in this case that would make payment of the proposed Restructuring Fee and Monthly Fee appropriate here. Payment of those

fees hurts customers, creditors, and all stakeholders without any commensurate benefit to the estate.

10.     The Committee therefore respectfully requests that the Court deny approval of Jefferies' retention unless the Monthly Fee and the Restructuring Fee are removed, and the M&A Transaction Fee is clarified.

## FACTUAL BACKGROUND

I.     **General Case Background.**

11.     On July 7, 2025 (the "**Petition Date**"), the Debtors commenced their voluntary cases under Chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee or examiner has been appointed in this case.

12.     On July 18, 2025, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Committee pursuant to Bankruptcy Code Section 1102.  [Docket No. 98].

13.     The Debtors' case is being funded through debtor-in-possession financing provided by Sandton Capital Solutions Master Fund VI, LP.  [*See* Docket No. 712 (the "**Final DIP Order**") and Docket No. 16 (the "**DIP Motion**")].  Although there were numerous objections to the DIP Motion, the Debtors, and the Committee, and the Deaton Parties arrived at a global settlement [*see* Dkt No. 505 (the "**Settlement Motion**" seeking approval of the "**Settlement**")], which the Court approved on October 6, 2025, and with the DIP lender agree on the terms of the Final DIP Order. Pursuant to the Settlement, these Chapter 11 cases are being financed through (i) the proceeds of

4

the Reserved Securities, (ii) the Platform Securities Proceeds (including the Ripple Tender Proceeds), and (iii) DIP financing in an aggregate amount of up to $25 million.[3]  *Id.* ¶ 26.

14.     Pursuant to the Settlement the Debtors will, as condition to continued access to DIP financing, propose a plan of reorganization that provides each Customer with the option to elect to have its interests in the Platform Securities contributed to a registered and publicly-listed closed-end fund or retain a beneficial interest in a liquidating trust that holds the equity of Liquidshares. *Id.* ¶ 28.  This structure will enable customers to retain the "upside" of their investments.

## II.     Jefferies' Retention Application.

15.     On July 25, 2025, Jefferies filed their application to be retained as Investment Banker for the Debtors pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code.  [Docket No. 129].

16.     The Application sets forth the scope of services Jefferies intends to provide the Debtors.  Those services include (i) <u>Restructuring</u>: efforts where Jefferies would provide advice and assistance in connection with any restructuring, reorganization, recapitalization, or conversion of the Company's indebtedness; (ii) <u>M&A</u>: efforts where Jefferies would provide the Company with advice and assistance in connection with a possible sale, merger, liquidation, or similar transaction; and (iii) <u>Financing</u>: efforts where Jefferies would provide the Company with advice and assistance with the arrangement of debtor-in-possession financing.  *Id.* ¶ 14.

17.     The Application requests approval of the following Fee and Expense Structure:

(a)     **Monthly Fee**:  $125,000 payable per month until the termination of the Engagement Letter.

---

[3]   Terms capitalized in this sentence but not defined herein have the meanings ascribed to them in the Settlement Motion [Dkt. No. 505].

(b) **Restructuring Fee**: A $2,500,000 fee paid "[p]romptly upon the consummation of a Restructuring," which is defined broadly enough to encompass virtually any case outcome.[4]

(c) **M&A Transaction Fee**: "Promptly upon the consummation of an M&A Transaction, a[n M&A Transaction Fee] equal to 2.0% of the Transaction Value of such M&A Transaction; provided, however, to the extent an M&A Transaction solely involves assets of one or more of the Funds, the M&A Transaction Fee payable on account of such M&A Transaction shall be equal to (i) 4.0% of the portion of Transaction Value of such M&A Transaction less than or equal to $10,000,000, plus (ii) 3.0% of the portion of Transaction Value of such M&A Transaction greater than $10,000,000 and less than or equal to $20,000,000, plus (iii) 2.0% of the portion of Transaction Value of such M&A Transaction greater than $20,000,000. It is expressly understood that in the event that more than one M&A Transaction shall occur, a separate M&A Transaction Fee shall be payable in respect of each M&A Transaction."

