**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>LINQTO TEXAS, LLC, *et al.*,[1]<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Chapter 11

Case No. 25-90186

(Jointly Administered)

**ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF**
**THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION**
**AND NOTICE PROCEDURES, (III) APPROVING THE FORMS OF BALLOT**
**AND NOTICES IN CONNECTION THEREWITH, (IV) APPROVING**
**MANAGEMENT SELECTION PROCEDURES, (V) APPROVING THE**
**COMBINED HEARING TIMELINE, AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed their *Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Management Selection Procedures; (V) Approving the Combined Hearing Timeline; and (VI) Granting Related Relief* (the "**Motion**"),[2] seeking, among other things, (a) authorization to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**") and (b) conditional approval of the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended,

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]     Unless otherwise indicated, capitalized terms used but not defined herein shall the meanings ascribed to such terms in the Motion.

modified or supplemented from time to time, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; and (c) granting related relief, all as more fully set forth in the Motion The Court has considered the Motion and having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; that this is a core proceeding pursuant to 28 U.S.C. § 157(b), and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' Estates, their creditors, and other parties in interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court, if any; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

**A.      Conditional Approval of the Disclosure Statement.**

1.      The Disclosure Statement, attached hereto as **Exhibit 1**, is conditionally approved as containing adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code and is subject to final approval of the Court at the Combined Hearing.

**B.      Approval of the Confirmation Schedule and Certain Dates and Deadlines with Respect to the Plan and the Disclosure Statement.**

2.      The Debtors' request for a Combined Hearing on the final approval of the Disclosure Statement and confirmation of the Plan, and the following Confirmation Schedule, are hereby approved:

| Event | Date |
|---|---|
| Voting Record Date | November 13, 2025 |
| Deadline for Plan Solicitation and Mailing and Publication of Confirmation Hearing Notice | December 17, 2025 |
| Deadline for Filing Plan Supplement | January 12, 2025 |
| Deadline for Objecting to the Disclosure Statement and Confirmation of the Plan | January 21, 2026, at 5:00 p.m. (prevailing Central Time) |
| Voting Deadline & Opt-In Deadline | January 26, 2026, at 5:00 p.m. (prevailing Central Time) |
| Deadline for Debtors to File Brief in Support of Confirmation | January 30, 2026 |
| Deadline for Filing Voting Report | January 30, 2026 |
| Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation | February 2, 2026, at 9:00 a.m. (prevailing Central Time) |

**C.      Approval of the Timing of the Combined Hearing and the Plan and Disclosure Statement Objection Deadline and the Procedures for Filing Objections to Confirmation of the Plan and Final Approval of the Disclosure Statement.**

3.      The Debtors' request that the Combined Hearing be held on **February 2, 2026, at 9:00 a.m. (prevailing Central Time)** and that the Plan and Disclosure Statement Objection Deadline be set for **January 21, 2026, at 5:00 p.m. (prevailing Central Time)** is hereby approved.  Objections to confirmation of the Plan and final approval of the Disclosure Statement must (a) be in writing; (b) comply with the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a

proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline set forth above.  Objections that fail to comply with this Order will not be considered by the Court.

**D.      Approval of the Solicitation and Voting Procedures.**

4.      The Solicitation and Voting Procedures, substantially in the form attached to this Order as **Exhibit 2**, are approved.

5.      The Claims and Solicitation Agent is authorized to assist the Debtors in (a) distributing the Solicitation Packages, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims, (c) responding to inquiries from Holders of Claims or Interests and other parties in interest relating to the Plan and Disclosure Statement, the Ballot, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors and equity holders regarding the Plan. The Claims and Solicitation Agent may, but is not obligated to, contact parties that submit incomplete or otherwise deficient ballots to make a reasonable effort to cure such deficiencies.

6.      The Claims and Solicitation Agent is also authorized to accept Ballots and Opt-In Forms via electronic online transmission through a customized online balloting portal on the Debtors' case website to be maintained by the Claims and Solicitation Agent ("**E-Ballot**").  Parties entitled to vote through E-Ballot Portal may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing E-Ballot Portal; parties entitled to submit an Opt-In Form may submit such form through the E-Opt-In Portal and electronically sign and submit the Form instantly by utilizing the E-Opt-In Portal.  The encrypted data and audit trail created by such electronic submission will become part of the record of any Ballot or Opt-In Form submitted in

4

this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.  The Debtors request that Ballots or Opt-In Forms submitted via the customized online balloting portal or opt-in form portal shall be deemed to contain an original signature.  E-Ballot and E-Opt-In are the sole manner in which Ballots or Opt-In Forms will be accepted via electronic or online transmission.  Ballots or Opt-In Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.

**E.    Approval of the Contents and Distribution of the Solicitation Packages.**

7.    The Solicitation Packages shall include the following materials, the forms of each of which are hereby approved:

a.    a copy of the Solicitation and Voting Procedures, substantially in the form attached to this Order as **Exhibit 2**;

b.    the Cover Letters, substantially in the form attached to this Order as **Exhibit 3** and **Exhibit 4**; and

c.    an applicable Ballot, together with detailed voting instructions with respect thereto and, only if sent via U.S. Mail, a pre-addressed, postage-prepaid return envelope, substantially in the form attached to this Order as **Exhibit 5A**, **Exhibit 5B**, **Exhibit 5C**, **Exhibit 5D**, **Exhibit 5E** and **Exhibit 5F**;

d.    a copy of the Management Selection Procedures, substantially in the form attached to this Order as **Exhibit 6;**

e.    a copy of the Combined Hearing Notice, substantially in the form attached to this Order as **Exhibit 7**, which shall provide instructions on how to obtain electronic or print copies of this Conditional Approval Order and the Plan and Disclosure Statement, attached to this Order as **Exhibit 1**; and

f.    any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

8.    The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.  The procedures for distributing the Solicitation Packages as set forth in

the Motion and the Solicitation and Voting Procedures satisfy the requirements of the Bankruptcy Code and the Bankruptcy Rules and are approved.

9.     The Debtors shall distribute or cause to be distributed Solicitation Packages to all entities who, as of the Voting Record Date, are entitled to vote to accept or reject the Plan as soon as practicable after entry of this Order, but in no event later than the Solicitation and Notice Deadline set forth above.  On or before the Solicitation and Notice Deadline, the Debtors shall also provide by electronic mail complete Solicitation Packages (excluding the Ballot and Cover Letters) in electronic format to the U.S. Trustee and all parties entitled to receive notice under Bankruptcy Rule 2002.

10.     The Debtors are authorized to distribute the Combined Hearing Notice as a separate mailing from the remaining documents included in the Solicitation Package.  If the Debtors mail the Combined Hearing Notice separately, the Debtors are not required to include an additional copy of the Combined Hearing Notice in the Solicitation Package.

11.     The Debtors shall not be required to mail Solicitation Packages or other solicitation materials to Holders of Claims and Interests that have already been paid in full during this case either through a critical vendor or cure payment (or as per the agreements of the parties) or that are authorized to be paid in full in the ordinary course of business pursuant to an agreement between the parties or order previously entered by this Court.

12.     Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Claims and Solicitation Agent and request paper copies of the corresponding materials received in electronic format (to be provided at the Debtors' expense as soon as practical following such request).

**F.      Approval of the Management Selection Procedures.**

13.     The Management Selection Procedures, substantially in the form attached to this Order as **Exhibit 6**, are approved. The Management Selection Procedures shall govern the process for soliciting and selecting evaluating proposals from qualified candidates to serve as Manager of the Closed-End Fund and Trustee of the Liquidating Trust under the Plan.

**G.      Approval of the Combined Hearing Notice.**

14.     The Combined Hearing Notice, substantially in the form attached to this Order as **Exhibit 7**, is approved and shall be served by the Debtor on all known Holders of Claims and Interests as of the Voting Record Date and any other party entitled to notice under Bankruptcy Rule 2002 and applicable Bankruptcy Local Rules (regardless of whether such parties are entitled to vote on the Plan) by no later than the Solicitation and Notice Deadline.  The Debtors are authorized, but not required, to publish the Combined Hearing Notice or a notice substantially similar thereto by the Solicitation and Notice Deadline in the *Wall Street Journal*.

15.     The Combined Hearing Notice constitutes adequate and sufficient notice of the Plan and Disclosure Statement, the Combined Hearing, the Combined Hearing Date, the Plan and Disclosure Statement Objection Deadline, and the release, injunction, and exculpation provisions contained in the Plan.

**H.      Approval of the Form of the Non-Voting Status Notices.**

16.     The Non-Voting Status Notices, substantially in the forms attached to this Order as **Exhibits 8A and 8B**, are approved.  Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes, as such Holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation and Notice Deadline, or as soon as reasonably practicable thereafter, the Claims and Solicitation Agent shall serve an applicable Non-Voting Status Notice in lieu of Solicitation

Packages to those Holders of Claims and Interests in the Non-Voting Classes, which includes Class 1 (Other Secured Claims), Class 2 (Priority Claims), Class 9 (Customer Rescission Claims), Class 10 (Intercompany Claims), Class 11 (Subordinated Governmental Claims), Class 12 (Other Subordinated Claims) and Class 12  (Existing Equity Interests) who are not entitled to vote on the Plan.

**I.      Approval of the Form of Assumption Notice**

17.      The Assumption Notice, substantially in the form attached to this Order as **Exhibit 9** is approved.  Service of the Assumption Notice with the Plan Supplement on counterparties to executory contracts and unexpired leases being assumed or rejected under the Plan shall constitute adequate notice of the assumption or rejection of such executory contracts and unexpired leases.

**J.      Approval of the Form of Disputed Claims Notice**

18.      The Disputed Claims Notice, substantially in the form attached to this Order as **Exhibit 10**, is approved.  The Debtors shall cause the Disputed Claims Notice to be served on Holders of Claims that are subject to a pending objection by the Debtor as set forth in the Solicitation and Voting Procedures.

**K.      Service of Solicitation Materials and Undeliverable Notices and Solicitation Materials**

19.      For purposes of serving the Solicitation Packages, Combined Hearing Notices, the Non-Voting Status Notices, and the Disputed Claims Notices, the Debtors may rely on the address and/or email information for the creditors receiving such notices as compiled, updated, and maintained by the Claims and Solicitation Agent as of the Voting Record Date, without any requirement to conduct additional research for updated addresses based on undeliverable Solicitation Packages (including the Ballots), Combined Hearing Notices, Non-Voting Status Notices, or Disputed Claims Notices.

20.     The Debtors shall be excused from (a) redistributing the Combined Hearing Notice, Solicitation Packages, and/or any other notices approved by this Order to any entity to the extent any such notices or materials sent to such entity's listed address are returned as undeliverable; and (b) sending the Combined Hearing Notice, Solicitation Package, and/or any other notices approved by this Order to any address that the Debtors have sent a notice in during the course of these Chapter 11 Cases, which notice was returned as undeliverable. The failure to distribute materials and notices to such entities shall not constitute inadequate notice of the Combined Hearing Notice, the Solicitation Package, the Plan and Disclosure Statement, or any deadlines approved by this Order, or a violation of the Bankruptcy Code or Bankruptcy Rules.

**L.     Miscellaneous**

21.     The Debtors' rights to modify or withdraw the Plan and Disclosure Statement in accordance with its terms are reserved.

22.     The Debtors are authorized, but not directed, to extend the Voting Deadline or Plan and Disclosure Statement Objection Deadline at their discretion, without further order of the Court.

23.     The Debtors are authorized to make non-substantive and material changes to the Plan and Disclosure Statement, Combined Hearing Notice, Solicitation and Voting Procedures, Ballot, Non-Voting Status Notices, the Assumption Notice, and related documents without further order of the Court.

24.     Nothing in this Order shall be construed as a waiver of the rights of the Debtors or any other party in interest, as applicable, to object to a Proof of Claim after the Voting Record Date.

25.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

27.     Notwithstanding any Bankruptcy Rule to the contrary, this Order shall be immediately effective upon its entry.

28.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2025

_____
ALFREDO R. PÉREZ
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**DISCLOSURE STATEMENT**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
### LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES

**SCHWARTZ PLLC**
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone: (713) 900-3737
Facsimile:  (702) 442-9887
Email:    ghamm@nvfirm.com
          vpolnick@nvfirm.com
          aagelakopoulos@nvfirm.com
          rwells@nvfirm.com

-and-

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile:  (702) 442-9887
Email:    saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors-in Possession*

Dated: December 10, 2025

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THIS "<u>DISCLOSURE STATEMENT</u>") TO HOLDERS OF CERTAIN CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE TO ACCEPT OR REJECT THE PLAN. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING ALL ATTACHED EXHIBITS AND DOCUMENTS INCORPORATED INTO THIS DISCLOSURE STATEMENT, AS WELL AS THE RISK FACTORS DESCRIBED IN <u>SECTION X</u> HEREIN.

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *JOINT CHAPTER 11 PLAN OF LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES* (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "<u>PLAN</u>"), OF WHICH THE DEBTORS WILL SEEK CONFIRMATION BY THE BANKRUPTCY COURT. A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u> AND IS INCORPORATED HEREIN BY REFERENCE. THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.

ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE TERMS AND PROVISIONS OF THE PLAN OR THE FINANCIAL INFORMATION AND DOCUMENTS INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, ON THE OTHER HAND, THE PLAN OR THE FINANCIAL INFORMATION AND DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE COMMITTEE, AND THE DIP LENDER (AS EACH TERM IS DEFINED HEREIN).

THE CONSUMMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT SET FORTH IN ARTICLE VIII OF THE PLAN. THERE IS NO ASSURANCE THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN OR, IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, THAT THE CONDITIONS NECESSARY FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED OR, IN THE ALTERNATIVE, WAIVED.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH PROPOSED TRANSACTION CONTEMPLATED BY THE PLAN.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE MERITS OF THE PLAN. THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE SPECIFIED. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT. THE DEBTORS TAKE NO RESPONSIBILITY FOR, OR CAN PROVIDE NO ASSURANCE AS TO, THE RELIABILITY OF ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS THAT ARE NOT CONTAINED IN OR ARE INCONSISTENT WITH THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF CLAIMS TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH PROPOSED TRANSACTION CONTEMPLATED THEREBY. ANY PERSON OR ENTITY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS. ADDITIONALLY, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE, OR ANY SIMILAR NON-U.S. REGULATORY AUTHORITY.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR' BOOKS AND RECORDS AND

ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS OF OPERATIONS.  THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

REGARDING CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY THE DEBTORS OR ANY OTHER PARTY, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS IN ACCORDANCE WITH RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY ANALOGOUS STATE OR FOREIGN LAWS OR RULES.  AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL, OR OTHER EFFECTS OF THE PLAN TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION, REPRESENTATIONS, OR STATEMENTS CONTAINED HEREIN HAVE BEEN PROVIDED BY THE DEBTORS. NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THIS DISCLOSURE STATEMENT, THE PLAN, OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE  ANY REPRESENTATION OR STATEMENT REGARDING THIS DISCLOSURE STATEMENT, THE PLAN, OR THE SOLICITATION, IN EACH CASE, OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR AS OTHERWISE INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN. IF ANY SUCH INFORMATION, REPRESENTATION, OR STATEMENT IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE LIQUIDATION TRANSACTIONS CONTEMPLATED THEREBY.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE SEC OR ANY STATE SECURITIES COMMISSION. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

## FORWARD-LOOKING STATEMENTS

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.

READERS ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES (INCLUDING THOSE FACTORS DISCUSSED IN SECTION X OF THIS DISCLOSURE STATEMENT) THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

**IMPORTANT INFORMATION REGARDING SOLICITATION
OF VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS
BECAUSE AS OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE
DEBTORS IN ONE OF THE FOLLOWING CLASSES AND ARE THEREFORE ENTITLED
TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 4 | Customer Claims |
| 5 | Trade Claims |
| 6 | Unsubordinated Governmental Claims |
| 7 | Other General Unsecured Claims |
| 8 | Customer Deficiency Claims |
| 9 | Customer Rescission Claims |

## **DELIVERY OF BALLOTS**

For your vote to be counted to accept or reject the plan, your ballot must be actually received by Epiq Corporate Restructuring LLC ("**Epiq**") before the voting deadline on January 26, 2026 (5:00 p.m., prevailing Central Time).

Ballots may be returned by the following methods**:**

a. **By electronic, online submission**: Please visit the Debtors' case website at: https://dm.epiq11.com/linqto and under the case actions section of the website, click on "e-ballot" link and follow the instructions to submit your ballot.  If you choose to submit your Ballot via Epiq's eBallot portal, you should <u>not</u> also return a hard copy of your ballot. You will need the unique e-ballot ID on your Ballot to vote via the online portal.

b. **By First-Class Mail**:

    Linqto Texas, LLC
    c/o Epiq Ballot Processing
    P.O. Box 4422
    Beaverton, OR 97076-4422

c. **By Overnight Courier or Hand Delivery:**
    **Linqto Texas, LLC**
    c/o Epiq Ballot Processing
    10300 SW Allen Blvd.
    Beaverton, OR 97005

If you have any questions on the procedures for voting on the Plan, please call the Claims and Solicitation Agent at:

    U.S. Toll Free: (888) 865-2086

    International: (971) 265-0883

    Email: Balloting@epiqglobal.com, with reference to "Linqto" in the subject line

<u>**RECOMMENDATION BY THE DEBTORS**</u>

**EACH DEBTOR'S GOVERNING BODY HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO HOLDERS OF CLAIMS OR INTERESTS AT THIS TIME. EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN <u>JANUARY 26, 2026 AT 5:00 P.M. (PREVAILING CENTRAL TIME)</u> IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.**

# Table of Contents

IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ................... i

I.     INTRODUCTION................................................................................. 1

II.    PRELIMINARY STATEMENT. ....................................................... 1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND THE PLAN. .......................................................... 2

A.  What is Chapter 11?.................................................................. 2

B.  What steps did the Debtors take to evaluate alternatives to a Chapter 11 filing?... 3

C.  Why are the Debtors sending me this Disclosure Statement? ............................... 3

D.  What does it mean that the Debtors are seeking conditional approval of this
Disclosure Statement. ................................................................... 3

E.  Why is the Bankruptcy Court holding a Combined Hearing? ............................... 3

F.  What is the purpose of the Combined Hearing? .................................... 4

G.  When is the Combined Hearing set to occur?........................................ 4

H.  Am I entitled to vote on the Plan? ........................................................ 4

I.  How do I vote for or against the Plan? .................................................. 4

J.  What are the Restructuring Transactions under the Plan?...................................... 4

K.  What will I receive from the Debtors if the Plan is consummated? ...................... 5

L.  What will I receive from the Debtors if I hold an Allowed Administrative Claim,
DIP Facility Claim, Professional Fee Claim, Priority Tax Claim or other claim
that has not been classified in the Plan?........................................................ 9

    1.  Administrative Claims. ................................................. 10

    2.  DIP Facility Claims...................................................... 10

    3.  Professional Fee Claims. ............................................. 11

        a.  Allowance of Professional Fee Claims. .................................. 11

        b.  Professional Fee Claims Reserve. ...................................... 11

    4.  Priority Tax Claims. ..................................................... 12

    5.  Canceled Equity Customer Claims............................. 12

M.  If the Plan provides that I get a distribution, do I get it upon Confirmation or

when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?".................................................................. 12

N.  What are the sources of Cash and other consideration required to fund the Plan?13

O.  How does the Plan treat Executory Contracts and Unexpired Leases? ............... 13

P.  Are any regulatory approvals required to consummate the Plan? ....................... 14

Q.  Is there potential litigation related to the Plan? .................................................. 14

R.  What happens to my recovery if the Plan is not confirmed or does not go effective?.............................................................................................................. 14

S.  Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan? .................................................................................................... 15

T.  Do I have to grant the releases under the Plan?................................................... 15

U.  Will Any Party Have Significant Influence over the Corporate Governance and Operations of the Wind-Down Debtors? .............................................................. 16

V.  Can the Plan be Modified, Revoked, or Withdrawn? .......................................... 16

W. Who Do I Contact If I Have Additional Questions with Respect to this Disclosure Statement or the Plan? ......................................................................................... 17

X.  Do the Debtors Recommend Voting in Favor of the Plan? ................................. 17

Y.  Who Supports the Plan?....................................................................................... 17

IV.  **OVERVIEW OF THE PLAN.** ...................................................................... 17

A.  General Settlement of Claims and Interests......................................................... 17

B.  Customer Recission Claims Settlement. .............................................................. 18

C.  The Liquidating Trust. ......................................................................................... 18

    1.  *Creation of the Liquidating Trust.*................................................................ 18

    2.  *Liquidating Trustee.* ..................................................................................... 20

    3.  *Liquidating Trustee's Authority and Duties.* ................................................ 21

    4.  *Transfer and Vesting of Assets to Liquidating Trust.* ................................... 22

    5.  *Administration of the Liquidating Trust Assets.* ........................................... 23

        a.  *Trust as a Plan Disbursing Agent.* ........................................................ 23

        b.  *Distribution of Platform Securities by Liquidating Trust.* ...................... 24

        c.  *Liquidity Option.*................................................................................... 24

*d. Sale of Funding Securities to Fund Liquidating Trust Operations.* ......... 25

6. *Designated Platform Securities.* ................................................. 25

7. *Termination of the Liquidating Trust.* ........................................ 26

8. *Regulatory Matters.* ............................................................. 26

D. The Closed-End Fund. ................................................................ 27

   1. *Cautionary Note Regarding Risk Factors and Forward-Looking Statements.* ................................................................................. 32

   2. *Summary of Fees and Expenses.* ............................................. 33

   3. *Transfer and Vesting of Closed-End Fund Assets.* ...................... 35

   4. *Section 1145 Exemption.* ....................................................... 36

   5. *Management of the Closed-End Fund.* ...................................... 37

   6. *Capital Structure and Leverage.* ............................................. 39

   7. *Certain Provisions in the Closed-End Fund Governing Documents.* ........... 40

      *a. Shareholders; Issuance of Additional Shares.* ...................... 40

      *b. Anti-Takeover and Other Provisions.* ................................ 41

      *c. Certain Aspects of the Delaware Control Share Statute.* ......... 41

      *d. Limitation of Liability; Indemnification.* ........................... 43

      *e. Derivative Actions, Direct Actions and Exclusive Jurisdiction.* ........ 43

      *f. Advance Notice Provisions for Shareholder Nominations and Shareholder Proposals.* ................................................................................. 44

      *g. Amendment of the Closed-End Fund Governing Documents.* ........ 45

      *h. Term, Dissolution, and Liquidation.* ................................ 45

   8. *Closed-End Fund Fees and Expenses.* ...................................... 45

   9. *Net Asset Valuation.* ............................................................ 48

E. The Wind-Down Trust ................................................................ 51

   1. *Creation of the Wind-Down Trust.* .......................................... 51

   2. *Preservation of Confidences and Attorney-Client Privilege.* .......... 52

   3. *Wind-Down Trustee.* ............................................................ 52

   4. *Wind-Down Trustee's Authority and Duties.* .............................. 53

5. *Transfer and Vesting of Assets to Wind-Down Trust.* .................................. 54

6. *Exited Customer Cash Pool.* ...................................................................... 54

7. *Administration of the Wind-Down Trust Assets.* ......................................... 54

8. *Administration of Platform Cash.* ............................................................... 55

9. *Termination of the Wind-Down Trust.* ......................................................... 55

10. *Regulatory Matters.* ..................................................................................... 56

11. *Certain Tax Matters.* .................................................................................... 56

V.    **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** .......................................................................... 57

VI.   **EVENTS LEADING TO THE CHAPTER 11 FILINGS.** ............................ 58
  A.       Potential Securities Violations. ........................................................ 58
     1.     *Securities Act Violations.* ..................................................... 58
     2.     *Exchange Act of 1934 Violations.* ......................................... 58
     3.     *Investment Company Act of 1940 Violations.* ...................... 59
     4.     *Investment Advisers Act of 1940 Violations.* ....................... 59
     5.     *Antifraud Statutes.* ................................................................ 59
     6.     *Other Jurisdictions' Securities Laws.* .................................. 59
  B.       Retention of New Management. ........................................................ 60
  C.       Efforts to Reduce Operating Costs and Expenses. .......................... 62
  D.       The Special Subcommittee's Delegated Authority ........................... 62
     1.     *Independent Investigation.* ................................................... 63
        a.   *Investigation Relating to New Directors and Officers.* ..... 64
        b.   *Investigation Relating to Other Current Directors and Officers.* ...... 65
        c.   *Conclusion.* ........................................................................ 65
     2.     *Management Incentive Plan.* ................................................ 66
        a.   *Establishment of Management Incentive Plan.* ................. 66
        b.   *Incentive Metrics and Performance Period.* ..................... 66
        c.   *Conditions Precedent.* ....................................................... 66
        d.   *Incentive Awards.* .............................................................. 67
             (i)  *Defined Terms.* .......................................................... 67
             (ii) *Award.* ...................................................................... 68
        e.   *Administrative Authority.* ................................................. 68
        f.   *Bankruptcy Approval.* ....................................................... 68

VII.  **MATERIAL DEVELOPMENTS AND EVENTS IN THE CHAPTER 11 CASES** ..................................................................................................... 69
  A.       Commencement of the Chapter 11 Cases. ....................................... 69
  B.       First Day and Second Day Relief and Other Case Matters. .............. 69
  C.       Appointment of the Unsecured Creditors Committee ........................ 70
  D.       Interim Approval of the DIP Financing Motion. .............................. 70
  E.       The Ripple Tender Motion. .............................................................. 71
  F.       Objections to the DIP Financing Motion and Ripple Motion. ........... 71

G.          The Settlement. .................................................................................... 72
H.        Schedules and Statements. ................................................................. 73
I.          Bar Dates. ............................................................................................. 73
J.          Lease Rejection. .................................................................................. 74

**VIII.**              **SOLICITATION AND VOTING PROCEDURES.** ...................... 74

A.  Holders of Claims or Interests Entitled to Vote on the Plan. ............................. 75

B.  Votes Required for Acceptance by a Class. ........................................................ 75

C.  Certain Factors to Be Considered Prior to Voting. ........................................... 75

D.  Solicitation Procedures. ..................................................................................... 76

     1.  *Claims and Solicitation Agent.* .................................................................. 76

     2.  *Solicitation Package.* .................................................................................. 76

     3.  *Distribution of the Solicitation Package and Plan Supplement.* ................. 76

**IX.**      **CONFIRMATION OF THE PLAN.** ................................................. 77

A.  The Combined Hearing. ...................................................................................... 77

B.  Requirements for Confirmation of the Plan. ...................................................... 77

     1.  *Acceptance by Impaired Classes.* ............................................................... 78

     2.  *Confirmation Without Acceptance by All Impaired Classes.* ...................... 78

     3.  *No Unfair Discrimination.* ......................................................................... 79

C.  Fair and Equitable Test. ...................................................................................... 79

     1.  *Secured Claims.* .......................................................................................... 79

     2.  *Unsecured Claims.* ...................................................................................... 79

     3.  *Interests.* ...................................................................................................... 79

     4.  *Feasibility.* .................................................................................................. 80

     5.  *Best Interests of Creditors.* ......................................................................... 80

**X.**     **RISK FACTORS.** ............................................................................... 80
    A.           Risks Related to the Debtors and These Chapter 11 Cases. ............... 81

     1.  *General.* ....................................................................................................... 81

     2.  *The Debtors Will Be Subject to Risks and Uncertainties Associated with These Chapter 11 Cases.* ........................................................................... 81

     3.  *Undue Delay in Confirmation or Consummation May Result in Additional Costs.* ........................................................................................................ 81

4. *The Debtors Have No Duty to Update.* .................................................... 81

5. *No Representations Outside This Disclosure Statement Are Authorized.* 81

6. *No Legal or Tax Advice Is Provided to You by This Disclosure Statement.* .................................................................................................. 82

7. *Forward-Looking Statements Are Not Assured, and Actual Results May Vary.* ........................................................................................................ 82

8. *No Admission Is Made.* ......................................................................... 82

B. Risks Related to the Plan ................................................................. 82

1. *Parties in Interest May Object to the Classification of Claims.* ............. 82

2. *The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation.* ................................................................................... 83

3. *Certain Creditors, Equity holders, and Other Parties-In-Interest May Bring Litigation Against the Debtors.* ..................................................... 83

4. *The Bankruptcy Court May Not Grant the Debtors' Request for Nonconsensual Confirmation.* ................................................................ 83

5. *The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis.* ....................................................................... 84

6. *Plan Releases, Injunctions and Exculpations May Not Be Approved.* ..... 84

7. *The Plan May Not Be Confirmed.* ........................................................... 84

8. *Conditions Precedent to the Plan Becoming Effective May Not Be Satisfied.* .................................................................................................. 84

9. *Continued Risk upon Confirmation and Potential Appeal of Confirmation.* .................................................................................................. 85

10. *Issuers of the Securities Underlying the Liquidating Trust and the Closed-End Fund May Object to the Assumption and Assignment of the Securities.* ............................................................................................... 85

C. Risks Relating to the Liquidating Trustee and Manager of the Closed-End Fund. .......................................................................................................... 85

1. *Risk Related to the Selection of the Liquidating Trustee.* ................. 85

2. *Risks Related to the Selection of the Manager of the Closed-End Fund.* ......................................................................................................... 85

D. Regulatory Risks. ........................................................................... 86

1. *The Debtors, the Liquidating Trust and the Closed-End Fund May Be Required to Obtain, and to Comply with, Regulatory Approvals, including Novel Relief or Other Regulatory Guidance.* ................... 86

2.    *Governmental Laws, Regulations and Actions Could Adversely Affect the Debtors, the Liquidating Trust, the Liquidating Trustee, the Closed-End Fund and/or a Manager of the Closed-End Fund.* ........ 87

3.    *The Debtors Are Currently Under Investigation by Federal and State Regulators and Such Investigations May Adversely Affect the Estates.* ........................................................................................... 87

4.    *The Liquidating Trust May be Subject to Certain Registration and Reporting under Federal Securities Laws.* ........................................ 87

5.    *The SEC May Disagree that Closed-End Fund Shares Issued Under the Plan are Exempt from Registration.* ............................................ 88

6.    *There is No Assurance that the Closed-End Fund will be Launched.* 88

7.    *The Closed-End Fund Will be Subject to Investment Company Act Registration and Reporting Requirements.* ...................................... 88

E.    Financial Risks ....................................................................................... 88

1.    *Claims Could Be More Than Projected.* ............................................ 88

2.    *The Amount and Timing of Available Distributions, if Any, May Vary.* ........................................................................................... 88

3.    *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.* .. 89

4.    *Risks Associated with Financial Projections.* ................................... 89

5.    *Liquidating Trust Expenses May Exceed Current Expectations.* ....... 89

6.    *The Liquidating Trust or the Closed-End Fund May Be Adversely Affected by Potential Litigation.* ....................................................... 90

7.    *Contingent Liabilities.* ...................................................................... 90

8.    *Borrowing Risk.* ................................................................................ 90

9.    *Non-U.S. Investments Risk.* .............................................................. 90

F.    Market Risks for the Liquidating Trust and the Closed-End Fund. .... 91

1.    *Risks Associated with Selling Liquidating Trust Assets as Needed for Orderly Liquidation.* ........................................................................ 91

2.    *Risks Associated with the Liquidity Option and Sales of the Liquidating Trust Assets through a Secondaries Platform.* .............. 91

3.    *Risks Associated with Equity Securities Portfolios.* .......................... 94

4.    *Risks Associated With Investments in Private Companies.* ................ 94

5.    *Risks Associated with General Private Vehicles.* .............................. 97

6.    *Closed-End Fund Shares Trading at a Discount or Premium.* .......... 98

7.    *Other Risks Relating to Share Price.* ................................................ 98

8.    *Risks Relating to Exchange Listing of Closed-End Fund Shares.* ..... 98

9.    *Risks Related to Valuation.* ............................................................... 99

10.    *Limited Operating History.* ............................................................... 99

11.    *Non-Diversification Risk.* .................................................................. 99

12.    *Concentration of Investments.* ......................................................... 99

13.    *Risks Related to the Use of Leverage.* ............................................ 100

14.    *Change in Investment Objective or Strategies.* ............................... 100

15.    *Active Management.* ....................................................................... 101

16.    *Conflicts.* ....................................................................................... 101

17.    *Risks Related to Future Growth.* ..................................................... 101

7

18. *Sector Risks.* ................................................................ 102
19. *Competition for Investment Opportunities.* ..................... 106

G.      Tax Risks. ......................................................................... 107
1. *The Liquidating Trust or Closed-End Fund Could Be Subject to Additional Tax Liabilities Due to Changes in Tax Laws and Tax Audits, Which Could Affect its Profitability and Increase Its Effective Tax Rate.* ............................................................................ 107
1. *The Tax Treatment of the Restructuring Transactions is Uncertain.* 107
2. *Taxation of the Closed-End Fund.* .................................... 108

**XI.**    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** ......................................................................... 109

A. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ........................................................................... 110
1. *COD Income.* .................................................................... 110
2. *Gain or Loss.* .................................................................... 111

B. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. ........................................... 112
1. *Customer Claims (Class 4).* ............................................... 112
   a. *Certain U.S. Federal Income Tax Consequences of the Liquidating Trust* ......................................................... 113
     i. *U.S. Federal Income Tax Consequences to the Liquidating Trust Beneficiaries.* ........................................... 113
     ii. *U.S. Federal Income Tax Classification of the Liquidating Trust.* ................................................................... 114
     iii. *General Tax Reporting by the Liquidating Trust and Holders of Liquidating Trust Interests.* .......................... 114
   b. *Certain U.S. Federal Income Tax Consequences of the Closed-End Fund.* .................................................... 115
     i. *Transfer of the Closed-End Fund Assets to the Closed-End Fund.* ...................................................... 116
     ii. *Taxation of the Closed-End Fund.* ..................... 118
   a. *Taxation of the Closed-End Fund as a C Corporation.* .......... 118
   b. *Taxation of the Closed-End Fund as a RIC.* ........................ 119
     iii. *Taxation of Shareholders.* ................................ 121
   a. *U.S. Holders.* ................................................................ 121
   b. *Non-U.S. Holders.* ........................................................ 124
   c. *Dividend Reinvestment Plan.* ....................................... 125
   d. *FATCA.* ....................................................................... 125
   e. *Foreign Taxation.* ......................................................... 126
   f. *Backup Withholding and Information Reporting.* ............. 126
2. *Allowed Class 5 Trade Claims, Allowed Class 6 Unsubordinated Governmental Claims, Allowed Class 7 Other General Unsecured Claims, Allowed Class 8 Customer Deficiency Claims, and Allowed Class 9 Customer Rescission Claims.* ............................ 127

b.  *U.S. Federal Income Tax Consequences to the Wind-Down Trust Beneficiaries.* ........................................................................ 127

c.  *U.S. Federal Income Tax Classification of the Wind-Down Trust.* ................................................................................................ 128

d.  *General Tax Reporting by the Wind-Down Trust and Holders of Wind-Down Trust Interests.* ...................................................... 128

e.   *Tax Reporting for Wind-Down Trust Assets Allocable to Disputed Claims.* .................................................................... 129

**XII.   RECOMMENDATION** ................................................................. 130

**EXHIBITS**[1]

EXHIBIT A    Joint Chapter 11 Plan of Reorganization of Linqto, Inc. and its Debtor Affiliates

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Liquidshares Portfolio Company Valuations as of November 30, 2025

---

[1]      Each Exhibit is incorporated herein by reference.

## I.      INTRODUCTION.

The above captioned debtors and debtors in possession (collectively, the "**Debtors**" and together with their non-Debtor affiliate, "**Linqto**" or the "**Company**") submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Plan.[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (AS RECONSTITUTED FROM TIME TO TIME, THE "UNDERLINE COMMITTEE") SUPPORT CONFIRMATION OF THE PLAN. THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES. ACCORDINGLY, THE DEBTORS AND THE COMMITTEE BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR SUCCESSFULLY COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT.

The Debtors, with the support of the Committee, propose the Plan to maximize value for all stakeholders.  The Plan provides for the creation of three vehicles: a Wind-Down Trust, a Liquidating Trust, and a Closed-End Fund.  Customers may elect to have their Customer Interests contributed to the Liquidating Trust, the Closed-End Fund, or a combination of the two, subject to the terms and limitations in the Plan. Each vehicle has a distinct purpose:

1.      The Wind-Down Trust will be responsible for monetizing certain assets including the Reserved Securities and the Retained Causes of Action.  It will also be responsible for the reconciliation of Claims against the Estates, and the administrative tasks associated with the winding up of the Debtors, subject to the terms of the Plan.  Except for Customer Claims, which get the treatment described in 2 and 3 below, the Wind-Down Trust is the vehicle through which all Claims will recover through the Plan.  A description of the Wind-Down Trust can be found in Article IV.E. of the Plan, and the Wind-Down Waterfall is described in Article IV.E.6. of the Plan.

2.      The formation of the Liquidating Trust will allow Customers, other than those who indirectly hold any Designated Platform Securities, to contribute their Customer Interest to the Liquidating Trust in exchange for Liquidating Trust Interests that represent the Customers' economic interest in a Liquidshares Portfolio Company.  The Liquidating Trust will terminate upon the earlier of (i) five (5) years

---

[1]      Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

from the Effective Date (subject to periodic extensions as may be approved by the Bankruptcy Court) and (ii) the occurrence of certain events as set forth in the Liquidating Trust Agreement. The Liquidating Trust is designed to allow most Customers to keep their envisioned investment as close to their original intent as possible. A description of the Liquidating Trust can be found in Article IV.C. of the Plan.

3.     The formation of the Closed-End Fund will allow Customers, including those who indirectly hold any Designated Platform Securities, to contribute their Customer Interest to the Closed-End Fund in exchange for publicly traded shares. The Closed-End Fund will not have a termination date. The Closed-End Fund will allow Customers to obtain intraday liquidity and to hold their investment long-term. All contributed Customer Interests will be pooled in the Closed-End Fund, and Electing Customers will receive shares of the Closed-End Fund equal to the value of such Electing Customers' contribution. A description of the Closed-End Fund can be found in Article IV.D. of the Plan.

These vehicles will allow Customers to retain the "upside" of their intended investments to the maximum extent possible. **The opportunity to elect to participate in the Closed-End Fund, the Liquidating Trust, or a combination of both, is set forth on the Ballot included with the Plan and Disclosure Statement. Customers should review the Plan, Disclosure Statement, and any Ballot or Notice of Non-Voting Status received carefully, consult with their own attorneys and professionals, and take care to complete the Ballot in its entirety.**

The Debtors and the Committee believe that the Plan represents the best recovery available for all stakeholders and should be approved and confirmed.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

### A.    What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a

plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.     What steps did the Debtors take to evaluate alternatives to a Chapter 11 filing?**

As described in Section VI of this Disclosure Statement, as well as in the *Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions, and Related Relief* [Docket No. 10], prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including restructuring options and means to legally operate their platform and comply with securities laws.

**C.     Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to (a) prepare a disclosure statement containing adequate information sufficient to enable a hypothetical reasonable investor to make an informed decision regarding acceptance of the Plan and (b) share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**D.     What does it mean that the Debtors are seeking conditional approval of this Disclosure Statement?**

Pursuant to the Disclosure Statement Motion,[2] the Debtors are seeking conditional approval of this Disclosure Statement pursuant to Rule 3016-2 of the Bankruptcy Local Rules for the Southern District of Texas. Upon entry of an order approving the Disclosure Statement Motion, the Debtors will commence solicitation of votes on the Plan in accordance with the timeline set forth therein. The Debtors will subsequently seek final approval of the Disclosure Statement contemporaneously with Confirmation of the Plan at the hearing to consider confirmation of the Plan (the "**Combined Hearing**").

**E.     Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan. At the Combined Hearing, the Bankruptcy Court will consider the final approval of the Disclosure Statement and Confirmation of the Plan. The Combined Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Combined Hearing once scheduled. The Combined Hearing may be adjourned from time to time without further notice.

---

[2]     The "**Disclosure Statement Motion**" means the *Debtors' Amended* <u>*Emergency*</u> *Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving Management Selection Procedures; (V) Approving the Combined Hearing Timeline; and (VI) Granting Related Relief* [Docket No. 1112].

**F.      What is the purpose of the Combined Hearing?**

The confirmation of the Plan by the Bankruptcy Court binds the Debtors and the Post-Restructuring Debtors (the issuer of any securities to be issued under the Plan), any Holder of a Claim acquiring property under the Plan, any Holder of a Claim against, or Interest in any of the Debtors, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the Confirmation Order entered by the Bankruptcy Court discharges the Debtor from any debt that arose before the confirmation of the Plan and provides for the treatment of such debt in accordance with the terms of the confirmed Plan. In addition, at the Combined Hearing, the Bankruptcy Court will consider the final approval of the Disclosure Statement.

**G.      When is the Combined Hearing set to occur?**

The Combined Hearing before the Bankruptcy Court shall be on **February 2, 2026, at 9:00 a.m. (prevailing Central Time)**. The Combined Hearing may be adjourned from time to time without further notice.

Objections to the adequacy of the Disclosure Statement and Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, **by no later than January 21, 2026, at 5:00 p.m., prevailing Central Time**.

**H.      Am I entitled to vote on the Plan?**

Your eligibility to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of November 13, 2025). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth in Article III of the Plan.

**I.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots that will be distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, the Ballot containing your vote and returned by your nominee, or the "pre-validated" Ballot provided by your nominee for direct return by you must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases, Epiq Corporate Restructuring LLC (the "**Claims and Solicitation Agent**") **on or before the Voting Deadline (*i.e.*, January 26, 2026, at 5:00 p.m. (prevailing Central Time)), as ordered by the Bankruptcy Court.** *See* Section VIII of this Disclosure Statement, entitled, "Solicitation and Voting."

**J.      What are the Restructuring Transactions under the Plan?**

The Restructuring Transactions under the Plan entail: (1) the establishment of the Liquidating Trust and the transfer of the Liquidating Trust Assets to the Liquidating Trust; (2) the

establishment of the Closed-End Fund and the transfer of the Closed-End Fund Assets to the Closed-End Fund; and (3) the establishment of a Wind-Down Trust and the transfer of the Wind-Down Trust Assets to the Wind-Down Trust; and (4) such other transactions that the applicable Entities determine to be necessary or appropriate in accordance with the Plan.

### K.    What will I receive from the Debtors if the Plan is consummated?

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code. Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

Except to the extent that a Holder of an Allowed Claim or Allowed Interest agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Claim or Interest, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtors' classification and treatment of Claims and Interests, reference should be made to the entire Plan.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[3] | Projected Recovery |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; (iii) such Holder's collateral; or (iv) such other treatment rendering such Claim Unimpaired. | $0.00 | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor, (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired. | Unknown | 100% |

---

[3]    These amounts reflect estimates as of the date hereof and may ultimately be higher or lower depending on, among other things, timely filed Proofs of Claim

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[3] | Projected Recovery |
| 3 | Exited Customer Claims | Each Holder of an Allowed Exited Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, a pro rata portion of the Existed Customer Cash Pool sufficient to render such Holders unimpaired | $50,000.00 | 100% |
| 4 | Customer Claims | Each Holder of an Allowed Customer Claim shall have the option to select between two types of treatment or a combination of the two types of treatment.  Holders of Allowed Customer Claims may select between having their interest in the Platform Securities contributed to a Liquidating Trust or to a Closed-End Fund or a combination of both. A description of these two options can be found in Article IV.C. and Article IV.D. of the Plan.  Should a Holder of Claim in this class not cast a Ballot, the default treatment will be that such Holder's Customer Interests will be transferred to the Closed-End Fund, if the Minimum Closed-End Fund Conditions are met, and, to the Liquidating Trust if not, all as further described in the Plan and the Plan Supplement.  Should a Holder of a Claim in this class cast a Ballot and not elect either the Liquidating Trust or the Closed-End Fund (or a combination of both) on their Ballot, the default treatment will be that such Holder's Customer Interests will be transferred to the Liquidating Trust.<br><br>Each Holder of an Allowed Customer Claim shall receive a Liquidating Trust Interest, representing such Holder's entitlement based on their Customer Interest as of the Petition Date.  If the Minimum Closed-End Fund Conditions are met, the Liquidating Trust Interests that correspond with the Liquidshares CEF Series shall be exchanged for Closed-End Fund Shares on the Closed-End Fund Exchange Date. If the Minimum Closed-End Fund Conditions are not met, all Customer Interests shall be administered through the Liquidating Trust.<br><br>The Minimum Closed-End Fund Conditions are described in more detail in Article IV.D.1.of the Plan.  On the Closed-End Fund | Unknown | 95% |

| \multicolumn{5}{c}{**SUMMARY OF EXPECTED RECOVERIES**} |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[3] | Projected Recovery |
| | | Exchange Date, the Closed-End Fund Assets will be transferred to the Closed-End Fund and the Liquidating Trust Interests of Electing Customers will be automatically exchanged for Closed-End Fund Shares. | | |
| 5 | Convenience Trade Claims | Each Allowed Convenience Trade Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of a Trade Claim to its share of the proceeds from the Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall, on account of the portion of such Convenience Trade Claim.  As of the Effective Date, the Debtors' liability for all Convenience Trade Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order, and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | $1,000,000.00 | 80%-100%, subject to Wind-Down Trust recoveries |
| 6 | Unsubordinated Governmental Claims | Each Holder of an Allowed Unsubordinated Governmental Claim shall receive a beneficial interest in the Wind-Down Trust. Such interest shall entitle each Holder of an Allowed Unsubordinated Governmental Claim to its share of the proceeds Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall. | $0.00 | 100% |
| 7 | Other General Unsecured Claims | Each Holder of an Allowed Other General Unsecured Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Other General Unsecured Claim to its share of the proceeds from the Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.  As of the Effective Date, the Debtors' liability for all Other General Unsecured Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | Unknown | Unknown, dependent upon Wind-Down Trust recoveries |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[3] | Projected Recovery |
| 8 | Customer Deficiency Claims | Each Holder of an Allowed Customer Deficiency Claim shall receive a beneficial interest in the Wind-Down Trust. Such interest shall entitle each Holder of an Allowed Customer Deficiency Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.<br><br>As of the Effective Date, the Debtors' liability for all Customer Deficiency Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | Unknown | Unknown, dependent upon Wind-Down Trust recoveries |
| 9 | Customer Rescission Claims | Each Holder of an Allowed Customer Rescission Claim shall receive a beneficial interest in the Wind-Down Trust. Such interest shall entitle each Holder of an Allowed Customer Rescission Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.<br><br>As of the Effective Date, the Debtors' liability for all Customer Rescission Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | Unknown | Unknown, dependent upon Wind-Down Trust recoveries |
| 10 | Intercompany Claims | Each Allowed Intercompany Claim shall be assumed, set off, settled, cancelled and released, or otherwise addressed at the option of the Debtors, *provided* that no distributions shall be made on account of any Intercompany Claims. | Unknown | 0% |
| 11 | Subordinated Governmental Claims | Each Holder of an Allowed Subordinated Governmental Claim shall receive a beneficial interest in the Wind-Down Trust. Such interest shall entitle each Holder of an Allowed Subordinated Governmental Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall. | Unknown | Unknown, dependent upon Wind-Down Trust recoveries |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[3] | Projected Recovery |
| | | As of the Effective Date, the Debtors' liability for all Subordinated Governmental Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | | |
| 12 | Other Subordinated Claims | Each Holder of an Allowed Subordinated Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Subordinated Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall. As of the Effective Date, the Debtors' liability for all Subordinated Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | Unknown | Unknown, dependent upon Wind-Down Trust recoveries |
| 13 | Existing Equity Interests | Each Holder of an Allowed Existing Equity Interest shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Existing Equity Interest to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall. As of the Effective Date, the Debtors' liability for all Existing Equity Interests shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement. | Unknown | Unknown, dependent upon Wind-Down Trust recoveries |

**L.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, Professional Fee Claim, Priority Tax Claim or other claim that has not been classified in the Plan?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims have not been classified as described below.

1. *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim (including claims of the type described in section 503(b)(9) of the Bankruptcy Code) shall be paid in full in Cash: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtor; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2. *DIP Facility Claims.*

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, and in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed DIP Claim, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) shall receive on account of such Allowed DIP Claim (a) payment in full in Cash, or (b) such other terms agreed to by the Holder of a DIP Claim.  Such other terms may include participation in the Closed-End Fund either in partial or full satisfaction of the Allowed DIP Claims.

Unless and until the Allowed DIP Claims are satisfied in accordance with the terms of the Plan, then notwithstanding entry of the Confirmation Order and anything to the contrary in the Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released, or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens or other rights securing the DIP Claims shall be deemed to have been waived, released, satisfied, or discharged, in whole or in part, and (iii) neither the DIP Loan Agreement nor any other agreement, instrument or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released, or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

Upon the satisfaction of Allowed DIP Claims in accordance with the terms of the Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

3.      *Professional Fee Claims.*

  a.      *Allowance of Professional Fee Claims.*

  Each Professional asserting a Fee Claim for services rendered on or before the Effective Date must File and serve on the Debtors (before the Effective Date), the Wind-Down Trustee (after the Effective Date) and such other Entities who are designated in the Confirmation Order an application for final Allowance of such Fee Claim no later than 60 days after the Effective Date. Objections to any Fee Claim must be Filed and served on the Debtors (before the Effective Date) or the Wind-Down Trustee (after the Effective Date) and the requesting Professional no later than 21 days after such final application for Allowance of such Fee Claim is Filed with the Bankruptcy Court. Each Holder of an Allowed Fee Claim shall be paid in full in Cash any Allowed Accrued Professional Compensation, including from funds held in the Professional Fee Claims Reserve, within five Business Days after entry of a Final Order of the Bankruptcy Court approving such amounts. Notwithstanding anything to the contrary contained in the Plan, the failure of the Professional Fee Claims Reserve to satisfy in full Allowed Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Allowed Fee Claims due and payable by the Debtors (before the Effective Date) or the Wind-Down Trustee (after the Effective Date), as the amounts in the Professional Fee Claims Reserve are solely estimates. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

  Except as otherwise specifically provided in the Plan on and after the Effective Date, the Wind-Down Debtors, the Wind-Down Trustee (subject to the Wind-Down Trust Agreement), as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, and other fees and expenses of the Professionals or other Entities related to implementation and consummation of the Plan incurred by the Wind-Down Trustee or the Wind-Down Debtors after the Effective Date.   Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, the Wind-Down Trustee (subject to the Wind-Down Trust Agreement) may employ any Professional or other Entity in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

  b.      *Professional Fee Claims Reserve.*

  On or prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Claims Reserve with Cash in an amount determined by the Debtors or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserve was established, which amount shall be based on (x) the aggregate amount of Accrued Professional Compensation billed by the Professionals prior to the Effective Date plus (y) an estimate of the aggregate Fee Claims for periods through the Effective Date that have not been billed, as provided to the Debtors by each Professional.  Each Professional shall estimate in good faith their Fee Claims for periods that have not been billed as of the Effective Date and shall deliver such good faith estimate to the Debtors no later than five Business Days after the Debtors so request; provided, however, that such estimate shall not be deemed to limit

11

the amount of fees and expenses that are the subject of such Professional's final request for payment of Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional through the Effective Date.

The Debtors shall not commingle any funds contained in the Professional Fee Claims Reserve and shall use such funds to pay only the Fee Claims, as and when Allowed by a Final Order of the Bankruptcy Court.  Except as provided in Article II.C.2. of the Plan, the Debtors shall not deposit any other funds or property in the Professional Fee Claims Reserve without further order of the Bankruptcy Court.  No Liens or Claims shall encumber the Professional Fee Claims Reserve in any way. The Professional Fee Claims Reserve shall be maintained in trust for the Professionals and shall not be considered property of the Estates.  The Debtors shall maintain records of all deposits to and payments made from the Professional Fee Claims Reserve.  To the extent that funds held in the Professional Fee Claims Reserve do not or are unable to satisfy the full amount of any Allowed Fee Claim, the Debtors (before the Effective Date) and the Liquidating Trustee (after the Effective Date) shall, within 5 Business Days after entry of the Final Order approving such Allowed Fee Claim, pay such Allowed Fee Claim from Cash on hand, without any further action or order of the Bankruptcy Court.

4.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, on the Effective Date, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.      *Canceled Equity Customer Claims.*

All Canceled Equity Customer Claims shall be deemed to have no value and are entitled to no recovery.  Canceled Equity Customer Claims are not classified in the Plan and shall receive no treatment under the Plan given the nature of such claims.

**M.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"**Confirmation**" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can become effective. Initial distributions to Holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "**Effective Date**"—or as soon as reasonably practicable thereafter, as specified in Article VI of the Plan. "**Consummation**" of the Plan refers to the occurrence of the Effective Date. *See* Section IX.B. of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to Consummation of the Plan.

**N.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund or make distributions under the Plan, as applicable, with: (i) the Closed-End Fund Assets, (ii) the Liquidating Trust Assets, and the (iii) Wind-Down Trust Assets.

**O.      How does the Plan treat Executory Contracts and Unexpired Leases?**

On the Effective Date, each Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party, if such Executory Contract or Unexpired Lease (i) has not previously been rejected by order of the Bankruptcy Court or is not the subject of a motion to reject on the Confirmation Date; (ii) is not identified in the Plan Supplement as a contract or lease to be assumed pursuant to the Plan; (iii) is not expressly assumed pursuant to the Plan; (iv) has not expired or terminated by its own terms on or prior to the Effective Date; or (v) has not been assumed or is not the subject of a motion to assume on the Confirmation Date.

Subject to the payment of any Cure Claim (and, if applicable, the provision of adequate assurance of future performance under such Executory Contract or Unexpired Lease), assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting assignment, the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before or on the date that the Debtors assume such Executory Contract or Unexpired Lease.

Any Change of Control Provision in any contract, agreement, or other document of the Debtors, including any Executory Contract or Unexpired Lease assumed or assumed and assigned, shall be deemed modified in accordance with section 365 of the Bankruptcy Code such that such assumption or assumption and assignment and the transactions contemplated by the Plan shall not (a) be prohibited, restricted or conditioned on account of such provision or require any consent thereunder, (b) breach or result in the modification or termination of such Executory Contract or Unexpired Lease, (c) result in any penalty or other fees or payments, accelerated or increased obligations, renewal or extension conditions, or any other entitlement in favor of such non-debtor party thereunder or (d) entitle the non-debtor party thereto to do or impose any of the foregoing or otherwise exercise any other default-related rights or remedies with respect thereto. For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or otherwise may not be terminated on account of such assumption or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition or entity conversion that may occur at any time before, on or in connection with the Effective Date. The Debtors may rely on the Plan and the Confirmation Order as a complete defense to any action by a party to an assumed Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease on account of such assumption or on account of the Plan, the transactions contemplated herein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to Article V of the Plan shall revest in and be fully enforceable by the Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing and providing for its assumption, or applicable law.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions and rejections (as applicable) of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Notwithstanding the foregoing, before the Effective Date, the Debtors shall have the right to amend the Plan Supplement to revise the list of Executory Contracts and Unexpired Leases being assumed or rejected.

**P.     Are any regulatory approvals required to consummate the Plan?**

To the extent that any regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained (or in certain cases substantially all such approvals have been obtained), and the Debtors are engaging as appropriate in order to procure such approvals, authorizations, consents, rulings, or documents (as applicable). The Debtors are relying on historical SEC staff guidance in structuring the Liquidating Trust and Closed-End Fund. There is no assurance that the SEC would not require changes to certain terms of the Plan.

Neither the SEC nor any state securities commission has approved or disapproved the Plan or determined that the information provided in this Disclosure Statement is truthful or complete. Any representation to the contrary is a criminal offense.

**Q.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation. *See* Section X.B. of this Disclosure Statement.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent (whether deemed or otherwise) of rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Section IX.B. of this Disclosure Statement.

**R.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

If the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein. Any alternative plan is likely to provide Holders of Claims and Interests with less recovery than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Section IX.C.5. of this Disclosure Statement, titled "Best Interests of Creditors" and the Liquidation Analysis attached hereto as **Exhibit B**.

**S.    Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties as set forth in Article IX. of the Plan. The Debtor Release, Third-Party Release, exculpation, and injunction provisions included in Article IX. of the Plan are an integral part of the Debtors' overall restructuring efforts.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve value of the Debtors' Estates for the benefit of all parties in interest.

The Restructuring Transactions contemplated in the Plan are the only paths available to the Company to avoid a liquidation via chapter 7 of the Bankruptcy Code. As such, the Debtor Release and the Third-Party Release appropriately offer certain protections to, among others, parties who constructively participated in the Debtors' restructuring process by supporting the Plan. For example, the DIP Lender plays an integral role in the Restructuring Transactions and has agreed to provide up to $60 million in new money under the DIP Facility to fund the administration of the Chapter 11 Cases and the implementation of the Restructuring Transactions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: ALL HOLDERS OF CLAIMS OR HOLDERS OF INTERESTS WHO AFFIRMATIVELY OPT IN TO THE RELEASES CONTAINED IN THE PLAN BY THE APPLICABLE OPT-IN DEADLINE.**

Based on the foregoing, the Debtors believe that the Debtor Release, Third-Party Release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

The release provisions contained in the Plan remain subject to ongoing review as part of the Independent Investigation by the Special Subcommittee (as such terms are defined in Section VI.D. below). The Debtors, acting at the direction of the Special Subcommittee, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date.

**T.    Do I have to grant the releases under the Plan?**

The Third-Party Releases will be binding only on a Person or Entity that affirmatively elects to opt in to the releases by checking the Opt-In box on the Ballot distributed with the Solicitation Packages or, for such Holders in the Non-Voting Classes, by submitting the Opt-In Form annexed to the Non-Voting Status Notice **on or before the Voting Deadline (*i.e.*, January 26, 2026 at 5:00 p.m. (prevailing Central Time)), as ordered by the Bankruptcy**

15

**Court**. Such parties may also access and complete the Opt-In Form electronically at https://dm.epiq11.com/case/linqto/info.

> **U.      Will Any Party Have Significant Influence over the Corporate Governance and Operations of the Wind-Down Debtors?**

On the Effective Date, the sole director and officer of Linqto shall be disclosed in a Plan Supplement. On the Effective Date, all persons acting as directors and/or managers of Linqto that have not been selected as directors and/or managers of Linqto shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith; *provided*, that the members of the Special Subcommittee shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at the authority and direction of the Special Subcommittee in accordance with the terms of the Plan.  The Special Subcommittee shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Wind-Down Trust or any other Person or Entity without the prior written consent of the Special Subcommittee's Chairperson, Jeremy Rosenthal, in which case such documents will continue to be subject to the attorney-client privilege of the debtors and work product protections or other privilege and immunity which shall be transferred as specified in the proceeding section of this sentence.

> **V.      Can the Plan be Modified, Revoked, or Withdrawn?**

Yes. Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan, provided that any such modification (whether material or immaterial) is in accordance with the terms of the Plan. Further, as noted above, the Debtors are relying on historical SEC staff guidance in structuring the Liquidating Trust and Closed-End Fund. There is no assurance that the SEC would not require changes to certain terms of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

**W.      Who Do I Contact If I Have Additional Questions with Respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Solicitation Agent via one of the following methods:

By regular mail, hand delivery, or overnight mail at:

> Linqto Texas, LLC
> c/o Epiq Ballot Processing
> P.O. Box 4421
> Beaverton, OR 97076-4421

By electronic mail at:

> LinqtoInfo@epiqglobal.com

By telephone at:

> (888) 865-2086 (domestic, toll free) or
> +1 (971) 265-0883 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Solicitation Agent at **https://dm.epiq11.com/case/linqto/info** (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy (for a fee).  PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**X.      Do the Debtors Recommend Voting in Favor of the Plan?**

Yes, the Debtors believe that the Plan provides for a larger distribution to all Holders of Claims or Interests than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**Y.      Who Supports the Plan?**

The Plan is supported by the Debtors and the Committee.

**IV.      OVERVIEW OF THE PLAN.**

The Plan contemplates the following key terms, among others described herein and therein:

**A.      General Settlement of Claims and Interests.**

As discussed in further detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the

Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.    Customer Recission Claims Settlement.**

The Plan contains a settlement of Customer Recission Claims pursuant to Rule 9019. The Debtors and the Committee are aware that significant numbers of customers may hold recission claims. However, Linqto's customer base may not be aware of their potential rights under securities law to assert recission claims. Linqto may have defenses to such claims, in whole, in part, or with respect to individual claimants. There is also a risk that governmental regulators would assert, on behalf of customers, a recission claim. To avoid the costs of litigating such claims, and potential arguments (by customers or regulators) that such claims should exist notwithstanding the failure to file such claims by the bar date, the Debtors and the Committee have proposed a settlement of such claims in the Plan. Pursuant to this settlement, each customer would have an automatically allowed recission claim, without the need to assert such a claim or to litigate that claim. In exchange, such recission claims would take (as a class) no more than 33% of all distributions with other *pari passu* creditors until all such other *pari passu* creditors were paid in full. Each Customer Recission Claim would be paid *pari passu* with other Customer Recission Claims. If the Customer Recissions Claim Settlement is not approved, then neither the automatic claim filing and allowance, nor the 33% class-wide cap shall apply to Customer Recission Claims.

**C.    The Liquidating Trust.**

*1.    Creation of the Liquidating Trust.*

The Liquidating Trust shall be formed on the Effective Date to effect the liquidation of Liquidshares and applicable Liquidating Trust Assets, (other than the Closed-End Fund Assets), including without limitation, the Platform Securities attributable to the Liquidating Trust Beneficiaries  as well as any and all transactions incidental thereto, in accordance with the Plan, the Confirmation Order, and the Liquidating Trust Agreement. The corpus of the Liquidating Trust will consist of the Liquidating Trust Assets.  On the Effective Date, pursuant to the Plan and in accordance with the Liquidating Trust Agreement, the Liquidating Trust Assets will be irrevocably transferred to and vest in the Liquidating Trust free and clear of any and all actual or alleged prepetition and postpetition Claims, Causes of Action, Interests, Liens, other encumbrances and liabilities of any kind, in each cast that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Liquidating Trust Agreement.  From and after the Effective Date, all proceeds of the Liquidating Trust Assets will be paid to the Liquidating Trust to be applied in accordance with the

Plan.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For the avoidance of doubt, all proceeds attributable to the Liquidshares CEF Series will remain in the Closed-End Fund Assets. The Liquidating Trust shall be a successor to the Debtors within the meaning of section 1145(a) of the Bankruptcy Code.

The Liquidating Trust shall have no objective to continue or engage in the conduct of a trade or business, except to the extent necessary to liquidate and distribute its assets.

Liquidshares shall remain the record holder of the Platform Securities, on the books and records of the applicable Portfolio Company) other than the Closed-End Fund Assets after the Closed-End Fund Exchange).  In connection therewith, the Liquidshares Operating Agreement will provide that the Liquidating Trustee shall be the sole manager of Liquidshares, with the authority to cause Liquidshares to sell the Platform Securities and extinguish the Liquidshares Series Equity (including the Liquidshares CEF Series on the Closed-End Fund Exchange Date) and related Liquidating Trust Interests attributable to such Platform Securities. Liquidshares shall have no objective to continue or engage in the conduct of a trade or business, including investing, reinvesting, or trading securities, except to the extent necessary to liquidate the Platform Securities as authorized and directed by the Liquidating Trustee. In connection therewith, the power and authority of the Liquidating Trustee in respect of the Platform Securities held by Liquidshares will be subject to the terms and conditions set forth in the Liquidating Trust Agreement, as if all the Platform Securities were held directly by the Liquidating Trust.  If at any time, to the extent that existing Restrictions on Transfer with respect to a series or class of Platform Securities allow, or are amended or waived to allow, Liquidshares intends to transfer the entirety of any series or class of Platform Securities to the Liquidating Trust and in the Liquidating Trustee's sole discretion, the Liquidating Trust may require Liquidshares to distribute such Platform Securities to the Liquidating Trust in redemption of the corresponding Liquidshares Series Equity, excluding any Platform Securities attributable to the Liquidshares CEF Series prior to the expiration of the time period allowable for the completion of the Minimum Closed-End Fund Conditions.  The Liquidating Trust Agreement shall otherwise provide that the Liquidating Trust Beneficiaries will continue to be provided, as nearly as practicable, the same economic benefits in respect of the Platform Securities regardless of whether Liquidshares or the Liquidating Trust is the record owner of the Platform Securities on the books and records of the applicable Portfolio Company.

As of the Effective Date, Liquidshares will adopt the Liquidshares Operating Agreement and the Debtors shall transfer to (or cause Liquidshares to issue to) the Liquidating Trust all of the equity interests of Liquidshares, such that Liquidshares will be a wholly owned subsidiary of the Liquidating Trust.  Liquidshares shall remain the record owner of the Platform Securities on the books and records of the applicable Portfolio Company, the existing equity interests of Liquidshares will be cancelled and Liquidshares will issue Liquidshares Series Equity, including the Liquidshares CEF Series, to the Liquidating Trust. Each Liquidshares Series Equity will be tied to a Platform Security or a group of Platform Securities, and the Liquidshares CEF Series shall be tied to the Closed-End Fund Assets.

On the Effective Date, the Liquidating Trust will issue Liquidating Trust Interests to Customers as set forth herein and in accordance with the Liquidating Trust Agreement.  As determined as of the Effective Date, such Liquidating Trust Interests will be issued in multiple

series that will correspond to the applicable Liquidshares Series Equity (other than Designated Platform Securities) or to the Liquidshares CEF Series. The Liquidating Trust Interests, including the Liquidating Trust Interests representing the Liquidshares CEF Series, shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

Additional information regarding the Liquidating Trust will be set forth in the Plan Supplement, including the identity of the Liquidating Trustee, the form of Liquidating Trust Agreement, funding mechanism, administration, assets to be held, liabilities assumed, and tax treatment.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional assets become known and subject to the Liquidating Trust's administration, the Debtors shall be deemed to have automatically transferred to the Liquidating Trust all of their right, title and interest in such assets. In accordance with sections 363, 365, and/or 1141 of the Bankruptcy Code, as applicable, all such assets shall automatically irrevocably vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to Allowed Claims until paid in full, as set forth in the Plan, and the reasonable fees and expenses of administering the applicable Liquidating Trust, including, without limitation, the reasonable fees and expenses of its Liquidating Trustee, as provided in the Liquidating Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to such additional assets or the Liquidating Trust.

<p align="center">2.    <em>Liquidating Trustee.</em></p>

On the Effective Date, the Liquidating Trustee will be the sole authorized representative of the Liquidating Trust Agreement (if any), with authority to render all services necessary to effectuate the terms of the Plan as they relate to the Liquidating Trust. From and after the Effective Date, the Liquidating Trustee will be deemed to have been appointed as the representative of the Liquidshares Estate by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code as limited by the Liquidating Trust Agreement; *provided that* nothing in the Plan, the Confirmation Order, or the Liquidating Trust Agreement shall limit or restrain the ability of the Wind-Down Trustee to pursue Retained Causes of Action on behalf of all of the Estates, as set forth in Article IV.C. of the Plan.

The powers, authority, responsibilities, and duties of the Liquidating Trustee will be governed by the Plan, the Confirmation Order, the Liquidating Trust Agreement, and other applicable Plan Supplement documents. The duty of the Liquidating Trustee will be to facilitate the liquidation and distribution of the Platform Securities, subject to the Plan, and the Liquidshares Estate for the benefit of Customers in accordance with the Liquidating Trust Agreement. The Liquidating Trustee shall have no duty to the Debtors.

The Liquidating Trustee may execute, deliver, file, or record such documents, instruments, releases, and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan as they relate to the Liquidating Trust.

The Committee and the Debtor Representative shall select the Liquidating Trustee, and its identity shall be disclosed by the Debtors in the Plan Supplement. Any successor Liquidating Trustee shall be appointed pursuant to the Liquidating Trust Agreement.

Additional information regarding the Liquidating Trustee will be set forth in the Plan Supplement, including further details with respect to the Liquidating Trustee's responsibilities and authority, powers and limitations, compensation, and professionals.

<div style="text-align:center">

3.      *Liquidating Trustee's Authority and Duties.*
</div>

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Liquidating Trust, and shall have all powers, rights and duties of a trustee, as set forth in the Liquidating Trust Agreement.

Among other things, the Liquidating Trustee shall:

(i)      hold and administer the Liquidating Trust Assets;

(ii)     administer the Platform Cash, as provided for in Article IV.C. of the Plan;

(iii)    have the power and authority to retain, as an expense of the Liquidating Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidating Trustee hereunder or in the Liquidating Trust Agreement;

(iv)     have the power and authority to obtain additional third-party funding for the Liquidating Trust;

(v)      make distributions to Customers as provided in the Liquidating Trust Agreement and the Plan;

(vi)     sell or transfer Platform Securities upon a Qualifying Liquidation Request, as provided for in Article IV.C. of the Plan;

(vii)    have the power and authority to cause Liquidshares to sell or transfer Funding Securities;

(viii)   have the power and authority to cause Liquidshares to sell or transfer Platform Securities and any Closed-End Fund Shares as permitted or contemplated by the Liquidating Trust Agreement;

(ix)     have the power and authority to effect the Closed-End Fund Exchange;

<div style="text-align:center">21</div>

(x) have the right to receive reasonable compensation for performing services as the Liquidating Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Liquidating Trustee in performing the duties and responsibilities required under the Plan and the Liquidating Trust Agreement;

(xi) be considered an estate representative as provided for under section 1123 of the Bankruptcy Code with respect to the assets placed in the Liquidating Trust; and

(xii) provide periodic reports and updates to Liquidating Trust Beneficiaries, including as set forth in conditions in existing SEC staff guidance.

4. *Transfer and Vesting of Assets to Liquidating Trust.*

On the Effective Date, or as soon thereafter as practicable:

(i) Debtors shall cause Liquidshares to issue to the Liquidating Trust the Liquidshares Series Equity, including the Liquidshares CEF Series, such that Liquidshares will be a wholly owned subsidiary of the Liquidating Trust.

(ii) The Liquidating Trust shall issue Liquidating Trust Interests to the Liquidating Trust Beneficiaries, reflecting their proportional interests in the Liquidating Trust Assets or in the Closed-End Fund Assets, in accordance with the allocation methodologies approved by the Debtor Representative and the Committee.

(iii) The Liquidating Trust shall issue Liquidating Trust Interests that correspond to the Liquidshares CEF Series to the Electing Customers reflecting their proportional interests in the Closed-End Fund Assets, in accordance with the allocation methodologies approved by the Debtor Representative and the Committee, and subject to the terms of the Closed-End Fund Exchange described in section IV.C.4. of the Plan.

(iv) The Liquidating Trust shall assume responsibility for all actions necessary to administer and realize the value of the Platform Securities subject to administration within the Liquidating Trust and related assets.

All transfers to the Liquidating Trust shall be exempt from any stamp, real estate transfer, mortgage recording, or similar taxes pursuant to section 1146(a) of the Bankruptcy Code.

> 5. *Administration of the Liquidating Trust Assets.*

From and after the Effective Date, the Liquidating Trustee shall administer all Liquidating Trust Assets in accordance with the Plan, the Liquidating Trust Agreement, and the Confirmation Order.

The Liquidating Trustee shall have full power and authority to manage, protect, conserve, and liquidate the Liquidating Trust Assets (other than Closed-End Fund Assets), to prosecute, settle, or compromise any claims or causes of action arising from the Liquidating Trust Assets, if any, and to make distributions to the Liquidating Trust Beneficiaries, all in a manner consistent with the Liquidating Trust Agreement, the purposes of the Liquidating Trust and in the best interests of its beneficiaries. Nothing in this paragraph shall be interpreted to limit or impair the rights and powers of the Wind-Down Trustee to manage, protect, conserve, and liquidate the Wind-Down Trust Assets, or to prosecute, settle, or compromise any claims or causes of action related to the Wind-Down Trust Assets.

> a. *Trust as a Plan Disbursing Agent.*

To further facilitate the liquidation and distribution of the Platform Securities, the Liquidating Trust shall serve as a Disbursing Agent for the distribution of (i) the Circle Shares to the Circle Securities Customers (excluding any Circle Shares in which the Electing Customers have an economic interest, which Circle Shares shall be included in the Closed-End Fund Assets, if the Minimum Closed-End Fund Conditions are met and (ii) the Closed-End Fund Assets to the Closed-End Fund on the Closed-End Fund Exchange Date, if the Minimum Closed-End Fund Conditions are met, in each case as permitted by applicable law.

As Disbursing Agent for the Circle Shares, the Liquidating Trust, solely in its capacity as such Disbursing Agent, on or as soon as practicable after the Effective Date, shall distribute Circle Shares to each Circle Shares Customer pro rata in accordance with the number of Circle Shares allocated to each such Customer. If the Minimum Closed-End Fund Conditions are met, such distribution will exclude any Circle Shares in which the Electing Customers have an economic interest.

As Disbursing Agent for the Closed- End Fund Securities, the Liquidating Trustee, on as soon as practicable after the Effective Date, if the Minimum Closed-End Fund Conditions are met, shall distribute the Liquidating Trust Interests that correspond with the Liquidshares CEF to Electing Customers. At the Closed-End Fund Exchange Date, the Liquidating Trust, solely in its capacity as Disbursing Agent, shall cause Liquidshares to transfer the Closed-End Fund Assets to the Closed-End Fund. Upon the occurrence of the Closed-End Fund Exchange, the Electing Customers shall automatically receive Closed-End Fund Shares in exchange for their relevant Liquidating Trust Interests, which will be automatically extinguished. If the Closed-End Fund Exchange Date does not occur on or prior to the nine (9) month anniversary of the Effective Date, the Electing Customers shall cease to be treated as Electing Customers and otherwise remain beneficial owners of Liquidating Trust Interests with the same rights and benefits as similarly

23

situated Customers who are not Electing Customers as provided in the Liquidshares Trust Agreement.

        *b.*      *Distribution of Platform Securities by Liquidating Trust.*

In accordance with the terms of the Liquidating Trust Agreement, the Liquidating Trust will be required to distribute or cause Liquidshares to distribute, as soon as reasonably practicable, but no more than once each fiscal quarter, on a pro rata basis to the applicable Liquidating Trust Beneficiaries Platform Securities that shall have been released of all Restrictions on Transfer such that such Securities may be transferred to such beneficiaries by Liquidshares or the Liquidating Trust without any such restriction.   Notwithstanding the foregoing, any Platform Securities allocated to Liquidshares CEF Series will remain in the Closed-End Fund Assets until transferred to the Closed-End Fund or, if the Closed-End Fund Exchange does not occur as specified above, the Platform Securities will be released to the Electing Customer, in accordance with the terms of the Liquidating Trust Agreement.

        *c.*      *Liquidity Option.*

Pursuant to the terms of the Liquidating Trust Agreement, the Liquidating Trust will establish a formal relationship for Liquidshares and/or the Liquidating Trust with one or more Secondaries Platforms that can permit Liquidshares to sell Platform Securities upon a Qualifying Liquidation Request.  A Qualifying Liquidation Request will be made only at the sole direction of a Liquidating Trust Beneficiary.   Upon receiving a Qualifying Liquidation Request, and upon satisfaction of the Qualifying Liquidation Conditions provided in the Liquidating Trust Agreement, the Liquidating Trustee will seek to cause Liquidshares to liquidate the applicable Platform Securities on a Secondaries Platform, subject to any terms or conditions imposed by such platform. Subject to the Liquidating Trustee's ability to cause Liquidshares to liquidate the Platform Securities, the Liquidating Trust will cause the redemption of the applicable Liquidshares Series Equity and Liquidating Trust Interests that correspond to the Platform Securities sold and will distribute the net proceeds of such a sale to the applicable Liquidating Trust Beneficiary as provided in the Liquidating Trust Agreement.

The Liquidating Trustee's role in facilitating a Qualifying Liquidation Request will be administrative only.  Without limiting the foregoing, the Liquidating Trustee will not be permitted to (i) guarantee or seek any price or range of prices for such Platform Securities, (ii) solicit participation in the Liquidity Option of the Liquidating Trust Beneficiaries, (iii) receive any differential compensation based on the size, value or occurrence of a transaction in Platform Securities occurring on or through a Secondaries Platform, or (iv) buy additional Platform Securities for the benefit of any Customer.  In addition, the Liquidating Trustee will not charge any fee (other than costs noted in the following sentence) to any Liquidating Trust Beneficiary. Any costs associated with the sale and liquidation of Platform Securities pursuant to a Qualifying Liquidation Request will be borne exclusively by the directing Liquidating Trust Beneficiary.  As soon as practicable following the Platform Securities' liquidation, the customer who elected to participate will receive the net proceeds from the sale of the applicable Portfolio Securities. The Liquidating Trustee's actions in connection with any such Liquidity Option or exercise thereof will be limited to administrative and ministerial matters, including, without limitation, providing notice to the Liquidating Trust Beneficiaries of upcoming liquidity windows, performing

administrative tasks in connection with the arrangement and consummation of any sales of the Liquidshares Portfolio Securities through the Secondaries Platform, and distributing any resulting proceeds to the applicable Liquidating Trust Beneficiary, in each case in accordance with the Liquidating Trust Agreement.

<div align="center">

*d.   Sale of Funding Securities to Fund Liquidating Trust Operations.*

</div>

Solely for the purpose of raising sufficient proceeds to administer the operations of the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement, (i) the Liquidating Trust may establish a formal relationship for Liquidshares and/or the Liquidating Trust with or more Secondaries Platforms that can permit Liquidshares to sell Funding Securities for the benefit of the Liquidating Trustee and/or (ii) sell a pro rata slice of Platform Securities to the Closed-End Fund in exchange for Closed-End Fund Shares.  Upon the sale of such Platform Securities, the Liquidating Trust will appropriately adjust the applicable Liquidating Trust Interests that correspond to the Platform Securities sold. The selection and sale of Funding Securities shall be at the discretion of the Liquidating Trustee.

As described in this Disclosure Statement, the Liquidating Trust shall adopt valuation methodologies to value the Platform Securities prior to the sale of any Funding Securities.  The valuation methodologies will be disclosed in the Liquidating Trust Agreement. The Liquidating Trust Oversight Board (as defined and described in the Liquidating Trust Agreement), will approve the valuation methodologies. With respect to the Liquidating Trust Assets for which market quotations are not readily available or are deemed not reliable, which are expected to represent a substantial portion of the Liquidating Trust Assets, the Liquidating Trust will value such securities at fair value according to its valuation methodologies as determined in good faith by the Liquidating Trustee.  The Liquidating Trustee will not guarantee a successful liquidation event, any price or range of prices for such Platform Securities.  In addition, the Liquidating Trustee will not charge any fee (other than costs noted in the following sentence) to any Liquidating Trust Beneficiary.  Any costs associated with the sale and liquidation of Funding Securities by the Liquidating Trustee to fund the operations of the Liquidating Trust will be borne exclusively by the Liquidating Trust on behalf of all Liquidating Trust Beneficiaries.

**Expenses to be borne by the Liquidating Trust will reduce the recovery on Platform Securities investments by the Trust Beneficial Owners. Liquidating Trust expenses include recurring and regular items, as well as extraordinary expenses for which it may be hard to budget or forecast. As a result, the amount of expenses ultimately incurred or incurred at any one time may exceed amounts expected or budgeted by the Trust.**

<div align="center">

*6.   Designated Platform Securities.*

</div>

Soley for the purpose of administering the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement, the Debtors and the Committee may elect to allocate the Designated Platform Securities to the Closed-End Fund Assets. Customers who have an economic interest in the Designated Platform Securities will be allocated Liquidating Trust Assets that correspond to the Liquidshares CEF Series and, on the Closed-End Fund Exchange Date, will receive Closed-End Fund Shares together with the Electing Customers.

<div align="center">25</div>

       7.     *Termination of the Liquidating Trust.*

The Liquidating Trust shall terminate upon the earlier of (i) five (5) years from the Effective Date (subject to periodic extensions as may be approved by the Bankruptcy Court) and (ii) the occurrence of certain events as set forth in the Liquidating Trust Agreement. Any remaining assets of the Liquidating Trust at the time of termination shall be distributed in accordance with the Liquidating Trust Agreement.  The Bankruptcy Court and any other court set forth in the Trust Agreement shall retain jurisdiction over the Liquidating Trust.

       8.     *Regulatory Matters.*

The Liquidating Trust Interests are not intended to be Securities within the meaning of the Securities Act.  However, to the extent that any such interests are deemed to be Securities, the offer and sale of any such Liquidating Trust Interests to Customers pursuant to the Plan shall be exempt from registration under the Section 5 of the Securities Act (and any applicable Blue Sky Laws) under  Section 1145(a)(1) of the Bankruptcy Code, except with respect to any Entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under Section 5 of the Securities Act and Blue Sky Laws if the following three principal requirements are satisfied: (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

To the extent any "offer or sale" of the Liquidating Trust Interests may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Allowed Claims against the Debtors, within the meaning of section 1145(a)(1) of the Bankruptcy Code.  The Liquidating Trust Interests, including the Liquidating Trust Interests representing the Liquidshares CEF Series, shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

Notwithstanding anything to the contrary in the Plan, the Liquidating Trust Agreement or the Liquidshares Operating Agreement, neither the Liquidating Trust nor Liquidshares shall engage in any activities, including with respect to the liquidity option, or otherwise conduct its affairs in a manner that would cause such entity to be required to register as an "investment company" within the meaning of the Investment Company Act of 1940, (as amended, the "**Investment Company Act**"), or to register any Liquidating Trust Interests issued by it under Section 12(g) of the Exchange Act.  Similarly, if the Liquidating Trustee is not registered as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act, it shall not engage in any activities or otherwise conduct its affairs in a manner that would cause the Liquidating Trustee to be required to register as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act.

### D.       The Closed-End Fund.

*Formation.*  On or about the Effective Date of the Plan, pursuant to Article IV.D.1. of the Plan, the Manager who has been appointed in accordance with the terms of the Plan, on behalf of the Electing Customers, shall be authorized and directed to take all the steps necessary to cause the formation of the Closed-End Fund for the purpose of initially holding and managing Closed-End Fund Assets, on behalf of Electing Customers.  If the Closed-End Fund is externally managed, the Manager will be an investment adviser registered with the SEC.  The Manager will be disclosed in the Plan Supplement.

The Closed-End Fund will be a newly organized Delaware statutory trust or corporation that will be registered under the Investment Company Act as a closed-end management investment company.  The Closed-End Fund Shares are expected to be listed on a national securities exchange and, therefore, will be freely transferable.  The Closed-End Fund's Board of Trustees (as defined in the Plan) will oversee the Closed-End Fund.  Whether the Closed-End Fund is a Delaware statutory trust or corporation will be disclosed in the Plan Supplement.  The Closed-End Fund will be established and operated in compliance with the Investment Company Act and all applicable rules and regulations of the SEC and any other applicable regulatory authority.  The registration of the Closed-End Fund under the Investment Company Act will not be a condition precedent to the occurrence of the Effective Date of the Plan.

Closed-end investment companies, such as the Closed-End Fund, differ from open-end investment companies (commonly referred to as mutual funds) in that closed-end investment companies generally list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder.  Shareholders can sell their shares in secondary market transactions.  By comparison, mutual funds issue securities that are redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas closed-end investment companies generally can stay more fully invested in securities consistent with the closed-end investment company's investment objective and policies. In addition, in comparison to open-end investment companies, closed-end investment companies have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

On the Effective Date, all the Closed-End Fund Assets will vest, and be deemed to vest, in the Closed-End Fund in accordance with section 1141 of the Bankruptcy Code and as further set forth in Article IV.D.4. of the Plan.

*Investment Objective.*  The investment objective of the Closed-End Fund is to seek long-term capital appreciation by investing in private companies. To achieve its objectives, under normal market conditions, the Closed-End Fund will invest 80% of its total assets either directly or indirectly through special purpose vehicles in equity securities of private companies principally in the technology, artificial intelligence, blockchain/digital assets, consumer/commerce technology, data security, cybersecurity, fintech, hardware technology, biotech, software and space/aerospace sectors.  The investment objective of the Closed-End Fund will not be a fundamental policy of the Closed-End Fund and may be changed by the Board of Trustees without the vote of a majority of the Closed-End Fund's outstanding voting securities (as defined by the

27

Investment Company Act).  The Closed-End Fund's fundamental policies may only be changed by the affirmative vote of the majority of the outstanding Closed-End Fund Shares.

There can be no assurance that the Closed-End Fund will achieve its investment objective. In furtherance of its investment objective, the Closed-End Fund, on the Closed-End Fund Exchange Date, will be invested in a portfolio consisting of Platform Securities, including any Designated Platform Securities, that are contributed to the Closed-End Fund by the Liquidating Trust in exchange for Closed-End Fund Shares that will be distributed to Electing Customers in exchange for their Liquidating Trust Interests.  The Liquidating Trust Interests issued to the Electing Customers will correspond to the Liquidshares CEF Series held by the Liquidating Trust. In turn, the Liquidshares CEF Series will correspond to the Platform Securities in which the Electing Customers had an economic interest.

*Investment Strategy.* Successful private companies have traditionally created significant value for investors in private markets and have typically been reserved for accredited and institutional investors. The decrease in the number of publicly traded companies in the United States has materially shrunk the investable universe for retail investors. At the same time, private companies now outnumber public companies in the United States by over six and one-half to one.[4]  The aggregate estimated value of private companies (excluding those organized as limited liability companies and limited partnerships) in the U.S. surpassed $10 trillion in the first quarter of 2025.[5]  Even as some private companies have become household names, exposure to them remains gated to the vast majority of retail investors. The Closed-End Fund is designed to provide retail investors with exposure to a group of private companies that the Manager believes are capable of additional growth, through an investment vehicle with publicly listed shares that provide intra-day liquidity and a fee structure aligned with democratizing access to private markets. The Closed-End Fund may invest in companies both in and outside the United States. As of the Closed-End Fund Exchange Date, the Closed-End Fund's portfolio will initially consist of Closed-End Fund Assets.

The Closed-End Fund generally will seek to limit its investments in any one private company to no more than 25% of its total assets, measured on the Closed-End Fund Exchange Date and thereafter on the date of any purchase of additional investments. While the Closed-End Fund will target this investment level, the value of the Closed-End Fund's investments will fluctuate so that any one investment may represent more than 25% of the Closed-End Fund's total assets at any given point in time.  The Manager may, in its sole discretion, determine whether to rebalance the Closed-End Fund's portfolio from time to time.

The Closed-End Fund will make direct investments in private companies, which will typically be in the form of non-controlling equity and equity-related securities, including, but not limited to, common stock, warrants, convertible preferred stock, other equity or equity-linked securities or ownership interests in business enterprises, other forms of senior equity, which may

---

[4]      Source: Apollo Academy, Many More Private Firms in the US, April 2024.

[5]      Source: Federal Reserve, Federal Reserve Statistical Release: Financial Accounts of the United States, First Quarter 2025.

or may not be convertible into a private company's common equity, and preferred stock and convertible debt securities.

The Closed-End Fund will also make indirect investments in private companies by purchasing units or shares of special purpose vehicles ("**SPVs**"), venture funds and private equity funds, limited liability companies, limited partnerships, pooled investment vehicles, including venture capital funds, that would be investment companies but for Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act, and other vehicles (each, a "**Private Vehicle**") that provide the Closed-End Fund with economic exposure to the equity of one or more of the private companies in which the Closed-End Fund focuses its investment strategy. Private Vehicles will typically not be controlled by the Closed-End Fund and will not be subsidiaries of the Closed-End Fund. Such investments may include investments made through "secondary transactions," in which the Closed-End Fund acquires an interest in an existing Private Vehicle from another investor. The Closed-End Fund also may seek indirect economic exposure to private companies in other ways, including through special situations, other equity or credit investments, equity-related and equity-linked investments such as forward contracts for future delivery of stock, swaps, and other synthetic equity agreements that provide it with economic exposure to the equity of a private company.

In seeking to achieve its investment objective, the Closed-End Fund will invest, without limit, in privately placed or restricted securities (including in Rule 144A securities, which are privately placed securities purchased by qualified institutional buyers), illiquid securities and securities in which no secondary market is readily available, of private companies. Issuers of these securities are not expected to have a class of securities registered, or be subject to periodic reporting, pursuant to the Exchange Act.

The Closed-End Fund generally intends to hold its investments as a long-term investor, consistent with its investment objective and strategies, and, accordingly, the Closed-End Fund does not expect to divest of investments on any particular timeline or upon the occurrence of any particular event. For example, the Closed-End Fund expects to continue to hold investments in a company after an initial public offering. However, the Closed-End Fund may divest of some or all of an investment as the Manager determines to be appropriate and consistent with the Closed-End Fund's investment objective or strategies. This may occur in connection with an initial public offering or acquisition of a company, in the event the Manager determines it is appropriate to rebalance the portfolio, where the Manager determines that the investment is no longer performing in-line with expectations or ceases to be a private company, or for any other reason in the Manager's discretion.

Under normal circumstances, substantially all of the Closed-End Fund's assets will be invested in direct or indirect investments in private companies. However, the Closed-End Fund may also invest, to a lesser extent in other investments, including listed companies, mutual funds, business development companies ("**BDCs**"), exchange-traded funds, money market funds, U.S. government securities and other fixed income obligations, and cash equivalents (such as bankers' acceptances, certificates of deposit, commercial paper, short-term government and corporate obligations and repurchase agreements), and crypto or digital assets, and may at times hold a significant percentage of its assets in such investments. To the extent that a significant portion of

the Closed-End Fund's assets are invested in such instruments for an extended period of time, the Closed-End Fund may not achieve its investment objective.

The Closed-End Fund expects that it will invest significantly in digital assets, artificial intelligence ("AI"), fintech, aerospace, and hardware related companies. Accordingly, the Closed-End Fund expects that its investments will be concentrated in securities of issuers having their principal business activities in industries or groups of industries in the financials and information technology sectors (i.e., more than 25% of the value of the Closed-End Fund's assets may be invested in such industries or groups of industries).

The Closed-End Fund intends to be classified as a "non-diversified" investment company under the Investment Company Act, which means that it intends to invest a high percentage of its assets in a limited number of issuers and may invest a larger proportion of its assets in a single issuer.

The Closed-End Fund is permitted to borrow money or issue debt securities in an amount up to 33 1/3% of its total assets in accordance with the Investment Company Act. The Closed-End Fund may establish one or more credit lines to borrow money for a range of purposes, including for the purpose of funding investments, to satisfy Closed-End Fund liabilities or obligations, or other specified purposes. The Closed-End Fund may pledge its assets to secure any such borrowings. There is no assurance, however, that the Closed-End Fund will be able to enter into a credit line or that it will be able to timely repay any borrowings under such credit line, which may result in the Closed-End Fund incurring leverage on its portfolio investments from time to time. The Closed-End Fund's use of leverage may increase or decrease from time to time in its discretion and the Closed-End Fund may, in the future, determine not to use leverage.

*Expenses*. The Closed-End Fund will bears its own operating expenses (including, without limitation, any ongoing costs in connection with the Plan and the listing of the Closed-End Fund Shares, and the fees and expenses charged by the Manager, as well as the administrator, custodian and transfer agent). Please refer to Section IV.B.2. – *Summary of Fees and Expenses* below.

*Listing and Trading.* The Closed-End Fund Shares are expected to be listed on a national securities exchange. Shares of closed-end investment companies listed for trading on a national securities exchange frequently trade at a discount from net asset value per share but may, in some cases, trade at a premium. The market price of the Closed-End Fund Shares may be affected by trading volume of the Closed-End Fund Shares, general market and economic conditions and other factors beyond the control of the Closed-End Fund. The foregoing factors may result in the market price of the Closed-End Fund Shares being greater than, less than, or equal to the Closed-End Fund's net asset value per share.

While the Closed-End Fund Shares are expected to be listed on a national securities exchange, an active public market for the Closed-End Fund Shares may not develop. As a result, Electing Customers may not be able to liquidate their investment for an indefinite period of time.

*Redemptions.* No shareholder of the Closed-End Fund will have the right to require the Closed-End Fund to redeem the Closed-End Fund Shares.

*Distributions.* There is no assurance that the Closed-End Fund will pay distributions to shareholders at any particular rate, with any particular frequency, or at all. Should the Closed-End Fund determine to pay distributions at any point, the Closed-End Fund may finance its distributions out of assets legally available for distribution from time to time, at the sole discretion of the Board of Trustees. The Closed-End Fund cannot assure shareholders that the Closed-End Fund will achieve investment results that would allow the Closed-End Fund to make distributions. All distributions will be at the sole discretion of the Board of Trustees and will depend on the Closed-End Fund's ability to dispose of its investments, any net investment income, its financial condition, and such other factors as the Board of Trustees may deem relevant from time to time.

*Dividend Reinvestment Plan*. To the extent the Closed-End Fund determines to pay distributions in the future, the Closed-End Fund intends to establish a dividend reinvestment plan (the "**DRIP**"). Pursuant to the DRIP, any dividends or distributions, net of any applicable U.S. federal withholding tax, paid by the Closed-End Fund will be reinvested automatically in the Closed-End Fund Shares. Shareholders automatically participate in the DRIP. A Shareholder who does not wish to participate in the DRIP and have distributions automatically reinvested may terminate participation in the DRIP at any time by written instructions to that effect. Shareholders who elect not to participate in the DRIP will receive all distributions in cash paid to the Shareholder of record (or, if the Shares are held in street or other nominee name, then to such nominee). Such written instructions must be received by the number of days specified in the Plan Supplement prior to the record date of the distribution or the Shareholder will receive such distribution in Closed-End Fund Shares through the DRIP. Under the DRIP, the Closed-End Fund's distributions to shareholders are reinvested in full and fractional Shares. The automatic reinvestment of distributions will not relieve shareholders of any federal, state or local income tax that may be payable (or required to be withheld) on such distributions. For additional discussion regarding the tax implications of participating in the DRIP, *see* Section XI. below – *Certain U.S. Federal Income Tax Consequences Related to Electing Customers*.

*Taxation*. It has not yet been determined whether the Closed-End Fund will meet the qualifications to be treated as a "regulated investment company" ("**RIC**") under Subchapter M of the Tax Code or if the Closed-End Fund will elect to be treated as a RIC.  Accordingly, for U.S. federal income tax purposes, the Closed-End Fund will be treated as either a RIC or as a U.S. corporation that is subject to taxation pursuant to Subchapter C of the Tax Code (a "**C**" corporation).

If the Closed-End Fund is treated as a C corporation, the Closed-End Fund will be subject to U.S. federal income tax on its taxable income at the rates applicable to C corporations (currently 21%) as well as applicable state and local income taxes. Distributions from the Closed-End Fund will generally be treated as taxable dividend income to the extent of the Closed-End Fund's earnings and profits. Distributions from the Closed-End Fund to non-U.S. investors will generally be subject to U.S. federal withholding tax at a rate of 30% or a reduced rate specified by an applicable income tax treaty.

If the Closed-End Fund is treated as a RIC, the Closed-End Fund generally will not be subject to U.S. federal income tax to the extent that it distributes its investment company taxable income and net realized capital gains. Distributions from the Closed-End Fund will generally be treated as taxable dividend income to the extent of the Closed-End Fund's earnings and profits,

except that certain dividends may be taxable as long-term capital gains. Distributions from the Closed-End Fund to non-U.S. investors will generally be subject to U.S. federal withholding tax at a rate of 30% or a reduced rate specified by an applicable income tax treaty, except for certain "interest-related dividends" and "short-term capital gain dividends."

Prospective investors are urged to consult their own tax advisors with respect to the specific U.S. federal, state, local, and non-U.S. tax consequences of owning Shares.

For a discussion of certain tax risks and considerations relating to an investment in the Closed-End Fund, see the discussion of certain U.S. federal income tax consequences of the Plan set forth in Section XI. below – *Certain U.S. Federal Income Tax Consequences of the Plan*.

*Tax Reporting*. As soon as practicable after the end of each calendar year, the Closed-End Fund will provide a statement on Internal Revenue Service ("**IRS**") Form 1099-DIV (or successor form), identifying the amount and character (*e.g.*, ordinary dividend income, qualified dividend income or long-term capital gain) of any distributions includable in Shareholders' taxable income for such year. For a discussion of the Closed-End Fund's tax reporting, discussion of certain U.S. federal income tax consequences of the Plan set forth in Section XI. below – *Certain U.S. Federal Income Tax Consequences of the Plan*.

*Reports to Shareholders*. The Closed-End Fund will prepare and transmit to shareholders an annual report and a semi-annual report within 60 days after the close of the reporting period for which the report is being made, or as otherwise required by Investment Company Act.

*Term*. The Closed-End Fund's term is perpetual unless the Closed-End Fund is otherwise terminated under the terms of the Closed-End Fund Governing Documents.

  *1.*   *Cautionary Note Regarding Risk Factors and Forward-Looking Statements.*

Before you invest in the Closed-End Fund Shares, you should carefully review the risk factors set forth in Section X. of this Disclosure Statement, which address the numerous risks that could have a material adverse effect on the Closed-End Fund's business, results of operations and financial position. There are also forward-looking statements contained in this Disclosure Statement which involve a number of risks and uncertainties, including statements concerning:

   (i)   the current and future business, operations, financial condition, operating results, or prospects of the Closed-End Fund and those of the issuers of the securities in which the Closed-End Fund invests;

   (ii)   the return or impact of current and future investments;

   (iii)   general market conditions, the state of the general economy, and its impact on the industries in which the Closed-End Fund invests;

   (iv)   the impact of changes in laws or regulations (including

the interpretation thereof), including tax laws, governing the operations of the Closed-End Fund or the issuers of securities in which the Closed-End Fund invests;

(v)     the Closed-End Fund's ability to deploy any capital raised in a future offering;

(vi)    the Closed-End Fund's contractual arrangements and relationships with third parties, including the Manager if such Manager is a third-party investment adviser, administrator, custodian and/or transfer agent;

(vii)   the impact of supply chain constraints on the issuers of the securities in which the Closed-End Fund invests and the global economy;

(viii)  uncertainty surrounding global financial stability;

(ix)    geopolitical tensions and hostilities, and the potential for such tensions and hostilities to adversely impact the industries or the issuers of the securities in which the Closed-End Fund invests;

(x)     the impact of information technology system failures, data security breaches, data privacy compliance, network disruptions, and cybersecurity attacks; and

(xi)    the ability of the Manager to locate suitable investments for the Closed-End Fund and to monitor and administer the Closed-End Fund's investments.

You should not place undue reliance on these forward-looking statements, which are based on information available as of the date of this Disclosure Statement.  Except as required by the federal securities laws, the Debtors undertake no obligation to revise or update any forward-looking statements, whether as a result of new information, future events or otherwise.

Forward-looking statements in this Disclosure Statement are excluded from the safe harbor protection provided by Section 27A of the Securities Act and Section 21E of the Exchange Act. The Closed-End Fund's actual operating results and financial condition could differ materially from those implied or expressed in the forward-looking statements for any reason, including the risk factors described in Section X. and any other information included in this Disclosure Statement.

2.    *Summary of Fees and Expenses.*

The following table contains information about the costs and expenses that shareholders of the Fund will bear directly or indirectly. The expenses shown in the table under "Annual Expenses" are based on estimated amounts for the Fund's first full year of operations and assume that the

Fund issues common shares (representing an aggregate public offering price of $100,000,000) and incurs leverage representing approximately 25% of its total assets. The purpose of the table and the example below is to help you understand the fees and expenses that you, as a shareholder of the Closed-End Fund, would bear directly or indirectly. The following table should not be considered a representation of the Closed-End Fund's future expenses. Actual expenses may be greater or less than shown and, all other things being equal, will increase as a percentage of net assets attributable to common shares if the Closed-End Fund issues fewer Shares than initially contemplated.

The following table contains information about the costs and expenses that shareholders of the Fund will bear directly or indirectly. The expenses shown in the table under "Annual Expenses" are based on estimated amounts for the Fund's first full year of operations and assume that the Fund issues 400,000 common shares (representing an aggregate public offering price of $100,000,000). The purpose of the table and the example below is to help you understand the fees and expenses that you, as a shareholder of the Fund, would bear directly or indirectly. The following table should not be considered a representation of the Fund's future expenses. Actual expenses may be greater or less than shown and, all other things being equal, will increase as a percentage of net assets attributable to common shares if the Fund issues fewer than 400,000 Shares.

**Shareholder Transaction Expenses**

| | |
|---|---|
| Sales load (as a percentage of offering price) | None |
| Offering expenses borne by the Fund (as a percentage of offering price)[1] | 2.50% |
| Dividend Reinvestment Plan fees[2] | None |

| Annual Expenses | Percentage of Average Net Assets Attributable to Common Shares |
|---|---|
| Management fee[3] | 1.29% |
| Interest expense[4] | 0.68% |
| Other expenses[5] | 1.03% |
| Acquired fund fees and expenses | 0.00% |
| Total annual expenses | 3.01% |

(1)     Electing customers will pay all organizational expenses of the Fund. In the event the MIP (as described in Section VI.D.2. below) is triggered, the expected value of the one-time MIP Payout is $1.45 million, assuming an aggregate public offering price of $100,000,000. The expected value of $1.45 million was calculated by considering various probabilities for market-capitalization-to-NAV ratios ranging from a 5% discount to a 100% premium. The analysis centered on a 10% to 20% premium.

(2)     You will pay brokerage charges if you direct the Plan Agent to sell your Shares held in a dividend reinvestment account.

(3)     If externally managed, the Fund will pay a management fee to the Manager in an annual amount equal to 1.29% of the Fund's average daily assets. Any changes to this amount by the selected Manager, will be included in the Plan Supplement.  If internally managed, the Fund will pay salaries to the Manager in an amount that would be less than 1.29% of the Fund's average monthly assets.

34

(4)                        Assumes the Fund uses leverage in an amount equal to 25% of the Fund's assets at an annual interest rate cost to the Fund of 0.68%. The cost of leverage, including the portion of the management fee attributable to the assets purchased with the proceeds of leverage, is borne by common shareholders. The actual amount of interest payments on borrowed funds and interest expense on reverse repurchase agreements borne by the Fund will vary over time in accordance with the level of the Fund's use of borrowings and reverse repurchase agreements and variations in market interest rates.

(5)                        Other Expenses are estimated for the current fiscal year. Assumes the use of leverage representing 25% of the Fund's assets.

(6)                        Acquired fund fees and expenses are based on estimated amounts for the current fiscal year.

**Example**

As required by relevant SEC regulations, the following Example illustrates the expenses that you would pay on a $1,000 investment in Common Shares, assuming (1) "Total annual expenses" of 3.01% of net assets attributable to Common Shares and (2) a 5% annual return:*

|  | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| Total Expenses Incurred | $30 | $95 | $164 | $364 |

*                        The Example should not be considered a representation of future expenses or returns. Actual expenses may be higher or lower than those assumed. Moreover, the Fund's actual rate of return may be higher or lower than the hypothetical 5% return shown in the Example. The Example assumes that all dividends and distributions are reinvested at NAV.

       *3.*        *Transfer and Vesting of Closed-End Fund Assets.*

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional assets become known and assigned to the Closed-End Fund Assets, and subject to the Minimum Closed-End Fund Conditions, the Debtors shall be deemed to have automatically transferred to the Closed-End Fund all of their right, title and interest in the Closed-End Fund Assets. In accordance with sections 363, 365, and/or 1141 of the Bankruptcy Code, as applicable, all such assets shall automatically and irrevocably vest in the Closed-End Fund and clear of all Claims and Liens, subject only to Allowed Claims until paid in full, as set forth in this Plan. Thereupon, the Debtors shall have no interest in or with respect to such additional assets or the Closed-End Fund.

              (i)      On the Effective Date, Liquidshares will issue to the Liquidating Trust, the Liquidshares CEF Series.

              (ii)     On the Effective Date, the Liquidating Trust will issue Liquidating Trust Interests that correspond to the Liquidshares CEF Series to the Electing Customers, subject to such Liquidating Trust Interests being mandatorily exchanged, without further action by the

Electing Customers, for shares of the Closed-End Fund in accordance with the terms of this Plan and the Plan Supplement on the Closed-End Fund Exchange Date;

(iii)   On the Closed-End Fund Exchange Date, (x) the Liquidating Trustee, solely in his or her capacity as such, will cause Liquidshares to transfer the Closed-End Fund Assets to the Closed-End Fund, (y) the Closed-End Fund Exchange will automatically occur immediately upon such transfer with respect to Liquidation Trust Interests that correspond to the Liquidshares CEF Series and are outstanding on the Closed-End Fund Exchange Date; and (z) the Liquidshares CEF Series will be extinguished.

All transfers to the Closed-End Fund shall be exempt from any stamp, real estate transfer, mortgage recording, or similar taxes pursuant to section 1146(a) of the Bankruptcy Code.

4.   *Section 1145 Exemption.*

Except with respect to any Entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the issuance of the Liquidating Trust Interests that corresponded to the Liquidshares CEF Series to Electing Customers under the Plan (to the extent the Liquidating Trust Interests are considered "securities" under applicable law) and the issuance of the Closed-End Fund Shares to Electing Customers under the Plan shall be exempt from registration under Section 5 of the Securities Act (and any applicable state securities law, referred to herein as "**Blue Sky Laws**") under Section 1145(a)(1) of the Bankruptcy Code. Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The Debtors believe that the transfer and vesting of Closed-End Fund Assets as described above will satisfy the requirements of Section 1145 of the Bankruptcy Code, except with respect to any Entity that is an underwriter as defined in Section 1145(b) of the Bankruptcy Code. Any "offer or sale" of the Closed-End Fund Shares (and, to the extent deemed securities under applicable law, the Liquidating Trust Interests that correspond to the Liquidshares CEF Series) that is made to Electing Customers is made under the Plan and in exchange for Allowed Claims against the Debtors, within the meaning of Section 1145(a)(1) of the Bankruptcy Code.

To the extent Section 1145 of the Bankruptcy Code is applicable to securities to be issued under the Plan, such securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under

the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  In addition, securities may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.  Notwithstanding the foregoing, any securities or instruments issued under the Plan remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, in the Closed-End Fund Governing Documents or the Liquidating Trust Agreement on the transferability of such securities and instruments; and (z) any other applicable regulatory approval.  The availability of the exemptions under Section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

5.    *Management of the Closed-End Fund.*

*Board of Trustees*.  The Fund will have a board of trustees to oversee the Manager. The Board of Trustees will not have responsibility for the day-to-day management of the Closed-End Fund, and its oversight role will not make the Board of Trustees a guarantor of the Closed-End Fund's investments or activities.  As required by the Investment Company Act, a majority of the Board of Trustees must be persons who are not "interested persons" (as defined in the Investment Company Act) of the Closed-End Fund (the "**Independent Trustees**").  If the names and business addresses of the Trustees and officers of the Closed-End Fund are known by the Plan Supplement filing date, such information will be included in the Plan Supplement.  If not, the Closed-End Fund will hold a shareholder meeting within 6 months of the Closed-End Fund Exchange Date to elect Trustees. The name and business address of the Trustees and officers of the Closed-End Fund, who will be in office at the Closed-End Fund Exchange Date, and their principal occupations and other affiliations during the past five years, as well as more detailed information about the Board members and its committees, will be set forth under "Management of the Closed-End Fund" in the Closed-End Fund's registration statement on Form N-2.

*Selection of the Manager.*  The Committee and the Debtor Representative shall initially select a Manager whose identity will be disclosed by the Debtors in the Plan Supplement. The Board of Trustees will approve the Manager of the Closed-End Fund.  Any successor Manager shall be appointed by the Board of Trustees in accordance with the requirements of the Investment Company Act.  The Manager will manage the day-to-day management and operation of the Closed-End Fund, subject to the oversight and supervision of the Board of Trustees of the Closed-End Fund.  In consideration for such services, the Closed-End Fund will pay the Management Fee as described below.  In conducting its oversight, the Board of Trustees will receive regular reports from the Manager regarding the Closed-End Fund's operations.  If the Closed-End Fund is externally managed, the Board of Trustees will appoint certain representatives of the Manager as officers of the Closed-End Fund with responsibility to monitor and report to the Board of Trustees on the Closed-End Fund's operations.  As the Closed-End Fund will be listed on a national

securities exchange, the Board of Trustees will establish an Audit Committee and a Nominating and Governance Committee. Any vacancy on the Board of Trustees may be filled by the remaining Trustees, except to the extent the Investment Company Act requires the election of Trustees by the holders of the Closed-End Fund's outstanding voting securities (the "**Shareholders**"). All of the officers of the Closed-End Fund will be directors, officers or employees of the Closed-End Fund, the Manager, or its affiliates. To the fullest extent allowed by applicable law, including the Investment Company Act, the Closed-End Fund Governing Documents will indemnify the Trustees and officers for all costs, liabilities, and expenses that they may experience as a result of their service as such.

*Investment Advisory Agreement*. If the Manager is external to the Closed-End Fund, the Manager must be an adviser registered with the SEC under the Investment Advisers Act, and the Board of Trustees (including a majority of the Independent Trustees) will approve an Investment Advisory Agreement with the Manager. The Investment Advisory Agreement will be terminable without penalty, on 60 days' prior written notice: by a majority vote of the entire Board of Trustees; by vote of a majority (as defined by the Investment Company Act) of the outstanding voting securities of the Closed-End Fund; or by the Manager. After the initial term of two years, the Investment Advisory Agreement may continue in effect from year to year only if such continuance is approved annually by either the Board of Trustees or the vote of a majority (as defined by the Investment Company Act) of the Closed-End Fund Shares; provided that, in either event, the continuance is also approved by a majority of the Independent Trustees by vote cast in-person (or as otherwise permitted by the SEC) at a meeting called for the purpose of voting on such approval. The Investment Advisory Agreement also will provide that it will terminate automatically in the event of its "assignment," as defined by the Investment Company Act and the rules promulgated thereunder.

The Investment Advisory Agreement will provide that, in the absence of willful misfeasance, bad faith, gross negligence, or reckless disregard of its duties to the Closed-End Fund, the Manager, its directors, officers, or employees and their affiliates, successors or other legal representatives will not be liable to the Closed-End Fund for any error of judgment, mistake of law, or act or omission by such person in connection with the performance of services to the Closed-End Fund. The Investment Advisory Agreement also will provide that the Closed-End Fund shall indemnify, to the fullest extent permitted by law, the Manager, or any partners, directors, officers or employees of the Manager and their respective affiliates, executors, heirs, assigns, successors, or other legal representatives, against any liability or expense to which the person may be liable that arises in connection with the performance of services to the Closed-End Fund, so long as the liability or expense is not incurred by reason of the person's willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties to the Closed-End Fund.

If the Closed-End Fund is internally managed, there will be no Investment Management Agreement.

*Administration Agreement*. The Board of Trustees will appoint an administrator to provide certain administrative services necessary for the operation of the Closed-End Fund. Such services are expected to include maintaining certain Closed-End Fund books and records,

providing accounting and tax services and preparing certain regulatory filings. The Closed-End Fund will bear all other costs and expenses of its operations, administration, and transactions.

6. *Capital Structure and Leverage.*

*Common Shares.* With respect to the Closed-End Fund Shares, the Closed-End Fund will be authorized to issue an unlimited number of shares of beneficial interest if a Delaware Statutory Trust, or of common stock if a corporation. Each Closed-End Fund share, when issued and paid for in accordance with the terms of the Plan, will be fully paid and non-assessable. Distributions may be paid to holders of Common Shares, as and when authorized by the Board of Trustees and declared by the Closed-End Fund out of funds legally available therefor. All Closed-End Fund Shares will be equal as to dividends, assets, and voting privileges and will have no conversion, preemptive, or other subscription rights. For so long as required by any national securities exchange on which the Closed-End Fund Shares are listed, if any, the Closed-End Fund will hold an annual meeting of Shareholders in each fiscal year. Holders of Closed-End Fund Shares will vote as a single class to elect the Board of Trustees and on additional matters with respect to which the Investment Company Act mandates a vote by Shareholders. Each Closed-End Fund Share will be entitled to one vote on all matters submitted to a vote of Shareholders.

*Preferred Shares.* The Closed-End Fund's organizational documents are expected to provide that the Board of Trustees may authorize and issue preferred shares having terms as determined by the Board of Trustees, by action of the Board of Trustees without prior approval of the holders of the Closed-End Fund Shares. Holders of Closed-End Fund Shares will have no preemptive right to purchase any preferred shares that might be issued. Any such preferred share offering would be subject to the limits imposed by the Investment Company Act. In addition, the Closed-End Fund generally will not be permitted to declare any cash dividend or other distribution on the Closed-End Fund Shares, or purchase any such Closed-End Fund Shares, unless, at the time of such declaration, the Closed-End Fund would have asset coverage of at least 200% after deducting the amount of such dividend or other distribution. The Investment Company Act grants to the holders of senior securities representing shares issued by the Closed-End Fund certain voting rights, including the right to elect two Trustees of the Board of Trustees. In accordance with the requirements of the Investment Company Act, in the event that the Closed-End Fund failed to pay dividends on its preferred shares for two years, holders of preferred shares would become entitled to elect a majority of the Trustees until the dividends are paid.

*Borrowings.* The Closed-End Fund will be permitted, without prior approval of the Closed-End Fund Shares, to borrow money or issue debt securities in an amount up to 33 1/3% of its total assets in accordance with the Investment Company Act. The Closed-End Fund may issue notes or other evidence of indebtedness (including bank borrowings or commercial paper) and may secure any such borrowings by mortgaging, pledging, or otherwise subjecting the Closed-End Fund's assets as security. In connection with such borrowings, the Closed-End Fund may be required to maintain minimum average balances with the lender or to pay a commitment or other fee to maintain a line of credit. Any such requirements will increase the cost of borrowing over the stated interest rate. There can be no assurance that the Closed-End Fund will be able to utilize leverage on terms that the Manager deems favorable at any given time. Borrowings by the Closed-End Fund will be subject to certain limitations under the Investment Company Act, including the amount of asset coverage required. In addition, agreements related to the borrowings may also

impose certain requirements, which may be more stringent than those imposed by the Investment Company Act. The rights of lenders to the Closed-End Fund to receive interest on, and repayment of, principal of any such borrowings will be senior to those of the Closed-End Fund Shares and holders of any preferred shares , and the terms of any such borrowings may contain provisions that limit certain activities of the Closed-End Fund, including the payment of dividends to holders of Closed-End Fund Shares and the holders of preferred shares, if any, in certain circumstances.

*Credit Facility*.  Subject to limitations imposed by the Investment Company Act upon the issuance of senior securities, the Closed-End Fund may establish one or more credit lines to borrow money for a range of purposes, including for the purpose of funding investments and to otherwise satisfy Closed-End Fund liabilities or obligations.  The Closed-End Fund may pledge its assets to secure any such borrowings.  There is no assurance, however, that the Closed-End Fund will be able to enter into a credit line or that it will be able to timely repay any borrowings under such credit line, which may result in the Closed-End Fund incurring leverage on its portfolio investments from time to time.

7.     *Certain Provisions in the Closed-End Fund Governing Documents.*

Shareholder rights in the Closed-End Fund will be established and governed by the Closed-End Fund Governing Documents.  An investor, including Electing Customers, should carefully review the Closed-End Fund Governing Documents as each Shareholder will agree to be bound by its terms and conditions.  The following is a summary description of certain items and select provisions of the Fund Governing Documents that may not be described elsewhere in this Disclosure Statement.  The description of such items and provisions is not definitive, and reference should be made to the complete text of the Closed-End Fund Governing Documents, copies of which will be included in the Plan Supplement.

a.     *Shareholders; Issuance of Additional Shares.*

The Manager may invest in the Closed-End Fund as a shareholder.

*Issuance of Additional Shares*.  The provisions of the Investment Company Act generally require that the public offering price (less underwriting commissions and discounts) of common shares sold by a closed-end investment company must equal or exceed the net asset value of such company's common shares (calculated within 48 hours of the pricing of such offering), unless such sale is made with the consent of a majority of its common shareholders.  The Closed-End Fund may, from time to time, seek the consent of the Shareholders to permit the issuance and sale by the Closed-End Fund of Common Shares at a price below the Closed-End Fund's then-current net asset value per share ("**NAV**"), subject to certain conditions.  If such consent is obtained, the Closed-End Fund may, contemporaneous with, and in no event more than one year following the receipt of such consent, sell Common Shares at price below NAV in accordance with any conditions adopted in connection with the giving of such consent.  Additional information regarding any consent of Shareholders obtained by the Closed-End Fund and the applicable conditions imposed on the issuance and sale by the Closed-End Fund of Common Shares at a price below NAV will be disclosed in the offering document relating to any such offering of Common Shares at a price below NAV.  Until such consent of Shareholders, if any, is obtained, the Closed-End Fund may not sell Common Shares at a price below NAV.

If the Manager is external to the Closed-End Fund and its compensation is based upon the value of the Closed-End Fund's net assets, such Manager's interests in recommending the issuance and sale of Common Shares at a price below NAV may conflict with the interests of the Closed-End Fund or its Shareholders.

### b.      *Anti-Takeover and Other Provisions.*

The Closed-End Fund Governing Documents are expected to include provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Closed-End Fund, to change the composition of the Board of Trustees, or to convert the Closed-End Fund to open-end status.  These provisions may have the effect of discouraging attempts to acquire control of the Closed-End Fund, attempts which could have the effect of increasing the expenses of the Closed-End Fund and interfering with the normal operation of the Closed-End Fund.  The Board of Trustees may be divided into three classes of Trustees, each serving a staggered three-year term and until his or her successor is elected and qualified.  A Trustee may be removed from office (i) at any meeting of the Shareholders by a vote of not less than two-thirds of the Closed-End Fund Shares, or (ii) with or without cause at any time by written instrument signed by at least two-thirds of the number of Trustees prior to such removal, specifying the date upon which such removal shall become effective.  Subject to the Investment Company Act, the Trustees may also fill vacancies caused by enlargement of their number or by the death, resignation, or removal of a Trustee.  The Closed-End Fund Governing Documents may require the affirmative vote of not less than 75% of the Closed-End Fund Shares to approve, adopt, or authorize an amendment to the Closed-End Fund Governing Documents that makes the Closed-End Fund Shares a "redeemable security" as that term is defined in the Investment Company Act, unless such amendment has been approved by a majority of the Trustees then in office, in which case approval by the vote of a majority of the outstanding voting securities, as defined in the Investment Company Act, is required, notwithstanding any provisions of the Closed-End Fund Governing Documents.  Upon the adoption of a proposal to convert the Closed-End Fund from a "closed-end company" to an "open-end company," as those terms are defined by the Investment Company Act, and the necessary amendments to the Closed-End Fund Governing Documents to permit such a conversion of the Closed-End Fund Shares, the Closed-End Fund shall, upon complying with any requirements of the Investment Company Act and applicable state law, become an "open-end" investment company.  Such affirmative vote or consent shall be in addition to the vote or consent of the Shareholders otherwise required by law, or any agreement between the Closed-End Fund and any relevant national securities exchange.

### c.      *Certain Aspects of the Delaware Control Share Statute.*

If the Closed-End Fund is organized as a Delaware statutory trust, it will be subject to the control share acquisition provisions (the "**Control Share Statute**") contained in Subchapter III of Delaware Statutory Trust Act (the "**DSTA**").  The Control Share Statute became automatically applicable to listed closed-end funds organized as Delaware statutory trusts upon its effective date of August 1, 2022.

The Control Share Statute provides for a series of voting power thresholds above which shares are considered control shares.  These voting power thresholds are as follows:

- 10% or more, but less than 15% of all voting power;
- 15% or more, but less than 20% of all voting power;
- 20% or more, but less than 25% of all voting power;
- 25% or more, but less than 30% of all voting power;
- 30% or more, but less than a majority of all voting power; or
- a majority or more of all voting power.

Voting power is defined by the Control Share Statute as the power to directly or indirectly exercise or direct the exercise of the voting power of fund shares in the election of trustees. Whether a voting power threshold is met is determined by aggregating the holdings of the acquirer as well as those of its "associates," which is broadly defined by the Control Share Statute.

Once one of the applicable foregoing thresholds are reached, an acquirer will have no voting rights under the DSTA or the governing documents of the Closed-End Fund with respect to shares acquired in excess of that threshold (*i.e.*, the "control shares") unless approved by the Shareholders or exempted by the Board of Trustees. Approval by the Shareholders will require the affirmative vote of two-thirds of all votes entitled to be cast on the matter, excluding voting securities held by the acquirer and its associates, as well as shares held by certain insiders of the Closed-End Fund. The Control Share Statute provides procedures for an acquirer to request a shareholder meeting for the purpose of considering whether voting rights shall be accorded to control Closed-End Fund Shares. Further approval by the Shareholders would be required with respect to additional acquisitions of control shares above the next applicable threshold level. The Board of Trustees will be permitted, but not obligated to, exempt specific acquisitions or classes of acquisitions of control shares, either in advance or retroactively.

The Control Share Statute requires Shareholders to disclose to the Closed-End Fund any control share acquisition within 10 days of such acquisition and, upon request, to provide any information that the Board of Trustees reasonably believes is necessary or desirable to determine whether a control share acquisition has occurred.

The Control Share Statute may protect the long-term interests of Shareholders by limiting the ability of certain investors to use their ownership to attempt to disrupt the Closed-End Fund's long-term strategy, such as by forcing a liquidity event. However, the Control Share Statute may also serve to entrench the Board of Trustees and make it less responsive to shareholder requests. The totality of positive or negative effects is difficult to predict as the Control Share Statute has been in effect for a relatively short period of time.

The foregoing is only a summary of certain aspects of the Control Share Statute. Shareholders should consult their own legal counsel to determine the application of the Control Share Statute with respect to their Closed-End Fund Shares and any subsequent acquisitions of Closed-End Fund Shares.

If the Closed-End Fund is organized as a corporation, the Closed-End Fund may opt-in to a control share statute similar to the Control Share Statute, subject to the limitations of the Investment Company Act.

####     d.        *Limitation of Liability; Indemnification.*

The Closed-End Fund Governing Documents will provide that *the* Trustees and former Trustees of the Board of Trustees and officers and former officers of the Closed-End Fund will not be liable to the Closed-End Fund or Shareholders for any loss or damage occasioned by any act or omission in the performance of their services as such in the absence of willful misfeasance, bad faith, gross negligence, or reckless disregard of the duties involved in the conduct of their office or as otherwise required by applicable law.  The Closed-End Fund Governing Documents will also contain provisions for the indemnification, to the extent permitted by law, of the Trustees, former Trustees of the Board of Trustees, officers, and former officers of the Closed-End Fund (as well as certain other related parties) by the Closed-End Fund (but not by the Shareholders individually) against any liability and expense to which any of them may be liable that arise in connection with the performance of their activities on behalf of the Closed-End Fund.  Persons extending credit to, contracting with, or having any claim against the Closed-End Fund shall look only to the assets of the Closed-End Fund for payment under such credit, contract, or claim, and neither the Shareholders, the Trustees, nor any of the Closed-End Fund's officers, employees, or agents, whether past, present, or future, shall be personally liable therefor.  The rights of indemnification and exculpation provided under the Closed-End Fund Governing Documents shall not be construed so as to limit liability or provide for indemnification of the Trustees, former Trustees of the Board of Trustees, officers, and former officers of the Closed-End Fund, and the other persons entitled to such indemnification for any liability (including liability under applicable federal or state securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification or limitation on liability would be in violation of applicable law, but shall be construed so as to effectuate the applicable provisions of the Closed-End Fund Governing Documents to the fullest extent permitted by law.

####     e.        *Derivative Actions, Direct Actions and Exclusive Jurisdiction.*

The Closed-End Fund Governing Documents may provide that Shareholders may bring a derivative action on behalf of the Closed-End Fund only if the following conditions are met: (i) the Shareholders must make a pre-suit demand upon the Trustees to bring the subject action, unless an effort to cause the Trustees to bring such an action is not likely to succeed; (ii) the Shareholders eligible to bring such derivative action under the DSTA or other applicable law who hold at least ten percent (10%) of the Closed-End Fund Shares of the Closed-End Fund or ten percent (10%) of the Closed-End Fund Shares of the series or class to which such action relates, shall join in the request for the Trustees to commence such action; (iii) the Trustees must be afforded a reasonable amount of time to consider the request of the Shareholders and to investigate the basis of such claim (the Trustees may retain counsel or other advisors in considering the merits of the request and Shareholders making such request must reimburse the Closed-End Fund for the expense of any such advisor if the Trustees determine not to take action); (iv) the Board of Trustees may designate a committee of one Trustee to consider a Shareholder demand if necessary or create a committee with a majority of Trustees who do not have a personal financial interest in the transaction at issue; and (v) any decision by the Trustees to bring, maintain, or compromise (or not to bring, maintain, or compromise) such court action, proceeding or claim, or to submit the matter to a vote of the Shareholders, shall be made by the Trustees in good faith and shall be binding upon the Shareholders.  A Shareholder may only bring a derivative action if Shareholders owning not

less than ten percent (10%) of the Closed-End Fund Shares or such series or class joins in the bringing of such court action, proceeding or claim.

Further, to the fullest extent permitted by Delaware or other applicable law, Shareholders may not bring direct actions against the Closed-End Fund and/or the Trustees, except to enforce their rights to vote or certain rights to distributions or books and records under the applicable law, in which case a Shareholder bringing such direct action must hold in the aggregate at least 10% of the Closed-End Fund Shares (or at least 10% of the class to which the action relates) to join in the bringing of such direct action.  Notwithstanding the foregoing, however, such provision shall not apply to any claims asserted under U.S. federal securities law.

The Closed-End Fund Governing Documents may provide that actions by Shareholders against the Closed-End Fund asserting a claim governed by Delaware law or the Closed-End Fund Governing Documents must be brought in the Court of Chancery of the State of Delaware or any other court in the State of Delaware with subject matter jurisdiction.  Shareholders will also waive the right to jury trial to the fullest extent permitted by law.  This exclusive jurisdiction provision may make it more expensive for a Shareholder to bring a suit.  Notwithstanding the foregoing, however, such provision shall not apply to any claims asserted under such U.S. federal securities law.

> *f.*     *Advance Notice Provisions for Shareholder Nominations and Shareholder Proposals.*

The Closed-End Fund Governing Documents will provide that with respect to an annual meeting of Shareholders, nominations of persons for election to the Board of Trustees and the proposal of business to be considered by Shareholders may be made only (1) pursuant to a notice of the meeting, (2) by the Board of Trustees, or (3) by a Shareholder who is entitled to vote at the meeting, who has complied with the advance notice procedures of the Closed-End Fund Governing Documents and who is a Shareholder of record at the time of the annual meeting and at the time of giving notice pursuant to the advance notice procedures of the Closed-End Fund Governing Documents.  With respect to special meetings of Shareholders, only the business specified in the notice of the meeting may be brought before the meeting.  Nominations of persons for election to the Board of Trustees at a special meeting may be made only (1) pursuant to a notice of the meeting, (2) by the Board of Trustees, or (3) provided that the Board of Trustees has determined that Trustees will be elected at the meeting, by a Shareholder who is entitled to vote at the meeting, who has complied with the advance notice provisions of the Closed-End Fund Governing Documents, and who is a Shareholder of record at the time of the special meeting and at the time of giving notice pursuant to the advance notice procedures of the bylaws.

The purpose of requiring Shareholders to give advance notice of nominations and other business is to afford the Board of Trustees a meaningful opportunity to consider the qualifications of the proposed nominees and the advisability of any other proposed business, and, to the extent deemed necessary or desirable by the Board of Trustees, to inform Shareholders and make recommendations about such qualifications or business, as well as to provide a more orderly procedure for conducting meetings of Shareholders.  Although the Closed-End Fund Governing Documents will not give the Board of Trustees any power to disapprove shareholder nominations for the election of Trustees or proposals recommending certain action, they may have the effect of

precluding a contest for the election of Trustees or the consideration of shareholder proposals if proper procedures are not followed, and of discouraging or deterring a third-party from conducting a solicitation of proxies to elect its own slate of trustees or to approve its own proposal without regard to whether consideration of such nominees or proposals might be harmful or beneficial to the Closed-End Fund and Shareholders.

> g.      *Amendment of the Closed-End Fund Governing Documents.*

The Closed-End Fund Governing Documents may generally be amended, in whole or in part, with the approval of a majority of the Board of Trustees (including a majority of the Independent Trustees, if required by the Investment Company Act) and without the approval of the Shareholders unless the approval of Shareholders is required under the Investment Company Act or such an amendment would limit shareholder rights, in accordance with the Closed-End Fund Governing Documents.  The bylaws in the Closed-End Fund Governing Documents may not be amended by Shareholders.

> h.      *Term, Dissolution, and Liquidation.*

The Closed-End Fund has an indefinite term.  In the event the Board of Trustees elects to liquidate the Closed-End Fund, after paying or adequately providing for the payment of all liabilities of the Closed-End Fund and the liquidation preference with respect to any outstanding preferred shares, and upon receipt of such releases, indemnities, and refunding agreements as they deem necessary for their protection, the Board of Trustees may distribute the remaining assets of the Closed-End Fund among the classes of Shares of the Closed-End Fund in accordance with the respective rights of such classes.

> 8.      *Closed-End Fund Fees and Expenses.*

The Closed-End Fund will bear all expenses and costs incurred in the conduct of the Closed-End Fund's business, including, without limitation, the following:

> i.      the Closed-End Fund's share of all fees, costs, and out-of-pocket expenses (including any legal and other professional fees and expenses and platform fees) incurred by the Closed-End Fund, the Manager, or its affiliates in connection with the formation of the Closed-End Fund (including all or a portion of such amounts in respect of the Closed-End Fund and the development, formation, and operation of investment vehicles established to facilitate investments by the Closed-End Fund, as well as other vehicles through which the Closed-End Fund makes or holds investments), the incorporation and registration of such entities (in the U.S. or otherwise), related regulatory filings (such as Form N-CSR, Form N-CEN, Form N-PORT, and others under the Investment Company Act), any related taxes, the offering and distribution of the interests therein (including jurisdictional legal and tax advice, preparation of disclosures, notifications, translations, publications (including, without limitation, on a website for regulatory, commercial, or other purposes)), such share being determined as between

the Closed-End Fund and any such other entity on a basis that the Manager determines in good faith is appropriate ("**Organizational Expenses**");

ii. legal (including without limitation in respect of corporate formalities, such as corporate secretary services and domiciliation services), accounting, regulatory (including expenses incurred in connection with certain filings and registrations (in the U.S. and externally)), compliance, administrator, consulting (including expert network and media consultants), valuation, custodial, depositary, auditing (including fees charged by an independent auditor in connection with in-kind subscriptions), costs associated with any post-petition regulatory audit, investigation, settlement, or review of any entity of the Closed-End Fund, costs incurred with any action, suit, or proceeding of any kind of nature, transfer agency, third-party director, administrator and Shareholder servicing, banking, database subscriptions (including, without limitation, subscriptions used for the purposes of researching, monitoring, valuing, or obtaining market data in respect of potential or existing portfolio investments), software licensing, web hosting, digital platform, data aggregation, marketing, translation, reporting and other external professional fees and expenses, but excluding, for the avoidance of doubt, the costs of the Manager's and its affiliates' general compliance with law not related to the Closed-End Fund;

iii. out-of-pocket costs of developing, sourcing, evaluating, negotiating, structuring, obtaining regulatory approvals for, purchasing, trading, settling, monitoring, holding and disposing of potential investments, whether consummated or unconsummated, and including expenses related to meetings or conferences hosted or attended by the Manager, its affiliates, or any of its respective employees, to source investments, attend industry conferences and trade association memberships, and, in the case of unconsummated investments, break-up fees, and of making, monitoring, holding, or selling investments (including, without limitation, expenses relating to risk assessment, due diligence, or ongoing monitoring of potential and existing investments, including the environmental, social, and governance risks related thereto), including expenses related to the organization or maintenance of any entity (including intermediate entities) used to acquire, hold, or dispose of any investment or otherwise facilitate the Closed-End Fund's investment activities, record-keeping expenses, travel, hotel accommodations, meals and entertainment expenses ("**Travel Expenses**"), consulting fees and expenses and any finders, placement, brokerage, or other similar fees and expenses; expenses associated with the preparation of the Closed-End Fund's financial statements and tax returns, the representation of the Closed-End Fund or Shareholders in tax matters and preparation of tax forms and the Closed-End Fund's information reporting regime compliance, and the preparation of tax reports for Shareholders in different jurisdictions, out-of-pocket costs and expenses, including without limitation, Travel Expenses, of meeting with Shareholders and reporting to Shareholders, including expenses incurred in

46

connection with the Closed-End Fund's Shareholder meetings (including Travel Expenses of the representatives of Shareholders, employees of the Manager, or its affiliates, speakers, and vendors), and annual software licensing fees and other fees related to investor reporting, as well as publication costs (including without limitation on a website or database, for regulatory, commercial, or other purposes);

iv.    except as otherwise provided herein, any taxes, fees, or other governmental charges levied against the Closed-End Fund, its income, the Closed-End Fund's Assets, or in connection with its business or operations;

v.    Board of Trustees' fees, board committee fees, and other costs and expenses of the Board of Trustees, including the operation of the board of any intermediary/holding vehicle, Travel Expenses for members of the Board of Trustees, Closed-End Fund employees, and employees of the Manager or its affiliates incurred in connection with meetings of the Board of Trustees, meetings with Shareholders or meetings related to the Closed-End Fund;

vi.    a fee to the Manager, which is typically a percentage payable monthly calculated based on the value of assets in the Closed-End Fund, if the Manager is external to the Closed-End Fund, or individual compensation and benefits to officers and employees of the Closed-End Fund, if internally managed (the "**Management Fee**");

vii.    interest on, and fees and expenses related to or arising from, any incurrence of indebtedness, including without limitation in respect of any credit facility, guarantees of indebtedness, or hedging activities of the Closed-End Fund (whether or not such facility or hedging arrangement is implemented);

viii.    premiums or fees for Trustees and officers of the Closed-End Fund or Manager liability insurance and other insurance protecting the Closed-End Fund or any indemnified party from liabilities in connection with the affairs of the Closed-End Fund;

ix.    amounts charged to the Closed-End Fund for certain reporting, legal, tax, valuation, accounting, and general administrative services provided by employees of the Manager or its affiliates;

x.    interest costs related to borrowing, any related facility fees, commitment expenses, and any other costs related to the borrowing;

xi.    all other costs and expenses of the Closed-End Fund, the Manager or its affiliates in connection with the Closed-End Fund's organization and/or operations, such as costs of litigation or other matters that are the subject of indemnification and costs of winding-up and liquidating the Closed-End Fund; and

xii.      where appropriate and relevant, all ongoing costs and expenses, as detailed under (i) to (xi) above, as incurred in connection with, or by, any other vehicles through which the Closed-End Fund makes or holds investments, as well as the respective general partners or equivalent (if not a partnership) of such entities.

The Manager may in the future enter into arrangements with certain persons to provide services to the Manager that benefit the Closed-End Fund.  The Manager will allocate fees and expenses with respect to such services on a fair and equitable basis.

The Closed-End Fund (and potentially a portfolio company or proposed portfolio company) may be charged amounts in connection with the provision of services by in-house personnel of the Manager and any of its affiliates.  The Manager will make the foregoing determination as to such amounts in its discretion, taking into account factors that it reasonably believes to be appropriate in the circumstances.

The expenses, fees, and commissions that will be borne by the Closed-End Fund are set out above, but there is no formal cap on the level of those expenses.

Expenses to be borne by the Closed-End Fund will reduce the actual returns realized by Shareholders on their investment in the Closed-End Fund (and may, in certain circumstances, reduce the amount of capital available to be deployed by the Closed-End Fund in investments). Closed-End Fund expenses include recurring and regular items, as well as extraordinary expenses for which it may be hard to budget or forecast.  As a result, the amount of Closed-End Fund expenses ultimately incurred or incurred at any one time may exceed amounts expected or budgeted by the Closed-End Fund.

The Manager will make judgments with respect to allocation of expenses in its good faith discretion, notwithstanding its interest in the outcome, and may make corrective allocations after the fact should it determine that such corrections are necessary or advisable.  Notwithstanding the foregoing, the portion of an expense allocated to the Closed-End Fund for a particular item or service may not reflect the relative benefit derived by the Closed-End Fund from that item or service in any particular instance.

Unless otherwise agreed in writing between the Closed-End Fund and the Manager from time to time, to the extent that the Manager or its affiliates (i) pays or otherwise bears the costs of any Closed-End Fund expenses or (ii) advances amounts to the Closed-End Fund on a temporary basis, the Closed-End Fund shall reimburse the Manager or such affiliate for the same.

         9.     *Net Asset Valuation.*

The NAV of the Closed-End Fund Shares will be determined quarterly by dividing the value of total assets minus liabilities by the total number of Closed-End Fund Shares outstanding.

The Board of Trustees will approve procedures pursuant to which the Closed-End Fund will value its investments.

In general, portfolio securities and assets of the Closed-End Fund for which market quotations are readily available will be valued on the basis of readily available market quotations at their current market value.  Securities held directly by the Closed-End Fund (i) which are listed or have unlisted trading privileges on a national or regional securities exchange shall be valued at their closing price on the date of determination on the largest national or regional securities exchange (measured by dollar volume of transactions in all securities traded thereon) on which such securities shall have traded, (ii) which are included in the National Market List compiled by the Financial Industry Regulatory Authority (FINRA) or similar lists compiled by comparable non-U.S. associations of securities dealers shall be valued at their closing price on the date of determination, or (iii) which are not described in clauses (i) or (ii) of this paragraph or for which prices cannot be determined in accordance with such clauses (i) or (ii) shall be valued at the mean between the last "bid" and "ask" prices on the date of determination, provided that in each of the foregoing cases, if no such prices are available on the relevant date of determination, the latest of such prices shall be used.

The value of any cash on hand or on deposit, bills and demand notices and accounts receivable, prepaid expenses, cash dividends, and interest declared or accrued as aforesaid and not yet received shall be deemed to be the full amount thereof unless in any case the same is unlikely to be paid or received in full, in which case the value thereof shall be determined after making such discount as the Manager may consider appropriate in such case to reflect the true value thereof.

Assets and liabilities initially expressed in foreign currencies will be converted into U.S. dollars using foreign exchange rates provided by a recognized pricing service.

With respect to the Closed-End Fund Assets for which market quotations are not readily available or are deemed not reliable, which are expected to represent a substantial portion of the Closed-End Fund Assets, the Closed-End Fund will value such securities at fair value according to its written valuation procedures ("**Valuation Policy**") and as determined in good faith by the Closed-End Fund's Valuation Designee.  The Board of Trustees will designate the Closed-End Fund's "Valuation Designee," which will be the Manager if the Closed-End Fund is externally managed, or an officer of the Closed-End Fund if the Closed-End Fund is internally managed.

The Valuation Policy will permit the Valuation Designee to use a variety of valuation methodologies in connection with valuing the Closed-End Fund's investments.  The methodology used for a specific type of investment may vary based on the market data available or other considerations.  As a general matter, valuing securities and assets accurately is difficult and can be based on inputs and assumptions which may not always be correct.

Valuations of the Closed-End Fund Assets will be supplied primarily by independent third-party pricing services appointed pursuant to the processes set forth in the Valuation Policy.  The Closed-End Fund's officers, consistent with the monitoring and review responsibilities set forth in the Valuation Policy, will regularly review procedures used and valuations provided by the pricing services.  Valuations provided by pricing services will generally be based on methods that the Closed-End Fund's officers believe are reasonably designed to approximate the amount that the Closed-End Fund would receive upon the sale of the portfolio security or asset.  When providing valuations to the Closed-End Fund, pricing services will use various inputs, methods, models and

assumptions, which may include information provided by broker-dealers and other market makers. Pricing services face the same challenges as the Closed-End Fund would in valuing securities and assets and may rely on limited available information. If the pricing service cannot or does not provide a valuation for a particular investment, or such valuation is deemed unreliable, such investment is fair valued. Quotes from broker-dealers (i.e., prices provided by a broker-dealer or other market participant, which may or may not be committed to trade at that price), adjusted for fluctuations in criteria such as credit spreads and interest rates, may also be used to value the Closed-End Fund's securities and assets.

The Board will oversee the Valuation Designee's implementation of the Valuation Policy and may consult with representatives from the Closed-End Fund's outside legal counsel or other third-party consultants in their discussions and deliberations. The value of the Closed-End Fund Assets will be based on information reasonably available at the time the valuation is made and that the Valuation Designee believes to be reliable. The Valuation Designee generally will value the Closed-End Fund's investments in accordance with Certification Topic ASC 820 of the Financial Accounting Standards Board.

The Closed-End Fund expects that it will hold a significant proportion of its assets in private investments that do not have readily ascertainable market prices.

In the event that the Valuation Designee determines that the above valuation guidelines are impracticable or not appropriate in relation to a particular Closed-End Fund Asset, or in the case of assets or liabilities not specifically referenced above, the Valuation Designee shall determine prudently and in good faith the fair value of such asset or liability, including the potential to rely on internal pricing models. Such valuations might vary from similar valuations performed by independent third parties for similar types of securities or assets or liabilities. The valuation of illiquid securities and other assets and liabilities is inherently subjective and subject to increased risk that the information utilized to value such assets or liabilities or to create the price models could be inaccurate or subject to other errors.

Electing Customers should be aware that there can be no assurance that the valuation of the Closed-End Fund Assets as determined under the procedures described above will in all cases be accurate, especially given that the Closed-End Fund and the Valuation Designee will not generally have access to all necessary financial and other information relating to certain of the Closed-End Fund Assets to determine independently the NAV of the Closed-End Fund's interests in those investments.

Closed-End Fund Assets valued at fair value by the Valuation Designee will be subject to a new valuation determination upon the next quarterly valuation of the Closed-End Fund. Electing Customers should be aware that fair value represents a good faith approximation of the value of an asset or liability. The fair value of one or more assets or liabilities may not, in retrospect, be the price at which those assets or liabilities could have been sold during the period in which the particular fair values were used in determining the NAV. As a result, the Closed-End Fund's issuance (including through dividend or distribution reinvestment) of Closed-End Fund Shares at a time when it owns investments that are valued at fair value may have the effect of diluting or increasing the economic interest of the Shareholders.

The Closed-End Fund may engage a third-party valuation firm to review the valuation of the Closed-End Fund's fair-valued investments.

Determination of fair values involves subjective judgments and estimates not susceptible to substantiation by auditing procedures. Accordingly, under current auditing standards, the notes to the Closed-End Fund's financial statements will refer to the uncertainty with respect to the possible effect of such valuations, and any change in such valuations, on the Closed-End Fund's financial statements.

### E.      The Wind-Down Trust

#### 1.      *Creation of the Wind-Down Trust.*

The Wind-Down Trust will be formed on the Effective Date to effect the liquidation and distribution of the Wind-Down Trust Assets, as well as any and all transactions incidental thereto, in accordance with the Plan, the Confirmation Order, and the Wind-Down Trust Agreement. The corpus of the Wind-Down Trust shall consist of the Wind-Down Trust Assets. On the Effective Date, pursuant to the Plan and in accordance with the Wind-Down Trust Agreement, the Wind-Down Trust Assets shall be irrevocably transferred to and vest in the Wind-Down Trust free and clear of any and all actual or alleged prepetition and postpetition Claims, Causes of Action, Interests, Liens, other encumbrances and liabilities of any kind , in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Wind-Down Trust Agreement. From and after the Effective Date, all proceeds of the Wind-Down Trust Assets shall be paid to the Wind-Down Trust to be applied in accordance with the Plan. Upon the transfer of the Wind-Down Trust Assets to the Wind-Down Trust, the Debtors will have no reversionary or further interest in or with respect to the Wind-Down Trust Assets.

A Wind-Down Trust will be created on or before the Effective Date.

The Wind-Down Trust Interests shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

The Wind-Down Trust shall be established to liquidate the Wind-Down Trust Assets and make distributions in accordance with the Plan, Confirmation Order, and Wind-Down Trust Agreement, and in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. The Wind-Down Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. Accordingly, the Wind-Down Trust Beneficiaries shall be treated for U.S. federal income tax purposes (1) as direct recipients of undivided interests in the Wind-Down Trust Assets (other than to the extent the Wind-Down Trust Assets are allocable to Disputed Claims) and as having immediately contributed such assets to the Wind-Down Trust, and (2) thereafter, as the grantors and deemed owners of the Wind-Down Trust and thus, the direct owners of an undivided interest in the Wind-

Down Trust Assets (other than such Wind-Down Trust Assets that are allocable to Disputed Claims).

### 2. *Preservation of Confidences and Attorney-Client Privilege.*

In connection with the vesting and transfer of assets to the Wind-Down Trust, including rights and the Retained Causes of Action, access to books and records, any documents and information produced by third parties to the Debtors or Special Subcommittee, any attorney-client privilege of the Debtors, and work-product protection or other privilege or immunity attaching to any documents or  communications (whether written or oral) transferred to the Wind-Down Trust shall vest in the Wind-Down Trust; *provided*, that the Special Subcommittee shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Wind-Down Trust or any other Person or Entity without the prior written consent of the Special Subcommittee's Chairperson, Jeremy Rosenthal, in which case such documents will continue to be subject to the attorney-client privilege of the Debtors and work product protections or other privilege and immunity which shall be transferred as specified in the proceeding section of this sentence.  The Wind-Down Trustee is authorized and the Debtors are directed to take all necessary actions to effectuate the transfer contemplated in this paragraph, including the transfer of such privileges, protections, and immunities.

### 3. *Wind-Down Trustee.*

On the Effective Date, the Wind-Down Trustee shall be the sole authorized representative and signatory of the Wind-Down Trust Agreement (if any), with authority to render all services necessary to effectuate the terms of the Plan as they relate to the Wind-Down Trust.

The powers, authority, responsibilities, and duties of the Wind-Down Trustee shall be governed by the Plan, the Confirmation Order, and the Wind-Down Trust Agreement. The Wind-Down Trustee shall have no duty to the Debtors.

The Wind-Down Trustee may execute, deliver, file, or record such documents, instruments, releases, and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan as they relate to the Wind-Down Trust.

The Committee shall select the Wind-Down Trustee, and its identity shall be disclosed by the Debtors at or prior to the Combined Hearing. Any successor Wind-Down Trustee shall be appointed pursuant to the Wind-Down Trust Agreement.

Additional information regarding the Wind-Down Trustee will be set forth in the Plan Supplement, including further detail with respect to the Wind-Down Trustee's responsibilities and authority, powers and limitations, compensation, and professionals. The Plan Supplement will also contain additional information regarding the establishment and administration of any reserves needed to address Disputed Claims, if any.

4.      *Wind-Down Trustee's Authority and Duties.*

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Wind-Down Trust, and shall have all powers, rights and duties of a trustee, as set forth in the Wind-Down Trust Agreement, subject to oversight by the Wind-Down Trust Oversight Committee.

Among other things, the Wind-Down Trustee shall:

(i)      hold and administer the Wind-Down Trust Assets, all of which shall be automatically transferred to the Wind-Down Trust;

(ii)     administer the Platform Cash, as described Article IV.E. of the Plan;

(iii)    have the sole authority and discretion on behalf of the Wind-Down Trust to evaluate and determine strategy with respect to the Retained Causes of Action, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Retained Causes of Action on behalf of the Wind-Down Trust on any terms and conditions as it may determine in good faith based on the best interests of Wind-Down Trust Beneficiaries;

(iv)     have the power and authority to retain, as an expense of the Wind-Down Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Wind-Down Trustee hereunder or in the Wind-Down Trust Agreement;

(v)      make distributions to Wind-Down Trust Beneficiaries as provided in the Wind-Down Trust Agreement and the Plan;

(vi)     have the right to receive reasonable compensation for performing services as the Wind-Down Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Wind-Down Trustee in performing the duties and responsibilities required under the Plan and the Wind-Down Trust Agreement;

(vii)    file, litigate, settle, compromise or withdraw objections to Claims;

(viii)   take any and all actions necessary of advisable to wind down the Debtors, their subsidiaries, affiliates, and Estates, including the platform, as provided in the Wind-Down Trust Agreement or the Liquidating Trust Agreement and with respect to Liquidshares, the Wind-Down Trustee and the Liquidating Trustee shall cooperate in the orderly wind up of Liquidshares when appropriate;

(ix)     be considered an estate representative as provided for under section 1123 of the Bankruptcy Code with respect to the assets placed in the Wind-Down Trust;

(x)    have the right to provide periodic reports and updates to Wind-Down Trust Beneficiaries regarding the status of the administration of the Wind-Down Trust Assets, including the Retained Causes of Action;

(xi)    enforce and defend the provisions of Article IX.C., IX.D., and IX.F of the Plan, including the assumption and retention of D&O Liability Insurance Policies. The Wind Down Trust agreement will incorporate the obligations to assume and procure the D&O Liability Insurance Policies and these enforcement provisions; and

(xii)    Sell the Reserved Securities, as provided in the Plan and the Wind-Down Trust Agreement.

5.    *Transfer and Vesting of Assets to Wind-Down Trust.*

On the Effective Date, pursuant to the Plan and in accordance with the Wind-Down Trust Agreement, all rights, title, and interests in and to the Wind-Down Trust Assets shall be irrevocably transferred to the Wind-Down Trust.  In accordance with section 1141 of the Bankruptcy Code, the Wind-Down Trust shall have no liability for, and the Wind-Down Trust Assets shall automatically vest in the Wind-Down Trust free and clear of, any and all actual or alleged pre-petition and post-petition Claims, Retained Causes of Action, Interests, Liens, encumbrances, or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates, or their property based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Wind-Down Trust Agreement.

All transfers to the Wind-Down Trust shall be exempt from any stamp, real estate transfer, mortgage recording, or similar taxes pursuant to section 1146(a) of the Bankruptcy Code.

6.    *Exited Customer Cash Pool.*

On or prior to the Effective Date, the Debtors shall establish and fund the Exited Customer Cash Pool.

The Debtors and/or the Wind-Down Trustee shall not commingle any funds contained in the Exited Customer Cash Pool and the Wind-Down Trustee shall use such funds to pay only the Exited Customer Claims, as and when Allowed.  No Liens or Claims shall encumber the Exited Customer Cash Pool in any way.

7.    *Administration of the Wind-Down Trust Assets.*

From and after the Effective Date, the Wind-Down Trustee shall administer all assets of the Wind-Down Trust in accordance with the Plan, the Wind-Down Trust Agreement, and the Confirmation Order.

Proceeds of Wind-Down Trust Assets (apart from the Exited Customer Cash Pool, which shall only be used to pay Exited Customer Claims) shall be paid to the applicable Holders of

Allowed Claims, on a pro rata basis, in the following priority and amounts (the "**Wind-Down Trust Waterfall**"):

(i)    First, to satisfy all costs and expenses of the Wind-Down Trust, as set forth in the Wind-Down Trust Agreement.

(ii)   Second, payment of any Allowed Administrative Claims not paid in full prior to the Effective Date.

(iii)  Third, to payment of Allowed Convenience Trade Claims.

(iv)   Fourth, pari passu payment of any Allowed Other General Unsecured Claims, Allowed Customer Deficiency Claims, Allowed Customer Rescission Claims, and Allowed Unsubordinated Governmental Claims, as modified pursuant to the Customer Recission Claims Settlement Pursuant to Article IV.B. of the Plan.

(v)    Fifth, payment of interest on all claims in the preceding section (iii).

(vi)   Sixth, if there are any remaining proceeds, payment of Allowed Subordinated Governmental Claims, and Allowed Subordinated Claims.

(vii)  Seventh, if there are any remaining proceeds, payment of Allowed Existing Equity Interests.

8.    *Administration of Platform Cash.*

On the Effective Date, or as soon thereafter as the Wind-Down Trustee determines, in his or her discretion, and before or upon winding down the Debtors' platform, the Wind-Down Trustee shall cause checks or wires to be issued to Customers for whose benefit the Debtors hold Platform Cash, each in the amount of Platform Cash held for any such Customer, as set forth in the Wind-Down Trust Agreement. The Wind-Down Trustee shall send a notice electronically requesting that Customers withdraw their Platform Cash within 60 days after such notice, the Wind-Down Trustee shall have the authority to issue a check or wire to such Customers based on the address or bank account information for each such Customer in the Debtors' books and records, without further notice to any Entity and without further order of the Court.

9.    *Termination of the Wind-Down Trust.*

The Wind-Down Trust shall terminate upon the earlier to occur of (a) the completion of all distributions required to be made under the Plan and the Wind-Down Trust Agreement or (b) five (5) years from the Effective Date, subject to such extensions as may be approved by the Bankruptcy Court upon motion of the Wind-Down Trustee. Any remaining assets of the Wind-Down Trust at the time of termination shall be distributed in accordance with the Wind-Down Trust Agreement.

10. *Regulatory Matters.*

The interests of Wind-Down Trust Beneficiaries in the Wind-Down Trust are not intended to be Securities within the meaning of the Securities Act.  However, to the extent that any such interests are deemed to be Securities, the offer and sale of any such interests in the Wind-Down Trust to Customers pursuant to the Plan shall be exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under Section 5 of the Securities Act and Blue Sky Laws if the following three principal requirements are satisfied: (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

To the extent any "offer or sale" of the interests in the Wind-Down Trust may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Allowed Claims against the Debtors, within the meaning of section 1145(a)(1) of the Bankruptcy Code.  The interests of Wind-Down Trust Beneficiaries in the Wind-Down Trust shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

Notwithstanding anything to the contrary in the Plan or the Wind-Down Trust Agreement, the Wind-Down Trust shall not engage in any activities, including with respect to the liquidity option, or otherwise conduct its affairs in a manner that would cause such entity to be required to register as an "investment company" within the meaning of the Investment Company Act, or to register any Wind-Down Trust Interests issued by it under Section 12(g) of the Exchange Act. Similarly, if the Wind-Down Trustee is not registered as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act, it shall not engage in any activities or otherwise conduct its affairs in a manner that would cause the Wind-Down Trustee to be required to register as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act.

11. *Certain Tax Matters.*

The Wind-Down Trustee shall file tax returns for the Wind-Down Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with the Plan.  The Wind-Down Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items is respect of any assets allocable to, or retained on account of, Disputed Claims) will be allocated to each holder in accordance with their relative ownership of Wind-Down Trust Interests.

As soon as possible after the Effective Date, the Wind-Down Trustee shall make a good faith valuation of the Wind-Down Trust Assets and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

The Wind-Down Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Wind-Down Trust for all taxable periods through the dissolution thereof.  Nothing in Article IV.D.10. of the Plan shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

The Wind-Down Trustee may, to the extent permitted by applicable law, timely elect to treat any Wind-Down Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9.  If a "disputed ownership fund" election is made, all parties (including the Wind-Down Trustee and the holders of Wind-Down Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing.  The Wind-Down Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.

Founded in 2010 by Bill Sarris as a technology and software development company providing services to financial technology firms, Linqto, Inc. evolved into a financial technology platform that was intended to enable investors to indirectly invest in private-market startups and pre-IPO companies.

From February 2020 through March 14, 2025, Linqto, Inc. operated an online platform that purported to allow customers to indirectly invest in private companies, with a focus on the technology sector.  More specifically, Debtor Liquidshares would purchase and hold Liquidshares Portfolio Companies.  With respect to a limited number of transactions at the start of the platform's operation, Linqto, Inc. would loan money to Liquidshares to fund its purchase of Platform Securities.  Following the acquisition of Platform Securities, the Platform Securities were held in Liquidshares' inventory.

Liquidshares then purported to allocate an economic interest in the Platform Securities to special purpose vehicles in the form of series limited liability companies (each, a "**Series**") and offered customers the opportunity to purchase an indirect economic interest in the Liquidshares Portfolio Company by purchasing units in the series limited liability companies.(the "**Units**"). Each Series was purportedly a fund eligible for exemption from the definition of an investment company under Section 3(c)(1) of the Investment Company Act.  Units in the Series were sold to customers using the platform, and were purportedly offered only to accredited investors.

Units were priced using "dynamic pricing," which was based on internally generated "estimates" of supply and demand that were designed to generate sales revenue to the Debtors in excess of their cost for acquiring the private securities.  This resulted in customers paying an excessive markup in lieu of management fees and/or carried interest.  Liquidshares also paid Linqto, Inc., where all corporate functions, including employes, were housed, a "service fee." Additionally, from April 2023 through August 2024, customers were also charged a 10% fee characterized as a "brokerage commission."  This fee was collected by Liquidshares and booked

to non-Debtor Linqto Capital, LLC ("**Linqto Capital**"), and was later characterized as a "redemption fee."

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS.

### A.   Potential Securities Violations.

Beginning in November 2020, counsel to the Debtors advised the Debtors that their corporate structure and practices may not be compliant with applicable federal and state securities laws.  Specifically, from November 2020 through January 2025, the following violations likely occurred:

*1.   Securities Act Violations.*

- The offering of Units likely violated Section 5 of the Securities Act by not following all conditions that would permit reliance on Rule 506(b) or Rule 506(c) of Regulation D under the Securities Act to conduct an exempt offering of Units.

- To the extent customers that were not eligible contract participants received contractual rights to payment based on the value of the applicable Platform Securities without obtaining ownership of such Platform Securities, the Debtors effecting such transactions would be deemed to have engaged in the unregistered offer and sale of security-based swaps ("**SBSs**") in violation of Section 5(e) of the Securities Act.

*2.   Exchange Act of 1934 Violations.*

- The Series could be considered one integrated issuer and if so, likely would have been required to register its securities under Section 12(g) of the Exchange Act.

- Depending on the customers' economic interest in the Platform Securities, the Debtors likely engaged in unregistered dealer activity in violation of Section 15(a) of the Exchange Act by purchasing and selling the Platform Securities to the Series or the customers.  The Debtors also likely engaged in unregistered dealer activity in violation of 15(a) of the Exchange Act by, among other things, buying and selling the Units as principal, charging a markup/brokerage commission/redemption fee to customers, and having a sales force of affiliated personnel to solicit transactions.

- Depending on the customers' economic interest in the Platform Securities, the Debtors may have engaged in unregistered "security-based swap dealer" activity in violation of Section 15F(a) of the Exchange Act by selling SBSs referencing the Private Securities.

- By operating the platform, Linqto, Inc. likely engaged in unregistered "broker" or "security-based swap execution facility" activity in violation of Section 15(a) or Section 3D(a) of the Exchange Act.

3.  *Investment Company Act of 1940 Violations.*

- The Platform Securities were never transferred to the Series and were held by Liquidshares. Liquidshares likely operated as an unregistered investment company and in violation of the registration provisions of Section 7(a) of the Investment Company Act.

- The Series likely operated as unregistered investment companies and in violation of the registration provisions in Section 7(a) of the Investment Company Act.

4.  *Investment Advisers Act of 1940 Violations.*

- Liquidshares and Linqto Liquidshares Manager LLC are likely investment advisers that were required to be registered with the SEC under Section 203 of the Investment Advisers Act of 1940.

5.  *Antifraud Statutes.*

- The Debtors likely violated Section 17(a) of the Securities Act by, among other things, failing to provide adequate disclosure to customers regarding the charged markups on the Units, the internal loans between Linqto, Inc. and Liquidshares and the structure in which the Platform Securities were held.

- The Debtors likely violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by, among other things, failing to provide adequate disclosure regarding the charged markups to customers, the internal loans between Linqto, Inc. and Liquidshares, and the structure in which the Platform Securities were held.

6.  *Other Jurisdictions' Securities Laws.*

- Linqto may have violated provisions of state and international securities laws throughout its operation.

In October 2024, the SEC's Division of Enforcement informed Linqto of an investigation to determine if violations of the federal securities laws had occurred.

Additionally, upon referral from the FINRA examinations staff, FINRA Enforcement is investigating Linqto Capital for related exceptions found during the new member exam, including alleged deficiencies relating to SEC and FINRA rules governing (i) anti-money laundering and know your customer procedures, (ii) filing and delivering of Form CRS, (iii) net capital requirements, (iv) commissions charged for brokerage services in connection with repurchases of

the Units, (v) adequacy of disclosures made to customers relating to ATS non-operation and commission charges, (vi) adequacy and availability of Linqto Capital's records, (vii) accuracy of Form ATS and ATS-R regulatory filings and (viii) the filing of FOCUS reports.

These investigations are ongoing.

### B.      Retention of New Management.

The Board engaged in efforts to hire a new CEO to succeed Bill Sarris and other executive management beginning in early 2024. Following a months-long search for a new chief executive, the Board appointed Francis "Dan" Siciliano II, co-founder and CEO of Nikkl, Inc. ("**Nikkl**"), as the Chief Executive Officer of Linqto, Inc. and a member of Linqto Inc.'s Board.  Mr. Siciliano began serving as CEO on January 2, 2025. Along with Mr. Siciliano, Michael Huskins, Cathy Siciliano, Jesus Ancheta and Sean Bowden joined Linqto, Inc.'s executive leadership team as General Counsel, Chief Operating Officer, Chief Administrative Officer, and CEO of Linqto Capital, respectively.  As set forth below, in connection with hiring the new management team, the Debtors and Nikkl began to explore a transaction in which Linqto, Inc. would acquire Nikkl.

Dan Siciliano is an independent director and Chair of the board of the Federal Home Loan Bank of San Francisco, the co-founder of Nikkl, co-founder, board member, and Chairman of the Silicon Valley Directors' Exchange (SVDX), and former Chairman of the national non-partisan American Immigration Council. He is also the founder of Optemy, a strategy consulting group that trains and advises boards and executives on various topics, including disruption/change management, the impact of autonomous (AI/ML/robotic) systems and innovations, executive compensation, corporate compliance, and technological competitiveness and security.

Dan Siciliano is the former Co-Director of Stanford's Directors' College, prior Co-Chair of the We Robot Conference on AI/Robotics, Law, and Policy, and the past faculty director of the Rock Center for Corporate Governance at Stanford University. He co-founded the Rock Center in 2006 and, as a Professor of the Practice and Associate Dean at Stanford Law School, led the Center until 2017. He was a Stanford faculty member for more than a decade, with a focus on corporate strategy and governance, capital financial markets, technological disruption (including fintech, insurtech, AI, and cybersecurity), and executive compensation. Mr. Siciliano is also qualified as an audit committee financial expert under NYSE Manual Section 303A.07(a). Mr. Siciliano has a J.D. from Stanford University and a B.A. from University of Arizona.

Michael Huskins, Linqto's General Counsel, was previously the Chief Legal Officer and a co-founder of Nikkl.

Mr. Huskins spent nearly eight years as head of product operations at Twilio Inc. and nearly seven years at McKinsey. He also served as General Counsel at a global semiconductor company manufacturer and practiced corporate and securities law at Wilson Sonsini. Mr. Huskins has an M.B.A from the Wharton School of University of Pennsylvania and an A.B. from Princeton University.

Cathy Siciliano, Linqto's Chief Operating Officer, has over 25 years of experience in high tech and financial services industries, including as multi-channel digital marketing leader at Silicon

Valley Bank. Ms. Siciliano has an M.B.A. from Harvard Business School and an A.B from Stanford University.

Jesus Ancheta, Linqto's Chief Administration Officer, is an executive with over 15 years of experience leading finance, operations, administration, services and customer success organizations in the software (SaaS) industry. Mr. Ancheta has a BS from the University of Arizona.

Sean Bowden, CEO of Linqto Capital, has over 25 years of experience building out business, regulatory, operational, and financial management programs. Mr. Bowden holds FINRA Series 7, 14, 14A, 21, 24, 25, 27, 28, 63, 79 and 99 licenses. Mr. Bowden has a B.A. from Fordham University.

Linqto, Inc. and Nikkl contemplated Linqto Inc.'s eventual acquisition of Nikkl in conjunction with the appointment of Nikkl's leadership team to lead Linqto, Inc. After discovering the challenges confronting Linqto, Inc., however, Nikkl elected to withdraw from consideration as an acquisition target for Linqto, Inc. on or about March 11, 2025. No purchase or sale agreement was executed.

As Linqto Inc.'s new leadership team gained access to company records and spoke with Linqto personnel, they quickly developed concerns about how the Company had historically interpreted and complied with applicable securities laws requirements. In particular, the new leadership team realized that prior management had knowingly failed to cure extensive and serious securities law violations that began as early as 2020.

In light of these violations, Mr. Siciliano removed a number of senior executives from their roles, and Linqto, Inc.'s new management team began investigating the Company's business operations and regulatory compliance issues and cooperating with ongoing investigations from regulators. Throughout the course of these investigations, which are ongoing, management discovered extensive regulatory compliance violations along with a culture of systematic and pervasive non-compliance, requiring immediate and serious corrective action.

In February of 2025, the Company engaged Sullivan & Cromwell LLP ("**S&C**") to, among other things, facilitate full cooperation with the SEC investigation and other investigations, assess the platform's regulatory compliance and advise on how the company could operate in a compliant manner going forward. Among myriad other compliance issues, Linqto, Inc.'s management also discovered that the Company failed to maintain an effective system for verifying the accredited status of its customers with respect to offerings available only to accredited investors.

As a result of the misinformation provided to customers and the improper operating structure, the Debtors face substantial contingent liabilities to their customers, which, taken together, may render the Debtors insolvent on a balance sheet basis.

When new management became aware of the Company's severe and pervasive operational and compliance deficiencies in February of 2025, management paused operation of the platform while it sought to implement proper controls and procedures. As new management became aware of the depth and extent of the Company's historical non-compliance with the securities laws, however, management determined that continued operation of the platform would be ill advised

and likely exacerbate the Company's liabilities. As a result, the Company determined to indefinitely suspend operation of the platform and, by extension, its customer-facing operations, on March 13, 2025.

In addition to the SEC investigation, FINRA's investigation of Linqto Capital is ongoing.

As these investigations are ongoing, Linqto, Inc.'s current management, together with the Debtors' professionals, are cooperating with the SEC and other regulators.

### C. Efforts to Reduce Operating Costs and Expenses.

In the months leading up to the filing of these Chapter 11 Cases, the Debtors' management implemented a variety of measures to improve efficiency and reduce operating costs. Between January and June of 2025, the Company implemented three reductions in force and several terminations, reducing its total number of full-time employees from 87 to 28 and reducing its monthly payroll by approximately $1,070,000, or approximately 68%, compared to January of 2025.

### D. The Special Subcommittee's Delegated Authority.

On June 3, 2025, the General Committee of the Board of Directors (the "**Board**") of Linqto, Inc. established the Special Subcommittee of the General Committee of the Board of the Company (the "**Special Subcommittee**"), comprised of Jeremy Rosenthal, Alison Kutler, and Norman Reed, as members; and Jeffrey S. Stein, as non-voting ex officio member and advisor.

The Special Subcommittee was vested by the General Committee with the exclusive authority to, among other things: (i) initiate, design, establish, direct, administer, control and conduct an internal investigation (the "**Independent Investigation**") of potential claims and causes of action of the Debtors and to take various actions in connection with the Independent Investigation; (ii) assert any claims or causes of action and/or to prosecute, settle, or assign any claims or causes of action related the matters subject to the Independent Investigation; (iii) initiate, design, negotiate, adopt, and seek approval of any new compensation arrangements for officers and executives of the Company, including any key employee incentive plan and/or any key employee retention plan (each a "**Key Employee Plan**"); (iv) examine, investigate, analyze, assess, evaluate, and approve (or reject) the terms and conditions of any transaction or proposed transaction (or any component thereof) between the Debtors, on the one hand, and any of their Related Parties, on the other hand, that presents an actual or potential conflict of interest, as reasonably determined by the Special Subcommittee (a "**Potential Conflict Transaction**"), for which the Special Subcommittee determines, in its sole reasonable discretion, presents an actual or potential conflict of interest with a Related Party; and (v) review, analyze, evaluate, monitor, and exercise general oversight of all proceedings and activities of the Company related to any Key Employee Plan and any Potential Conflict Transaction.

Further, the Special Subcommittee was vested by the General Committee with the authority to examine, investigate, analyze, assess, evaluate, approve the terms and conditions of, and authorize the Company to enter into: (i) any debt financing proposal; (ii) any proposed sale of all or a portion of the Debtors' equity holdings or assets; and (iii) any proposed action to cause the chapter 11 filing of any of the Debtors, including communications with the boards of such

entities, including as to the Company's position as to the appropriateness and requirement for any such filing, and any other matters related thereto, including any appropriate presentations, plans of reorganization or liquidation, and/or actions before the Bankruptcy Court.

               1.     *Independent Investigation.*

Prior to the Petition Date, in their capacity as voting members of the Special Subcommittee, Jeremy Rosenthal and Alison Kutler commenced the Independent Investigation into whether the Debtors hold any viable and valuable claims or causes of action that are worthy of pursuit in the context of the Chapter 11 Cases.[6]  Effective as of June 13, 2025, Linqto, Inc. retained Katten Muchin Rosenman LLP ("**Katten**") as counsel to render independent legal services at the sole discretion of the Special Subcommittee, including in connection with the Independent Investigation.  As set forth in the Plan, the provisions of Article IX. of the Plan, including the release and exculpation, are subject to ongoing review and modification, including as part of the Independent Investigation, which remains ongoing as of the date hereof. Accordingly, the Debtors, in consultation with the Special Subcommittee, reserve the right to modify Persons or Entities included as "Released Parties" or "Exculpated Parties" under the Plan until the Combined Hearing.

Based upon, among other things, the scope of the Company's historical violations of securities law and in order to preserve estate resources and limit administrative expenses, the Special Subcommittee, in its reasonable business judgment, narrowed the Independent Investigation to solely whether the Debtors hold any viable and valuable claims or causes of action against the Debtors' directors and officers as of the Petition Date.  As a result, all potential estate claims against any other Related Party of the Debtors will be preserved for the benefit of the Debtors' stakeholders as "Retained Causes of Action" and such Related Parties will not be "Released Parties" under the Plan.

In furtherance of the Independent Investigation, the Special Subcommittee has, to date and with assistance from Katten, carried out extensive diligence into the matters subject to the Independent Investigation. Specifically, the Special Subcommittee issued document and information requests to the Debtors seeking, among other things, Board and committee materials and minutes, corporate governance documents, directors' and officers' insurance policies, litigation- and securities-related documents, documentation of related party transactions, transaction documents, certain financial information, and other documents and information relevant to the Independent Investigation.  In response to these requests, Katten received and reviewed over 3,900 documents.  Katten also requested all documents, including emails, collected by the Company in connection with all ongoing government investigations.  In response to this request, Katten received access to a database containing over 3.8 million custodial emails, attachments, Teams messages, and other documents from current and former Company personnel. Katten conducted targeted searches based on Katten's legal and factual analysis and, to date, has

---

[6]       Mr. Rosenthal, as Chairperson of the Special Subcommittee, determined that Mr. Reed would not participate in the Independent Investigation. Therefore, as used in this section, as it relates to the Independent Investigation, the term "Special Subcommittee" does not include Mr. Reed.

reviewed over 38,000 documents relevant to the Independent Investigation.  In addition, Katten has conducted four interviews of individuals relevant to the Independent Investigation.

The Special Subcommittee has met with Katten on a weekly basis to direct the Independent Investigation and obtain updates on the workstreams and findings of the Independent Investigation.  Katten has also been in communication with counsel to the Committee since its appointment, including to apprise the Committee on the general scope and status of the Independent Investigation.

The Special Subcommittee has divided the Independent Investigation into two general categories, which are described below.

<div align="center"><i>a.    Investigation Relating to New Directors and Officers.</i></div>

The first category of the Independent Investigation relates to whether the Debtors hold any viable and valuable claims or causes of action against current Linqto directors and officers who were first appointed to the Board or were hired as officers of Linqto in early 2025:[7]  Dan Siciliano II, CEO, Michael Huskins, General Counsel, Cathy Siciliano, Chief Operating Officer, Jesus Ancheta, Chief Administrative Officer, Sean Bowden, CEO Linqto Capital, and Alison Kutler, Director (collectively, the "**New D&Os**").[8] The New D&Os were instrumental in, among other things, beginning to address Linqto's operational and compliance deficiencies both internally and externally (including to the applicable governmental regulators), pausing operation of the Linqto platform while it sought to implement proper controls and procedures, and cooperating with the ongoing investigations by government regulators (collectively, the "**Responsive Actions**").

The Special Subcommittee's Independent Investigation of the New D&Os included an analysis of, among other things, (i) the facts and circumstances leading to the New D&Os' appointments at Linqto; (ii) the New D&Os' conduct since each New D&O's respective appointment; and (iii) the allegations against the New D&Os raised by various stakeholders of the Debtors in materials delivered to the Board and pleadings filed in the Chapter 11 Cases.

The Independent Investigation as to the New D&Os is substantially complete. After receiving a detailed privileged legal presentation from Katten, which followed months of thorough analysis, the Special Subcommittee concluded that (i) the New D&Os were not involved in the Company's potential securities law violations, pursued the Responsive Actions, and appropriately discharged their fiduciary duties during the relevant period; and (ii) allegations against the New D&Os raised by various stakeholders were unfounded.

Accordingly, the Special Subcommittee concluded that the Debtors do not have viable and valuable claims or causes of action against the New D&Os that are worthy of pursuit. Further, the

---

[7]    For the avoidance of doubt, this category of the Independent Investigation does not include any current directors and officers who were on the Board or employed by Linqto prior to Mr. Siciliano taking over the position of CEO.

[8]    Mr. Rosenthal, as Chairperson of the Special Subcommittee, determined that Ms. Kutler would not participate in this area of the Independent Investigation.

New D&Os have provided significant value to the Debtors during these Chapter 11 Cases. Accordingly, the New D&Os will be "Released Parties" under the Plan.

> b.   *Investigation Relating to Other Current Directors and Officers.*

The second category of the Independent Investigation relates to whether the Debtors hold viable and valuable claims or causes of action against current directors and officers who have been at the Company since at least 2024 (collectively, the "**Other Current D&Os**").

The Special Subcommittee's Independent Investigation of the Other Current D&Os included an analysis of, among other things, (i) historical operational and compliance deficiencies; (ii) historical violations of securities laws; (iii) management and oversight of the Company's business; (iv) communications with customers, investors, or other third parties; and (v) use of Company assets by Related Parties and entry into Related Party transactions.

The Special Subcommittee determined that the Debtors hold potential claims and causes of action against the Other Current D&Os that should be preserved under the Plan as "Retained Causes of Action" if not otherwise resolved in the Chapter 11 Cases. Accordingly, only the Persons and Entities specified as "Released Parties" in the Plan will receive the releases set forth in Article IX. of the Plan, and all potential estate claims and causes of action against other Persons and Entities, including the Other Current D&Os, will be preserved under the Plan as "Retained Causes of Action," regardless of whether such potential claims and causes of action relate to the Independent Investigation.

> c.   *Conclusion.*

In accordance with its delegated authority and its members' fiduciary obligations, the Special Subcommittee is continuing to investigate potential estate claims and causes of action. The description herein of potential estate claims and causes and action examined as part of the Independent Investigation is not exhaustive, and the Special Subcommittee, working with Katten, is continuing to examine additional claims and causes of action and the Independent Investigation remains ongoing as of the date hereof. The outcome of the Independent Investigation could result in material modifications to the Plan, including, without limitation, changes to the release and exculpation provisions.

The Special Subcommittee, the Debtors, and the Committee have been working cooperatively to assess ways to maximize the value of potential estate claims and causes of action that are subject to the Independent Investigation. In accordance with the Plan, the definition of "Released Parties" may be modified, including to add additional Released Parties, if such modification is determined by the Special Subcommittee based on the outcome of the Independent Investigation, in consultation with the Committee.

The Special Subcommittee, working with Katten, will provide the Court and constituents with any updates to the results of the Independent Investigation prior to or in connection with the Combined Hearing.

2.      *Management Incentive Plan.*

    a.      *Establishment of Management Incentive Plan.*

On and after the Effective Date, the Plan shall facilitate the implementation of the Management Incentive Plan ("**MIP**") to provide a single collective incentive that will be divided among Dan Siciliano, Michael Huskins, Cathy Siciliano, Jesus Ancheta and Sean Bowden (collectively, the "**Key Employees**") whose continued performance is critical to (a) maximizing the value of the estates and (b) ensuring the successful formation of a viable Liquidating Trust and Closed-End Fund.

    b.      *Incentive Metrics and Performance Period.*

The MIP is designed to protect the Customers by ensuring that the Key Employees only participate in a surplus Closed-End Fund value created, if any. Specifically, only after the Closed-End Fund achieves a 110% market premium over the total fair value of the portfolio of securities and other instruments held by the Closed-End Fund, and as determined in accordance with the rules and regulations of the Investment Company Act, do the Key Employees begin to share in a portion of the surplus value created through creation of the Closed-End Fund.

If the market price of the Closed-End Fund Shares does not exceed 110% of the total fair value of the Closed-End Fund, the Key Employees will receive no compensation under the MIP, all as provided more specifically below. As a result, the Customers will be approximately made whole for bankruptcy-related expenses before any payout is made.

In this way, the economics of the MIP are similar to an employee stock option program where the call option is out of the money at the time of issuance. However, unlike employee stock options that have unlimited upside, the MIP Payout (as defined below) is capped as a function of the market price of the Closed-End Fund Shares. Moreover, because the MIP is tied to the market price of the Closed-End Fund Shares rather than the total fair value of the Closed-End Fund, the MIP does not compensate the Key Employees for any increase in the total fair value of the Closed-End Assets contributed to the Closed-End Fund by Customers.

    c.      *Conditions Precedent.*

Each Key Employees is only eligible for the MIP Payout Amount if the following conditions precedent are met:

- The Key Employee is an employee in good standing with the Debtors as of the date that the Confirmation Date;

- The Plan is successfully Confirmed;

- Both the Liquidating Trust and the Closed-End Fund are formed in accordance with the Plan and all applicable laws and regulations and the Key Employee is an employee in good standing with the Debtors as of the date the Liquidating Trust and the Closed-End Fund are formed; and

66

- The Manager is not an entity that is controlled by or affiliated with the Key Employees.

    *d.*    *Incentive Awards.*

        *(i)*    *Defined Terms.*

"***Average Per-Share Market Price***" means with respect to the Closed-End Fund Shares, the average of the Closing Prices (as defined below) during the Measurement Period (as defined below).

"***Closing Price***" means the price of the last reported sale of the common stock (or equivalent) of the Closed-End Fund on the principal exchange or market where the Closed-End Fund's common stock is traded during the regular trading session on a given trading day.

"***Fully Diluted Basis***" means, with respect to the number of shares of the Closed-End Fund's capital stock outstanding, the total number of shares that would be outstanding assuming the conversion, exercise, or exchange of all outstanding securities (whether or not then exercisable or convertible) that are convertible into or exercisable or exchangeable for shares of such capital stock, including, without limitation, all outstanding options, warrants, restricted stock units, restricted stock awards, convertible notes, convertible preferred stock, and similar rights and all shares reserved for issuance under any equity incentive or similar plans, but excluding any such securities that have expired or been cancelled without exercise or conversion.

"***Market Premium Ratio***" means the quotient of dividing the Total Market Capitalization (as defined below) by the Total Net Asset Value (as defined below). For example, if the Total Market Capitalization is 111 and the Total Net Asset Value is 100, then the Market Premium Ratio would be 1.11x.

"***Measurement Date***" means the trading day that is 180 calendar days after trading of the Closed-End Fund's common stock commences, provided that if such 180th calendar day after trading commences is not a trading day then the Measurement Date shall be the next trading date after the 180th calendar day.

"***Measurement Period***" the measurement period is the period from when the Closed-End Fund begins trading until the Measurement Date.

"***Total Market Capitalization***" means the Average Per-Share Market Price (as defined below) of the Closed-End Fund multiplied by the total shares of capital stock of the Closed-End Fund outstanding on a Fully Diluted Basis as of the Measurement Date.

"***Total Fair Value***" means the average fair value of all securities held by the Closed-End Fund during the Measurement Period where fair value is calculated in accordance with Section 2(a)(41) of the Investment Company and Rule 2a-5 under the Investment Company Act and such fair value shall be calculated on a monthly basis during the Measurement Period.

"***Total Net Asset Value***" means the difference of (x) Total Fair Value less (y) average liabilities during the Measurement Period.

*(ii)      Award.*

If the Market Premium Ratio is at or below 1.1x as of the Measurement Date, the MIP Payout Amount is $0.

If the Market Premium Ratio is greater than 1.1x, the MIP Payout Amount is the lesser of:

- The product of (x) 1/5 multiplied by (y) the difference between Total Market Capitalization less the product of 1.1 multiplied by the Total Fair Value; or

- 5% of the Total Market Capitalization or the amount calculated in accordance with the following.

For example, suppose that the Total Market Capitalization is 60, and the Total Fair Value is 50. The Market Premium Ratio is 60/50 = 1.2, which is greater than 1.1x. Therefore, to calculate the MIP Payout Amount, the first calculation would be (1/5) * (60 – (1.1 * 50)) = 1.0. The second calculation would be 50 * 0.05 = 2.5. Therefore, the MIP Payout Amount would be 1.0, the lesser of the two calculated amounts.

As a condition to the payment of the KEP Payout Amount, if requested by the Manager, the Key Employees, working as independent contractors, shall each provide up to five hours per week of their time during the Measurement Period to help the Manager successfully run the Closed-End Fund, subject to customary and ordinary limitations for vacation, sick days, personal days, disability, and/or death, provided, however, that at no time will any Key Employee take on a role that would be deemed to be an Affiliated Person.

The MIP Payout Amount (if otherwise payable pursuant to the MIP) shall be paid to the Key Employees, as determined by Mr. Siciliano, in six equal monthly cash payments starting on the date that is five (5) business days after the Measurement Date. In the alternative, at the option of the Closed-End Fund Manager, the MIP Payout Amount can be paid in registered, listed, and fully tradable common stock of the Closed-End Fund issued to the Key Employees in a single payment five (5) business days after the Measurement Date.  The MIP Payout Amount shall be subject to the rules and regulations of the Investment Company Act, including with respect to sections 18 and 23 thereof.

*e.      Administrative Authority.*

The Manager shall have the authority to implement the MIP, in accordance with, and pursuant to the Plan.

*f.      Bankruptcy Approval.*

The MIP shall be approved pursuant to the Plan.

## VII.   MATERIAL DEVELOPMENTS AND EVENTS IN THE CHAPTER 11 CASES

### A.   Commencement of the Chapter 11 Cases.

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.   First Day and Second Day Relief and Other Case Matters.

Each of the Debtors Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**") on July 7, 2025 (*i.e.*, the Petition Date) in the Bankruptcy Court. On or around the Petition Date, the Debtors Filed certain "first day" motions requesting emergency relief (the "**First Day Pleadings**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A list of each of the First Day Pleadings is set forth in the *Declaration of Jeffrey S. Stein in Support of the Debtors' Chapter 11 Petitions, First Day Motions and Related Relief*. The First Day Pleadings, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at **https://dm.epiq11.com/linqto**.

At a hearing on July 8, 2025 (the "**First Day Hearing**"), the Bankruptcy Court granted all of the relief initially requested in the First Day Pleadings on an interim or final basis. In particular, the Bankruptcy Court approved the following motions:

- *Debtors' Emergency Motion for Entry of An Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees and Commissions, (D) Honor the Terms of Premium Financing Agreements, and (E) Enter Into New Premium Financing Agreements in the Ordinary Course of Business; and (II) Granting Related Relief [Docket No. 5]*, *see* Docket No. 43;

- *Debtors' Emergency Motion for Entry of An Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No. 6]*. *see* Docket No. 42; and

- *Debtors' Emergency Motion For Entry of Interim and Final Orders Authorizing the Debtors to: (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (II) Continue to Perform Intercompany Transactions, and (III) Maintain Existing Business Forms [Docket No. 7]*, *see* Docket Nos. 41, 190, and 394.

On July 14, 2025, the Debtors filed a *Motion for Entry of an Order (I) Approving (A) Procedures for the Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Entry Into Broker Fee Arrangements in Connection with Such Sales; (II) Approving the Assumption of Executory Contracts in Connection with the Sale of Certain Assets and Related Fee Agreements; And (III) Granting Related Relief [Docket No. 80] (the "**Block Trades Motion**"),*

seeking an order, among other things, (a) authorizing and approving certain notices and procedures for the sale or transfer in any individual transaction or series of related transactions, of certain investment securities in non-public companies held by Debtor Linqto Liquidshares, LLC, (b) approving the assumption of certain agreements related thereto, (c) and authorizing the Debtors to enter into certain new agreements related thereto. At a hearing on August 5, 2025, the Court approved the Block Trades Motion.

The Debtors also filed several other motions after the Petition Date to further facilitate a smooth and efficient administration of these Chapter 11 Cases and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code. The Debtors requested retained: (i) Schwartz, PLLC, as legal counsel; (ii) Sullivan & Cromwell, LLP, as special regulatory and corporate counsel; (iii) Jeffries LLC, as investment banker; (iv) Triple P TRS, LLC, as restructuring advisor; (v) ThroughCo Communications, LLC, as public relations agent; (vi) Breakpoint Partners LLC, as restructuring advisors; and (vii) Epiq Corporate Restructuring, LLC as Claims, Noticing and Solicitation Agent.

### C.    Appointment of the Unsecured Creditors Committee.

On July 18, 2025, the U.S. Trustee appointed the Committee. As of the date the Committee was appointed, the members of the Committee were: Sky Ventures Limited, Charles Hejny, Mariann Dickman Raab, Ricardo Ledesma, Robert Pazdera, Melanie Huscroft, Ardi Family Trust dated 09/10/2008, Consort Partners, INC., and Impact Tech, INC. The Committee is represented by Brown Rudnick LLP and Orrick, Herrington & Sutcliffe LLP, as legal counsel and Alvarez & Marsal North America, LLC, as financial advisor.

Immediately after the Committee's appointment, the Debtors began sharing diligence with the Committee. The Debtors have also practically engaged the Committee regarding the key components of these Chapter 11 Cases, including the Final DIP Order, and the substance of the Plan. On November 11, 2024, the Debtors, the Committee, the DIP Lender, and the Consenting Term Loan Lenders agreed to the terms set forth in the Committee Settlement and incorporated in the Plan. As a result, the Committee supports the Plan.

### D.    Interim Approval of the DIP Financing Motion.

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Financing Motion**") [Docket No. 16], seeking to borrow up to $60,000,000 (the "**DIP Financing**"), including $10,000,000 on an interim basis.

On July 8, 2025, the Court entered the Interim DIP Order [ECF No. 40] authorizing the Debtors to incur and guarantee the DIP Obligations (as defined in the Interim DIP Order up to $10,000,000 on an interim basis and granting the DIP Lender, *inter alia*, superpriority administrative expense claims against each of the Debtors, on a joint and several basis, and legal, valid, enforceable, non-avoidable, and automatically and fully perfected DIP Liens (as defined in

the Interim DIP Order) in all of the Debtors' rights, title, and interest to cash and cash equivalents, funds in any deposit account, all securities, and other DIP Collateral (as defined in the Interim DIP Order) to secure the DIP Obligations.

### E.   The Ripple Tender Motion.

In December 2024, Ripple Labs, Inc. ("**Ripple**") announced a tender offer that closed on or about January 8, 2025 (the "**December Ripple Tender**"). Liquidshares tendered 243,444 shares of Ripple in the December Ripple Tender, for an expected purchase price of approximately $30 million. Of the 243,444 shares offered, Ripple purchased 151,105 shares (the "**Ripple Shares**") at a price of $125 per share, for total proceeds of approximately $18.8 million (the "**Ripple Tender Proceeds**"). The Ripple Shares were Platform Securities.

The December Ripple Tender occurred before current management was hired in January 2025. Upon learning of the various securities investigations the Debtors faced, the Debtors' new management elected to hold the Ripple Tender Proceeds in a money market account at Silicon Valley Bank, a division of First-Citizens Bank & Trust, held by Liquidshares (the "**Proceeds Account**"). While the Debtors elected to segregate the Ripple Tender Proceeds from funds held in other money market and operating accounts, the Proceeds Account is not a restricted account or escrow account.

As of the Petition Date, the Proceeds Account held roughly $19,230,000 in Ripple Tender Proceeds, inclusive of interest.

Along with the Ripple Tender Proceeds, the Proceeds Account holds funds arising from distributions and dividends from Liquidshares Portfolio Companies other than Ripple (collectively with the Ripple Proceeds, the "**Platform Securities Proceeds**"). As of the Petition Date, the Proceeds Account held roughly $641,000 from Platform Securities other than Ripple.

On July 14, 2025, the Debtors' filed a *Motion for Entry of an Order (I) Authorizing the Use of Platform Securities Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Determining that the Ripple Sale Proceeds are Assets of the Bankruptcy Estate, and (III) Granting Related Relief* [Docket No. 79] (the "**Ripple Motion**") seeking authority to use the Platform Securities Proceeds, including the Ripple Tender Proceeds, free and clear of all liens, claims, encumbrances, and interests, (ii) determining that the Platform Securities Proceeds are assets of the Debtors' bankruptcy estate and may be used by the Debtors for the daily operations of the enterprise, which includes the administration of the Chapter 11 Cases, and (iii) granting related relief.

### F.   Objections to the DIP Financing Motion and Ripple Motion.

The Committee, shortly after its appointment, asserted informal objections directly to the Debtors regarding the DIP Financing and Ripple Motions.  The Committee asserted, in its informal objections, that the Platform Securities and the Platform Sale Proceeds were held in a constructive or resulting trust and such did not constitute "property of the estate" - and that customers of Linqto were not unsecured creditors under the Bankruptcy Code.

71

On July 29, 2025, Deaton, on behalf of himself and the Deaton Represented Creditors (together with Deaton, the "**Deaton Parties**") filed an objection to the DIP Financing Motion and Ripple Motion (the "**Deaton Objection**") [Docket No. 142]. Approximately 186 Customers filed joinders to the Deaton Objection or similar objections, responses, or requests for relief as pro se parties in interest (collectively, the "**Customer Objections**"). Of these Customer Objections, approximately 90 were filed by Deaton Represented Creditors. The Deaton Parties objected to the DIP Financing and use of the Platform Securities Proceeds, contending that the Platform Securities and Platform Securities Proceeds are not assets of the Debtors' estates but are held in constructive trust for the Customers.

On August 12, 2025, Sapien Group USA LLC and its group affiliates ("**Sapien**"), filed a limited objection to the DIP Financing Motion and Ripple Motion [Docket No. 230] (the "**Sapien Limited Objection**"), essentially arguing that the relief sought by the Debtors is premature and the Customers' alleged interest in the Platform Securities should be fully litigated before the Debtors can secure the funding necessary to administer their Chapter 11 Cases.

## G. The Settlement.

After arms'-length negotiations, the Debtors, the Committee, and the Deaton Parties (collectively, the "**Settlement Parties**") reached a compromise regarding funding the administration of the Chapter 11 Cases and the treatment of the claims or interests of Customers (the "**Settlement**"). The Settlement resolved objections to the DIP Financing Motion and the Ripple Motion and set forth terms for the treatment of the claims or interests of Customers pursuant to a plan of reorganization, subject to Sections 1125, 1126, and 1129 of the Bankruptcy Code.

On September 16, 2025, the Debtors filed an *Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 505] (the "**Settlement Motion**").

Pursuant to the terms of the Settlement, the Debtors are authorized to finance the administration of the Chapter 11 Cases through use of (i) the proceeds of Reserved Securities, (ii) the Platform Securities Proceeds (including the Ripple Tender Proceeds), and (iii) DIP financing in an aggregate amount of up to $25,000,000, in accordance with the Approved Budget (as defined therein). In exchange, the Debtors agreed to the treatment of Customer claims or interests under a plan of reorganization to be proposed, the principal terms of which are set forth in the "Customer Securities Treatment Term Sheet" (as defined in the Settlement Motion).

The Term Sheet provides that the Debtors will propose a plan of reorganization that provides each Customer with the option to elect to have its interests in the Platform Securities contributed to the Liquidating Trust or the Closed-End Fund.

With respect to the Ripple Tender Proceeds, the Settlement Parties agreed that the plan of reorganization would provide those Customers affected by the sale of Ripple shares with a separate ratable interest related to the Cash held by the Debtors.

On October 3, 2025, the Court overruled any objections to the DIP Motion, Ripple Motion and Settlement Motion and approved the motions. On the same day, the Court entered orders approving the Settlement Motion (*see* Docket No. 704) and the Ripple Motion (*see* Docket No. 705).

On October 6, 2025, the Court entered a final order approving the DIP Motion [Docket No. 712].

### H.  Schedules and Statements.

On July 8, 20205, the Bankruptcy Court entered an *Order (1) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs, and (II) Granting Related Relief (V) Rule 2015.3 Financial Reports* [Docket No. 45] (the "**Schedules and Statements Extension Order**"), extending the deadline to submit the Debtors' schedules of assets and liabilities and statements of financial affairs (the "**Schedules and Statements**").

On August 1, 2025, the Debtors filed their Schedules and Statements [Docket Nos. 218, 219, 220, 221, 222, 223, 224 and 235]. The Debtors subsequently filed amendments to certain Schedules and Statements [Docket Nos. 533, 534, 535, and 69].

### I.  Bar Dates.

On July 8, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, (IV) Approving Notice of Bar Dates and (IV) Granting Related Relief* [Docket No. 488]. On September 15, 2025, the Bankruptcy Court entered an order [Docket No. 488] (the "**Bar Date Order**") establishing the following bar dates:

**General Bar Date: November 12, 2025, at 5:00 p.m. (prevailing Central Time)** (the "**General Bar Date**"), for each entity to file proofs of claim based on prepetition claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code, against any Debtor;

**Governmental Bar Date: January 5, 2025, at 5:00 p.m. (prevailing Central Time)** (the "**Governmental Bar Date**"), for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Proofs of Claim against any Debtor;

**Amended Schedules Bar Date**:  in the event that the Debtors amend their schedules of assets and liabilities, the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Central Time, on the date that is 30 days from the date on which the Debtors mail notice of an amendment or supplement of the schedules of assets and liabilities (the "**Amended Schedules Bar Date**"), for claimants holding claims affected by the amendment or supplement to file Proofs of Claim against any Debtor; and

**Rejection Damages Bar Dat**e:  the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, (b) 5:00 p.m., prevailing Central Time, on the date that is 30 days

following service of an order approving the Debtors' rejection of the applicable executory contract or unexpired lease (the "**Rejection Damages Bar Date**"), and (c) any such other date that the Court may fix in the applicable order approving such rejection, for claimants holding claims based upon such rejection to file Proofs of Claim against any Debtor; and

Any party required to file a Proof of Claim under the Bar Date Order that fails to do so before the applicable bar date is forever barred, estopped, and enjoined from asserting such claim against the Debtors.

### J.    Lease Rejection.

On July 14, 2025, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to (a) Reject Certain Executory Contracts and Unexpired Leases and (b) Abandon Certain Personal Property, if any, Effective as of the Rejection Date, and (III) Granting Related Relief* [Docket No. 81] (the "**Lease Rejection Motion**"),seeking authorization to reject certain leases and abandon certain personal property, as applicable, that may be located at the premises of each lease. On the same day, the Court entered an order approving the Lease Rejection Motion [Docket No. 191].

## VIII.   SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot (the "**Ballot**") to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines (the "**Solicitation Procedures**") are set forth in **Exhibit 2** attached to the Conditional Disclosure Statement Order.

"*Conditional Disclosure Statement Order*" means the order, including all exhibits attached thereto, entered by the Bankruptcy Court, conditionally approving the Disclosure Statement Motion.

The Conditional Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING**
**PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS**
**ONLY A SUMMARY**.

PLEASE REFER TO THE CONDITIONAL DISCLOSURE STATEMENT ORDER
FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING
PROCESS.

---

### A.    Holders of Claims or Interests Entitled to Vote on the Plan.

The Debtors are soliciting votes to accept or reject the Plan from Holders of Claims or Interests in Classes 4, 5, 6, 7, 8 and 9 (each, a "**Voting Class**," and collectively, the "**Voting Classes**"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims or Interests in the Voting Class have the right to vote to accept or reject the Plan. The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 10, 11, 12, and 13.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than half of the number of total allowed claims that have voted and an affirmative vote of at least two-thirds of the dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Section X. of this Disclosure Statement.

### D.    Solicitation Procedures.

####     1.    Claims and Solicitation Agent.

The Debtors have retained Epiq Corporate Restructuring, LLC  as, among other things, the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

####     2.    Solicitation Package.

The following materials and documents constitute the solicitation package (collectively, the "**Solicitation Package**") that will be distributed to Holders of Claims or Interests in the Voting Classes:

- a copy of the Solicitation and Voting Procedures;

- the Cover Letters (as defined in the Conditional Disclosure Statement Order);

- a customed Ballot, together with detailed voting instructions with respect thereto and, only if sent via U.S. Mail, a pre-addressed, postage-prepaid return envelope;

- a copy of the procedures for the solicitation, qualification and selection of a Litigation Trustee and Manager of the Closed-End Fund;

- notice of the combined hearing to consider final approval of the adequacy of the Disclosure Statement and confirmation of the Plan, which notice shall provide instructions on how to obtain electronic copies or print copies of the Conditional Disclosure Statement Order, Plan and Disclosure Statement; and

- any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

####     3.    Distribution of the Solicitation Package and Plan Supplement.

The Debtors will cause the Claims and Solicitation Agent to distribute the Solicitation Package to Holders of Claims or Interests in the Voting Classes by **December 17, 2025**.

The Solicitation Package, through the Combined Hearing Notice, shall provide instructions for (a) accessing the Plan and Disclosure Statement and the Conditional Approval Order in electronic format through the Debtors' case website at https://dm.epiq11.com/linqto or (b) obtaining paper and email copies upon request.  All other contents of the Solicitation Package, including the Ballot, Solicitation and Voting Procedures, and Combined Hearing Notice, will be provided in paper format if the package is sent via U.S. Mail.  Any party that receives the materials in electronic format but would prefer paper format may contact the Claims and Solicitation Agent by:  (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888)  865-2086  (toll  free)  or  (971)  265-0883  (international);  or  (d) emailing Balloting@epiqglobal.com, and referencing "Linqto" in the subject line.  Additionally, the Plan

and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

The Debtors will file the Plan Supplement (as defined in the Plan) on or before **January 12, 2026**, and will serve notice on parties in interest, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' case website.

## IX.    CONFIRMATION OF THE PLAN.

### A.    The Combined Hearing.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a chapter 11 plan. At the Combined Hearing, in addition to seeking Combined of the Plan, the Debtors will also seek final approval of the Disclosure Statement. The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

**The Combined Hearing is scheduled for February 2, 2026, at 9:00 a.m. (prevailing Central Time). The deadline to file an objection to the confirmation of the Plan or the final approval of the Disclosure Statement is January 21, 2026, at 5:00 p.m. (prevailing Central Time).**

### B.    Requirements for Confirmation of the Plan.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is impaired (an "**Impaired Class**") under a chapter 11 plan unless, with respect to each claim or interest of such class the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.[9]

---

[9]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (i) the Plan is accepted by all Impaired Classes of Claims, or if accepted by only one Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

*1.    Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[11]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an Impaired Class as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of Allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

Pursuant to Article III.E. of the Plan, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

*2.    Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all Impaired Classes have not accepted it; *provided, however*, the plan has been accepted by at least one Impaired Class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an Impaired Class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, by utilizing the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. The Debtors reserve all rights to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet

their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 3. *No Unfair Discrimination.*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent but rather that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two (2) classes differently without unfairly discriminating against either class.

## C.    **Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### 1. *Secured Claims.*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

### 2. *Unsecured Claims.*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (b) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### 3. *Interests.*

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (a) the plan provides that each holder of an interest in that

class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

### 4. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). The Plan provides for the orderly Wind- Down of the Debtors' Estates upon the Effective Date. Accordingly, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan meets the feasibility requirements of the Bankruptcy Code.

### 5. Best Interests of Creditors.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirm a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Debtors, with the assistance of their advisors, prepared a liquidation analysis (the "**Liquidation Analysis**," attached hereto as **Exhibit B**). As reflected in the Liquidation Analysis, value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.

Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

## X. RISK FACTORS.

**THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.**

A. **Risks Related to the Debtors and These Chapter 11 Cases.**

    *1.*    *General.*

It is impossible to predict with certainty the amount of time that it will take to implement the transactions set forth in the Plan or to assure parties-in-interest that the Plan will be confirmed or become effective. A delay in the bankruptcy proceedings to confirm or consummate the Plan may also involve additional expense.

    *2.*    *The Debtors Will Be Subject to Risks and Uncertainties Associated with These Chapter 11 Cases.*

For the remainder of these Chapter 11 Cases, the Debtors' ability to develop and execute a Chapter 11 plan will be subject to the risks and uncertainties associated with Chapter 11. These risks include, but are not limited to, the following: (a) the ability to develop, confirm and consummate the Plan; (b) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a Chapter 11 plan, to appoint a Chapter 11 trustee or to convert these Chapter 11 Cases to Chapter 7 proceedings; and (c) the actions and decisions of the Debtors' creditors, equity holders and other parties-in-interest who have interests in these Chapter 11 Cases that may be inconsistent with the Debtors' objectives. Because of the risks and uncertainties associated with these Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the remainder of these Chapter 11 Cases that may be inconsistent with the Debtors' plans.

    *3.*    *Undue Delay in Confirmation or Consummation May Result in Additional Costs.*

If Confirmation and Consummation of the Plan do not occur expeditiously, these Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses, which may adversely impact the recoveries on account of Allowed Claims.

    *4.*    *The Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered by the Bankruptcy Court.

    *5.*    *No Representations Outside This Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

6. *No Legal or Tax Advice Is Provided to You by This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of Claims against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims. Holders of Allowed Claims should carefully review Section XI below – *Certain U.S. Federal Income Tax Consequences of the Plan* to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Debtors. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or whether to object to Confirmation of the Plan.

7. *Forward-Looking Statements Are Not Assured, and Actual Results May Vary.*

This Disclosure Statement contains forward-looking statements. These forward-looking statements include factors that could cause actual results to differ materially, such as: those factors described in this Section X. of this Disclosure Statement; the effects of the Bankruptcy Court rulings in these Chapter 11 Cases and the outcome of the cases in general; the length of time the Debtors will remain in these Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other parties-in-interest in these Chapter 11 Cases; risks associated with third-party motions in these Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the increased administrative and restructuring costs related to these Chapter 11 Cases; and the payments of Allowed Claims and the amount of expenses projected to recognize recoveries and reconcile such Claims.

8. *No Admission Is Made.*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims.

**B.    Risks Related to the Plan.**

1. *Parties in Interest May Object to the Classification of Claims.*

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class. The Debtors believe that all Claims have been appropriately classified in the Plan.

However, to the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after

finding that a classification was inappropriate and requiring a reclassification, would confirm the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

<p style="text-align:center"><em>2.     The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation.</em></p>

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Package to all Holders of Claims as of the voting record date in the Classes entitled to vote. Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be delayed or denied. If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited. The Debtors cannot provide any assurance that such a re-solicitation would be successful. Re-solicitation could delay or jeopardize confirmation of the Plan. Non-confirmation of the Plan could result in protracted chapter 11 cases.

<p style="text-align:center"><em>3.     Certain Creditors, Equity holders, and Other Parties-In-Interest May Bring Litigation Against the Debtors.</em></p>

Although the Debtors believe the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors, equity holders and other parties-in-interest may challenge Confirmation of the Plan.  It is also possible that certain parties will commence litigation against the Debtor with respect to the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Debtors' estates, however, could be material and may result in protracted delay and addition costs.

<p style="text-align:center"><em>4.     The Bankruptcy Court May Not Grant the Debtors' Request for Nonconsensual Confirmation.</em></p>

In the event that any impaired class of claims does not vote to accept, the Bankruptcy Court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual

Confirmation of the Plan may result in, among other things, litigation, case delays and increased expenses.

     5.      *The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis.*

Conversion to Chapter 7 liquidation would, in the Debtors' view, produce a less favorable outcome for Holders of Claims than would the Plan. However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

     6.      *Plan Releases, Injunctions and Exculpations May Not Be Approved.*

There can be no assurance that the Plan releases, injunctions and exculpations, as provided in Article IX. of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a Chapter 11 plan that differs from the Plan or the Plan not being confirmed.

     7.      *The Plan May Not Be Confirmed.*

The Debtors make no assurance that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims may receive with respect to their Allowed Claims in a subsequent plan of reorganization or liquidation.

     8.      *Conditions Precedent to the Plan Becoming Effective May Not Be Satisfied.*

There can be no assurance as to such timing or as to the occurrence of the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions precedent to the effectiveness of the Plan will be met or that the other conditions to Consummation, if any, will be satisfied or sufficiently waived. Even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the proposed Liquidating Trust or proposed Closed-End Fund would each achieve the requisite number of customer votes in order to be formed or that the Plan will otherwise be consummated.

9.      *Continued Risk upon Confirmation and Potential Appeal of Confirmation.*

Even if the Plan is confirmed, the Debtors will continue to face uncertainty prior to and after Consummation, including potential appeal.  Even if the Plan is consummated, there will be continued risks, including certain risks that are beyond the control of the Debtors, such as deterioration of general market conditions or other changes in economic conditions, changes in the securities industry or the value of the underlying assets of the Debtors, or an increase in expenses. As a result of these risks and others, there is no guarantee that a Chapter 11 Plan will achieve the Debtors' stated goals, including their ability to form the Liquidating Trust and the Closed-End Fund.

10.      *Issuers of the Securities Underlying the Liquidating Trust and the Closed-End Fund May Object to the Assumption and Assignment of the Securities.*

The Debtors will seek to assume and assign the contracts associated with the Trust Assets and Closed-End Fund Assets pursuant to section 365 of the Bankruptcy Code.  There can be no assurance that the issuers of Liquidating Trust Assets or Closed-End Fund Assets that may be subject to contractual transfer restrictions with such issuers will not object to the assumption and assignment of the contracts associated with the Liquidating Trust Assets or Closed-End Fund Assets.  Such objections may result in materially adverse effects to the administration of the Plan, including, but not limited to, an increase in costs and/or a material delay to the Consummation of the Plan and the transactions contemplated thereunder.

**C.      Risks Relating to the Liquidating Trustee and Manager of the Closed-End Fund.**

1.      *Risk Related to the Selection of the Liquidating Trustee.*

The trustee for the Liquidating Trust (the "**Liquidating Trustee**") has not been selected to manage the Liquidating Trust Assets and the process for selection has not been finalized. Successful management of the Liquidating Trust Assets will depend on the experience, diligence, skill and network of business contacts of the Trustee to evaluate and negotiate the liquidation of the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement]

There is no assurance that the Liquidating Trustee will be a registered investment adviser and, therefore, the Liquidating Trustee may not have the requisite experience to manage the Liquidating Trust Assets.

2.      *Risks Related to the Selection of the Manager of the Closed-End Fund.*

No entity or person managing the Closed-End Fund (which may be internal or external to the Closed-End Fund, the "**Manager**") has been selected to manage the Closed-End Fund and the process for selection has not been finalized.  The performance of the Closed-End Fund will depend on the experience, diligence, skill and network of business contacts of the Manager and the professionals it employs or may subsequently retain, to identify, evaluate, negotiate, structure, close, monitor and manage the Closed-End Fund's investments.  The Manager will evaluate, negotiate, structure, close and monitor the Closed-End Fund's investments in accordance with the terms of the Investment Advisory Agreement.  The Closed-End Fund's future success will depend

to a significant extent on the continued service and coordination of the Manager's senior investment professionals. The departure of any of the Manager's key personnel, including the portfolio managers, or of a significant number of the investment professionals of the Manager, could have a material adverse effect on the Closed-End Fund's business, financial condition or results of operations. In addition, the Closed-End Fund cannot assure investors that any Manager selected will remain the Closed-End Fund's Manager. The Closed-End Fund may not be able to find a suitable replacement Manager, resulting in a disruption in its operations that could adversely affect its financial condition, business and results of operations. This could have a material adverse effect on the Closed-End Fund's financial conditions, results of operations and cash flow.

### D.     Regulatory Risks.

    *1.     The Debtors, the Liquidating Trust and the Closed-End Fund May Be Required to Obtain, and to Comply with, Regulatory Approvals, including Novel Relief or Other Regulatory Guidance.*

In order to consummate the transactions contemplated under the Plan, the Debtors, the Liquidating Trust, the Liquidating Trustee, the Closed-End Fund, and/or the Manager may be required to obtain, and to comply with, approvals, exemptive relief or guidance from regulatory agencies or other governmental authorities, including the SEC. The process of obtaining necessary approvals, exemptive relief or guidance can be lengthy and complex; and can also sometimes result in the establishment of conditions that make the entity or activity for which the approval was sought unprofitable or otherwise unattractive. In addition, such approvals may be subject to denial, revocation or modification under various circumstances. Failure to obtain or comply with the conditions of approvals, exemptive relief or guidance, or failure to comply with applicable laws or regulations, may result in the delay in or prevent the establishment of the Trust or the Closed-End Fund.

Failure to obtain necessary or advisable regulatory approval, exemptive relief or guidance could prevent or impose limitations or restrictions on the consummation of the transactions contemplated by the Plan and/or Confirmation of the Plan or result in changes to the Plan, the Liquidating Trust or the Closed-End Fund that limit the economic benefits to creditors as compared to the transactions currently contemplated under the Plan.

While the Debtors are relying on existing SEC staff guidance in the structuring of the Liquidating Trust and the Closed-End Fund, in light of the features of the Closed-End Fund and the Trust, including the Liquidating Trust Assets, the number of Liquidating Trust interest holders, and the liquidity windows that will be made available to holders of the Trust interests under the Plan, there is no assurance that the Liquidating Trust or the Closed-End Fund will not be required to seek additional guidance or exemptive relief from the SEC or its staff. If and to the extent an exemptive order or no-action relief would be required, this would be expected to require additional time, resources and costs that may delay the formation or operation of the Liquidating Trust and the Closed-End Fund.

No assurances are made as to whether any required U.S. federal and state regulatory approvals, exemptive relief or guidance will be received. The Debtors cannot assess with any certainty that the regulators will not take actions that would prevent the Debtors from effectuating

all or any of the transactions contemplated by the Plan or otherwise prevent Confirmation, including the issuance of securities in the Liquidating Trust or the Closed-End Fund to the extent such regulator disagrees with the structure contemplated by the Plan.

> 2. *Governmental Laws, Regulations and Actions Could Adversely Affect the Debtors, the Liquidating Trust, the Liquidating Trustee, the Closed-End Fund and/or a Manager of the Closed-End Fund.*

The Debtors, the Liquidating Trust, the Liquidating Trustee, the Closed-End Fund, and/or any Manager are, or will be, subject to various federal, state and local laws, orders and regulations. Failure to comply with these laws, orders and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations and any changes to such laws or regulations, may have a material adverse effect on the Debtors', the Liquidating Trust's and/or the Closed-End Fund's financial position, liquidity and cash flows.  Such laws and regulations may require more stringent and costly measures.

> 3. *The Debtors Are Currently Under Investigation by Federal and State Regulators and Such Investigations May Adversely Affect the Estates.*

The Debtors are currently, and may be subject to various investigations, inquiries, requests for information and informal and formal proceedings from federal, state and international authorities, including but not limited to, the SEC, FINRA and certain states, related to certain prepetition conduct.  The Debtors have cooperated with the relevant authorities regarding these investigations and provided documents responsive to the requests, and continue to work with such authorities on investigations related to the businesses and to prepetition conduct.  At this time, it is impossible to estimate the impact of such investigations.

Additionally, parties have commenced litigation against the Debtors and it is possible that other parties may commence litigation in the future.  In addition, as a result of these investigations, the Debtors could be subject to civil or criminal penalties or administrative sanctions, including fines, disgorgement, restitution, compliance orders and suspension of licenses, any of which could adversely affect the Debtors' financial condition and creditor recoveries.

> 4. *The Liquidating Trust May be Subject to Certain Registration and Reporting under Federal Securities Laws.*

The Liquidating Trust may be or may in the future become subject to registration under the Investment Company Act and reporting requirements under the Exchange Act or Investment Company Act.  While the Debtors take the position that the Trust should not be required to register as an investment company and that the Liquidating Trust may rely on historical no-action relief by the staff of the SEC with respect to reporting requirements under the Exchange Act, subject to certain conditions such as the filing of annual reports on Form 10-K with unaudited financial statements (prepared in accordance with the liquidation basis of accounting), the SEC may disagree and could require registration of the Liquidating Trust under the Investment Company Act or the Exchange Act either immediately or at some point in the future.  The extent of such reporting requirements may not be ascertainable as of the Effective Date.  Compliance with such

reporting requirements may be burdensome and may adversely impact the recoveries that the Trust is able to obtain for the assets its holds (such assets, the "**Trust Assets**").  Compliance with any applicable reporting requirements under the Exchange Act and/or the Investment Company Act may subject the Trust to additional regulatory risks that the Trust would not otherwise face as a non-reporting company. If the Trust is subject to the Investment Company Act, the Trustee may be required to comply with the Investment Advisers Act of 1940.

        5.    *The SEC May Disagree that Closed-End Fund Shares Issued Under the Plan are Exempt from Registration.*

The Debtors believe that the Closed-End Fund is a successor entity, that its shares are issued under the Plan in exchange for claims and, therefore, the offering of its shares is exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code. However, if the SEC were to disagree with the Debtors' conclusion, this could jeopardize or significantly delay the approval and launch of the Closed-End Fund and the implementation of the Plan.

        6.    *There is No Assurance that the Closed-End Fund will be Launched.*

There is no assurance that the Debtors will receive the necessary amount of assets to launch the Closed-End Fund. *See* Section IV.B. of this Disclosure Statement for further information.

        7.    *The Closed-End Fund Will be Subject to Investment Company Act Registration and Reporting Requirements.*

The Closed-End Fund will be required to register under the Investment Company Act and register any sale of its securities under the Securities Act or rely on an exemption.  Further, it will be required to prepare and file periodic reports under the Investment Company Act.  Compliance with such reporting requirements presents a cost to the Closed-End Fund that will impact its financial performance. Any external Manager will be required to comply with the Investment Advisers Act of 1940.

## E.    **Financial Risks**

        1.    *Claims Could Be More Than Projected.*

There can be no assurance that the estimated amount of Allowed Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of Distributions in one or more Classes to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the assumptions underlying the projected recoveries discussed in this Disclosure Statement, and the variation may be material.

        2.    *The Amount and Timing of Available Distributions, if Any, May Vary.*

While the Debtors have attempted to project what they believe are likely Distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the Distributions described in the Plan.  The

projections will necessarily be affected by events with unknown or uncertain timing, including, among other things, recoveries generated in connection with the liquidation of some or all of the Debtors' remaining assets, the outcome of objections to Claims, and the cost and expenses of such actions and general administration and wind down of the Debtors' estates.  Additionally, the timing of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on account of Allowed Claims.

> 3.   *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of preparation and that was made available to the financial advisors of the Debtors and the Committee for verification.  Books and records prepared prepetition may be incomplete or inaccurate.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement is accurate.

> 4.   *Risks Associated with Financial Projections.*

The Debtors' management, with the assistance of their financial advisors, have prepared the financial projections based on certain assumptions.  The financial projections represent the management's view based on currently known factors, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Trust and the Closed-End Fund.  Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many of which will be beyond the control of the Liquidating Trust, the Liquidating Trustee, the Closed-End Fund and/or any Manager and may differ materially from the financial projections.  The Liquidating Trustee may not be able to liquidate Liquidating Trust Assets in the timeframe or at prices that are consistent with the financial projections and as envisioned under the Plan, the Liquidating Trust Agreement and this Disclosure Statement after the Effective Date.  No assurance is made that the Trust can operate for the timeframe necessary for any portfolio company to complete an initial public offering, or that the Trust can or will hold the securities of any portfolio company until such portfolio company completes an initial public offering as trusts are formed for the purpose of orderly liquidation of assets and generally wind down in 3 to 5 years.  No assurance is made that the Closed-End Fund will achieve its investment objective.

> 5.   *Liquidating Trust Expenses May Exceed Current Expectations.*

The ultimate amount of distributable assets and Cash available to distribute to the holders of Liquidating Trust Interests depends, in part, on the manner in which the Trust operates and the expenses that it incurs in doing so.  Such expenses may include, without limitation, the reasonable and necessary expenses of administering the Trust, including the costs to liquidate the Trust Assets, including with respect to any liquidity windows, and make distributions.  If the Trust incurs professional or other expenses in excess of current expectations, the amount of distributable assets

remaining to provide distributions to the holders of Trust Interests will decrease.  There can be no assurances about the amounts or timing of any distributions to be made by the Trust.

6.  *The Liquidating Trust or the Closed-End Fund May Be Adversely Affected by Potential Litigation.*

In the future, the Liquidating Trust, the Liquidating Trustee, the Closed-End Fund or any Manager may become subject to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the financial results of the Trust or of the Closed-End Fund.  It is not possible to predict the potential litigation that the Trust or the Closed-End Fund may become party to, nor the final resolution of such litigation.  The impact of any such litigation on each of the Trust's and the Closed-End Fund's businesses and financial stability, however, could be material.

7.  *Contingent Liabilities.*

In connection with the disposition of Liquidating Trust Assets, the Liquidating Trust may be required to make representations about the business and financial affairs of a portfolio company typical of those made in connection with the sale of a business.  The Liquidating Trust may also be required to indemnify the purchasers of such investment to the extent that any such representations turn out to be inaccurate with respect to potential liabilities.  These arrangements may result in contingent liabilities that ultimately result in funding obligations that must be satisfied through a return of distributions previously made to the Trust.

8.  *Borrowing Risk.*

The Liquidating Trust may borrow money as necessary to fund its costs and expenses, in accordance with the Liquidating Trust Agreement.  The Liquidating Trust's failure to satisfy financial or operating covenants imposed by its lenders could lead to defaults and, potentially, termination of its loans and foreclosures on its assets.  Such debt could also be senior to the Trust interests held by creditors electing to receive such interests under the Plan.  Such debt, including failure to pay such debt, could impact the amount and timing of Distributions.

9.  *Non-U.S. Investments Risk.*

The Closed-End Fund may hold non-U.S. securities.  Non-U.S. securities involve certain factors not typically associated with investing in U.S. securities, including risks relating to: (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar and the various foreign currencies in which foreign investments are denominated, and costs associated with conversion of investment principal and income from one currency into another; (ii) inflation matters, including rapid fluctuations in inflation rates; (iii) differences between the U.S. and foreign securities markets, including potential price volatility in and relative liquidity of some foreign securities markets, the absence of uniform accounting, auditing and financial reporting standards, practices and disclosure requirements and the potential of less government supervision and regulation; (iv) economic, social and political risks, including potential exchange control regulations and restrictions on foreign investment and repatriation of capital, the risks of political, economic or social instability and the possibility of expropriation or confiscatory taxation; (v) the possible imposition of foreign taxes on income and gains recognized with respect

to such securities; and (vi) difficulties in enforcing legal judgements in foreign courts.  Laws and regulations of foreign countries may impose restrictions that would not exist in the United States and may require financing and structuring alternatives that differ significantly from those customarily used in the United States.  No assurance can be given that a change in political or economic climate, or particular legal or regulatory risks, including changes in regulations regarding foreign ownership of assets or repatriation of funds or changes in taxation might not adversely affect an investment held by the Closed-End Fund or any Manager. The aforementioned risk factors may increase transaction costs and adversely affect the value of Closed-End Fund Assets.

### F.  Market Risks for the Liquidating Trust and the Closed-End Fund.

  *1.  Risks Associated with Selling Liquidating Trust Assets as Needed for Orderly Liquidation.*

It may be difficult to sell the Liquidating Trust Assets at an attractive price.  The price at which the Liquidating Trust Assets could be sold may be below the original cost of the holders of the Trust Interests tied to such Liquidating Trust Assets.  The Liquidating Trustee may not be able to sell Trust Assets at all.  This means that a holder of a Liquidating Trust Interest may not be able to use the Liquidity Option to raise money for immediate or future needs.

  *2.  Risks Associated with the Liquidity Option and Sales of the Liquidating Trust Assets through a Secondaries Platform.*

There is no assurance that the Liquidating Trustee will be able to use the services of one or more Secondaries Platforms to sell Liquidating Trust Assets upon a Qualifying Liquidation Request. A Secondaries Platform may change its eligibility criteria at any time, or may impose requirements that the Liquidating Trust and/or Liquidshares cannot meet in a given Liquidity Option or at all. There is no assurance that there will be a market for some or any of the Platform Securities on such Secondaries Platform at the time a Qualifying Liquidation Request or at all. The Secondaries Platforms may require a minimum transaction or lot sizes. Even if there is a market, there is no assurance that sufficient Qualifying Liquidation Requests will be received during any Liquidity Option to meet the minimum requirement for a sale of such Platform Securities on such Secondaries Platform. There is no assurance that any Liquidity Option request will be accepted or consummated, that a market will exist for any particular security, or that pricing will be at or near reported fair market value as calculated pursuant to the Liquidating Trust's valuation methodology.

Sales on or through a Secondaries Platform are not guaranteed. Even when a Qualifying Liquidation Request is accepted, execution is not guaranteed and may be partial, delayed, or cancelled. There is no assurance that any minimum price, fair market value, or minimum volume will be achieved. The concentration of sell interest during a Liquidity Option may depress achievable prices or increase execution costs. Aggregation and allocation mechanics may be required to meet platform minimums or transfer restrictions. To satisfy minimum size requirements, the Liquidating Trust may need to aggregate multiple Qualifying Liquidation Requests or prioritize requests. If insufficient volume is obtained, a sale may not proceed. Any such process may result in unequal timing of liquidity among similarly situated Liquidating Trust Beneficiaries.

Because the Platform Securities are comprised of investments in private unregistered companies and the market for the securities of such private companies is typically illiquid, the price that the Liquidating Trust Beneficiaries may receive for such securities, if any, may fluctuate significantly from day to day and in each transaction, and there is no guarantee that fair market value or any minimum value will be received for such securities. Further, the Liquidating Trustee's role in facilitating a Qualifying Liquidation Request will be limited to administrative and ministerial matters only.  Without limiting the foregoing, the Liquidating Trustee will not be permitted to (i) guarantee or seek any price or range of prices for the sale of any Platform Securities on a Secondaries Platform, (ii) solicit participation in the Liquidity Option of the Liquidating Trust Beneficiaries, (iii) receive any differential compensation based on the size, value or occurrent of a transaction in Platform Securities occurring on or through a Secondaries Platform, or (iv) buy additional Platform Securities. Consequently, Liquidating Trust Beneficiaries will not know or be able to approve the price, counterparties, timing, size or fees applicable to any sale prior to execution and any such price may be below the original cost of such Platform Securities.

If a Liquidating Trust Beneficiary fails to validly submit a Qualifying Liquidation Request, it will not be permitted to submit such request until the next Liquidity Option, which could materially delay liquidity and expose the Liquidating Trust Beneficiary to additional market risk. Liquidity Options may result in long delays between the time a Liquidating Trust Beneficiary elects to sell and the time any sale can occur. The agreements under which the Platform Securities were purchased and the issuers of the Platform Securities may also impose blackout periods, consent requirements, or transfer freezes that override any Liquidity Option further delaying or preventing sales.

Sales of Platform Securities are subject to Restrictions on Transfer and issuer-level requirements that may delay, condition, or prevent transfer, including rights of first refusal, co-sale and lock-up rights, required issuer or board consents, minimum hold periods, legends, information rights limitations, NDA requirements, and opinions of counsel. These restrictions can delay or prevent sales, re-direct sales to issuers or insiders under formulaic or discounted pricing, or impose procedural conditions (*e.g.*, investor-qualification confirmations) that depress achievable proceeds.  The Liquidating Trustee's ability to settle trades may be materially affected by such constraints, custodial peculiarities, or issuer refusal or delay in granting consents. The time required to obtain consents or remove legends can be substantial and may exceed any given Liquidity Option. Issuers may also decline to waive restrictions in whole or in part. Sale processes may be re-routed from open secondaries markets to issuer buybacks or internal transfers at less favorable terms, or may fail to close within expected timelines.

The Liquidating Trustee expects to value assets for reporting purposes based on certain valuation methodologies developed by the Trustee. These valuations may differ significantly from actual sale prices. Events between valuation cut-off dates and settlement may materially change asset values. Liquidity Option pricing may reflect discounts, liquidity adjustments, marketability haircuts, and reserves for taxes, indemnities, and expenses, with pricing established as of the valuation cut-off date for each window. There can be no assurance that reported fair value will match proceeds realized in arm's-length transactions.

Secondaries Platforms typically charge commissions, transaction fees, and other costs that reduce net proceeds. In some cases, fee schedules may favor fewer, larger trades over multiple

smaller trades, potentially creating conflicts with the interests of Liquidating Trust Beneficiaries who submit smaller orders. All such commissions and fees related to a Qualifying Liquidation Request will be borne by the directing Liquidating Trust Beneficiary. The Liquidating Trust Beneficiaries will not know the precise amount of Platform Securities sold, the price received, or the commissions and fees deducted until after settlement.

Information asymmetry and limited disclosure are common in private company secondary markets. Buyers may have different or greater access to issuer information than sellers, and no Secondaries Platform, the Liquidating Trust, or the Liquidating Trustee will provide investment, legal, accounting, tax, or valuation advice. As a result, sales may occur at prices that do not reflect intrinsic value, recent issuer developments, or pending corporate actions. Corporate events and actions may occur between submission of a Qualifying Liquidation Request and execution, including financings, recapitalizations, stock splits, conversions, issuer tender offers, or changes to rights and preferences. These events can alter pricing, eligibility, or the terms of sale. Tax consequences of sales will vary and may be adverse. A sale of Platform Securities may be a taxable event to the relevant Liquidating Trust Beneficiary, including recognition of ordinary income or capital gains, possible withholding, estimated tax obligations, and reporting requirements. The timing of tax information may not align with personal filing needs. Operational, regulatory, and counterparty risks associated with Secondaries Platforms may affect execution and settlement. Platforms may experience outages, cybersecurity incidents, or service disruptions; they may change operating procedures without notice or be subject to regulatory inquiries, enforcement actions, or suspensions that impair their ability to process transactions. Trades may be subject to extended or failed settlement, rescission, or post-closing claims, and counterparties may default or be unable to fund. Any of the foregoing could reduce or delay proceeds or unwind transactions.

Secondary transactions may require staged or contingent closings, extended settlement cycles, escrow arrangements, side letters, or comfort letters from issuers. Closing risk is heightened by mismatches between buyer and issuer transfer requirements, information rights disputes, sanctions and know-your-customer clearance issues, or last-minute ROFR exercises. The Liquidating Trustee may incur additional legal and platform costs, and settlement timing may slip beyond target windows.

The Liquidating Trustee and its professionals may receive material non-public information (MNPI) under non-disclosure agreements (NDA) or issuer confidentiality policies, and certain Liquidshares Portfolio Companies restrict dissemination of quarterly updates, sponsor decks, or cap-table details. The Liquidating Trustee may be barred from trading while in possession of MNPI, or may sell only in structured processes that mitigate MNPI exposure. Conversely, a lack of current information may depress pricing or cause platforms and buyers to impose additional discounts or require representation packages that are unavailable, limiting liquidity and pricing. The Liquidating Trustee may not be able to share granular information with Liquidating Trust Beneficiaries without breaching confidentiality undertakings.

Operational failures by the Liquidating Trustee, transfer agents, custodians, or platforms could delay settlements or distributions. The Liquidating Trustee may rely on third-party systems for order intake, allocation, and settlement; outages, cyber events, data breaches, or fraud could compromise sensitive information, impede transactions, or result in losses and remediation costs borne by the Liquidating Trust.

Privacy and confidentiality risks apply. To process transfers, the Liquidating Trust or Liquidshares may be required to share limited information with issuers, transfer agents, brokers, Secondaries Platforms and potential buyers, often under NDAs. Despite contractual protections, inadvertent disclosures or data breaches could occur.

3.      *Risks Associated with Equity Securities Portfolios.*

The value of equity securities that comprise Liquidating Trust Assets or Closed-End Fund Assets will fluctuate based on changes in a portfolio company's financial condition and overall market and economic conditions. Equity securities of companies that operate in certain sectors or industries tend to experience greater volatility than companies that operate in other sectors or industries or the broader equity markets. An adverse event, such as an unfavorable earnings report, may depress the value of equity securities held by the Liquidating Trust or the Closed-End Fund. The value of equity securities may also decline due to factors which affect a particular industry or industries, such as labor shortages or increased production costs and competitive conditions within an industry. The value of the equity securities that comprise Trust Assets or Closed-End Fund Assets may decline for a number of other reasons which directly relate to the issuer, such as management performance, financial leverage, the issuer's historical and prospective earnings, the value of its assets and reduced demand for its goods and services. The value of the equity securities that comprise Liquidating Trust Assets or Closed-End Fund Assets may also fluctuate because of changes in investors' perceptions of the financial condition of an issuer or the general condition of the relevant stock market, or when political or economic events affecting the issuers occur. In addition, common equity values may be particularly sensitive to rising interest rates, as the cost of capital rises and borrowing costs increase. Common equity securities which the Liquidating Trust or the Closed-End Fund hold are structurally subordinated to preferred stock, bonds and other debt instruments in a company's capital structure in terms of priority to corporate income, and are therefore inherently more risky than preferred stock or debt instruments of such issuers.

Accordingly, the Liquidating Trust or the Closed-End Fund may not be able to realize gains from its equity interests, and any gains that it does realize on the disposition of any equity interests may not be sufficient to offset any other losses it experiences.

4.      *Risks Associated With Investments in Private Companies.*

The Liquidating Trust and the Closed-End Fund will directly or indirectly hold investments in private companies. Such investments involve a number of risks, including the following:

- there is no assurance that, to date, the relative risks and benefits of investing in a particular class of a portfolio company's equity securities have been evaluated. Any such failure to have properly evaluated the relative rights and value of a class of securities in which the Liquidating Trust or Closed-End Fund is invested could cause the loss of part or all of any investment, which in turn could have a material and adverse effect on the net asset value and results of operations for the Liquidating Trust or Closed-End Fund;

- these portfolio companies may have limited financial resources and may be unable to meet their obligations under their existing debt, which may lead

94

to equity financings, possibly at discounted valuations resulting in the reduction or loss of the Liquidating Trust's or the Closed-End Fund's investment. These companies may also have difficulty accessing capital markets to meet future capital needs, which may limit their ability to grow or repay their outstanding indebtedness;

- they may have limited operating histories, narrower, less established product lines and smaller market shares than larger businesses, which tend to render them more vulnerable to competitors' actions, market conditions and consumer sentiment in respect of their products or services, as well as general economic downturns;

- they may have less predictable operating results, may from time to time be parties to litigation, may be engaged in rapidly changing businesses with products subject to a substantial risk of obsolescence, and may require substantial additional capital to support their operations, finance expansion or maintain their competitive position;

- because they are privately owned, there is generally little publicly available information about these businesses; therefore, the Trustee and/or Manager may not learn all of the material information regarding these businesses and may be unable to obtain financial or other information regarding the companies. Furthermore, there can be no assurance that the information that the Trustee or any Manager obtains with respect to any investment is reliable;

- they are generally not subject to SEC reporting requirements, are not required to maintain their accounting records in accordance with generally accepted accounting principles, and are not required to maintain effective internal controls over financial reporting. As a result, the Trustee and/or Manager may not have timely or accurate information about the business, financial condition and results of operations;

- investments in such companies are typically in restricted securities that are not traded in public markets and are subject to transfer restrictions and substantial holding periods, so that the Liquidating Trustee or the Manager may not be able to resell some of its holdings for extended periods, which may be several years. There can be no assurance that the Trust or the Closed-End Fund will be able to realize the value of private company investments in a timely manner. Contractual transfer limitations imposed on such a company's stockholders, as well as other contractual obligations, such as rights of first refusal and co-sale rights, generally expire only upon an IPO by the portfolio company or the occurrence of another liquidity/exit event. Prior to an IPO or other liquidity/exit event, the ability of the Trust or a Manager to liquidate its private portfolio company positions may be constrained. There also is no assurance that the private companies in which the Trust or the Closed-End Fund holds will ever have a liquidity event;

- such transfer restrictions could limit the ability of the Liquidating Trustee or Manager to liquidate its positions in these securities if it is unable to find buyers acceptable to its portfolio companies, or where applicable, their stockholders.  Such buyers may not be willing to purchase the portfolio securities at adequate prices or in volumes sufficient to liquidate the Closed-End Fund's or Liquidating Trust's position.  Furthermore, prospective buyers may be deterred from entering into purchase transactions with the Trust or the Closed-End Fund due to the delay and uncertainty that these transfers and other limitations create;

- even if a portfolio company completes an IPO, the Trustee or Manager will typically not be able to sell the position until any applicable post-IPO lockup restriction expires.  As a result of lockup restrictions, the market price of securities that the Liquidating Trust may hold or the Closed-End Fund may hold or invest in may decline substantially before it is able to sell them following an IPO;

- they are more likely to depend on the management talents and efforts of a small group of persons; therefore, the death, disability, resignation or termination of one or more of these persons could have a material adverse impact on the portfolio company and, in turn, on the Liquidating Trust and the Closed-End Fund;

- The illiquidity of such private companies may make it difficult for the Liquidating Trustee or a Manager to sell such investments should the need arise. Also, if required to liquidate all or a portion of the portfolio quickly, the Trustee or Manager may realize significantly less than the value at which the Trust or Closed-End Fund had previously recorded on any investments.  There will be no limitation on the portion of any portfolio that may be invested in illiquid securities, and the Trust and the Closed-End Fund anticipate that all or a substantial portion of the portfolio may be invested in such illiquid securities at all times; and

- such private companies frequently have much more complex capital structures than traditional publicly traded companies, and may have multiple classes of equity securities with differing rights, including with respect to voting and distributions.  In certain cases, such private companies may also have senior or *pari passu* preferred stock or senior debt outstanding, which may heighten the risk of holding the underlying equity of such private companies.

A portfolio company's failure to satisfy financial or operating covenants imposed by its lenders could lead to defaults and, potentially, termination of its loans and foreclosure on its assets, which could trigger cross-defaults under other agreements and jeopardize the equity investment held by the Liquidating Trust and the investments held and made by the Closed-End Fund in such portfolio company.  The Closed-End Fund may incur expenses to the extent necessary to seek

recovery of any equity investment or to negotiate new terms with a financially distressed portfolio company.

Further, the Closed-End Fund will have no limitation on the portion of its portfolio that may be invested in illiquid securities, and all or a substantial portion of the Closed-End Fund's portfolio is expected to be invested in illiquid securities on the Closed-End Fund Exchange Date. The Closed-End Fund may invest without limitation in investments in which no active trading secondary market is readily available or which are otherwise illiquid.

5. *Risks Associated with General Private Vehicles.*

The Liquidating Trust Assets and Closed-End Fund Assets currently, and with respect to the Closed-End Fund may in the future be, comprised of investments in units or shares of private funds, including venture funds and private equity funds (each, a "**Private Vehicle**"). Such investments in Private Vehicles are subject to a number of risks.

Private Vehicle interests are expected to be illiquid and subject to restricted marketability, and the realization of investments from them may take considerable time and/or be costly. Some of the Private Vehicles which the Liquidating Trust or Closed-End Fund may hold may have only limited operating histories. Although the Liquidating Trustee or Manager will seek to receive detailed information from each Private Vehicle regarding its business strategy and any performance history, in most cases the Liquidating Trustee or Manager will have little or no means of independently verifying this information. In addition, Private Vehicles may have little or no near-term cash flow available to distribute to investors, including the Liquidating Trust or Closed-End Fund. Due to the pattern of cash flows in Private Vehicles and the illiquid nature of their investments, investors typically will see negative returns in the early stages of Private Vehicles. Then, as investments are able to realize liquidity events, such as a sale or initial public offering, positive returns will be realized if the Private Vehicle's investments are successful.

Private Vehicle interests are ordinarily valued based upon valuations provided by the Private Vehicle Manager, which may be received on a delayed basis. Certain securities in which the Private Vehicles invest may not have a readily ascertainable market price and are fair valued by the Private Vehicle Managers. A Private Vehicle Manager may face a conflict of interest in valuing such securities because their values may have an impact on the Private Vehicle Manager's compensation. The Trustee and Manager will review and perform due diligence on the valuation procedures used by each Private Vehicle Manager and monitor the returns provided by the Private Vehicles. However, neither the Trustee nor Manager will be able to confirm the accuracy of valuations provided by Private Vehicle Managers. Inaccurate valuations provided by Private Vehicles could materially adversely affect the value of the Trust Assets and Closed-End Fund Assets.

The governing documents of a Private Vehicle may include provisions that would enable the general partner, the manager, or a majority in interest (or higher percentage) of its limited partners or members, under certain circumstances, to terminate the Private Vehicle prior to the end of its stated term. Early termination of a Private Vehicle in which the Trust or Closed-End Fund is invested may result in the Trust or Closed-End Fund having distributed to it a portfolio of immature and illiquid securities, or the Closed-End Fund's inability to invest all of its capital as

97

anticipated, either of which could have a material adverse effect on the performance of the Trust or the Closed-End Fund, as applicable.

Although the Trust and/or Closed-End Fund may hold investments in a Private Vehicle, holders of interests in the Trust and/or shares of the Closed-End Fund will not themselves be equity holders of that Private Vehicle and will not be entitled to enforce any rights directly against the Private Vehicle or assert claims directly against any Private Vehicles.  Holders of interests in the Trust and/or shares of the Closed-End Fund will have no right to receive the information issued by the Private Vehicles that may be available to the Trust or the Closed-End Fund as an investor in the Private Vehicles.  In addition, Private Vehicles generally are not registered as investment companies under the Investment Company Act; therefore, the Trust and the Closed-End Fund, as investors in Private Vehicles, will not have the benefit of the protections afforded by Investment Company Act.  Managers of Private Vehicle may not be registered as investment advisers under the Investment Advisers Act of 1940, in which case the Trust and the Closed-End Fund, as investors in Private Vehicles managed by such managers, will not have the benefit of certain of the protections afforded by the Investment Advisers Act of 1940.

6.    *Closed-End Fund Shares Trading at a Discount or Premium.*

Shares of  the Closed-End Fund may trade at a premium or discount to their NAV.  There can be no assurance that the shares will trade at a price equal to or higher than the NAV.  The possibility that the shares may trade at a discount to NAV is separate and distinct from the risk that the NAV may not accurately reflect the true value of the Closed-End Fund's investments and the risk that the NAV may decline.

In addition to NAV, the market price of the Closed-End Fund's shares may be affected by such factors as distributions that the Closed-End Fund may make to the Closed-End Fund's shareholders or significant trading in one or more of the Closed-End Fund Assets immediately prior to their initial public offering, at times causing the market price to rise and, at times causing the market price to decrease; in each case, such events are, in turn, further affected by expenses, the stability of the Closed-End Fund's distributions, liquidity and market supply and demand. Any issuance of additional shares may have an adverse effect on prices in the secondary market for the shares by increasing the number of shares available, which may create downward pressure on the market price for the shares. The Closed-End Fund cannot predict whether the shares will trade above, at, or below their NAV.

7.    *Other Risks Relating to Share Price.*

If the Closed-End Fund sells additional Shares after this offering or is perceived by the public as intending to sell additional Shares, the market price of the Shares could decline.

8.    *Risks Relating to Exchange Listing of Closed-End Fund Shares.*

An active, liquid and orderly market for the Closed-End Fund's shares may not develop or be sustained.  Investors may be unable to sell their shares at or above the price at which they

initially exchanged their claims for those shares. Further, the Closed-End Fund's shares price may be volatile and could decline significantly or rapidly.

9.   *Risks Related to Valuation.*

At the outset, the Trust Assets and Closed-End Fund Assets are expected to be recorded at fair value because they are not publicly traded.  Therefore, there will be uncertainty as to the value of the Trust Assets and Closed-End Fund Assets.  The fair value of securities and other investments that are not publicly traded that comprise the Trust Assets and Closed-End Fund Assets may not be readily determinable.  The methods for valuing these securities may include: fundamental analysis (sales, income, or earnings multiples, etc.), discounts from market prices of similar securities, purchase price of securities, subsequent private transactions in the security or related securities, or discounts applied to the nature and duration of restrictions on the disposition of the securities, or any combination of these and other factors.

The value of the Trust Assets and Closed-End Fund Assets, whether at the initial public offering or liquidation of a portfolio company may differ, sometimes significantly, from the valuations assigned by the Debtors to the Trust Assets or Closed-End Fund Assets.  In addition, the timing of an initial public offering or liquidation may also affect the values obtained.  There can be no guarantee that the investments that comprise the Trust Assets and Closed-End Fund Assets could ultimately be realized at the Trust or Closed-End Fund's valuation of such investments.

10.   *Limited Operating History.*

The Closed-End Fund will be a newly organized closed-end investment company with no operating history.  As a result, it may be subject to the business risks and uncertainties associated with any new business, including the risk that it may not achieve its investment objectives.  Further, the Manager may have limited experience managing a closed-end fund.

11.   *Non-Diversification Risk.*

The Closed-End Fund will be classified as non-diversified for purposes of the Investment Company Act, which means that the Closed-End Fund will not be limited by the Investment Company Act with respect to the proportion of its assets that it may invest in securities of a single issuer. The Closed-End Fund intends to assume large positions in the securities of a small number of issuers. Accordingly, the Closed-End Fund's NAV may fluctuate to a greater extent than that of a diversified investment company as a result of changes in the financial condition or assessed fair value of a single issuer. The Closed-End Fund may also be more susceptible to any single economic or regulatory occurrence than a diversified investment company.

12.   *Concentration of Investments.*

The Closed-End Fund Assets will be in private companies in the technology, artificial intelligence, blockchain/digital assets, consumer/commerce technology, data security, cybersecurity, fintech, hardware technology, biotech, software and space/aerospace sectors, and therefore will be particularly exposed to the risks attendant to investments in those sectors. There is no assurance as to the degree of diversification of such investments, either by geographic region,

asset type or sector.  Accordingly, a significant portion of such investments may be made in relatively few geographic regions, asset types, security types or industry sectors.  By concentrating in a single sector, there may be a greater risk of adverse developments in that sector than a fund that invests in a wide variety of industries.  Any such concentration of risk may increase losses suffered, which could have a material adverse effect on the overall financial condition of the Closed-End Fund.  The Closed-End Fund may be subject to greater volatility with respect to its portfolio investments than a fund that is more broadly diversified.  Even when the Manager attempts to control risks and diversify the portfolio, risks associated with different assets may be correlated in unexpected ways, with the result that the Closed-End Fund may face concentrated exposure to certain risks.  Conversely, the Closed-End Fund may encounter unexpected changes in the correlation of assets or markets, which confound their attempts to hedge or limit risk and result in investment losses.  Many risk management techniques are based on observed historical market behavior, but future market behavior may be entirely different.  Although the Manager will attempt to identify, monitor and manage significant risks, these efforts may not necessarily take all risks into account and there can be no assurance that these efforts will be effective.  Any inadequacy or failure of such risk management efforts could result in material losses.

13.    *Risks Related to the Use of Leverage.*

The Closed-End Fund may borrow money, which may magnify the potential for gain or loss and may increase the risk of investing in the Closed-End Fund.  The use of leverage is speculative and involves certain risks.  Although leverage will increase the Closed-End Fund's investment return if the Closed-End Fund's interest in a Closed-End Fund Asset purchased with borrowed funds earns a greater return than the interest expense the Closed-End Fund pays for the use of those funds, the use of leverage will decrease the return if the Closed-End Fund fails to earn as much on such Closed-End Fund Asset purchased with borrowed funds as it pays for the use of those funds.  The use of leverage will in this way magnify the volatility of changes in the value of an investment in the Closed-End Fund, especially in times of a "credit crunch" or during general market turmoil.  The Closed-End Fund may be required to pledge its assets as collateral for its borrowings and to maintain minimum average balances in connection with its borrowings or to pay a commitment or other fee to maintain a line of credit; either of these requirements would increase the cost of borrowing over the stated interest rate.  In addition, a lender to the Closed-End Fund may terminate or refuse to renew any credit facility into which the Closed-End Fund has entered.  If the Closed-End Fund is unable to access additional credit, it may be forced to sell its investments at inopportune times, which may further depress the returns of the Closed-End Fund.

14.    *Change in Investment Objective or Strategies.*

The Closed-End Fund is designed to provide retail investors with exposure to a group of private companies that the Manager believes are capable of additional growth, through an investment vehicle with publicly listed shares that provide intra-day liquidity and a fee structure aligned with democratizing access to private markets. As of the Closed-End Fund Exchange Date, the Closed-End Fund's portfolio will initially consist of the Platform Securities in which the Electing Customers had an economic interest. However, the Manager may change the Closed-End Fund's investment objective and strategies or modify or waive certain of the Closed-End Fund's operating policies and strategies without shareholder approval (except as required by the Investment Company Act or other applicable laws). The Closed-End Fund cannot predict the

effects that any changes to its current operating policies and strategies would have on the Closed-End Fund's business, operating results and value of its shares.  Nevertheless, the effects may adversely affect the Closed-End Fund's business and impact its ability to make distributions.

15.     *Active Management.*

The Closed-End Fund is subject to management risk because it is an actively managed investment portfolio.  The Closed-End Fund's ability to achieve its investment objective depends upon the Manager's skill in determining the Closed-End Fund's allocation of the Closed-End Fund Assets and in selecting the best mix of investments.  There is a risk that the Manager's evaluation and assumptions regarding investments may be incorrect in view of actual market conditions.  The Manager will apply investment techniques and risk analyses in making investment decisions for the Closed-End Fund, but there can be no guarantee that these will produce the desired results. The Closed-End Fund may be subject to a relatively high level of management risk because the Closed-End Fund invests in private market investments, which are highly specialized instruments that require investment techniques and risk analyses different from those associated with investing in public equities and bonds.  The Closed-End Fund's allocation of its investments across direct investments, including Private Vehicles, and other portfolio investments representing various strategies, geographic regions, asset classes and sectors may vary significantly over time based on the Manager's analysis and judgment.  As a result, the particular risks most relevant to an investment in the Closed-End Fund, as well as the overall risk profile of the Closed-End Fund's portfolio, may vary over time.  It is possible that the Closed-End Fund will focus on an investment that performs poorly or underperforms other investments under various market conditions.

16.     *Conflicts.*

The Closed-End Fund may be subject to conflicts of interest. The Manager (or an affiliate person of the Manager) may have or may be permitted to market, organize, sponsor, act as general partner or as the primary source for transactions for other pooled investment vehicles and other accounts, which may be offered on a public or private placement basis, and to engage in other investment and business activities. Some of these funds and accounts will have investment strategies that overlap with the investment strategies of the Closed-End Fund. Such activities may raise conflicts of interest for which the resolution may not be determinable.

17.     *Risks Related to Future Growth.*

The Closed-End Fund may need additional capital to grow and to fund growth in its investments, and the Closed-End Fund may issue additional securities in order to obtain this additional capital.  The inability to obtain new capital or a reduction in the availability of new capital could limit the Closed-End Fund's ability to grow or pursue business opportunities, which may have an adverse effect on the value of the Closed-End Fund's shares.  If the Closed-End Fund sells additional shares after the initial offering to raise new capital, or is perceived by the public as intending to sell additional shares, the market price of the shares could decline.  Additionally, if the Closed-End Fund's shares are trading below the Closed-End Fund's NAV per share, the Closed-End Fund's ability to grow may be limited.

18.    *Sector Risks.*

- *Technology Sector.*

The Closed-End Fund's assets will be concentrated in securities of companies having their principal business activities in groups of industries in the technology sector. Accordingly, the Closed-End Fund's performance will be particularly susceptible to adverse events impacting the technology sector, which may include, but are not limited to, the following: rapid changes in technology product cycles; rapid product obsolescence; government regulation; and increased competition, both domestically and internationally, including competition from foreign competitors with lower production costs. These companies are also heavily dependent on patent and intellectual property rights, the loss or impairment of which may adversely impact a company's profitability. A small number of companies represent a large portion of the technology industry. In addition, a rising interest rate environment tends to negatively affect technology companies, those technology companies seeking to finance expansion would have increased borrowing costs, which may negatively impact earnings. Technology companies having high market valuations may appear less attractive to investors, which may cause sharp decreases in their market prices.

- *Artificial Intelligence.*

Companies involved in AI-related businesses may have limited product lines, markets, financial resources or personnel. These companies face intense competition and potentially rapid product obsolescence, and many depend significantly on retaining and growing the consumer base of their respective products and services. Many of these companies are also reliant on the end-user demand of products and services in various industries that may in part utilize AI and/or data services. Further, many companies involved in AI-related businesses may be substantially exposed to the market and business risks of other industries or sectors, and the Closed-End Fund may be adversely affected by negative developments impacting those companies, industries or sectors. In addition, these companies are heavily dependent on intellectual property rights and may be adversely affected by loss or impairment of those rights. There can be no assurance that companies involved in the AI industry will be able to successfully protect their intellectual property to prevent the misappropriation of their technology, or that competitors will not develop technology that is substantially similar or superior to such companies' technology. AI companies also face risks specific to training data and model development, including allegations that third-party models or datasets used to develop or enhance products lacked proper licenses or consents, challenges obtaining or maintaining access to high-quality models, datasets, or specialized hardware, and higher operating costs driven by compute-intensive training and inference.

AI companies are potential targets for cyberattacks, which can have a materially adverse impact on the performance of these companies. In addition, the collection of data from consumers and other sources could face increased scrutiny as regulators consider how the data is collected, stored, safeguarded and used. Compliance with evolving regulatory obligations specific to AI, such as the EU AI Act and emerging United States federal and state oversight of model transparency, safety and privacy, may require significant changes to products, practices and business models, which may adversely affect AI companies subject to such regulations.

Many AI companies also depend on third-party cloud infrastructures operated by a small number of service providers to host and deliver their offerings; interruptions, price increases or preferential treatment of competitors by those service providers, or any cyberattacks on those providers, could materially and adversely affect the operations of such AI companies.

AI companies typically engage in significant research and development spending, and there is no guarantee that the products or services produced by these companies will be successful. AI companies, especially smaller companies, tend to be more volatile than companies that do not rely heavily on technology. AI could face increasing regulatory scrutiny in the future, which may limit the development of this technology and impede the growth of companies that develop and/or utilize this technology.

- *Blockchain / Digital Assets.*

Companies involved in the digital assets, blockchain or Web3 technology are subject to the various risks that could negatively impact the value of such companies. Digital asset technologies are highly disruptive and uncertain, and rapid technological advances may render existing assets obsolete. The trading platforms for digital assets are relatively new, largely unregulated, and thus more vulnerable to fraud and failures compared to traditional, regulated exchanges. Shutdowns of these platforms due to fraud, technical glitches, external attacks or security issues can significantly affect digital asset prices and market volatility. These assets are typically stored in digital wallets, accessible only via private keys-if lost or stolen, the assets may be irretrievable. Digital assets also face manipulation risks and reliance on third-party products with potential vulnerabilities. Historically, digital assets have exhibited extreme price volatility and may become highly illiquid in stressed markets. Their value is not necessarily correlated to traditional economic or market forces, and demand for a digital asset could collapse, potentially driving its value to zero. Crypto asset trading platforms may be operating out of compliance with applicable laws and regulations. Such crypto asset trading platforms are, or may become, subject to enforcement actions by regulatory authorities.

Blockchain is a decentralized digital ledger that records crypto asset transactions, but its applications remain largely untested. Companies in this sector face volatile adoption rates, intense competition, and potential product obsolescence. Their financial performance is often tied to fluctuations in digital asset prices. Many blockchain companies operate with limited regulatory oversight, but stricter regulations could increase costs, restrict business activities, or even lead to prohibitions. Additionally, blockchain firms store sensitive consumer data, making them targets for cybersecurity threats and theft. Loss or compromise of cryptographic keys could also result in irreversible asset losses.

Additional risks related to blockchain technology include: (i) the risk that the integrity and viability of the consensus mechanism of the blockchain fails; (ii) the risk that the blockchain's capacity to execute and settle transactions in a timely and predictable manner is compromised; and (iii) the open source nature of blockchain technology which makes it vulnerable to being "forked" by users and miners/validators (i.e., creation of a new competing blockchain when a significant portion of the miners/validators adopts updates to the existing blockchain protocol).

- *Consumer / Commerce.*

Consumer technology companies produce a wide range of products and services for general consumers. The operations and performance of consumer technology companies depend significantly on global and regional economic conditions. Adverse macroeconomic conditions, including slow growth or recession, high unemployment, inflation, and higher interest rates, can adversely impact consumer confidence and spending and materially adversely affect demand for consumer technology companies' products and services.

Consumer technology companies may be required to use, store and share confidential information, including personal information with respect to their customers. Data security measures cannot provide absolute security, and losses or unauthorized access to or releases of confidential information can occur and could materially adversely affect a company's business and reputation.

- *Data Security / Cybersecurity.*

Companies involved in the data security and cybersecurity industries provide products and services intended to protect the integrity of data and network operations for private and public networks, computers and mobile devices, including network security, application security, endpoint security, identity and access management, cloud security, data security, general security and other forms of emerging security systems. These companies typically face intense competition and potentially rapid product obsolescence. Cybersecurity companies may be adversely impacted by government regulations and actions and may be subject to additional regulatory oversight with regard to privacy concerns and cybersecurity risk. These companies are also heavily dependent on intellectual property rights and may be adversely affected by loss or impairment of those rights. Cybersecurity companies may also be negatively affected by the decline or fluctuation of subscription renewal rates for their products and services, which may have an adverse effect on profit margins. Cybersecurity companies, especially smaller companies, tend to be more volatile than companies that do not rely heavily on technology. In addition to their cybersecurity business, certain of these companies may be involved in other businesses unrelated to cybersecurity.

- *Fintech.*

FinTech Companies may be adversely impacted by government regulations, economic conditions, and deterioration in credit markets. These companies may have significant exposure to consumers and businesses in the form of loans and other financial products or services. FinTech Companies typically face intense competition and potentially rapid product obsolescence. Many Fintech companies operate under complex financial regulatory regimes, which can force product changes, add cost and result in fines. There is significant risk that regulatory oversight of FinTech Companies may increase in the future, which could increase costs and adversely impact the current business models of some FinTech Companies. FinTech Companies with significant alternative currency exposure may also be negatively impacted during high periods of volatility within the crypto markets.

Fintech companies may face competition from larger and more established firms, and a Fintech company may not currently or in the future derive any revenue from disruptive

technologies. In addition, Fintech companies may not be able to capitalize on their disruptive technologies if they face political and/or legal attacks from competitors, industry groups or local and national governments.

Fintech companies can be subject to operational and information security risks resulting from cybersecurity incidents. The failure to protect against cybersecurity incidents could cause significant interruptions in Fintech companies' operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to customers. Such a failure or unauthorized disclosure of data could harm the Fintech companies' reputation, subject them to legal claims, increased costs, financial losses, data privacy breaches, regulatory intervention and otherwise affect their business and financial performance.

- *Hardware.*

Companies engaged in the development and manufacturing of advanced hardware technologies, including autonomous systems and robotics, typically have high research and capital expenditures and, as a result, their profitability can vary widely. The space in which they are engaged is highly competitive and their products and services may become obsolete very quickly. These companies are heavily dependent on intellectual property rights and may be adversely affected by loss or impairment of those rights. These companies are also subject to legal, regulatory and political changes that may have a large impact on their profitability. A failure in a company's product or even questions about the safety of the product could be devastating to the company, especially if it is the company's marquee product.

In addition, these companies may be exposed to a limited number of contract manufacturers with geopolitically sensitive supply chains, which amplifies disruptions from trade restrictions, natural disasters or public-health events. Where global trade controls apply, export restrictions can abruptly curtail market access, depress demand or force costly re-engineering.

- *Health / Biotech / Clean-tech.*

Biotech companies invest heavily in research and development which may not necessarily lead to commercially successful products. These companies are also subject to increased governmental regulation which may delay or inhibit the release of new products. Many biotech companies are dependent upon their ability to use and enforce intellectual property rights and patents. Any impairment of such rights may have adverse financial consequences. Biotech companies can be significantly affected by technological change and obsolescence, product liability lawsuits and consequential high insurance costs.

- *Software-as-a-Service / Enterprise Software.*

Enterprise software companies develop and provide specialized software solutions for enterprises, rather than individual consumers, to streamline business operations and improve productivity. If enterprise software companies are unable to develop new or sufficiently differentiated products and services, enhance and improve their product offerings and support services in a timely manner or position and price their products and services to meet demand, customers may not purchase, subscribe to or renew their license, hardware support or cloud

offerings. Enterprise software companies rely on copyright, trademark, patent and trade secret laws, confidentiality procedures, controls and contractual commitments to protect their intellectual property. If enterprise software companies cannot protect their intellectual property against unauthorized copying or use, or other misappropriation, they may not remain competitive.

Because enterprise software companies' services are complex and incorporate a variety of hardware, proprietary software, third-party and open-source software, their services may have errors or defects that could result in unanticipated downtime for their subscribers and harm to their reputation and business.

Many enterprise software companies have been and are targets for computer hackers, cyberattacks and other perpetrators or threat actors because these companies store and process large amounts of data, including sensitive data. Enterprise software companies and their third-party vendors are regularly subject to attempts by third parties to identify and exploit product and service vulnerabilities, penetrate or bypass their security measures, and gain unauthorized access, which may lead to the compromise of confidential information and harm to enterprise software companies' reputation and business.

- *Space / Aerospace.*

The space and aerospace industry operate in highly regulated markets, where changes in domestic and foreign government policy, defense budgets, procurement cycles, and export controls can materially affect operations and demand. Many such companies are reliant on a limited number of large government or commercial contracts, and the loss, delay, or renegotiation of such contracts may have a significant adverse impact on financial performance. The sector also depends on a globally dispersed supply chain, where supplier distress, quality issues and retrofit campaigns can disrupt deliveries and raise costs. In recent years, global supply chain disruptions have impacted, and may continue to impact in the future, aerospace and defense companies' ability to procure raw materials, microelectronics, and certain commodities. Such disruptions may be driven by supply chain market constraints and macroeconomic conditions, including inflation and labor market shortages. Current geopolitical conditions, including conflicts and other causes of strained intercountry relations, as well as sanctions and other trade restrictive activities, may in the future contribute to these issues. Supply costs can be increased due to the above factors.

19.     *Competition for Investment Opportunities.*

The Closed-End Fund will operate in a highly competitive market for investment opportunities. A number of entities, including venture capital firms and funds, public and private investment funds (including hedge funds), BDCs, commercial and investment banks, commercial financing companies, and internal venture capital arms of various companies will compete with the Closed-End Fund to make the types of investments that the Closed-End Fund plans to make. Many of the Closed-End Fund's competitors are substantially larger than the Closed-End Fund will be and have considerably greater financial, technical and marketing resources than the Closed-End Fund will have. The Closed-End Fund may be at a competitive disadvantage with the Closed-End Fund's competitors in a particular sector or investment, as some of them have greater capital, a greater willingness to take on risk, more personnel or greater sector or investment strategy specific expertise. The Closed-End Fund may be unable to find a sufficient number of attractive

opportunities to meet its investment objective and there is no assurance as to the timing of investments. There can be no assurance that the Manager will be able to maintain or draw upon its relationships, which could have an adverse effect on the Closed-End Fund's ability to find suitable investments and otherwise achieve its investment objective.

**G.     Tax Risks.**

There are a number of material income tax considerations, risks, and uncertainties associated with the Trust and the Closed-End Fund. Holders of Claims and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth in Article XI. below – *Certain U.S. Federal Income Tax* Consequences *of the Plan*.

> 1.     *The Liquidating Trust or Closed-End Fund Could Be Subject to Additional Tax Liabilities Due to Changes in Tax Laws and Tax Audits, Which Could Affect its Profitability and Increase Its Effective Tax Rate.*

The Liquidating Trust and Closed-End Fund are subject to complex tax laws and regulations of the multiple jurisdictions in which it operates. These laws and regulations are subject to uncertain interpretation and are subject to change, which changes may apply with retroactive effect. The Liquidating Trust or Closed-End Fund's interpretation and application of these laws and regulations, as well as the Liquidating Trust or Closed-End Fund's compliance with certain other requirements, require significant judgment and the use of assumptions and estimates.

As a result, the Liquidating Trust or Closed-End Fund will be exposed to the risk that tax authorities could disagree with its interpretations of the applicable laws and regulations or its tax calculations and methodologies, including the classification of its revenues or the determination of the jurisdictions to which profits are attributed. Accordingly, the Liquidating Trust or Closed-End Fund may be subject to tax audits and other similar proceedings with tax authorities in a number of jurisdictions. Any such audits and other similar proceedings could result in additional taxes, including interest and penalties, which could, in turn, adversely affect the Liquidating Trust or Closed-End Fund's investment returns.

> 2.     *The Tax Treatment of the Restructuring Transactions is Uncertain.*

There are a number of material income tax considerations, risks and uncertainties associated with Consummation of the Plan. Holders of Eligible Claims and other interested parties should read carefully the discussion set forth in Article XII. below – *Certain U.S. Federal Income Tax* Consequences *of the Plan* for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan. The U.S. federal income tax characterization of the transactions contemplated by the Plan  is complex and uncertain and there are various alternative ways in which such transactions can reasonably be characterized.

It is possible that the receipt of the Liquidating Trust Interests will not be treated as a taxable event for U.S. federal income tax purposes, but no assurance can be given in this regard and it is possible that the IRS or a court would take the contrary view that the receipt of the Liquidating Trust Interests is a taxable exchange by a Holder of an Allowed Customer Claim's economic interest in the Platform Securities for the Liquidating Trust Interests that gives rise to gain or loss for U.S. federal income tax purposes.

There are additional uncertainties with respect to the treatment of a Holder of Allowed Customer Claims that elects to receive Closed-End Fund Shares. It is unclear whether, and to what extent, such Holder is treated as exchanging previously owned property for new property on the Effective Date and whether the transfer of the Closed-End Fund Assets to the Closed-End Fund is treated as a taxable disposition of the Closed-End Fund Assets in exchange for Closed-End Fund Shares. It is possible that the transfer of the Closed-End Fund Assets to the Closed-End Fund will not qualify as a non-recognition transaction pursuant to Section 351(a) of the Code because such transfer will give rise to an impermissible diversification of the Electing Customer's interest. However, it is also possible that such transfer will qualify as a non-recognition transaction, in which case an Electing Customer generally would not recognize any gain or loss incremental to any gain or loss recognized on any deemed exchange described above.

Each of these characterizations is subject to significant uncertainty and affected by events or actions that occur (including events or actions following the Closed-End Fund Exchange Date) that are beyond the control of the Debtors and the Closed-End Fund. No ruling from the IRS has been or will be sought and no opinion of counsel is being provided.

Customers are urged to consult their own tax advisors regarding the implications to them of the transactions contemplated by the Plan.

### 3. Taxation of the Closed-End Fund.

The Closed-End Fund may seek to qualify, and elect to be treated, as a RIC under Subchapter M of the Tax Code. The law and regulations regarding the qualification of a corporation as a RIC and their application to the Closed-End Fund is uncertain. It has not yet been determined whether the Closed-End Fund will meet the requirements to be treated as a RIC, or if an election will be made to treat the Closed-End Fund as a RIC if it so qualifies. To qualify for the favorable U.S. federal income tax treatment generally accorded to RICs, the Closed-End Fund must, among other things, derive in each taxable year at least 90% of its gross income from certain prescribed sources and distribute for each taxable year at least 90% of its "investment company taxable income" (generally, ordinary income plus the excess, if any, of net short-term capital gain over net long-term capital loss). If the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund intends to distribute at least the minimum amount necessary to qualify for such favorable U.S. federal income tax treatment and will be subject to tax on any undistributed taxable income or gains, including net capital gain. These requirements may impose significant limitations on the investments the Closed-End Fund may make and on the Closed-End Fund's operations.

If for any taxable year the Closed-End Fund does not qualify or elect to be treated as a RIC, all of its taxable income for that year (including its net capital gain) would be subject to tax at regular corporate rates without any deduction for distributions to shareholders, and such distributions would be taxable as ordinary dividends to the extent of the Closed-End Fund's current and accumulated earnings and profits (as determined for U.S. federal income tax purposes)..

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

The following discussion is an overview of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to Holders entitled to vote to accept or reject the Plan.  This overview is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial authorities, published administrative positions of the IRS, and other applicable authorities (collectively, "**Applicable Tax Law**"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan is subject to a high level of uncertainty.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.  No portion of this discussion is or will be binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Holders take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons using a mark to market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  Furthermore, this overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).  This overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This overview does not discuss differences in tax consequences to Holders

that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders entitled to vote to accept or reject the Plan described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in.  This overview does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "**U.S. Holder**" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "**Non-U.S. Holder**" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass through entities) and partners (or other beneficial owners) of partnerships (or other pass through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING OVERVIEW OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.

### A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.

#### 1.   COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**COD Income**") if the taxpayer's outstanding indebtedness is satisfied for total consideration less than the amount of such indebtedness.

Under section 108 of the IRC, however, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "**Bankruptcy Exception**"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (but only to the extent of the taxpayer's insolvency) (the "**Insolvency Exception**").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce certain tax attributes by the amount of COD Income that it excluded from gross income.  Under section 108(d)(6) of the IRC, when an entity that is a pass-through entity recognizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level.

In general, the Debtors do not expect the Plan to give rise to material COD Income.  To the extent that there is any COD Income recognized in connection with the Plan, Debtors that are treated as corporations for U.S. federal income tax purposes (or as an entity that is disregarded as separate from a Debtor that is a corporation for U.S. federal income tax purposes) will generally be eligible for the Bankruptcy Exception and will generally exclude any such COD Income from its gross income and reduce its tax attributes as described above.  With respect to any Debtor that is treated as a pass-through entity for U.S. federal income taxes, however, any COD Income will be allocated to the holders of equity interests in such Debtor and will only be excluded from gross income (and give rise to a reduction of tax attributes) under the Bankruptcy Exception or the Insolvency Exception if such holder of equity interests is itself under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code or to the extent of such holder of equity interest's insolvency, respectively.

2.      *Gain or Loss.*

The Debtors generally do not expect the transactions contemplated by the Plan (including any amendment or restatement of the Liquidshares Operating Agreement) to be treated as taxable events with respect to some or all of the Debtors and therefore do not expect the transactions contemplated by the Plan to give rise to material gain or loss to the Debtors for U.S. federal income tax purposes. However, as discussed below, the U.S. federal income tax characterization of the transactions contemplated by the Plan is uncertain and there are several ways in which such transactions can reasonably be characterized. If any of the transactions are treated as a taxable disposition of assets by some or all of the Debtors, Debtors that are treated as corporations for U.S. federal income tax purposes will generally be subject to tax on any gain. Such gain may be offset by available losses at such Debtor before reduction in respect of any COD Income.  Any such gain or loss recognized by a Debtor that is treated as a pass-through entity for U.S. federal income taxes will be allocated to the holders of equity interests in such Debtor.

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

1.    *Customer Claims (Class 4).*

Each Holder of an Allowed Customer Claim may select between having their interest in the Platform Securities contributed to a Liquidating Trust or to a Closed-End Fund, or a combination of the two.

The tax treatment of U.S. Holders of Allowed Customer Claims under the Plan depends significantly on the tax treatment of their initial investment into the Debtors.  Linqto launched a private investment platform that purported to allow investors to indirectly invest in private-market startups and pre-IPO companies.  Instead of buying shares in an underlying Issuer, investors were purportedly buying units in a corresponding, bankruptcy-remote special-purpose vehicle created to hold the shares of the specific Issuer which were to be set up as series limited-liability companies.  Each unit of interest in the SPV would correspond to one share of the Issuer.  Various agreements documented this intended structure, including subscription agreements, Liquidshares Operating Agreement, customer certificates identifying each customer as a "member" of a particular SPV, account statements reflecting each customer's "economic interest" in the Issuer, and Schedules K-1 delivered to customers.  However, the Debtors' records reflect that all Platform Securities were (and will remain until the Effective Date) held by Liquidshares, and the various SPVs were not properly formed for state law purposes.

There is some uncertainty with respect to how the initial customer investments should be treated under Applicable Tax Law, but the Debtors generally expect that most customers have taken the position that they are partners in a partnership.  As subscription amounts were transferred by the Customers to Liquidshares and Liquidshares subsequently purchased the Securities, it is possible that the Customers would, for U.S. federal income tax purposes, be viewed as partners in the Liquidshares partnership, with economics tied to their applicable Security(ies) (the "**Partnership Treatment**").  While alternative tax positions could also be supportable, this is a position that has some support based in the case law and IRS authorities defining the terms "partner" and "partnership."  Although there were certain omissions with respect to the corporate formation of the entities and historic compliance failures, it is federal law, not state law, that controls the determination of who is a partner for U.S. federal income tax purposes, and the facts and circumstances reflect an intent of the parties to join together in an enterprise that was a partnership under Applicable Tax Law.

If the Partnership Treatment is respected, it is expected that the applicable Holder would assert that the receipt of the Liquidating Trust Interests is not a transaction that results in a realization event for U.S. federal income tax purposes.  Rather, the transaction would be viewed as a contribution of the Holder's Liquidshares partnership interest to the Liquidating Trust in a transaction that is not a taxable event.  If the applicable Holder elects to split its recovery between the Liquidating Trust and the Closed-End Fund, it is possible that the transaction would be bifurcated into a partially tax-free transaction (with respect to the Liquidating Trust Interest) and a partially taxable transaction (with respect to the Closed-End Fund).

An alternative position that the receipt of Liquidating Trust Interests is not a taxable event may be that the transaction does not involve the exchange of property "differing materially in either kind or extent" (the "**Alternative Treatment**"). Such position relies, among other things, on the theory that despite the form of the transaction, in substance the taxpayer holds a property interest that does not differ materially before and after the receipt of the Liquidating Trust Interest (*i.e.*, an interest in the underlying Security).

It is possible that the IRS or a court could disagree with the Partnership Treatment, the Alternative Treatment, and any additional positions for tax-free treatment. Any such disagreement could lead to a redetermination of tax consequences discussed herein, potentially in a way that has a materially adverse impact on the Debtors and the Customers.

The Debtors emphasize there is a material risk that the positions described throughout this discussion may not be sustained.

### a. Certain U.S. Federal Income Tax Consequences of the Liquidating Trust

Pursuant to the Plan, each Holder of an Allowed Class 4 Customer Claim that is not an Electing Customer shall receive a beneficial interest in the Liquidating Trust.

### i. U.S. Federal Income Tax Consequences to the Liquidating Trust Beneficiaries.

In general, it is expected that a Liquidating Trust Beneficiary will take the position that no gain or loss is recognized upon the receipt of its interest in the Liquidating Trust. However, as discussed above, the IRS may disagree with this position.

If such treatment is respected, it would be expected that the customers would treat the transactions occurring on the Effective Date as a tax-deferred contribution of their partnership interests in Liquidshares to the Liquidating Trust. Further, if a Holder elects to receive Liquidating Trust Interests in exchange for part of its Allowed Class 4 Claim and interests in the Closed-End Fund with respect to the remainder of its Allowed Class 4 Claim, it is possible that the receipt of the Liquidating Trust Interest would be tax-free and the receipt of the interest in the Closed-End Fund will be taxable. In that case, such Holder would recognize gain or loss in an amount equal to the difference between (a) the fair market value of the Closed-End Fund interest received and (b) while subject to uncertainty, a proportionate portion of the tax basis in such Claim.

In the event this position for tax-free treatment is not respected by the IRS, each Liquidating Trust Beneficiary will generally recognize gain or loss in an amount equal to the difference between (i) the fair market value of its undivided interest in the Liquidating Trust Assets and (ii) the adjusted tax basis of their Allowed Class 4 Customer Claim. Any gain or loss so recognized may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year; a Holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets will generally equal the fair market value of such interest; and a Holder's holding period in such assets generally will begin the day following establishment of the Liquidating Trust.

113

Each Holder of an Allowed Class 4 Claim is urged to consult its tax advisor to determine whether gain or loss will be recognized by such Holder and, if so, whether such gain or loss will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

> ii.   *U.S. Federal Income Tax Classification of the Liquidating Trust.*

It is intended that the Liquidating Trust will be treated as an "investment trust" in accordance with Treas. Reg. Section 301.7701-4(c). Accordingly, the Liquidating Trust Agreement will provide that the Liquidating Trustee has no power to vary the investment of the Liquidating Trust Beneficiaries, and that the existence of the Series is incidental to the purpose of facilitating direct investment in the Liquidating Trust Assets.

While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Liquidating Trust Beneficiaries could vary from those discussed herein.

> iii.   *General Tax Reporting by the Liquidating Trust and Holders of Liquidating Trust Interests.*

In accordance with the treatment of the Liquidating Trust as an investment trust, all parties shall treat the Liquidating Trust as a grantor trust of which the Holders of Liquidating Trust Interests are the owners and grantors, and treat the Holders of Liquidating Trust Interests as the direct owners of an undivided interest in the Liquidating Trust Assets for all U.S. federal income tax purposes, consistent with their economic interests therein. The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).

Items of taxable income, gain, loss, deduction, and/or credit of the Liquidating Trust shall be allocated among the holders of Liquidating Trust Interests in accordance with their relative ownership of the applicable Series of Liquidating Trust Interests.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interests are not dependent on the Liquidating Trust distributing any Platform Securities, cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, a distribution of cash or Platform Securities or cash by the Liquidating Trust will not be separately taxable to a holder of Liquidating Trust Interest as the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and, if applicable, was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus in the case of any Non-U.S. Holders, the Liquidating Trustee may be required

to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). In addition, if Liquidshares is determined to be engaged in a U.S. trade or business (either directly or indirectly through holding an interest in a pass through Liquidshares Portfolio Company), a Non-U.S. Holder of a Liquidating Trust Interest would also be deemed to be engaged in such business. If Non-U.S. Holders were treated as being engaged in a U.S. trade or business in any year because of the activities, or an investment, of Liquidshares in such year constituted a U.S. trade or business, each Non-U.S. Holder would generally be required to file a U.S. federal income tax return for such year, reporting its allocable share, if any, of Liquidshares income or loss effectively connected with such trade or business and would be required to pay U.S. federal income tax at regular U.S. tax rates on any such income.  Moreover, a corporate Non-U.S. Holder might be subject to a 30% U.S. branch profits tax on its allocable share of Liquidshares effectively connected income.  The 30% rate applicable to branch profits may be reduced or eliminated under the provisions of an applicable income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is organized. In addition, the Liquidating Trustee would be required to withhold and pay over to the IRS certain amounts with respect to each Non-U.S. Holder's allocable share of the partnership's effectively connected income.  **Non-U.S. Holders are urged to consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including holding Liquidating Trust Interests.**

> *b.*     *Certain U.S. Federal Income Tax Consequences of the Closed-End Fund.*

The U.S. federal income tax characterization of the transactions contemplated by the Plan for Electing Customers is uncertain and there are several ways in which such transactions can reasonably be characterized. To the extent that a Holder of an Allowed Customer Claim is treated as receiving property that differs materially either in kind or extent from the property such Holder was treated as owning prior to the Effective Date, such Holder will generally be treated as having exchanged such previously owned property for new property on the Effective Date in a taxable exchange that may give rise to gain or loss for U.S. federal income tax purposes.

As discussed above, there is some uncertainty with respect to how the initial customer investments are treated under Applicable Tax Law and it is possible that the Partnership Treatment applies to treat Allowed Customer Claims as interests in the Liquidshares partnership, with economics tied to their applicable Security(ies).  In such a case, an Electing Customer may be viewed as exchanging its partnership interest for a new partnership interest tied to the Closed-End Fund Assets to the extent the Electing Customer elects to receive Closed-End Fund Shares.  While not entirely clear, it is expected that such exchange would be a taxable event giving rise to gain or loss for U.S. federal income tax purposes.  However, even if such exchange were viewed as a nontaxable exchange, the Electing Customer may be subject to tax on the transfer of the Closed-End Fund Assets to the Closed-End Fund and the distribution of the Closed-End Fund Shares, as described below.

As described above, the Alternative Treatment discussed above would view Allowed Customer Claims as representing a direct interest in the Customer's applicable Security(ies). Under such approach, to the extent the Electing Customer is not receiving Liquidating Trust Interests in exchange for their Allowed Claims, such Electing Customer would likely be viewed

as exchanging their interests in the applicable Security(ies) for either a direct interest in such Electing Customer's pro rata share of the Closed-End Fund Assets or for a partnership interest in a partnership holding such Closed-End Fund Assets in a taxable exchange that would likely give rise to gain or loss for U.S. federal income tax purposes.

However, it is also possible that treatment similar to the Partnership Treatment will apply to treat Allowed Customer Claims as interests in the Liquidshares partnership, with economics tied to all assets of the Liquidshares partnership, and that the Electing Customer would be viewed as exchanging such interest for an interest in a partnership tied to the Closed-End Fund Assets to the extent the Electing Customer elects to receive Closed-End Fund Shares.  There are material uncertainties regarding how income in respect of such a partnership interest would be allocated under such characterization, including the impact of such characterization on such Customers' historic reporting.  It is also unclear whether such exchange for new partnership interests would be treated as a taxable exchange.  However, even if such exchange were viewed as a nontaxable exchange, the Electing Customer may be subject to tax on the transfer of the Closed-End Fund Assets and the distribution of the Closed-End Fund Shares as described below.

Alternatively, an Allowed Customer Claim could possibly be viewed as a direct interest in a pro rata share of all assets of the Liquidshares partnership that is exchanged by the Electing Customer for a pro rata share of only the Closed-End Fund Assets to the extent the Electing Customer elects to receive Closed-End Fund Shares. In such a case, an Electing Customer's recognition of gain or loss for U.S. federal income tax purposes upon the Consummation of the Plan would likely be limited to the extent that the Electing Customer's pro rata share of the assets deemed exchanged is different than the assets deemed received.

To the extent that a Holder is treated as having exchanged previously owned property for new property in a taxable exchange, such Holder's adjusted basis in the new property will be equal to the fair market value of the previously owned property and its holding period in the new property will not include the holding period for the previously owned property.

> i.     *Transfer of the Closed-End Fund Assets to the Closed-End Fund.*

The U.S. federal income tax characterization of the transfer of the Closed-End Fund Assets to the Closed-End Fund is also uncertain.  In general, a transfer of assets to a corporation by a group of transferors in exchange for all of the interests in a corporation may qualify as a non-recognition transaction pursuant to Section 351(a) of the IRC, subject to certain requirements under Applicable Tax Law. Among those requirements are the "investment company" rules, which generally provide that a transfer to a corporation is not treated as a non-recognition transaction to the extent the transfer of property is to an "investment company" and the transfer results, directly or indirectly, in "diversification" of a transferor's interests. The Closed-End Fund is generally expected to be treated as an investment company for this purpose.

The extent to which the transfer of Closed-End Fund Assets to the Closed-End Fund is treated as a diversification of the Electing Customer's interests depends in part on (a) what property the Electing Customer is treated as having owned prior to the Effective Date and (b) whether and to what extent the Electing Customer is treated as exchanging such property for new property on

the Effective Date.  If the Electing Customers are not treated as owning their pro rata shares of Closed-End Fund Assets as of the Closed-End Fund Exchange Date, the transfer of the Closed-End Fund Assets to the Closed-End Fund would generally be expected to give rise to a "diversification" of the Electing Customers' interests and be treated as a taxable disposition for U.S. federal income tax purposes. If the transfer of the Closed-End Fund Assets to the Closed-End Fund is treated as a taxable disposition by the Electing Customers, each Electing Customer's aggregate adjusted basis in its Closed-End Fund Shares will be equal to the fair market value of the property transferred by such Electing Customer to the Closed-End Fund on the Closed-End Fund Exchange Date and the holding period of the Closed-End Fund Shares will begin as of Closed-End Fund Exchange Date.

If the Electing Customers are treated as owning pro rata shares of Closed-End Fund Assets as of the Closed-End Fund Exchange Date (whether resulting from a prior taxable exchange or otherwise), the transfer of the Closed-End Fund Assets to the Closed-End Fund in exchange for Closed-End Fund Shares would generally not be expected to give rise to a "diversification" of the Electing Customers' interests and could qualify as a non-recognition transaction pursuant to Section 351(a) of the IRC. However, the relevant provisions of the IRC and the Treasury Regulations are complex and qualification as a non-recognition transaction thereunder could be adversely affected by events or actions that occur (including events or actions following the Closed-End Fund Exchange Date) that are beyond the control of the Debtors and the Closed-End Fund. If non-recognition treatment applies, each Electing Customer's aggregate adjusted basis in its Closed-End Fund Shares will be equal to its aggregate adjusted basis in the property transferred by such Electing Customer to the Closed-End Fund (taking into account any adjustments to basis in respect of any prior deemed taxable exchange) and the holding period of the Closed-End Fund Shares will include the period in which the Electing Customer held such property.

Furthermore, it is not entirely clear whether subsequent to the Effective Date and prior to the Closed-End Fund Exchange Date, Electing Customers will be treated as directly owning their pro rata shares of the Closed-End Fund Assets through Liquidshares, or a partnership interest in Liquidshares.  If the Electing Customers are treated as owning a partnership interest in Liquidshares, each Electing Customer will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Liquidshares' income, gain, loss, deduction and credit for each taxable year of Liquidshares ending with or within the Electing Customer's taxable year. Each item generally will have the same character as if the Electing Customer had recognized the item directly. Electing Customers will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Liquidshares for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from Liquidshares. In addition, in such case, Liquidshares would be treated as making the contribution of the Closed-End Fund Assets to the Closed-End Fund (in a transaction intended to be tax-free under Section 351(a) as described above) and then distributing the Closed-End Fund Shares to the Electing Customers.  To the extent that the Closed-End Fund Shares are treated as "marketable securities", such distribution would be taxable except to the extent that (a) the Electing Customer's distributive share of the net gain that would be recognized if all "marketable securities" held by Liquidshares would be sold for fair market value immediately prior to the distribution of the Closed-End Fund Shares to the Electing Customers exceeds (b) such Electing Customer's distributive share of the net gain attributable to marketable securities held by Liquidshares immediately following such distribution.  The application of the exception set forth in the

117

preceding sentence will depend in part on the tax treatment of the Consummation of the Plan to the Electing Customers discussed above.  To the extent the Allowed Customer Claims are treated as partnership or direct interests with economics tied to the Closed-End Fund Assets, an Electing Customer generally will not recognize material gain as a result of such distribution after application of the foregoing exception.  However, this is a factual determination that is not free from doubt and no assurance can be provided in this regard.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSFER OF THE CLOSED-END FUND ASSETS TO THE CLOSED-END FUND ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES. NO RULING FROM THE IRS HAS BEEN OR WILL BE SOUGHT AND NO OPINION OF COUNSEL IS BEING PROVIDED. THE FOREGOING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND MAY NOT BE RELIED UPON AS TAX ADVICE. EACH ELECTING CUSTOMER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE APPLICATION OF U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX LAWS TO ITS PARTICULAR SITUATION.

### ii.      Taxation of the Closed-End Fund.

It has not yet been determined whether the Closed-End Fund will meet the qualifications to be treated as a RIC under Subchapter M of the IRC or if the Closed-End Fund will elect to be treated as a RIC. Accordingly, the Closed-End Fund will be treated as either a RIC or as a U.S. corporation that is subject to taxation pursuant to Subchapter C of the IRC (a "**C**" corporation).

### a.   Taxation of the Closed-End Fund as a C Corporation.

If the Closed-End Fund is taxed as a C corporation, the Closed-End Fund will generally be subject to U.S. federal income tax on its taxable income at rates applicable to corporations (currently 21%). Any such U.S. corporate income tax could materially reduce cash available to make distributions on the Closed-End Fund Shares.

The Closed-End Fund will recognize gain or loss on the sale, exchange or other taxable disposition of an equity security of a portfolio company equal to the difference between the amount realized by the Closed-End Fund on the sale, exchange or other taxable disposition and the Closed-End Fund's adjusted tax basis in such equity security. Any such gain will be subject to U.S. federal income tax at regular corporate rates, regardless of how long the Closed-End Fund has held such equity security. The amount realized by the Closed-End Fund generally will be the amount paid by the purchaser of the equity security. Thus, the Closed-End Fund will be subject to U.S. federal income tax on its long-term capital gains, like ordinary income, at a rate of 21%.

The Closed-End Fund may have income that is sourced to other countries and taxed in other countries. Because of the differences in the way countries calculate taxable income, the Closed-End Fund may have net taxable income in other countries in years in which the Closed-End Fund has net losses for U.S. tax purposes. Similarly, the Closed-End Fund may have net taxable income for U.S. tax purposes in years in which the Closed-End Fund has net losses in one or more other countries. This mismatch may cause the Closed-End Fund to not be able to use foreign taxes paid as credit against U.S. taxes.

The amount of interest deductions the Closed-End Fund may take in each year is subject to limitations, and any such deductions would be limited to 30% of the Closed-End Fund's taxable income, as adjusted under applicable IRC provisions.

### b.   Taxation of the Closed-End Fund as a RIC.

If the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund will be required, among other things, to meet certain income, asset diversification and distribution requirements.

(i)      The Closed-End Fund will be required to derive in each taxable year at least 90% of its gross income from the following sources: (i) dividends, interest (including tax-exempt interest), payments with respect to certain securities loans, and gains from the sale or other disposition of stock, securities or foreign currencies, or other income (including gain from options, futures and forward contracts) derived with respect to its business of investing in such stock, securities or foreign currencies; and (ii) interests in "qualified publicly traded partnerships" (as defined in the IRC). Generally, a qualified publicly traded partnership includes a partnership the interests of which are traded on an established securities market or readily tradable on a secondary market (or the substantial equivalent thereof).

(ii)     The Closed-End Fund will be required to diversify its holdings so that, at the end of each quarter of each taxable year (i) at least 50% of the market value of the Closed-End Fund's total assets is represented by cash and cash items, U.S. government securities, the securities of other RICs and other securities, with such other securities limited, in respect of any one issuer, to an amount not greater than 5% of the value of the Closed-End Fund's total assets and not more than 10% of the outstanding voting securities of such issuer and (ii) not more than 25% of the market value of the Closed-End Fund's total assets is invested in the securities (other than U.S. government securities and the securities of other RICs) of (a) any one issuer, (b) any two or more issuers that the Closed-End Fund controls and that are determined to be engaged in the same business or similar or related trades or businesses or (c) any one or more "qualified publicly traded partnerships" (as defined in the IRC). These asset diversification requirements are subject to certain special and complex measurement rules. For example, the Closed-End Fund generally will not fail to satisfy the asset diversification requirements solely as a result of a change in value with respect to assets held by the Closed-End Fund as of the end of a prior quarter.

(iii)    The Closed-End Fund will be required to distribute in each taxable year at least 90% of its investment company taxable income (generally, its ordinary income and the excess of any net short-term capital gain over net long-term capital loss).

As long as the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund  generally will not be subject to U.S. federal income tax to the extent that it distributes its investment company taxable income and net realized capital gains. If the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund  intends to distribute at least the minimum amount necessary to qualify for the favorable U.S. federal income tax treatment generally accorded to RICs and will be subject to income tax at regular corporate rates on any taxable income or gains that it does not distribute to its shareholders.

If the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund will either distribute or retain for reinvestment all or part of its net capital gain (which consists of the excess of its net long-term capital gain over its net short-term capital loss). If any such gain is retained, the Closed-End Fund will be subject to a corporate income tax on such retained amount, including any amount designated as undistributed capital gain pursuant to the following sentence. In that event, the Closed-End Fund expects to designate the retained amount as undistributed capital gain in a notice to its shareholders, each of whom, if subject to U.S. federal income tax on long-term capital gains, (i) will be required to include in income for U.S. federal income tax purposes as long-term capital gain its share of such undistributed amounts, (ii) will be entitled to credit its proportionate share of the tax paid by the Closed-End Fund  against its U.S. federal income tax liability and to claim refunds to the extent that the credit exceeds such liability and (iii) will increase its basis in its shares by the amount of undistributed capital gain included in such shareholder's gross income net of the tax deemed paid by the shareholder under clause (ii).

The IRC imposes a 4% nondeductible excise tax on a RIC to the extent the RIC does not distribute by the end of any calendar year at least the sum of (i) 98% of its ordinary income (taking into account certain deferrals and elections but not taking into account any capital gain or loss) for the calendar year and (ii) 98.2% of its capital gain in excess of its capital loss (adjusted for certain ordinary losses) for a one-year period generally ending on October 31 of the calendar year and (iii) any income or gains realized, but not distributed, and on which the RIC paid no federal income tax, in preceding years. In addition, the minimum amounts that must be distributed in any year to avoid the excise tax is reduced to reflect any over-distribution from the previous year and amounts of investment company taxable income and net capital gain realized, but not distributed, and on which the RIC paid U.S. federal income tax for a tax year ending in the relevant calendar year are deemed distributed in such calendar year for purposes of the excise tax. If the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund intends to distribute any income and capital gain in the manner necessary to minimize imposition of the 4% non-deductible excise tax. However, there can be no assurance that sufficient amounts of the Closed-End Fund's taxable income and capital gain will be distributed to entirely avoid the imposition of the excise tax. In that event, the Closed-End Fund will be liable for the excise tax only on the amount by which it does not meet the foregoing distribution requirement.

Certain investment practices in which the Closed-End Fund may engage are subject to special and complex U.S. federal income tax provisions that may, among other things, (i) disallow,

suspend or otherwise limit the allowance of certain losses or deductions, (ii) convert lower-taxed long-term capital gains or "qualified dividend income" into higher-taxed short-term capital gains or ordinary income, (iii) convert an ordinary loss or a deduction into a capital loss (the deductibility of which is more limited), (iv) cause the Closed-End Fund to recognize income or gain without a corresponding receipt of cash, (v) adversely affect the time as to when a purchase or sale of stock or securities is deemed to occur, (vi) adversely alter the characterization of certain complex financial transactions and (vii) produce income that does not constitute "qualified" income for purposes of the 90% gross income requirement described above. These U.S. federal income tax provisions could therefore affect the amount, timing and character of distributions to shareholders. The Closed-End Fund intends to structure and monitor its transactions and may make certain tax elections and may be required to dispose of securities to mitigate the effect of these provisions and prevent disqualification of the Closed-End Fund as a RIC (which may adversely affect the net after-tax return to the Closed-End Fund).

<div align="center">

*iii.*      *Taxation of Shareholders.*

</div>

The following is a general summary of certain U.S. federal income tax consequences that may be relevant to Electing Customers that receive and hold Closed-End Fund Shares. The Closed-End Fund's actual tax treatment will depend on its elections and operations, and the Closed-End Fund will describe its tax considerations in its own offering materials. The following is provided solely for convenience and does not modify or supersede any tax disclosure made by the Closed-End Fund.

<div align="center">

*a.*      *U.S. Holders.*

</div>

This section applies to an Electing Customer that is a "U.S. holder." A U.S. holder is a beneficial owner of Closed-End Fund Shares who or that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia.

- an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source; or

- a trust (i) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons (within the meaning of the IRC) who have the authority to control all substantial decisions of the trust or (ii) that has in effect a valid election under applicable Treasury Regulations to be treated as a United States person.

*Distributions*. If the Closed-End Fund is taxed as a C corporation, distributions paid on Closed-End Fund Shares will be treated as dividends to the extent paid out of the Closed-End

<div align="center">121</div>

Fund's current or accumulated earnings and profits (as determined under U.S. federal income tax principles).

If the Closed-End Fund qualifies, and elects to be treated, as a RIC, distributions paid to a U.S. holder by the Closed-End Fund from its net capital gain, which is the excess of net long-term capital gain over net short-term capital loss, if any, that the Closed-End Fund properly reports as capital gains dividends ("capital gain dividends") are taxable as long-term capital gains, regardless of how long the U.S. holder has held its Closed-End Fund Shares. All other dividends paid by the Closed-End Fund (including dividends from short-term capital gains) from its current or accumulated earnings and profits as determined for U.S. federal income tax purposes ("ordinary income dividends") are generally subject to tax as ordinary income.

In the case of corporate shareholders, properly reported ordinary income dividends paid by the Closed-End Fund generally will be eligible for the dividends received deduction to the extent that the Closed-End Fund's income consists of dividend income from U.S. corporations and certain holding period requirements are satisfied. A non-corporate shareholder (including a shareholder who is an individual) is generally eligible for taxation at reduced maximum rates on properly reported ordinary income dividend received from the Closed-End Fund to the extent that (i) the ordinary income dividend is attributable to "qualified dividend income" (*i.e.*, generally dividends paid by U.S. corporations and certain foreign corporations) received by the Closed-End Fund, (ii) the Closed-End Fund satisfies certain holding period and other requirements with respect to the stock on which such qualified dividend income was paid and (iii) the shareholder satisfies certain holding period and other requirements with respect to the Closed-End Fund Shares. Qualified dividend income eligible for these special rules is not actually treated as capital gains, however, and thus will not be included in the computation of net capital gain and generally cannot be used to offset any capital losses. In general, only the portion of the dividends the Closed-End Fund reports as qualified dividend income may be included as qualified dividend income. Dividend income from passive foreign investment companies and, in general, dividend income from REITs is not eligible for the reduced rate for qualified dividend income and is taxed as ordinary income. There can be no assurance as to what portion of the Closed-End Fund's distributions will qualify for favorable treatment as qualified dividend income.

Distributions of earnings from dividends paid by certain "qualified foreign corporations" can also qualify for the lower federal income tax rates on qualifying dividends. A shareholder will also have to satisfy a more than 60-day holding period as well as other requirements with respect to any distributions of qualifying dividends in order to obtain the benefit of the lower tax rate. Distributions of earnings from non-qualifying dividends, interest income, other types of ordinary income and short-term capital gains will be taxed at the ordinary income tax rate applicable to the taxpayer. Tax-deferred retirement accounts generally do not incur a tax liability with respect to a Closed-End Fund's dividends or other distributions unless a distribution is being taken or a withdrawal is being made.

Regardless of whether the Closed-End Fund is taxed as a C corporation or whether the Closed-End Fund qualifies, and elects to be treated, as a RIC, any distributions in excess of the Closed-End Fund's current and accumulated earnings and profits (as determined for U.S. federal income tax purposes) are treated as a tax-free return of capital to the extent of the U.S. holder's adjusted tax basis in its Closed-End Fund Shares, and thereafter as capital gain from the sale of

Closed-End Fund Shares. The amount of any Closed-End Fund distribution that is treated as a tax-free return of capital reduces the U.S. holder's adjusted tax basis in the Closed-End Fund Shares, thereby increasing the potential gain or reducing the potential loss on any subsequent sale or other disposition of the Closed-End Fund Shares.

It is possible that if the Closed-End Fund qualifies, and elects to be treated, as a RIC, the Closed-End Fund may decide to retain some or all of its net capital gains, and to designate the retained amount as a "deemed distribution." In that case, among other consequences, the Closed-End Fund will pay corporate-level tax on the retained amount, U.S. holders will be required to include their share of the deemed distribution in income as if the distribution was actually made, and U.S. holders will be entitled to claim a credit or refund equal to their allocable share of the corporate-level tax the Closed-End Fund pays on the retained capital gain. The amount of the deemed distribution net of such tax will be added to the cost basis of the Closed-End Fund Shares. Since the Closed-End Fund expects, under the circumstances described in the preceding three sentences, to pay tax on any retained capital gains at its regular corporate capital gain tax rate, and since that rate may be in excess of the maximum rate currently payable by non-corporate U.S. holders on long-term capital gains, the amount of tax that non-corporate U.S. holders will be treated as having paid may exceed the tax they owe on the capital gain dividend. If applicable, such excess generally may be claimed as a credit or refund against other U.S. federal income tax obligations. Holders not subject to U.S. federal income tax or otherwise required to file a U.S. federal income tax return would be required to file a U.S. federal income tax return on the appropriate form in order to claim a refund for the taxes the Closed-End Fund paid. In order to utilize the deemed distribution approach, the Closed-End Fund must provide written notice to its shareholders prior to the expiration of 60 days after the close of the relevant tax year.

*Sales or Other Disposition of Closed-End Fund Shares.* The sale or other disposition of Closed-End Fund Shares (including upon the liquidation of the Closed-End Fund) will generally result in capital gain or loss and will be long-term capital gain or loss if the Closed-End Fund Shares have been held for more than one year. The amount of the gain or loss will be measured by the difference between the adjusted tax basis in the Closed-End Fund Shares and the amount of proceeds received in exchange for such Closed-End Fund Shares. If the Closed-End Fund qualifies, and elects to be treated, as a RIC and any capital gain dividends were distributed by the Closed-End Fund, any loss upon the sale or other disposition of Closed-End Fund Shares held for six months or less will be treated as long-term capital loss to the extent of any capital gain dividends received (including amounts credited as an undistributed capital gain) with respect to such Closed-End Fund Shares.

Any loss recognized on a sale or other disposition of Closed-End Fund Shares will be disallowed if the U.S. holder acquires other Closed-End Fund Shares within a 61-day period beginning 30 days before and ending 30 days after the sale or exchange of the Closed-End Fund Shares. In such case, the U.S. holder's tax basis in the Closed-End Fund Shares acquired will be adjusted to reflect the disallowed loss.

Current U.S. federal income tax law taxes both long-term and short-term capital gain of corporations at the rates applicable to ordinary income. For non-corporate taxpayers, short-term capital gain is currently taxed at rates applicable to ordinary income while long-term capital gain generally is taxed at reduced maximum rates.

123

b.     *Non-U.S. Holders.*

This section applies to "Non-U.S. holders." A Non-U.S. holder is a beneficial owner of Closed-End Fund Shares who is not a U.S. holder (as defined above).

If the Closed-End Fund is taxed as a C corporation, all distributions will be subject to withholding of federal tax at a 30% rate (or lower rate provided by an applicable treaty) to the extent such distributions do not exceed the Closed-End Fund's current and accumulated earnings and profits unless an applicable exception applies. If such distributions are income effectively connected (or treated as effectively connected) with a U.S. trade or business ("**ECI**") of the Non-U.S. holder (and, if a treaty applies, are attributable to a U.S. permanent establishment of the Non-U.S. holder), the Closed-End Fund will not be required to withhold U.S. federal tax if the Non-U.S. holder complies with applicable certification and disclosure requirements, although the distributions will be subject to U.S. federal income tax at the rates applicable to U.S. holders. Special certification requirements apply to a Non-U.S. holder that is a non-U.S. partnership or non-U.S. trust, and such entities are urged to consult their own tax advisers.

If the Closed-End Fund qualifies, and elects to be treated, as a RIC, the foregoing description of the treatment of the Closed-End Fund's distributions will apply only to distributions of the Closed-End Fund's "investment company taxable income" (including interest income and realized net short-term gains in excess of realized long-term capital losses, which generally would be free of federal withholding tax if paid to Non-U.S. holders directly). However, U.S.-source withholding taxes are not generally imposed on dividends paid by RICs to the extent the dividends are reported as "interest-related dividends" or "short-term capital gain dividends." Interest-related dividends and short-term capital gain dividends generally represent distributions of interest or short-term capital gains that would not have been subject to U.S. withholding tax at the source if they had been received directly by a non-U.S. person, and that satisfy certain other requirements. No assurances can be given as to whether any of the Closed-End Fund's distributions will be reported as eligible for this exemption from withholding tax. In addition, Non-U.S. holders should be aware that U.S. withholding rules require the Closed-End Fund (or its withholding agent) to withhold on distributions in the absence of certainty as to whether such distributions are eligible for the exemption from withholding tax. Since amounts designated as interest-related dividends may be reduced to the extent such amounts exceed the Closed-End Fund's "qualified net interest income" for the taxable year in which such dividend is distributed, the Closed-End Fund will generally not be certain that the entire amount of mid-year distributions of interest-related dividends is, in fact, properly treated as such. Accordingly, such distributions to Non-U.S. holders may be subject to over-withholding by the Closed-End Fund (or its withholding agent).

Actual or deemed distributions of the Closed-End Fund's net capital gains to a Non-U.S. holder, if the Closed-End Fund qualifies, and elects to be treated, as a RIC, and gains realized by a Non-U.S. holder upon the sale of its Closed-End Fund Shares (including upon a liquidation of the Closed-End Fund) in all circumstances, will not be subject to U.S. federal income tax unless the distributions or gains, as the case may be, are ECI of the Non-U.S. holder (and, if an income tax treaty applies, are attributable to a U.S. permanent establishment maintained by the Non-U.S. holder) or, in the case of an individual, the Non-U.S. holder was present in the United States for 183 days or more during the taxable year and certain other conditions are met. If the Closed-End Fund qualifies, and elects to be treated, as a RIC and distributes its net capital gains in the form of

124

deemed rather than actual distributions, a Non-U.S. holder will be entitled to a U.S. federal income tax credit or tax refund equal to the allocable share of the corporate-level tax the Closed-End Fund pays on the capital gains deemed to have been distributed; however, in order to obtain the refund, the Non-U.S. holder must obtain a U.S. taxpayer identification number and file a U.S. federal income tax return even if the Non-U.S. holder would not otherwise be required to obtain a U.S. taxpayer identification number or file a U.S. federal income tax return.

If any actual or deemed distributions of the Closed-End Fund's net capital gains, or any gains realized upon the sale or redemption of its Closed-End Fund Shares, are ECI of the Non-U.S. holder (and, if an income tax treaty applies, are attributable to a U.S. permanent establishment maintained by the Non-U.S. holder), such amounts will be subject to U.S. income tax, on a net-income basis, in the same manner, and at the graduated rates applicable to, a U.S. holder. For a corporate Non-U.S. holder, the after-tax amount of distributions (both actual and deemed) and gains realized upon the sale or redemption of the Closed-End Fund Shares that are ECI (and, if an income tax treaty applies, are attributable to a U.S. permanent establishment maintained by the Non-U.S. holder), may under certain circumstances, be subject to an additional "branch profits tax" at a 30% rate (or at a lower rate if provided for by an applicable treaty).

NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISERS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF HOLDING THE CLOSED-END FUND SHARES.

### c. *Dividend Reinvestment Plan.*

As discussed under "Dividend Reinvestment Plan" above, the Fund intends to establish DRIP pursuant to which any dividends or distributions, net of any applicable U.S. federal withholding tax, paid by the Fund will be reinvested automatically in Closed-End Fund Shares unless a shareholder elects to instead receive cash distributions. The automatic reinvestment of distributions will not relieve participants of any federal, state or local income tax that may be payable (or required to be withheld) on such distributions and shareholders will be taxed upon the reinvested amounts as if the shareholder actually received the distribution in cash and then reinvested the cash in Shares. The tax consequences of the reinvestment of distributions will generally be as discussed above with respect to U.S. holders and Non-U.S. holders, respectively. A shareholder's basis for determining gain or loss upon the sale of Closed-End Fund Shares received in a distribution from the Closed-End Fund will be equal to the total dollar amount of the distribution payable to the shareholder. Any Closed-End Fund Shares received in a distribution will have a new holding period for tax purposes commencing on the day following the day on which the Closed-End Fund Shares are credited to the shareholder's account.

### d. *FATCA.*

Under legislation commonly referred to as the "Foreign Account Tax Compliance Act" (or "**FATCA**"), the applicable withholding agent generally will be required to withhold 30% of any payment of dividends on the Closed-End Fund Shares paid to (i) a non-U.S. financial institution (whether such financial institution is the beneficial owner or an intermediary) unless such non-U.S. financial institution agrees to verify, report and disclose its U.S. account holders and meets certain other specified requirements or (ii) a non-financial non-U.S. entity (whether such entity is

the beneficial owner or an intermediary) unless such entity certifies that it does not have any substantial U.S. owners or provides the name, address and taxpayer identification number of each U.S. owner and such entity meets certain other specified requirements. If payments of this withholding tax are made, Non-U.S. holders that are otherwise eligible for an exemption from, or reduction in, withholding of U.S. federal income.

Taxes with respect to such interest or dividends will be required to seek a credit or refund from the IRS to obtain the benefit of such exemption or reduction. The Closed-End Fund will not pay any additional amounts in respect of any amounts withheld. This withholding may be applied to reduce any future distributions to which a holder may be entitled.

### e.   *Foreign Taxation.*

Income earned and gain realized by the Closed-End Fund from sources within a foreign country may be subject to withholding and other taxes imposed by that country. Tax conventions between certain countries and the U.S. may reduce or eliminate such taxes.

The imposition of such taxes will reduce the amount of dividends and distributions paid to the Closed-End Fund's shareholders. If the Closed-End Fund qualifies, and elects to be treated, as a RIC, and if more than 50% of the value of the Closed-End Fund's total assets at the close of its taxable year consists of securities of foreign corporations, the Closed-End Fund will be eligible and may elect to treat a proportionate amount of certain foreign taxes paid by it as a distribution to each shareholder which would generally permit each shareholder either (1) to credit this amount (subject to applicable limitations) or (2) to deduct this amount for purposes of computing its U.S. federal income tax liability. The Closed-End Fund will notify its shareholders if it makes this election.

Furthermore, the amount of the foreign tax credit that is available may be limited to the extent that dividends from a foreign corporation qualify for the lower tax rate on "qualifying dividends."

### f.   *Backup Withholding and Information Reporting.*

Backup withholding may apply to distributions on the Closed-End Fund Shares with respect to certain U.S. holders. Such U.S. holders generally will be subject to backup withholding unless such U.S. holders provide their correct taxpayer identification number and certain other information, certified under penalties of perjury, to the dividend paying agent, or otherwise establishes an exemption from backup withholding. Any amount withheld under backup withholding is allowed as a credit against such U.S. holder's U.S. federal income tax liability, provided the proper information is provided to the IRS. Generally, the Closed-End Fund must report to the IRS and to Non-U.S. holders the amount of interest and dividends paid to the Non-U.S. holders and the amount of tax, if any, withheld with respect to those payments. Copies of the information returns reporting such dividend payments and any withholding may also be made available to the tax authorities in the country in which the holder resides under the provisions of an applicable treaty or agreement. In general, a Non-U.S. holder will not be subject to backup withholding with respect to payments of dividends if (a) the Non-U.S. holder provides its name and address, and certifies, under penalties of perjury, to the applicable withholding agent that it is

not a U.S. person (which certification may be made on an IRS Form W-8BEN or W-8BEN-E (or successor form)) or (b) the Non-U.S. holder holds the Closed-End Fund Shares through certain foreign intermediaries or certain foreign partnerships, and satisfies the certification requirements of applicable Treasury regulations. A Non-U.S. holder will be subject to information reporting and, depending on the circumstances, backup withholding with respect to the proceeds of the sale or other disposition (including a redemption) of the Closed-End Fund Shares within the United States or conducted through certain U.S.-related payors, unless the payor of the proceeds receives the statement described above or the Non-U.S. holder otherwise establishes an exemption. Backup withholding is not an additional tax. Any amounts withheld from payments made to a shareholder may be refunded or credited against such shareholder's U.S. federal income tax liability, if any, provided that the required information is furnished to the IRS.

      2.     *Allowed Class 5 Trade Claims, Allowed Class 6 Unsubordinated Governmental Claims, Allowed Class 7 Other General Unsecured Claims, Allowed Class 8 Customer Deficiency Claims, and Allowed Class 9 Customer Rescission Claims.*

            b.     *U.S. Federal Income Tax Consequences to the Wind-Down Trust Beneficiaries.*

Each Holder of an Allowed Class 5 Trade Claim, Allowed Class 6 Unsubordinated Governmental Claim, Allowed Class 7 Other General Unsecured Claim, Allowed Class 8 Customer Deficiency Claim, and Allowed Class 9 Customer Rescission Claim shall receive a beneficial interest in the Wind-Down Trust

In general, a Wind-Down Trust Beneficiary will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the fair market value of its undivided interest in the Wind-Down Trust Assets consistent with its economic rights in the Wind-Down Trust received in respect of its Claim and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor. Pursuant to the Plan, the Wind-Down Trustee will in good faith value the assets transferred to the Wind-Down Trust, and all parties must consistently use such valuation for all U.S. federal income tax purposes.

In the event of the subsequent disallowance of any Disputed Claim or the reallocation of undeliverable distributions, it is possible that a holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Claim may be deferred until all Customer Deficiency Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain or income in respect of any additional distributions received. *See also* the discussion of "Tax Reporting for Wind-Down Trust Assets Allocable to Disputed Claims" below.

Any gain or loss recognized with respect to an Allowed Claim may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder's aggregate tax basis in its undivided interest in the Wind-Down Trust Assets (other than those allocable to Disputed Claims) will generally equal the fair market value of such interest, and a Holder's holding period in such assets generally will begin the day following establishment of the Wind-Down Trust.

<div style="text-align: center">

*c.*     *U.S. Federal Income Tax Classification of the Wind-Down Trust.*

</div>

The Wind-Down Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to sections 671 through 679 of the Tax Code, with no objective to continue or engage in the conduct of a trade of business. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The Wind-Down Trust will be structured with the intention of complying with such general criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Wind-Down Trustee, and Holders of interests in the Wind-Down Trust) shall treat the transfer of Wind-Down Trust Assets to the Wind-Down Trust as (i) a transfer of the Wind-Down Trust Assets directly to Holders of Wind-Down Trust Interests (other than to the extent Wind-Down Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to the Wind-Down Trust of Wind-Down Trust Assets in exchange for Wind-Down Trust Interests. Accordingly, Holders of Wind-Down Trust Interests should be treated for U.S. federal income tax purposes as the grantors and deemed owners of the Wind-Down Trust and thus, the direct owners of their respective share of Wind-Down Trust Assets (other than such Wind-Down Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the Wind-Down Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Wind-Down Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Wind-Down Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Wind-Down Trust and the Wind-Down Trust Beneficiaries could vary from those discussed herein.

<div style="text-align: center">

*d.*     *General Tax Reporting by the Wind-Down Trust and Holders of Wind-Down Trust Interests.*

</div>

In accordance with the treatment of the Wind-Down Trust as a liquidating trust for U.S. federal income tax purposes, all parties must treat the Wind-Down Trust as a grantor trust of which the Holders of Wind-Down Trust Interests are the owners and grantors, and treat the Holders of Wind-Down Trust Interests as the direct owners of an undivided interest in the Wind-Down Trust Assets (other than any assets allocable to Disputed Claims) for all U.S. federal income tax purposes, consistent with their economic interests therein. The Wind-Down Trustee will file tax returns for the Wind-Down Trust treating the Wind-Down Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).

<div style="text-align: center">

128

</div>

Items of taxable income of the Wind-Down Trust (other than otherwise accounted for in a "disputed ownership fund") shall be allocated among the holders of Wind-Down Trust Interests by reference to the manner in which an amount of Cash equal to such taxable income would be distributed  (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Wind-Down Trust had distributed all its assets (valued at their book value, and, if applicable, other than assets allocable to Disputed Claims) to the Wind-Down Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Wind-Down Trust.  Similarly, taxable loss of the Wind-Down Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Wind-Down Trust Assets.

As soon as reasonably practicable after the Effective Date, the Wind-Down Trustee shall make (or cause to be made) a good faith valuation of the Wind-Down Trust Assets, and such valuation shall be used consistently by all parties for United States federal income tax purposes. The Wind-Down Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Wind-Down Trust that are required by any government unit for taxing purposes.

The U.S. federal income tax obligations of a holder with respect to its Wind-Down Trust Interests are not dependent on the Wind-Down Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Wind-Down Trust's income even if the Wind-Down Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions, a distribution of cash by the Wind-Down Trust will not be separately taxable to a holder of Wind-Down Trust Interest as the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Wind-Down Trust). Holders of Wind-Down Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Wind-Down Trust on account of Disputed Claims.

The Wind-Down Trustee will comply with all applicable governmental withholding requirements. Thus in the case of any non-U.S. Holders, the Wind-Down Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). Non-U.S. Holders are urged to consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including holding Wind-Down Trust Interests.

    e.  *Tax Reporting for Wind-Down Trust Assets Allocable to Disputed Claims.*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (or the receipt of an adverse determination by the IRS upon audit if not contested by the Wind-Down Trustee), the Wind-Down Trustee (i) may elect to treat any Wind-Down Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and

(ii) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Wind-Down Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will generally be treated as received by holders in respect of their Claims as if distributed by the Debtors at such time. All parties (including, without limitation, the Debtors, the Wind-Down Trustee, and the holders of Wind-Down Trust Interests) will be required to report for tax purposes consistently with the foregoing. A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

## XII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: December 10, 2025

Respectfully submitted,

**LINQTO TEXAS, LLC**
**(for itself and on behalf of its Debtor affiliates)**
a Texas Corporation

*/s/ Jeffrey S. Stein*
Jeffrey S. Stein
Chief Restructuring Officer

# EXHIBIT A

## PLAN OF REORGANIZATION

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## JOINT CHAPTER 11 PLAN OF
## LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES

**SCHWARTZ PLLC**

Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:  (713) 900-3737
Facsimile:  (702) 442-9887
Email:      ghamm@nvfirm.com
            vpolnick@nvfirm.com
            aagelakopoulos@nvfirm.com
            rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:  (702) 385-5544
Facsimile:  (702) 442-9887
Email:      saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors-in Possession*

Dated: December 9, 2025

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

## Table of Contents

**ARTICLE I.** DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW .................................................................6

A.    Defined Terms ........................................................................................6
B.    Rules of Interpretation ..........................................................................23
C.    Computation of Time .............................................................................24
D.    Governing Law .......................................................................................24
E.    Reference to Monetary Figures...............................................................24

**ARTICLE II.** ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS AND STATUTORY FEES ....................................................................................24

A.    Administrative Claims ............................................................................24
B.    DIP Facility Claims ................................................................................25
C.    Professional Fee Claims.........................................................................25

　　　1.    Allowance of Professional Fee Claims...................................25
　　　2.    Professional Fee Claims Reserve............................................26

D.    Priority Tax Claims................................................................................27
E.    Canceled Equity Customer Claims ........................................................27
F.    Statutory Fees........................................................................................27

**ARTICLE III.** CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS .......................................................................27

A.    Classification of Claims and Interests....................................................27
B.    Treatment of Claims and Interests .........................................................28

　　　1.    Class 1 – Other Secured Claims..............................................29
　　　2.    Class 2 – Other Priority Claims...............................................29
　　　3.    Class 3 – Exited Customer Claims...........................................29
　　　4.    Class 4 – Customer Claims......................................................29
　　　5.    Class 5 – Convenience Trade Claims.......................................30
　　　6.    Class 6 – Unsubordinated Governmental Claims. .................31
　　　7.    Class 7 – Other General Unsecured Claims ............................31
　　　8.    Class 8 – Customer Deficiency Claims. ..................................31
　　　9.    Class 9 –Customer Rescission Claims.....................................32
　　　10.   Class 10– Intercompany Claims. ............................................32
　　　11.   Class 11 – Subordinated Governmental Claims. .....................32
　　　12.   Class 12 – Other Subordinated Claims. ..................................33
　　　13.   Class 13 – Existing Equity Interests. ......................................33

C.    Special Provision Governing Unimpaired Claims...................................34
D.    Elimination of Vacant Classes ...............................................................34

| | | | |
|---|---|---|---|
| E. | | Voting Classes, Presumed Acceptance by Non-Voting Classes | 34 |
| F. | | Intercompany Interests | 34 |
| G. | | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. | 34 |
| H. | | Controversy Concerning Impairment | 34 |
| I. | | Subordinated Claims | 34 |

**ARTICLE IV.** MEANS FOR IMPLEMENTATION OF THE PLAN ................................... 35

| | | | |
|---|---|---|---|
| A. | | General Settlement for Claims and Interests | 35 |
| B. | | Customer Recission Claims Settlement. | 35 |
| C. | | Creation of the Liquidating Trust | 36 |
| | 1. | Liquidating Trustee | 37 |
| | 2. | Liquidating Trustee's Authority and Duties | 38 |
| | 3. | Transfer and Vesting of Assets to Liquidating Trust | 39 |
| | 4. | Administration of the Liquidating Trust Assets | 40 |
| | 5. | Designated Platform Securities. | 42 |
| | 6. | Termination of the Liquidating Trust | 43 |
| | 7. | Regulatory Matters | 43 |
| D. | | Creation of the Closed-End Fund | 44 |
| | 1. | Formation of the Closed-End Fund | 45 |
| | 2. | Management of the Closed-End Fund | 45 |
| | 3. | Closed-End Fund Expenses. | 46 |
| | 4. | Transfer and Vesting of Closed-End Fund Assets. | 46 |
| | 5. | Regulatory Matters | 47 |
| | 6. | Term, Dissolution, and Liquidation. | 48 |
| E. | | Creation of the Wind-Down Trust | 48 |
| | 1. | Preservation of Confidences and Attorney-Client Privilege | 49 |
| | 2. | Wind-Down Trustee | 50 |
| | 3. | Wind-Down Trustee's Authority and Duties | 50 |
| | 4. | Transfer and Vesting of Assets to Wind-Down Trust | 51 |
| | 5. | Exited Customer Cash Pool | 52 |
| | 6. | Administration of the Wind-Down Trust Assets | 52 |
| | 7. | Administration of Platform Cash | 53 |
| | 8. | Termination of the Wind-Down Trust | 53 |
| | 9. | Regulatory Matters | 53 |
| | 10. | Certain Tax Matters | 54 |
| F. | | Preservation of Retained Causes of Action. | 55 |
| G. | | Process for the Selection of the Liquidating Trustee and Manager of the Closed-End Fund. | 55 |
| H. | | Restructuring Transactions. | 56 |
| I. | | Management Incentive Plan | 57 |

2

|  | 1. | Conditions Precedent. | 57 |
|  | 2. | Incentive Awards. | 57 |
|  | 3. | The Award. | 59 |

| J. | Corporate Action | 59 |
| K. | Effectuating Documents; Further Transactions | 59 |
| L. | Exemption from Certain Taxes and Fees | 60 |
| M. | Cancellation of Existing Securities and Agreements | 60 |
| N. | Closing the Chapter 11 Cases | 60 |
| O. | Wind-Down Debtors | 61 |

**ARTICLE V.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................................61

| A. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 61 |
| B. | Assumption of the D&O Liability Insurance Policies and Fiduciary Liability Insurance Policies; Indemnification Obligation | 62 |
| C. | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 63 |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 63 |
| E. | Rejection Damages Claims | 64 |
| F. | Contracts and Leases Entered Into After the Petition Date | 64 |
| G. | Modifications, Amendments, Supplements, Restatements or Other Agreements | 64 |
| H. | Reservation of Rights | 64 |
| I. | Nonoccurrence of Effective Date | 65 |

**ARTICLE VI.** PROVISIONS GOVERNING DISTRIBUTIONS | 65 |

| A. | Timing and Calculation of Amounts To Be Distributed; Entitlement to Distributions | 65 |

|  | 1. | Timing and Calculation of Amounts To Be Distributed | 65 |
|  | 2. | Entitlement to Distributions | 65 |

| B. | Disbursing Agent | 65 |
| C. | Rights and Powers of Disbursing Agent | 66 |

|  | 1. | Powers of a Disbursing Agent | 66 |
|  | 2. | Expenses Incurred on or After the Effective Date | 66 |

| D. | Distributions on Account of Claims Allowed After the Effective Date | 66 |

|  | 1. | Payments and Distributions on Disputed Claims | 66 |
|  | 2. | Special Rules for Distributions to Holders of Disputed Claims | 66 |

| E. | Minimum Distributions | 66 |
| F. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 67 |

|   |   | 1. | Delivery of Distributions in General | 67 |
|   |   | 2. | Partial Distributions | 67 |
|   |   | 3. | Undeliverable Distributions and Unclaimed Property | 67 |
| G. | | | Compliance with Tax Requirements/Allocations | 68 |
| H. | | | Surrender of Canceled Instruments or Securities | 68 |
| I. | | | Foreign Currency Exchange Rate | 68 |
| J. | | | Claims Paid or Payable by Third Parties | 68 |
|   |   | 1. | Claims Paid by Third Parties | 68 |
|   |   | 2. | Claims Payable by Third Parties | 69 |
|   |   | 3. | Applicability of Insurance Policies | 69 |

**ARTICLE VII.** PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ... 69

| A. | Allowance of Claims | 69 |
| B. | Disallowance of Certain Claims | 69 |
| C. | Prosecution of Objections to Claims | 70 |
| D. | Claims Estimation | 70 |
| E. | No Distribution Pending Allowance | 70 |
| F. | Distributions After Allowance | 71 |
| G. | No Interest | 71 |

**ARTICLE VIII.** CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE ... 71

| A. | Conditions Precedent to Confirmation | 71 |
| B. | Conditions Precedent to the Effective Date | 71 |
| C. | Waiver of Conditions | 72 |
| D. | Effect of Nonoccurrence of Conditions | 72 |

**ARTICLE IX.** SETTLEMENT, RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS ... 72

| A. | Compromise and Settlement of Claims, Equity Interests and Controversies | 72 |
| B. | Release of Liens | 73 |
| C. | Releases by the Debtors | 73 |
| D. | Releases by the Releasing Parties | 74 |
| E. | Opt-Outs | 76 |
| F. | Exculpation | 76 |
| G. | Injunction | 77 |
| H. | Setoffs and Recoupment against Holders | 78 |
| I. | Setoffs and Recoupment by Holders | 78 |

**ARTICLE X.** BINDING NATURE OF PLAN ... 79

**ARTICLE XI.** RETENTION OF JURISDICTION ... 79

**ARTICLE XII.** MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .....81

A.    Modifications and Amendments .................................................................81
B.    Effect of Confirmation on Modifications ..................................................82
C.    Revocation or Withdrawal of the Plan ......................................................82
D.    Substantial Consummation of the Plan ......................................................82

**ARTICLE XIII.** MISCELLANEOUS PROVISIONS ............................................82

A.    Successors and Assigns ..............................................................................82
B.    Reservation of Rights .................................................................................82
C.    Further Assurance .......................................................................................83
D.    Service of Documents .................................................................................83
E.    Term of Injunctions or Stays ......................................................................84
F.    Entire Agreement ........................................................................................84
G.    Exhibits .......................................................................................................84
H.    Votes Solicited in Good Faith ....................................................................85
I.    Immediate Binding Effect ..........................................................................85
J.    Conflicts ......................................................................................................85
K.    Dissolution of the Committees ...................................................................85
L.    Additional Documents ................................................................................86
M.    Tax Reporting and Compliance ..................................................................86

## <u>INTRODUCTION</u>

Linqto, Inc. and the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections, as well as a summary and description of this Plan and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.  *Defined Terms*.

As used in this Plan, capitalized terms have the meanings set forth below.

1.  "*Accrued Professional Compensation*" means, at any given date, all accrued and/or contingent fees and reimbursable expenses (including, without limitation, success fees in accordance with the applicable engagement letter with the Debtors) for legal, financial advisory, accounting and other professional services rendered on or before the Effective Date by any Professional in the Chapter 11 Cases that are awardable and allowable under section 328, 330(a) or 331 of the Bankruptcy Code, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount).  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.  "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through and including the Effective Date; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (d) the Independent Director Fee Claims.

3.  "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

4.  "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

5.  "*Affiliated Person*" has the meaning set forth in section 2(a)(3) of the Investment Company Act.

6.  "*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, there is no requirement to move the Bankruptcy Court for allowance of a Claim or Interest to be an Allowed Claim or Interest under the Plan.

7.  "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims and Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through

and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable Law.

8.      "*Ballot*" means a ballot accompanying the Plan and Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote to the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

9.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended, and as applicable to the Chapter 11 Cases.

10.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time, and as applicable to the Chapter 11 Cases.

12.     "*Bar Date(s)*" means the applicable date(s) designated by the Bankruptcy Court (or pursuant to the Bankruptcy Rules) as the last date for filing Proofs of Claims or Interests in the Chapter 11 Cases of the respective Debtors, including the Claims Bar Date, the Governmental Unit Bar Date, and the Administrative Claims Bar Date.

13.     "*Blue Sky Laws*" means all applicable state securities statutes, rules, regulations, and orders that govern or restrict the offer, sale, issuance, or distribution of securities, including any required registrations, qualifications, or exemptions, and any related antifraud provisions, in connection with the Liquidating Trust Interests and Closed-End Fund Shares to be issued under the Plan.

14.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

15.     "*Canceled Equity*" means a Platform Security which has been canceled or extinguished or will be canceled or extinguished prior to the Effective Date and for which the Debtors did not receive any Cash or other security, such that the security no longer represents any continuing investment in the issuing company.  For the avoidance of doubt, Canceled Equity includes Thrasio Holdings, Inc, Linqto Inc., and BlockFi, Inc.

16.     "*Canceled Equity Customer Claim*" means a Claim or Interest held by a Customer arising from or relating to Canceled Equity.

17.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

18.     "*Cause(s) of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties,

and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer Laws.

19.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20.    "*Circle*" means Circle Internet Group, Inc., doing business as Circle, or any successor thereof.

21.    "*Circle Securities Customers*" means a Customer that holds an indirect equity interest in Platform Securities issued by Circle.

22.    "*Circle Shares*" means shares of class A common stock of Circle, including all proceeds received in respect thereof on or after the Petition Date, if any.

23.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors or any of the Estates.

24.    "*Claims and Solicitation Agent*" means Epiq Corporate Restructuring LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

25.    "*Claims Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

26.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Claims and Solicitation Agent or the Clerk of the Bankruptcy Court.

27.    "*Class*" means a class of Claims or Interests as set forth in Article III of this Plan in accordance with section 1122(a) of the Bankruptcy Code.

28.    "*Closed-End Fund*" means a publicly listed Delaware statutory trust or corporation that will be registered under the Investment Company Act as a closed-end investment company formed in accordance with the Closed-End Fund Governing Documents.

29.     "*Closed-End Fund Assets*" means (i) the Platform Securities corresponding to the Liquidshares CEF Series and (ii) any Designated Platform Security, which are to be transferred to the Closed-End Fund pursuant to the terms of this Plan and the Liquidating Trust Agreement, including all proceeds on or after the Petition Date received in respect thereof, if any.

30.     "*Closed-End Fund Exchange*" means the exchange of Liquidating Trust Interests that correspond with the Liquidshares CEF Series for shares of the Closed-End Fund by the Electing Customers pursuant to the terms of the Plan, the Liquidating Trust Agreement, and the Confirmation Order.

31.     "*Closed-End Fund Exchange Date*" means the date the Closed-End Fund is registered under the Investment Company Act, which shall occur upon the filing with the SEC by the Closed-End Fund of a Form N-8A registration statement together with a Form N-2 registration statement and as set forth in Article IV.B.4 of this Plan.

32.     "*Closed-End Fund Governing Documents*" means the Declaration of Trust (if the Closed-End Fund is a statutory trust) or Certificate of Incorporation (if the Closed-End Fund is a corporation) and any by-laws.

33.     "*Closed-End Fund Option*" means the treatment available under the Plan pursuant to which a Customer may elect on its Ballot, be deemed to have elected, to have some or all of the Platform Securities, which are attributable to such Customers' prepetition economic interests in the Platform Securities, transferred to the Closed-End Fund.

34.     "*Closed-End Fund Shares*" means the outstanding voting securities of the Closed-End Fund representing the Closed-End Fund's common shares.

35.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

36.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code, on July 18, 2025, as set forth in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 98] and as may be reconstituted from time to time.

37.     "*Committee Settlement*" means the settlement between the Debtors, the Committee, and the Deaton Parties as set forth in the Linqto Debtor Customer Securities Treatment Term Sheet, which settlement is agreed to and supported by the Debtors, the Committee and the Deaton Parties.

38.     "*Conditional Disclosure Statement Order*" means the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving Management Selection Procedures; (V) Approving the Combined Hearing Timeline; and (VI) Granting Related Relief* [Docket No [●]].

39.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

40.   "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

41.   "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

42.   "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Committee and the Debtors.

43.   "*Convenience Trade Claim*" means Allowed Trade Claims that are less than or equal to $60,000.

44.   "*Consummation*" means the occurrence of the Effective Date.

45.   "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

46.   "*Customer*" means an individual or entity who purchased a direct or indirect equity interest in a Liquidshares Portfolio Company.

47.   "*Customer Claim*" means a claim based on the Customer Interest in the Platform Securities which shall be classified and treated in the Plan, *provided, however*, that Customer Claim shall not include Canceled Equity Customer Claims, or Exited Customer Claims.

48.   "*Customer Deficiency Claim*"[2] means, for any Holder of a Customer Claim based on a Customer Interest in Funding Securities that are liquidated as set forth herein or in the Plan Supplement, a claim based on the value of any such Holder's interest in such Funding Securities, as set forth in the Customer Deficiency Claim Table.

49.   "*Customer Deficiency Claim Table*" means a table, to be filed in the Plan Supplement, reflecting the fair and reasonable value of equity interest in the Funding Securities as of the Platform Securities Valuation Date, which shall be used to estimate the value of Customer Deficiency Claims.

---

[2]   By way of example, if a Customer holds a Customer Interest in 100 shares of a Funding Security, and the Liquidating Trust liquidates 5% of its holdings in the Funding Security, such Customer would have a Customer Claim for 100 shares of such Funding Security, for which the treatment would be that such Customer would receive (i) 95 shares of the Funding Security (either contributed to a Liquidating Trust or to a Closed-End Fund, at such Customer's election) and (ii) a Customer Deficiency Claim for the value of 5 shares of such Funding Security, as set forth in the Customer Deficiency Claim Table.

50. "*Customer Interest*" means the legal claim or interest of a particular Customer on account of their indirect economic interest in certain Platform Securities as of the Petition Date.

51. "*Customer Rescission Claim*" means any Claim of a Customer arising from alleged violations of federal or state securities laws, fraud misrepresentation, omissions, or other actionable conduct in connection with the offer, sale, or marketing of Platform Securities through the Linqto platform.

52. "*Customer Recission Claims Settlement*" means the settlement described in Article IV.B of this Plan.

53. "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

54. "*Deaton*" means John E. Deaton, on behalf of himself and the Deaton Represented Creditors.

55. "*Deaton Parties*" means Deaton and the Deaton Represented Creditors.

56. "*Deaton Represented Creditors*" means the creditors represented by Deaton.

57. "*Debtor Release*" means the release set forth in Article IX.C. of this Plan.

58. "*Debtor Representative*" means the Debtors' Chief Restructuring Officer, Jeffrey S. Stein, or any successor to such position.

59. "*Debtors*" means each of the following: Linqto, Inc.; Linqto Liquidshares, LLC; Linqto Liquidshares Manager, LLC; and Linqto Texas, LLC.

60. "*Designated Platform Security*" means a Platform Security that the Debtors and the Committee have determined will be transferred to the Closed-End Fund Assets solely upon their determination that such transfer is necessary and appropriate to manage the Liquidating Trust and which Designated Platform Securities shall be listed in the Plan Supplement.

61. "*DIP Claims*" means any Claim held by the DIP Lender arising under or relating to the DIP Loan Agreement or the DIP Orders on account of funding the DIP Facility, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Facility, the DIP Loan Agreement, or the other DIP Facility Documents.

62. "*DIP Facility*" means the Debtors' senior secured superpriority credit facility in an aggregate principal amount of up to $25 million entered into on the terms and conditions set forth in the DIP Facility Documents, which the Bankruptcy Court approved pursuant to the Final DIP Order.

63. "*DIP Facility Documents*" means the DIP Loan Agreement and any other documentation necessary to effectuate the incurrence of the DIP Facility, including, but not limited

to, any notes, certificates, agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing).

64.     "*DIP Lender*" means Sandton Capital Solutions Master Fund VI, LP.

65.     "*DIP Loan Agreement*" means that certain *Senior Secured Superpriority Debtor-In-Possession Loan Agreement*, dated as of September 25, 2024, by and among the Debtors and the DIP Lender, setting forth the terms and conditions of an up to $25 million debtor-in-possession financing facility.

66.     "*DIP Order(s)*" means, as applicable, the Interim DIP Order and/or Final DIP Order approving, among other things, the terms of the DIP Facility.

67.     "*Disbursing Agent*" means the Debtors, the Wind-Down Debtors, the Liquidating Trustee, the Wind-Down Trustee, or the Manager of the Closed-End Fund, as applicable, selected by the Debtors, the Chief Restructuring Officer, or the Committee, as applicable.

68.     "*Disclosure Statement*" means the related disclosure statement describing this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law or Court order.

69.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which an objection or request for estimation has been Filed; or (e) is listed as contingent, unliquidated, or disputed in the Debtors' Schedules.

70.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims are eligible to receive distributions under the Plan on account of Allowed Claims.

71.     "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article VIII.B hereof have been satisfied or waived in accordance with Article VIII.C hereof and (b) no stay of the Confirmation Order is in effect. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

72.     "*Electing Customers*" means (i) Customers who elect the Closed-End Fund Option on their Ballot for all or a portion of their interest in the Platform Securities (ii) all Customers who do not cast a Ballot; and (iii) Customers who have an economic interest in the Designated Platform Securities.

73.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

75.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case and all property acquired by such Debtor after the Petition Date and before the Effective Date.

76.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

77.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such, and subject to the limitations set forth in Article IX.F hereof: (a) the Debtors; (b) the Committee and each member of the Committee, solely in their respective capacities as such; (c) any other statutory committee appointed in the Chapter 11 Cases and each of their respective members, solely in their respective capacities as such; (d) the following current directors of the Board of Linqto, Inc: Adam Henderson, Alison Kutler, Norman Reed, and Jeremy Rosenthal; and (e) the Debtors' Chief Restructuring Officer, Jeffrey S. Stein, or any successor to such position.[3]

78.     "*Exculpation*" means the exculpation provision set forth in Article IX.F hereof.

79.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

80.     "*Exited Customer Cash Pool*" means Cash in the amount of the Allowed Exited Customer Claims.

81.     "*Exited Customer Claim*" means a Claim held by a Customer who had an economic interest in a Platform Security, which was acquired, merged, or otherwise sold during the Chapter 11 Cases, and for which the Debtors received a distribution or other cash payment on account of such acquisition, merger, or other sale that has not been paid to a Customer, and whose Securities were canceled, extinguished, or converted as a result thereof and no continuing Securities in such issuing Entity exists.

82.     "*Existing Equity Interest*" or "*Interest*" means: (a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized, or outstanding shares of stock and other ownership interests, together with (i) any options, warrants, or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto, and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing in any of the Debtors, which subpart (ii) shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidating preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights. For the avoidance of doubt, a Customer Claim or any interest issued associated with any Platform Security shall not

---

[3]     The "Exculpated Parties" are subject to ongoing review as part of the Independent Investigation.

13

be considered an Equity Interest except to the extent that it is a Customer Claim on account of an indirect investment in Linqto, Inc.

83. "*Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred during the Chapter 11 Cases, through and including the Effective Date, under sections 328, 330, 331, 503(b)(2), 503(b)(3), 502(b)(4), or 503(b)(5) of the Bankruptcy Code.

84. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

85. "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, and (III) Granting Related Relief* [Docket No. 712].

86. "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

87. "*Funding Securities*" means (i) the Platform Securities which are to be liquidated to fund the administrative expenses of these Chapter 11 Cases, the Wind-Down Trust, and/or the Liquidating Trust, as set forth in this Plan and Disclosure Statement, and which will be disclosed in the Plan Supplement; and (ii) Securities that were sold by the Debtors prior to the Petition Date, and that but for such sale would have been Platform Securities.

88. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, special committee, or such similar body of any of the Debtors, or the Wind-Down Debtors, as applicable.

89. "*Governmental Claim*" means any Claim properly asserted by a Governmental Unit.

90. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91. "*Governmental Unit Bar Date*" means the date by which Proofs of Claim must be Filed with respect to Claims held by Governmental Units.

92.     "*Holder*" means an Entity holding a Claim against or an Interest in a Debtor, as applicable.

93.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

94.     "*Indemnification Provisions*" means, collectively, all indemnification provisions in place immediately before the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise).

95.     "*Independent Directors*" means Jeremy Rosenthal and Alison Kutler, each solely in his or her capacity as an independent director of Linqto, Inc.

96.     "*Independent Director Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Independent Directors pursuant to their respective director agreements with Linqto, Inc.  On the Effective Date, the Independent Director Fee Claims shall be deemed Allowed Administrative Claims against Linqto, Inc.

97.     "*Independent Investigation*" means the investigation of potential claims and causes of action of the Debtors conducted by the Special Subcommittee.

98.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor arising before the Petition Date.

99.     "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor.

100.     "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, (B) Use Cash Collateral (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 40].

101.     "*Investment Advisers Act*" means the Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder.

102.     "*Investment Company Act*" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

103.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Chapter 11 Cases.

104.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

105.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

106. "*Liquidating Trust*" means the trust to be established on or before the Effective Date in accordance with the Plan to effect the liquidation of Liquidshares and applicable Liquidating Trust Assets (other than the Closed-End Fund Assets), including without limitation the Platform Securities attributable to the Liquidating Trust Beneficiaries as well as any and all transactions incidental thereto, pursuant to the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.

107. "*Liquidating Trust Agreement*" means the document creating and governing the Liquidating Trust (including any ancillary documents expressly referenced and incorporated therein), which shall, to the extent applicable, be included in the Plan Supplement and which may be modified to account for the modifications made to this Plan following the filing of such Plan Supplement.

108. "*Liquidating Trust Assets*" means the Liquidshares Series Equity, including Liquidshares CEF Series until the Closed-End Fund Exchange, as set forth in Article IV.B.4 of this Plan, and the Liquidating Trust Funding.

109. "*Liquidating Trust Beneficiary*" means a record holder of Liquidating Trust Interest as set forth on the books and records of the Liquidating Trust.

110. "*Liquidating Trust Funding*" means an amount (which shall be disclosed in a Plan Supplement), in cash, to fund the administration of the Liquidating Trust.  The source of Liquidating Trust Funding shall be the sale of certain Funding Securities otherwise allocable to Claims held by Liquidating Trust Beneficiaries, as set forth in the Liquidating Trust Agreement, the sale of which shall give rise to a Customer Deficiency Claim for any Holder of a Customer Interest in such Funding Securities.

111. "*Liquidating Trust Interest*" means a beneficial interest in the Liquidating Trust, all of which will be issued to Liquidating Trust Beneficiaries as provided in this Plan and the Liquidating Trust Agreement, and which shall represent a Customer's interest in the Liquidshares Series Equity, including the Liquidshares CEF Series, attributable to such Customer's economic interest in Platform Securities.

112. "*Liquidating Trustee*" means the trustee of the Liquidating Trust.

113. "*Liquidity Option*" means the option of a Liquidating Trust Beneficiary to direct the Liquidating Trust to seek to cause Liquidshares to sell or transfer certain Platform Securities described under Article IV.B.4 of this Plan and subject to the terms and conditions of the Liquidating Trust Agreement.

114. "*Liquidshares*" means Debtor Linqto Liquidshares LLC or Wind-Down Debtor Linqto Liquidshares LLC.

115. "*Liquidshares CEF Series*" means the Liquidshares Series Equity attributable to the Liquidating Trust Interests that reflect the proportional interests of Electing Customers in the Closed-End Fund Assets, and (ii) any Designated Portfolio Securities, on the Effective Date.

116.     "*Liquidshares Operating Agreement*" means the Third Amended and Restated Operating Agreement of Liquidshares, which shall be included in the Plan Supplement and which may be modified to account for the modifications made to this Plan following the filing of such Plan Supplement.

117.     "*Liquidshares Portfolio Company*" means any corporation, limited liability company, limited partnership or other entity in which Liquidshares holds, directly or indirectly, an investment (noncontrolling) interest, other than an investment in a Debtor.

118.     "*Liquidshares Series Equity*" means the equity interests representing a class or series of equity securities of a Liquidshares Portfolio Company to which a Customer had an economic interest as of the Effective Date (subject to aggregation of multiple classes or series of a Liquidshares Portfolio Company, or securities of multiple Liquidshares Portfolio Companies as may be provided in the Liquidshares Operating Agreement) to be issued by Liquidshares in series to the Liquidating Trust as provided in the Liquidshares Operating Agreement.

119.     "*Manager*" means the manager of the Closed-End Fund.  If the Closed-End Fund is externally managed, the Manager will be an investment adviser registered with the SEC.

120.     "*Minimum Closed-End Fund Conditions*" means (i) Customers with an economic interest meeting the minimum of amount of Platform Securities established by the Manager selecting the Closed-End Fund, including with respect to any individual Platform Security caps, and (ii) the filing of the Closed-End Fund Governing Documents and notification of registration with the SEC.

121.     "*Opt-In Form*" means the form by which all Holders of Claims against the Debtors or Interests may voluntarily opt in to become a Releasing Party by checking the applicable box on such form.

122.     "*Other General Unsecured Claim*" means any claim that is not an Exited Customer Claim, Customer Claim, Customer Deficiency Claim, Governmental Claim, Intercompany Claim, or Convenience Trade Claim, or not otherwise a Priority Claim, Secured Claim, or Administrative Claim.

123.     "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim, (b) a DIP Claim, or (c) a Priority Tax Claim.

124.     "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim or Secured Tax Claim.

125.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

126.     "*Petition Date*" means July 7, 2025.

127.     "*Plan*" means this joint chapter 11 plan, the Plan Supplement, and all exhibits and schedules annexed hereto or referenced herein, in each case, as may be amended, supplemented,

or otherwise modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

128. "*Plan Administration Process*" means the implementation of the transactions contemplated in this Plan and the process of objecting to or Allowing Claims on or after the Effective Date.

129. "*Plan Objection Deadline*" means the date established by the Bankruptcy Court for the deadline to File objections to the Confirmation of the Plan.

130. "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including, but not limited to, the following, as applicable: (a) Liquidating Trust Agreement; (b) Wind-Down Trust Agreement; (c) the Closed-End Fund Governing Document; (d) the Schedules of assumed or rejected Executory Contracts and Unexpired Leases; (e) the schedule of Retained Causes of Action; (f) the New Liquidshares Operating Agreement; and (g) the Rescission Security Table. Any and all Plan Supplement documents shall be in form and substance reasonably satisfactory to the Committee.

131. "*Platform Cash*" means Cash on the Debtors' platform that was wired by a Customer for the purchase of Platform Securities, held in an "FBO" account (or an account of similar nature) for the benefit of such wiring Customer and which was not used to purchase an interest in Platform Securities, and held by the Debtors as of the Petition Date which has not otherwise been withdrawn by such wiring Customer since the Petition Date. Fort the avoidance of doubt, Platform Cash is not property of the Debtors' Estates.

132. "*Platform Securities*" means Securities of a Liquidshares Portfolio Company owned by Liquidshares to which the Customers had an indirect economic interest, including all proceeds received in respect thereof on or after the Petition Date. For the avoidance of doubt, Platform Securities does not include Securities held by Liquidshares in Linqto, Inc. or the Reserved Securities.

133. "*Platform Securities Valuation Date*" means November 30, 2025 for purposes of valuation of Customer Deficiency Claims and for purposes of tabulation of Customer Claims for voting purposes only.

134. "*Priority Claim*" means all manner of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code.

135. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

136. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

137.    "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

138.    "*Professional Fee Claim*" any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional on or after the Petition Date through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

139.    "*Professional Fee Claims Reserve*" means a Cash reserve established and maintained by the Debtors to pay in full in Cash Accrued Professional Compensation to the extent Allowed.

140.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Governmental Unit Bar Date, the Rejection Claims Bar Date, or the Administrative Claims Bar Date, as applicable.

141.    "*Qualifying Liquidation Conditions*" means (i) the conditions and threshold participations set forth in the Liquidating Trust Agreement and, if applicable, by the buyer of the Platform Securities, which may include sufficient market value of any applicable Platform Securities to be liquidated, (ii) compliance with any applicable Restrictions on Transfer applicable to the subject Platform Securities, (iii) any other conditions set forth in the Liquidating Trust Agreement, (iv) Platform Securities that are not part of an aggregated class; (v) any other terms or conditions that may be required by the SEC or its staff, if any, or (vi) any other terms or conditions which the Liquidating Trustee deems necessary or appropriate to comply with the terms of the Plan and the Liquidating Trust Agreement.

142.    "*Qualifying Liquidation Request*" means the election by a Customer to require the Liquidating Trustee to sell one or more Platform Securities representing the Customer's economic interest in such Platform Securities pursuant to the terms and conditions of the Liquidating Trust Agreement.

143.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

144.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

145.    "*Rejection Claims Bar Date*" means, to the extent not previously established by prior order of the Bankruptcy Court, the first Business Day that is thirty (30) calendar days after the Effective Date.

146.    "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or Entity's respective heirs, executors, estates, and nominees.

147.    "*Released Parties*" means, collectively, and in each case solely in its capacity as such and subject to the limitations set forth in Article IX hereof: (a) the Debtors; (b) the Wind-Down Debtors; (c) the DIP Lender; (d) the Committee and each member of the Committee; (e) the following members of the Debtors' current management and/or current members of the Board of Directors of Linqto, Inc.: Jesus Ancheta, Sean Bowden, Michael Huskins, Alison Kutler, Jeremy Rosenthal, Cathy Siciliano, Francis Daniel Siciliano II, and Jeffrey S. Stein; (f) any Professional retained by the Debtors, the Special Subcommittee, or the Committee by order of the Bankruptcy Court in the Chapter 11 Cases; and (g) each Related Party of each Entity in clauses (c) through (f).[4] For the avoidance of doubt, no current or former officer or director of the Debtors is included in Released Parties, other than those set forth in (e).

148.    "*Releasing Parties*" means, collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the DIP Lender; (d) the Committee and each member of the Committee; (e) all Holders of Claims; (f) all Holders of Interests; (g) each current and former Affiliate of each Entity in clause (a) through (f); and (h) each Related Party of each Entity in clause (a) through this clause (g) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan; *provided, however*, that any Person or Entity that, to the extent applicable, does not opt in to the releases in Article IX hereof shall not be deemed a Releasing Party.

149.    "*Rescission Security*" means a Platform Security that decreased in value between the purchase of such security and the Petition Date, as set forth in the Rescission Security Table.

150.    "*Rescission Security Table*" means a table reflecting the value of Rescission Securities over time, to be filed in the Plan Supplement.

151.    "*Reserved Securities*" means the Securities owned by Liquidshares  or any other Debtor if intended to be owned by Liquidshares that are not Platform Securities and to which Customers did not have an economic interest.

---

[4]    The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

152. "*Restrictions on Transfer*" means with respect to the Platform Securities and Reserved Securities (i) any and all provisions in contracts, agreements, or corporate governance documents, or (ii) any and all governmental statutes, rules or regulations, including the rules and regulations of the SEC, judicial order or other determination, that prohibit, limit or otherwise encumber the transfer of ownership, rights, or interests in a Platform Security or any interest therein.

153. "*Restructuring Transactions*" means the transactions described in Article IV.G of the Plan.

154. "*Retained Causes of Action*" means all Causes of Action held by the Estates that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time, each of which shall be transferred from the Debtors to the Wind-Down Trust on the Effective date, and, for the avoidance of doubt, all entitlements, proceeds, and rights to payment with respect to any of the foregoing, with further details to be set forth in the Plan Supplement.

155. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

156. "*SEC*" means the U.S. Securities and Exchange Commission.

157. "*Secondaries Platform*" means a broker or dealer in securities that is: (i) duly registered as such under Section 15 of the Exchange Act; (ii) a member in good standing of the Financial Industry Regulatory Authority, Inc.; (iii) duly registered as, and approved to operate an, alternative trading system as provided for in Sections 242.300 through 242.303 of Chapter 17 of the Code of Federal Regulations; and (iv) who is in the business of facilitating the secondary trading of private and unregistered companies through its alternative trading system or otherwise.

158. "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

159. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

160. "*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

161. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act and 3(a)(10) of the Exchange Act and, with respect to the Closed-End Fund the meaning in section 2(a)(36) of the Investment Company Act.

162.   "*Special Subcommittee*" means the Special Subcommittee of the General Committee of the Board of Directors of Linqto, Inc. comprising Alison Kutler, Norman Reed, and Jeremy Reosenthal as voting members, and Jeffrey S. Stein as non-voting *ex officio* member and advisor, appointed pursuant to an *Action by Written Consent of the General Committee of the Board of Directors of Linqto, Inc.*, effective as of June 3, 2025.

163.   "*Subordinated Claim*" means any Claim against a Debtor subject to subordination under section 510 of the Bankruptcy Code, whether by operation of law or contract.

164.   "*Subordinated Governmental Claims*" means any Claim held by a Governmental Unit that is subject to subordination under section 510 of the Bankruptcy Code.

165.   "*Third-Party Release*" means the non-Debtor releases set forth in Article  IX.D. of this Plan.

166.   "*Trade Claim*" means an unsecured Claim incurred by the Debtors to a vendor or other provider of goods or services to the Debtors, on account of such goods or services.

167.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

168.   "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

169.   "*Unsubordinated Governmental Claims*" means any Claim held by a Governmental Unit that is not subject to subordination under section 510 of the Bankruptcy Code.

170.   "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

171.   "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

172.   "*Wind-Down Debtor*" means any Debtor after the Effective Date.

173.   "*Wind-Down Trust*" means the vehicle to be established in accordance with the Plan, the Confirmation Order and the Wind-Down Trust Agreement and which shall hold and monetize all Wind-Down Trust Assets for the benefit of the Wind-Down Trust Beneficiaries.

174.   "*Wind-Down Trust Agreement*" means the document creating and governing the Wind-Down Trust (including any ancillary documents expressly referenced and incorporated therein), which shall, to the extent applicable, be included in the Plan Supplement and which may be modified to account for the modifications made to this Plan following the filing of such Plan Supplement.

175.   "*Wind-Down Trust Assets*" means (i) the Retained Causes of Action and any proceeds thereof, together with all privileges related thereto (including, but not limited to, any attorney-client and work product privileges); (ii) all defenses, offsets, rights of recoupment, rights

22

of disallowance, recharacterization and/or equitable subordination of the Debtors and the Estates with respect to the Retained Causes of Action; (iii) the Reserved Securities not otherwise sold during the pendency of the Chapter 11 Cases; (iv) the Professional Fee Claims Reserve; (v) the Exited Customer Cash Pool; (vi) any and all other property of the Estates as of the Confirmation Date that is not a Liquidating Trust Asset (which assets include any assets held in the Closed-End Fund Assets) pursuant to this Plan, including zero value Platform Securities as determined on the Confirmation Date; and (vii) all rights of the Wind-Down Trust arising from the Plan itself; and (viii) the Wind-Down Trust Funding.

176.    "*Wind-Down Trust Beneficiary*" means any Holder of an administrative expense claim (to the extent not paid on or before the Effective Date), Trade Claim, Exited Customer Claim, Other General Unsecured Claim, Customer Deficiency Claim, Customer Rescission Claim, or Subordinated Claim.

177.    "*Wind-Down Trust Funding*" means an amount (which shall be disclosed in a Plan Supplement), in cash, to fund the administration of the Wind-Down Trust.  The source of the Wind-Down Trust Funding shall be the sale of certain Funding Securities, as set forth in the Wind-Down Trust Agreement.

178.    "*Wind-Down Trust Waterfall*" has the meaning set forth in ARTICLE IV.E.6. of this Plan.

179.    "*Wind-Down Trustee*" means the trustee of the Wind-Down Trust, to be appointed by the Committee.

B.    *Rules of Interpretation*.

For purposes of this Plan, unless *otherwise* provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) whenever from the context it is appropriate, the words "and" or "or" shall mean "and/or"; (c) unless otherwise specified, any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be in such form and on such terms and conditions; (d) unless otherwise specified, any reference in this Plan to an existing document, schedule or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (e) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (f) unless otherwise specified, all references in this Plan to Articles are references to Articles of this Plan or to this Plan; (g) the words "herein," "hereof" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (j) unless otherwise set forth in this Plan, the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Liquidating Trustee or the Wind-Down Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

C.      *Computation of Time.*

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply. If a payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall instead occur on the next succeeding Business Day but shall be deemed to have occurred as of the required date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of this Plan, any agreements, documents, instruments or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided, however*, that corporate governance matters relating to the Debtors shall be governed by the laws of the state of incorporation of the applicable Debtor.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

# ARTICLE II.
# ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims, have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III.

A.      *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable

treatment, each Holder of an Allowed Administrative Claim (including claims of the type described in section 503(b)(9) of the Bankruptcy Code) shall be paid in full in Cash: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtor; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Facility Claims*.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, and in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed DIP Claim, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) shall receive on account of such Allowed DIP Claim (a) payment in full in Cash, or (b) such other terms agreed to by the Holder of a DIP Claim. Such other terms may include participation in the Closed-End Fund either in partial or full satisfaction of the Allowed DIP Claims.

Unless and until the Allowed DIP Claims are satisfied in accordance with the terms of this Plan, then notwithstanding entry of the Confirmation Order and anything to the contrary in this Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released, or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens or other rights securing the DIP Claims shall be deemed to have been waived, released, satisfied, or discharged, in whole or in part, and (iii) neither the DIP Loan Agreement nor any other agreement, instrument or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released, or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

Upon the satisfaction of Allowed DIP Claims in accordance with the terms of this Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

C.      *Professional Fee Claims*.

1.      <u>Allowance of Professional Fee Claims.</u>

Each Professional asserting a Fee Claim for services rendered on or before the Effective Date must File and serve on the Debtors (before the Effective Date), the Wind-Down Trustee (after the Effective Date) and such other Entities who are designated in the Confirmation Order an application for final Allowance of such Fee Claim no later than 60 days after the Effective Date.

Objections to any Fee Claim must be Filed and served on the Debtors (before the Effective Date) or the Wind-Down Trustee (after the Effective Date) and the requesting Professional no later than 21 days after such final application for Allowance of such Fee Claim is Filed with the Bankruptcy Court. Each Holder of an Allowed Fee Claim shall be paid in full in Cash any Allowed Accrued Professional Compensation, including from funds held in the Professional Fee Claims Reserve, within five Business Days after entry of a Final Order of the Bankruptcy Court approving such amounts. Notwithstanding anything to the contrary contained in this Plan, the failure of the Professional Fee Claims Reserve to satisfy in full Allowed Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Allowed Fee Claims due and payable by the Debtors (before the Effective Date) or the Wind-Down Trustee (after the Effective Date), as the amounts in the Professional Fee Claims Reserve are solely estimates. To the extent necessary, this Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

Except as otherwise specifically provided in this Plan on and after the Effective Date, the Wind-Down Debtors, the Wind-Down Trustee (subject to the Wind-Down Trust Agreement), as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, and other fees and expenses of the Professionals or other Entities related to implementation and consummation of this Plan incurred by the Wind-Down Trustee or the Wind-Down Debtors after the Effective Date.   Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, the Wind-Down Trustee (subject to the Wind-Down Trust Agreement) may employ any Professional or other Entity in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.     Professional Fee Claims Reserve.

On or prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Claims Reserve with Cash in an amount determined by the Debtors or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserve was established, which amount shall be based on (x) the aggregate amount of Accrued Professional Compensation billed by the Professionals prior to the Effective Date plus (y) an estimate of the aggregate Fee Claims for periods through the Effective Date that have not been billed, as provided to the Debtors by each Professional.  Each Professional shall estimate in good faith their Fee Claims for periods that have not been billed as of the Effective Date and shall deliver such good faith estimate to the Debtors no later than five Business Days after the Debtors so request; *provided, however*, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of such Professional's final request for payment of Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional through the Effective Date.

The Debtors shall not commingle any funds contained in the Professional Fee Claims Reserve and shall use such funds to pay only the Fee Claims, as and when Allowed by a Final Order of the Bankruptcy Court.  Except as provided in this Article II.C.2, the Debtors shall not deposit any other funds or property in the Professional Fee Claims Reserve without further order

of the Bankruptcy Court.  No Liens or Claims shall encumber the Professional Fee Claims Reserve in any way. The Professional Fee Claims Reserve shall be maintained in trust for the Professionals and shall not be considered property of the Estates.  The Debtors shall maintain records of all deposits to and payments made from the Professional Fee Claims Reserve.  To the extent that funds held in the Professional Fee Claims Reserve do not or are unable to satisfy the full amount of any Allowed Fee Claim, the Debtors (before the Effective Date) and the Liquidating Trustee (after the Effective Date) shall, within 5 Business Days after entry of the Final Order approving such Allowed Fee Claim, pay such Allowed Fee Claim from Cash on hand, without any further action or order of the Bankruptcy Court.

D.      *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, on the Effective Date, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Canceled Equity Customer Claims*.

All Canceled Equity Customer Claims shall be deemed to have no value and are entitled to no recovery.  Canceled Equity Customer Claims are not classified in this Plan and shall receive no treatment under the Plan given the nature of such claims.

F.      *Statutory Fees*.

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors (before the Effective Date) or the Wind-Down Trustee (after the Effective Date) (or the Disbursing Agent on behalf of the Debtors or the Wind-Down Trustee, as applicable) for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

Prior to the Effective Date, the Debtors shall timely File reports for each month (including any fraction thereof) when they become due, in a form reasonably acceptable to the U.S. Trustee. On and after the Effective Date, the Wind-Down Trustee (or the Disbursing Agent on behalf of the Wind-Down Trustee) shall timely File reports for each quarter (including any fraction thereof) in a form reasonably acceptable to the U.S. Trustee.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.      *Classification of Claims and Interests*.

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth

27

below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Exited Customer Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Customer Claims | Impaired | Entitled to Vote |
| 5 | Convenience Trade Claims | Impaired | Entitled to Vote |
| 6 | Unsubordinated Governmental Claims | Impaired | Entitled to Vote |
| 7 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Customer Deficiency Claims | Impaired | Entitled to Vote |
| 9 | Customer Rescission Claims | Impaired | Entitled to Vote |
| 10 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Subordinated Governmental Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | Other Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 13 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Claims and Interests*.

Except to the extent that a Holder of an Allowed Claim or Allowed Interest agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Claim or Interest, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described. Unless otherwise

indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

1.   <u>Class 1 – Other Secured Claims.</u>

(a)   *Classification*: Class 1 consists of all Other Secured Claims.

(b)   *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; (iii) such Holder's collateral; or (iv) such other treatment rendering such Claim Unimpaired.

(c)   *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.   <u>Class 2 – Other Priority Claims.</u>

(a)   *Classification*: Class 2 consists of all Other Priority Claims.

(b)   *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor, (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired.

(c)   *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.   <u>Class 3 – Exited Customer Claims.</u>

(a)   *Classification:* Class 3 consists of all Exited Customer Claims.

(b)   *Treatment*: Each Holder of an Allowed Exited Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, a pro rata portion of the Existed Customer Cash Pool sufficient to render such Holders unimpaired.

(c)   *Voting*: Class 3 is Unimpaired under the Plan. Holders of Exited Customer Claims are not entitled to vote to accept or reject the Plan and are deemed to accept.

4.   <u>Class 4 – Customer Claims.</u>

(a)   *Classification:* Class 4 consists of all Customer Claims.

(b)     *Treatment:* Each Holder of an Allowed Customer Claim shall have the option to select between two types of treatment or a combination of the two types of treatment.  Holders of Allowed Customer Claims may select between having their interest in the Platform Securities contributed to a Liquidating Trust or to a Closed-End Fund or a combination of both.  A description of these two options can be found in Article IV. A and Article IV.B. of this Plan.  Should a Holder of Claim in this class not cast a Ballot, the default treatment will be that such Holder's Customer Interests will be transferred to the Closed-End Fund, if the Minimum Closed-End Fund Conditions are met, and, to the Liquidating Trust if not, all as further described in the Plan and the Plan Supplement.  Should a Holder of a Claim in this class cast a Ballot and not elect either the Liquidating Trust or the Closed-End Fund (or a combination of both) on their Ballot, the default treatment will be that such Holder's Customer Interests will be transferred to the Liquidating Trust.

Each Holder of an Allowed Customer Claim shall receive a Liquidating Trust Interest, representing such Holder's entitlement based on their Customer Interest as of the Petition Date.  If the Minimum Closed-End Fund Conditions are met, the Liquidating Trust Interests that correspond with the Liquidshares CEF Series shall be exchanged for Closed-End Fund Shares on the Closed-End Fund Exchange Date. If the Minimum Closed-End Fund Conditions are not met, all Customer Interests shall be administered through the Liquidating Trust.

The Minimum Closed-End Fund Conditions are described in more detail in Article IV.C.1 of this Plan.  On the Closed-End Fund Exchange Date, the Closed-End Fund Assets will be transferred to the Closed-End Fund and the Liquidating Trust Interests of Electing Customers will be automatically exchanged for Closed-End Fund Shares.

(c)     *Voting:* Class 4 is Impaired under the Plan.  Holders of Customer Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 – Convenience Trade Claims.

(a)     *Classification*: Class5 consists of all Convenience Trade Claims.

(b)     *Treatment*: Each Allowed Convenience Trade Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of a Trade Claim to its share of the proceeds from the Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall, on account of the portion of such Convenience Trade Claim.

As of the Effective Date, the Debtors' liability for all Convenience Trade Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order, and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)     *Voting*: Class 5 is Impaired under the Plan. Holders of Convenience Trade Claims are entitled to vote to accept or reject the Plan.

6.     Class 6 – Unsubordinated Governmental Claims.

(a)     *Classification*: Class 6 consists of all Unsubordinated Governmental Claims.

(b)     *Treatment*:  Each Holder of an Allowed Unsubordinated Governmental Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Unsubordinated Governmental Claim to its share of the proceeds Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

(c)     *Voting*: Class 6 is Impaired under the Plan. Holders of Unsubordinated Governmental Claims are entitled to vote to accept or reject the Plan.

7.     Class 7 – Other General Unsecured Claims .

(a)     *Classification*: Class 7consists of all Other General Unsecured Claims.

(b)     *Treatment*: Each Holder of an Allowed Other General Unsecured Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Other General Unsecured Claim to its share of the proceeds from the Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall. As of the Effective Date, the Debtors' liability for all Other General Unsecured Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)     *Voting*: Class 7 is Impaired under the Plan. Holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.     Class 8 – Customer Deficiency Claims.

(a)     *Classification*: Class 8 consists of all Customer Deficiency Claims.

(b)     *Treatment*: Each Holder of an Allowed Customer Deficiency Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Customer Deficiency Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

As of the Effective Date, the Debtors' liability for all Customer Deficiency Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)     *Voting*: Class 8 is Impaired under the Plan. Holders of Customer Deficiency Claims are entitled to vote to accept or reject the Plan.

9.     <u>Class 9 –Customer Rescission Claims.</u>

(a)     *Classification*: Class 9 consists of all Customer Rescission Claims.

(b)     *Treatment*: Each Holder of an Allowed Customer Rescission Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Customer Rescission Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

As of the Effective Date, the Debtors' liability for all Customer Rescission Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)     *Voting*: Class 9 is Impaired under the Plan. Holders of Customer Rescission Claims are entitled to vote to accept or reject the Plan.

10.     <u>Class 10– Intercompany Claims.</u>

(a)     *Classification*: *Class* 10 consists of all Intercompany Claims.

(b)     *Treatment*: Each Allowed Intercompany Claim shall be assumed, set off, settled, cancelled and released, or otherwise addressed at the option of the Debtors, *provided* that no distributions shall be made on account of any Intercompany Claims.

(c)     *Voting*: Class 10 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.     <u>Class 11 – Subordinated Governmental Claims.</u>

(a)     *Classification*: Class 11 consists of all Subordinated Governmental Claims.

(b)     *Treatment*: Each Holder of an Allowed Subordinated Governmental Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Subordinated Governmental Claim

to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

As of the Effective Date, the Debtors' liability for all Subordinated Governmental Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)    *Voting*: Class 11 is Impaired under the Plan. Holders of Subordinated Governmental Claims are not entitled to vote to accept or reject the Plan.

12.    Class 12 – Other Subordinated Claims.

(a)    *Classification*: Class 12 consists of all Subordinated Claims.

(b)    *Treatment*: Each Holder of an Allowed Subordinated Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Subordinated Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

As of the Effective Date, the Debtors' liability for all Subordinated Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)    *Voting*: Class 12 is Impaired under the Plan. Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan and are deemed to reject.

13.    Class 13 – Existing Equity Interests.

(a)    *Classification*: Class 13 consists of all Existing Equity Interests.

(b)    *Treatment*: Each Holder of an Allowed Existing Equity Interest shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Existing Equity Interest to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

As of the Effective Date, the Debtors' liability for all Existing Equity Interests shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

(c)    *Voting*: Class 13 is Impaired under the Plan. Holders of Existing Equity Interests are not entitled to vote on the Plan and are deemed to reject.

C.      *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote, and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests.*

Intercompany Interests shall be extinguished, settled, cancelled, released, or otherwise addressed at the option of the Debtors, provided that no distributions shall be made on account of any Intercompany Interests.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to

the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Wind-Down Trustee reserves the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *General Settlement for Claims and Interests.*

As discussed in further detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.     *Customer Rescission Claims Settlement.*

This Plan is a settlement of Customer Rescission Claims pursuant to Rule 9019.  If the Customer Rescission Claims Settlement is approved through this Plan, then each Customer with a Customer Interest in a Rescission Security shall automatically hold a Customer Rescission Claim in the amount set forth on the Rescission Security Table for each Rescission Security held by such Customer, whether or not such Customer filed a proof of claim reflecting a Customer Rescission Claim.  Holders of Customer Rescission Claims, in exchange for an automatically Allowed Customer Rescission Claim, agree that the Customer Rescission Claims as a class are entitled to a maximum of 33% of any aggregate distribution from the Wind-Down Trust, and are otherwise subject to the Wind-Down Trust Waterfall in all other respects.  If all other senior and *pari passu* Holders within the Wind-Down Trust Waterfall receive a 100% payout on such Holders' Claims, only then will Holders of Allowed Customer Rescission Claims be entitled to an additional distribution above the 33% aggregate cap, to the extent available.

The automatic allowance of such claims, and the 33% aggregate cap, are part of a holistic settlement.  If either component of that settlement is not approved and incorporated in the confirmed Plan, then Customers with a Customer Interest in a Recission Security shall not automatically be granted an Allowed Customer Rescission Claim consistent with the preceding paragraph.  Holders of Allowed Customer Rescission Claims (which, for the avoidance of doubt,

35

would not include any automatic granting and allowance of such claims unless otherwise preserved) would then receive pari passu treatment pursuant to the Wind-Down Trust Waterfall.

C.     *Creation of the Liquidating Trust.*

The Liquidating Trust shall be formed on the Effective Date to effect the liquidation of Liquidshares and applicable Liquidating Trust Assets, (other than the Closed-End Fund Assets), including without limitation, the Platform Securities attributable to the Liquidating Trust Beneficiaries as well as any and all transactions incidental thereto, in accordance with the Plan, the Confirmation Order, and the Liquidating Trust Agreement. The corpus of the Liquidating Trust shall consist of the Liquidating Trust Assets.  On the Effective Date, pursuant to the Plan and in accordance with the Liquidating Trust Agreement, the Liquidating Trust Assets shall be irrevocably transferred to and vest in the Liquidating Trust free and clear of any and all actual or alleged prepetition and postpetition Claims, Causes of Action, Interests, Liens, other encumbrances and liabilities of any kind, in each cast that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Liquidating Trust Agreement.  From and after the Effective Date, all proceeds of the Liquidating Trust Assets shall be paid to the Liquidating Trust to be applied in accordance with the Plan.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.  For the avoidance of doubt, all proceeds attributable to the Liquidshares CEF Series shall remain in the Closed-End Fund Assets.  The Liquidating Trust shall be a successor within the meaning of section 1145(a) of the Bankruptcy Code to the Debtors.

The Liquidating Trust shall have no objective to continue or engage in the conduct of a trade or business, except to the extent necessary to liquidate and distribute its assets.

Liquidshares shall remain the record holder of the Platform Securities, on the books and records of the applicable Portfolio Company, other than the Closed-End Fund Assets after the Closed-End Fund Exchange.  In connection therewith, the Liquidshares Operating Agreement will provide that the Liquidating Trustee shall be the sole manager of Liquidshares, with the authority to cause Liquidshares to sell the Platform Securities and extinguish the Liquidshares Series Equity (including the Liquidshares CEF Series on the Closed-End Fund Exchange Date) and related Liquidating Trust Interests attributable to such Platform Securities.  Liquidshares shall have no objective to continue or engage in the conduct of a trade or business, including investing, reinvesting, or trading securities, except to the extent necessary to liquidate the Platform Securities as authorized and directed by the Liquidating Trustee.  In connection therewith, the power and authority of the Liquidating Trustee in respect of the Platform Securities held by Liquidshares will be subject to the terms and conditions set forth in the Liquidating Trust Agreement, as if all the Platform Securities were held directly by the Liquidating Trust.  If at any time, to the extent that existing Restrictions on Transfer with respect to a series or class of Platform Securities allow, or are amended or waived to allow, Liquidshares intends to transfer the entirety of any series or class of Platform Securities to the Liquidating Trust and in the Liquidating Trustee's sole discretion, the Liquidating Trust may require Liquidshares to distribute such Platform Securities to the Liquidating Trust in redemption of the corresponding Liquidshares Series Equity, excluding any Platform Securities attributable to the Liquidshares CEF Series prior to the expiration of the time

period allowable for the completion of the Minimum Closed-End Fund Conditions. The Liquidating Trust Agreement shall otherwise provide that the Liquidating Trust Beneficiaries will continue to be provided, as nearly as practicable, the same economic benefits in respect of the Platform Securities regardless of whether Liquidshares or the Liquidating Trust is the record owner of the Platform Securities on the books and records of the applicable Portfolio Company.

As of the Effective Date, Liquidshares shall adopt the Liquidshares Operating Agreement and the Debtors shall transfer to (or cause Liquidshares to issue to) the Liquidating Trust all of the equity interests of Liquidshares, such that Liquidshares will be a wholly owned subsidiary of the Liquidating Trust. Liquidshares shall remain the record owner of the Platform Securities on the books and records of the applicable Portfolio Company, the existing equity interests of Liquidshares will be cancelled and Liquidshares will issue Liquidshares Series Equity, including the Liquidshares CEF Series, to the Liquidating Trust. Each Liquidshares Series Equity will be tied to a Platform Security or a group of Platform Securities, and the Liquidshares CEF Series shall be tied to the Closed-End Fund Assets.

On the Effective Date, the Liquidating Trust shall issue Liquidating Trust Interests to Customers as set forth herein and in accordance with the Liquidating Trust Agreement. As determined as of the Effective Date, such Liquidating Trust Interests will be issued in multiple series that will correspond to the applicable Liquidshares Series Equity or to the Liquidshares CEF Series. The Liquidating Trust Interests, including the Liquidating Trust Interests representing the Liquidshares CEF Series, shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

Additional information regarding the Liquidating Trust will be set forth in the Plan Supplement, including the identity of the Liquidating Trustee, the form of Liquidating Trust Agreement, funding mechanism, administration, assets to be held, liabilities assumed, and tax treatment.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional assets become known and subject to the Liquidating Trust's administration, the Debtors shall be deemed to have automatically transferred to the Liquidating Trust all of their right, title and interest in such assets. In accordance with sections 363, 365, and/or 1141 of the Bankruptcy Code, as applicable, all such assets shall automatically irrevocably vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to Allowed Claims until paid in full, as set forth in the Plan, and the reasonable fees and expenses of administering the applicable Liquidating Trust, including, without limitation, the reasonable fees and expenses of its Liquidating Trustee, as provided in the Liquidating Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to such additional assets or the Liquidating Trust.

1.    <u>Liquidating Trustee</u>.

On the Effective Date, the Liquidating Trustee shall be the sole authorized representative of the Liquidating Trust Agreement (if any), with authority to render all services necessary to effectuate the terms of this Plan as they relate to the Liquidating Trust. From and after the Effective Date, the Liquidating Trustee shall be deemed to have been appointed as the representative of each

of the Estates by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code except to the extent limited by the Liquidating Trust Agreement; *provided that* nothing in this Plan, the Confirmation Order, or the Liquidating Trust Agreement shall limit or restrain the ability of the Wind-Down Trustee to pursue Retained Causes of Action on behalf of all of the Estates, as set forth in Article IV.H of the Plan.

The powers, authority, responsibilities, and duties of the Liquidating Trustee shall be governed by this Plan, the Confirmation Order, the Liquidating Trust Agreement, and other applicable Plan Supplement documents.  The duty of the Liquidating Trustee shall be to facilitate the liquidation and distribution of the Platform Securities, subject to the Plan, and the Liquidshares Estate for the benefit of Customers in accordance with the Liquidating Trust Agreement.  The Liquidating Trustee shall have no duty to the Debtors.

The Liquidating Trustee may execute, deliver, file, or record such documents, instruments, releases, and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan as they relate to the Liquidating Trust.

The Committee and the Debtor Representative shall select the Liquidating Trustee, and its identity shall be disclosed by the Debtors in the Plan Supplement.  Any successor Liquidating Trustee shall be appointed pursuant to the Liquidating Trust Agreement.

Additional information regarding the Liquidating Trustee will be set forth in the Plan Supplement, including further details with respect to the Liquidating Trustee's responsibilities and authority, powers and limitations, compensation, and professionals.

2.      Liquidating Trustee's Authority and Duties.

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Liquidating Trust, and shall have all powers, rights and duties of a trustee, as set forth in the Liquidating Trust Agreement.

Among other things, the Liquidating Trustee shall:

(a)      hold and administer the Liquidating Trust Assets;

(b)      administer the Platform Cash, as provided for in Article IV.D.7;

(c)      have the power and authority to retain, as an expense of the Liquidating Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidating Trustee hereunder or in the Liquidating Trust Agreement;

(d)      have the power and authority to obtain additional third-party funding for the Liquidating Trust;

(e)      make distributions to Customers as provided in the Liquidating Trust Agreement and the Plan;

(f)     sell or transfer Platform Securities upon a Qualifying Liquidation Request, as provided for in Article IV.B;

(g)     have the power and authority to cause Liquidshares to sell or transfer Funding Securities

(h)     have the power and authority to cause Liquidshares to sell or transfer Platform Securities and any Closed-End Fund Shares as permitted or contemplated by the Liquidating Trust Agreement;

(i)     have the power and authority to effect the Closed-End Fund Exchange;

(j)     have the right to receive reasonable compensation for performing services as the Liquidating Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Liquidating Trustee in performing the duties and responsibilities required under the Plan and the Liquidating Trust Agreement;

(k)     be considered an estate representative as provided for under section 1123 of the Bankruptcy Code with respect to the assets placed in the Liquidating Trust; and

(l)     provide periodic reports and updates to Liquidating Trust Beneficiaries, including as set forth in conditions in existing SEC staff guidance.

3.     <u>Transfer and Vesting of Assets to Liquidating Trust</u>.

On the Effective Date, or as soon thereafter as practicable:

(a)     Debtors shall cause Liquidshares to issue to the Liquidating Trust the Liquidshares Series Equity, including the Liquidshares CEF Series, such that Liquidshares will be a wholly owned subsidiary of the Liquidating Trust.

(b)     The Liquidating Trust shall issue Liquidating Trust Interests to the Liquidating Trust Beneficiaries, reflecting their proportional interests in the Liquidating Trust Assets or in the Closed-End Fund Assets, in accordance with the allocation methodologies approved by the Debtor Representative and the Committee.

(c)     The Liquidating Trust shall issue Liquidating Trust Interests that correspond to the Liquidshares CEF Series to the Electing Customers reflecting their proportional interests in the Closed-End Fund Assets, in accordance with the allocation methodologies approved by the Debtor Representative and the Committee, and subject to the terms of the Closed-End Fund Exchange described in Article IV.C.4 of the Plan.

(d)   The Liquidating Trust shall assume responsibility for all actions necessary to administer and realize the value of the Platform Securities subject to administration within the Liquidating Trust and related assets.

All transfers to the Liquidating Trust shall be exempt from any stamp, real estate transfer, mortgage recording, or similar taxes pursuant to section 1146(a) of the Bankruptcy Code.

4.   <u>Administration of the Liquidating Trust Assets</u>.

From and after the Effective Date, the Liquidating Trustee shall administer all Liquidating Trust Assets in accordance with the Plan, the Liquidating Trust Agreement, and the Confirmation Order.

The Liquidating Trustee shall have full power and authority to manage, protect, conserve, and liquidate the Liquidating Trust Assets (other than Closed-End Fund Assets), to prosecute, settle, or compromise any claims or causes of action arising from the Liquidating Trust Assets, if any, and to make distributions to the Liquidating Trust Beneficiaries, all in a manner consistent with the Liquidating Trust Agreement, the purposes of the Liquidating Trust and in the best interests of its beneficiaries.  Nothing in this paragraph shall be interpreted to limit or impair the rights and powers of the Wind-Down Trustee to manage, protect, conserve, and liquidate the Wind-Down Trust Assets, or to prosecute, settle, or compromise any claims or causes of action related to the Wind-Down Trust Assets.

(a)   *Liquidating Trust as a Disbursing Agent*.

To further facilitate the liquidation and distribution of the Platform Securities, the Liquidating Trust shall serve as a Disbursing Agent for the distribution of (x) the Circle Shares to the Circle Securities Customers (excluding any Circle Shares in which the Electing Customers have an economic interest, which Circle Shares shall be included in the Closed-End Fund Assets and (y) the Closed-End Fund Assets to the Closed-End Fund on the Closed-End Fund Exchange Date, if the Minimum Closed-End Fund Conditions are met, in each case as permitted by applicable law.

As Disbursing Agent for the Circle Shares, the Liquidating Trust, solely in its capacity as such Disbursing Agent, on or as soon as practicable after the Effective Date, shall distribute Circle Shares to each Circle Shares Customer pro rata in accordance with the number of Circle Shares allocated to each such Customer.  If the Minimum Closed-End Fund Conditions are met, such distribution will exclude any Circle Shares in which the Electing Customers have an economic interest.

As Disbursing Agent for the Closed-End Fund Securities, the Liquidating Trustee, on as soon as practicable after the Effective Date, if the Minimum Closed-End Fund Conditions are met, shall distribute the Liquidating Trust Interests that correspond with the Liquidshares CEF Series to Electing Customers.  At the Closed-End Fund Exchange Date, the Liquidating Trust, solely in its capacity as Disbursing Agent, shall cause Liquidshares to transfer the Closed-End Fund Assets to the Closed-End Fund.  Upon the occurrence of the Closed-End Fund Exchange, the Electing Customers shall automatically receive Closed-End Fund Shares in exchange for their relevant Liquidating Trust Interests, which will be automatically extinguished. If the Closed-End Fund

40

Exchange Date does not occur on or prior to the nine (9) month anniversary of the Effective Date, the Electing Customers shall cease to be treated as Electing Customers and otherwise remain beneficial owners of Liquidating Trust Interests with the same rights and benefits as similarly situated Customers who are not Electing Customers as provided in the Liquidating Trust Agreement.

        (b)      *Distribution of Platform Securities by Liquidating Trust*.

In accordance with the terms of the Liquidating Trust Agreement, the Liquidating Trust will be required to distribute or cause Liquidshares to distribute, as soon as reasonably practicable, but no more than once each fiscal quarter, on a pro rata basis to the applicable Liquidating Trust Beneficiaries Platform Securities that shall have been released of all Restrictions on Transfer such that such Securities may be transferred to such beneficiaries by Liquidshares or the Liquidating Trust without any such restriction. Notwithstanding the foregoing, any Platform Securities allocated to Liquidshares CEF Series will remain in the Closed-End Fund Assets until transferred to the Closed-End Fund or, if the Closed-End Fund Exchange does not occur as specified above, the Platform Securities will be released to the Electing Customer, in accordance with the terms of the Liquidating Trust Agreement.

        (c)      *Liquidity Option*.

Pursuant to the terms of the Liquidating Trust Agreement, the Liquidating Trust will establish a formal relationship for Liquidshares and/or the Liquidating Trust with one or more Secondaries Platforms that can permit Liquidshares to sell Platform Securities upon a Qualifying Liquidation Request. A Qualifying Liquidation Request will be made only at the sole direction of a Liquidating Trust Beneficiary. Upon receiving a Qualifying Liquidation Request, and upon satisfaction of the Qualifying Liquidation Conditions provided in the Liquidating Trust Agreement, the Liquidating Trustee will seek to cause Liquidshares to liquidate the applicable Platform Securities on a Secondaries Platform, subject to any terms or conditions imposed by such platform. Subject to the Liquidating Trustee's ability to cause Liquidshares to liquidate the Platform Securities, the Liquidating Trust will cause the redemption of the applicable Liquidshares Series Equity and Liquidating Trust Interests that correspond to the Platform Securities sold and will distribute the net proceeds of such a sale to the applicable Liquidating Trust Beneficiary as provided in the Liquidating Trust Agreement.

The Liquidating Trustee's role in facilitating a Qualifying Liquidation Request will be administrative only. Without limiting the foregoing, the Liquidating Trustee will not be permitted to (i) guarantee or seek any price or range of prices for such Platform Securities, (ii) solicit participation in the Liquidity Option of the Liquidating Trust Beneficiaries, (iii) receive any differential compensation based on the size, value or occurrence of a transaction in Platform Securities occurring on or through a Secondaries Platform, or (iv) buy additional Platform Securities for the benefit of any Customer. In addition, the Liquidating Trustee will not charge any fee (other than costs noted in the following sentence) to any Liquidating Trust Beneficiary. Any costs associated with the sale and liquidation of Platform Securities pursuant to a Qualifying Liquidation Request will be borne exclusively by the directing Liquidating Trust Beneficiary. As soon as practicable following the Platform Securities' liquidation, the customer who elected to participate will receive the net proceeds from the sale of the applicable securities of Liquidshares

Portfolio Companies. The Liquidating Trustee's actions in connection with any such Liquidity Option or exercise thereof will be limited to administrative and ministerial matters, including, without limitation, providing notice to the Liquidating Trust Beneficiaries of upcoming liquidity windows, performing administrative tasks in connection with the arrangement and consummation of any sales of the Platform Securities through the Secondaries Platform, and distributing any resulting proceeds to the applicable Liquidating Trust Beneficiary, in each case in accordance with the Liquidating Trust Agreement.

(d)     *Sale of Funding Securities to Fund Liquidating Trust Operations*.

Solely for the purpose of raising sufficient proceeds to administer the operations of the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement, (i) the Liquidating Trust may establish a formal relationship for Liquidshares and/or the Liquidating Trust with or more Secondaries Platforms that can permit Liquidshares to sell Funding Securities for the benefit of the Liquidating Trustee and/or (ii) sell a pro rata slice of Platform Securities to the Closed-End Fund in exchange for Closed-End Fund Shares. Upon the sale of such Platform Securities, the Liquidating Trust will appropriately adjust the applicable Liquidating Trust Interests that correspond to the Platform Securities sold. The selection and sale of Funding Securities shall be at the discretion of the Liquidating Trustee.

As described in the Disclosure Statement, the Liquidating Trust shall adopt valuation methodologies to value the Platform Securities prior to the sale of any Funding Securities. The valuation methodologies will be disclosed in the Liquidating Trust Agreement. The Liquidating Trust Oversight Board (as defined and described in the Liquidating Trust Agreement), will approve the valuation methodologies. With respect to the Liquidating Trust Assets for which market quotations are not readily available or are deemed not reliable, which are expected to represent a substantial portion of the Liquidating Trust Assets, the Liquidating Trust will value such securities at fair value according to its valuation methodologies as determined in good faith by the Liquidating Trustee. The Liquidating Trustee will not guarantee a successful liquidation event, any price or range of prices for such Platform Securities. In addition, the Liquidating Trustee will not charge any fee (other than costs noted in the following sentence) to any Liquidating Trust Beneficiary. Any costs associated with the sale and liquidation of Funding Securities by the Liquidating Trustee to fund the operations of the Liquidating Trust will be borne exclusively by the Liquidating Trust on behalf of all Liquidating Trust Beneficiaries.

(e)     *Liquidating Trust Expenses*.

Expenses to be borne by the Liquidating Trust will reduce the recovery on Platform Securities investments by the Liquidating Trust Beneficiaries. Liquidating Trust expenses include recurring and regular items, as well as extraordinary expenses for which it may be hard to budget or forecast. As a result, the amount of expenses ultimately incurred or incurred at any one time may exceed amounts expected or budgeted by the Liquidating Trust.

5.     Designated Platform Securities.

Soley for the purpose of administering the Liquidating Trust, pursuant to the terms of the Liquidating Trust Agreement, the Debtors and the Committee may elect to allocate the Designated

Platform Securities to the Closed-End Fund Assets. Customers who have an economic interest in the Designated Platform Securities will be allocated Liquidating Trust Interests that correspond to the Liquidshares CEF Series and, on the Closed-End Fund Exchange Date, will receive Closed-End Fund Shares together with the Electing Customers.

6.      Termination of the Liquidating Trust.

The Liquidating Trust shall terminate upon the earlier of (i) five (5) years from the Effective Date (subject to periodic extensions as may be approved by the Bankruptcy Court) and (ii) the occurrence of certain events as set forth in the Liquidating Trust Agreement. Any remaining assets of the Liquidating Trust at the time of termination shall be distributed in accordance with the Liquidating Trust Agreement. The Bankruptcy Court and any other court set forth in the Liquidating Trust Agreement shall retain jurisdiction over the Liquidating Trust.

7.      Regulatory Matters.

The Liquidating Trust Interests are not intended to be Securities within the meaning of the Securities Act. However, to the extent that any such interests are deemed to be Securities, the offer and sale of any such Liquidating Trust Interests to Customers pursuant to the Plan shall be exempt from registration under the section 5 of the Securities Act (and any applicable Blue Sky Laws) under section 1145(a)(1) of the Bankruptcy Code, except with respect to any Entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under Section 5 of the Securities Act and Blue Sky Laws if the following three principal requirements are satisfied: (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

To the extent any "offer or sale" of the Liquidating Trust Interests may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Allowed Claims against the Debtors, within the meaning of section 1145(a)(1) of the Bankruptcy Code. The Liquidating Trust Interests, including the Liquidating Trust Interests representing the Liquidshares CEF Series, shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

Notwithstanding anything to the contrary in the Plan, the Liquidating Trust Agreement or the Liquidshares Operating Agreement, neither the Liquidating Trust nor Liquidshares shall engage in any activities, including with respect to the liquidity option, or otherwise conduct its affairs in a manner that would cause such entity to be required to register as an "investment company" within the meaning of the Investment Company Act, or to register any Liquidating Trust Interests issued by it under Section 12(g) of the Exchange Act. Similarly, if the Liquidating Trustee is not registered as an investment adviser under the Investment Advisers Act or as a broker-

dealer under the Exchange Act, it shall not engage in any activities or otherwise conduct its affairs in a manner that would cause the Liquidating Trustee to be required to register as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act.

D.   *Creation of the Closed-End Fund.*

On or after the Effective Date, and in accordance with the Plan and the Plan Supplement, the Manager on behalf of the Electing Customers shall be authorized and directed to take all the steps necessary to cause the formation of a Closed-End Fund for the purpose of initially holding and managing the Closed-End Fund Assets, on behalf of Electing Customers.

The Closed-End Fund shall be a newly organized Delaware statutory trust or corporation that will be registered under the Investment Company Act, as a closed-end management investment company.  The Closed-End Fund Shares shall be listed on a national stock exchange and, therefore, will be freely transferrable.  The Closed-End Fund's Board of Trustees, if the Closed-End Fund is a Delaware statutory trust, or Board of Directors, if the Closed-End Fund is a corporation, (each a "**Board**" and referred to herein as the "**Board of Trustees**") will oversee the Closed-End Fund.  The Closed-End Fund shall be established and operated in compliance with the Investment Company Act and all applicable rules and regulations of the SEC and any other applicable regulatory authority.  The registration of the Closed-End Fund under the Investment Company Act shall not be a condition precedent to the occurrence of the Effective Date of the Plan.  The Closed-End Fund shall be a successor within the meaning of section 1145(a) of the Bankruptcy Code to the Debtors.

As described in the Disclosure Statement, the net asset value per share of the Closed-End Fund Shares shall be determined by dividing the value of total assets minus liabilities by the total number of Closed-End Fund Shares outstanding.  The Board of Trustees will approve procedures pursuant to which the Closed-End Fund will value its investments.  With respect to the Closed-End Fund Assets for which market quotations are not readily available or are deemed not reliable, which are expected to represent a substantial portion of the Closed-End Fund Assets, the Closed-End Fund will value such securities at fair value according to its written valuation procedures and as determined in good faith by the Closed-End Fund's Valuation Designee.  The Board of Trustees will designate the Closed-End Fund's "**Valuation Designee**," which will be the Manager if the Closed-End Fund is externally managed, or an officer of the Closed-End Fund if the Closed-End Fund is internally managed.  It is expected that the Closed-End Fund will use the same or similar methodologies to the Liquidating Trust as described in Article IV.B.4 of the Plan.

As described in the Disclosure Statement, the Closed-End Fund will be invested in a portfolio generally consisting of Platform Securities that are contributed to the Closed-End Fund by the Liquidating Trust in exchange for Closed-End Fund Shares that will be distributed to Electing Customers in exchange for their Liquidating Trust Interests on the Closed-End Fund Exchange Date.  The Liquidating Trust Interests initially issued to the Electing Customers will correlate with correspond to the Liquidshares CEF Series held by the Liquidating Trust subject to such Liquidating Trust Interests being mandatorily exchanged, without further action by the Electing Customers, for shares of the Closed-End Fund in accordance with the terms of this Plan and the Plan Supplement and Liquidating Trust Agreement on the Closed-End Fund Exchange

Date.  The Liquidshares CEF Series correspond to the Platform Securities in which the Electing Customers had an economic interest.

The Closed-End Fund may qualify as a "regulated investment company" for U.S. federal income tax purposes, in which case the Closed-End Fund would generally not be subject to U.S. federal income tax on its taxable income and gains that it distributes as dividends for U.S. federal income tax purposes to Closed-End Fund shareholders.

Additional information regarding the Closed-End Fund will be set forth in the Plan Supplement, including the identity of the Manager, the form of the Closed-End Fund Governance Documents, assets to be held, liabilities assumed, and tax treatment.

1.      Formation of the Closed-End Fund.

Upon selection, the Manager, as Closed-End Fund sponsor and sole initial shareholder, shall cause the following to occur to form the Closed-End Fund if the Minimum Closed-End Fund Conditions are met:

(a)     Filing a Declaration of Trust (if a Delaware Trust) or Certificate of Incorporation (if a Delaware corporation) with the Division of Corporations of the State of Delaware.  Shareholder rights in the Closed-End Fund will be established and governed by the Closed-End Fund Governing Documents.

(b)     Filing of Form N-8A, notification of registration of an investment company under section 8(a) of the Investment Company Act, with the SEC.

(c)     Seeding of the Closed-End Fund in accordance with section 14(a) of the Investment Company Act.

(d)     Filing of Form N-2, registration statement for closed-end management investment companies under the Investment Company Act on or after the Effective Date.

(e)     The listing of the Closed-End Fund Shares on a national securities exchange.

2.      Management of the Closed-End Fund.

As further described in the Disclosure Statement, the Closed-End Fund Governing Documents, and registration statement on Form N-2, the Manager will manage the day-to-day management and operation of the Closed-End Fund subject to the oversight and supervision of the Board of Trustees of the Closed-End Fund.  As required by the Investment Company Act, a majority of the Board of Trustees must be persons who are not "interested persons" (as defined in the Investment Company Act) of the Closed-End Fund (the "**Independent Trustees**").  Any vacancy on the Board of Trustees may be filled by the remaining Trustees, except to the extent the Investment Company Act requires the election of Trustees by the Closed-End Fund shareholders.

The Manager, subject to the supervision and oversight of the Board of Trustees, will provide investment advisory, management and administrative services to the Closed-End Fund. The Committee and the Debtor Representative shall select a Manager whose identity will be disclosed by the Debtors in the Plan Supplement. The Board of Trustees will approve the Manager of the Closed-End Fund. Any successor Manager shall be approved by the Board of Trustees in accordance with the requirements of the Investment Company Act.

If the Manager is external to the Closed-End Fund, the Manager must be an adviser registered with the SEC under the Investment Advisers Act and the Board of Trustees (including a majority of the Independent Trustees) will approve an investment advisory agreement (the "**Investment Advisory Agreement**") with such Manager. The Investment Advisory Agreement will be terminable without penalty, on 60 days' prior written notice: by a majority vote of the entire Board of Trustees; by vote of a majority (as defined by the Investment Company Act) of the outstanding voting securities of the Closed-End Fund; or by the Manager. After the initial term of two years, the Investment Advisory Agreement may continue in effect from year to year only if such continuance is approved annually by either the Board of Trustees or the vote of a majority (as defined by the Investment Company Act) of the Closed-End Fund Shares; provided that in either event the continuance is also approved by a majority of the Independent Trustees by vote cast in person (or as otherwise permitted by the SEC) at a meeting called for the purpose of voting on such approval. The Investment Advisory Agreement also will provide that it will terminate automatically in the event of its "assignment," as defined by the Investment Company Act and the rules thereunder.

If the Closed-End Fund is internally managed, there will be no Investment Advisory Agreement. Instead, the Board of Trustees will directly retain individual persons to manage the Closed-End Fund.

3.     Closed-End Fund Expenses.

The Closed-End Fund will bear all expenses and costs incurred in the conduct of the Closed-End Fund's business, including, without limitation the expenses described in the Disclosure Statement.

Expenses to be borne by the Closed-End Fund will reduce the actual returns realized by Closed-End Fund shareholders on their investment in the Closed-End Fund (and may, in certain circumstances, reduce the amount of capital available to be deployed by the Closed-End Fund in investments). Closed-End Fund expenses include recurring and regular items, as well as extraordinary expenses for which it may be hard to budget or forecast. As a result, the amount of Closed-End Fund expenses ultimately incurred or incurred at any one time may exceed amounts expected or budgeted by the Closed-End Fund.

4.     Transfer and Vesting of Closed-End Fund Assets.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional assets become known and assigned to the Closed-End Fund Assets, and subject to the Minimum Closed-End Fund Conditions, the Debtors shall be deemed to have automatically transferred to the Closed-End Fund all of their

right, title and interest in the Closed-End Fund Assets.  In accordance with sections 363, 365, and/or 1141 of the Bankruptcy Code, as applicable, all such assets shall automatically and irrevocably vest in the Closed-End Fund and clear of all Claims and Liens, subject only to Allowed Claims until paid in full, as set forth in this Plan.  Thereupon, the Debtors shall have no interest in or with respect to such additional assets or the Closed-End Fund.

> (a)  On the Effective Date, Liquidshares will issue to the Liquidating Trust, the Liquidshares CEF Series.

> (b)  On the Effective Date, the Liquidating Trust will issue Liquidating Trust Interests that correspond to the Liquidshares CEF Series to the Electing Customers, subject to such Liquidating Trust Interests being mandatorily exchanged, without further action by the Electing Customers, for shares of the Closed-End Fund in accordance with the terms of this Plan and the Plan Supplement on the Closed-End Fund Exchange Date;

> (c)  On the Closed-End Fund Exchange Date, (x) the Liquidating Trustee, solely in his or her capacity as such, will cause Liquidshares to transfer the Closed-End Fund Assets to the Closed-End Fund, (y) the Closed-End Fund Exchange will automatically occur immediately upon such transfer with respect to Liquidating Trust Interests that correspond to the Liquidshares CEF Series and are outstanding on the Closed-End Fund Exchange Date; and (z) the Liquidshares CEF Series will be extinguished.

All transfers to the Closed-End Fund shall be exempt from any stamp, real estate transfer, mortgage recording, or similar taxes pursuant to section 1146(a) of the Bankruptcy Code.

5.  <u>Regulatory Matters.</u>

Except with respect to any Entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the issuance of the Liquidating Trust Interests that corresponded to the Liquidshares CEF Series to Electing Customers under the Plan (to the extent the Liquidating Trust Interests are considered "securities" under applicable law) and the issuance of the Closed-End Fund Shares to Electing Customers under the Plan shall be exempt from registration under Section 5 of the Securities Act (and any applicable state securities law, referred to herein as "**Blue Sky Laws**") under Section 1145(a)(1) of the Bankruptcy Code. Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The Debtors believe that the transfer and vesting of Closed-End Fund Assets as described above will satisfy the requirements of Section 1145 of the Bankruptcy Code, except with respect to any Entity that is an underwriter as defined in Section 1145(b) of the Bankruptcy Code. Any "offer or sale" of the Closed-End Fund Shares (and, to the extent deemed securities under applicable law, the Liquidating Trust Interests that correspond to the Liquidshares CEF Series) that is made to Electing Customers is made under the Plan and in exchange for Allowed Claims against the Debtors, within the meaning of Section 1145(a)(1) of the Bankruptcy Code.

To the extent Section 1145 of the Bankruptcy Code is applicable to securities to be issued under the Plan, such securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. In addition, securities may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance. Notwithstanding the foregoing, any securities or instruments issued under the Plan remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, in the Closed-End Fund Governing Documents or the Liquidating Trust Agreement on the transferability of such securities and instruments; and (z) any other applicable regulatory approval. The availability of the exemptions under Section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

      6.    <u>Term, Dissolution, and Liquidation</u>.

The Closed-End Fund has an indefinite term. In the event the Board of Trustees elects to liquidate the Closed-End Fund, after paying or adequately providing for the payment of all liabilities of the Closed-End Fund and the liquidation preference with respect to any outstanding preferred shares, and upon receipt of such releases, indemnities and refunding agreements as they deem necessary for their protection, the Board of Trustees may distribute the remaining assets of the Closed-End Fund among the classes of the Closed-End Fund Shares in accordance with the respective rights of such classes.

E.    *Creation of the Wind-Down Trust*.

The Wind-Down Trust will be formed on the Effective Date to effect the liquidation and distribution of the Wind-Down Trust Assets, as well as any and all transactions incidental thereto, in accordance with the Plan, the Confirmation Order, and the Wind-Down Trust Agreement. The corpus of the Wind-Down Trust shall consist of the Wind-Down Trust Assets. On the Effective Date, pursuant to the Plan and in accordance with the Wind-Down Trust Agreement, the Wind-Down Trust Assets shall be irrevocably transferred to and vest in the Wind-Down Trust free and clear of any and all actual or alleged prepetition and postpetition Claims, Causes of Action,

Interests, Liens, other encumbrances and liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Wind-Down Trust Agreement.  From and after the Effective Date, all proceeds of the Wind-Down Trust Assets shall be paid to the Wind-Down Trust to be applied in accordance with the Plan.  Upon the transfer of the Wind-Down Trust Assets to the Wind-Down Trust, the Debtors will have no reversionary or further interest in or with respect to the Wind-Down Trust Assets.

A Wind-Down Trust will be created on or before the Effective Date.

The Wind-Down Trust Interests shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

The Wind-Down Trust shall be established to liquidate the Wind-Down Trust Assets and make distributions in accordance with the Plan, Confirmation Order, and Wind-Down Trust Agreement, and in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust.  The Wind-Down Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.  Accordingly, the Wind-Down Trust Beneficiaries shall be treated for U.S. federal income tax purposes (1) as direct recipients of undivided interests in the Wind-Down Trust Assets (other than to the extent the Wind-Down Trust Assets are allocable to Disputed Claims) and as having immediately contributed such assets to the Wind-Down Trust, and (2) thereafter, as the grantors and deemed owners of the Wind-Down Trust and thus, the direct owners of an undivided interest in the Wind-Down Trust Assets (other than such Wind-Down Trust Assets that are allocable to Disputed Claims).

1.      Preservation of Confidences and Attorney-Client Privilege.

In connection with the vesting and transfer of assets to the Wind-Down Trust, including rights and the Retained Causes of Action, access to books and records, any documents and information produced by third parties to the Debtors or Special Subcommittee, any attorney-client privilege of the Debtors, and work-product protection or other privilege or immunity attaching to any documents or  communications (whether written or oral) transferred to the Wind-Down Trust shall vest in the Wind-Down Trust; *provided*, that the Special Subcommittee shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Wind-Down Trust or any other Person or Entity without the prior written consent of the Special Subcommittee's Chairperson, Jeremy Rosenthal, in which case such documents will continue to be subject to the attorney-client privilege of the Debtors and work product protections or other privilege and immunity which shall be transferred as specified in the proceeding section of this sentence.  The Wind-Down Trustee is authorized and the Debtors are directed to take all necessary actions to effectuate the transfer contemplated in this paragraph, including the transfer of such privileges, protections, and immunities.

2.      <u>Wind-Down Trustee</u>.

On the Effective Date, the Wind-Down Trustee shall be the sole authorized representative and signatory of the Wind-Down Trust Agreement (if any), with authority to render all services necessary to effectuate the terms of this Plan as they relate to the Wind-Down Trust.

The powers, authority, responsibilities, and duties of the Wind-Down Trustee shall be governed by this Plan, the Confirmation Order, and the Wind-Down Trust Agreement. The Wind-Down Trustee shall have no duty to the Debtors.

The Wind-Down Trustee may execute, deliver, file, or record such documents, instruments, releases, and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan as they relate to the Wind-Down Trust.

The Committee shall select the Wind-Down Trustee, and its identity shall be disclosed by the Debtors at or prior to the Confirmation Hearing. Any successor Wind-Down Trustee shall be appointed pursuant to the Wind-Down Trust Agreement.

Additional information regarding the Wind-Down Trustee will be set forth in the Plan Supplement, including further detail with respect to the Wind-Down Trustee's responsibilities and authority, powers and limitations, compensation, and professionals. The Plan Supplement will also contain additional information regarding the establishment and administration of any reserves needed to address Disputed Claims, if any.

3.      <u>Wind-Down Trustee's Authority and Duties</u>.

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Wind-Down Trust, and shall have all powers, rights and duties of a trustee, as set forth in the Wind-Down Trust Agreement, subject to oversight by the Wind-Down Trust Oversight Committee (as defined in the Wind-Down Trust Agreement).

Among other things, the Wind-Down Trustee shall:

(a)      hold and administer the Wind-Down Trust Assets, all of which shall be automatically transferred to the Wind-Down Trust;

(b)      administer the Platform Cash, as described herein;

(c)      have the sole authority and discretion on behalf of the Wind-Down Trust to evaluate and determine strategy with respect to the Retained Causes of Action, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Retained Causes of Action on behalf of the Wind-Down Trust on any terms and conditions as it may determine in good faith based on the best interests of Wind-Down Trust Beneficiaries;

(d)    have the power and authority to retain, as an expense of the Wind-Down Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Wind-Down Trustee hereunder or in the Wind-Down Trust Agreement;

(e)    have the power and authority to obtain funding for the Wind-Down Trust, either from the sale of Funding Securities or from a third party;

(f)    make distributions to Wind-Down Trust Beneficiaries as provided in the Wind-Down Trust Agreement and the Plan;

(g)    have the right to receive reasonable compensation for performing services as the Wind-Down Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Wind-Down Trustee in performing the duties and responsibilities required under the Plan and the Wind-Down Trust Agreement;

(h)    file, litigate, settle, compromise or withdraw objections to Claims;

(i)    take any and all actions necessary of advisable to wind down the Debtors, their subsidiaries, affiliates, and Estates, including the platform, as provided in the Wind-Down Trust Agreement or the Liquidating Trust Agreement and with respect to Liquidshares, the Wind-Down Trustee and the Liquidating Trustee shall cooperate in the orderly wind up of Liquidshares when appropriate;

(j)    be considered an estate representative as provided for under section 1123 of the Bankruptcy Code with respect to the assets placed in the Wind-Down Trust;

(k)    have the right to provide periodic reports and updates to Wind-Down Trust Beneficiaries regarding the status of the administration of the Wind-Down Trust Assets, including the Retained Causes of Action;

(l)    enforce and defend the provisions of Article IX.C., IX.D., and IX.F of this Plan, including the assumption and retention of D&O Liability Insurance Policies. The Wind Down Trust agreement will incorporate the obligations to assume and procure the D&O Liability Insurance Policies and these enforcement provisions; and

(m)    Sell the Reserved Securities, as provided in the Plan and the Wind-Down Trust Agreement.

4.    <u>Transfer and Vesting of Assets to Wind-Down Trust</u>.

On the Effective Date, pursuant to this Plan and in accordance with the Wind-Down Trust Agreement, all rights, title, and interests in and to the Wind-Down Trust Assets shall be irrevocably

transferred to the Wind-Down Trust.  In accordance with section 1141 of the Bankruptcy Code, the Wind-Down Trust shall have no liability for, and the Wind-Down Trust Assets shall automatically vest in the Wind-Down Trust free and clear of, any and all actual or alleged pre-petition and post-petition Claims, Retained Causes of Action, Interests, Liens, encumbrances, or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates, or their property based on any acts or omissions prior to the Effective Date, except as expressly set forth in this Plan and the Wind-Down Trust Agreement.

All transfers to the Wind-Down Trust shall be exempt from any stamp, real estate transfer, mortgage recording, or similar taxes pursuant to section 1146(a) of the Bankruptcy Code.

5.    Exited Customer Cash Pool.

On or prior to the Effective Date, the Debtors shall establish and fund the Exited Customer Cash Pool.

The Debtors and/or the Wind-Down Trustee shall not commingle any funds contained in the Exited Customer Cash Pool and the Wind-Down Trustee shall use such funds to pay only the Exited Customer Claims, as and when Allowed.  No Liens or Claims shall encumber the Exited Customer Cash Pool in any way.

6.    Administration of the Wind-Down Trust Assets.

From and after the Effective Date, the Wind-Down Trustee shall administer all assets of the Wind-Down Trust in accordance with the Plan, the Wind-Down Trust Agreement, and the Confirmation Order.

Proceeds of Wind-Down Trust Assets (apart from the Exited Customer Cash Pool, which shall only be used to pay Exited Customer Claims) shall be paid to the applicable Holders of Allowed Claims, on a *pro rata* basis, in the following priority and amounts (the "**Wind-Down Trust Waterfall**"):

(a)    First, to satisfy all costs and expenses of the Wind-Down Trust, as set forth in the Wind-Down Trust Agreement.

(b)    Second, payment of any Allowed Administrative Claims not paid in full prior to the Effective Date.

(c)    Third, to payment of Allowed Convenience Trade Claims.

(d)    Fourth, *pari passu* payment of any Allowed Other General Unsecured Claims, Allowed Customer Deficiency Claims, Allowed Customer Rescission Claims, and Allowed Unsubordinated Governmental Claims, as modified pursuant to the Customer Recission Claims Settlement Pursuant to Article IV.B. of the Plan.

(e)    Fifth, payment of interest on all claims in the preceding section (iii).

(f)     Sixth, if there are any remaining proceeds, payment of Allowed Subordinated Governmental Claims, and Allowed Subordinated Claims.

(g)     Seventh, if there are any remaining proceeds, payment of Allowed Existing Equity Interests.

7.     <u>Administration of Platform Cash</u>.

On the Effective Date, or as soon thereafter as the Wind-Down Trustee determines, in his or her discretion, and before or upon winding down the Debtors' platform, the Wind-Down Trustee shall cause checks or wires to be issued to Customers for whose benefit the Debtors hold Platform Cash, each in the amount of Platform Cash held for any such Customer, as set forth in the Wind-Down Trust Agreement. The Wind-Down Trustee shall send a notice electronically requesting that Customers withdraw their Platform Cash. 60 days after such notice, the Wind-Down Trustee shall have the authority to issue a check or wire to such Customers based on the address or bank account information for each such Customer in the Debtors' books and records, without further notice to any Entity and without further order of the Court.

8.     <u>Termination of the Wind-Down Trust</u>.

The Wind-Down Trust shall terminate upon the earlier to occur of (a) the completion of all distributions required to be made under the Plan and the Wind-Down Trust Agreement or (b) five (5) years from the Effective Date, subject to such extensions as may be approved by the Bankruptcy Court upon motion of the Wind-Down Trustee. Any remaining assets of the Wind-Down Trust at the time of termination shall be distributed in accordance with the Wind-Down Trust Agreement.

9.     <u>Regulatory Matters</u>.

The interests of Wind-Down Trust Beneficiaries in the Wind-Down Trust are not intended to be Securities within the meaning of the Securities Act.  However, to the extent that any such interests are deemed to be Securities, the offer and sale of any such interests in the Wind-Down Trust to Customers pursuant to the Plan shall be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under Section 5 of the Securities Act and Blue Sky Laws if the following three principal requirements are satisfied: (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

To the extent any "offer or sale" of the interests in the Wind-Down Trust may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Allowed Claims against the Debtors, within the meaning of section 1145(a)(1) of the Bankruptcy Code.  The

interests of Wind-Down Trust Beneficiaries in the Wind-Down Trust shall not be certificated and shall not be transferable except by will, intestate succession or operation of law.

Notwithstanding anything to the contrary in the Plan or the Wind-Down Trust Agreement, the Wind-Down Trust shall not engage in any activities, including with respect to the liquidity option, or otherwise conduct its affairs in a manner that would cause such entity to be required to register as an "investment company" within the meaning of the Investment Company Act, or to register any Wind-Down Trust Interests issued by it under Section 12(g) of the Exchange Act. Similarly, if the Wind-Down Trustee is not registered as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act, it shall not engage in any activities or otherwise conduct its affairs in a manner that would cause the Wind-Down Trustee to be required to register as an investment adviser under the Investment Advisers Act or as a broker-dealer under the Exchange Act.

10.    Certain Tax Matters.

The Wind-Down Trustee shall file tax returns for the Wind-Down Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with the Plan.  Items of taxable income of the Wind-Down Trust (other than otherwise accounted for in a "disputed ownership fund") shall be allocated among the holders of Wind-Down Trust Interests by reference to the manner in which an amount of Cash equal to such taxable income would be distributed  (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Wind-Down Trust had distributed all its assets (valued at their book value, and, if applicable, other than assets allocable to Disputed Claims) to the Wind-Down Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Wind-Down Trust.  Similarly, taxable loss of the Wind-Down Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Wind-Down Trust Assets.

As soon as possible after the Effective Date, the Wind-Down Trustee shall make a good faith valuation of the Wind-Down Trust Assets and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

The Wind-Down Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Wind-Down Trust for all taxable periods through the dissolution thereof.  Nothing in this Article IV.D.10 shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

The Wind-Down Trustee may, to the extent permitted by applicable law, timely elect to treat any Wind-Down Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9.  If a "disputed ownership fund" election is made, all parties (including the Wind-Down Trustee and the holders of Wind-Down Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing.  The Wind-Down Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

F.      *Preservation of Retained Causes of Action.*

Except as otherwise provided herein, in accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, and the rights of the Wind-Down Trustee to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Trustee may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the holders of Wind-Down Trust Interests. No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Trustee, as applicable, will not pursue any and all Retained Causes of Action against it. The Debtors and the Wind-Down Trustee expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity. Unless any Retained Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Wind-Down Trustee expressly reserves all Retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation. The Wind-Down Trustee reserves and shall retain such Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trustee, except as otherwise expressly provided in the Plan. The Wind-Down Trustee through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Retained Causes of Action. The Wind-Down Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, Final Order, or approval of the Bankruptcy Court.

G.      *Process for the Selection of the Liquidating Trustee and Manager of the Closed-End Fund.*

Jefferies will conduct a process to identify and select a Manager for the Closed-End Fund, and a Liquidating Trustee for the Liquidating Trust.  Selection of such Manager and Liquidating Trustee shall be subject to the terms of the Committee Settlement.  The term sheet memorializing the Committee Settlement has been approved by the Court at Docket No. 704. The following process milestones shall apply to the marketing and selection process:

| Date | Process Milestone |
|------|-------------------|
| Week of 11/24/25 | **Launch marketing process; share non-disclosure agreements with all potential bidders** |
| Weeks of 12/1/25 and 12/8/25 | **Process non-disclosure agreements, share request for proposals and supplemental information, initial bidder diligence discussions** |
| Week of 12/8/25 | **Provide process letter with bidding procedures to potential bidders under non-disclosure agreements** |
| 12/15/25 | **Initial bid deadline** |
| Week of 12/15/25 through week of 12/29/25 | **Discussions with bidders and follow-up diligence** |
| 1/5/26 | **Final bid deadline** |
| Week of 1/5/26 | **Evaluation of final bids, negotiation of terms** |
| Week of 1/5/26 | **Announce winning bidder(s) and prepare Plan Supplement to disclose asset manager(s)** |

The procedures applicable to potential bidders for the Manager and Liquidating Trustee positions have been approved by the Court at Docket No. [●].

H.    *Restructuring Transactions.*

Prior to, on or after the Effective Date, and pursuant to the Plan, the Debtor, and the Wind-Down Debtor may enter into the restructuring transactions that are not inconsistent with the Plan (each, a "**Restructuring Transaction**"), and may take any actions as may be necessary or appropriate to affect any or all of the Liquidating Trust, the Closed-End Fund, the Wind-Down Trust, or the dissolution of the Debtors or the Liquidshares special purpose vehicles, if applicable. The Restructuring Transactions, provided they are not inconsistent with the Plan or the Plan Supplement, may include one or more sales, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the reorganized Debtors, the Liquidating Trust, the Closed-End Fund or the Wind-Down Trust to be necessary or appropriate. As of the date hereof, the actions to effect the Restructuring Transaction may include:

- the holdback of Platform Securities to be liquidated via the Closed-End Fund or other financing option in the exercise of the Wind-Down Trustee's business judgment to fund the repayment of the DIP Facility and the Wind-Down Budget;

- the execution and delivery of appropriate instruments of sale, transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and the Plan Supplement and having other terms for which the applicable parties agree, including, without limitation, exercise of rights pursuant to the provisions of Tex. Business Organizations Code § 1.002, *et seq.*, Tex. Business Organizations Code § 10.001 *et seq.,* and any other provisions of Texas law governing divisive mergers or other applicable state law;

- the filing of appropriate certificates or articles of formation, reformation, merger, consolidation, conversion or dissolution pursuant to applicable state law, including specifically the ability to convert Liquidshares to a Texas entity; and

- all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 365, and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

I.    *Management Incentive Plan.*

Pursuant and subject to the approval of the Plan, on and after the Effective Date, the Plan shall facilitate the implementation of the Management Incentive Plan ("**MIP**") to provide a single collective incentive that will be divided among Francis "Dan" Siciliano, Michael Huskins, Cathy Siciliano, Jesus Ancheta and Sean Bowden (each, a "**Key Employee**") whose continued performance is critical to (a) maximizing the value of the estates and (b) ensuring the successful formation of a viable Liquidating Trust and Closed-End Fund.

1.    Conditions Precedent.

Each Key Employee is only eligible for the MIP Payout Amount (as outlined below) if the following conditions precedent are met:

(a)    The Key Employee is an employee in good standing with the Debtors as of the Confirmation Date;

(b)    The Plan is successfully Confirmed;

(c)    Both the Liquidating Trust and the Closed-End Fund are formed in accordance with the Plan and all applicable laws and regulations, and the Key Employee is an employee in good standing with the Debtors as of the date the Liquidating Trust and the Closed-End Fund are formed; and

(d)    The Manager is not an entity that is controlled by or affiliated with the Key Employees.

2.    Incentive Awards.

The following defined terms apply to the MIP.

(a)    "**Average Per-Share Market Price**" means with respect to the Closed-End Fund, the average of the Closing Prices (as defined below) during the Measurement Period (as defined below).

(b)    "**Closing Price**" means the price of the last reported sale of the common stock (or equivalent) of the Closed-End Fund on the principal exchange or market where the Closed-End Fund's common stock is traded during the regular trading session on a given trading day.

(c)    "**Fully Diluted Basis**" means, with respect to the number of shares of the Closed-End Fund's capital stock outstanding, the total number of shares that would be outstanding assuming the conversion, exercise, or exchange of all outstanding securities (whether or not then exercisable or convertible) that are convertible into or exercisable or exchangeable for shares of such capital stock, including, without limitation, all outstanding options, warrants, restricted stock units, restricted stock awards, convertible notes, convertible preferred stock, and similar rights and all shares reserved for issuance under any equity incentive or similar plans, but excluding any such securities that have expired or been cancelled without exercise or conversion.

(d)    "**Market Premium Ratio**" means the quotient of dividing the Total Market Capitalization (as defined below) by the Total Net Asset Value (as defined below). For example, if the Total Market Capitalization is 111 and the Total Net Asset Value is 100, then the Market Premium Ratio would be 1.11x.

(e)    "**Measurement Date**" means the trading day that is 180 calendar days after trading of the Closed-End Fund's common stock commences, provided that if such 180th calendar day after trading commences is not a trading day then the Measurement Date shall be the next trading date after the 180th calendar day.

(f)    "**Measurement Period**" the measurement period is the period from when the Closed-End Fund begins trading until the Measurement Date.

(g)    "**Total Market Capitalization**" means the Average Per-Share Market Price (as defined below) of the Closed-End Fund multiplied by the total shares of capital stock of the Closed-End Fund outstanding on a Fully Diluted Basis as of the Measurement Date.

(h)    "**Total Fair Value**" means the average fair value of all securities held by the Closed-End Fund during the Measurement Period where fair value is calculated in accordance with Section 2(a)(41) of the Investment Company Act and Rule 2a-5 under the Investment Company Act and such fair value shall be calculated on a monthly basis during the Measurement Period.

(i)    "**Total Net Asset Value**" means the difference of (x) Total Fair Value less (y) average liabilities during the Measurement Period.

3.      The Award.

The "**MIP Payout Amount**" is set forth as follows in this Section 3. If the Market Premium Ratio is at or below 1.1x as of the Measurement Date, the MIP Payout Amount is $0. If the Market Premium Ratio is greater than 1.1x, the MIP Payout Amount is the lesser:

(a)      The product of (x) 1/5 multiplied by (y) the difference between Total Market Capitalization less the product of 1.1 multiplied by the Total Fair Value; or

(b)      5% of the Total Market Capitalization or the amount calculated in accordance with the following.

As a condition to the payment of the MIP Payout Amount, if requested by the Manager, the Key Employees, working as independent contractors, shall each provide up to five hours per week of their time during the Measurement Period to help the Manager successfully run the Closed-End Fund, subject to customary and ordinary limitations for vacation, sick days, personal days, disability, and/or death, *provided, however,* that at no time will any Key Employee take on a role that would be deemed to be an Affiliated Person.

The MIP Payout Amount (if otherwise payable pursuant to the MIP) shall be paid to the Key Employees, as determined by Mr. Siciliano, in six equal monthly cash payments starting on the date that is five (5) business days after the Measurement Date. In the alternative, at the option of the Manager, the MIP Payout Amount can be paid in registered, listed, and fully tradable common stock of the Closed-End Fund issued to the Key Employees in a single payment five (5) business days after the Measurement Date.  The MIP Payout Amount shall be subject to the rules and regulations of the Investment Company Act, including with respect to sections 18 and 23 thereof.

The Manager shall have the authority to implement the MIP, in accordance with, and pursuant to the Plan.

J.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects. All matters provided for in this Plan involving the legal or corporate structure of the Debtors, and any corporate action required by the Debtors and the Liquidating Trust and the Closed-End Fund, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, and without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Liquidating Trustee or Manager, as applicable. The authorizations and approvals contemplated by this paragraph shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Liquidating Trustee and Manager are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate,

implement and further evidence the terms and conditions of this Plan, and the corporate actions and transactions contemplated under this Plan, without the need for any approvals, authorizations or consents except for those expressly required pursuant to this Plan.

L.    *Exemption from Certain Taxes and Fees*.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to the Liquidating Trust and from the Liquidating Trust to the Closed-End Fund pursuant to, in contemplation of or in connection with this Plan or pursuant to: (1) the issuance, distribution, transfer or exchange of any debt, Equity Security or other Equity Interest in the Debtors; (2) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment or recording of any lease or sublease; or (4) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instruments of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, or governmental assessment.

M.    *Cancellation of Existing Securities and Agreements*.

On the Effective Date, or such later date as determined by the Debtors or the Wind-Down Trustee, except for the purpose of evidencing a right to a distribution under the Plan or to the extent otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, the Confirmation Order, or the Plan Supplement, all agreements, instruments, certificates, and other documents evidencing Claims or Interests, without any need for further action or approval of the Bankruptcy Court or for a Holder to take further action, shall automatically be deemed discharged, cancelled, and of no further force and effect, and the obligations of the Debtors, any non-Debtor Affiliate, thereunder or in any way related thereto, including any Liens and/or Claims in connection therewith, shall be deemed satisfied in full, cancelled, discharged, released, and of no force or effect.  Holders of or parties to such cancelled instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

N.    *Closing the Chapter 11 Cases*.

As soon as practicable after the Effective Date the Wind-Down Debtors may seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

As of the Effective Date, the Wind-Down Debtors may submit a separate order to the Bankruptcy Court under certification of counsel closing the Chapter 11 Cases of Linqto Texas,

LLC, *et al.* and changing the caption of the Chapter 11 Cases accordingly. Nothing in the Plan shall authorize the closing of any case retroactive to a date that precedes the date any such order is entered. All contested matters and adversary proceedings relating to either of the Debtors, including objections to Claims, shall be filed, administered, and adjudicated in the remaining Chapter 11 Case without the need to reopen the other Chapter 11 Cases. Any request for retroactive relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the Filing of a motion to close the Chapter 11 Cases, the Wind-Down Debtors shall file a final report with respect to the other Chapter 11 Cases.

O.      *Wind-Down Debtors*.

On the Effective Date, the sole director and officer of Linqto shall be disclosed in a Plan Supplement. On the Effective Date, all persons acting as directors and/or managers of Linqto that have not been selected as directors and/or managers of Linqto shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith; *provided*, that the members of the Special Subcommittee shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at the authority and direction of the Special Subcommittee in accordance with the terms of the Plan.  The Special Subcommittee shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Wind-Down Trust or any other Person or Entity without the prior written consent of the Special Subcommittee's Chairperson, Jeremy Rosenthal, in which case such documents will continue to be subject to the attorney-client privilege of the debtors and work product protections or other privilege and immunity which shall be transferred as specified in the proceeding section of this sentence.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*.

On the Effective Date, each Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party, if such Executory Contract or Unexpired Lease (i) has not previously been rejected by order of the Bankruptcy Court or is not the subject of a motion to reject on the Confirmation Date; (ii) is not identified in the Plan Supplement as a contract or lease to be assumed pursuant to the Plan; (iii) is not expressly assumed pursuant to this Plan; (iv) has not expired or terminated by its own terms on or prior to the Effective Date; or (v) has not been assumed or is not the subject of a motion to assume on the Confirmation Date.

Subject to the payment of any Cure Claim (and, if applicable, the provision of adequate assurance of future performance under such Executory Contract or Unexpired Lease), assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting assignment, the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract

or Unexpired Lease at any time before or on the date that the Debtors assume such Executory Contract or Unexpired Lease.

Any change of control provision in any contract, agreement, or other document of the Debtors, including any Executory Contract or Unexpired Lease assumed or assumed and assigned, shall be deemed modified in accordance with section 365 of the Bankruptcy Code such that such assumption or assumption and assignment and the transactions contemplated by this Plan shall not (a) be prohibited, restricted or conditioned on account of such provision or require any consent thereunder, (b) breach or result in the modification or termination of such Executory Contract or Unexpired Lease, (c) result in any penalty or other fees or payments, accelerated or increased obligations, renewal or extension conditions, or any other entitlement in favor of such non-debtor party thereunder or (d) entitle the non-debtor party thereto to do or impose any of the foregoing or otherwise exercise any other default-related rights or remedies with respect thereto. For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or otherwise may not be terminated on account of such assumption or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition or entity conversion that may occur at any time before, on or in connection with the Effective Date. The Debtors may rely on this Plan and the Confirmation Order as a complete defense to any action by a party to an assumed Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease on account of such assumption or on account of this Plan, the transactions contemplated herein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Article V of this Plan shall revest in and be fully enforceable by the Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing and providing for its assumption, or applicable law.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions and rejections (as applicable) of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Notwithstanding the foregoing, before the Effective Date, the Debtors shall have the right to amend the Plan Supplement to revise the list of Executory Contracts and Unexpired Leases being assumed or rejected.

B.      *Assumption of the D&O Liability Insurance Policies and Fiduciary Liability Insurance Policies; Indemnification Obligation.*

The Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the foregoing assumption of each of the D&O Liability Insurance Policies and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Liability Insurance Policies.

In addition and for the avoidance of doubt, after the Effective Date, none of the Debtors shall terminate or otherwise reduce the coverage under any "tail" D&O Liability Insurance Policies

62

covering the Debtors' current boards of directors in effect on or after the Petition Date and, subject to the terms of the applicable D&O Liability Insurance Policies, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

As to directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of each of the Debtors, as applicable, in each case to the extent that such Person or Entity was employed by any of the Debtors on the Petition Date and is a Released Party, the Indemnification Provisions applicable to such Person or Entity shall (1) not be discharged, impaired, or otherwise affected in any way, including by this Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced, or terminated after the Effective Date, and (4) survive the effectiveness of this Plan on terms no less favorable to such directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the reorganized Debtors so long as such Person or Entity is a Released Party.

C.      *Payments Related to Assumption of Executory Contracts and Unexpired Leases*.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided, however*, that the Debtors may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*.

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

E.      *Rejection Damages Claims*.

All Claims arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be Filed with the Claims and Solicitation Agent or the clerk of the Bankruptcy Court and served upon counsel for the Debtors or Wind-Down Debtors (as applicable) within thirty days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving the rejection of such Executory Contract or Unexpired Lease; and (ii) the effective date of such rejection (including the Effective Date). Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as an Other General Unsecured Claim. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by this section will be forever barred from assertion against the Debtors, the Estates or the property of the Estates, the Liquidating Trust, the Closed-End Fund, or the Wind-Down Trust.

F.      *Contracts and Leases Entered Into After the Petition Date*.

Contracts and leases entered into or assumed after the Petition Date by any Debtor that are not assigned to any purchaser in connection with a section 363 sale or the Liquidating Trust (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a Proof of Claim within thirty days after the Effective Date in accordance with this Plan or have their rights forever satisfied, settled, and released.

G.      *Modifications, Amendments, Supplements, Restatements or Other Agreements*.

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, whether executed before or during the Chapter 11 Cases, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, extension rights, purchase rights and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or the Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*.

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors before the Effective Date and the

Wind-Down Debtors after the Effective Date shall have sixty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

I.    *Nonoccurrence of Effective Date*.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts To Be Distributed; Entitlement to Distributions*.

1.    <u>Timing and Calculation of Amounts To Be Distributed</u>.

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VI.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2.    <u>Entitlement to Distributions</u>.

On the Effective Date, the applicable Disbursing Agent shall be authorized to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. If a Claim is transferred (a) twenty-one or more days before the Distribution Record Date and reasonably satisfactory documentation evidencing such transfer is Filed with the Court, the Disbursing Agent shall make the applicable distributions to the applicable transferee, or (b) twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is Filed with the Court and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

B.    *Disbursing Agent*.

Except as otherwise provided herein, all distributions under this Plan shall be made by a Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Liquidating Trust.

C.      *Rights and Powers of Disbursing Agent.*

      1.      <u>Powers of a Disbursing Agent</u>.

A Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof; *provided, however*, that any such Disbursing Agent shall waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under this Plan to be distributed by such Disbursing Agent.

      2.      <u>Expenses Incurred on or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Estate, the Liquidating Trust or Wind-Down Trust, as applicable.

D.      *Distributions on Account of Claims Allowed After the Effective Date.*

      1.      <u>Payments and Distributions on Disputed Claims</u>.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

      2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>.

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Debtors (before the Effective Date) or the Liquidating Trustee (after the Effective Date), (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed or disallowed (with only Allowed portions of such Disputed Claims remaining).

E.      *Minimum Distributions.*

Notwithstanding anything herein to the contrary, other than on account of Claims in Classes 1 and 2, the Liquidating Trustee, Wind-Down Trustee, and the Disbursing Agents, as

applicable, shall not be required to make distributions or payments of less than $100 (whether Cash or otherwise).

F.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

      1.      <u>Delivery of Distributions in General</u>.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims or Interests at the address for each such Holder as indicated on the Debtors' or Liquidating Trust's or Wind-Down Trust's records (as applicable) as of the date of any such distribution.

      2.      <u>Partial Distributions</u>.

The Liquidating Trustee, Wind-Down Trustee, or the Disbursing Agent, as applicable, shall not be required to make partial distributions on account of Allowed Claims.

      3.      <u>Undeliverable Distributions and Unclaimed Property</u>.

          (a)      *Failure To Claim Undeliverable Distributions.*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however,* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the later of (i) the Effective Date and (ii) the date of such distribution. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust or Wind-Down Trust (as applicable) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state or other jurisdiction escheat, abandoned or unclaimed property laws to the contrary), and the Claim or Equity Interest of any Holder to such property or interest in property shall be forever barred. The Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the applicable books and records of the Debtors and the Bankruptcy Court's filings.

          (b)      *Failure To Present Checks.*

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within 180 calendar days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days after the issuance of such check shall be forever barred, estopped and enjoined from asserting any such Claim against the Liquidating Trust, Wind-Down Trust, or their respective property. In such cases, any Cash held for payment on account of such Claims shall be property of the Liquidating Trust or Wind-Down Trust, as applicable, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Liquidating Trust or Wind-Down Trust, as applicable, to attempt to locate any Holder of an Allowed Claim.

G.      *Compliance with Tax Requirements/Allocations*.

In connection with this Plan, to the extent applicable, the Debtors (before the Effective Date) and the Wind-Down Trustee (after the Effective Date) shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Debtors, the Wind-Down Trust and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information, documentation, and certifications necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Wind-Down Trust reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the Wind-Down Trust and Disbursing Agent, or such other Person designated by the Wind-Down Trust and the Disbursing Agent, IRS Form W-9 or, if the payee is a foreign Person, an applicable IRS Form W-9, or any other forms or documents reasonably requested by the Wind-Down Trust or the Disbursing Agent to reduce or eliminate any withholding required by a Governmental Unit.

H.      *Surrender of Canceled Instruments or Securities*.

As a condition precedent to receiving any distribution under this Plan, each Holder of a Claim shall be deemed to have surrendered the Certificates or other documentation underlying each such Claim, and all such surrendered Certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

I.      *Foreign Currency Exchange Rate*.

Except as otherwise provided in a Final Order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, as of the Petition Date.

J.      *Claims Paid or Payable by Third Parties*.

1.      <u>Claims Paid by Third Parties</u>.

The Debtors or Wind-Down Trustee, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Wind-Down

Trustee (or a Disbursing Agent). To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Wind-Down Trustee (or a Disbursing Agent) on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Wind-Down Trustee (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Effective Date.

       2.      <u>Claims Payable by Third Parties</u>.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

       3.      <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Allowance of Claims*.

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Bankruptcy Code or under this Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), on and after the Effective Date, the Liquidating Trust and the Wind-Down Trust, as applicable, will have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interests as of the Petition Date.

B.    *Disallowance of Certain Claims*.

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed

disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed pursuant to this Plan, and Holders of such Claims may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Liquidating Trust or the Wind-Down Trust, as applicable.

C.      *Prosecution of Objections to Claims*.

The Wind-Down Trustee, shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections, including omnibus objections, to Claims as permitted under this Plan. From and after the Effective Date, the Wind-Down Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Wind-Down Trustee shall administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court. The Wind-Down Trustee reserves the right to resolve any Disputed Claim in an appropriate forum outside the jurisdiction of the Bankruptcy Court under applicable governing law.

D.      *Claims Estimation*.

Any Debtor before the Effective Date or the Wind-Down Trustee, after the Effective Date, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor or Wind-Down Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. Notwithstanding any provision otherwise in this Plan, a Claim or any component of a Claim against any Debtor or any post-confirmation vehicle that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless the holder of such Claim obtains a stay pending appeal of the decision disallowing such claim pursuant to applicable rules.  No reserve shall be required to be held against any Claim so estimated at zero. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Wind-Down Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

E.      *No Distribution Pending Allowance*.

If an objection to a Claim is Filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

F.    *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim or Interest or Interest, without any postpetition interest to be paid on account of such Allowed Claim.

G.    *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

# ARTICLE VIII.
# CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A.    *Conditions Precedent to Confirmation.*

1.    The Disclosure Statement shall have been approved as containing "adequate information" under section 1125 of the Bankruptcy Code; and

2.    The Bankruptcy Court shall have found that parties in interest received adequate notice of, and an opportunity to be heard as to, the Disclosure Statement, the Plan, and the Confirmation Hearing.

B.    *Conditions Precedent to the Effective Date.*

1.    It shall be a condition to the Effective Date that the following provisions, terms and conditions are satisfied (or waived pursuant to the provisions of Article VIII.C hereof), and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived:

    (a)    Confirmation shall have occurred, and the Confirmation Order shall not have been vacated and shall not be subject to a stay pending appeal;

    (b)    All actions, documents, certificates, deeds, filings, notifications, pleadings, orders, letters, instruments, and agreements necessary to implement this Plan, including the documents set forth in the Plan Supplement, shall have been effected or executed and delivered to the required parties, in accordance with the Plan (including the Plan Supplement), and, to the extent

required, Filed with the applicable Governmental Units in accordance with applicable laws;

(c)    All approvals and consents of Governmental Units that are legally required for the consummation of this Plan and the occurrence of the Effective Date shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect;

(d)    No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of this Plan; and

(e)    The Professional Fee Claims Reserve shall have been established and funded in Cash in accordance with Article II.C.2.

C.    *Waiver of Conditions.*

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived by the Debtors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.

D.    *Effect of Nonoccurrence of Conditions.*

If the Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE IX.
## SETTLEMENT, RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Equity Interests and Controversies.*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest, or any distribution to be made on account of such Allowed Claim or Allowed Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interest of the Debtors', their Estates and Holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and

Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Trustee may compromise and settle Claims against the Estates and Retained Causes of Action against other Persons or Entities.

B.      *Release of Liens*.

**Except as otherwise provided in this Plan, or the Confirmation Order, or in any contract, instrument, release or other agreement or document amended or created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall vest in the Liquidating Trust.**

C.      *Releases by the Debtors*.

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, the Wind-Down Debtors, and their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the Debtors or their Estates, from any and all Claims and Causes of Action whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that the Debtors, Wind-Down Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the**

Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person or Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) post-Effective Date obligations of any Person or Entity under the Plan, the Confirmation Order, the Plan Administration Process, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan; (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (3) the Retained Causes of Action; (4) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (5) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     *Releases by the Releasing Parties.*

Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected

pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.**

E.      *Opt-Ins*.

The releases in Article IX.D. above will be binding only on a Person or Entity that affirmatively elects to opt in to the releases by checking the Opt-In box on their respective Ballot or via separate Opt-In Form, as applicable.

F.      *Exculpation*.

**Except as otherwise specifically provided in this Plan or the Confirmation Order, to the fullest extent permissible under applicable Law, from and after the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases prior to the Effective Date, including, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, the Independent Investigation, the Filing of the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Filing of the Chapter 11 Cases, the Plan Administration Process, before or during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Except as otherwise specifically provided in this Plan, pursuant to and in accordance with section 1125(e) of the Bankruptcy Code, upon Confirmation, the Debtors and each of their respective current Affiliates, agents, representatives, members, principals, officers, directors, managers, employees, advisors, and attorneys, in each case in their capacity as such, shall be deemed to have participated in good faith and in compliance with applicable**

Law and, therefore is hereby exculpated from and shall not be liable at any time for the violation of any applicable Law, rule, or regulation governing, any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code; or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security, offered or sold under the Plan (to the extent applicable), except for claims related to any act or omission that is determined in a Final Order to have constituted intentional breach of fiduciary duty, actual fraud, willful misconduct, or gross negligence; *provided*, that in all respects the foregoing Persons and Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.

The exculpation hereunder will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

G.    *Injunction*.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR CONFIRMATION ORDER, OR ON ACCOUNT OF OBLIGATIONS ISSUED OR CREATED PURSUANT TO THIS PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, OR CAUSES OF ACTION THAT ARE SUBJECT TO EXCULPATION OR SETTLEMENT ARE PERMANENTLY ENJOINED FROM TAKING THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE RELEASED PARTIES OR THE EXCULPATED PARTIES (OR THE PROPERTY OF SUCH PERSONS OR ENTITIES): (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND; OR (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND, IN EACH CASE IN THE FOREGOING CLAUSES (I) THROUGH (IV), ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED, EXCULPATED, OR SETTLED OR TO BE RELEASED, EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY SUCH PARTY) PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER. ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

No Person or Entity who has held, holds, or may hold Claims, Equity Interests, or Causes of Action may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Released Parties or the Exculpated Parties, as applicable, that relates to or is

**reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article IX.C, Article IX.D, Article IX.E, or Article IX.F without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Released Party or Exculpated Party, as applicable. At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable claim of any kind, the Bankruptcy Court may, or shall if any Released Party or Exculpated Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, each in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under this Plan shall be deemed to have consented to the injunction provisions set forth in this Article IX.G.**

H.      *Setoffs and Recoupment against Holders*.

Except as otherwise expressly provided for in this Plan, the Debtors or Wind-Down Trust, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Equity Interest, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtors or Wind-Down Trust, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Debtors or the Wind-Down Trust (as applicable) of any such claims, rights and Causes of Action that such Debtors or Liquidating Trust (as applicable) may possess against such Holder.

I.      *Setoffs and Recoupment by Holders*.

In no event shall any Holder of Claims or Interests (including those arising from the rejection of any Executory Contracts or Unexpired Leases) be entitled to set off any Claim against any claim, right or Cause of Action of the Debtors or the Wind-Down Trust, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the thirtieth day after the Effective Date. In no event shall any Holder of

Claims (including those arising from the rejection of any Executory Contracts or Unexpired Leases) be entitled to recoup any Claim against any claim, right or Cause of Action of the Debtors or the Wind-Down Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.D of this Plan on or before the thirtieth day after the Effective Date.

Notwithstanding anything to the contrary, nothing shall modify the rights, if any, of any Holder of Claims or any current or former party to an Executory Contract or Unexpired Lease, to assert any right of setoff or recoupment that such party may have under applicable non-bankruptcy law.

## ARTICLE X.
## BINDING NATURE OF PLAN

**THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR VOTED TO REJECT THIS PLAN.**

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Liquidating Trust, the Liquidating Trustee, the Wind-Down Trust, The Wind-Down Trustee, and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims or Equity Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan; *provided, however*, that, from and after the Effective Date, the Liquidating Trustee and the Wind-Down Trustee, as applicable, shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.  resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed;

(c) the Liquidating Trustee amending, modifying, or supplementing, after the Effective Date, pursuant to Article V.G of this Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide or resolve any and all matters related to Retained Causes of Action;

7.      adjudicate, decide or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      resolve any cases, controversies, suits, or disputes that may arise in connection with Other General Unsecured Claims, including the establishment of any bar dates, related notices, claim objections, allowance, disallowance, estimation and distribution;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of this Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with this Plan or the Disclosure Statement;

10.      enter and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code;

11.      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of this Plan n or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, or any Entity's obligations incurred in connection with this Plan;

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan;

13.      resolve any cases, controversies, suits, disputes or Covered Claims with respect to the exculpation, injunctions and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such exculpation, injunctions and other provisions;

14.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Equity Interest for amounts not timely repaid;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

16.     determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with this Plan or the Disclosure Statement;

17.     enter one or more orders or final decrees concluding or closing the Chapter 11 Cases;

18.     adjudicate any and all disputes arising from or relating to distributions under this Plan;

19.     consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with this Plan;

22.     hear and determine matters concerning any tax matters relating to the restructuring, including state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the injunctions, exculpations, and other provisions set forth in Article IX of this Plan;

24.     enforce all orders previously entered by the Bankruptcy Court; and

25.     hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the forgoing, if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.     *Modifications and Amendments*.

Subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan

prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

B.      *Effect of Confirmation on Modifications*.

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

D.      *Substantial Consummation of the Plan*.

Substantial consummation of this Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.      *Successors and Assigns*.

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary or guardian, if any, of each Entity.

B.      *Reservation of Rights*.

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur (except to the extent expressly provided therein). Neither this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by any Debtor with respect to this Plan, the Plan Supplement or the Disclosure Statement

shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests before the Effective Date.

C.      *Further Assurance*.

The Debtors or the Liquidating Trust or Wind-Down Trust, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

D.      *Service of Documents*.

Any pleading, notice or other document required by this Plan to be served on or delivered shall be sent by overnight mail to:

To the Debtors:

> Linqto, Inc.
> P.O. Box 2859
> Sunnyvale, CA 94087
> Attn: Jeffrey S. Stein
>
> with copies to:
>
> Schwartz PLLC
> 440 Louisiana Street, Suite 1055
> Houston, Texas 77002
> Attn:       Gabrielle A. Hamm
>                  (ghamm@nvfirm.com);
>                  Veronica A. Polnick
>                  (vpolnick@nvfirm.com); and
>                  Athanasios E. Agelakopoulos
>                  (aagelakopoulos@nvfirm.com)
> Telephone:  (713) 900-3737
> Facsimile:  (702) 442-9887
>
> and
>
> 601 East Bridger Avenue
> Las Vegas, Nevada 89101
> Attn:       Samuel A. Schwartz
>                  (saschwartz@nvfirm.com)
> Telephone:  (702) 385-5544
> Facsimile:  (702) 442-9887

To the Liquidating Trustee:

> To Be Disclosed in a Plan Supplement

To the Wind-Down Trustee:

> To Be Disclosed in a Plan Supplement

After the Effective Date, the Liquidating Trustee has authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidating Trustee is authorized to limit the list of Entities receiving documents pursuant to a pre-Effective Date request under Bankruptcy Rule 2002 to those Entities who have filed renewed requests pursuant to Bankruptcy Rule 2002.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten Business Days after the date of entry of the Confirmation Order, the Debtors shall serve a notice of Confirmation ("**Confirmation Hearing Notice**") by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address, provided that the Debtors are unable to ascertain new address information for such Entity after a commercially reasonable search. Mailing of such notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances the Petition Date shall be returned to the Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

E. *Term of Injunctions or Stays*.

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

F. *Entire Agreement*.

Except as otherwise indicated herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into this Plan.

G. *Exhibits*.

All exhibits hereto (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall initially be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date to the extent practicable. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and

documents from the Debtors' restructuring website at https://dm.epiq11.com/case/linqto or the Bankruptcy Court's website at www.txs.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

H.   *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of securities offered and sold under this Plan (if any), and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale or purchase of the securities offered and sold under this Plan.

I.   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon (i) the Debtors, the Liquidating Trust, or the Liquidating Trustee, (ii) any and all Holders of Claims and Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), (iii) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, (iv) each Entity acquiring property under the Plan and (v) any and all non-Debtor parties to Executory Contracts and Unexpired Leases. The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

J.   *Conflicts.*

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control. In the event of an inconsistency between the Plan (excluding the Plan Supplement) and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall govern and control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of a conflict between any provision of this Plan and the Confirmation Order, the Confirmation Order shall govern and control.

K.   *Dissolution of the Committees.*

Each Committee shall dissolve, and the current and former members of each Committee shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided* that the Committees and their respective

Professionals shall have the right to file, prosecute, review, and object to any applications for approval of Fee Claims filed in accordance with Article II.C.1 of this Plan.

L.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof. The Debtors or the Liquidating Trustee or Wind-Down Trustee, as applicable, and all Holders of Claims and Equity Interests receiving distributions pursuant to this Plan (if any) and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

M.    *Tax Reporting and Compliance.*

The Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Dated: December 9, 2025

Respectfully submitted,

**LINQTO TEXAS, LLC**
**(for itself and on behalf of its Debtor affiliates)**
a Texas Corporation

*/s/ Jeffrey S. Stein*
Jeffrey S. Stein
Chief Restructuring Officer

**EXHIBIT B**

**LIQUIDATION ANALYSIS**



**PORTAGE POINT PARTNERS**

# Linqto

*Liquidation Analysis*



DISCUSSION PURPOSES ONLY

DECEMBER 2025

# Table of Contents

1. Liquidation Analysis Summary

2. Detailed Chapter 7 Liquidation Scenario

3. Detailed Chapter 11 Plan of Reorganization Scenario

This presentation is for information purposes only, is confidential and may not be reproduced or distributed. Moreover, this presentation does not constitute an offer to sell, or the solicitation of an offer to buy any product or service. Portage Point Partners, LLC and its affiliates ("Portage Point") expressly disclaims any liability for information contained in, or for omissions from, this presentation. Any estimates and projections contained herein involve significant elements of subjective judgment and analysis which may or may not be correct. Information respecting prior performance is not necessarily indicative of actual results, the realization of which is dependent upon many factors, many of which are beyond the control of Portage Point.



# Liquidation Analysis

*Liquidation Analysis Summary*

DISCUSSION PURPOSES ONLY

# Liquidation Analysis Summary

The Liquidation Analysis evaluates recoveries available to Linqto customers and creditors under two potential scenarios — a Chapter 7 conversion versus the proposed Chapter 11 Plan of Reorganization. The analysis highlights the material recovery differential resulting from an orderly reorganization under the Plan compared to a forced liquidation process under Chapter 7

## OVERVIEW OF ASSUMPTIONS

- The analysis assumes a conversion to Chapter 7 on or about January 18, 2026 (the "Conversion Date"), following termination of the Chapter 11 process
- Upon conversion, the Bankruptcy Court would appoint a Chapter 7 Trustee to oversee the liquidation of all remaining estate assets, including cash, investments, and other receivables
- The Chapter 7 scenario reflects an expedited, forced liquidation process with proceeds reduced by Chapter 7 Trustee commissions, professional fees, and administrative wind-down costs, consistent with typical Chapter 7 administration
- The Chapter 11 Plan of Reorganization scenario assumes the case proceeds under its existing structure and timeline, with customer recoveries delivered through a Closed-End Fund (CEF) or Liquidating Trust (LT), allowing for continued management and orderly realization of portfolio assets
- Overall, the Chapter 11 Plan of Reorganization yields meaningfully higher recoveries for customers (~95%) compared to a Chapter 7 liquidation (~68%), primarily due to lower administrative costs and avoidance of forced asset sales

**CHAPTER 7 SCENARIO CLAIMANT RECOVERY BRIDGE ($M)[1]**



**CHAPTER 11 SCENARIO CLAIMANT RECOVERY BRIDGE ($M)[1]**



The Liquidation Analysis demonstrates that the Proposed Chapter 11 Plan of Reorganization provides a superior outcome for customers, preserving approximately 95% of value versus ~68% under a Chapter 7 conversion, while maintaining an orderly and transparent distribution process

(1)   Values represent the average of Low and High figures from the detailed analyses on pages 7 and 10, respectively

# Liquidation Analysis

*Detailed Chapter 7 Liquidation Scenario*

DISCUSSION PURPOSES ONLY

# Global Notes – Chapter 7 Scenario

| Assets | Notes |
|---|---|
| Cash & Equivalents | 1 |
| Accounts Receivable | 2 |
| Company Shares (Inventory) | 3A |
| Shares Corresponding to Customer Holdings | 3B |
| Security Deposits | 4 |
| PP&E | 5 |
| Expected Tax Refunds and Credits | 6 |
| **Total Distributable Value Before Liquidation Costs** | |
| | |
| **Less: Liquidation Costs** | |
| Estimated Liquidation Overhead | 7 |
| Chapter 7 Trustee Fees | 8 |
| Wind Down Trust Costs | 9 |
| **Total Liquidation Costs** | |
| **Net Liquidation Proceeds to Creditors** | |
| **Distribution of Net Proceeds Available for Creditors** | |
| | |
| **Chapter 11 Claims Types** | Notes |
| **Secured Claims** | |
| Texas Business Personal Property Tax | 10 |
| DIP Financing Claims | 11 |
| **Total Secured Claims** | |
| **Proceeds Available for Next Priority of Creditors** | |
| **Priority Claims** | |
| Administrative Claims | 12 |
| Priority Tax Claims | 13A |
| Priority Non-tax claims | 13B |
| **Total Priority Claims** | |
| **Proceeds Available for Next Priority of Creditors** | |
| **General Unsecured Claims** | |
| Trade Claims | 14A |
| Customer Claims[3] | 14B |
| **Total General Unsecured Claims** | |

## BASIS OF PRESENTATION[1]

**1** Represents the estimated cash balance of as of January 18, 2026

**2** Based on the September Monthly Operating Report (MOR) and the Schedules of Assets and Liabilities (SOAL). Recovery assumes limited collectability given aging and potential litigation-related exposure

**3** Represents Linqto Liquidshares Portfolio of publicly and privately traded securities marked at Fair Market Value (FMV) as of November 30, 2025[2]. Recovery percentage in liquidation scenario is derived from Portage Point Liquidation Simulation

**4** Represents the security deposit from the Washington, D.C. office as reported in the September MOR and SOAL

**5** Represents net book values for furniture, fixtures, equipment, and leasehold improvements from the September MOR and SOAL. Recovery (4–8%) reflects liquidation value after commissions and sale costs

**6** Represents anticipated tax refunds and credits based on the September MOR and SOAL, subject to offset risks

**7** Represents ongoing overhead and administrative support costs required for liquidation activities, including investment team members assisting with executing transactions

**8** Represents trustee compensation calculated in accordance with 11 U.S.C. § 326, based on gross proceeds available for distribution in a Chapter 7 scenario

**9** Represents estimated Wind Down costs, calculated assuming a 30-month wind down using monthly cost estimates derived from the Wind Down Trust Budget

**10** Represents corporate tax obligations for Linqto Texas entity (amount TBD)

**11** Represents the amounts payable to the DIP lender, reflects the minimum MOIC and payment of all fees assuming repayment as of January 18, 2026

**12** Represents a $2.0 million reserve for unknown or unliquidated administrative claims

**13** Represents the priority tax and priority employee claims as listed in the SOAL

**14** Represents customer-related claims tied to the Customer linked shares, including trade claims, exited customer claims, customer deficiency claims and other unsecured obligations as reflected in the SOAL

---

(1)   Terms not otherwise defined herein are ascribed their meaning within the Plan
(2)   FMV is calculated as of 11/30/2025 using the Company's internally developed methodology and judgement
(3)   Customer claims do not include  Customer Rescission Claims which are subject to the Customer Recession Claims Settlement contained in the Plan

DISCUSSION PURPOSES ONLY

# Liquidation Analysis – Chapter 7 Scenario

| Estimated Proceeds Generated | | | Chapter 7 Liquidation | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Potential Recovery | | | |
| | | | Recovery Estimates (%) | | Recovery Estimates ($) | | |
| Assets | Notes | Balance | | | Low | | High |
| Cash & Equivalents | 1 | $ 4,074,000 | 100% | 100% | $ 4,074,000 | $ | 4,074,000 |
| Accounts Receivable | 2 | 1,921,383 | 0% | 0% | - | | - |
| Company Shares (Inventory) | 3A | 9,813,951 | 73% | 77% | 7,197,860 | | 7,548,932 |
| Shares Corresponding to Customer Holdings | 3B | 971,496,017 | 73% | 77% | 712,525,692 | | 747,278,734 |
| Security Deposits | 4 | 4,700 | 50% | 75% | 2,350 | | 3,525 |
| PP&E | 5 | 123,839 | 4% | 8% | 4,954 | | 9,907 |
| Expected Tax Refunds and Credits | 6 | 1,027,986 | 10% | 20% | 102,799 | | 205,597 |
| **Total Distributable Value Before Liquidation Costs** | | **$ 988,461,877** | | | **$ 723,907,654** | **$** | **759,120,695** |
| | | | Cost Estimates (%) | | Cost Estimates ($) | | |
| Less: Liquidation Costs | | Amount | Low | High | Low | | High |
| Estimated Liquidation Overhead | 7 | (2,364,357) | 100% | 100% | (2,364,357) | | (2,364,357) |
| Chapter 7 Trustee Fees | 8 | | 3% | 3% | (21,740,480) | | (22,796,871) |
| Wind Down Trust Costs | 9 | (18,973,563) | 100% | 100% | (18,973,563) | | (18,973,563) |
| **Total Liquidation Costs** | | **$ (21,337,920)** | | | **$ (43,078,399)** | **$** | **(44,134,790)** |
| **Net Liquidation Proceeds to Creditors** | | | | | **$ 680,829,255** | **$** | **714,985,904** |

| Distribution of Net Proceeds Available for Creditors | | | Chapter 7 Liquidation | | | | |
|---|---|---|---|---|---|---|---|
| | | | Recovery Estimates (%) | | Recovery Estimates ($) | | |
| Chapter 11 Claims Types | Notes | Balance | Low | High | Low | | High |
| **Secured Claims** | | | | | | | |
| Texas Business Personal Property Tax | 10 | $ - | 100% | 100% | $ - | $ | - |
| DIP Financing Claims | 11 | 21,612,347 | 100% | 100% | 21,612,347 | | 21,612,347 |
| **Total Secured Claims** | | **$ 21,612,347** | | | **$ 21,612,347** | **$** | **21,612,347** |
| **Proceeds Available for Next Priority of Creditors** | | | | | **$ 659,216,908** | **$** | **693,373,557** |
| **Priority Claims** | | | | | | | |
| Administrative Claims | 12 | $ 2,000,000 | 100% | 100% | $ 2,000,000 | $ | 2,000,000 |
| Priority Tax Claims | 13A | 2,779,000 | 100% | 100% | 2,779,000 | | 2,779,000 |
| Priority Non-tax claims | 13B | 53,912 | 100% | 100% | 53,912 | | 53,912 |
| **Total Priority Claims** | | **$ 4,832,912** | | | **$ 4,832,912** | **$** | **4,832,912** |
| **Proceeds Available for Next Priority of Creditors** | | | | | **$ 654,383,996** | **$** | **688,540,645** |
| **General Unsecured Claims** | | | | | | | |
| Trade Claims | 14A | $ 2,954,042 | 66% | 69% | $ 1,944,680 | $ | 2,046,186 |
| Customer Claims | 14B | 991,079,664 | 66% | 69% | 652,439,316 | | 686,494,459 |
| **Total General Unsecured Claims** | | **$ 994,033,706** | | | **$ 654,383,996** | **$** | **688,540,645** |

Note: Liquidation Analysis does not include any recoveries from prosecution of the Retained Causes of Action

DISCUSSION PURPOSES ONLY

# Liquidation Analysis

*Detailed Chapter 11 Plan of Reorganization Scenario*

DISCUSSION PURPOSES ONLY

# Global Notes – Chapter 11 Scenario

| Assets | Notes |
|---|---|
| Cash & Equivalents | 1 |
| Accounts Receivable | 2 |
| Company Shares (Inventory) | 3A |
| Shares Corresponding to Customer Holdings | 3B |
| Security Deposits | 4 |
| PP&E | 5 |
| Expected Tax Refunds and Credits | 6 |
| **Total Distributable Value Before Liquidation Costs** | |

| Less: Liquidation Costs | |
|---|---|
| Wind Down Trust Costs | 7 |

| **Total Liquidation Costs** | |
|---|---|
| **Net Liquidation Proceeds to Creditors** | |
| **Distribution of Net Proceeds Available for Creditors** | |

| Chapter 11 Claims Types | Notes |
|---|---|
| **Secured Claims** | |
| Texas Business Personal Property Tax | 8 |
| DIP Financing Claims | 9 |
| **Total Secured Claims** | |
| **Proceeds Available for Next Priority of Creditors** | |
| **Priority Claims** | |
| Administrative Claims | 10 |
| Priority Tax Claims | 11A |
| Priority Non-tax claims | 11B |
| **Total Priority Claims** | |
| **Proceeds Available for Next Priority of Creditors** | |
| **General Unsecured Claims** | |
| Trade Claims | 12A |
| Customer Claims[3] | 12B |
| **Total General Unsecured Claims** | |

## BASIS OF PRESENTATION[1]

**1** Represents the estimated cash balance of as of January 18, 2026 (including professional fee escrow)

**2** Based on the September Monthly Operating Report (MOR) and the Schedules of Assets and Liabilities (SOAL). Recovery assumes limited collectability given aging and potential litigation-related exposure

**3** Represents Linqto Liquidshares Portfolio of publicly and privately traded securities marked at Fair Market Value (FMV) as of November 30, 2025[2]. Recovery percentage in liquidation scenario is derived from Portage Point Liquidation Simulation

**4** Represents the security deposit from the Washington, D.C. office as reported in the September MOR and SOAL

**5** Represents net book values for furniture, fixtures, equipment, and leasehold improvements from the September MOR and SOAL. Recovery (4–8%) reflects liquidation value after commissions and sale costs

**6** Represents anticipated tax refunds and credits based on the September MOR and SOAL, subject to offset risks

**7** Represents estimated Wind Down costs, calculated assuming a 24-month wind down using monthly cost estimates derived from the Wind Down Trust Budget

**8** Represents corporate tax obligations for Linqto Texas entity (amount TBD)

**9** Represents the amounts payable to the DIP lender, reflects the minimum MOIC and payment of all fees assuming repayment as of January 18, 2026

**10** Represents a $2.0 million reserve for unknown or unliquidated administrative claims

**11** Represents the priority tax and priority employee claims as listed in the SOAL

**12** Represents customer-related claims tied to the Customer linked shares, including trade claims, exited customer claims, customer deficiency claims and other unsecured obligations as reflected in the SOAL

---

(1)   Terms not otherwise defined herein are ascribed their meaning within the Plan
(2)   FMV is calculated as of 11/30/2025 using the Company's internally developed methodology and judgement
(3)   Customer claims do not include  Customer Rescission Claims which are subject to the Customer Recession Claims Settlement contained in the Plan

DISCUSSION PURPOSES ONLY

# Liquidation Analysis – Chapter 11 Scenario

| Estimated Proceeds Generated | | | Chapter 11 Plan of Reorganization | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Potential Recovery | | |
| | | | Recovery Estimates (%) | | Recovery Estimates ($) | | |
| Assets | Notes | Balance | | | Low | Low | High |
| Cash & Equivalents | 1 | $ 4,074,000 | 100% | 100% | $ 4,074,000 | $ | 4,074,000 |
| Accounts Receivable | 2 | 1,921,383.43 | 0% | 0% | - | | - |
| Company Shares (Inventory) | 3A | 9,813,951.35 | 100% | 100% | 9,813,951.35 | | 9,813,951.35 |
| Shares Corresponding to Customer Holdings | 3B | 971,496,017.33 | 100% | 100% | 971,496,017.33 | | 971,496,017.33 |
| Security Deposits | 4 | 4,700.00 | 50% | 75% | 2,350.00 | | 3,525.00 |
| PP&E | 5 | 123,838.64 | 4% | 8% | 4,953.55 | | 9,907.09 |
| Expected Tax Refunds and Credits | 6 | 1,027,986.00 | 10% | 20% | 102,798.60 | | 205,597.20 |
| **Total Distributable Value Before Liquidation Costs** | | **$ 988,461,877** | | | **$ 985,494,071** | **$** | **985,602,998** |
| | | | Cost Estimates (%) | | Cost Estimates ($) | | |
| Less: Liquidation Costs | | Amount | Low | High | Low | | High |
| Wind Down Trust Costs | 7 | $ (15,178,850) | 100% | 100% | $ (15,178,850) | $ | (15,178,850) |
| | | | | | | | |
| **Total Liquidation Costs** | | **$ (15,178,850)** | | | **$ (15,178,850)** | **$** | **(15,178,850)** |
| **Net Liquidation Proceeds to Creditors** | | | | | **$ 970,315,221** | **$** | **970,424,148** |

| Distribution of Net Proceeds Available for Creditors | | | Chapter 11 Plan of Reorganization | | | | |
|---|---|---|---|---|---|---|---|
| | | | Recovery Estimates (%) | | Recovery Estimates ($) | | |
| Chapter 11 Claims Types | Notes | Balance | Low | High | Low | | High |
| **Secured Claims** | | | | | | | |
| Texas Business Personal Property Tax | 8 | $ - | 100% | 100% | $ - | $ | - |
| DIP Financing Claims | 9 | 21,612,347 | 100% | 100% | 21,612,347 | | 21,612,347 |
| **Total Secured Claims** | | **$ 21,612,347** | | | **$ 21,612,347** | **$** | **21,612,347** |
| **Proceeds Available for Next Priority of Creditors** | | | | | **$ 948,702,874** | **$** | **948,811,801** |
| **Priority Claims** | | | | | | | |
| Administrative Claims | 10 | $ 2,000,000 | 100% | 100% | $ 2,000,000 | $ | 2,000,000 |
| Priority Tax Claims | 11A | 2,779,000 | 100% | 100% | 2,779,000 | | 2,779,000 |
| Priority Non-tax claims | 11B | 53,912 | 100% | 100% | 53,912 | | 53,912 |
| **Total Priority Claims** | | **$ 4,832,912** | | | **$ 4,832,912** | **$** | **4,832,912** |
| **Proceeds Available for Next Priority of Creditors** | | | | | **$ 943,869,962** | **$** | **943,978,889** |
| **General Unsecured Claims** | | | | | | | |
| Trade Claims | 12A | $ 2,954,042 | 95% | 95% | $ 2,804,967 | $ | 2,805,290 |
| Customer Claims | 12B | 991,079,664 | 95% | 95% | 941,064,995 | | 941,173,599 |
| **Total General Unsecured Claims** | | **$ 994,033,706** | | | **$ 943,869,962** | **$** | **943,978,889** |

Note: Liquidation Analysis does not include any recoveries from prosecution of the Retained Causes of Action

DISCUSSION PURPOSES ONLY

10



# PORTAGE POINT PARTNERS

**CHICAGO**
300 North LaSalle | Suite 1420
Chicago, IL 60654

**NEW YORK**
640 Fifth Avenue | 10th Floor
New York, NY 10019

**LOS ANGELES**
11911 San Vicente Boulevard | Suite 360
Los Angeles, CA 90049

**DALLAS**
2100 McKinney Avenue | Suite 1800
Dallas, TX 75201

**ATLANTA**
3333 Piedmont Road NE | Suite 755
Atlanta, GA 30305

**PALM BEACH**
222 Lakeview Avenue | Suite 800
Palm Beach, FL 33401

**TAMPA**
1646 West Snow Avenue | Mailbox 82
Tampa, FL 33606

**HOUSTON**
1980 Post Oak Boulevard | Suite 100
Houston, TX 77056

**BOSTON**
One International Place
Boston, MA 02110

**PHILADELPHIA**
Three Logan Square | 1717 Arch Street | Suite 3830
Philadelphia, PA 19103

**NASHVILLE**
214 Overlook Circle
Brentwood, TN 37027

## EXCELLENCE. INTENSITY. PACE.

www.portagepointpartners.com

**EXHIBIT C**

**LIQUIDSHARES PORTFOLIO COMPANY
VALUATIONS AS OF NOVEMBER 30, 2025**

**Linqto**

*Linqto Liquidshares Portfolio*
*FMV Marks as of 11/30/2025*

| # | Company | Total Shares Owned | FMV per Share | FMV Total |
|---|---------|-------------------:|-------------:|----------:|
| 1 | Abra | 80,000 | $3.50 | $280,000.00 |
| 2 | Acorns | 80,191 | $3.59 | $287,885.69 |
| 3 | Addepar | 105,263 | $3.09 | $324,999.51 |
| 4 | Alchemy | 1,384 | $185.76 | $257,095.30 |
| 5 | Algolia | 8,645 | $12.37 | $106,917.04 |
| 6 | Alloy | 12,460 | $6.00 | $74,697.70 |
| 7 | Alto Pharmacy | 50,000 | $8.11 | $405,500.00 |
| 8 | Anthropic | 244,736 | $203.21 | $49,733,414.40 |
| 9 | ASAPP | 48,500 | $0.38 | $18,430.00 |
| 10 | Astranis Space | 21,645 | $10.02 | $216,882.90 |
| 11 | Automation Anywhere | 26,126 | $4.09 | $106,724.71 |
| 12 | Avathon | 39,864 | $0.89 | $35,478.96 |
| 13 | Axiom Space | 8,880 | $131.87 | $1,170,976.00 |
| 14 | BigID | 76,666 | $1.24 | $95,065.84 |
| 15 | BitGo | 28,151 | $10.06 | $283,058.31 |
| 16 | Bitpay | 209,325 | $1.01 | $210,371.63 |
| 17 | Blockchain Coinvestors | 167,000 | $10.00 | $1,670,000.00 |
| 18 | Blockdaemon | 120,277 | $2.66 | $320,337.74 |
| 19 | Bloomreach | 31,080 | $4.00 | $124,320.00 |
| 20 | Branch Metrics | 11,539 | $12.39 | $142,910.52 |
| 21 | Brex | 12,922 | $11.77 | $152,066.10 |
| 22 | Calm | 42,858 | $2.26 | $96,859.08 |
| 23 | Carbon 3D | 48,860 | $8.52 | $416,287.20 |
| 24 | Cerebras | 779,933 | $38.05 | $29,676,450.65 |
| 25 | Chainalysis | 89,494 | $7.55 | $675,232.23 |
| 26 | Chime | 19,060 | $21.13 | $402,737.80 |
| 27 | Circle | 513,959 | $79.93 | $41,080,742.87 |
| 28 | Cityblock | 4,634 | $8.21 | $38,045.14 |
| 29 | Cohere | 1,495 | $167.00 | $249,665.00 |
| 30 | ConsenSys | 4,673 | $32.78 | $153,162.25 |
| 31 | Copper | 61,000 | $3.33 | $203,130.00 |
| 32 | CoreWeave | 5,500 | $73.12 | $402,160.00 |
| 33 | Cybereason | 83,400 | $0.00 | $0.00 |
| 34 | DailyPay | 6,667 | $17.74 | $118,294.80 |
| 35 | Dapper Labs | 4,840 | $9.51 | $46,028.40 |
| 36 | Databricks | 10,987 | $171.04 | $1,879,260.43 |
| 37 | Dataminr | 14,124 | $9.84 | $138,980.16 |
| 38 | Deel | 3,306 | $36.52 | $120,748.34 |
| 39 | Degreed | 30,208 | $3.09 | $93,342.72 |
| 40 | Discord | 1,137 | $260.27 | $295,926.99 |
| 41 | DriveWealth | 29,000 | $11.74 | $340,460.00 |
| 42 | Dune Analytics | 1,449 | $52.00 | $75,348.00 |
| 43 | Eat Just | 58,825 | $5.06 | $297,458.42 |
| 44 | Eightfold.ai | 17,262 | $2.65 | $45,744.30 |
| 45 | Epic Games | 844 | $421.96 | $356,132.13 |
| 46 | Events.com | 240,000 | $1.67 | $400,800.00 |
| 47 | Fanatics | 5,445 | $40.85 | $222,414.64 |
| 48 | Figment | 84,316 | $2.97 | $250,418.52 |
| 49 | Gecko Robotics | 5,241 | $39.60 | $207,543.60 |
| 50 | Glint Pay | 4,722,223 | $0.18 | $850,000.14 |
| 51 | Groq (Sold) | 103,772 | $33.86 | $3,513,979.35 |
| 52 | H2O.ai | 116,769 | $2.36 | $274,991.00 |
| 53 | Honeybook | 30,488 | $3.07 | $93,445.72 |

**Linqto**

*Linqto Liquidshares Portfolio*
*FMV Marks as of 11/30/2025*

| # | Company | Total Shares Owned | FMV per Share | FMV Total |
|---|---------|-------------------:|--------------:|----------:|
| 54 | Impossible Foods | 39,460 | $1.79 | $70,633.40 |
| 55 | iTrustCapital | 11,764 | $85.00 | $999,940.00 |
| 56 | Kore.ai | 21,740 | $9.83 | $213,704.20 |
| 57 | Kraken | 264,098 | $43.37 | $11,452,609.77 |
| 58 | Lambda Labs | 34,390 | $50.34 | $1,731,278.58 |
| 59 | Ledger | 162,100 | $4.95 | $802,395.00 |
| 60 | Lightmatter | 38,627 | $54.85 | $2,118,594.38 |
| 61 | Linqto | | $0.49 | $0.00 |
| 62 | Liquid Death | 44,094 | $8.58 | $378,216.29 |
| 63 | Locus Robotics | 3,158 | $23.15 | $73,091.91 |
| 64 | M1 Finance | 29,655 | $5.40 | $160,137.00 |
| 65 | Motive | 50,750 | $5.27 | $267,351.00 |
| 66 | Neo4j | 10,000 | $7.89 | $78,900.00 |
| 67 | Optoro | 0 | $0.98 | $0.00 |
| 68 | Patreon | 10,000 | $8.22 | $82,150.00 |
| 69 | Placer.ai | 68,750 | $2.69 | $184,765.63 |
| 70 | Polysign | 10,083,237 | $0.01 | $100,832.37 |
| 71 | Postman | 10,696 | $9.90 | $105,917.14 |
| 72 | Prove Identity | 14,786 | $8.96 | $132,408.63 |
| 73 | Pryon | 44,682 | $6.67 | $297,805.53 |
| 74 | PsiQuantum | 67,332 | $30.88 | $2,079,380.49 |
| 75 | Quantum Space | 461,382 | $1.33 | $613,638.06 |
| 76 | Qumulo | 25,000 | $6.38 | $159,500.00 |
| 77 | Redwood Materials | 9,062 | $44.22 | $400,676.33 |
| 78 | Relativity Space | 228 | $8.89 | $2,026.92 |
| 79 | Ripple | 4,717,787 | $156.52 | $738,437,456.81 |
| 80 | Rippling | 7,462 | $52.91 | $394,844.27 |
| 81 | SambaNova Systems | 59,107 | $14.43 | $852,618.48 |
| 82 | Scale AI | 35,686 | $16.24 | $579,540.64 |
| 83 | SecurityScorecard | 45,000 | $1.98 | $89,100.00 |
| 84 | Shield AI | 11,419 | $80.89 | $923,625.82 |
| 85 | Singlestore | 0 | $1.68 | $0.00 |
| 86 | SnapLogic | 182,945 | $1.23 | $225,632.17 |
| 87 | Solugen | 7,716 | $8.26 | $63,734.16 |
| 88 | Space Exploration Technologies | 148,817 | $225.94 | $33,624,085.02 |
| 89 | Space Perspective | 288,568 | $0.00 | $0.00 |
| 90 | Standard AI | 8,712 | $7.91 | $68,911.92 |
| 91 | Stripe | 54,313 | $44.20 | $2,400,743.23 |
| 92 | Syntiant | 52,091 | $9.50 | $494,734.27 |
| 93 | TAE Technologies | 6,250 | $44.16 | $276,000.00 |
| 94 | Tanium | 41,667 | $4.12 | $171,668.04 |
| 95 | Tealium | 15,000 | $4.49 | $67,350.00 |
| 96 | ThoughtSpot | 42,000 | $3.55 | $149,100.00 |
| 97 | Thrasio | 0 | $0.00 | $0.00 |
| 98 | TradeShift | 54,041 | $1.00 | $54,041.00 |
| 99 | Turo | 27,231 | $8.20 | $223,158.05 |
| 100 | Unstoppable Domains | 30,970 | $13.00 | $402,610.00 |
| 101 | Upgrade | 125,000 | $2.99 | $373,750.00 |
| 102 | Uphold | 6,773,502 | $2.08 | $14,066,305.82 |
| 103 | Varo | 77,330 | $0.97 | $75,010.10 |
| 104 | Viz.ai | 70,000 | $2.29 | $159,950.00 |
| 105 | Wellhub | 4,839 | $30.12 | $145,731.32 |
| 106 | WHOOP | 105,078 | $2.68 | $281,083.65 |
| 107 | Workrise | 534 | $66.64 | $35,585.76 |
| 108 | xAI | 499,184 | $45.73 | $22,826,436.36 |
| 109 | Xpansiv | 21,277 | $4.31 | $91,703.87 |
| 110 | ZincFive | 75,000 | $6.50 | $487,500.00 |
| 111 | Zipline | 53,673 | $31.06 | $1,666,993.93 |
| **Total** | | **33,673,613** | **$** | **981,247,879.50** |

Note: FMV is calculated as of 11/30/2025 using the Company's internally developed methodology and judgement

# EXHIBIT 2

## SOLICITATION AND VOTING PROCEDURES

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) |
| | ) Case No. 25-90186 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

## SOLICITATION AND VOTING PROCEDURES

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**A.      The Combined Hearing.**   The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence at **9:00 a.m. (prevailing Central Time) on February 2, 2026**, before the Honorable Alfredo R. Pérez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, 4th floor, Courtroom 400, Houston, Texas, 77002. **Please be advised that you may participate in the hearing either in person or by an audio or video connection.** Audio communication will be by use of the Court's dial-in facility. You may access the facility at **(832) 917-1510**. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is **282694**. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

the personal information setting.  Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open Court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**B.**     **Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to confirmation of the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, and final approval of the adequacy of the Disclosure Statement is **5:00 p.m. (prevailing Central Time) on January 21, 2026,** (the "**Plan and Disclosure Statement Objection Deadline**").  Any objection to the relief sought at the Combined Hearing must:  (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

**C.**     **The Voting Record Date.**  The Court has established **November 13, 2025**, as the record date for purposes of determining which Holders of Claims in the Voting Classes (as defined herein) are entitled to vote on the Plan (the "**Voting Record Date**").

**D.**     **The Voting Deadline.**  The Court has established **5:00 p.m. (prevailing Central Time) on January 26, 2026**, as the voting deadline (the "**Voting Deadline**") for the Plan.  The Debtors may extend the Voting Deadline, at their discretion, without further order of the Court.  To be counted as votes to accept or reject the Plan, all ballots (collectively, the "**Ballots**") must be properly executed, completed, and delivered in accordance with the instructions provided on or with the Ballot so that they are ***actually received***, in any case, no later than the Voting Deadline by Epiq Corporate Restructuring, LLC, the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases ("**Epiq**") or the "**Claims and Solicitation Agent**").

| | |
|---|---|
| **Ballots Returned By First Class Mail:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 |
| **Ballots Returned by Overnight Courier or Hand Delivery:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

| | |
|---|---|
| **Ballots Submitted Electronically By Online Submission:** | Please visit the Debtors' case website at: https://dm.epiq11.com/linqto and under the Case Actions section of the website, click on "E-Ballot" link and follow the instructions to submit your Ballot.  If you choose to submit your Ballot via Epiq's eBallot Portal, you should <u>not</u> also return a hard copy of your Ballot.<br><br>You will need the unique e-ballot ID on your Ballot to vote via the online portal.<br><br>**"E-Balloting" is the sole manner in which the Ballot will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.** |

## E.    Form, Content, and Manner of Notices

1.    ***The Solicitation Package.***  The Solicitation Package for Holders in Voting Classes shall contain the following:

a.    a copy of the Solicitation and Voting Procedures;

b.     the Cover Letters;

c.    a Ballot that includes an Opt-In Election, together with detailed voting instructions with respect thereto and, only if sent via U.S. Mail, a pre-addressed, postage-prepaid return envelope;

d.    a copy of the Management Selection Procedures;

e.    a copy of the Combined Hearing Notice, which shall provide instructions on how to obtain electronic copies or print copies of the Plan and Disclosure Statement and Conditional Approval Order through the Debtors' case website;

f.    any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

2.    ***Distribution of the Solicitation Packages.***

The Solicitation Package, through the Combined Hearing Notice, shall provide instructions for (a) accessing the Plan and Disclosure Statement and the Conditional Approval Order in electronic format through the Debtors' case website at https://dm.epiq11.com/linqto or (b) obtaining paper and email copies upon request.  All other contents of the Solicitation Package, including the Ballot, Solicitation and Voting Procedures, and Combined Hearing Notice, will be provided in paper format if the package is sent via U.S. Mail.  Any party that receives the materials in electronic format but would prefer paper format may contact the Claims and Solicitation Agent by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422; (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com,

and referencing "Linqto" in the subject line.  Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

Five (5) Business Days after entry of the Conditional Approval Order, or as soon as reasonably practicable thereafter (the "**Solicitation and Notice Deadline**"), the Debtors shall email or mail, or cause to be mailed, the Solicitation Package to (a) all Holders of Claims in the Voting Classes who are entitled to vote, as described in Section F below, and (b) any Holder who would otherwise be entitled to vote in accordance with Section F below.  In addition, the Debtors shall serve, or cause to be served, by electronic mail the Combined Hearing Notice containing all of the materials in the Solicitation Package (excluding the Ballot and Cover Letter) in electronic format on the U.S. Trustee and all parties entitled to receive notice under Bankruptcy Rule 2002.

For purposes of serving the Solicitation Packages, Non-Voting Status Notices, and the Disputed Claims Notices, the Debtors may rely on the email and/or address information for the Voting Class, Non-Voting Classes, and unclassified Claims as compiled, updated, and maintained by the Claims and Solicitation Agent as of the Voting Record Date.  The Debtors and the Claims and Solicitation Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots), Non-Voting Status Notices, or Disputed Claims Notices.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that any Holder of a Claim who has filed duplicative Claims that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

3. ***Resolution of Disputed Claims for Voting Purposes; Resolution Event***

(a) If a Claim in a Voting Class is subject to an objection that is filed with the Court on or prior to seven (7) days before the Voting Deadline:  (i) the Debtors shall cause the applicable Holder to be served with the Disputed Claims Notice (which notice shall be served together with such objection); and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined herein) occurs as provided herein.

(b) If a Claim in the Voting Class is subject to an objection that is filed with the Court less than seven (7) days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

(c) A "Resolution Event" means the occurrence of one or more of the following events no later than two (2) Business Days prior to the Voting Deadline:

(i) an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

(ii) an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

(iii) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim, which allowance may be for voting purposes only, in an agreed-upon amount and such agreement (or notice of such agreement) is conveyed by the Debtors to the Claims and Solicitation Agent by electronic mail or otherwise;

(iv) the pending objection is voluntarily withdrawn by the objecting party; or

(v) parties who timely file an objection prior to the Confirmation Objection Deadline, but fail to cast a ballot prior to the Voting Deadline, may cast a ballot through the time of the Confirmation in connection with the resolution of their objections.

(d) No later than one (1) Business Day following the occurrence of a Resolution Event, the Debtors shall cause the Claims and Solicitation Agent to distribute via email or overnight mail a Solicitation Package and, for overnight packages, a pre-addressed, postage pre-paid envelope to the relevant Holder to the extent such Holder has not already received a Solicitation Package.

**4.** ***Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan and Optional Release Opt-In Form***

Certain Holders of Claims that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code, or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, will receive only the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form attached as **Exhibit 8A** to the Conditional Approval Order. Certain Holders of Claims or Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Deemed to Reject the Plan*, substantially in the form attached as **Exhibit 8B** to the Conditional Approval Order.  Such notice will include the Optional Release Opt-In Form and will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

**F.** **Voting and General Tabulation Procedures**

**1.** ***Holders of Claims Entitled to Vote***

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

(a)    Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; (ii) is not the subject of a pending objection filed with the Court not later than **January 21, 2026** (seven (7) days prior to the Voting Deadline), with respect to which a Resolution Event has not occurred at least two (2) Business Days prior to the Voting Deadline; and (iii) is not the subject of a timely filed motion under Bankruptcy Rule 3018 on or before the Solicitation and Notice Deadline;

(b)    Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely filed Proof of Claim or that are in Classes 3, 4, and/or 8) shall be disallowed for voting purposes (unless the applicable Claims Bar Date has not yet expired, in which case such scheduled Claims would be allowed to vote in the amount of $1.00);

(c)    Holders of Claims that arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, or (ii) in an order entered by the Court, in each case regardless of whether a Proof of Claim has been filed; and

(d)    the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

Notwithstanding the foregoing, Holders of Claims that have been paid in full during these Chapter 11 Cases either through a critical vendor or cure payment (or as per the agreements of the parties) or that are authorized to be paid in full in the ordinary course of business pursuant to an agreement between the parties or order previously entered by the Court shall not be entitled to vote on the Plan on account of such Claims.

## 2.   *Establishing Claim Amounts for Voting Purposes*

**Voting Classes**. Each Holder of a Claim in the Classes listed below as of the Voting Record Date shall be entitled to vote the amount of its Claim in accordance with the procedures set forth below for filed and Scheduled Claims.

Class 4 Customer Claims

Class 5 Convenience Trade Claims

Class 6 Unsubordinated Governmental Claims

Class 7 Other General Unsecured Claims

Class 8 Customer Deficiency Claims

Class 9 Customer Rescission Claims

**Filed and Scheduled Claims**.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Claims and Solicitation Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

(a)     the Claim amount Allowed by order of the Court;

(b)     the Claim amount (i) settled or agreed upon by the Debtors, as reflected in a document filed with the Court, or (ii) set forth in an order of the Court;

(c)     the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under these Solicitation and Voting Procedures;

(d)     the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

(e)     if a Claim, for which a Proof of Claim has been timely filed, is filed for unknown or undetermined amounts, or is wholly unliquidated, or contingent (as determined on the face of the Claim or after a reasonable review of the supporting documentation by the Claims and Solicitation Agent) and such Claim has not been allowed, such Claim shall be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00;

(f)     if a Claim, for which a Proof of Claim was timely filed, is filed as contingent, unliquidated, or disputed in part, such Claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution;

(g)     Customer Deficiency Claims shall be calculated in amount using the Platform Securities Valuation Date and the Customer Deficiency Claim Table;

(h)     the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is

7

not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided further* that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00;

(i)    Proofs of Claim filed for $0.00 are not entitled to vote;

(j)    notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors has objected to such duplicate Claims;

(k)    if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Voting Record Date, the later filed amending Proof of Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Proof of Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim.  Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Voting Record Date shall not be considered for purposes of these tabulation rules; and

(l)    in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**3.    Voting and Ballot Tabulation Procedures**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

(a)    except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely and properly submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors, in their sole discretion, shall be entitled to reject such Ballot as invalid and, therefore, not count it in connection with Confirmation of the Plan;

(b)    the Debtors will file a voting report (the "**Voting Report**") with the Court by **January 30, 2026**, which is two (2) Business Day before the Combined Hearing.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, or lacking necessary information, received via facsimile, or damaged (in each case, an "**Irregular Ballot**").  The Voting Report shall indicate the Debtors' intention with regard to each Irregular Ballot;

(c)      the method of delivery of Ballots to be sent to the Claims and Solicitation Agent is at the election and risk of each Holder.  Except as otherwise provided, a Ballot will be deemed delivered only when the Claims and Solicitation Agent actually receives the properly executed Ballot;

(d)      an executed Ballot is required to be submitted by the Entity submitting such Ballot.  Delivery of a Ballot to the Claims and Solicitation Agent by facsimile, electronic mail, or any electronic means other than the Claims and Solicitation Agent's online portal will not be valid;

(e)      no Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation Agent), or the Debtors' legal or financial advisors and, if so sent, such Ballot will not be counted;

(f)      if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly executed and dated Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

(g)      Holders must vote all of their Claims either to accept or reject the Plan and may not split any votes.  A Ballot that partially rejects and partially accepts the Plan shall not be counted.  Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

(h)      a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

(i)      the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

(j)      neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots to any party other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

(k)      unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Holder of Claims prior to the Voting Deadline or such Ballots will not be counted;

(l)      in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect

9

to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

(m) subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report and subject to final determination by the Court;

(n) if a Claim has been estimated or a Claim has otherwise been Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(o) Customer Deficiency Claims shall be calculated in an amount using the Platform Securities Valuation Date and the Customer Deficiency Claim Table;

(p) if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

(q) the following Ballots shall not be counted in determining the acceptance or rejection of the Plan, any Ballot: (i) that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) cast by any Entity that does not hold a Claim in a Voting Class; (iii) cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) that is unsigned or lacking an original signature (for the avoidance of doubt, a Ballot cast via the online balloting portal will be deemed to contain an original signature); and (v) submitted by any Entity not entitled to vote pursuant to the procedures described herein;

(r) after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or an Order of the Court;

(s) the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes;

(t) where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or

10

(iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall be deemed to accept the Plan; and

(u)     for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

## G.     Amendments to the Plan and Solicitation and Voting Procedures

The Debtors reserve the right to make non-substantive or immaterial changes to the Plan and Disclosure Statement (including, for the avoidance of doubt, the Plan Supplement), any Ballot, the Combined Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Plan and Disclosure Statement and any other materials in the Solicitation Package before their distribution.

# **EXHIBIT 3**

**SOLICITATION COVER LETTER**

December 10, 2025

RE:     **In re Linqto Texas, LLC, et al.**
        **Case No. 25-90186 (ARP) (the "Chapter 11 Cases")**

**TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN**:

As you may know, on July 7, 2025 (the "**Petition Date**"), Linqto Texas, LLC and certain of its affiliates (collectively, the "**Debtors**")[1] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. •] (the "**Conditional Approval Order**"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (the "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto. You have received this communication because you are entitled to vote on the Plan.

**The Debtors believe that confirmation and implementation of the Plan is in the best interests of the Debtors' creditors and other stakeholders.  As described in the Plan and Section IX.C.5. of the Disclosure Statement, the Debtors believe that rejection of the Plan would result in a worse recovery for Holders of Claims and Interests than they would receive under the Plan.  Therefore, the Debtors recommend that all Holders of Claims entitled to vote on the Plan cast a vote to <u>accept</u> the Plan.**

As set forth in Article III.B., the Plan provides for the following treatment of Claims that are entitled to vote:

<u>Class 3 Exited Customer Claims</u>

Each Holder of an Allowed Exited Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, a pro rata portion of the Existed Customer Cash Pool sufficient to render such Holders unimpaired.

"***Exited Customer Claim***" means a Claim held by a Customer who had an economic interest in a Platform Security, which was acquired, merged, or otherwise sold during the Chapter 11 Cases, and for which the Debtors received a distribution or other cash payment on account of such acquisition, merger, or

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

other sale that has not been paid to a Customer, and whose Securities were canceled, extinguished, or converted as a result thereof and no continuing Securities in such issuing Entity exists.

<u>Class 4 Customer Claims</u>

Each Holder of an Allowed Customer Claim shall have the option to select between two types of treatment or a combination of the two types of treatment. Holders of Allowed Customer Claims may select between having their interest in the Platform Securities contributed to a Liquidating Trust or to a Closed-End Fund or a combination of both. A description of these two options can be found in Article IV. A and Article IV.B. of this Plan. Should a Holder of Claim in this class not cast a Ballot, the default treatment will be that such Holder's Customer Interests will be transferred to the Closed-End Fund, if the Minimum Closed-End Fund Conditions are met, and, to the Liquidating Trust if not, all as further described in the Plan and the Plan Supplement. Should a Holder of a Claim in this class cast a Ballot and not elect either the Liquidating Trust or the Closed-End Fund (or a combination of both) on their Ballot, the default treatment will be that such Holder's Customer Interests will be transferred to the Liquidating Trust.

Each Holder of an Allowed Customer Claim shall receive a Liquidating Trust Interest, representing such Holder's entitlement based on their Customer Interest as of the Petition Date. If the Minimum Closed-End Fund Conditions are met, the Liquidating Trust Interests that correspond with the Liquidshares CEF Series shall be exchanged for Closed-End Fund Shares on the Closed-End Fund Exchange Date. If the Minimum Closed-End Fund Conditions are not met, all Customer Interests shall be administered through the Liquidating Trust.

The Minimum Closed-End Fund Conditions are described in more detail in Article IV.C.1 of this Plan. On the Closed-End Fund Exchange Date, the Closed-End Fund Assets will be transferred to the Closed-End Fund and the Liquidating Trust Interests of Electing Customers will be automatically exchanged for Closed-End Fund Shares.

**"*Customer Claim*"** means a claim based on the Customer Interest in the Platform Securities which shall be classified and treated in the Plan, *provided, however*, that Customer Claim shall not include Canceled Equity Customer Claims, or Exited Customer Claims.

<u>Class 5 Convenience Trade Claims</u>

Each Allowed Convenience Trade Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, a beneficial interest in the Wind-Down Trust. Such interest shall entitle each Holder of a Trade Claim to its share of the proceeds from the Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall, on account of the portion of such Convenience Trade Claim.

**"*Convenience Trade Claim*"** means Allowed Trade Claims that are less than or equal to $60,000.

<u>Class 6 Unsubordinated Governmental Claims</u>

Each Holder of an Allowed Unsubordinated Governmental Claim shall receive a beneficial interest in the Wind-Down Trust. Such interest shall entitle each Holder of an Allowed Unsubordinated Governmental Claim to its share of the proceeds Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

**"*Unsubordinated Governmental Claims*"** means any Claim held by a Governmental Unit that is not subject to subordination under section 510 of the Bankruptcy Code.

Class 7 Other General Unsecured Claims

Each Holder of an Allowed Other General Unsecured Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Other General Unsecured Claim to its share of the proceeds from the Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall. As of the Effective Date, the Debtors' liability for all Other General Unsecured Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

"**Other General Unsecured Claim**" means any claim that is not an Exited Customer Claim, Customer Claim, Customer Deficiency Claim, Governmental Claim, Intercompany Claim, or Convenience Trade Claim, or not otherwise a Priority Claim, Secured Claim, or Administrative Claim.

Class 8 Customer Deficiency Claims.

Each Holder of an Allowed Customer Deficiency Claim shall receive a beneficial interest in the Wind-Down Trust.  Such interest shall entitle each Holder of an Allowed Customer Deficiency Claim to its share of the proceeds from Wind-Down Trust Assets pursuant to the Wind-Down Trust Waterfall.

As of the Effective Date, the Debtors' liability for all Customer Deficiency Claims shall be (i) assumed by the Wind-Down Trust without further act, deed, or Court order and (ii) administered and paid from the Wind-Down Trust as set forth in the Wind-Down Trust Agreement.

"**Customer Deficiency Claim**"[3] means, for any Holder of a Customer Claim based on a Customer Interest in Funding Securities that are liquidated as set forth herein or in the Plan Supplement, a claim based on the value of any such Holder's interest in such Funding Securities, as set forth in the Customer Deficiency Claim Table.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to Holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

a.  a copy of the Solicitation and Voting Procedures;

b.   the Cover Letters;

c.  a Ballot that includes an Opt-In Election, together with detailed voting instructions with respect thereto and, only if sent via U.S. Mail, a pre-addressed, postage-prepaid return envelope;

d.  a copy of the Management Selection Procedures;

e.  a copy of the Combined Hearing Notice, which shall provide instructions on how to obtain electronic copies or print copies of the Plan and Disclosure Statement and Conditional Approval Order through the Debtors' case website;

---

[3]     By way of example, if a Customer holds a Customer Interest in 100 shares of a Funding Security, and the Liquidating Trust liquidates 5% of its holdings in the Funding Security, such Customer would have a Customer Claim for 100 shares of such Funding Security, for which the treatment would be that such Customer would receive (i) 95 shares of the Funding Security (either contributed to a Liquidating Trust or to a Closed-End Fund, at such Customer's election) and (ii) a Customer Deficiency Claim for the value of 5 shares of such Funding Security, as set forth in the Customer Deficiency Claim Table.

3

f.      any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

---

**The Debtors strongly urge you to cast a vote to ACCEPT the Plan and to properly and timely submit your Ballot in accordance with the instructions in your Ballot.**

**In order to have your vote to accept or reject the Plan counted, your Ballot must actually be received by the Claims and Solicitation Agent on or before the Voting Deadline <u>January 26, 2026, at 5:00 p.m. (prevailing Central Time).</u>**

---

Instructions for casting your Ballot are provided on your Ballot.  You are encouraged to submit your Ballot online via the eBalloting Platform on the Claims and Solicitation Agent's website (https://dm.epiq11.com/linqto).

**PLEASE READ THE PLAN CAREFULLY.  IN PARTICULAR, PLEASE REVIEW THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS PROVIDED IN ARTICLE IX OF THE PLAN.**

The materials in the Solicitation Package are intended to be self-explanatory.  If you would like to access or request electronic or paper copies of the Conditional Approval Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC Ballot Processing c/o Epiq Corporate Restructuring, LLC, P.O. Box 4422, Beaverton, OR 97076 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

Please be advised that the Claims and Solicitation Agent is not authorized to, and will not, provide legal advice to you.  If you need legal advice, please consult with your attorney.

Sincerely,

Linqto Texas, LLC, Linqto, Inc., Linqto Liquidshares LLC and Linqto Liquidshares Manager LLC, each on its own behalf

## EXHIBIT 4

### COMMITTEE COVER LETTER

## The Official Committee of Unsecured
## Creditors of Linqto Texas, LLC, *et al.*

Chapter 11 Case No. 25-90186 (ARP) (Bankr. S.D. Tex.)

c/o Brown Rudnick LLP
Seven Times Square, 47th Floor
New York, NY 10036

-and-

Orrick, Herrington & Sutcliffe LLP
609 Main Street, Fl. 40
Houston, TX 77002-3106

December 10, 2025

To:    Holders of Class 3 Exited Customer Claims, Class 4 Customer Claims, Class 5 Convenience Trade Claims, Class 6 Unsubordinated Governmental Claims, Class 7 Other General Unsecured Claims, and Class 8 Customer Deficiency Claims under the *Joint Chapter 11 Plan of Linqto Texas, LLC and its Debtor Affiliates*

The Official Committee of Unsecured Creditors (the "**Committee**")[1] of Linqto Texas, LLC, *et al.* (the "**Debtors**") submits this letter to all unsecured creditors concerning their consideration of whether to vote in favor of the *Joint Chapter 11 Plan of Linqto Texas, LLC and its Debtor Affiliates* [Docket No. 1135] (the "**Plan**").[2]  You are receiving this letter because the Debtors are soliciting your vote on their Plan.  For the reasons outlined below, the Committee recommends that all unsecured creditors vote to **<u>APPROVE</u>** the Plan.

> **FOR THE REASONS DESCRIBED BELOW, THE COMMITTEE SUPPORTS THE PLAN AND BELIEVES THAT THE RECOVERY BEST SERVES THE INTEREST OF ALL CONSTITUENTS OF THE COMMITTEE.  THE COMMITTEE (A) SUPPORTS THE RELIEF AND TREATMENT (INCLUDING THE DEBTOR AND THIRD-PARTY RELEASES) PROVIDED UNDER THE PLAN AND (B) RECOMMENDS THAT CREDITORS ENTITLED TO VOTE *<u>VOTE IN FAVOR</u>* OF THE PLAN.**
>
> **THE COMMITTEE RECOMMENDS CUSTOMERS CAREFULLY CONSIDER THE LIQUIDATION TRUST AND CLOSED-END FUND AND SELECT ACCORDING TO WHICH BEST MEETS THEIR PERSONAL FINANCIAL GOALS AND NEEDS.**

---

[1]    This letter and the recommendation contained herein are submitted by the Committee as a whole, and not by or on account of any member of the Committee in his, her or its individual capacity.  Committee members, in their individual capacities, reserve all rights with respect to the Plan.

[2]    The Plan and Disclosure Statement are available online at https://ecf.txsb.uscourts.gov/.  Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Disclosure Statement (as defined below) or the Plan.

December 10, 2025
Page 2

## The Committee's Recommendation

The Committee strongly supports the Plan and urges all customers and creditors of the Debtors to vote in favor of the Plan.  The Plan addresses complex issues arising from the intersection of applicable securities laws and Linqto's prepetition failures – under prior management – to comply with those laws, despite its promises to customers.  These failures could have led to costly, value-destructive litigation, and unfavorable outcomes for customers.  Instead, the Plan provides recoveries to customers that are likely better than could be achieved through successful litigation: an estimated return of 95% of their securities or the value thereof.  This value will be delivered **in kind** through one of two structures designed to comply with applicable laws and regulations.  The Plan preserves value for distribution to unsecured creditors (including customers for claims based on the estimated 5% of shares that will not be delivered and recission claims) by funding a litigation trust that will recover on claims against the parties responsible for these cases.

Linqto's business was to create legal structures to allow individuals to invest in private securities that are typically not offered to individual investors.  However, when the Debtors filed these cases, they revealed that the company's prior management had utterly failed to deliver on these promises.  In many instances, the promised structures were never created, or they were created but did not hold the core asset:  the private securities customers intended to invest in.  Linqto also appears to have violated federal securities laws, often in multiple different ways.  As a result, when Linqto filed for bankruptcy, there was serious doubt over whether customers had any legal entitlement to their securities.  Customers faced the risk of being treated as unsecured creditors with claims valued at an arbitrary date (i.e., the date of original purchase) despite significant appreciation in value of their underlying investments.  There was also a serious risk that customers' underlying securities would be considered "property of the estate," used to satisfy non-customer debts, allowing others to benefit from the appreciation in value of such securities.  At the time of filing, Linqto had virtually no liquidity and limited non-customer securities.

The Committee strongly disagreed with this characterization, maintaining that customer securities were held by Linqto in a constructive or resulting trust - directly or indirectly- ensuring they could only be delivered to their rightful owners.  However, litigating these trust and related issues would have been extraordinarily expensive, and with insufficient funds in the Debtors' estates to fund that litigation, customers would likely have borne those costs one way or another.  Moreover, the outcome of that litigation was binary:  either customers or the Debtors would prevail completely, leaving the other side with few ways to advance a reorganization plan.  As a result, even the "best case" litigation outcome would likely resemble the Plan – but at far greater expense, reducing the securities ultimately delivered to customers.  There was also a serious risk that these cases could collapse into a chapter 7 liquidation, where the legal tools that the Plan uses to deliver customer securities to their rightful owners would be unavailable and bankruptcy costs would almost certainly fall on Customers.

Since its appointment, the Committee has focused on the Debtors' business situation, prior fraudulent activities, regulatory issues, financing needs, the nature of customer interests in the Platform Securities, and other factors affecting recoveries for unsecured creditors.  Initially, the

December 10, 2025
Page 3

Committee engaged in negotiations with Linqto and the DIP Lender regarding debtor-in-possession financing [Docket No. 16] (the "**DIP Motion**") and Linqto's motion for authority to use the Ripple sale proceeds [Docket No. 79] (the "**Ripple Motion**").  The Committee's position with respect to the motions was that customers hold an equitable interest in the Platform Securities, meaning those securities did not constitute property of the Debtors' estates – an issue fundamental to these cases and to the relief sought in the DIP Motion and the Ripple Motion.  The Committee communicated these and other objections informally to the Debtors and was prepared to litigate if necessary.  At the same time, the Committee and , John E. Deaton and the creditors he represents (collectively, the "Deaton Parties")entered into negotiations with the Debtors and the DIP Lender to resolve the issues and arrive at a consensual resolution.

## The Plan Settlement

Ultimately, after weeks of hard-fought negotiations, the Committee, the Deaton Parties, and the Debtors reached a global settlement embodied in a term sheet [Docket No. 704, Ex. 1] (the "**Settlement**"), which the Court approved and is incorporated into the Plan.  The Settlement resolved equitable and trust claims regarding customer securities, and other related issues, in exchange for agreement on the essential terms of the Plan, including the treatment of customer claims and other claims.  By doing so, the Settlement avoided the substantial time, risk, and cost of litigating the Committee's constructive and resulting trust claims before the Court.

Following Court approval, the Committee turned its focus on implementing the Settlement through the Plan.  The Committee negotiated and assisted in drafting the Plan and related documents and has worked with the Debtors and others to create a Plan structure that fulfils the Settlement, maximizes recoveries for customers and other creditors, and complies with applicable securities laws.  In addition, the Committee commenced an investigation into misconduct by prior Linqto management and others, evaluating potential claims and causes of action that could yield proceeds to increase recoveries for customers and creditors.  The Committee also analyzed the Debtors' assets, liabilities, and financing needs.

The Plan provides customers with two options:  (i) participation in a Liquidating Trust, which will manage the liquidation and distribution of customer securities in-kind and any proceeds from transfers of those securities; and/or (ii) participation in a Closed-End Fund, in which customers will transfer their securities to a publicly listed fund in exchange for shares in that fund. The Plan also creates  a Wind-Down Trust to pursue claims and causes of action (including claims and causes of action against prior directors and officers) to generate recoveries for creditors.

The structure of the Plan is the best path forward for customers and unsecured creditors under the circumstances.  It achieves the Committee's primary goal:  enabling customers to receive interests in their securities and benefit from future appreciation, while ensuring that customer and other unsecured creditors receive recoveries on account of their claims.

December 10, 2025
Page 4

The primary aspects of the Plan include the following:

- Customer Choice.  Rather than forcing customers into either the Liquidating Trust or the Closed-End Fund, the Plan allows customers to choose the option which best suits their holdings, financial situation, and expectations of future performance.

- Liquidity Option.  The Liquidating Trust will allow customers wishing to sell their securities the opportunity to do so.  The Committee and the Debtors' CRO will jointly select a Liquidating Trustee, who will administer the Trust for the benefit of participating customers participating in the Trust.  The trustee will seek to establish an account with a secondaries platform to enabling sales of certain customer securities during certain designated periods, at the customer's request.  Net proceeds from such sales will be distributed to customers as soon as practicable.  This structure provides liquidity to customers while ensuring compliance with the securities laws.

- Case Funding.  These cases must be funded for customers to recover an interest in their securities and any upside of those securities.  Unfortunately, these costs cannot be funded from the Debtors' assets alone.  These cases are being funded by allocating costs, *first*, to the proceeds of securities which the Debtors themselves own; *second*, to the proceeds of sales of customer securities; and *third*, to the debtor-in-possession financing facility.  In other words, customer securities will be charged – as little as possible – to fund these cases. The Committee estimates this will result in approximately a 5% haircut, *i.e.*, for every 100 securities of a particular company a customer indirectly owned, they will receive approximately 95.  This is only an estimate; the actual percentage depends on factors outside of any parties' control, such as the market value of customer securities. Customers will also have a claim for any securities sold to fund the cases.

The Committee believes that these terms, which are the result of extensive good-faith negotiations between the parties, represent the best possible resolution of the interests and rights of customers and creditors under the circumstances created by Linqto's prior misconduct.

Based on the foregoing, the Committee supports the Plan and believes that the recovery provided to customers and creditors under the Plan represents a negotiated result that best serves the interests of all customers and creditors.  The Committee therefore recommends that customers and creditors vote in favor of the Plan.

*The foregoing description of the Settlement and Plan is not intended as a substitute for the Disclosure Statement.  The Committee cannot provide you with any investment advice. Please review Article X of the Disclosure Statement ("Risk Factors") and Article XI of the Disclosure Statement ("Certain United States Federal Income Tax Consequences Of The Plan").*

Your vote is important.  To have your vote counted, you must complete the ballot previously provided to you in accordance with the procedures set forth therein.  **PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR**

December 10, 2025
Page 5

**BALLOT IN ITS ENTIRETY.** Your ballot must be received ***on or before January 26, 2026 at 5:00 p.m. Central Time to be counted.***

If you have any questions regarding voting procedures or otherwise, please contact counsel to the Committee, Robert J. Stark, Kennth J. Aulet, or Bennett S. Silverberg at (212) 209-4800, or Shari I. Dwoskin at (617) 856-8200.

Very truly yours,

THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS
OF LINQTO TEXAS LLC, *ET AL*.

**EXHIBIT 5**

**CLASS 4 BALLOT**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) |
| | ) Case No. 25-90186 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**CLASS 4: CUSTOMER CLAIM BALLOT FOR
VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE AND OPT IN TO RELEASES**

---

**PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS BEFORE COMPLETING THIS BALLOT.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026 (THE "VOTING DEADLINE"). IF THIS BALLOT IS NOT PROPERLY COMPLETED, EXECUTED, AND RECEIVED BY THE CLAIMS AND SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED.**

**YOU CAN ALSO OBTAIN COPIES IN PAPER FORMAT OF ANY SOLICITATION MATERIALS (A) FREE OF CHARGE BY (I) ACCESSING THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/LINQTO; (II) WRITING TO LINQTO TEXAS, LLC, C/O EPIQ BALLOT PROCESSING, P.O. BOX 4422, BEAVERTON, OR 97076-4422; (III) CALLING (888) 865-2086 (TOLL FREE) OR (971) 265-0883 (INTERNATIONAL); OR (IV) EMAILING BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO "LINQTO" IN THE SUBJECT LINE; OR (B) FOR A FEE VIA PACER AT HTTPS://ECF.TXSB.USCOURTS.GOV/.**

---

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto*

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

*Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**Additional Information.** Your rights are described in the Plan and Disclosure Statement and related materials. If you would like paper copies of the Plan and Disclosure Statement and other Solicitation Materials, or if you need to obtain additional Solicitation Packages, you may obtain them at no charge from Epiq Corporate Restructuring, LLC ("**Epiq**"), the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "**Claims and Solicitation Agent**"), by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

You are receiving this ballot (the "**Ballot**") because records indicate that you are the Holder of a Customer Claim in Class 4 as of November 13, 2025 (the "**Voting Record Date**"). Accordingly, you may have a right to vote to accept or reject the Plan.

**If the Plan is confirmed by the Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.** To have your vote counted, you must complete, sign, and return this Ballot by **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Claims and Solicitation Agent immediately at the address, telephone number, or email address set forth above.

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE IX.D.</u> CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE IX.D.</u> OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN.**

You should review the Plan and Disclosure Statement and the instructions contained herein before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. **THE DEBTORS AND THE CLAIMS AND SOLICITATION AGENT ARE NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

**PLEASE SUBMIT YOUR BALLOT BY *ONLY ONE* OF THE FOLLOWING METHODS AS DETAILED BELOW (1) VIA PAPER BALLOT; OR (2) VIA EBALLOT PORTAL:**

<div style="border:1px solid black; padding:1em;">

<u>**If Submitting Your Vote through the E-Balloting Portal**</u>

**Epiq will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://dm.epiq11.com/linqto, click on the "E-Ballot" link under the Case Actions section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**Epiq's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**If your Ballot is not received by the Claims and Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

</div>

**If you prefer to return a hard copy of your Ballot, you may return it in the preaddressed, postage prepaid envelope or:**

| **By first class mail to:** | **Via overnight courier or hand delivery to:** |
|---|---|
| Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

**Item 1**. Amount of Claim.[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Customer Claims in the following aggregate unpaid amount (insert amount in box below):

> Voting Shares: See **Exhibit A** to this Ballot
>
> Debtor:

**Any admission of Claims and Interest for purposes of voting on the Plan is not an admission of liability on the part of the Debtors or any other party for payment or distribution purposes.**

**Item 2**. Vote on Plan.

The Holder of the Customer Claims set forth in Item 1 votes to (please check only one):

> ☐ **ACCEPT** (vote FOR) the Plan        ☐ **REJECT** (vote AGAINST) the Plan

**Item 3. Customer Claim Election (if you do not make an election below, you will be deemed to have elected 100% to the Liquidating Trust)**

| ☐ 100% Liquidating Trust Option (LT) | ☐ 100% Closed-End Fund Option (CEF) | ☐ Combination (you must choose a box below or your election will default 100% to the Liquidating Trust) | | |
|---|---|---|---|---|
| | | ☐ | **10% LT** | **90% CEF** |
| | | ☐ | **20% LT** | **80% CEF** |
| | | ☐ | **30% LT** | **70% CEF** |
| | | ☐ | **40% LT** | **60% CEF** |
| | | ☐ | **50% LT** | **50% CEF** |
| | | ☐ | **60% LT** | **40% CEF** |
| | | ☐ | **70% LT** | **30% CEF** |
| | | ☐ | **80% LT** | **20% CEF** |
| | | ☐ | **90% LT** | **10% CEF** |
| | | **LT means Liquidating Trust** <br> **CEF means Closed-End Fund** <br><br> **Any alteration of the options in this box will result in your election defaulting entirely (100%) to the Liquidating Trust.** | | |

---

[3]   For voting purposes only, subject to tabulation rules.

**Item 4.** **Important information regarding the third-party release provision in the Plan (the "Third-Party Release") and objection and opt out rights.**

**Article IX.D. of the Plan contains the following Third-Party Release:**

Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction,

agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\* \* \*

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT

---

[4]    The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.  YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

<u>**OPTIONAL RELEASE ELECTION**</u>**.  YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

| |
|---|
| ☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.** |

<u>**Item 5**</u>**. Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim being voted;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)     the Entity has cast the same vote with respect to all of its Claims; and

(d)     no other Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

Name of Holder: _____

(Print or Type)

Signature: _____

Name of Signatory: _____

(If other than Holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

---

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON JANUARY 26, 2026, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1.    The Debtors are soliciting the votes of Holders of Claims with respect to the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.    The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in total dollar amount and more than one-half in number of Claims that actually vote on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code, or for Shares, Holders of at least two-thirds in amount of Shares that actually vote on the Plan.  Please review the Disclosure Statement for more information.

3.    To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein.  **Ballots will not be accepted by electronic mail or facsimile.**

4.    **Use of Ballot**.  To ensure that your Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as instructed herein.

5.      Your Ballot **_must_** be returned to the Claims and Solicitation Agent so as to be **_actually received_** by the Claims and Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is 5:00 p.m. (prevailing Central Time) on January 26, 2026.**

6.      If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, the following Ballots will not be counted:

    (a)    any Ballot that partially rejects and partially accepts the Plan;

    (b)    Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation Agent), any agent, indenture trustee, or the Debtor's financial or legal advisors;

    (c)    Ballots sent by electronic mail or facsimile;

    (d)    any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    (e)    any Ballot cast by an Entity that does not hold a Claim in a Voting Class;

    (f)    any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g)    any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed);

    (h)    any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed original); and/or

    (i)    any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

7.      The method of delivery of Ballots to the Claims and Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Solicitation Agent **_actually receives_** the originally executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

8.      If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9.      You must vote all of your Claims, regardless if such Claims are asserted against one or multiple Debtors, either to accept or reject the Plan and may **_not_** split your vote.

10.    This Ballot does **_not_** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.    **<u>Please be sure to sign and date your Ballot</u>**. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the ballot.

**PLEASE SUBMIT YOUR BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND SOLICITATION AGENT AT:**

**U.S. TOLL FREE: (888) 865-2086**

**INTERNATIONAL: (971) 265-0883**

**OR EMAIL BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO LINQTO IN THE SUBJECT LINE**

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JANUARY 26, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME), AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY AT THE DISCRETION OF THE DEBTORS.**

# **EXHIBIT 5B**

## **CLASS 5 BALLOT**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**CLASS 5: CONVENIENCE TRADE CLAIM BALLOT FOR
VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE AND OPT IN TO RELEASES**

---

**PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS BEFORE COMPLETING THIS BALLOT.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026 (THE "VOTING DEADLINE"). IF THIS BALLOT IS NOT PROPERLY COMPLETED, EXECUTED, AND RECEIVED BY THE CLAIMS AND SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED.**

**YOU CAN ALSO OBTAIN COPIES IN PAPER FORMAT OF ANY SOLICITATION MATERIALS (A) FREE OF CHARGE BY (I) ACCESSING THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/LINQTO; (II) WRITING TO LINQTO TEXAS, LLC, C/O EPIQ BALLOT PROCESSING, P.O. BOX 4422, BEAVERTON, OR 97076-4422; (III) CALLING (888) 865-2086 (TOLL FREE) OR (971) 265-0883 (INTERNATIONAL); OR (IV) EMAILING BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO "LINQTO" IN THE SUBJECT LINE; OR (B) FOR A FEE VIA PACER AT HTTPS://ECF.TXSB.USCOURTS.GOV/.**

---

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

"**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**Additional Information.** Your rights are described in the Plan and Disclosure Statement and related materials. If you would like paper copies of the Plan and Disclosure Statement and other Solicitation Materials, or if you need to obtain additional Solicitation Packages, you may obtain them at no charge from Epiq Corporate Restructuring, LLC ("**Epiq**"), the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "**Claims and Solicitation Agent**"), by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

You are receiving this ballot (the "**Ballot**") because records indicate that you are the Holder of a Convenience Trade Claim in Class 5 as of November 13, 2025 (the "**Voting Record Date**"). Accordingly, you may have a right to vote to accept or reject the Plan.

**If the Plan is confirmed by the Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.** To have your vote counted, you must complete, sign, and return this Ballot by **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Claims and Solicitation Agent immediately at the address, telephone number, or email address set forth above.

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE IX.D.</u> CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE IX.D.</u> OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN.**

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

You should review the Plan and Disclosure Statement and the instructions contained herein before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  **THE DEBTORS AND THE CLAIMS AND SOLICITATION AGENT ARE NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

**PLEASE SUBMIT YOUR BALLOT BY *ONLY ONE* OF THE FOLLOWING METHODS AS DETAILED BELOW (1) VIA PAPER BALLOT; OR (2) VIA EBALLOT PORTAL:**

---

**If Submitting Your Vote through the E-Balloting Portal**

**Epiq will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://dm.epiq11.com/linqto, click on the "E-Ballot" link under the Case Actions section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**Epiq's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**If your Ballot is not received by the Claims and Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

---

**If you prefer to return a hard copy of your Ballot, you may return it in the preaddressed, postage prepaid envelope or:**

| **By first class mail to:** | **Via overnight courier or hand delivery to:** |
|---|---|
| Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

**Item 1**. Amount of Claim.[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Convenience Trade Claims in the following aggregate unpaid amount (insert amount in box below):

Amount: $_____

Debtor: _____

**Any admission of Claims and Interest for purposes of voting on the Plan is not an admission of liability on the part of the Debtors or any other party for payment or distribution purposes.**

**Item 2**. Vote on Plan.

The Holder of the Convenience Trade Claims set forth in Item 1 votes to (please check only one):

☐ **ACCEPT** (vote FOR) the Plan        ☐ **REJECT** (vote AGAINST) the Plan

**Item 3**. Important information regarding the third-party release provision in the Plan (the "**Third-Party Release**") and objection and opt out rights.

Article IX.D. of the Plan contains the following Third-Party Release:

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other**

---

3    For voting purposes only, subject to tabulation rules.

4

applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

*       *       *

5

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.  YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

---

[4]   The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

| |
|---|
| ☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.** |

**Item 4. Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim being voted;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)     the Entity has cast the same vote with respect to all of its Claims; and

(d)     no other Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

| |
|---|
| Name of Holder: _____<br>(Print or Type)<br><br>Signature: _____<br><br>Name of Signatory: _____<br>(If other than Holder)<br><br>Title: _____<br><br>Address: _____<br><br>          _____<br><br>          _____<br><br>Telephone Number: _____<br><br>Email: _____<br><br>Date Completed: _____ |

7

> **IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON JANUARY 26, 2026, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in total dollar amount and more than one-half in number of Claims that actually vote on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code, or for Shares, Holders of at least two-thirds in amount of Shares that actually vote on the Plan. Please review the Disclosure Statement for more information.

3. To ensure that your Ballot is counted, you **must** complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4. **Use of Ballot**. To ensure that your Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as instructed herein.

5. Your Ballot **must** be returned to the Claims and Solicitation Agent so as to be **actually received** by the Claims and Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is 5:00 p.m. (prevailing Central Time) on January 26, 2026.**

6. If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, the following Ballots will not be counted:

   (a) any Ballot that partially rejects and partially accepts the Plan;

   (b) Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation Agent), any agent, indenture trustee, or the Debtor's financial or legal advisors;

   (c) Ballots sent by electronic mail or facsimile;

   (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

   (e) any Ballot cast by an Entity that does not hold a Claim in a Voting Class;

   (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

   (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed);

(h)     any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed original); and/or

(i)     any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

7.     The method of delivery of Ballots to the Claims and Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Solicitation Agent ***actually receives*** the originally executed Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.     If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9.     You must vote all of your Claims, regardless if such Claims are asserted against one or multiple Debtors, either to accept or reject the Plan and may ***not*** split your vote.

10.     This Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.     **Please be sure to sign and date your Ballot**.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the ballot.

### PLEASE SUBMIT YOUR BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND SOLICITATION AGENT AT:**

**U.S. TOLL FREE: (888) 865-2086**

**INTERNATIONAL: (971) 265-0883**

**OR EMAIL BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO LINQTO IN THE SUBJECT LINE**

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JANUARY 26, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME), AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY AT THE DISCRETION OF THE DEBTORS.**

# EXHIBIT 5C

## CLASS 6 BALLOT

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 25-90186 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**CLASS 6: UNSUBORDINATED GOVERNMENTAL CLAIM BALLOT FOR
VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE AND OPT IN TO RELEASES**

---

**PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS BEFORE COMPLETING THIS BALLOT.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026 (THE "<u>VOTING DEADLINE</u>"). IF THIS BALLOT IS NOT PROPERLY COMPLETED, EXECUTED, AND RECEIVED BY THE CLAIMS AND SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED.**

**YOU CAN ALSO OBTAIN COPIES IN PAPER FORMAT OF ANY SOLICITATION MATERIALS (A) FREE OF CHARGE BY (I) ACCESSING THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/LINQTO; (II) WRITING TO LINQTO TEXAS, LLC, C/O EPIQ BALLOT PROCESSING, P.O. BOX 4422, BEAVERTON, OR 97076-4422; (III) CALLING (888) 865-2086 (TOLL FREE) OR (971) 265-0883 (INTERNATIONAL); OR (IV) EMAILING BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO "LINQTO" IN THE SUBJECT LINE; OR (B) FOR A FEE VIA PACER AT HTTPS://ECF.TXSB.USCOURTS.GOV/.**

---

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

1

from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

   **Additional Information.** Your rights are described in the Plan and Disclosure Statement and related materials. If you would like paper copies of the Plan and Disclosure Statement and other Solicitation Materials, or if you need to obtain additional Solicitation Packages, you may obtain them at no charge from Epiq Corporate Restructuring, LLC ("**Epiq**"), the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "**Claims and Solicitation Agent**"), by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

You are receiving this ballot (the "**Ballot**") because records indicate that you are the Holder of a Unsubordinated Governmental Claim in Class 6 as of November 13, 2025 (the "**Voting Record Date**"). Accordingly, you may have a right to vote to accept or reject the Plan.

**If the Plan is confirmed by the Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.** To have your vote counted, you must complete, sign, and return this Ballot by **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Claims and Solicitation Agent immediately at the address, telephone number, or email address set forth above.

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.D. CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN.**

You should review the Plan and Disclosure Statement and the instructions contained herein before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. **THE DEBTORS AND THE CLAIMS AND SOLICITATION AGENT ARE NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

**PLEASE SUBMIT YOUR BALLOT BY *ONLY ONE* OF THE FOLLOWING METHODS AS DETAILED BELOW (1) VIA PAPER BALLOT; OR (2) VIA EBALLOT PORTAL:**

---

<u>**If Submitting Your Vote through the E-Balloting Portal**</u>

**Epiq will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://dm.epiq11.com/linqto, click on the "E-Ballot" link under the Case Actions section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**Epiq's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**If your Ballot is not received by the Claims and Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

---

**If you prefer to return a hard copy of your Ballot, you may return it in the preaddressed, postage prepaid envelope or:**

| **By first class mail to:** | **Via overnight courier or hand delivery to:** |
|:---:|:---:|
| Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

**Item 1**. **Amount of Claim.**[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Unsubordinated Governmental Claims in the following aggregate unpaid amount (insert amount in box below):

> Amount: $_____
>
> Debtor: _____

**Any admission of Claims and Interest for purposes of voting on the Plan is not an admission of liability on the part of the Debtors or any other party for payment or distribution purposes.**

**Item 2**. **Vote on Plan.**

The Holder of the Unsubordinated Governmental Claims set forth in Item 1 votes to (please check only one):

> ☐ **ACCEPT** (vote FOR) the Plan        ☐ **REJECT** (vote AGAINST) the Plan

**Item 3**. **Important information regarding the third-party release provision in the Plan (the "Third-Party Release") and objection and opt out rights.**

**Article IX.D. of the Plan contains the following Third-Party Release:**

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or**

---

[3]    For voting purposes only, subject to tabulation rules.

unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\*      \*      \*

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN. YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

---

[4]    The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION.** **YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.**

**<u>Item 4</u>. Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

    (a)    as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim being voted;

    (b)    the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

    (c)    the Entity has cast the same vote with respect to all of its Claims; and

    (d)    no other Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

Name of Holder: _____
(Print or Type)

Signature: _____

Name of Signatory: _____
(If other than Holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

> **IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON JANUARY 26, 2026, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in total dollar amount and more than one-half in number of Claims that actually vote on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code, or for Shares, Holders of at least two-thirds in amount of Shares that actually vote on the Plan. Please review the Disclosure Statement for more information.

3. To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4. **Use of Ballot**. To ensure that your Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as instructed herein.

5. Your Ballot *must* be returned to the Claims and Solicitation Agent so as to be *actually received* by the Claims and Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is 5:00 p.m. (prevailing Central Time) on January 26, 2026.**

6. If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, the following Ballots will not be counted:

    (a) any Ballot that partially rejects and partially accepts the Plan;

    (b) Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation Agent), any agent, indenture trustee, or the Debtor's financial or legal advisors;

    (c) Ballots sent by electronic mail or facsimile;

    (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    (e) any Ballot cast by an Entity that does not hold a Claim in a Voting Class;

    (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed);

(h)      any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed original); and/or

(i)      any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

7.      The method of delivery of Ballots to the Claims and Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Solicitation Agent ***actually receives*** the originally executed Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.      If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9.      You must vote all of your Claims, regardless if such Claims are asserted against one or multiple Debtors, either to accept or reject the Plan and may ***not*** split your vote.

10.      This Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.      **<u>Please be sure to sign and date your Ballot</u>**.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the ballot.

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY**</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND SOLICITATION AGENT AT:**

**U.S. TOLL FREE: (888) 865-2086**

**INTERNATIONAL: (971) 265-0883**

**OR EMAIL BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO LINQTO IN THE SUBJECT LINE**

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JANUARY 26, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME), AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY AT THE DISCRETION OF THE DEBTORS.**

## **EXHIBIT 5D**

**CLASS 7 BALLOT**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) |
| | ) Case No. 25-90186 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

### CLASS 7: OTHER GENERAL UNSECURED CLAIM BALLOT FOR VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND OPT IN TO RELEASES

---

**PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS BEFORE COMPLETING THIS BALLOT.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026 (THE "<u>VOTING DEADLINE</u>"). IF THIS BALLOT IS NOT PROPERLY COMPLETED, EXECUTED, AND RECEIVED BY THE CLAIMS AND SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED.**

**YOU CAN ALSO OBTAIN COPIES IN PAPER FORMAT OF ANY SOLICITATION MATERIALS (A) FREE OF CHARGE BY (I) ACCESSING THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/LINQTO; (II) WRITING TO LINQTO TEXAS, LLC, C/O EPIQ BALLOT PROCESSING, P.O. BOX 4422, BEAVERTON, OR 97076-4422; (III) CALLING (888) 865-2086 (TOLL FREE) OR (971) 265-0883 (INTERNATIONAL); OR (IV) EMAILING BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO "LINQTO" IN THE SUBJECT LINE; OR (B) FOR A FEE VIA PACER AT HTTPS://ECF.TXSB.USCOURTS.GOV/.**

---

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

"**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**Additional Information.** Your rights are described in the Plan and Disclosure Statement and related materials. If you would like paper copies of the Plan and Disclosure Statement and other Solicitation Materials, or if you need to obtain additional Solicitation Packages, you may obtain them at no charge from Epiq Corporate Restructuring, LLC ("**Epiq**"), the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "**Claims and Solicitation Agent**"), by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

You are receiving this ballot (the "**Ballot**") because records indicate that you are the Holder of a Other General Unsecured Claim in Class 7 as of November 13, 2025 (the "**Voting Record Date**"). Accordingly, you may have a right to vote to accept or reject the Plan.

**If the Plan is confirmed by the Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.** To have your vote counted, you must complete, sign, and return this Ballot by **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Claims and Solicitation Agent immediately at the address, telephone number, or email address set forth above.

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.D. CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN.**

You should review the Plan and Disclosure Statement and the instructions contained herein before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. **THE DEBTORS AND THE CLAIMS AND SOLICITATION AGENT ARE NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

**PLEASE SUBMIT YOUR BALLOT BY *ONLY ONE* OF THE FOLLOWING METHODS AS DETAILED BELOW (1) VIA PAPER BALLOT; OR (2) VIA EBALLOT PORTAL:**

---

**If Submitting Your Vote through the E-Balloting Portal**

**Epiq will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://dm.epiq11.com/linqto, click on the "E-Ballot" link under the Case Actions section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**_____

**Epiq's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**If your Ballot is not received by the Claims and Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

---

If you prefer to return a hard copy of your Ballot, you may return it in the preaddressed, postage prepaid envelope or:

| **By first class mail to:** <br><br> Linqto Texas, LLC <br> c/o Epiq Ballot Processing <br> P.O. Box 4422 <br> Beaverton, OR 97076-4422 | **Via overnight courier or hand delivery to:** <br><br> Linqto Texas, LLC <br> c/o Epiq Ballot Processing <br> 10300 SW Allen Boulevard <br> Beaverton, OR 97005 |
|---|---|

**Item 1**. **Amount of Claim.**[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Other General Unsecured Claims in the following aggregate unpaid amount (insert amount in box below):

Amount: $_____

Debtor: _____

**Any admission of Claims and Interest for purposes of voting on the Plan is not an admission of liability on the part of the Debtors or any other party for payment or distribution purposes.**

**Item 2**. **Vote on Plan.**

The Holder of the Other General Unsecured Claims set forth in Item 1 votes to (please check only one):

☐ **ACCEPT** (vote FOR) the Plan          ☐ **REJECT** (vote AGAINST) the Plan

**Item 3**. **Important information regarding the third-party release provision in the Plan (the "Third-Party Release") and objection and opt out rights.**

**Article IX.D. of the Plan contains the following Third-Party Release:**

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other**

---

[3]   For voting purposes only, subject to tabulation rules.

applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

*        *        *

5

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.  YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

---

[4]     The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

---

☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.**

---

**<u>Item 4</u>. Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim being voted;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)     the Entity has cast the same vote with respect to all of its Claims; and

(d)     no other Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

---

Name of Holder: _____
(Print or Type)

Signature: _____

Name of Signatory: _____
(If other than Holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

---

> **IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON JANUARY 26, 2026, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in total dollar amount and more than one-half in number of Claims that actually vote on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code, or for Shares, Holders of at least two-thirds in amount of Shares that actually vote on the Plan. Please review the Disclosure Statement for more information.

3. To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4. **Use of Ballot**. To ensure that your Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as instructed herein.

5. Your Ballot *must* be returned to the Claims and Solicitation Agent so as to be *actually received* by the Claims and Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is 5:00 p.m. (prevailing Central Time) on January 26, 2026.**

6. If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, the following Ballots will not be counted:

    (a) any Ballot that partially rejects and partially accepts the Plan;

    (b) Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation Agent), any agent, indenture trustee, or the Debtor's financial or legal advisors;

    (c) Ballots sent by electronic mail or facsimile;

    (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    (e) any Ballot cast by an Entity that does not hold a Claim in a Voting Class;

    (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed);

(h)      any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed original); and/or

(i)      any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

7.      The method of delivery of Ballots to the Claims and Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Solicitation Agent ***actually receives*** the originally executed Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.      If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9.      You must vote all of your Claims, regardless if such Claims are asserted against one or multiple Debtors, either to accept or reject the Plan and may ***not*** split your vote.

10.      This Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.      **Please be sure to sign and date your Ballot**.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the ballot.

### PLEASE SUBMIT YOUR BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND SOLICITATION AGENT AT:**

**U.S. TOLL FREE: (888) 865-2086**

**INTERNATIONAL: (971) 265-0883**

**OR EMAIL BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO LINQTO IN THE SUBJECT LINE**

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JANUARY 26, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME), AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY AT THE DISCRETION OF THE DEBTORS.**

**<u>EXHIBIT 5E</u>**

**CLASS 8 BALLOT**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) |
| | )    Case No. 25-90186 |
| Debtors. | ) |
| | )    (Jointly Administered) |
| | ) |

**CLASS 8: CUSTOMER DEFICIENCY CLAIM BALLOT FOR**
**VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF**
**LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO**
**CHAPTER 11 OF THE BANKRUPTCY CODE AND OPT IN TO RELEASES**

---

**PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS BEFORE COMPLETING THIS BALLOT.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026 (THE "<u>VOTING DEADLINE</u>"). IF THIS BALLOT IS NOT PROPERLY COMPLETED, EXECUTED, AND RECEIVED BY THE CLAIMS AND SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED.**

**YOU CAN ALSO OBTAIN COPIES IN PAPER FORMAT OF ANY SOLICITATION MATERIALS (A) FREE OF CHARGE BY (I) ACCESSING THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/LINQTO; (II) WRITING TO LINQTO TEXAS, LLC, C/O EPIQ BALLOT PROCESSING, P.O. BOX 4422, BEAVERTON, OR 97076-4422; (III) CALLING (888) 865-2086 (TOLL FREE) OR (971) 265-0883 (INTERNATIONAL); OR (IV) EMAILING BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO "LINQTO" IN THE SUBJECT LINE; OR (B) FOR A FEE VIA PACER AT HTTPS://ECF.TXSB.USCOURTS.GOV/.**

---

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto*

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

1

*Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

      **Additional Information.** Your rights are described in the Plan and Disclosure Statement and related materials. If you would like paper copies of the Plan and Disclosure Statement and other Solicitation Materials, or if you need to obtain additional Solicitation Packages, you may obtain them at no charge from Epiq Corporate Restructuring, LLC ("**Epiq**"), the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "**Claims and Solicitation Agent**"), by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

You are receiving this ballot (the "**Ballot**") because records indicate that you are the Holder of a Customer Deficiency Claim in Class 8 as of November 13, 2025 (the "**Voting Record Date**"). Accordingly, you may have a right to vote to accept or reject the Plan.

**If the Plan is confirmed by the Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.** To have your vote counted, you must complete, sign, and return this Ballot by **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Claims and Solicitation Agent immediately at the address, telephone number, or email address set forth above.

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE IX.D.</u> CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE IX.D.</u> OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN.**

You should review the Plan and Disclosure Statement and the instructions contained herein before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. **THE DEBTORS AND THE CLAIMS AND SOLICITATION AGENT ARE NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

**PLEASE SUBMIT YOUR BALLOT BY *ONLY ONE* OF THE FOLLOWING METHODS AS DETAILED BELOW (1) VIA PAPER BALLOT; OR (2) VIA EBALLOT PORTAL:**

---

### If Submitting Your Vote through the E-Balloting Portal

**Epiq will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://dm.epiq11.com/linqto, click on the "E-Ballot" link under the Case Actions section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**_____

**Epiq's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**If your Ballot is not received by the Claims and Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

---

**If you prefer to return a hard copy of your Ballot, you may return it in the preaddressed, postage prepaid envelope or:**

| By first class mail to: | Via overnight courier or hand delivery to: |
|---|---|
| Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

**Item 1**. Amount of Claim.[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Customer Deficiency Claims in the following aggregate unpaid amount (insert amount in box below):

> Amount to be determined pursuant to the Solicitation Procedures Docket [•] for tabulation purposes only.
>
> Share Count: See **Exhibit A** to this Ballot
>
> Debtor: _____

**Any admission of Claims and Interest for purposes of voting on the Plan is not an admission of liability on the part of the Debtors or any other party for payment or distribution purposes.**

**Item 2**. **Vote on Plan.**

The Holder of the Customer Deficiency Claims set forth in Item 1 votes to (please check only one):

> ☐ **ACCEPT** (vote FOR) the Plan          ☐ **REJECT** (vote AGAINST) the Plan

**Item 3**. **Important information regarding the third-party release provision in the Plan (the "Third-Party Release") and objection and opt out rights.**

> **Article IX.D. of the Plan contains the following Third-Party Release:**
>
> **Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort**

---

[3]    For voting purposes only, subject to tabulation rules.

or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

*     *     *

5

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.  YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

---

[4]   The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.**

<u>**Item 4**</u>. **Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim being voted;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)     the Entity has cast the same vote with respect to all of its Claims; and

(d)     no other Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

Name of Holder: _____
(Print or Type)

Signature: _____

Name of Signatory: _____
(If other than Holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS
BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON JANUARY 26, 2026,
AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY
THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN
THE DISCRETION OF THE DEBTORS.

### INSTRUCTIONS FOR COMPLETING THIS BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan. **PLEASE READ
    THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING
    THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the
    Holders of at least two-thirds in total dollar amount and more than one-half in number of Claims
    that actually vote on the Plan and if the Plan otherwise satisfies the requirements for confirmation
    provided by section 1129(a) of the Bankruptcy Code, or for Shares, Holders of at least two-thirds
    in amount of Shares that actually vote on the Plan. Please review the Disclosure Statement for
    more information.

3.  To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed
    herein. **Ballots will not be accepted by electronic mail or facsimile.**

4.  **Use of Ballot**. To ensure that your Ballot is counted, you must: (a) complete your Ballot in
    accordance with these instructions; (b) clearly indicate your decision either to accept or reject the
    Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as
    instructed herein.

5.  Your Ballot *must* be returned to the Claims and Solicitation Agent so as to be *actually received* by
    the Claims and Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is 5:00
    p.m. (prevailing Central Time) on January 26, 2026.**

6.  If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may
    be counted only in the sole and absolute discretion of the Debtors. Additionally, the following
    Ballots will not be counted:

    (a)  any Ballot that partially rejects and partially accepts the Plan;

    (b)  Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation
         Agent), any agent, indenture trustee, or the Debtor's financial or legal advisors;

    (c)  Ballots sent by electronic mail or facsimile;

    (d)  any Ballot that is illegible or contains insufficient information to permit the identification
         of the Holder of the Claim;

    (e)  any Ballot cast by an Entity that does not hold a Claim in a Voting Class;

    (f)  any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g)  any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-
         Ballot Portal will be deemed signed);

(h)      any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed original); and/or

(i)      any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

7.      The method of delivery of Ballots to the Claims and Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Solicitation Agent ***actually receives*** the originally executed Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.      If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9.      You must vote all of your Claims, regardless if such Claims are asserted against one or multiple Debtors, either to accept or reject the Plan and may ***not*** split your vote.

10.      This Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.      **Please be sure to sign and date your Ballot**.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the ballot.

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY**</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND SOLICITATION AGENT AT:**

**U.S. TOLL FREE: (888) 865-2086**

**INTERNATIONAL: (971) 265-0883**

**OR EMAIL BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO LINQTO IN THE SUBJECT LINE**

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JANUARY 26, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME), AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY AT THE DISCRETION OF THE DEBTORS.**

**EXHIBIT 5F**

**CLASS 9 BALLOT**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 25-90186 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**CLASS 9:  CUSTOMER RECISSION CLAIM BALLOT FOR
VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
LINQTO TEXAS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE AND OPT IN TO RELEASES**

---

**PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS BEFORE COMPLETING THIS BALLOT.**

**FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026 (THE "<u>VOTING DEADLINE</u>"). IF THIS BALLOT IS NOT PROPERLY COMPLETED, EXECUTED, AND RECEIVED BY THE CLAIMS AND SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED.**

**YOU CAN ALSO OBTAIN COPIES IN PAPER FORMAT OF ANY SOLICITATION MATERIALS (A) FREE OF CHARGE BY (I) ACCESSING THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/LINQTO; (II) WRITING TO LINQTO TEXAS, LLC, C/O EPIQ BALLOT PROCESSING, P.O. BOX 4422, BEAVERTON, OR 97076-4422; (III) CALLING (888) 865-2086 (TOLL FREE) OR (971) 265-0883 (INTERNATIONAL); OR (IV) EMAILING BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO "LINQTO" IN THE SUBJECT LINE; OR (B) FOR A FEE VIA PACER AT HTTPS://ECF.TXSB.USCOURTS.GOV/.**

---

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

"**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**Additional Information.** Your rights are described in the Plan and Disclosure Statement and related materials. If you would like paper copies of the Plan and Disclosure Statement and other Solicitation Materials, or if you need to obtain additional Solicitation Packages, you may obtain them at no charge from Epiq Corporate Restructuring, LLC ("**Epiq**"), the claims and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "**Claims and Solicitation Agent**"), by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

You are receiving this ballot (the "**Ballot**") because records indicate that you are the Holder of a Customer Rescission Claim in Class 9 as of November 13, 2025 (the "**Voting Record Date**"). Accordingly, you may have a right to vote to accept or reject the Plan.

**If the Plan is confirmed by the Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.** To have your vote counted, you must complete, sign, and return this Ballot by **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Claims and Solicitation Agent immediately at the address, telephone number, or email address set forth above.

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.D. CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN.**

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

You should review the Plan and Disclosure Statement and the instructions contained herein before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  **THE DEBTORS AND THE CLAIMS AND SOLICITATION AGENT ARE NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

**PLEASE SUBMIT YOUR BALLOT BY *ONLY ONE* OF THE FOLLOWING METHODS AS DETAILED BELOW (1) VIA PAPER BALLOT; OR (2) VIA EBALLOT PORTAL:**

<table>
<tr><td>

**If Submitting Your Vote through the E-Balloting Portal**

Epiq will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://dm.epiq11.com/linqto, click on the "E-Ballot" link under the Case Actions section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#:_____

Epiq's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

If your Ballot is not received by the Claims and Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.

</td></tr>
</table>

If you prefer to return a hard copy of your Ballot, you may return it in the preaddressed, postage prepaid envelope or:

<table>
<tr>
<td>

**By first class mail to:**

Linqto Texas, LLC
c/o Epiq Ballot Processing
P.O. Box 4422
Beaverton, OR 97076-4422

</td>
<td>

**Via overnight courier or hand delivery to:**

Linqto Texas, LLC
c/o Epiq Ballot Processing
10300 SW Allen Boulevard
Beaverton, OR 97005

</td>
</tr>
</table>

**Item 1**. **Amount of Claim.**[3]

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Customer Recission Claims in the following aggregate unpaid amount (insert amount in box below):

> Amount: $1.00
>
> Share Count: please see Exhibit A to this Ballot
>
> Debtor: _____

**Any admission of Claims and Interest for purposes of voting on the Plan is not an admission of liability on the part of the Debtors or any other party for payment or distribution purposes.**

**Item 2**. **Vote on Plan.**

The Holder of the Customer Recission Claims set forth in Item 1 votes to (please check only one):

> ☐ **ACCEPT** (vote FOR) the Plan          ☐ **REJECT** (vote AGAINST) the Plan

**Item 3**. **Important information regarding the third-party release provision in the Plan (the "Third-Party Release") and objection and opt out rights.**

**Article IX.D. of the Plan contains the following Third-Party Release:**

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other**

---

[3]   For voting purposes only, subject to tabulation rules.

applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\*      \*      \*

5

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE IX OF THE PLAN. YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX OF THE PLAN.**

---

[4]   The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION.   YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

| |
|---|
| ☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.** |

**<u>Item 4</u>. Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim being voted;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)     the Entity has cast the same vote with respect to all of its Claims; and

(d)     no other Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

| |
|---|
| Name of Holder: _____<br>(Print or Type)<br><br>Signature: _____<br><br>Name of Signatory: _____<br>(If other than Holder)<br><br>Title: _____<br><br>Address: _____<br><br>_____<br><br>_____<br><br>Telephone Number: _____<br><br>Email: _____<br><br>Date Completed: _____ |

> IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON JANUARY 26, 2026, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in total dollar amount and more than one-half in number of Claims that actually vote on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code, or for Shares, Holders of at least two-thirds in amount of Shares that actually vote on the Plan. Please review the Disclosure Statement for more information.

3. To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4. **Use of Ballot**. To ensure that your Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as instructed herein.

5. Your Ballot *must* be returned to the Claims and Solicitation Agent so as to be *actually received* by the Claims and Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is 5:00 p.m. (prevailing Central Time) on January 26, 2026.**

6. If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, the following Ballots will not be counted:

   (a) any Ballot that partially rejects and partially accepts the Plan;

   (b) Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Solicitation Agent), any agent, indenture trustee, or the Debtor's financial or legal advisors;

   (c) Ballots sent by electronic mail or facsimile;

   (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

   (e) any Ballot cast by an Entity that does not hold a Claim in a Voting Class;

   (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

   (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed);

8

(h) any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed original); and/or

(i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

7. The method of delivery of Ballots to the Claims and Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Solicitation Agent *actually receives* the originally executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

8. If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9. You must vote all of your Claims, regardless if such Claims are asserted against one or multiple Debtors, either to accept or reject the Plan and may *not* split your vote.

10. This Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date your Ballot**. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the ballot.

### PLEASE SUBMIT YOUR BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND SOLICITATION AGENT AT:**

**U.S. TOLL FREE: (888) 865-2086**

**INTERNATIONAL: (971) 265-0883**

**OR EMAIL BALLOTING@EPIQGLOBAL.COM, WITH A REFERENCE TO LINQTO IN THE SUBJECT LINE**

**IF THE CLAIMS AND SOLICITATION AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JANUARY 26, 2026, AT 5:00 P.M. (PREVAILING CENTRAL TIME), AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY AT THE DISCRETION OF THE DEBTORS.**

# **EXHIBIT 6**

## **MANAGEMENT SELECTION PROCEDURES**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | Case No. 25-90186 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## MANAGEMENT SELECTION PROCEDURES

On July 7, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") in the Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"). The Debtors continue to operate their business and manage their property as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On July 18, 2025, the Office of the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors (the "**Committee**") in these Chapter 11 Cases.

On December 5, 2025, the Debtors filed their *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (the "**Disclosure Statement**") and *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (the "**Plan**").

On December 5, 2025, the Debtors filed  their Amended *Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation and Notice Procedures;  (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Approving Management Selection Procedures; (V) Approving the Combined Hearing Timeline; and (VI) Granting Related Relief* [Docket No. 1112] (the "**Solicitation Motion**") seeking, among other things, approval of the Management Selection Procedures (as defined below).

On December 5, 2025, the Bankruptcy Court entered an order approving the Solicitation Motion [Docket No. [•]] (the "**Solicitation Order**"), which approved, among other things, the procedures set forth below pursuant to which the Debtors are authorized to select a (i) liquidating

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

trustee for the Liquidating Trust, and (ii) manager for the Closed-End Fund  (the "**Management Selection Procedures**").[2]

The Debtors are offering interested parties the opportunity to (i) operate as the trustee of the Liquidating Trust (the "**Liquidating Trustee**") **and/or** (ii) manage (the "**Manager**") the Closed-End Fund, each pursuant to and in accordance with the Plan.  During the week of November 24, 2025, the Debtors' investment banker, Jefferies ("**Jefferies**"), began outreach to potentially interested parties advising them of the opportunity to operate the trust and/or manage the Closed-End Fund.  The Debtors' representatives, Jefferies and the Committee, shall oversee the Management Selection Procedures, through which interested parties can bid to be the Trustee, the Manager, or both.  The Committee and the Debtor Representative (as defined in Docket No. 704), on the Debtors' behalf,[3] shall jointly select the Liquidating Trustee and the Manager following the completion of the Management Selection Procedures.

---

**Copies of the Solicitation Order approving the Management Selection Procedures and other related documents are available at https://dm.epiq11.com/linqto.**

---

| CONTACT INFORMATION OF THE RESPONSIBLE PARTIES | |
|---|---|
| **Investment Banker to the Debtors** | |
| Jefferies LLC | Ryan Hamilton rhamilton@jefferies.com Michael O'Hara Michael.OHara@jefferies.com |
| **Counsel to the Debtors** | |
| Schwartz PLLC | Samuel A. Schwartz, Esq. saschwartz@nvfirm.com Gabrielle Hamm, Esq. ghamm@nvfirm.com Veronica Polnick, Esq. vpolnick@nvfirm.com |

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Solicitation Order or the Plan.

[3] The Debtors have delegated to the Debtor Representative full authority to make such selection on behalf of the Debtors without any obligation to report to or consult with any other individual in doing so.

| Counsel to the Committee | |
|---|---|
| Brown Rudnick LLP | Robert J. Stark, Esq. RStark@brownrudnick.com<br><br>Kenneth J. Aulet, Esq. KAulet@brownrudnick.com<br><br>Bennett S. Silverberg, Esq. BSilverberg@brownrudnick.com |

## I.      KEY DATES AND DEADLINES

| Initial Bid Deadline | December 15, 2025 |
|---|---|
| Final Bid Deadline | January 5, 2026 |
| Announce Winning Bidder(s) | Week of January 5, 2026 |
| Confirmation Hearing | February 2, 2026, at 9:00 a.m. (prevailing Central Time) |
| Deadline to Launch the Closed End Fund | October 31, 2026 |

## II.      MARKETING PROCEDURES

The Debtors, in consultation with Jefferies and the Committee, developed a list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the resources and expertise to operate as Liquidating Trustee, the Manager or both.  The list includes parties whom the Debtors or their advisors previously were in contact with regarding these Chapter 11 Cases as well as new parties whom the Debtors and its advisors reasonably believe may be interested in pursuing the opportunity, or who were referred by the Committee (collectively, the "**Contact Parties**").  The Debtors and the Committee jointly will continue to discuss and may supplement the list of Contact Parties throughout the Liquidation Trustee Selection Procedures, as appropriate.

The Debtors or the Committee may distribute (if not already distributed) to each Contact Party and any other potential transaction party ("**Potential Bidder**") an "Information Package" consisting of:

(i)      a copy of these Management Selection Procedures, the Solicitation Order, and the Plan;

(ii)      a form non-disclosure agreement ("**NDA**") acceptable to the Debtors; and

(iii)      any other materials appropriate under the circumstances.

### III.   OVERVIEW

**a.    Liquidating Trustee.**  As set forth in the Plan, the Debtors shall establish the Liquidating Trust as part of the Customer recoveries and distributions under the Plan through the liquidation of Liquidshares (one of the Debtors) and the applicable Platform Securities (other than the Closed-End Fund Assets), as well as any and all transactions incidental thereto, in accordance with the Plan, the Confirmation Order, and the Liquidating Trust Agreement.  The Liquidating Trust will be formed for the purpose of the orderly liquidation of Liquidshares and will generally wind down in 3 to 5 years from its formation.

  i.    <u>Liquidating Trustee</u>.  The Debtors and the Committee jointly seek to select a qualified party to operate as Liquidating Trustee as outlined in the Plan.

**b.    Closed-End Fund.** As set forth in the Plan, the Debtors shall also establish a Closed End Fund as part of the Customer recoveries and distributions under the Plan, *provided* that the Minimum Closed-End Fund Conditions are met.  The Closed End Fund will operate as a publicly listed Delaware statutory trust or corporation that will be registered under the Investment Company Act as a closed-end investment company formed in accordance with the Closed-End Fund Governing Documents.  The Fund Assets include the Platform Securities which are to be transferred to the Closed-End Fund pursuant to the terms of this Plan.

  i.    **Closed End Fund Manager.** The Debtors and the Committee jointly seek to select a qualified party to manage the Closed-End Fund as outlined in the Plan.

### IV.   PARTICIPATION REQUIREMENTS

**a.    <u>Due Diligence</u>.**  To receive due diligence information, including full access to the Debtors' electronic data room (the "**Data Room**") and to additional non-public information regarding the Debtors, the Plan and the Closed End Fund, a Potential Bidder must deliver the following documents (collectively, the "**Preliminary Bid Documents**") by email to each of: (i) Schwartz, PLLC; (ii) Brown Rudnick LLP; and (ii) Jefferies (collectively, the "**Bid Recipients**"):

  (i)    an executed NDA on terms acceptable to the Debtors;

  (ii)   the identity of the Potential Bidder and a list of contacts for the Potential Bidder; and

  (iii)  a description of the diligence the Potential Bidder seeks to conduct.

Upon delivery of the Preliminary Bid Documents, the Debtors will provide instructions to such party for accessing the Data Room.  The Debtors will address all reasonable requests for additional information and due diligence access.  The Debtors or the Committee may refuse any party access to due diligence information, including access to the Data Room, in whole or in part and at any time, if the Debtors jointly with the Committee determine in their reasonable business judgment after consultation with their respective counsel that (i) access by such party may be harmful to the Debtors or their estates or (ii) such party has not established that it intends or has the capacity to consummate a transaction in good faith.

The due diligence period and the Data Room shall be open until the Bid Deadline. After the Bid Deadline, the Debtors shall have no obligation to furnish due diligence information. The Debtors or the Committee jointly may, in the exercise of their reasonable business judgment and in consultation with their respective counsel, extend a party's time to conduct due diligence.

The Debtors make no representation or warranty as to the information provided through this due diligence process or otherwise, including the documents in the Data Room, except as set forth in any executed definitive documents for the transaction.

     **b.**    **Qualified Bid Requirements.** Only bids and bidders that satisfy the following conditions will be considered or permitted to participate in the bidding and Liquidating Trustee **and/or** Manager Selection Procedures (each, a "**Qualified Bid**" and the bidder(s) submitting a Qualified Bid, a "**Qualified Bidder**"):

1. The bid must be in writing and timely and properly submitted in accordance with the bid submission process set forth below.

2. The bid must fully disclose the identity of each person or entity that is participating in the bid (and the complete terms of such participation) and each such person or entity shall have delivered an executed NDA to the Debtors in accordance with the instructions set forth above. "Participation" in a bid includes persons or entities that are equity holders in an entity specially formed for the purpose of operating as Liquidating Trustee, the Closed End Fund Manager, or both.

3. The bid must identify (a) the qualifications of the Qualified Bidder to operate as Liquidating Trustee **and/or** Closed-End Fund Manager, (b) the minimum Liquidating Trustee **and/or** Closed-End Fund Manager operating conditions required by the proposed Qualified Bidder ; and (c) any consideration to be paid.

4. Bids must state that the bidder is prepared to consummate the transaction promptly following entry of an order approving the Plan and be accompanied by (a) a proposed management agreement executed by the bidder (the "**Proposed Management Agreement**"), a form of which will be available in the Data Room for the Liquidating Trust and the Closed-End Fund (the "**Form Management Agreement**"),[4] (b) a redline of the Proposed Management Agreement against the Form Management Agreement, and (c) evidence of authorization and approval from the board (or comparable governing body) of each person or entity participating in the bid with respect to the submission, execution, delivery, and performance of the bid and Proposed Management Agreement.

---

[4] The Debtors and the Committee shall jointly determine the terms and contents of the Form Management Agreement. Except as to any Committee member(s) that are potential bidders, the Debtors and the Committee shall jointly evaluate the bidder's Proposed Management Agreement.

5. The bid must be (a) unqualified and not subject to any contingencies or conditions (including any further due diligence, material financing conditions, or internal approval (such as but not limited to board approval)) and (b) binding and irrevocable until (i) if such bid is the Winning Bid or a Backup Bid, the Effective Date or (ii) the Debtors file a notice of Winning Bid that does not name such bid as the Winning Bid or a Backup Bid.

6. The bid must include financial and other information sufficient for the Debtors and the Committee jointly to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Liquidating Trust or the Closed-End Fund, including the availability of funds, resources and expertise to manage the Closed End Fund.

7. The bid must identify any and all executory contracts to which the Debtors are a party that the bidder wishes to have assumed and assigned to it in connection with the acquisition (if any). The bidder shall be solely responsible for the payment of any cure cost required pursuant to section 365 of the Bankruptcy Code.

8. The bid must include contact information for the specific person(s) the Debtors and the Committee should contact in the event they have questions regarding the bid.

By submitting a bid, a bidder is deemed to acknowledge (and shall represent in any definitive document) that (i) it has had an opportunity to inspect and examine the Platform Securities and to conduct any and all due diligence prior to submitting its bid, (ii) it has relied solely upon its own independent review, investigation, and/or inspection of the Platform Securities and any documents in submitting its bid, and (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied by operation of law or otherwise, regarding the Debtors' business, the Platform Securities, or the completeness of any information provided in connection with the Management Selection Procedures.

The Debtors, the Committee (excepting any Committee member(s) that are potential bidders), and their respective advisors shall maintain in confidence in accordance with the applicable executed NDA any information provided by a bidder that is designated as confidential, except as otherwise set forth in these Management Selection Procedures, and shall use such confidential information only in connection with the evaluation of bids or otherwise in connection with the chapter 11 case or in accordance with the executed NDA.  Notwithstanding the foregoing and any provisions in an executed NDA, the Debtors, the Committee, and their respective advisors may disclose confidential information (i) with the prior written consent of the applicable bidder, (ii) to the applicable bidder, and (iii) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court, or other governmental order, or regulation, including, as appropriate, regulatory agencies.

    **c.**    <u>**Bid Submission and Evaluation Procedures**</u>.  Bids (including all requirements to be considered a Qualified Bid) must be submitted in writing to the Bid Recipients so as to be received by no later than **January 5, 2026** (the "**Bid Deadline**").

    Each bidder shall comply with all reasonable requests by the Debtors or the Committee for additional information and due diligence access regarding the ability of a bidder to consummate the transaction.  A bidder's failure to comply with such requests may be a basis for the Debtors or the Committee to determine such bidder is not a Qualified Bidder and the associated bid is not a Qualified Bid.

    Notwithstanding compliance with the terms of being considered a Qualified Bidder, the Debtors and the Committee jointly may determine that any potential bidder should not proceed. Such determination may be based on, without limitation, a determination that such bidder is not capable of or qualified to deliver the proposed services; such bidder faces regulatory or legal investigations or exposure, such bidder's proposal would not be acceptable even with economic improvements, or any other reason agreed to jointly between the Debtors and the Committee.  If the Debtors and Committee choose to exercise such right, such bidder shall not be considered a Qualified Bidder.

    The Debtors and the Committee, in their reasonable business judgment, shall jointly determine (i) which bids meet the criteria to qualify as a Qualified Bid and (ii) if there is more than one Qualified Bid, which Qualified Bid will serve as the baseline bid at the commencement of the Management Selection Procedures to facilitate obtaining the highest and best value for the Debtors' estates.  Any bid that does not meet the criteria for a Qualified Bid set forth above shall be rejected as a non-conforming bid.  If there are no timely Qualified Bids, no selection process will be held.

## V.    APPROVAL

    The Debtors and the Committee jointly shall designate the Qualified Bidders' (the "**Winning Bidder**") bids that are the highest or otherwise best (the "**Winning Bid**"), as well as the next highest bid after each Winning Bid (the "**Backup Bid**") and the Qualified Bidder submitting each Backup Bid which shall be the backup bidder(s) (the "**Backup Bidder(s)**").

    The Debtors, with the consent of the Committee, will announce the Winning Bid(s) and, if applicable, the Backup Bid(s) the week of January 5, 2026.

    As soon as reasonably practicable after conclusion of the Closed-End Fund Management and Liquidating Trustee Selection Procedures, but in no event later than 48 hours after the process concludes, the Debtors shall file with the Court a notice of the results of the Management Selection Procedures (the "**Notice of Winning Bid**"), which shall include (i) a copy of the Winning Bid(s) and Backup Bid(s), (ii) the identities of the Winning Bidder(s) and Backup Bidder(s), and (iii) a list of all executory contracts proposed to be assumed and assigned as part of the transaction (if any).

    The Debtors and the Committee may adopt such other rules for the Management Selection Procedures (including procedural rules and rules that may depart from those set forth herein) that they reasonably determine will result in the highest or otherwise best value for the Debtors' estates

and that are not inconsistent with any Court order; *provided* that any changed or additional rules of the Management Selection Procedures are not materially inconsistent with these procedures, do not favor one Qualified Bidder over another, and are communicated to all participants substantially simultaneously at or prior to the management selections.

A hearing to approve the Plan and the Winning Bid(s) (the "**Confirmation Hearing**") will take place on **February 2, 2026, at 9:00 a.m.** (prevailing Central Time).

    a.    If, for any reason, a Winning Bidder(s) fails to timely consummate its management agreement, the Debtors may seek to consummate the transaction to the Backup Bidder(s) in accordance with the terms of the Backup Bid(s) and pursuant to the Proposed Management Agreements associated therewith without further approval by the Court (in which case the Backup Bidder shall be deemed the Winning Bidder).

    b.    If a Winning Bidder(s) fails to timely consummate its management agreement due to a breach or failure to perform on the part of the Winning Bidder(s), the Debtors specifically reserve the right to seek all available damages from the defaulting Winning Bidder(s).

    c.    The Backup Bid(s) and the obligation of the Backup Bidder(s) to consummate the transaction shall remain open and in full force, until the earlier of (x) the Effective Date or (y) the Closed End Fund Exchange Date.

    d.    The Winning Bidder(s) shall appear at the Confirmation Hearing personally or through a duly authorized representative who shall be prepared to testify in support of the Winning Bid(s) and the Winning Bidder's ability to close the transaction in a timely manner and provide adequate assurance of future performance under any and all executory contracts to be assumed and assigned.

Any objections to the proposed transaction must be filed with the Court no later than **January 21, 2026, at 5:00 p.m.** (prevailing Central time). Objections to the Winning Bidder's adequate assurance of future performance and the proposed assumption and assignment of any executory contract must be filed with the Court no later than **January 21, 2026, at 5:00 p.m.** (prevailing Central time).

The Debtors and the Winning Bidder(s) shall consummate the transaction no later than the earlier of (x) the Effective Date or (y) Closed End Fund Exchange Date.

## VI.    OTHER PROVISIONS

    a.    **Bid Protections.** No bidder, whether or not a Qualified Bidder, shall be entitled to bid protections unless consented to in writing by the Debtors and the Committee and approved by the Court. The Debtors and the Committee reserve the right to seek, in consultation with their respective advisors, approval of bid protections from the Court on emergency notice to the extent the Debtors, in their business judgment, and the Committee jointly determine that such bid

protections are necessary or advisable under the circumstances to facilitate obtaining the highest and best value for the Debtors' estates.

**b.**     **Reservation of Rights.**  The Debtors and the Committee reserve their rights to modify the Management Selection Procedures in their business judgment in any manner that will best promote the goals of these Management Selection Procedures or impose additional customary terms and conditions on the transaction, including extending the deadlines set forth herein, adjourning the Management Selection Procedures or the Confirmation Hearing, adding procedural rules that are reasonably necessary or advisable under the circumstances to conduct the Management Selection Procedures, cancelling the process, and rejecting any or all bids or Qualified Bids.

**c.**     **Consent to Jurisdiction.**  All Qualified Bidders shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Management Selection Procedures or the construction and enforcement of these Management Selection Procedures.

**d.**     **Fiduciary Duties.**  Notwithstanding anything to the contrary in these Management Selection Procedures, the Solicitation Order, or any other document, order, or instrument in these chapter 11 cases, nothing in these Management Selection Procedures shall require the Debtors or the Committee, after consulting with their respective counsel, to take any action or to refrain from taking any action with respect to any transaction if taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**e.**     **Committee or Debtor Affiliates as Potential Bidders.**  Notwithstanding anything to the contrary in these Management Selection Procedures, potential bidders shall not participate in the Management Selection Procedures, except as otherwise provided herein.

Houston, Texas
Dated:  December 10, 2025

_/s/ Veronica A. Polnick_
**SCHWARTZ PLLC**

Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted _pro hac vice_)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone: (713) 900-3737
Facsimile: (702) 442-9887
Email: ghamm@nvfirm.com
            vpolnick@nvfirm.com
            aagelakopoulos@nvfirm.com
            rwells@nvfirm.com

9

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887
Email: saschwartz@nvfirm.com
*Counsel to the Debtors and*
*Debtors in Possession*

## **EXHIBIT 7**

## **COMBINED HEARING NOTICE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 25-90186 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF COMBINED HEARING TO CONSIDER FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**The Combined Hearing.** The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence at **9:00 a.m. (prevailing Central Time) on February 2, 2026**, before the Honorable Alfredo R. Pérez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, 4th floor, Courtroom 400, Houston, Texas, 77002. **Please be advised that you may participate in the hearing either in person or by an audio or video connection.** Audio communication will be by use of the Court's dial-in facility. You may access the facility at **(832) 917-1510**. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is **282694**. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting. Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

in open Court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The Voting Record date is **November 13, 2025**, which is the date for determining which Holders of Claims are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Voting Deadline**").  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan you must:  (a) follow the instructions on the Ballot carefully; (b) complete all of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions on the Ballot so that it is actually received by the Debtors' claims, noticing and solicitation agent (the "**Claims and Solicitation Agent**"), Epiq Corporate Restructuring, LLC ("**Epiq**"), on or before the Voting Deadline.  A failure to follow such instructions may disqualify your vote.

**Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to confirmation of the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, and the adequacy of the Disclosure Statement is **5:00 p.m. (prevailing Central Time) on January 21, 2026** (the "**Plan and Disclosure Statement Objection Deadline**").  Any objection to the relief sought at the Combined Hearing must:  (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

**Assumption or Rejection of Contracts.**  The Plan provides that each of the Debtor's Executory Contracts and Unexpired Leases will be deemed **rejected** as of the Effective Date unless it:  (1) has previously been assumed by the Debtors by Final Order of the Bankruptcy Court; (2) is listed on the schedule of Retained Contracts included in the Plan Supplement; or (3) is the subject of a motion to assume or reject pending as of the Effective Date.  **Claims for rejection damages must be filed in accordance with the provisions of Article V.E. of the Plan.**

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

> **ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND A THIRD-PARTY RELEASE.  YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**Please be advised that Article IX. of the Plan contains the following release, exculpation, and injunction provisions:[3]**

**RELEASES BY THE DEBTORS (Article IX.C.):**   **Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully,**

---

[3]  The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights.  If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.

conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, the Wind-Down Debtors, and their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the Debtors or their Estates, from any and all Claims and Causes of Action whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that the Debtors, Wind-Down Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person or Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) post-Effective Date obligations of any Person or Entity under the Plan, the Confirmation Order, the Plan Administration Process, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan; (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (3) the Retained Causes of Action; (4) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (5) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy

3

Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**RELEASES BY THE RELEASING PARTIES (ARTICLE IX.D.):** Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction,

agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the **Effective Date** related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\*       \*       \*

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[4] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

---

[4]   The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**EXCULPATION OF CERTAIN PARTIES (ARTICLE IX.F.):** Except as otherwise specifically provided in this Plan or the Confirmation Order, to the fullest extent permissible under applicable Law, from and after the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases prior to the Effective Date, including, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, the Independent Investigation, the Filing of the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Filing of the Chapter 11 Cases, the Plan Administration Process, before or during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Except as otherwise specifically provided in this Plan, pursuant to and in accordance with section 1125(e) of the Bankruptcy Code, upon Confirmation, the Debtors and each of their respective current Affiliates, agents, representatives, members, principals, officers, directors, managers, employees, advisors, and attorneys, in each case in their capacity as such, shall be deemed to have participated in good faith and in compliance with applicable Law and, therefore is hereby exculpated from and shall not be liable at any time for the violation of any applicable Law, rule, or regulation governing, any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code; or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security, offered or sold under the Plan (to the extent applicable), except for claims related to any act or omission that is determined in a Final Order to have constituted intentional breach of fiduciary duty, actual fraud, willful misconduct, or gross negligence; *provided*, that in all respects the foregoing Persons and Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.

The exculpation hereunder will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

UNDER THE PLAN, "*EXCULPATED PARTY*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH, AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F. HEREOF: (A) THE DEBTORS; (B) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (C) ANY OTHER STATUTORY COMMITTEE APPOINTED IN THE CHAPTER 11 CASES AND EACH OF THEIR RESPECTIVE MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (D) THE FOLLOWING CURRENT DIRECTORS OF THE BOARD OF LINQTO, INC: ADAM HENDERSON, ALISON KUTLER, NORMAN REED, AND JEREMY ROSENTHAL; AND (E) THE DEBTORS' CHIEF RESTRUCTURING OFFICER, JEFFREY S. STEIN, OR ANY SUCCESSOR TO SUCH POSITION.

**INJUNCTION (ARTICLE IX.G.): EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR CONFIRMATION ORDER, OR ON ACCOUNT OF OBLIGATIONS ISSUED OR CREATED PURSUANT TO THIS PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, OR CAUSES OF ACTION THAT ARE SUBJECT TO EXCULPATION OR SETTLEMENT ARE PERMANENTLY ENJOINED FROM TAKING THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE RELEASED PARTIES OR THE EXCULPATED PARTIES (OR THE PROPERTY OF SUCH PERSONS OR ENTITIES): (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND; OR (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND, IN EACH CASE IN THE FOREGOING CLAUSES (I) THROUGH (IV), ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED, EXCULPATED, OR SETTLED OR TO BE RELEASED, EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY SUCH PARTY) PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER. ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

No Person or Entity who has held, holds, or may hold Claims, Equity Interests, or Causes of Action may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Released Parties or the Exculpated Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article IX.C, Article IX.D, Article IX.E, or Article IX.F without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Released Party or Exculpated Party, as applicable. At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable claim of any kind, the Bankruptcy Court may, or shall if any Released Party or Exculpated Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, each in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under this Plan shall be deemed to have consented to the injunction provisions set forth in this Article IX.G.

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  If you would like to access or request electronic or paper copies of the Conditional Approval Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC c/o Epiq Ballot Processing, P.O. Box 4422., Beaverton, OR 97076-4421; (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to Linqto in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

**The Plan Supplement**.  The Debtors will file the Plan Supplement (as defined in the Plan) on or before **January 12, 2026**, and will serve notice on parties in interest, which will:  (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR VOTED TO REJECT THIS PLAN.**

---

Dated: December 10, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

/s/ *Veronica A. Polnick*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:     (713) 900-3737
Facsimile:      (702) 442-9887
Email:          ghamm@nvfirm.com
                vpolnick@nvfirm.com
                aagelakopoulos@nvfirm.com
                rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:     (702) 385-5544
Facsimile:      (702) 442-9887
Email:          saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

## **EXHIBIT 8A**

**NON-VOTING STATUS NOTICE - UNIMPAIRED**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 25-90186 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

NOTICE OF NON-VOTING STATUS TO HOLDERS OF
UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**Notice of Non-Voting Status.** Because of the nature and treatment of your Claim under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) that is (a) Unimpaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (b) unclassified, you are *not* entitled to vote on the Plan.

**The Combined Hearing.** The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence at **9:00 a.m. (prevailing Central Time) on February 2, 2026**, before the Honorable Alfredo R. Pérez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, 4th floor, Courtroom 400, Houston, Texas, 77002. **Please be advised that you may participate in the hearing either in person or by an audio or video connection.** Audio communication will be by use of the Court's dial-in facility. You may access the facility at **(832) 917-1510**. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is **282694**. Video communication will be by use of the GoToMeeting

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.  Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open Court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to confirmation of the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, and the adequacy of the Disclosure Statement is **5:00 p.m. (prevailing Central Time) on January 21, 2026**  (the "**Plan and Disclosure Statement Objection Deadline**").  Any objection to the relief sought at the Combined Hearing must:  (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

**Additional Information.**  If you would like to access or request electronic or paper copies of the Conditional Approval Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC Ballot Processing c/o Epiq Corporate Restructuring, LLC, P.O. Box 4422, Beaverton, OR 97076 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

---

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.D. CONTAINS A THIRD-PARTY RELEASE.  ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN. THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.**

---

Dated: December 10, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

/s/ *Veronica A. Polnick*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:     (713) 900-3737
Facsimile:     (702) 442-9887
Email:          ghamm@nvfirm.com
                vpolnick@nvfirm.com
                aagelakopoulos@nvfirm.com
                rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:     (702) 385-5544
Facsimile:     (702) 442-9887
Email:          saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

## OPTIONAL:  RELEASE OPT-IN FORM

You are receiving this opt-in form (the "**Opt-In Form**") because you are a Holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**").  To the extent the Plan is confirmed, Holders of Claims or Interests are deemed to grant the third-party release (the "**Third-Party Release**") set forth in the Plan and reproduced in this notice if such Holder affirmatively opts in to the releases by completing and returning this form in accordance with the directions herein or files an objection to the Third-Party Release with the Court on or before **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Opt-In Deadline**").

If you believe you are a Holder of a Claim or Interest with respect to the Debtors and choose to opt in to the Third-Party Release set forth in Article IX of the Plan, please promptly complete, sign, and date this Opt-In Form and return it via either of the following options: (a) first class mail, overnight courier or hand delivery to the Debtors' claims, noticing and solicitation agent (the "**Claims and Solicitation Agent**"), Epiq Corporate Restructuring, LLC ("**Epiq**"), at the address set forth below, or (b) through the Claims, Noticing and Solicitation Agent's online E-Opt-In Portal as instructed below.  Holders are strongly encouraged to submit any Opt-In Form through the Claims and Solicitation Agent's online Portal.  Parties that submit their Opt-In Form using the E- Opt-In Portal should **NOT** also submit a paper Opt-In Form.

**THIS OPT-IN FORM MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY THE OPT-IN DEADLINE.  IF THE OPT-IN FORM IS RECEIVED AFTER THE OPT-IN DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1</u>. Important information regarding the Third-Party Release.

**Article IX.D. of the Plan contains the following Third-Party Release:**

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants,**

1

attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\*　　\*　　\*

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT

MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[1] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE IX OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX OF THE PLAN.**

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

---

[1]   The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.**

**<u>Item 2</u>. Certifications.**

By signing this Opt-In Form, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of a Claim or Interest;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status* and that this Opt-In Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

(d)     no other Opt-In Form has been submitted or, if any other Opt-In Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt-In Forms are hereby revoked.

Name of Holder: _____
(Print or Type)

Signature: _____

Name of Signatory: _____
(If other than Holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

**IF YOU HAVE MADE THE OPTIONAL OPT-IN ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-IN FORM AND RETURN IT PROMPTLY BY *ONLY ONE* OF THE METHODS BELOW:**

| | |
|---|---|
| **By First Class Mail:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 |
| **If by overnight courier or hand delivery:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |
| **By Electronic, Online Submission:** | Please visit the Debtors' case website at:  https://dm.epiq11.com/linqto.  Under the Case Actions section, click on the "E-Opt-In Portal" link and follow the directions to submit your Opt-In Form.  If you choose to submit your Opt-In Form via Epiq's E-Opt-In Portal, you should <u>not</u> also return a hard copy of your Opt-In Form.<br><br>The E- Opt-In Portal is the sole manner in which this Opt-In Form will be accepted via electronic or online transmission.  Opt-In Forms submitted by facsimile or email will not be counted. |

**THE OPT-IN DEADLINE IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026. THE CLAIMS, NOTICING AND SOLICITATION AGENT MUST *ACTUALLY RECEIVE* YOUR OPT IN ELECTION ON OR BEFORE THE OPT-IN DEADLINE.**

# **EXHIBIT 8B**

## **NON-VOTING STATUS NOTICE - IMPAIRED**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 25-90186 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF IMPAIRED
CLAIMS OR INTERESTS CONCLUSIVELY DEEMED TO REJECT THE PLAN**

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

**Notice of Non-Voting Status.**  Because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*.  Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) or Interest in the Debtors that is Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**The Combined Hearing.**  The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence at **9:00 a.m. (prevailing Central Time) on February 2, 2026**, before the Honorable Alfredo R. Pérez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, 4th floor, Courtroom 400, Houston, Texas, 77002. **Please be advised that you may participate in the hearing either in person or by an audio or video connection.** Audio communication will be by use of the Court's dial-in facility. You may access the facility at **(832) 917-1510**. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is **282694**. Video communication will be by use of the GoToMeeting

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.  Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open Court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to confirmation of the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, and the adequacy of the Disclosure Statement is **5:00 p.m. (prevailing Central Time) on January 21, 2026**  (the "**Plan and Disclosure Statement Objection Deadline**").  Any objection to the relief sought at the Combined Hearing must:  (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

**Additional Information.**  If you would like to access or request electronic or paper copies of the Conditional Approval Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC c/o Epiq Ballot Processing, P.O. Box 4422., Beaverton, OR 97076 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to Linqto in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

---

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE IX.D.</u> CONTAINS A THIRD-PARTY RELEASE.  ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE IX.D.</u> OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN. THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.**

---

Dated: December 10, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

/s/ *Veronica A. Polnick*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:      (713) 900-3737
Facsimile:      (702) 442-9887
Email:          ghamm@nvfirm.com
                vpolnick@nvfirm.com
                aagelakopoulos@nvfirm.com
                rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:      (702) 385-5544
Facsimile:      (702) 442-9887
Email:          saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

## OPTIONAL:  RELEASE OPT-IN FORM

You are receiving this opt-in form (the "**Opt-In Form**") because you are a Holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**"). To the extent the Plan is confirmed, Holders of Claims or Interests are deemed to grant the third-party release (the "**Third-Party Release**") set forth in the Plan and reproduced in this notice if such Holder affirmatively opts in to the releases by completing and returning this form in accordance with the directions herein or files an objection to the Third-Party Release with the Court on or before **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Opt-In Deadline**").

If you believe you are a Holder of a Claim or Interest with respect to the Debtors and choose to opt in to the Third-Party Release set forth in Article IX of the Plan, please promptly complete, sign, and date this Opt-In Form and return it via either of the following options: (a) first class mail, overnight courier or hand delivery to the Debtors' claims, noticing and solicitation agent (the "**Claims and Solicitation Agent**"), Epiq Corporate Restructuring, LLC ("**Epiq**"), at the address set forth below, or (b) through the Claims, Noticing and Solicitation Agent's online E-Opt-In Portal as instructed below.  Holders are strongly encouraged to submit any Opt-In Form through the Claims and Solicitation Agent's online Portal.  Parties that submit their Opt-In Form using the E- Opt-In Portal should **NOT** also submit a paper Opt-In Form.

**THIS OPT-IN FORM MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY THE OPT-IN DEADLINE.  IF THE OPT-IN FORM IS RECEIVED AFTER THE OPT-IN DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1</u>. Important information regarding the Third-Party Release.

> **Article IX.D. of the Plan contains the following Third-Party Release:**
>
> **Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants,**

1

attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\*        \*        \*

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT

MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[1] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.  YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

---

[1]    The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION.** **YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.**

**<u>Item 2</u>. Certifications.**

By signing this Opt-In Form, the undersigned certifies to the Court and the Debtors that:

    (a)    as of the Voting Record Date, either: (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of a Claim or Interest;

    (b)    the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status* and that this Opt-In Form is made pursuant to the terms and conditions set forth therein;

    (c)    the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

    (d)    no other Opt-In Form has been submitted or, if any other Opt-In Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt-In Forms are hereby revoked.

Name of Holder: _____
                               (Print or Type)

Signature: _____

Name of Signatory: _____
                             (If other than Holder)

Title: _____

Address: _____

                _____

                _____

Telephone Number: _____

Email: _____

Date Completed: _____

**IF YOU HAVE MADE THE OPTIONAL OPT-IN ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-IN FORM AND RETURN IT PROMPTLY BY *ONLY ONE* OF THE METHODS BELOW:**

| | |
|---|---|
| **By First Class Mail:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 |
| **If by overnight courier or hand delivery:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |
| **By Electronic, Online Submission:** | Please visit the Debtors' case website at:  https://dm.epiq11.com/linqto.  Under the Case Actions section, click on the "E-Opt-In Portal" link and follow the directions to submit your Opt-In Form.  If you choose to submit your Opt-In Form via Epiq's E-Opt-In Portal, you should <u>not</u> also return a hard copy of your Opt-In Form.<br><br>The E- Opt-In Portal is the sole manner in which this Opt-In Form will be accepted via electronic or online transmission.  Opt-In Forms submitted by facsimile or email will not be counted. |

**THE OPT-IN DEADLINE IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026. THE CLAIMS, NOTICING AND SOLICITATION AGENT MUST *ACTUALLY RECEIVE* YOUR OPT IN ELECTION ON OR BEFORE THE OPT-IN DEADLINE.**

## **EXHIBIT 9**

**ASSUMPTION NOTICE**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) |
| | )    Case No. 25-90186 |
| Debtors. | ) |
| | )    (Jointly Administered) |
| | ) |

**NOTICE OF (I) EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE
ASSUMED BY THE DEBTORS PURSUANT TO THE PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

The Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* [Docket No. [•]] (the "**Assumption Schedule**") with the Court as part of the Plan Supplement on [•], 2026, as contemplated under the Plan, a copy of which is attached hereto as Schedule A. The Assumption Schedule lists Executory Contracts and Unexpired Leases that the Debtors are proposing to assume and assign and cure amounts related thereto. The Debtors' determination to assume the agreements identified on the Assumption Schedule is subject to revision.

**Any and all Executory Contracts and Unexpired Leases that are not listed on the Assumption Schedule attached as Schedule A are rejected pursuant to the Debtors' Plan.  Any proofs of claim asserting Claims arising from the rejection of any Executory Contracts or Unexpired Leases must be filed with the Claims and Noticing Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745].  The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

**The Combined Hearing.**  The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence at **9:00 a.m. (prevailing Central Time) on February 2, 2026**, before the Honorable Alfredo R. Pérez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, 4th floor, Courtroom 400, Houston, Texas, 77002. **Please be advised that you may participate in the hearing either in person or by an audio or video connection.** Audio communication will be by use of the Court's dial-in facility. You may access the facility at **(832) 917-1510**. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is **282694**. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.  Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open Court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**The Cure Amounts.**  Section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption.  Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the Assumption Schedule. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

Absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on the Assumption Schedule will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter.  In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to confirmation of the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, and the adequacy of the Disclosure Statement is **5:00 p.m. (prevailing Central Time) on January 21, 2026**  (the "**Plan and Disclosure Statement Objection Deadline**").  Any objection to the relief sought at the Combined Hearing must:  (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

Any objections to Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Combined Hearing will be heard at a subsequent hearing on a date agreed to by the counterparty to such Executory Contract or Unexpired Lease and the Debtors.

**ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO TIMELY OBJECT TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OR CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND ASSIGNMENT AND CURE AMOUNT.**

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCYRELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT.**

**Additional Information.**  If you would like to access or request electronic or paper copies of the Conditional Approval Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC c/o Epiq Ballot Processing, P.O. Box 4422., Beaverton, OR 97076 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to "Linqto" in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

Dated: December 10, 2025        Respectfully submitted,
Houston, Texas

**SCHWARTZ PLLC**

/s/ *Veronica A. Polnick*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:    (713) 900-3737
Facsimile:    (702) 442-9887
Email:       ghamm@nvfirm.com
             vpolnick@nvfirm.com
             aagelakopoulos@nvfirm.com
             rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:    (702) 385-5544
Facsimile:    (702) 442-9887
Email:       saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

**EXHIBIT 10**

**NON-VOTING STATUS NOTICE – DISPUTED CLAIMS**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) |
| | )    Case No. 25-90186 |
| Debtors. | ) |
| | )    (Jointly Administered) |
| | ) |

## NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS

On [•], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [•]] (the "**Conditional Approval Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1135] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* [Docket No. 1140] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan (these "**Solicitation and Voting Procedures**") and for filing objections to the Plan; (e) approving management selection procedures; and (f) scheduling certain dates with respect thereto.

You are receiving this notice because you are the Holder of a Claim that is subject to a pending objection by the Debtor. **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before January 24, 2026 (the date that is two (2) Business Days before the Voting Deadline)** (each, a "**Resolution Event**"):

(a)    an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

(b)    an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

(c)    a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim, which allowance may be for voting purposes only, in an agreed-upon amount and such agreement

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: P.O. Box 2859, Sunnyvale, CA 94087.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement or the Conditional Approval Order, as applicable.

(or notice of such agreement) is conveyed by the Debtors to the Claims, Noticing and Solicitation Agent by electronic mail or otherwise;

(d)     the pending objection is voluntarily withdrawn by the objecting party; or

(e)     parties who timely file an objection prior to the Confirmation Objection Deadline, but fail to cast a ballot prior to the Voting Deadline, may cast a ballot through the time of the Confirmation in connection with the resolution of their objections.

**The Combined Hearing.**  The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence at **9:00 a.m. (prevailing Central Time) on February 2, 2026**, before the Honorable Alfredo R. Pérez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, 4th floor, Courtroom 400, Houston, Texas, 77002. **Please be advised that you may participate in the hearing either in person or by an audio or video connection.** Audio communication will be by use of the Court's dial-in facility. You may access the facility at **(832) 917-1510**. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is **282694**. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.  Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open Court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to confirmation of the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, and the adequacy of the Disclosure Statement is **5:00 p.m. (prevailing Central Time) on January 21, 2026**  (the "**Plan and Disclosure Statement Objection Deadline**").  Any objection to the relief sought at the Combined Hearing must:  (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

**Obtaining Solicitation Materials or Information Regarding the Status of Your Claims**.  If you have any questions regarding the status of any of your Claims, or if you would like to access or request electronic or paper copies of the Conditional Approval Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' case website at https://dm.epiq11.com/linqto; (b) writing to Linqto Texas, LLC c/o Epiq Ballot Processing, P.O. Box 4422., Beaverton, OR 97076 (c) calling (888) 865-2086 (toll free) or (971) 265-0883 (international); or (d) emailing Balloting@epiqglobal.com, with a reference to Linqto in the subject line. Additionally, the Plan and Disclosure Statement and the Conditional Approval Order (including exhibits) are also available for a fee via PACER at https://ecf.txsb.uscourts.gov/ (a PACER account is required).

**Occurrence of a Resolution Event.**  If a Resolution Event occurs such that you are entitled to vote on the Plan, then no later than one business day thereafter, the Debtors' claims and solicitation agent Epiq Corporate Restructuring, LLC  ("**Epiq**" or the "**Claims and Solicitation Agent**") shall distribute a Ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Claims and Solicitation Agent no later than the Voting Deadline, which is **5:00 p.m. (prevailing Central Time) on January 26, 2026.**

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE IX.D.</u> CONTAINS A THIRD-PARTY RELEASE.  ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE IX.D.</u> OF THE PLAN USING THE ENCLOSED OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN. THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.**

Dated: December 10, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

/s/ *Veronica A. Polnick*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
Renee D. Wells (TX Bar No. 24013731)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:      (713) 900-3737
Facsimile:      (702) 442-9887
Email:           ghamm@nvfirm.com
                     vpolnick@nvfirm.com
                     aagelakopoulos@nvfirm.com
                      rwells@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:      (702) 385-5544
Facsimile:      (702) 442-9887
Email:           saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

## OPTIONAL:  RELEASE OPT-IN FORM

You are receiving this opt-in form (the "**Opt-In Form**") because you are a Holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Linqto Texas, LLC and Its Debtor Affiliates* (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**"). To the extent the Plan is confirmed, Holders of Claims or Interests are deemed to grant the third-party release (the "**Third-Party Release**") set forth in the Plan and reproduced in this notice if such Holder affirmatively opts in to the releases by completing and returning this form in accordance with the directions herein or files an objection to the Third-Party Release with the Court on or before **5:00 p.m. (prevailing Central Time) on January 26, 2026** (the "**Opt-In Deadline**").

If you believe you are a Holder of a Claim or Interest with respect to the Debtors and choose to opt in to the Third-Party Release set forth in Article IX of the Plan, please promptly complete, sign, and date this Opt-In Form and return it via either of the following options: (a) first class mail, overnight courier or hand delivery to the Debtors' claims, noticing and solicitation agent (the "**Claims and Solicitation Agent**"), Epiq Corporate Restructuring, LLC ("**Epiq**"), at the address set forth below, or (b) through the Claims, Noticing and Solicitation Agent's online E-Opt-In Portal as instructed below.  Holders are strongly encouraged to submit any Opt-In Form through the Claims and Solicitation Agent's online Portal.  Parties that submit their Opt-In Form using the E- Opt-In Portal should **NOT** also submit a paper Opt-In Form.

**THIS OPT-IN FORM MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY THE OPT-IN DEADLINE.  IF THE OPT-IN FORM IS RECEIVED AFTER THE OPT-IN DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1</u>. **Important information regarding the Third-Party Release.**

**Article IX.D. of the Plan contains the following Third-Party Release:**

**Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (subject to the limitations in Article IX.E. below) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties (other than the Debtors, Wind-Down Debtors, their Estates, and any Person or Entity seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that such Releasing Parties or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants,**

attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Independent Investigation, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Plan Administration Process, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; or (2) any Person or Entity that is not a Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Administration Process and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Third-Party Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

\*       \*       \*

UNDER THE PLAN, "**RELEASED PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH AND SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX HEREOF: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) THE FOLLOWING MEMBERS OF THE DEBTORS' CURRENT

MANAGEMENT AND/OR CURRENT MEMBERS OF THE BOARD OF DIRECTORS OF LINQTO, INC.: JESUS ANCHETA, SEAN BOWDEN, MICHAEL HUSKINS, ALISON KUTLER, JEREMY ROSENTHAL, CATHY SICILIANO, FRANCIS DANIEL SICILIANO II, AND JEFFREY S. STEIN; (F) ANY PROFESSIONAL RETAINED BY THE DEBTORS, THE SPECIAL SUBCOMMITTEE, OR THE COMMITTEE BY ORDER OF THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES; AND (G) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (C) THROUGH (F).[1] FOR THE AVOIDANCE OF DOUBT, NO CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS IS INCLUDED IN RELEASED PARTIES, OTHER THAN THOSE SET FORTH IN (E).

UNDER THE PLAN, "**RELEASING PARTIES**" MEANS, COLLECTIVELY, AND IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDER; (D) THE COMMITTEE AND EACH MEMBER OF THE COMMITTEE; (E) ALL HOLDERS OF CLAIMS; (F) ALL HOLDERS OF INTERESTS; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); AND (H) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN; *PROVIDED, HOWEVER*, THAT ANY PERSON OR ENTITY THAT, TO THE EXTENT APPLICABLE, DOES NOT OPT IN TO THE RELEASES IN ARTICLE IX HEREOF SHALL NOT BE DEEMED A RELEASING PARTY.

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IF YOU OPT IN TO THE RELEASES, YOU ARE A "**RELEASING PARTY**" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN **ARTICLE IX** OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

**YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.  YOU WILL BE CONSIDERED A "<u>RELEASING PARTY</u>" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT-IN DEADLINE. THE ELECTION TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU DO NOT OPT IN TO THE RELEASE CONTAINED IN <u>ARTICLE IX</u> OF THE PLAN.**

---

[1]  The "Released Parties" are subject to ongoing review including as part of the Independent Investigation.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE IX.D. OF THE PLAN BY CHECKING THE BOX BELOW:**

☐ **The Undersigned Holder of the Claim elects to <u>OPT IN to the Third-Party Release</u>.**

<u>**Item 2**</u>. **Certifications.**

By signing this Opt-In Form, the undersigned certifies to the Court and the Debtors that:

(a)      as of the Voting Record Date, either:  (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of a Claim or Interest;

(b)      the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status* and that this Opt-In Form is made pursuant to the terms and conditions set forth therein;

(c)      the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

(d)      no other Opt-In Form has been submitted or, if any other Opt-In Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt-In Forms are hereby revoked.

Name of Holder: _____
                                                    (Print or Type)

Signature: _____

Name of Signatory: _____
                                                    (If other than Holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

**IF YOU HAVE MADE THE OPTIONAL OPT-IN ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-IN FORM AND RETURN IT PROMPTLY BY *ONLY ONE* OF THE METHODS BELOW:**

| | |
|---|---|
| **By First Class Mail:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 |
| **If by overnight courier or hand delivery:** | Linqto Texas, LLC<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |
| **By Electronic, Online Submission:** | Please visit the Debtors' case website at:  https://dm.epiq11.com/linqto.  Under the Case Actions section, click on the "E-Opt-In Portal" link and follow the directions to submit your Opt-In Form.  If you choose to submit your Opt-In Form via Epiq's E-Opt-In Portal, you should <u>not</u> also return a hard copy of your Opt-In Form.<br><br>The E-Opt-In Portal is the sole manner in which this Opt-In Form will be accepted via electronic or online transmission.  Opt-In Forms submitted by facsimile or email will not be counted. |

**THE OPT-IN DEADLINE IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 26, 2026. THE CLAIMS, NOTICING AND SOLICITATION AGENT MUST *ACTUALLY RECEIVE* YOUR OPT IN ELECTION ON OR BEFORE THE OPT-IN DEADLINE.**