(d) **DIP Financing Fee**: "Promptly upon consummation of a DIP Financing, a [DIP Financing Fee] equal to 2.0% of the aggregate amount committed in connection with such DIP Financing."

(e) **Expenses**: All out of pocket expenses incurred by Jefferies in "in connection with the engagement contemplated under the Engagement Letter."

*Id.* ¶ 16.

### III. Subsequent Procedural History.

18. The Debtors had been engaged in ongoing discussions with the Committee regarding the Committee's objections to the terms of the Application. However, due to a miscommunication and/or mistake, on August 19, 2025, the Debtors filed a certificate of no objection with respect to the Application. [Docket No. 324 (the "**CNO**")]. Later that day, the Court entered an order approving Jefferies' retention [Docket No. 326 (the "**Retention Order**")], although at the time the Committee understood its objection deadline had been extended.

---

[4] The Application defines "Restructuring" as "any restructuring, reorganization, recapitalization, repayment or material modification of the Company's outstanding indebtedness or obligations (including, without limitation, any preferred equity), however achieved, including, without limitation, through any offer by the Company with respect to any outstanding Company indebtedness or obligations, a solicitation of votes, approvals, or consents giving effect thereto (including with respect to a prepackaged or prenegotiated plan of reorganization or other plan pursuant to [the Bankruptcy Code], the execution of any agreement giving effect to the same, an offer by any third party to convert, exchange or acquire any outstanding Company indebtedness or obligations, or any similar balance sheet restructuring involving the Company[.]" ¶ 14(a)(i).

19. Immediately after entry of the Retention Order, the Committee contacted the Debtors to address this issue. The Debtors and the Committee thereafter agreed to seek to settle the Committee's objections such that there would be no need to vacate the order (as the Debtors and the Committee were in the midst of far-reaching case negotiations that ultimately led to a settlement term sheet approved by this Court), but those efforts have been unsuccessful. Accordingly, the Debtors and the Committee agreed the order should be vacated so that the Committee's objections could be presented to the Court. Accordingly, the Debtors and the Committee jointly filed a motion to reconsider the Retention Order and have it vacated. [Docket No. 558 (the "**Joint Reconsideration Motion**")].

20. On September 29, 2025, the Court granted the Joint Reconsideration Motion and vacated the Retention Order. [Docket No. 599 (the "**Order to Vacate**")]. On October 9, 2025, Jefferies filed a motion to reconsider the Order to Vacate. [Docket No. 740 (the "**Reconsideration Motion**")].

## OBJECTION

I. **The Court Should Not Approve The Fee And Expense Structure As Proposed Because The Restructuring Fee And The Monthly Fee Are Unreasonable Under The Circumstances And Not In The Estate's Best Interests.**

   A. **Legal Standards.**

21. Section 327(a) provides that debtors, "with the Court's approval, may employ" professionals such as investment bankers. *See* 11 U.S.C. 327(a). The Debtors seek approval of Jefferies' retention under Sections 327(a) and 328(a) of the Bankruptcy Code under the terms set forth in the Engagement Letter, including the Fee and Expense Structure.

22. Section 328 limits compensation for such professionals. It provides, among other things, that debtors may seek court approval to retain a professional "on any *reasonable* terms and

7

conditions[.]" 11 U.S.C. § 328(a) (emphasis added). The movant "bears the burden of proof by a preponderance of the evidence that the proposed terms of employment are reasonable." *In re Affordable Med Scrubs LLC*, No. 15-33448, 2016 WL 1244771, at *2 (Bankr. N.D. Ohio Mar. 29, 2016) (citing *In re Metricom, Inc.*, 275 B.R. 364, 371 (Bankr. N.D. Cal. 2002)).

23. Courts analyzing the terms of a proposed retention under Section 328(a) typically consider whether:

> i. The proposed terms reflect the marketplace for these types of services;
> ii. The fees are reasonable under the circumstances of the case;
> iii. The parties engaged in arms-length negotiations to arrive at the terms;
> iv. The retention and proposed terms are in the best interests of the estate; and
> v. Creditors oppose the retention or proposed fees.

*In re Frontier Commc'ns Corp.*, 623 B.R. 358, 363-64 (Bankr. S.D.N.Y. 2020) (citing, *inter alia*, *In re Energy Partners, Ltd.*, 409 B.R. 211, 226 (Bankr. S.D. Tex. 2009)).

24. When "the terms of" a professional's "compensation are approved as part of their retention under Section 328(a), professionals largely lock in how they will be paid[.]" *In re Frontier Commc'ns*, 623 B.R. at 362. Once the court has approved compensation terms under Section 328(a), "the court cannot on the submission of the final fee application instead approve a 'reasonable' fee under § 330(a)," except under rare circumstances. *In re Texas Sec., Inc.*, 218 F.3d 443, 445 (5th Cir. 2000). That is why the party "seeking the employment of professionals under § 328(a) must establish that the terms and conditions of employment are reasonable, and evidence, not conclusory statements, is required to satisfy that burden." *See In re High Voltage Eng'g Corp.*, 311 B.R. 320, 333 (Bankr. D. Mass. 2004).

25. When faced with some reasonable terms and others that are unreasonable, a court need not "reject an application as presented but may approve" the employment of a professional

8

on any terms and conditions the court finds necessary to satisfy the requirement of reasonableness in Section 328(a). *In re Fed. Mogul-Glob., Inc.*, 348 F.3d 390, 398 (3d Cir. 2003) (Alito, C.J.).

### B. The Restructuring Fee And Monthly Fee Are Unreasonable Given The Services Jefferies Foreseeably Would And Has Provided.[5]

26. The Committee has no concerns with Jefferies' capabilities or qualifications. Nor does the Committee object to the DIP Financing Fee, because DIP financing was procured with Jefferies' assistance. But other than that, the Committee sees no meaningful role for an Investment Banker in this case. The path of this case has borne out the Committee's views: there has not been one.

27. The Debtors are not restructuring and have never proposed a restructuring. The myriad violations of securities and laws and unresolved regulatory compliance issues made this clear. The Debtors knew this and tacitly admitted to it on day one. *See* First Day Decl. ¶¶ 53-55 ("Because of the defects in the Debtors' corporate structure, violations of the securities laws, and the nature of the Debtors' assets, the Debtors believe that a number of these potential alternatives are not feasible"). From the time the Committee was appointed, the Debtors made clear that while their preferred case resolution was the creation of a closed-end fund, they saw no meaningful possibility of restarting the Linqto platform. The Committee had many disagreements with the Debtors' initial case strategy – but there has never been a disagreement on that point.

28. There was not at the beginning of this case any realistic possibility of a "restructuring, reorganization, recapitalization, repayment or material modification of the Company's outstanding indebtedness[.]" Application ¶ 14(a)(i). The Debtors came into this case with zero funded debt to restructure. Nor a fight over enterprise value. This case is not one of the

---

[5] The Committee does not seek to contest the Application on the basis of the first or third factors listed in paragraph 23 above, and therefore does not address them.

9

many where the recovery is of varying levels throughout the capital structure, and the go-forward control of the company depends on where the enterprise value "breaks", and who will be the fulcrum debt. The Debtors' "capital stack" is (i) customers; (ii) unsecured claims of vendors, employees, and professional service providers; (iii) claims from regulators, including the SEC and FINRA, (iv) potential litigation claimants, and (v) equity. The Debtors' value is in their assets – the securities allocable to customers, and the much smaller number of securities kept on the Debtors' books – and litigation claims.

29. Finally, Jefferies played no role in structuring the plan settlement. The plan embodied in the Settlement is the result of negotiations among the Debtors, the Committee, and the Deaton Parties (as defined in the Settlement), in which Jefferies did not participate. Moreover, the Committee is unaware of any involvement by Jefferies in the plan process currently underway.

30. In sum, Jefferies helped obtain the DIP financing and is left with little to nothing more to contribute. At this point in the case, the parties have agreed on the outcome to be achieved, and all efforts are centered on achieving it – at the lowest possible cost. Every dime spent on professionals takes away from the interests that will be available to customers and the cash available to compensate creditors.

31. Further, as the Committee has previously noted, the history of financial firms in bankruptcy has led to most financial firms being *expressly prohibited* from restructuring, in large part because history has shown restructuring failed financial firms is a fools' errand.[6] *See* 11 U.S.C. 109(c) (prohibiting stockbrokers and commodity brokers from eligibility under chapter 11, by reference to 109(b) prohibiting banks, with minor exceptions, from eligibility to file under

---

[6] Where an insolvent financial firm has going-concern value (e.g., it is undergoing a liquidity crisis) it is generally sold prior to bankruptcy.

chapter 11). Instead, they are subject to special liquidation schemes. *See* 15 U.S.C § 78fff(a)(4) (purpose of a SIPA liquidation of a broker-dealer is the liquidation of the business of a debtor)[7]; 11 U.S.C. § 741-753 (chapter 7 liquidation provisions for a stockbroker); 11 U.S.C. § 761-767 (chapter 7 liquidation provisions for a commodity broker); 12 U.S.C. § 1821 (liquidation procedures for FDIC-insured bank).[8]

32.     Under these circumstances, a $2.5 million "Restructuring Fee", which would be triggered upon consummation of a plan Jefferies never had a role in structuring, is unreasonable, and not in the best interests of the estate. The same goes for the Monthly Fee. Jefferies should not continue to be paid automatically every month when its job is done. The Restructuring Fee and Monthly Fee are simply not justified.

33.     The Application makes no serious attempt to justify it. The Application, the O'Hara Declaration, and the Siciliano Declaration proffer little other than conclusory statements. The Court, in exercising "its duties as a gatekeeper, must have a sufficient strong record when deciding whether to approve a professional under § 328(a)", and "evidence, not conclusory statements, is required[.]" *In re Energy Partners*, 409 B.R. at 225-226 (citing *In re High Voltage Eng'g*, 311 BR. at 33).

---

[7] It is worth noting that although Linqto was not a registered broker-dealer, it "likely" conducted unregistered broker-dealer activity, according to a memo prepared by its prepetition counsel. *See Maxwell et al. v. Sarris,* No. 1:25-cv-05643-LAK-BCM, ECF No. 12-10 (S.D.N.Y. July 31, 2025). Had Linqto registered as a broker-dealer (it did not, though it had a broker-dealer subsidiary that is a non-debtor) it would have been expressly ineligible for chapter 11.

[8] Jefferies has taken the position that an unsolicited offer well into this case made by certain equity holders (which Jefferies does not allege it procured) is evidence for its role in the Reconsideration Motion. The Committee (as noted below) will separately address this argument, along with other concerns that the Committee has with regard to the retention of Jefferies raised by the Reconsideration Motion, rather than delay the filing of this Objection to do so.

34. There are certainly roles in which Jefferies can "advise" or "consult" or "review" various activities taken in this case, and the Committee was given a list of such roles. However, the Committee does not see how those roles could justify the Monthly Fee or the Restructuring Fee. The Debtors have ample professionals doing so on an hourly basis, and Jefferies must establish not simply that it can provide advice, nor that it can provide advice that *in other contexts* is worth millions of dollars, but that that advice is worth millions of dollars *in the context of this case*.

35. The Committee does not see a realistic possibility of Jefferies obtaining an M&A Transaction Fee that would be worth retaining Jefferies subject to the Monthly Fee and the Restructuring Fee. However, that fee should be clarified to ensure that there is no ambiguity that transfer of customer securities as part of satisfying customer claims would not entitle Jefferies to an M&A fee; and that no sale of securities (customer or non-customer) would trigger an M&A fee, as the Committee understands that the Debtors have been separately hiring a broker for such transactions.

36. The Committee has great respect for Jefferies. None of the above is intended to call Jefferies' qualifications or skills into question. But there simply is not a need for millions of dollars' worth of investment banker work in this case (other than the raising of a DIP facility), however qualified. There was not at the time of the filing of the Application; and there is not today.

        **C.**    **That Jefferies Intends To Apply For Compensation And Allow The U.S. Trustee To Review Its Compensation Under § 330 Does Not Affect The Unreasonableness Of The Proposed Fees.**

37. To support the approval of the Fee and Expense Structure, the Application makes the apparent concession that "notwithstanding the approval of the Engagement Letter under § 328(a) of the Bankruptcy Code, Jefferies intends to apply for compensation for professional

services rendered and reimbursement of expenses incurred … subject to the Court's approval and in compliance with" applicable law. Application ¶ 28. The Application adds that "[n]otwithstanding the foregoing, Jefferies agrees that the U.S. Trustee may review Jefferies' compensation under § 330 of the Bankruptcy Code." *Id.*

38. That does not matter. The Debtors have chosen to retain Jefferies under Section 328(a). *See, e.g.*, *id.* ¶ 6 ("The bases for the relief requested herein are §§ 327(a), 328(a), and 1107" of the Bankruptcy Code). If the Court approves the Restructuring and Monthly Fees, the Court "cannot on submission of the final fee application instead approve a 'reasonable' fee under § 330(a)," unless the Court "finds that the original arrangement was improvident due to unanticipated circumstances as required by § 328(a)." *In re Energy Partners*, 409 B.R. at 224; *see also In re XO Commc'ns, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005) ("Under section 328(a), a court may not revisit its prior determination as to the reasonableness of an agreement previously approved unless it determines that the terms and conditions proved to be improvident at the time they were approved in light of then-unforeseen circumstances.").

39. Further, Jefferies does not extend this right to object under Section 330 to any party other than the U.S. Trustee – such as the Committee.

### D. Creditors Oppose The Proposed Fees.

40. The only fiduciary representing creditors in this case is the Committee. As noted above, the Debtors have no prepetition secured or funded debt, and no other creditor constituency (e.g., secured lenders) has supported the Application. The Committee's opposition, as expressed herein, represents the opposition of customer creditors as a class and therefore merits substantial weight in determining whether to approve the proposed fees. *See, e.g.*, *In re Frontier Commc'ns*, 623 B.R. at 363-64.

### E. The Reconsideration Motion Raises New Issues With Regard To The Jefferies Retention.

41. The Reconsideration Motion was filed the evening before the Committee had agreed to file this Objection. The Committee believes certain statements made in the Reconsideration Motion by Jefferies are relevant to the issues identified in this Objection or raise further issues that may be relevant to the Application. The Committee reserves all rights to supplement this Objection based on those issues and statements in the Reconsideration Motion.

[*Remainder of page intentionally left blank.*]

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court: (i) deny approval of the Application to the extent it includes the Restructuring Fee and the Monthly Fee, and fails to clarify the application of the M&A Transaction Fee and (ii) grant such other or further relief as the Court deems just and proper.

Dated: October 10, 2025
      Houston, Texas

                **BROWN RUDNICK LLP**

                */s/ Robert J. Stark*
                Robert J. Stark (admitted *pro hac vice*)
                Jeffrey L. Jonas (admitted *pro hac vice*)
                Kenneth J. Aulet (admitted *pro hac vice*)
                Bennett S. Silverberg (admitted *pro hac vice*)
                Seven Times Square, 47th Floor
                New York, NY 10036
                Telephone: (212) 209-4800
                Email: rstark@brownrudnick.com
                           jjonas@brownrudnick.com
                           kaulet@brownrudnick.com
                           bsilverberg@brownrudnick.com

                *Counsel for the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 10, 2025, a true and correct copy of the Objection to the *Debtors' Application for Entry of an Order (A) Authorizing the Employment and Retention of Jefferies LLC as Investment Banker, (B) Waiving and Modifying Certain Time-Keeping Requirements, and (C) Granting Related Relief* was served on all parties registered to receive electronic notice of filings in this case through the Court's CM/ECF system.

                                                    */s/  Robert J. Stark*